**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

—————————————————————x
In re: **COLUMBIA ENTITIES LITIGATION**  :  MASTER FILE: 04-11704 (REK)
:
:
:
:
—————————————————————x

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, by and through their counsel, allege the following based upon the investigation

of counsel, which included interviews with persons with knowledge of the conduct complained

of herein and a review of United States Securities and Exchange Commission ("SEC") filings, as

well as other regulatory filings, reports, advisories, press releases, media reports, news articles,

academic literature, and academic studies.  Plaintiffs believe that substantial additional

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity

for discovery.

## NATURE OF THE ACTION

1.      This is a federal class and derivative action based upon the charging of excessive

and improper fees and expenses to Columbia mutual fund investors by Columbia Management

Advisors, Inc. ("Columbia Management"), the investment adviser of the Columbia family of

mutual funds, and those of its subsidiaries and affiliates also named herein as Defendants.

Defendants then used these fees, in part, to improperly pay and induce brokerage firms to steer

more investors into Columbia mutual funds (the "Columbia Funds" or the "Funds").  As a result

of their material omissions and/or other conduct detailed below, Defendants are liable under the

Investment Company Act of 1940 (the "Investment Company Act"); the Investment Advisers

Act of 1940 (the "Investment Advisers Act"); for unjust enrichment; and for breaches of their

fiduciary duties to a class (the "Class") of all persons or entities who held one or more shares or

other ownership units of Columbia Funds, as set forth in Exhibit A hereto, during the period

August 2, 1999 to March 22, 2004, inclusive (the "Class Period"), and who were damaged

thereby.

     2.     In essence, Defendants used Columbia Fund investor assets to pay kickbacks to

brokerages in exchange for the brokerages steering their clients into Columbia Funds.

Defendants referred to this as buying "shelf-space" at the brokerages where they made

undisclosed and improper payments to brokerages including, but not limited to, UBS Financial

Services Inc. ("UBS"), Morgan Stanley, American Express, A.G. Edwards, Linsco Private

Ledger, Janney Montgomery Scott, RBC Dain Rauscher, Wells Fargo, Chase Investment

Services Corp., FSC Securities Corporation, SunAmerica Securities, Bank One, Salomon Smith

Barney, and Wachovia Securities to induce them to direct investors into Columbia Funds.  In

addition, Defendants paid brokerages to push Columbia Funds through the use of directed

brokerage -- awarding a brokerage firm the business, and resulting commissions, for conducting

transactions of the Funds' underlying securities.  Then, once invested in one or more of the

Columbia Funds, the investors were harmed by being charged and paying fees to Defendants that

were used improperly by Defendants, the purpose of which was undisclosed, to pay brokers to

push Columbia Funds on still more investors in order to increase the level of investments in

Columbia Funds.

     3.     Columbia Management and the other defendants were motivated to engage in this

undisclosed plan of charging excessive fees to Fund investors to capitalize on Defendants'

scheme to induce brokers to steer investors into Columbia Funds.  The fees Columbia collected

for managing and advising the Columbia Funds were calculated as a percentage of the Funds'

value and, therefore, increased as the assets invested in the Columbia Funds grew.  While

Columbia Management and the other defendants thus benefited from the increase in Fund assets, neither the Funds nor the Fund investors benefited from expanding the size of the Funds.

4.      Defendants' practice of charging excessive fees and commissions to Columbia Funds investors to pay and induce brokers to steer investors into Columbia Funds necessarily created material insurmountable conflicts of interest for the brokers who were purportedly acting in the best interests of their clients – but, in fact, were only concerned with their pay-offs from Columbia Management and the other defendants.

5.      The practice of charging excessive fees and commissions also created material insurmountable conflicts of interest for the investment advisers to the Columbia Funds who had a duty to act in the best interests of fund investors but were, in fact, only concerned with siphoning fees from Columbia Funds investors to induce brokers to increase the amount of investments in Columbia Funds.

6.      The truth about Columbia Management and the other defendants began to emerge on March 22, 2004 when Salomon Smith Barney disclosed it had engaged in a revenue-sharing plan by selling shelf-space to mutual fund companies in return for additional payments to push those companies' funds.  Columbia Management and the other defendants participated in this scheme.

7.      In actions to date against the brokerage firm Morgan Stanley DW, Inc. ("Morgan Stanley"), the SEC and the National Association of Securities Dealers ("NASD") fined and sanctioned Morgan Stanley for accepting impermissible payments from mutual fund companies in exchange for aggressively pushing those companies' funds over other funds – the very practices at issue in this case.

8. In condemning practices identical to some of the ones complained of herein, the SEC, in its Cease and Desist order against Morgan Stanley, stated:

> This matter arises from Morgan Stanley DW's failure to disclose adequately certain material facts to its customers . . . [namely that] it collected from a select group of mutual fund complexes amounts in excess of standard sales loads and Rule 12b-1 trail payments.
>
> \*    \*    \*
>
> Although the Asset Retention Program and Partners funds' prospectuses and SAIs [Statements of Additional Information] contain various disclosures concerning payments to the broker-dealers distributing their funds, none adequately disclose the preferred programs as such, nor do most provide sufficient facts about the preferred programs for investors to appreciate the dimension of the conflicts of interest inherent in them. For example, none of the prospectuses specifically discloses that Morgan Stanley DW receives payments from the fund complexes, that the fund complexes send portfolio brokerage commissions to Morgan Stanley DW or Morgan Stanley & Co. in exchange for enhanced sales and marketing, nor do they describe for investors the various marketing advantages provided through the programs.

*See* Morgan Stanley Cease and Desist Order, November 17, 2003.

9. In the Morgan Stanley Order, the SEC concluded that such conduct violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act"), among other statutes, that prohibits any person in the offer or sale of any securities from obtaining money or property "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading." *Id.*

10. In a similar enforcement action against Morgan Stanley, the NASD also condemned the practices at issue here and concluded that such payments to brokerages violated NASD Rule 2830(k), which prohibits the type of directed brokerage payments made by

Columbia Management and the other defendants to brokerages such as American Express, A.G. Edwards, Salomon Smith Barney, and Wachovia Securities.

11.    Additional actions by the SEC, NASD, and/or the New York Stock Exchange ("NYSE") against Franklin Advisers, Inc., Franklin Templeton Distributors, Inc., PIMCO and Edward D. Jones & Co., L.P. further illustrate the crackdown on mutual funds that engage in directed brokerage and revenue-sharing particularly when it is undisclosed.

12.    The actions by Columbia Management and the other defendants created insurmountable, unmanageable conflicts of interest that were not disclosed and that constituted violations of Defendants' fiduciary duties owed to the Funds' investors, and violations of the Investment Company Act and Investment Advisers Act.  Defendants purposefully omitted to disclose any of the improper excessive fees and commissions passed on to Plaintiffs and the other members of the Class.  Defendants concealed such fees used to induce brokers to push Columbia Funds as they realized that the inducements created an insurmountable conflict of interest material to any reasonable person deciding whether to invest in Columbia Funds.

13.    The actions of the Columbia Defendants described herein are substantially the same as those already condemned by the SEC and NASD.  As described by Senator Peter Fitzgerald (R-Ill.) in a January 28, 2004 article in *The Los Angeles Times* about a Senate committee hearing on mutual fund abuses, "'the mutual fund industry is indeed the world's largest skimming operation,'" tantamount to "'a $7-trillion trough' exploited by fund managers, brokers and other insiders."

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under and pursuant to Sections 34(b), 36(a) and (b) and 48(a) of the Investment Company Act, 15 U.S.C. §§80a-33(b), 80a-35(a) and (b) and

80a-47(a), Sections 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§80b-6 and 80b-15, 28 U.S.C. §§ 1331, 1337, and common law.

15.    This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act, 15 U.S.C. §80a-43; Section 214 of the Investment Advisers Act, 15 U.S.C. §80b-14; and 28 U.S.C. § 1391(b).

16.    Many of the acts charged herein, including the creation and utilization of improper revenue-sharing agreements, the failure to disclose the excessive fees and commissions that Defendants improperly siphoned from Columbia Funds investors, and the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Defendants conducted other substantial business within this District and many Class members reside within this District.  Additionally, Columbia Management Group, Inc. maintains its principal office in this judicial district.

17.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

18.    Plaintiff Joan Cohen held during the Class Period and continues to hold shares or units of the Liberty Acorn Twenty Fund (n/k/a Columbia Acorn Select Fund)[1] and has been

---

[1] In September 2003, the Columbia Management Group decided to rename all of the funds in its fund family (including the Liberty Acorn Funds) using the Columbia brand and to drop the Liberty brand.  Liberty Acorn Twenty Fund was renamed to Columbia Acorn Select Fund.

damaged by the conduct alleged herein.  A copy of her verification is attached as Exhibit B, submitted herewith.

19.      Plaintiff Gene F. Osburn held during the Class Period and continues to hold shares or units of the Liberty Acorn Twenty Fund (n/k/a Columbia Acorn Select Fund) and has been damaged by the conduct alleged herein.  A copy of his verification is attached as Exhibit B, submitted herewith.

20.      Plaintiff Paula Slicker held during the Class Period and continues to hold shares or units of the Columbia Acorn Fund and has been damaged by the conduct alleged herein.  A copy of her verification is attached as Exhibit B, submitted herewith.

21.      Plaintiff Jean S.B. Simmonds and R.L. Simmonds held during the Class Period and continue to hold shares or units of the Columbia Acorn Fund and have been damaged by the conduct alleged herein.  A copy of their verifications are attached as Exhibit B, submitted herewith.

**Defendants**

**The Investment Adviser and Columbia Defendants**

22.      Defendant FleetBoston Financial Corporation ("Fleet")[2], n/k/a Defendant Bank of America Corporation ("BOA"), is a financial services company.  BOA is currently the ultimate parent of Defendants bearing the Columbia name.  Defendant Fleet was previously the ultimate parent of Defendants bearing the Columbia name prior to its merger with and into BOA. Defendant Fleet maintained its corporate headquarters at 100 Federal Street, Boston,

---

[2]  As of April 1, 2004, Fleet merged with and into Bank of America Corporation pursuant to an Agreement and Plan of Merger, dated October 27, 2003.  Bank of America Corporation, as successor-in-interest to Fleet, is currently the ultimate parent of defendants bearing the Columbia name.  Bank of America Corporation is named as a defendant herein as the parent of the Columbia defendants.

Massachusetts 02110.  Defendant BOA maintains its corporate headquarters at Bank of America

Corporate Center, Charlotte, North Carolina.

23.    Defendant Columbia Management Group, Inc. ("Columbia Group"), a wholly

owned subsidiary of Fleet, is the asset management arm of Fleet.  Through its member firms,

including Columbia Management Advisors, Inc. and Columbia Wanger Asset Management, L.P.

("Columbia Wanger") f/k/a Liberty Wanger Asset Management, L.P., Columbia Group offers

asset management services and financial products.  Columbia Group is located at One Financial

Center, Boston, MA 02111-2621.

24.    Defendant Columbia Management Advisors, Inc. ("Columbia Management"), a

wholly-owned subsidiary of Columbia Group, offers investment products and money

management services and is the investment adviser and day-to-day manager of the Columbia

Funds.  On April 1, 2003, registered investment advisers Fleet Investment Advisors, Inc., Stein

Roe & Farnham Incorporated, Colonial Management Associates, Inc., Liberty Advisory Services

Corp., Newport Fund Management, Inc., Columbia Funds Management Company and Newport

Pacific Management, Inc., which had advised various of the Columbia Funds and their

predecessor entities during the Class Period, merged into Columbia Management.  All references

herein to "Columbia Management" refer to Columbia Management and its predecessor entities

throughout the Class Period.  Columbia Management and its subsidiaries market, sponsor, and

provide investment advisory, distribution, and administrative services to mutual funds.

Columbia Management is registered as an investment advisor under the Investment Advisers Act

and, together with Columbia Wanger, managed and advised the Columbia Funds during the

Class Period.  Columbia Management, along with Columbia Wanger, has ultimate responsibility

for overseeing the day-to-day management of the Columbia Funds. Columbia Management is headquartered at 100 Federal Street, Boston, Massachusetts 02110.

25.    Defendant Columbia Wanger, a wholly-owned subsidiary of Columbia Group, offers investment products and money management services. Columbia Wanger is registered as an investment advisor under the Investment Advisers Act and, together with Columbia Management, managed and advised the Columbia Funds during the Class Period. Columbia Wanger, along with Columbia Management, has ultimate responsibility for overseeing the day-to-day management of the Columbia Funds.[3] Columbia Wanger is headquartered at 227 West Monroe, Suite 3000, Chicago, Illinois 60606.

26.    Defendant Columbia Funds Distributor, Inc. ("Columbia Distributor" or "Distributor Defendant")[4], a subsidiary of Fleet and a registered broker-dealer, is the distributor of the Columbia Funds. In this capacity, Columbia Distributor was responsible for underwriting, sponsoring and retailing the Columbia Funds. Columbia Distributor, a Massachusetts corporation, maintains its headquarters at One Financial Center, Boston, Massachusetts 02111.

27.    BOA, Fleet, Columbia Group, Columbia Management, Columbia Wanger and Columbia Distributor are collectively referred to as the "Columbia Defendants."

28.    Defendants Columbia Management and Columbia Wanger are collectively referred to as the "Investment Adviser Defendants."

---

[3] Columbia Wanger has ultimate responsibility for overseeing the day-to-day management of the following six Columbia Funds: Columbia Acorn Fund (f/k/a Liberty Acorn Fund), Columbia Acorn International Fund (f/k/a Liberty Acorn International Fund), Columbia Acorn USA Fund (f/k/a Liberty Acorn USA Fund), Columbia Acorn Select Fund (f/k/a Liberty Acorn Twenty Fund), Columbia Acorn International Select Fund (f/k/a Liberty Acorn Foreign Forty Fund) and Columbia Thermostat Fund.

[4] Effective October 13, 2003, Liberty Funds Distributor, Inc. was renamed Columbia Funds Distributor, Inc.

**The Officers and Trustee Defendants**

**The Trustees**

29.    During the Class Period, Charles P. McQuaid ("McQuaid") served as a Trustee of the Funds.  He was responsible for overseeing at least six portfolios in the Fund complex.  McQuaid served as a Trustee for the Columbia Acorn Trust.  McQuaid is deemed an interested person because of his affiliation with the Investment Adviser, namely, his position as Senior Vice President of Wanger Advisors Trust.  McQuaid violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

30.    During the Class Period, Ralph Wanger ("Wanger") served as a Trustee of the Funds.  He was responsible for overseeing at least 10 portfolios in the Columbia Acorn Trust.  Wanger is deemed an interested person because of his affiliation with the Investment Adviser, namely, his position as President of Wanger Advisors Trust.  Wanger violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

31.    During the Class Period, Joseph R. Palombo ("Palombo"), served as a Trustee of the Funds.  Palombo is deemed an interested person because of his affiliation with the Investment Adviser, namely, his position as the Executive Vice President and Chief Operating Officer of Columbia Management.  Palombo served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust IX and Columbia Funds Trust XI.  He was responsible for overseeing at least 85 portfolios in the Fund complex.  Palombo violated his fiduciary duties to the Funds and

the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

32.    During the Class Period, Margaret Eisen ("Eisen"), for her services as a Trustee, received compensation totaling $28,125.00 for the fiscal year ended December 31, 2002. Eisen served as a Trustee for the Columbia Acorn Trust. She was responsible for overseeing at least six portfolios in the Fund complex. Eisen violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

33.    During the Class Period, Leo A. Guthart ("Guthart"), for his services as a Trustee, received compensation totaling $40,750.00 for the fiscal year ended December 31, 2002. Guthart served as a Trustee for the Columbia Acorn Trust. He was responsible for overseeing at least six portfolios in the Fund complex. Guthart violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

34.    During the Class Period, Irving B. Jerome Kahn, Jr. ("Kahn"), for his services as a Trustee, received compensation totaling $48,000.00 for the fiscal year ended December 31, 2002. Kahn served as a Trustee for the Columbia Acorn Trust. He was responsible for overseeing at least six portfolios in the Fund complex. Kahn violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

35.    During the Class Period, Steven Kaplan ("Kaplan"), for his services as a Trustee, received compensation totaling $45,750.00 for the fiscal year ended December 31, 2002. Kaplan served as a Trustee for the Columbia Acorn Trust. He was responsible for overseeing at least six

portfolios in the Fund complex. Kaplan violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

36.    During the Class Period, David C. Kleinman ("Kleinman"), for his services as a Trustee, received compensation totaling $48,250.00 for the fiscal year ended December 31, 2002. Kleinman served as a Trustee for the Columbia Acorn Trust. He was responsible for overseeing at least six portfolios in the Fund complex. Kleinman violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

37.    During the Class Period, Allan B. Muchin ("Muchin"), for his services as a Trustee, received compensation totaling $46,000.00 for the fiscal year ended December 31, 2002. Muchin served as a Trustee for the Columbia Acorn Trust. He was responsible for overseeing at least six portfolios in the Fund complex. Muchin violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

38.    During the Class Period, Robert R. Nason ("Nason"), for his services as a Trustee, received compensation totaling $90,000.00 for the fiscal year ended December 31, 2002. Nason served as a Trustee for the Columbia Acorn Trust. He was responsible for overseeing at least six portfolios in the Fund complex. Nason violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

39.    During the Class Period, and John A. Wing ("Wing"), for his services as a Trustee, received compensation totaling $25,625.00 for the fiscal year ended December 31, 2002. Wing served as a Trustee for the Columbia Acorn Trust. He is responsible for overseeing at least six portfolios in the Fund complex. Wing violated his fiduciary duties to the Funds and

the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

40.    During the Class Period, Douglas A. Hacker ("Hacker"), for his services as a Trustee, received compensation totaling $115,500.00 for the fiscal year ended December 31, 2003.  Hacker served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust IX and Columbia Funds Trust XI.  He was responsible for overseeing at least 85 portfolios in the Fund complex.  Hacker violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

41.    During the Class Period, Janet Langford Kelly ("Kelly"), for her services as a Trustee, received compensation totaling $101,500.00 for the fiscal year ended December 31, 2003.  Kelly served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust IX and Columbia Funds Trust XI.  She was responsible for overseeing at least 85 portfolios in the Fund complex. Kelly violated her fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

42.    During the Class Period, Richard W. Lowry ("Lowry"), for his services as a Trustee, received compensation totaling $128,150.00 for the fiscal year ended December 31, 2003. Lowry served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust V, Columbia Funds Trust Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII,

Columbia Funds Trust IX and Columbia Funds Trust XI. He was responsible for overseeing at least 87 portfolios in the Fund complex. Lowry violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

43.    During the Class Period, Salvatore Macera ("Macera"), for his services as a Trustee, received compensation totaling $56,500.00 for the fiscal year ended December 31, 2003. Macera served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust IV, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VIII, Columbia Funds Trust IX and Columbia Funds Trust XI. He was responsible for overseeing at least 94 portfolios in the Fund complex. Lowry violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

44.    During the Class Period, William E. Mayer ("Mayer"), for his services as a Trustee, received compensation totaling $133,150.00 for the fiscal year ended December 31, 2003. Mayer served as a Trustee for Columbia Funds Trust I and Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust IX and Columbia Funds Trust XI. He was responsible for overseeing at least 87 portfolios in the Fund complex. Mayer violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

45.    During the Class Period, Charles R. Nelson ("Nelson"), for his services as a Trustee, received compensation totaling $155,073.00 for the fiscal year ended December 31, 2003. Nelson served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II,

Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust IX and Columbia Funds Trust XI.  He was responsible for overseeing at least 120 portfolios in the Fund complex.  Nelson violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

46.     During the Class Period, John J. Neuhauser ("Neuhauser"), for his services as a Trustee, received compensation totaling $143,568.00 for the fiscal year ended December 31, 2003. Neuhauser served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII and Columbia Funds Trust IX. He was responsible for overseeing at least 88 portfolios in the Fund complex.  Neuhauser violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

47.     During the Class Period, Patrick J. Simpson ("Simpson"), for his services as a Trustee, received compensation totaling $64,234.00 for the fiscal year ended December 31, 2003. Simpson served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust IX and Columbia Funds Trust XI.   He was responsible for overseeing 119 portfolios in the Fund complex.  Simpson violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

48.     During the Class Period, Thomas E. Stitzel ("Stitzel"), for his services as a Trustee, received compensation totaling $103,500.00 for the fiscal year ended December 31,

2003. Stitzel served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust IX and Columbia Funds Trust XI. He was responsible for overseeing 85 portfolios in the Fund complex. Stitzel violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

49.    During the Class Period, Thomas C. Theobald ("Theobald"), for his services as a Trustee, received compensation totaling $110,250.00 for the fiscal year ended December 31, 2003. Theobald served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust IX and Columbia Funds Trust XI. He was responsible for overseeing 85 portfolios in the Fund complex. Theobald violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

50.    During the Class Period, Anne-Lee Verville ("Verville"), for her services as a Trustee, received compensation totaling $128,250.00 for the fiscal year ended December 31, 2003. Verville served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust IX and Columbia Funds Trust XI. She was responsible for overseeing at least 86 portfolios in the Fund complex. Verville violated her fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

51.     During the Class Period, Richard L. Woolworth ("Woolworth"), for his services as a Trustee, received compensation totaling $64,234.00 for the fiscal year ended December 31, 2003. Woolworth served as a Trustee for Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust IX and Columbia Funds Trust XI.  He was responsible for overseeing at least 119 portfolios in the Fund complex. Woolworth violated his fiduciary duties to the funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

**The Officers**

52.     In addition to Defendants McQuaid, Wanger and Palombo, the following were the executive officers of the Columbia Funds during the Class Period.

53.     During the Class Period, J. Kevin Connaughton ("Connaughton") was an officer of multiple portfolios in the Fund Complex.  Connaughton violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

54.     During the Class Period, P. Zachary Egan ("Egan") was an officer of multiple portfolios in the Fund Complex.  Egan violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

55.     During the Class Period, Kevin S. Jacobs ("Jacobs") was an officer of multiple portfolios in the Fund Complex.  Jacobs violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

56.     During the Class Period, Kenneth A. Kalina ("Kalina") was an officer of multiple portfolios in the Fund Complex.  Kalina violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

57.     During the Class Period, Bruce H. Lauer ("Lauer") was an officer of multiple portfolios in the Fund Complex.  Lauer violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

58.     During the Class Period, Jean Loewenberg ("Loewenberg") was an officer of multiple portfolios in the Fund Complex.  Loewenberg violated her fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

59.     During the Class Period, Robert A. Mohn ("Mohn") was an officer of multiple portfolios in the Fund Complex.  Mohn violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

60.     During the Class Period, Louis J. Mendes ("Mendes") was an officer of multiple portfolios in the Fund Complex.  Mendes violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

61.     During the Class Period, Todd Narter ("Narter") was an officer of multiple portfolios in the Fund Complex.  Narter violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

62.     During the Class Period, Christopher Olson ("Olson") was an officer of multiple portfolios in the Fund Complex.  Olson violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

63.     During the Class Period, John H. Park ("Park") was an officer of multiple portfolios in the Fund Complex.  Park violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

64.     During the Class Period, Vincent P. Pietropaolo ("Pietropaolo") was an officer of multiple portfolios in the Fund Complex.  Pietropaolo violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

65.     During the Class Period, Joseph Turo ("Turo") was an officer of multiple portfolios in the Fund Complex.  Turo violated his fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

66.     During the Class Period, Leah J. Zell ("Zell") was an officer of multiple portfolios in the Fund Complex.  Zell violated her fiduciary duties to the Funds and the Funds' investors by participating in, approving, and/or allowing the conduct complained of herein.

67.     Defendants McQuaid, Wanger, Palombo, Eisen, Guthart, Kahn, Kaplan, Kleinman, Muchin, Nason, Wing, Hacker, Kelly, Lowry, Macera, Mayer, Nelson, Neuhauser, Simpson, Stitzel, Theobald, Verville, Woolworth, Connaugton, Egan, Jacobs, Kalina, Lauer, Loewenberg, Mohn, Mendes, Narter, Olson, Park, Pietropaolo, Turo and Zell were Trustees and/or Officers of the Columbia Funds during the Class Period and are collectively referred to herein as the "Trustee/Officer Defendants."  For the purposes of their service as Trustees and/or Officers of the Columbia Funds, the business address for the Trustees and/or Officers of the Trusts is Columbia Wanger Asset Management, L.P., 227 West Monroe Street, Suite 3000, Chicago, Illinois 60606.

68.     Defendants John Does 1-100 were Columbia Trustees and/or Officers during the Class Period, and any other wrongdoers later discovered, whose identities have yet to be ascertained and which will be determined during the course of Plaintiffs' Counsel's ongoing investigation.

**The Columbia Funds**

69.    Nominal Defendants the Columbia Funds, as identified on the list annexed hereto as Exhibit A, are open-ended management companies consisting of the capital invested by mutual fund shareholders, all having a Board of Trustees charged with representing the interests of the shareholders in the funds.  The Columbia Funds are named as nominal Defendants solely to the extent they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

70.    The Columbia Funds offer multiple classes of shares, with each class representing a *pro rata* interest in each Columbia Fund.  Columbia Fund shares are issued to Columbia Fund investors pursuant to prospectuses that must comply with the federal securities laws, including the Investment Company Act.  All of the prospectuses are substantially the same on the matters relevant to this litigation.

71.    Each of the Columbia Funds is an open-ended management investment company organized as a Massachusetts business trust.  An open-ended company is a management company that "offer[s] for sale or has outstanding any redeemable securities of which it is the issuer."  15 U.S.C. § 80a-5.  A redeemable security is defined as "any security . . . under the terms of which the holder, upon its presentation to the issuer . . . is entitled . . . to receive approximately his proportionate share of the issuer's current net assets, or the cash equivalent thereof."  15 U.S.C. §80a-2(a)(32).

72.    All of the Columbia Funds are alter egos of one another.  The Funds are essentially pools of investor assets that are managed and administered by a common body of officers and employees of Columbia Group who administer the Columbia Funds generally.  The Columbia Funds have no independent will and are totally dominated by Columbia Group and the

common body of trustees established by Columbia Group.  Thus, in substance, the Columbia

Funds function as components of one unitary organization.

73.    All Columbia Funds share the Investment Adviser Defendants as their investment

advisers and share Columbia Distributor as their principal underwriter and distributor.  The

actions taken by the Investment Adviser Defendants and Columbia Distributor for an individual

Fund also affect the other Columbia Funds.  For example, the Statement of Additional

Information dated May 1, 2003 for the Liberty Acorn Trust describes that the actions taken by

Columbia Management and Columbia Distributor impact all the Funds:

> Research products or services furnished by brokers and dealers
> may be used in servicing any or all of the clients of the Adviser
> and not all such research products or services are used in
> connection with the management of the Funds.

74.    Similarly, the SEC issued a report in December 2000 titled "Division of

Investment Management:  Report on Mutual Fund Fees and Expenses" where it was noted that

". . . many fund expenses, including the management fee, are incurred at the portfolio level and

then allocated among a fund's classes typically based on the relative net assets of each class."

## SUBSTANTIVE ALLEGATIONS

## DEFENDANTS IMPROPERLY USED FUND ASSETS TO UNDULY INFLUENCE BROKERS TO PUSH COLUMBIA FUNDS ON UNWITTING INVESTORS

### Defendants Used Improper Means to Acquire "Shelf-Space" at Brokerages

75.    Unbeknownst to Plaintiffs and the other members of the Class, Columbia

Management and the other defendants used the assets of its mutual fund investors to participate

in "shelf-space" programs at various brokerages, including, but not limited to, UBS, Morgan

Stanley, American Express, A.G. Edwards, Linsco Private Ledger, Janney Montgomery Scott,

RBC Dain Rauscher, Wells Fargo, Chase Investment Services Corp., FSC Securities

Corporation, SunAmerica Securities, Bank One, Salomon Smith Barney, and Wachovia

Securities. Columbia Management and the other defendants improperly paid these and other brokerages to aggressively push Columbia mutual funds on unwitting investors. Columbia Management and the other defendants made these payments through a variety of means including: cash; directing the trades – and the lucrative commissions – in the securities and other investments of the underlying investment portfolios of the Columbia Funds to these brokerages ("directed brokerage"); paying excessive commissions under the guise of "Soft Dollars," as defined below; and, making other improper payments used as inducements to brokerages to steer their unwitting clients into Columbia Funds.

76.    These *quid pro quo* "shelf-space" arrangements between Defendants and the brokerage firms called for millions of dollars in additional compensation to be paid from Defendants to the brokerages as incentive to steer unwitting investors into the Columbia Funds, resulting in inflated fees being paid by investors. According to a former Columbia wholesaler employed during the Class Period, Columbia wholesalers were only able to position themselves on a broker's preferred list if they made payments to the broker. For example, wholesalers would often subsidize Christmas parties, golf outings and/or theater tickets for brokers.

77.    Pursuant to the "shelf-space" program agreements, brokers steered unknowing clients into Columbia Funds because the brokers were paid more for selling Columbia Funds than for other mutual funds. According to a former broker and financial adviser who was employed at Morgan Stanley during the Class Period, there was an added monetary incentive to sell Columbia Funds. During particular occasions, the commission for selling Columbia Funds was raised 1% from 4% to 5%.

78.     The payments for these *quid pro quo* arrangements with brokerage houses came in the form of "revenue-sharing" payments consisting of cash, improper and excessive "Soft Dollars," 12b-1 fees, and directed brokerage among other improper inducements.

79.     The costs of Columbia Management and the other defendants' revenue-sharing agreements were the burden of the Columbia Funds' shareholders through the fees and expenses paid by the Funds and their shareholders.  As stated in the Annual Report for the Columbia Acorn Funds dated December 31, 2004:  "***As a fund shareholder, you incur two types of costs. There are transaction costs*** … ***There are also continuing costs***, which generally include investment advisory fees, Rule 12b-1 fees, and other fund expenses."  (Emphasis added).  As alleged below, 12b-1 fees are assessed directly against shareholders' interests, and all these fees reduce the amount by which shareholders are legally entitled to redeem their shares.

**Defendants Paid Brokerages to Push Unwitting Clients into Columbia Funds**

80.     Defendants regularly made revenue-sharing payments to brokerage houses as part of the *quid pro quo* "shelf-space" arrangements.  In other words, Defendants paid the brokerage houses and their brokers to push their clients into Columbia Funds.  To the extent revenue-sharing payments were made by the Investment Adviser, the Investment Adviser recouped these payments through their management fees, thereby directly diminishing investors' holdings in the Funds.

81.     According to a former employee of Columbia Distributor, Columbia Group partnered with various brokerage firms in order to push Columbia Funds on unwitting investors.

82.     Columbia Management and the other defendants had agreements and arrangements with more than one dozen brokerage firms whereby Columbia Funds were promoted preferentially in exchange for special payment rates to brokers selling Columbia Funds, directed brokerage payments, vacations, and gifts.  Many of these brokerage firms have

now admitted their "shelf-space" arrangements for which Columbia Management and the other defendants "paid to play" with monies siphoned from the Funds and their shareholders.

83.    Although precise information regarding the total amount Columbia Management and the other defendants improperly paid under their multiple revenue-sharing agreements will not be available until discovery begins, information that has been made public by other major mutual fund companies shows that tens of millions of dollars was likely paid by Columbia Management and the other defendants.  For example, the brokerage firm Edward D. Jones has now disclosed on its website that its seven preferred fund families paid it an aggregate of more than $89 million in revenue sharing during 2004 alone.

84.    None of the Columbia Defendants' improper revenue-sharing agreements was disclosed during the Class Period.

## Columbia Management's Improper Shelf-Space Arrangements with Salomon Smith Barney

85.    In a March 22, 2004 supplement to numerous Salomon Smith Barney Funds prospectuses, the following language appeared:

> Effective March 22, 2004, the following is added after the first paragraph under the heading "Management -- Distribution plans" in the Prospectuses for each of the Funds listed below:
>
> In addition, the distributors may make payments for distribution and/or shareholder servicing activities out of their past profits and other available sources. The distributors may also make payments for marketing, promotional or related expenses to dealers. The amount of these payments is determined by the distributors and may be substantial. The manager or an affiliate may make similar payments under similar arrangements.
>
> **The payments described above are often referred to as "revenue sharing payments." The recipients of such payments may include the funds' distributor and other affiliates of the manager, broker-dealers, financial institutions and other financial intermediaries through which investors may purchase shares of a fund.  In some circumstances, such payments may**

**create an incentive for an intermediary or its employees or
associated persons to recommend or sell shares of a fund to
you**.  Please contact your financial intermediary for details about
revenue sharing payments it may receive.

(Emphasis added).

86.     The Columbia Funds were identified as one of the mutual fund families that

brokers at Salomon Smith Barney, a division of Citigroup Global Markets Inc. ("CGMI"), were

paid to push in a June 2004 press release on the Salomon Smith Barney website titled "Mutual

Funds, Revenue Sharing and Other Compensation Disclosure."  *See*

http://www.smithbarney.com/products_services/mutual_funds/investor_information/revenueshar

e.html.

## Columbia Management's Improper "Shelf-Space" Arrangements with Wachovia Securities

87.     Wachovia Securities has revealed on its website that it "receive[s] payments from

many of the companies whose funds we sell."  *See*

http://www.wachovia.com/files/MutualFund_Guide.pdf.  Wachovia Securities, on its website,

identified the Columbia Funds as one of the mutual fund families from which Wachovia received

payments. According to Wachovia, payments "can range as high as 2/10 of 1 percent of fund

sales at Wachovia Securities...  In addition, for any fund that you continue to hold in your

account a year later, we can receive an additional payment of up to 1/10 of 1 percent annually of

the dollar value."  *See id.*  These payments are in addition to the compensation formula for

Wachovia financial advisers who sell the funds.

## Columbia Management's Improper "Shelf-Space" Arrangements with Janney Montgomery Scott

88.     On October 21, 2004, Janney Montgomery Scott ("Janney") disclosed that the

company received payments to push mutual fund families, including Columbia Funds:

> Janney and our Financial Consultants receive compensation when clients invest in mutual funds.  Depending on share class, compensation may be a front-end sales charge, a concession from a fund company or a fee if mutual funds are purchased in a Janney-based account.  In addition, Janney may receive a 12b-1 fee from companies on an annual basis.

*        *        *

> Additionally, Janney may on occasion receive commissions as compensation for executing trades on behalf of mutual funds.

http://www.janneys.com/breakpoints/fcbreakpoints.html.

89.    As of December 31, 2003, Janney listed 32 companies, in declining order of financial commitment, from which it received monetary payments in the form of, among other things, 12b-1 fees and directed brokerage.  Columbia Group was 13th on the list.

## Columbia Management's "Shelf-Space" Arrangements with Linsco Private Ledger

90.    According to Linsco's website, Columbia Funds was a part of Linsco's Sponsorship Program.  As a result, Linsco brokers who sold Columbia Funds were not assessed ticket charges on transactions.  *See* http://www.lpl.com/html/disset.html.

91.    A ticket charge is a transactional fee assessed against a broker's commission. Dropping the ticket charge increases the payment to the broker on the sale of a mutual fund. Linsco brokers who sold Columbia Funds were rewarded for pushing those Funds through a higher commission due to the waiver of the ticket charge.

## Columbia Management's "Shelf-Space" Arrangements with RBC Dain Rauscher

92.    In an announcement on its website, RBC Dain Rauscher states:  "The following list represents the fund companies making asset- or sales-based financial payments to RBC Dain Rauscher, in order of financial contribution, from January 1 though November 30, 2004 . . ." Columbia is among the listed fund families.  *See*

http://www.rbcdain.com/DRP_1.0/Public_Site/Common_Pages/DRP_1.0VContentIndex/1,3798 1,1-5-12-9,00.html.

## Columbia Management's "Shelf-Space" Arrangements with Chase Investment Services Corp.

93.    Chase Investment Services Corp. ("CISC") disclosed on its website in October 2004 that several fund companies, including Columbia, participate in revenue-sharing agreements with CISC.  In addition to sales loads and 12b-1 fees received by CISC, payments are made "based on the amount of the fund's shares sold by CISC or owned by CISC's clients." *See* www.chase.com/cm/crb/pfs/file/document/RevenueSharing_Oct04.pdf.

94.    Columbia Management and the other defendants paid CISC a percentage of the total purchase of Columbia Funds by CISC brokers.  Percentage payments range from 0.08% to 0.35%.  In addition to this upfront reward for selling Columbia Funds, CISC also received an additional quarterly payment of 0.04% to 0.10% of the total amount held per year.  CISC further received fixed annual payments, paid quarterly, of up to $40,000.  Finally, on top of all these payments by Columbia Management and the other defendants to CISC for pushing Columbia Funds, CISC was reimbursed for expenses incurred for sales meetings, seminars, and conferences.

## Columbia Management's "Shelf-Space" Arrangements with FSC Securities Corporation

95.    FSC Securities Corporation represents financial advisors under the AIG group umbrella.  The firm's September 14, 2004 "FSC Disclosure Document for Mutual Fund and Variable Annuity Investors" indicates that "sponsors," including Columbia, participate in revenue-sharing arrangements with FSC.  According to the FSC Disclosure Document, sponsors pay FSC an amount "in addition to the customary sales charges in connection with the sales of

mutual funds." The upfront payment is 25 bps and an annual fee of 11 bps of assets. *See* www.fscorp.com/EPProgramDisclosure.pdf.

96.     FSC Securities also disclosed that its individual brokers, as well as FSC Securities, are compensated by fund families, including Columbia. FSC Securities explained that "some funds may carry higher sales charges and/or higher dealer concession charges than others . . . which may create an incentive for representatives to sell such funds." Furthermore, on sales of "sponsors' mutual funds" – like Columbia – FSC brokers did not have to pay a ticket charge, further increasing their compensation. *Id.*

97.     Finally, FSC Securities disclosed that it also received compensation in the form of 12b-1 fees: "12b-1 fees are payments made by a mutual fund in connection with a distribution of its securities. The fund company takes 12b-1 fees out of the fund's assets each year for marketing and distribution expenses, which ***may include compensating representatives***." *Id.* (emphasis added).

**Columbia Management's "Shelf-Space" Arrangements with SunAmerica Securities**

98.     SunAmerica, like FSC, has an identical "Disclosure Document for Mutual Fund and Variable Annuity Investors" dated September 14, 2004. Columbia is identified as one of the participants in a revenue-sharing agreement with SunAmerica. According to the SunAmerica Disclosure Document, "sponsors" pay SunAmerica an amount "in addition to the customary sales charges in connection with the sales of mutual funds." The upfront payment is 25 bps and an annual fee of 11 bps of assets. *See* http://www.sunamericasecurities.com/docs/EPProgramDisclosureSAS.pdf.

99.     SunAmerica also disclosed that its individual brokers, as well as SunAmerica, are compensated by fund families, including Columbia. SunAmerica explained that "some funds may carry higher sales charges and/or higher dealer concession charges than others . . . which

may create an incentive for representatives to sell such funds." Furthermore, on sales of "sponsors' mutual funds" – like Columbia – SunAmerica brokers did not have to pay a ticket charge, further increasing their compensation. *Id.*

100.    Finally, SunAmerica disclosed that it also received compensation in the form of 12b-1 fees: "12b-1 fees are payments made by a mutual fund in connection with a distribution of its securities. The fund company takes 12b-1 fees out of the fund's assets each year for marketing and distribution expenses, ***which may include compensating representatives***." *Id.* (emphasis added).

## Columbia Management's "Shelf-Space" Arrangements with Bank One

101.    In a document entitled "A Guide to Mutual Fund Investing," Bank One describes its revenue-sharing plan and the amounts received from participant companies. Columbia is a participant in Bank One's revenue-sharing plan. Columbia paid Bank One a percentage of the total dollar amount of Columbia Funds sold by Bank One brokers. Percentage payments ranged from 0.08% to 0.35%. In addition to this upfront reward for selling Columbia Funds, Bank One also received an additional quarterly payment of 0.04% to 0.10% of the total amount held per year. Bank One further received fixed annual payments, paid quarterly, of up to $40,000. Finally, on top of all these payments by Columbia to Bank One for pushing Columbia Funds, Bank One was reimbursed for expenses incurred for sales meetings, seminars, and conferences. *See* http://www.bankone.com/resources/Guide_to_Mutual_Fund_Investing.pdf.

## Defendants Concealed Their Practices From Investors

102.    Defendants knew that these "shelf-space" arrangements presented a clear, unmanageable conflict of interest, pitting the financial interest of the broker against that of its clients. Rather than disclosing this material information, knowing that a recommendation to purchase Columbia Funds would be completely undermined if clients knew that the broker was

paid from Fund assets to give it, Defendants concealed the truth regarding these revenue-sharing arrangements.

**Defendants' "Shelf-Space" Program Created Undisclosed Conflicts of Interest**

103.    Defendants' participation in "shelf-space" programs through the means described above created undisclosed, insurmountable conflicts of interest.  For example, Defendants' participation in "shelf-space" programs at the brokerage houses identified above, among others, created an atmosphere where brokers did everything they could to steer investors into Columbia Funds in order to line their own pockets with money without concern for the best interests of the investors.  In addition, Defendants' use of directed brokerage as a means of paying for shelf-space created additional conflicts of interest as creating incentives for brokers to push Columbia Funds took precedence over getting the best execution price for Columbia Funds transactions. The use of directed brokerage caused Defendants to purchase or sell securities in the Funds' portfolios to satisfy revenue-sharing commitments rather than to benefit these portfolios.  Such inherent conflicts of interest were plainly unmanageable and insurmountable.

**THE COLUMBIA DEFENDANTS ENGAGED IN IMPROPER CONDUCT**

**The Trustee/Officer Defendants Breached Their
Fiduciary Duties to Columbia Funds Investors**

104.    Mutual fund Boards of Trustees have a duty to protect investors and closely guard the fees paid to an Investment Adviser and guarantee that they are not excessive and that the Investment Adviser is acting in the best interest of the mutual fund investors.  As explained by William Donaldson, the head of the SEC, in a January 7, 2004 speech to the Mutual Funds Directors Forum:

> The board of directors of a mutual fund has significant responsibility to protect investors. By law, directors generally are responsible for the oversight of all of the operations of a mutual fund. In addition, under the Investment Company Act, directors are

assigned key responsibilities, such as negotiating and evaluating the reasonableness of advisory and other fees, selecting the fund's independent accountants, valuing certain securities held by the fund, and managing certain operational conflicts.

The role of fund directors is particularly critical in the mutual fund context because almost all funds are organized and operated by external money-management firms, thereby creating inherent conflicts of interest and potential for abuse. Money-management firms operating mutual funds want to maximize their profits through fees provided by the funds, but the fees, of course, paid to these firms, reduce the returns to fund investors.

Independent directors, in particular, should serve as "independent watchdogs" guarding investors' interests - and helping to protect fund assets from uses that will be of primary benefit to management companies. These interests must be paramount, for it is the investors who own the funds and for whose sole benefit they must be operated.

http://www.sec.gov/news/speech/spch010704whd.htm.

105.    The Investment Company Institute ("ICI"), of which Columbia is a member,

recently described the duties of mutual fund boards as follows:

More than 77 million Americans have chosen mutual funds to gain convenient access to a professionally managed and diversified portfolio of investments.

Investors receive many other benefits by investing in mutual funds, including strong legal protections and full disclosure. In addition, shareholders gain an extra layer of protection because each mutual fund has a board of directors looking out for shareholders' interests.

**Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors. The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.**

\*      \*      \*

**In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking**

> **after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.**

Understanding the Role of Mutual Fund Directors, available on the ICI's website at http://www.ici.org/issues/dir/bro_mf_directors.pdf.  (Emphasis added).[5]

106.    Columbia Funds public filings state that the Board of Trustees for each Columbia Fund is responsible for the management and supervision of the Columbia Funds.  In this regard, the Statement of Additional Information dated May 1, 2003 (the "SAI") for the Liberty Acorn Trust, which is available to the investor upon request, is typical of the SAIs available for the other Columbia Funds set forth at Exhibit A.  It states:  "The board of Trustees has overall management responsibility for the Funds."

107.    The SAI also sets forth in greater detail the purported process by which the investment managers are selected:

> Except for COLUMBIA THERMOSTAT FUND, each Fund's Advisory Agreement automatically terminated on November 1, 2001 when Fleet acquired the asset management business of Liberty Financial Companies, Inc. ("LFC"). At a meeting of the board of Trustees held on August 15, 2001, called in part for the purpose of voting on the approval of new Advisory Agreements with Liberty WAM that were substantially identical to the previous Advisory Agreements, the new Advisory Agreements were approved through July 31, 2003 by the unanimous vote of the "non-interested" Trustees of the Trust voting separately. The Trustees considered information about, among other things: (1) Liberty WAM and its respective personnel, resources and investment process; (2) the terms of the new Advisory Agreements; (3) the nature and quality of services provided by Liberty WAM; (4) the investment performance of each Fund and of similar funds managed by other advisors; (5) the profitability to

---

[5]      The ICI describes itself as the national association of the U.S. investment company industry.  Founded in 1940, its membership includes approximately 8,500 mutual funds, 600 closed-end funds, 140 exchange-traded funds, and five sponsors of unit investment trusts.  Its mutual fund members have 87.7 million individual shareholders and manage approximately $7.8 trillion in investor assets.

Liberty WAM of its relationship with the Funds; (6) fall-out benefits from that relationship; (7) compensation payable by the Funds to affiliates of the Adviser for other services; (8) economies of scale; and (9) comparative fees and expense ratios. The Trustees also considered the terms of an agreement between the Trust and Fleet National Bank (the "Fleet Agreement") in which Fleet agreed that during the initial term of the new Advisory Agreements, except as otherwise authorized by the Trustees, it would: (1) reserve the autonomy of the Trust; (2) preserve the independence of Liberty WAM, including its investment philosophy and approach to investment operations, research and talent; (3) allow Liberty WAM considerable latitude to recruit and compensate (on competitive terms) investment management personnel; (4) not interfere with Liberty WAM's relationships with regional brokers unless regulatory or compliance concerns dictate and permit Liberty WAM to continue to allocate the commissions and soft dollar payments as it has in the past; (5) maintain the trading desk at Liberty WAM for domestic and international trading activities; and (6) not add to the current management responsibilities of any portfolio manager of a Fund the responsibility to manage additional funds from the Fleet organization without the consent of the Trustees.

In addition, the Trustees considered matters relating to the possible effects on Liberty WAM and the Funds of the acquisition of the asset management business of LFC by Fleet, including: (1) the terms of the Fleet Agreement; (2) certain actions taken by LFC and Liberty WAM to help retain and incent their key personnel; (3) the general reputation, financial resources and business activities of Fleet and its parent organization; (4) the potential benefits of scale from combining the asset management businesses of Fleet and LFC, including the ability to attract and retain key personnel and enhance technology and customer service; (5) the stated intention of Fleet to consult with the Board of the Funds prior to removing or reducing any voluntary fee waivers or expense limitations; and (6) the stated intention of Fleet to provide investment professionals of Liberty WAM with access to greater resources as a result of the acquisition.

108.    In truth and in fact, however, the Columbia Funds Boards of Trustees were captive to and controlled by the Investment Adviser Defendants, who prevented the Columbia Funds Boards of Trustees from fulfilling their statutory and fiduciary duties to manage and supervise the Columbia Funds, approve all significant agreements and otherwise take reasonable

steps to prevent the Investment Adviser Defendants from skimming Columbia Funds assets.  In

many cases, key Columbia Funds Trustees were employees or former employees of the

Investment Adviser Defendants and were beholden for their positions, not to Columbia Funds

investors but, rather, to the Investment Adviser Defendants they were supposed to oversee.  The

members of the Columbia Funds Boards of Trustees served for indefinite terms at the pleasure of

the Investment Adviser Defendants and formed purportedly independent committees, charged

with responsibility for billions of dollars of fund assets (comprised largely of investors' college

and retirement savings).

109.    The Columbia Funds Trustees oversaw numerous Columbia Funds rendering it

impracticable for them to properly perform their supervisory and monitoring functions.

Therefore, the Columbia Funds Trustees functioned to falsely legitimize Columbia Management

and the other defendants' improper conduct.

110.    To ensure that the Trustees were compliant, the Investment Adviser Defendants

often recruited key fund Trustees from the ranks of investment adviser companies.  For example,

in addition to being a Trustee or Director of several Columbia Funds, Defendant Wanger also

was the President (since 1970) of Columbia Acorn Fund; and President, Chief Investment

Officer and Portfolio Manager (since 1992) of Liberty Wanger Asset Management.  In addition,

Defendant McQuaid was Portfolio Manager (since 1995) and Director of Research (since 1992)

of Liberty Wanger Asset Management while Defendant Palombo was Executive Vice President

and Chief Operating Officer of Columbia Group since December 2001 and Executive Vice

President and Chief Operating Officer of Columbia Management since April 2003.

111.    In exchange for creating and managing the Columbia Funds, the Investment

Adviser Defendants charged the Columbia Funds a variety of fees, each of which was calculated

as a percentage of assets under management.  Hence, the more money invested in the Funds, the

greater the fees paid to the Investment Adviser Defendants.  In theory, the fees charged to mutual

fund investors are negotiated at arm's-length between the fund board and the investment

management company and must be approved by the independent members of the board.

However, as a result of the Columbia Funds Boards of Trustees' dependence on the investment

management company, and their failure to properly manage the investment advisers, millions of

dollars in Columbia Funds assets were transferred through fees payable from Columbia Funds

assets to the Investment Adviser Defendants that were of no benefit to Fund investors.

112.     These practices proved to be enormously profitable for Columbia Management

and the other defendants at the expense of Plaintiffs and the other members of the Class who had

invested in the Columbia Funds.  In this regard, a Forbes article, published on September 15,

2003, stated as follows:

> The average net profit margin at publicly held mutual fund firms
> was 18.8% last year, blowing away the 14.9% margin for the
> financial industry overall . . . .  **Economies of scale?  This is a
> business made for them – but, . . . the customers don't see the
> benefit**.
>
> **The [mutual fund] business grew 71-fold (20 fold in real terms)
> in the two decades through 1999, yet costs as a percentage of
> assets somehow managed to go up 29%**. . . .  Fund vendors have
> a way of stacking their boards with rubber stamps.  As famed
> investor Warren Buffett opines in Berkshire Hathaway's 2002
> annual report: 'Tens of thousands of "independent" directors, over
> more than six decades, have failed miserably.'  A genuinely
> independent board would occasionally fire an incompetent or
> overcharging fund advisor.  That happens just about never."

(Emphasis added).

113.     Due in large part to the conflicted boardroom culture created by Columbia Funds

Trustees, Plaintiffs and the other members of the Class never knew, nor could they have known,

from reading the Fund prospectuses or otherwise, of the extent to which the Investment Adviser

Defendants were using so-called 12b-1 fees, directed brokerage, and excessive commissions to improperly siphon assets from the Funds to the detriment of Plaintiffs and the Class.

**The Columbia Defendants' Improper**
**Use of Revenue-Sharing, Directed Brokerage and Excessive Commissions**

114.    The Investment Adviser Defendants paid excessive commissions and directed brokerage business to broker-dealers who steered their clients into Columbia Funds as part of a *quid pro quo* "shelf-space program" arrangement between Columbia Management and brokerages.  Such payments were used to fund sales contests and other undisclosed financial incentives to further push Columbia Funds.  These incentives created an undisclosed conflict of interest and caused brokers to steer clients to Columbia Funds regardless of the Funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty.  As described by the National Association of Insurance and Financial Advisors:

> Directed brokerage results when a mutual fund manager uses commissions payable for executing the fund's securities trades to obtain a preferred position for the fund in the broker-dealer's distribution network.  This practice creates numerous potential conflicts of interest, including possible incentives for broker-dealers to base their fund recommendations to customers on brokerage commission considerations rather than on whether a particular fund is the best match for a client.

*See* http://www.naifa.org/frontline/20040428_SEC_aa.html.

115.    By paying the excessive commissions and directing brokerage business to participate in "shelf-space programs," the Investment Adviser Defendants violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan.  Additionally, in several actions to date against brokerages and mutual funds, the SEC, the NASD and various other government regulators have made it clear that the undisclosed use of excessive commissions and directed brokerage to participate in "shelf-space programs" -- as Columbia Management and the other defendants have done here -- is highly improper.

116.    The SEC has expressed serious concerns regarding the significant conflicts of interest inherent in revenue-sharing programs and has mandated that proper disclosure must be made.  Specifically, the SEC has stated that "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds.  Even though revenue-sharing is paid to broker-dealers directly by fund investment advisers, rather than out of fund assets, it is possible that some advisers may seek to increase the advisory fees that they charge the fund to finance those distribution activities . . . .  Moreover, revenue-sharing arrangements may prevent some advisers from reducing their current advisory fees."  69 Fed. Reg. 6438, 6411, n. 21 (February 10, 2004).  The Morgan Stanley revenue sharing programs that the SEC declared improper included both cash payments made ostensibly by the distributor or adviser, as well as payments through directed brokerage.

117.    The SEC has brought actions against other mutual fund companies for some of the same type of behavior complained about here.  As stated by the SEC in its March 31, 2004 Cease and Desist order against Massachusetts Financial Services, Inc. ("MFS"):

> **MFS did not adequately disclose to MFS shareholders that it Allocated Fund Brokerage Commissions to Satisfy Strategic Alliances**.
>
> \*        \*        \*
>
> Specifically, Item 16(c) of the Form N-1A requires a description in the SAI of "how the Fund will select brokers to effect securities transactions for the Fund" and requires that "[i]f the Fund will consider the receipt of products or services other than brokerage or research services in selecting brokers, [the Fund should] specify those products or services."
>
> \*        \*        \*
>
> **The SAIs did not adequately disclose to shareholders that MFS had entered into bilateral arrangements in which it agreed to**

> **allocate specific negotiated amounts of fund brokerage
> commissions, subject to best execution, to broker-dealers for
> "shelf space" or heightened visibility within their distribution
> systems**.

*See* The March 31, 2004 SEC Order Instituting Administrative and Cease-and-Desist

Proceedings, Making Findings and Imposing Remedial Sanctions against MFS, File No. 3-

11450, at http://www.sec.gov/litigation/admin/ia-2224.htm.  (Emphasis added).

118.    Similarly, in the Administrative Proceeding against Morgan Stanley, the SEC

explained:

> At issue in this matter are two distinct disclosure failures. The first
> relates to Morgan Stanley DW's operation of mutual fund
> **marketing programs in which it collected from a select group
> of mutual fund complexes amounts in excess of standard sales
> loads and Rule 12b-1 trail payments. These programs were
> designed to specially promote the sale of those mutual funds
> with enhanced compensation to individual registered
> representatives, known as financial advisors ("FAs"), and
> branch managers as well as increased visibility in its extensive
> retail distribution network**.

*See* The Morgan Stanley SEC Cease-and-Desist Order, at

http://www.sec.gov/litigation/admin/33-8339.htm (footnote omitted) (emphasis added).

119.    On September 15, 2004, PIMCO fund affiliates entered into a settlement with the

SEC.  Similar to the allegations in this complaint against Columbia, the SEC charged PIMCO

entities with failing to disclose their use of directed brokerage to pay for shelf-space at brokerage

firms.  The press release stated:

> The Securities and Exchange Commission announced today a
> settled enforcement action against the investment adviser, sub-
> adviser, and principal underwriter and distributor for the PIMCO
> Funds Multi-Manager Series funds (the PIMCO MMS Funds). The
> suit charges the entities with **failing to disclose to the PIMCO
> MMS Funds' Board of Trustees and shareholders material
> facts and conflicts of interest that arose from their use of
> directed brokerage on the PIMCO MMS Funds' portfolio**

> **transactions to pay for "shelf space" arrangements with selected broker-dealers**.

> \*　　\*　　\*

> Stephen M. Cutler, Director of the SEC's Division of Enforcement, stated, "An investment adviser's undisclosed use of mutual fund assets to defray the adviser's, or an affiliated distributor's, own marketing expenses is a breach of the adviser's duty. Our action today — like the action brought by the Commission against Massachusetts Financial Services Company some six months ago — demonstrates the Commission's resolve to ensure that mutual fund shareholders know how their money is being spent."

*See* http://www.sec.gov/news/press/2004-130.htm.  (Emphasis added).

120.    On December 13, 2004, the SEC announced a settlement of charges against Franklin Advisers, Inc. and Franklin Templeton Distributors (collectively "Franklin") "alleging that Franklin, without proper disclosure, used fund assets to compensate brokerage firms for recommending the Franklin Templeton mutual funds over others to their clients."  The SEC press release stated:

> This practice is known as compensating brokerage firms for "shelf space."  As part of the settlement, Franklin agreed to pay $1 million in disgorgement and a $20 million penalty as well as undergo certain compliance reforms.

> \*　　\*　　\*

> The use of brokerage commissions to compensate brokerage firms for marketing created a conflict of interest between FA and the funds because FA benefited from the increased management fees resulting from increased fund sales.  Mutual funds that follow this practice of using brokerage commissions for marketing have an incentive to do their fund portfolio trading through brokerage firms that might not be the best choice for fund shareholders.  FA was required, but failed, to disclose adequately the arrangements to the boards so they could approve this use of fund assets, and to shareholders so they could be informed when making investment decisions.

*See* http://www.sec.gov/news/press/2004-168.htm.

121.    On December 22, 2004, the SEC, NASD, and NYSE announced settled enforcement proceedings against Edward D. Jones & Co., L.P. ("Edward Jones") "related to allegations that Edward Jones failed to adequately disclose revenue-sharing payments that it received from a select group of mutual fund families that Edward Jones recommended to its customers."  As part of the settlement, Edward Jones paid $75 million in disgorgement and civil penalties.  The press release stated:

> Linda Chatman Thomsen, Deputy Director of the Commission's Division of Enforcement, said "Edward Jones' undisclosed receipt of revenue sharing payments from a select group of mutual fund families created a conflict of interest.  When customers purchase mutual funds, they should be told about the full nature and extent of any conflict of interest that may affect the transaction.  Edward Jones failed to do that."

> *        *        *

> In NASD's separate settlement, in addition to the receipt of direct revenue sharing payments, NASD found that the firm gave preferential treatment to the Preferred Funds in exchange for millions of dollars in directed brokerage from three of the Preferred Fund families.  This violates NASD's "Anti-Reciprocal Rule," Conduct Rule 2830(k), which prohibits regulated firms from favoring the distribution of shares of particular mutual funds on the basis of brokerage commission to be paid by the fund companies.

*See* http://www.sec.gov/news/press/2004-177.htm.

122.    Further illustrating that the NASD views revenue-sharing programs as improper and impermissible, a February 16, 2005 press release regarding the NASD's filing of a complaint against American Funds Distributors states:

> American Funds Distributors, Inc. violat[ed] NASD's Anti-Reciprocal Rule by directing approximately $100 million in brokerage commissions over a three-year period to about 50 brokerage firms that were the top sellers of American Funds.

> *        *        *

40

The commissions were payments for executing trades for the
American Funds' portfolio that were directed to the brokerage
firms as additional compensation for past sales of American Funds,
and to ensure that American Funds would continue to receive
preferential treatment at those firms.

*      *      *

"Prior cases in this area have focused on retail firms that received
directed brokerage payments from mutual fund companies in
exchange for giving preferential treatment to their funds," said
NASD Vice Chairman Mary L. Schapiro. ***Today's action makes
clear that it is just as impermissible to offer and makes such
payments as it is to receive them.***"

(Emphasis added).

123.    The undisclosed excessive commissions and directed brokerage business used by

Defendants, and considered improper by the SEC as noted above, did not fund any services that

benefited the Columbia Funds' shareholders.  These practices materially harmed Plaintiffs and

other members of the Class from whom the illegitimate and improper fees were taken.

**The Investment Adviser Defendants Used**
**Rule 12b-1 Marketing Fees For Improper Purposes**

124.    12b-1 fees were routinely taken from the Columbia Funds and their investors.  For

example, for the year ended December 31, 2004, 12b-1 fees taken from the Columbia Acorn

Fund under a 12b-1 Plan were $2,594,000.00.

125.    In addition to such reported 12b-1 fees, by paying excessive brokerage

commissions and directed brokerage, and by making cash revenue-sharing payments subsidized

from Fund and investor assets, Columbia Management and the other defendants made additional

payments that fell within the purview of Rule 12b-1.  Columbia Management and the other

defendants violated Section 12 of the Investment Company Act because neither the reported 12b-

1 payments nor the other payments were made pursuant to a valid Rule 12b-1 Plan.

126.    Section 12(b) of the Investment Company Act prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act, are met.  The Rule 12b-1 conditions, among others, are that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made."

127.    Additionally, the directors/trustees "have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether the plan should be implemented or continued."  The directors/trustees may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. § 80a-35(a) and (b)] of the Act that *there is a reasonable likelihood that the plan will benefit the company and its shareholders*." (Emphasis added).

128.    The exceptions to the Section 12(b) prohibition on mutual fund marketing were enacted in 1980, principally on the ground that the marketing of mutual funds, all things being equal, should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors.  During the Class Period, the Boards of Trustees authorized, and the Investment

Adviser Defendants collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees.  These excessive fees were paid to the Columbia distributor as well as the brokers for pushing Columbia Funds.

129.    However, the purported Rule 12b-1 fees charged to Columbia Funds investors were highly improper because the conditions of Rule 12b-1 were not met.  There was no "reasonable likelihood" that the plan would benefit the company and its shareholders.  On the contrary, as the Funds were marketed and the number of Fund investors increased, the economies of scale thereby created, if any, were not passed on to Columbia Funds investors.  For example, despite the fact that net assets of the Columbia Acorn International Select Fund (Class B shares) increased from $1,551,000 to $3,162,000 from 2000 to 2003, the NAV per share of the fund decreased by 18%, falling from $17.13 in 2000 to $14.12 in 2003.  Yet during the same period, expenses charged by Defendants increased, with the ratio of expenses to net assets jumping from 2.33% in 2000 to 2.45% in 2003.

130.    Moreover, Defendants failed to reduce 12b-1 fees as the assets of the Funds increased.  As fund assets increase, certain fixed costs remain the same, thereby reducing the overall costs per investor.  To account for the decline in costs, fees to the Funds and its investors should be reduced.  Despite this fact, Defendants failed to reduce 12b-1 fees that should not have increased as the size of the Fund assets increased.

131.    The rise in fees and simultaneous fall in the NAV of the Fund, and the failure to reduce 12b-1 fees, were red flags that the Trustee/Officer Defendants disregarded.  The Columbia Funds' marketing efforts were creating diminished marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance. The Trustee/Officer Defendants ignored or failed to review written reports of the amounts

expended pursuant to the Columbia Funds Rule 12b-1 Plan, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 Plan, on a quarterly basis as required and hence failed to terminate the plans and the payments made pursuant to the Rule 12b-1 Plan, even though such payments harmed Columbia Funds shareholders.

132.    As discussed herein, in violation of Rule 12b-1, Defendants made additional undisclosed payments to brokers, in the form of excessive commissions, that were not disclosed or authorized by the Funds Rule 12b-1 plans.  Defendants shifted to the Funds or investors expenses which were the responsibility of the Investment Advisers without any corresponding reduction in the advisory fees.  This resulted in inflated advisory fees and directly impacted the shareholders' investments.

**The Improper Use of Excessive Commissions and Directed Brokerage**

133.    The Investment Adviser Defendants paid excessive commissions and directed brokerage business to broker-dealers who steered their clients into Columbia Funds as part of a *quid pro quo* "shelf-space" program arrangement between Columbia Management, the other defendants and brokerages.  Such payments and directed brokerage payments were used to fund undisclosed financial incentives to further push Columbia Funds.  These incentives created an undisclosed conflict of interest and caused brokers to steer clients to Columbia Funds regardless of the Funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty.

134.    By paying the excessive commissions and directing brokerage business to participate in "shelf-space" programs, the Investment Adviser Defendants violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 Plan.  Additionally, in several actions to date against brokerages and mutual funds, the SEC, the NASD and various other governmental regulators have made it clear that the use of

excessive commissions and directed brokerage to participate in "shelf-space" programs – as Columbia Management and the other defendants have done here – are highly improper.

135.    The excessive commissions and directed brokerage used by Columbia Management and the other defendants did not fund any services that benefited the Columbia Funds shareholders.  This practice materially harmed Plaintiffs and other members of the Class from whom the illegitimate and improper fees under the guise of so-called excessive commissions and directed brokerage business were taken.

**Improper Use of Soft Dollars**

136.    Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well.  Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary duties "solely by reason of [their] having caused the account to pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined ***in good faith*** that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. § 78bb(e)(1) (emphasis added).  In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined to include any service that "provides lawful and appropriate assistance to the money manager in the performance of his investment decision making responsibilities."  1986 Soft Dollar Release, 35 SEC Docket at 907.  The commission amounts charged by brokerages to

investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

137.    The Investment Adviser Defendants' actions went far beyond what is permitted by the Section 28(e) safe harbor by routinely using Soft Dollars to pay brokers to push unwitting clients into Columbia Funds.  The Investment Adviser Defendants used Soft Dollars for this purpose as well as for overhead costs (for items such as computer hardware and software) thus charging Columbia Funds investors for costs not covered by the Section 28(e) safe harbor and that, consistent with the Investment Advisers' fiduciary duties, properly should have been borne by the Investment Adviser Defendants.

138.    The Investment Adviser Defendants paid excessive commissions to broker dealers on top of any legitimate Soft Dollars to steer their clients to Columbia Funds and also directed brokerage business to firms that favored Columbia Funds.  Such payments and directed-brokerage payments were used to fund sales contests and other undisclosed financial incentives to push Columbia Funds.  These improper incentives created an undisclosed conflict of interest and caused brokers to steer clients to Columbia Funds regardless of the Funds' investment quality relative to other investment alternatives for the investor and to thereby breach their duties of loyalty to Plaintiffs and the other members of the Class.  By paying the excessive brokerage commissions, the Investment Adviser Defendants also violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan.

**The Prospectuses Were Materially False and Misleading**

139.    Plaintiffs and the other members of the Class were entitled to, and did receive, prospectuses pursuant to which the Columbia Funds shares were offered.

140.    Prospectuses are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to

invest in a mutual fund as well as continue to hold or redeem their shares. Section 34(b) of the Investment Company Act requires, *inter alia*, that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor.

141.    Each of the prospectuses and SAIs issued during the Class Period failed to properly disclose to investors material information about the Columbia Funds and the fees and costs associated with them. As set forth below, each of the prospectuses contained the same materially false and misleading statements and omissions regarding strategies for growth, revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars.

142.    Each of the prospectuses issued during the Class Period contained substantially the same materially false and misleading statements in that they omitted key information regarding the Funds' strategy for growth of assets, revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars that were required to be disclosed in "easy to understand language" such that a reasonable investor could make an informed decision whether or not to, among other things, continue to hold his or her shares in the Funds.

143.    Defendants continued to disseminate or cause to be disseminated the prospectuses to Fund investors who were continuing to hold their shares, and such investors relied on such prospectuses.

144.    The annual reports and semi-annual reports disseminated to Plaintiffs and the Class during the Class Period contained substantially the same materially false and misleading statements and omissions regarding strategies for growth, revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars that are contained in the prospectuses and SAIs, as discussed herein. The annual reports and semi-annual reports also specifically refer the reader to the relevant Fund prospectus.

145.    Further emphasizing Defendants' failure to adequately disclose its revenue-sharing and directed brokerage practices, Defendants fell far short of the disclosures required by SEC Form N-1A. Form N-1A details the disclosures that must be made by a mutual fund such that investors can "evaluate the risks of an investment and [. . .] decide whether to invest in a Fund by providing a balanced disclosure of positive and negative factors. Disclosure in the prospectus should be designed to assist an investor in comparing and contrasting the Fund with other funds." SEC Form N-1A, General Instruction C.1.(b). Item 16(c) of Form N-1A requires that the Statement of Additional Information for a prospectus include a detailed description of "how the Fund will select brokers to effect securities transactions for the Fund." *Id*. Item 16(c) also requires that "[i]f the Fund will consider the receipt of products or services other than brokerage or research services in selecting brokers, [the Fund should] specify those products and services." *Id*. As described herein, Defendants failed to satisfy these disclosure requirements.

**Material Omissions Regarding Strategies for Growth**

146.    The May 1, 2003 prospectus for the Columbia Acorn Fund is similar in substance to all Columbia Funds prospectuses issued during the Class Period in that it omits to state that one of the principal methods for increasing assets of the Funds was through participation in "shelf-space programs."

147.    For example, the prospectus states the Fund "seeks to provide long-term growth of capital." This statement is materially false and misleading because it failed to disclose that one of the strategies of the Fund was to pay brokers kickbacks to steer clients into the Funds, thereby growing Fund assets in order to maximize management fees payable to the Investment Adviser.

**Material Omissions Regarding Revenue-sharing**

148.    The May 1, 2003 SAI for the Liberty Acorn Trust is similar in substance to all Columbia Fund SAIs issued during the Class Period in that under the heading, "How to Buy Shares," it stated with respect to its description of the distribution plan and method by which it offered shares to the public:

> LFD [the Distributor] may, at its expense, provide special sales incentives (such as cash payments in addition to the commissions specified in the Funds' SAI) to FSFs [Financial Service Firms] that agree to promote the sale of shares of the Funds or other funds that LFD distributes. At its discretion, the Distributor may offer special sales incentives only to selected FSFs or to FSFs who have previously sold or expect to sell significant amounts of the Funds' shares.

149.    This SAI, as well as all other SAIs, were materially false and misleading in that they failed to disclose, *inter alia*, the following materially misleading adverse facts which damaged Plaintiffs and the other members of the Class:

(a)    that the Investment Adviser Defendants and/or Distributor Defendant used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf-space" programs whereby the broker steered clients into Columbia Funds;

(b)    that the Investment Advisor Defendants and/or Distributor Defendant used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space" programs, and that the revenue-sharing payments were in excess of standard sales loads and 12b-1 payments;

(c)    that cash revenue-sharing payments were actually occurring, in very substantial amounts;

(d)     that the Investment Adviser Defendants and/or Distributor Defendant directed brokerage payments to firms that favored Columbia Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Columbia Funds Rule 12b-1 Plan and also involved direct costs to the Funds;

(e)     that the Investment Adviser Defendants and/or the Distributor Defendant compensated themselves out of investor assets for any payment made pursuant to revenue-sharing agreements;

(f)     that such revenue-sharing payments created undisclosed conflicts of interest;

(g)     that the Columbia Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee/Officer Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(h)     that any economies of scale achieved by marketing of the Columbia Funds to investors were not passed on to Columbia Funds investors but, rather, as the Columbia Funds grew, fees charged to Columbia Funds investors continued to increase; and

(i)     that the Trustee/Officer Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the investors in Columbia Funds.

**Material Omissions Regarding Directed Brokerage Business and Improper Use of Soft Dollars**

150.    The May 1, 2003 SAI for the Liberty Acorn Trust is similar in substance to all Columbia Fund SAIs issued during the Class Period in that under the heading "Portfolio Transactions," it states:

> With respect to issues of securities involving brokerage commissions, when more than one broker or dealer is believed to be capable of providing the best combination of price and execution with respect to a particular portfolio transaction for a Fund, the Adviser often selects a broker or dealer that has furnished it with research products or services such as research reports, subscriptions to financial publications and research compilations, compilations of securities prices, earnings, dividends, and similar data, and computer data bases, quotation equipment and services, research-oriented computer software and services, and services of economists and other consultants. Selection of brokers or dealers is not made pursuant to an agreement or understanding with any of the brokers or dealers; however, the Adviser uses an internal allocation procedure to identify those brokers or dealers who provide it with research products or services and the amount of research products or services they provide, and endeavors to direct sufficient commissions generated by its clients' accounts in the aggregate, including the Funds, to such brokers or dealers to ensure the continued receipt of research products or services that the Adviser feels are useful. In certain instances, the Adviser receives from brokers and dealers products or services which are used both as investment research and for administrative, marketing, or other non-research purposes.

151.    The above statement is materially false and misleading in that it failed to disclose that Investment Adviser Defendants and/or the Distributor Defendant chose brokers to execute sales of the Funds' portfolios – and thereby directed the commissions from the sales of the portfolio securities to these brokers – to satisfy negotiated arrangements with brokerages to give Columbia Management and the other defendants "shelf-space" visibility and to push their clients into Columbia Funds in exchange for directed brokerage, and by failing to disclose the

substantial volume of such payments. Additionally, the above statement is materially false and misleading by omitting to disclose that:

(a)    the Investment Adviser Defendants and/or Distributor Defendant used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf-space" programs whereby the broker steered clients into Columbia Funds;

(b)    the Investment Advisor Defendants and/or Distributor Defendant used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space" programs, that the revenue-sharing payments were in excess of standard sales loads and 12b-1 payments and that the commission payments were higher than what would be "best execution" or standard in order to compensate brokers for promoting Fund shares;

(c)    the Investment Adviser Defendants and/or Distributor Defendant directed brokerage payments to firms that favored Columbia Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Columbia Funds Rule 12b-1 Plan;

(d)    such revenue-sharing payments created undisclosed conflicts of interest;

(e)    the Columbia Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee/Officer Defendants and there was not a reasonable likelihood that the plan would benefit the Funds and their shareholders;

(f)    any economies of scale achieved by marketing of the Columbia Funds to investors were not passed on to Columbia Funds investors but, rather, as the Columbia Funds grew, fees charged to Columbia Funds investors continued to increase; and

(g)    the Trustee/Officer Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the investors in Columbia Funds.

**Material Omissions Regarding 12b-1 Fees**

152.    The May 1, 2003 prospectus for the Columbia Acorn Fund is similar in substance to all prospectuses issued during the Class Period in that under the heading "Distribution and Service Fees," it states:

> The Fund has adopted a plan under Rule 12b-1 that permits it to pay its distributor marketing and other fees to support the sale and distribution of Class A, B and C shares and certain services provided to you by your financial advisor. The annual service fee may equal up to 0.25% for Class A, Class B and Class C shares. The annual distribution fee may equal up to 0.10% for Class A shares and 0.75% for Class B and Class C shares. Distribution and service fees are paid out of the assets of these classes. Over time, these fees may reduce the return on your investment and may cost you more than paying other types of sales charges.

153.    The above statement is materially false and misleading in that it fails to state that Columbia Management and the other defendants used 12b-1 fees to participate in "shelf-space programs" to provide kickbacks to brokers for directing their clients into Columbia Funds. Additionally, the above statement is materially false and misleading by omitting to disclose that:

(a)    the Investment Adviser Defendants and/or Distributor Defendant used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages

known as "shelf-space" programs whereby the broker steered clients into Columbia Funds;

(b)    the Investment Advisor Defendants and/or Distributor Defendant used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space" programs, and that the revenue-sharing payments were in excess of standard sales loads and 12b-1 payments;

(c)    the Investment Adviser Defendants and/or Distributor Defendant directed brokerage payments to firms that favored Columbia Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Columbia Funds Rule 12b-1 Plan;

(d)    the Investment Adviser Defendants and/or the Distributor Defendant compensated themselves out of investor assets for any payment made pursuant to revenue-sharing agreements;

(e)    such revenue-sharing payments created undisclosed conflicts of interest;

(f)    the Columbia Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee/Officer Defendants and there was not a reasonable likelihood that the plan would benefit the Funds and their shareholders;

(g)    any economies of scale achieved by marketing of the Columbia Funds to investors were not passed on to Columbia Funds investors but, rather, as the Columbia Funds grew, fees charged to Columbia Funds investors continued to increase; and

(h)    the Trustee/Officer Defendants had abdicated their duties under the

Investment Company Act and their common law fiduciary duties, failed to monitor and

supervise the Investment Adviser Defendants and, as a consequence, the Investment

Adviser Defendants were able to systematically skim millions and millions of dollars

from the investors in Columbia Funds.

**Defendants' Wrongdoing Directly Impacted Plaintiffs and the Class**

154.    A mutual fund company is very different from a traditional corporation, in that a

mutual fund is:

> a 'mere shell,' a **pool of assets** consisting mostly of portfolio
> securities that **belongs to the individual investors** holding shares
> in the fund. The management of this asset pool is largely in the
> hands of an investment adviser, an independent entity which
> generally organizes the fund and provides it with investment
> advice, management services, and office space and staff...

*Moses v. Black*, No. 78-1913, 1981 U.S. Dist. LEXIS 10870, at *8 (S.D.N.Y. Feb 3, 1981)

(emphasis added).

155.    Unlike the situation in regard to a traditional corporation, if those in charge of a

mutual fund engage in wrongful activities negatively impacting the mutual fund, investors are

directly impacted because a mutual fund is nothing more than a collection of the investors'

money.

156.    When a cost is imposed on a traditional corporation, that cost impacts the NAV of

the corporation, but it does not necessarily impact the market price of the corporation's shares.

Thus, there is no direct impact of those costs on the shareholder.  In contrast, costs imposed on a

mutual fund directly reduce the price at which the funds' shares are bought and sold, and do

directly impact fund shareholders.

157.    Unlike a traditional corporation, mutual fund shares do not trade at a price set by a public market.  Rather, they are bought from the fund and sold back to the fund at NAV of the fund per share.

158.    Open-end mutual funds such as the Columbia Funds are required to issue "redeemable securities," which are defined as "any security . . . under the terms of which the holder, upon its presentation to the issuer . . . is entitled . . . to receive approximately his proportionate share of the issuer's current net assets, or the cash equivalent thereof."  15 U.S.C. § 80a-2(a)(32).  The value of an investor's mutual fund is determined by subtracting a fund's liabilities from its assets to arrive at the fund's NAV.  The improper and excessive fees and charges at issue here immediately reduced the Funds' NAV per share, decreasing the amount at which each shareholder is entitled to redeem his or her shares.  This has a direct impact on shareholders.

159.    Defendants' own prospectuses, SAIs, and annual reports acknowledge that the cost of investing in a Fund is not limited to the initial price of purchasing shares.  That cost also includes additional fees and expenses subsequently imposed on the investors in connection with the service aspect of mutual fund investing.

160.    For example, as stated in the Annual Report for the Columbia Acorn Funds dated December 31, 2004:  "*As a fund shareholder, you incur two types of costs.  There are transaction costs* … *There are also continuing costs*, which generally include investment advisory fees, Rule 12b-1 fees, and other fund expenses."  (Emphasis added).

161.    During the Class Period, the Distributor Defendant was reimbursed directly by the class members for the costs of its service plan:

Under the Plan, each Fund pays LFD service and distribution fees at the annual rates described in the Prospectus for that Funds' Class A, Class B and Class C shares. LFD may use the entire amount of such fees to defray the cost of commissions and service fees paid to FSFs and for certain other purposes. Since the distribution and service fees are payable regardless of LFD's expenses, LFD may realize a profit from the fees. The Plan authorizes any other payments by the Funds to LFD and its affiliates (including the Adviser) with respect to the Class A, B, C and D shares to the extent that such payments might be construed to be indirect financing of the distribution of those shares.

May 1, 2003 SAI for Liberty Acorn Trust.

162.    The SEC has also acknowledged that the improper use of 12b-1 fees, directed brokerage and revenue-sharing harm fund shareholders directly, noting that:

Foregoing an opportunity to seek lower commission rates, to use brokerage to pay custodial, transfer agency and other fund expenses, or to obtain any available cash rebates, *is a real and meaningful cost to fund shareholders*.

\*    \*    \*

We believe that the way brokerage has been used to pay for distribution involves unmanageable conflicts of interest that may harm funds and fund shareholders.

SEC Release No. IC-26356, 2004 SEC LEXIS 418, at \*20-21 (Feb. 24, 2004) (emphasis added).

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

163.    Plaintiffs bring these claims (except for Count V that is brought derivatively on behalf of the Columbia Funds) as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who held shares, units, or like interests in any of the Columbia Funds between August 2, 1999 and March 22, 2004, inclusive (the "Class Period"), and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

164.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are many thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Columbia Management, Columbia Distributor, and other defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

165.    Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal and state law that is complained of herein.

166.    Plaintiffs will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class and securities litigation.

167.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Investment Company Act was violated by Defendants' acts as alleged herein;

(b)    whether the Investment Advisers Act was violated by Defendants' acts as alleged herein;

(c)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and financial statements of the Columbia Funds;

(d)    whether Defendants breached their common law fiduciary duties to the Class and/or aided and abetted common law breaches of fiduciary duties; and

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

168.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**Demand on the Boards to Take Corrective Action Would Be Futile**

169.    Plaintiffs have not made any demand on the Boards of Trustees (the "Boards") to institute this action for their derivative claim brought pursuant to the Investment Adviser Act in Count V below.  Such demand would be a futile act because the Boards are incapable of making an independent and disinterested decision for the following reasons:

170.    As alleged in detail herein, each of the Trustee/Officer Defendants was appointed by, and serves at the pleasure of, the Investment Adviser Defendants.  Each of the Trustee/Officer Defendants is controlled by and beholden to the Investment Adviser Defendants for his or her position and substantial compensation as Trustees/Officers.  Although as a technical matter, the shareholders have a right to vote out the Trustee, the Trustees know that this is extremely unlikely if the Investment Advisers support the Trustees, which they have done throughout the Class Period.  Accordingly, each of the Trustee/Officer Defendants is incapable of evaluating a demand independently and disinterestedly.

171.    Because of their lack of independence from the Investment Adviser Defendants, the Trustee/Officer Defendants wrongfully approved advisor fees, the revenue-sharing programs, directed brokerage, 12b-1 fees, Soft Dollars, and the materially misleading disclosures in the Columbia Funds prospectuses in each of the years they served as Trustees/Officers.

172.    As alleged in detail herein, each of the Trustee/Officer Defendants participated in, approved, and/or recklessly or negligently disregarded the wrongs complained of herein.  The conduct of the Trustee/Officer Defendants was in breach of their fiduciary duties and could not have been an exercise of good faith business judgment.

173.    The Trustee/Officer Defendants allowed a course of conduct that prejudiced the Columbia Funds and investors as the Trustee/Officer Defendants allowed the excessive fees to be charged and shareholder investments to be used for improper purposes such as kickbacks to brokers.  The payment of kickbacks to brokers was conduct that should have been prevented by the Trustee/Officer Defendants, but was not.

174.    The Trustee/Officer Defendants also were self-interested in the improper kickbacks paid to brokers who steered their clients' assets into the Columbia Funds in order to increase the assets in the Funds.  Appreciation of a mutual fund's assets is one of the keys to its survival, for if a mutual fund's assets stagnate or decrease, there is a great likelihood that the fund will be disbanded or merged with another fund.  If the mutual fund is disbanded or merged, the board members for that fund necessarily lose their positions on the fund's board as well as the compensation for sitting on the fund's board.

175.    Additionally, each of the Trustee/Officer Defendants received substantial payments and benefits by virtue of his or her membership on one or more Boards and his or her control of hundreds of Columbia Funds.  For example:

a) Defendant Eisen oversaw at least six Portfolios and received compensation of $28,125.00 in 2002;

b) Defendant Guthart oversaw at least six Portfolios and received compensation of $40,750.00 in 2002;

c) Defendant Kahn oversaw at least six Portfolios and received compensation of $48,000.00 in 2002;

d) Defendant Kaplan oversaw at least six Portfolios and received compensation of $45,750.00 in 2002;

e) Defendant Kleinman oversaw at least six Portfolios and received compensation of $48,250.00 in 2002;

f) Defendant Muchin oversaw at least six Portfolios and received compensation of $46,000.00 in 2002;

g) Defendant Nason oversaw at least six Portfolios and received compensation of $90,000.00 in 2002;

h) Defendant Wing oversaw at least six Portfolios and received compensation of $25,625.00 in 2002;

i) Defendant Hacker oversaw at least 85 Portfolios and received compensation of $115,500.00 in 2003;

j) Defendant Kelly oversaw at least 85 Portfolios and received compensation of $101,500.00 in 2003;

k) Defendant Lowry oversaw at least 87 Portfolios and received compensation of $128,150.00 in 2003;

l) Defendant Macera oversaw at least 94 Portfolios and received compensation of $56,500.00 in 2003;

m) Defendant Mayer oversaw at least 87 Portfolios and received compensation of $133,150.00 in 2003;

n) Defendant Nelson oversaw at least 120 Portfolios and received compensation of $155,073.00 in 2003;

o) Defendant Nuehauser oversaw at least 88 Portfolios and received compensation of $143,568.00 in 2003;

p) Defendant Simpson oversaw at least 119 Portfolios and received compensation of $64,234.00 in 2003;

q)      Defendant Stitzel oversaw at least 85 Portfolios and received compensation of $103,500.00 in 2003;

r)      Defendant Theobald oversaw at least 85 Portfolios and received compensation of $110,250.00 in 2003;

s)      Defendant Verville oversaw at least 86 Portfolios and received compensation of $128,250.00 in 2003; and

t)      Defendant Woolworth oversaw at least 119 Portfolios and received compensation of $64,234.00 in 2003.

176.    Each of the Trustee/Officer Defendants has thus benefited from the wrongdoing herein alleged and has engaged in such conduct to preserve his or her positions of control and the benefits thereof.

177.    Each of the Trustee/Officer Defendants was a Trustee and/or Officer during the Class Period and most continue to serve as a Trustee/Officer, and the Trustee/Officer Defendants comprise the Boards.  Thus, in order to bring this action for breaching their fiduciary duties, the Trustee/Officer Defendants would be required to sue themselves and their fellow Trustees/Officers with whom they have had close business and personal relationships throughout the Class Period.  Accordingly, a majority of the Boards is incapable of evaluating a demand independently and disinterestedly.

## INVESTMENT COMPANY ACT CLAIMS

### COUNT I

**AGAINST THE INVESTMENT ADVISER DEFENDANTS, THE TRUSTEE/OFFICER DEFENDANTS AND THE COLUMBIA DISTRIBUTOR FOR VIOLATIONS OF SECTION 34(b) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS**

178.    Plaintiffs repeat and reallege each and every allegation contained above at paragraphs 1-177 as if fully set forth herein.

179.    This Count is asserted against the Investment Adviser Defendants in their role as investment advisers to the Columbia Funds, against Columbia Distributor in its role as the distributor of the Columbia Funds, and against the Trustee/Officer Defendants for their roles in the creation and dissemination of the materially false and misleading Registration Statements, prospectuses, and SAIs.

180.    The Investment Adviser Defendants, the Trustee/Officer Defendants, and the Columbia Distributor made untrue statements of material fact in registration statements and reports filed and disseminated pursuant to the Investment Company Act and omitted to state facts necessary to prevent the statements made therein, in light of the circumstances under which they were made, from being materially false and misleading.  The Investment Adviser Defendants, Trustee/Officer Defendants, and the Columbia Distributor failed to disclose the following:

(a)    that the Investment Adviser Defendants authorized the payment directly and indirectly from fund and shareholder assets of cash payments and excessive commissions to broker dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12b of the Investment Company Act, and unprotected by any "safe harbor";

(b)    that the Investment Adviser Defendants and/or Distributor Defendant compensated themselves out of investor assets for payments made pursuant to revenue-sharing agreements;

(c)    that the Investment Adviser Defendants and/or Distributor Defendant directed brokerage payments to firms that favored Columbia Funds, which was a form of marketing that was not disclosed in or authorized by the Columbia Funds Rule 12b-1 Plan;

     (d)    that the Columbia Funds Rule 12b-1 Plan was not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee/Officer Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

     (e)    that by paying brokers to aggressively steer their clients to the Columbia Funds, the Investment Adviser Defendants were aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

     (f)    that any economies of scale achieved by marketing of the Columbia Funds to new investors were not passed on to Columbia Funds investors; on the contrary, as the Columbia Funds grew, fees charged to Columbia Funds investors increased;

     (g)    that Defendants improperly used Soft Dollars and excessive commissions, paid from Columbia Funds assets, to pay for overhead expenses the cost of which should have been borne by Defendants and not Columbia Funds investors; and

     (h)    that the Trustee/Officer Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that the Trustee/Officer Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Columbia Funds.

     181.    By reason of the conduct described above, the Investment Adviser Defendants, the Trustee/Officer Defendants, and the Columbia Distributor violated Section 34(b) of the Investment Company Act.

182.    As a direct, proximate and foreseeable result of the Investment Adviser Defendants', the Trustee/Officer Defendants' and the Columbia Distributor's violation of Section 34(b) of the Investment Company Act, Plaintiffs and the other members of the Class have incurred damages.  Plaintiffs and the other members of the Class were injured as holders of the Funds because they were deceived into believing that they would earn a return on their investment that would reflect a use of all the Funds' assets to benefit the Funds and their investors, when in fact the return on investment was reduced by the wrongful payments that served to benefit only the Advisors and affiliated Defendants.  In reliance on such deceptive statements, Plaintiffs and the Class continued to hold their shares and sustained injury by virtue of the continuing impact of the undisclosed charges on the value of their holdings.

183.    Plaintiffs and the other members of the Class have been specially injured by these Defendants' violations of Section 34(b) of the Investment Company Act.  Such injuries were suffered directly by the shareholders.

184.    The Investment Adviser Defendants, the Trustee/Officer Defendants, and the Columbia Distributor, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal such adverse material information.

### COUNT II

**AGAINST COLUMBIA DISTRIBUTOR, THE INVESTMENT ADVISER DEFENDANTS AND THE TRUSTEE/OFFICER DEFENDANTS FOR VIOLATIONS OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS**

185.    Plaintiffs repeat and reallege each and every allegation contained above at paragraphs 1-177 as if fully set forth herein.

186.    This Count is brought by Plaintiffs (as Columbia Funds securities holders), on behalf of themselves and the Class, against Columbia Distributor, the Investment Adviser Defendants, and the Trustee/Officer Defendants for breaches of their fiduciary duties as defined by Section 36(a) of the Investment Company Act.

187.    Columbia Distributor, the Investment Adviser Defendants, and the Trustee/Officer Defendants each had a fiduciary duty to Plaintiffs and the other members of the Class.

188.    Columbia Distributor, the Investment Adviser Defendants, and the Trustee/Officer Defendants violated Section 36(a) by improperly charging investors in the Columbia Funds purported Rule 12b-1 marketing fees; by drawing on Columbia Funds assets to make undisclosed payments of Soft Dollars, directed brokerage, and excessive commissions, in violation of Rule 12b-1; by making improper revenue-sharing payments and directly or indirectly imposing the cost of such payments on the Funds and their shareholders;

189.    By reason of the conduct described above, Columbia Distributor, the Investment Adviser Defendants, and the Trustee/Officer Defendants violated Section 36(a) of the Investment Company Act.

190.    As a direct, proximate, and foreseeable result of Columbia Distributor's, the Investment Adviser Defendants', and the Trustee/Officer Defendants' breaches of their fiduciary duties in their roles as principal underwriter, investment adviser, and trustees and officers, respectively, to Columbia Funds investors, Plaintiffs and the other members of the Class have incurred millions and millions of dollars in damages.  Plaintiffs and the other members of the Class were injured as holders of the Funds because they were deceived into believing Defendants were not improperly taking assets out of the Funds to the detriment of the Funds and Fund

investors when in fact Defendants were systematically and improperly removing assets from the Funds with a direct injurious impact on both the Funds and their shareholders.

191.    Plaintiffs, in this Count, seek to enjoin Defendants from engaging in such practices in the future, as well as recover improper Rule 12b-1 fees, Soft Dollars, excessive commissions, cash revenue-sharing payments and management fees charged to the Columbia Funds and the individual investors by Columbia Distributor, the Investment Adviser Defendants, and the Trustee/Officer Defendants.

## COUNT III

### AGAINST COLUMBIA DISTRIBUTOR, THE INVESTMENT ADVISER DEFENDANTS AND THE TRUSTEE/OFFICER DEFENDANTS FOR VIOLATIONS OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

192.    Plaintiffs repeat and reallege each and every allegation contained above at paragraphs 1-177 as if fully set forth herein.

193.    This Count is brought by Plaintiffs (as Columbia Funds securities holders), on behalf of themselves and the Class, against Columbia Distributor, the Investment Adviser Defendants and the Trustee/Officer Defendants for breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

194.    Columbia Distributor, the Investment Adviser Defendants, and the Trustee/Officer Defendants had a fiduciary duty to the Columbia Funds and to the fund investors with respect to the receipt of compensation for services and of payments of a material nature made by and to the Columbia Distributor, the Investment Adviser Defendants, and the Trustee/Officer Defendants.

195.    Columbia Distributor, the Investment Adviser Defendants, and the Trustee/Officer Defendants violated Section 36(b) by improperly charging investors in the

Columbia Funds purported Rule 12b-1 marketing fees, and by drawing on assets of the investors

of Columbia Funds to make undisclosed payments of Soft Dollars and excessive commissions in

violation of Rule 12b-1, despite the fact that the payments at issue benefited only the Defendants

and not the Funds.  In addition, Defendants violated Section 36(b) by wrongfully inflating their

advisory fees in an amount that would compensate them for further revenue-sharing payments

made ostensibly from the assets of the Investment Adviser Defendants or Distributor Defendant.

By virtue of the forgoing, Defendants charged a "fee that is so disproportionately large that it

bears no reasonable relationship to the services rendered and could not have been the product of

arm's-length bargaining" in violation of the standard set forth in *Gartenberg v. Merrill Lynch*

*Asset Managements, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982).

196.    By reason of the conduct described above, Columbia Distributor, the Investment

Adviser Defendants, and the Trustee/Officer Defendants violated Section 36(b) of the Investment

Company Act.

197.    The Trustee/Officer Defendants received improper payments, in that they

received their compensation despite the fact they violated their fiduciary duties to the investors.

198.    As a direct, proximate and foreseeable result of the Columbia Distributor's, the

Investment Adviser Defendants', and the Trustee/Officer Defendants' breach of the fiduciary

duties in their roles as principal underwriter, investment advisor and officers and trustees,

respectively, to the Columbia Funds, the Funds have incurred millions and millions of dollars in

damages as a result of Defendants' systematic and improper withdrawal of assets from the

Funds.

199.    Plaintiffs, on behalf of themselves and the other members of the Class, seek an award of damages on this Count for the period beginning one year prior to the institution of the action and ending on the date that this lawsuit was commenced.

200.    Plaintiffs, on behalf of themselves and the other members of the Class, in this count seek to recover all of the 12b-1 fees, Soft Dollars, excessive commissions, and excessive management fees charged to the Columbia Funds by Columbia Distributor, the Investment Adviser Defendants, and the Trustee/Officer Defendants.

## COUNT IV

### AGAINST THE INVESTMENT ADVISER DEFENDANTS (AS CONTROL PERSONS OF THE TRUSTEES AND COLUMBIA DISTRIBUTOR) FOR VIOLATIONS OF SECTION 48(a) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

201.    Plaintiffs repeat and reallege each and every allegation contained above at paragraphs 1-177 as if fully set forth herein.

202.    This Count is brought pursuant to Section 48(a) of the Investment Company Act against the Investment Adviser Defendants, who caused the Columbia Trustees and Columbia Distributor to commit the violations of the Investment Company Act alleged herein.  It is appropriate to treat these Defendants as a group for pleading purposes and to presume that the misconduct complained of herein is the collective actions of the Investor Adviser Defendants, the Columbia Trustees, and Columbia Distributor.

203.    The Columbia Trustees and Columbia Distributor are liable under Section 34(b), 36(a), and 36(b) of the Investment Company Act to Plaintiffs and the other members of the Class as set forth herein.

204.    The Investment Adviser Defendants were "control persons" of the Columbia Trustees and Columbia Distributor that caused the violations complained of herein.  By virtue of

their positions of operational control and/or authority over the Columbia Trustees and Columbia Distributor, the Investment Adviser Defendants directly and indirectly, had the power and authority, and exercised the same, to cause the Columbia Trustees and Columbia Distributor to engage in the wrongful conduct complained of herein.

206. Pursuant to Section 48(a) of the Investment Company Act, by reason of the foregoing, the Investment Adviser Defendants are liable to Plaintiffs and the other members of the Class to the same extent as are the Columbia Trustees and Columbia Distributor for their primary violations of Sections 34(b), and 36(a) and (b) of the Investment Company Act.

206. By virtue of the foregoing, Plaintiffs, and the other members of the Class are entitled to damages against the Investment Adviser Defendants.

## INVESTMENT ADVISERS ACT CLAIM

### COUNT V

**AGAINST THE INVESTMENT ADVISER DEFENDANTS UNDER SECTION 215 OF THE INVESTMENT ADVISERS ACT FOR VIOLATIONS OF SECTION 206 OF THE INVESTMENT ADVISERS ACT DERIVATIVELY ON BEHALF OF THE COLUMBIA FUNDS**

207. Plaintiffs repeat and reallege each and every allegation contained above at paragraphs 1-177 as if fully set forth herein. For purposes of this Count only, Plaintiffs allege that Defendants under this Count have acted with knowledge and/or recklessness.

208. This Count is based upon Section 215 of the Investment Advisers Act, 15 U.S.C. §80b-15.

209. The Investment Adviser Defendants served as "investment advisers" to the Columbia Funds and the Columbia Funds investors pursuant to the Investment Advisers Act.

210. As fiduciaries pursuant to the Investment Advisers Act, the Investment Adviser Defendants were required to serve the Columbia Funds in a manner in accordance with the

federal fiduciary standards set forth in Section 206 of the Investment Advisers Act, 15 U.S.C.
§80b-6, governing the conduct of investment advisers.

211.    All of the Columbia Funds are alter egos of one another.  The Funds are
essentially pools of investor assets that are managed and administered by a common body of
officers and employees of Columbia Funds who administer the Columbia Funds generally.  The
Columbia Funds have no independent will and are totally dominated by Columbia Management
and the common body of trustees established by Columbia Funds.  Thus, in substance, the
Columbia Funds function as components of one unitary organization.  Therefore, this claim is
properly brought derivatively on behalf of all of the Columbia Funds listed in Exhibit A.

212.    During the Class Period, the Investment Adviser Defendants breached their
fiduciary duties to the Columbia Funds by engaging in a deceptive contrivance, scheme, practice
and course of conduct pursuant to which they knowingly and/or recklessly engaged in acts,
transactions, practices and courses of business which operated as a fraud upon the Columbia
Funds.  Central to that effort was the imposition on the Funds of management advisory and
distribution agreements that would facilitate their efforts to wrongfully extract assets from the
Funds and their shareholders.  As detailed above, the Investment Adviser Defendants skimmed
money from the Columbia Funds by charging and collecting fees from the Columbia Funds in
violation of the Investment Company Act and the Investment Advisers Act.  The purpose and
effect of said scheme, practice and course of conduct was to enrich the Investment Adviser
Defendants, among other defendants, at the expense of the Columbia Funds.  The Investment
Adviser Defendants breached their fiduciary duties owed to the Columbia Funds by engaging in
the aforesaid transactions, practices and courses of business knowingly or recklessly so as to
constitute a deceit and fraud upon the Columbia Funds.

213.    The Investment Adviser Defendants are liable as direct participants in the wrongs complained of herein.  The Investment Adviser Defendants, because of their position of authority and control over the Columbia Funds, were able to and did control the fees charged to and collected from the Columbia Funds and otherwise control the operations of the Columbia Funds.

214.    The Investment Adviser Defendants had a duty to (1) disseminate accurate and truthful information with respect to the Columbia Funds; and (2) truthfully and uniformly act in accordance with their stated policies and fiduciary responsibilities to the Columbia Funds.  The Investment Adviser Defendants participated in the wrongdoing complained of herein in order to prevent the Columbia Fund shareholders from knowing of the Investment Adviser Defendants' breaches of fiduciary duties including:  (1) the charging of the Columbia Funds and Columbia Funds investors improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" as a marketing tool; (4) charging the Columbia Funds for excessive and improper commission payments to brokers; and (5) wrongfully inflating their management and/or distribution fees to obtain reimbursement for revenue sharing payments.

215.    As a result of the Investment Advisers' multiple breaches of their fiduciary duties owed to the Columbia Funds, the Columbia Funds were damaged.

216.    The Columbia Funds are entitled to rescind their investment advisory contracts with the Investment Adviser Defendants and recover all fees paid in connection with such agreements.

## BREACH OF FIDUCIARY DUTY CLAIMS

### COUNT VI

### BREACH OF FIDUCIARY DUTY AGAINST THE
### INVESTMENT ADVISER DEFENDANTS ON BEHALF OF THE CLASS

217.    Plaintiffs repeat and reallege each of the preceding allegations above at paragraphs 1-177 as if fully set forth herein, except that Plaintiffs do not repeat and reallege in this Count any allegations of deception by Defendants.  The wrongdoing complained of in this Count is limited to the wrongful payment of excessive fees and commissions, without regard to any deception, misrepresentation or omission.

218.    As investment advisers to the Columbia Funds, the Investment Adviser Defendants were fiduciaries to Plaintiffs and the other members of the Class and were required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.

219.    The Investment Adviser Defendants breached their fiduciary duties to Plaintiffs and the other members of the Class by failing to manage the companies entrusted to their care in the best interests of Plaintiffs and the Class and by causing the Funds and their shareholders to bear costs that served only the interest of the Investment Adviser and Distributor Defendants.

220.    Plaintiffs and the other members of the Class have been specially injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages.

### COUNT VII

### BREACH OF FIDUCIARY DUTY AGAINST THE
### TRUSTEE/OFFICER DEFENDANTS ON BEHALF OF THE CLASS

221.    Plaintiffs repeat and reallege each of the preceding allegations above at paragraphs 1-177 as if fully set forth herein, except that Plaintiffs do not repeat and reallege in

this Count any allegations of deception by Defendants.  The wrongdoing complained of in this Count is limited to the wrongful payment of excessive fees and commissions, without regard to any deception, misrepresentation or omission.

222.    As Columbia Funds Trustees and Officers, the Trustee/Officer Defendants had a fiduciary duty to Plaintiffs and the Class to supervise and monitor the Investment Adviser Defendants for the Funds' benefit.

223.    The Trustee/Officer Defendants breached their fiduciary duties by reason of the acts alleged herein, including their knowing or reckless failure to prevent the Investment Adviser Defendants from (1) charging the Columbia Funds and Columbia Funds investors improper Rule 12b-1 marketing fees; (2) making improper payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" as a marketing tool; (4) charging the Columbia Funds for excessive and improper commission payments to brokers; and (5) making improper revenue-sharing payments, the costs of which were all borne by the Funds and their investors.

224.    Plaintiffs and the other members of the Class have been specially injured as a direct, proximate and foreseeable result of such breach on the part of the Trustee/Officer Defendants and have suffered substantial damages.

## UNJUST ENRICHMENT

### COUNT VIII

#### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT ON BEHALF OF THE CLASS

225.    Plaintiffs repeat and reallege each of the preceding allegations above at paragraphs 1-177 as if fully set forth herein, except that Plaintiffs do not repeat and reallege in this Count any allegations of deception by Defendants.  The wrongdoing complained of in this

Count is limited to the wrongful payment of excessive fees and commissions, without regard to any deception, misrepresentation or omission.

226.    Defendants benefited from their unlawful acts through the excessive and improper fees they charged and received from Plaintiffs and the other members of the Class. It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiffs and other members of the Class and retained by Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(A)    Determining that this action is a proper class action and certifying Plaintiffs as the Class representatives and Plaintiffs' counsel as Class counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(B)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)    On Count V, awarding the Columbia Funds rescission of their contracts with the Investment Adviser Defendants, including recovery of all fees which would otherwise apply, and recovery of all fees paid to the Investment Adviser Defendants;

(D)    Ordering an accounting of all Columbia Funds-related fees, commissions, and Soft Dollar payments;

(E)    Ordering restitution of all unlawfully or discriminatorily obtained fees and charges;

(F)    Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or

equity to attach, impound or otherwise restrict the Defendants' assets to assure that Plaintiffs and the Class have an effective remedy;

        (G)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

        (H)    Such other and further relief as the Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs hereby demand a trial by jury.

Dated:  June 9, 2005

        Respectfully submitted,

        **MOULTON & GANS, P.C.**

        By:  <u>/s/ Nancy Freeman Gans</u>
             Nancy Freeman Gans (BBO #184540)
        33 Broad Street, Suite 1100
        Boston, Massachusetts  02109-4216
        (617) 369-7979

        *Counsel for Plaintiffs Joan Cohen, Gene F.*
        *Osburn, Jean S.B. Simmonds and R.L. Simmonds*
        *and Proposed Liaison Counsel*

        **MILBERG WEISS BERSHAD**
        **  & SCHULMAN LLP**
        Jerome M. Congress
        Janine L. Pollack
        Kim E. Miller
        Michael R. Reese
        One Pennsylvania Plaza
        New York, New York  10119-0165
        (212) 594-5300

        *Counsel for Plaintiff Joan Cohen and Proposed*
        *Co-Lead Counsel*

**STULL, STULL & BRODY**
Jules Brody
Aaron Brody
6 East 45th Street
New York, New York  10017
(212) 687-7230

*Counsel for Plaintiffs Gene F. Osburn, Jean S.B. Simmonds and R.L. Simmonds and Proposed Co-Lead Counsel*

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
Marshall N. Perkins
The World Trade Center – Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland  21202
(410) 332-0030

*Counsel for Plaintiff Joan Cohen*

**WEISS & LURIE**
Joseph H. Weiss
Richard A. Acocelli
551 Fifth Avenue, Suite 1600
New York, New York  10176
(212) 682-3025

*Counsel for Plaintiffs Gene F. Osburn, Jean S.B. Simmonds and R.L. Simmonds*

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
280 King of Prussia Road
Radnor, Pennsylvania  19087
(610) 667-7706

*Counsel for Plaintiff Paul Slicker*

**GILMAN AND PASTOR, LLP**
David Pastor (BBO #391000)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts  01906
(781) 231-7850

*Counsel for Plaintiff Paul Slicker*

*Additional Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I, Daniel P. Dietrich, hereby certify that I served a copy of the foregoing

document upon counsel for all parties by mailing a copy of the same, postage prepaid, to

each attorney of record, this 9th day of June, 2005.


_____/s/ Daniel P. Dietrich_____
Daniel P. Dietrich