**EXHIBIT G**



U.S. Securities and Exchange Commission

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 50841 / December 13, 2004**

**INVESTMENT ADVISERS ACT OF 1940**
**Release No. 2337 / December 13, 2004**

**INVESTMENT COMPANY ACT OF 1940**
**Release No. 26692 / December 13, 2004**

**Admin. Proc. File No. 3-11769**

| | |
|---|---|
| In the Matter of<br><br>Franklin Advisers, Inc. and<br>Franklin/ Templeton<br>Distributors, Inc.,<br><br>Respondents. | : ORDER INSTITUTING ADMINISTRATIVE<br>: AND CEASE-AND-DESIST PROCEEDINGS,<br>: MAKING FINDINGS, AND IMPOSING<br>: REMEDIAL SANCTIONS AND A CEASE-AND-<br>: DESIST ORDER PURSUANT TO SECTIONS<br>: 203(e) AND 203(k) OF THE INVESTMENT<br>: ADVISERS ACT OF 1940, SECTIONS 9(b)<br>: AND 9(f) OF THE INVESTMENT COMPANY<br>: ACT OF 1940, AND SECTION 15(b) OF THE<br>: SECURITIES EXCHANGE ACT OF 1934 |

## I.

The United States Securities and Exchange Commission (the "Commission") deems it appropriate and in the public interest that administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") and Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") against Franklin Advisers, Inc. ("FA" or "Franklin Advisers") and Franklin/ Templeton Distributors, Inc. ("FTDI") (collectively, the "Respondents").

## II.

In anticipation of the institution of these proceedings, Respondents have submitted an Offer of Settlement (the "Offer") that the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or in which

the Commission is a party, and without admitting or denying the findings, except those findings pertaining to the jurisdiction of the Commission over them and the subject matter of these proceedings, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940, Sections 9(b) and 9(f) of the Investment Company Act of 1940, and Section 15(b) of the Securities Exchange Act of 1934 ("Order") as set forth below.

## III.

On the basis of this Order and Respondents' Offer, the Commission finds[1] that:

### Respondents

1. FA is an investment adviser registered with the Commission and headquartered in San Mateo, California. FA provides investment advisory, portfolio management, and administrative services to a majority (though not all) of the mutual funds in the Franklin Templeton Investments complex.[2] As of January 31, 2004, FA had $138.4 billion in assets under management.

2. FTDI is a broker-dealer registered with the Commission and headquartered in St. Petersburg, Florida. FTDI provides sales and marketing services and acts as the principal underwriter and distributor of shares of most of the U.S.-registered mutual funds in the Franklin Templeton Investments complex. FTDI earns fees and commissions in connection with the sale of the FT Fund shares.

### Summary

3. Between 2001 and 2003, Franklin Templeton Investments ("Franklin" or "FT"), a global mutual fund complex, entered into inadequately disclosed agreements with 39 broker-dealer firms. Pursuant to those agreements, FT used $52 million in brokerage commissions --which were fund assets -- to compensate those broker-dealers for providing preferential marketing of the funds. The use of fund brokerage commissions in lieu of cash payments by FTDI for these marketing arrangements created potential conflicts of interest that should have been, but were not, adequately disclosed to the FT Fund Boards of Directors and FT fund shareholders. These agreements with the broker-dealers, known as "shelf space" agreements, bought placement on certain broker-dealers' lists of recommended mutual funds and on the brokers-dealers' websites, among other things. The objective in entering into the shelf space agreements was to increase sales of the FT funds.

4. FTDI, the principal underwriter and distributor of shares of most of the FT mutual funds, negotiated the terms of the shelf space arrangements and attempted to have each broker-dealer receive the amount contemplated in its agreement with FTDI. FA, which provides investment advisory, portfolio management, and administrative services to a majority of the FT mutual funds, had the duty to inform the fund directors and shareholders of

potential conflicts of interest.

5. FA, aided and abetted by FTDI, failed to adequately disclose that the shelf space arrangements shifted marketing expenses from FTDI to fund shareholders. They also failed to disclose that if the shelf space agreements successfully increased fund sales, FA would benefit from an increase in its compensation, which was calculated as a percentage of total assets under management. In addition, because FTDI asked FT's traders to meet specific directed brokerage targets for certain broker-dealers, FT risked executing trades in a manner inconsistent with shareholder interests. Finally, without knowledge of these agreements, the Boards were unable adequately to evaluate the funds' overall marketing expenses and other issues.

6. By engaging in the inadequately disclosed practice of using fund assets for shelf space, FA and FTDI violated the securities laws. FA and FTDI also violated the law by not ensuring that the commission payments for shelf space were assets of the specific fund promoted by the broker-dealer. As a result, some funds may have been improperly disadvantaged in that the assets of those funds were used for the benefit of other funds.

### FTDI Used Brokerage Commissions To Pay For Shelf Space

7. Between January 2001 and the end of 2003, FTDI negotiated shelf space agreements with banks and broker-dealers. Under these agreements, FTDI agreed to pay the broker-dealers for heightened access to the broker-dealers' distribution or sales systems. The heightened access included placement of certain Franklin funds on the brokers' websites and lists of preferred mutual funds, access to brokers, participation in broker conferences, and other advantages. Senior FTDI officers negotiated these deals for FTDI.

8. For the period 2001 through 2003, FTDI sent 39 broker-dealers a total of $52 million in brokerage commissions "directed" as a credit for shelf space arrangements. When the FT traders directed brokerage to the broker-dealers with whom they had shelf space agreements, commissions on mutual fund portfolio trades were used to offset shelf space payments. These brokerage commissions were fund assets. FTDI made some payments in cash, but cash payments were an expense to FTDI. So, FTDI preferred to avoid the cost through the use of directed brokerage. This use of commissions created potential conflicts of interest that needed to be adequately disclosed.

9. When FTDI paid for shelf space with brokerage commissions, it did so according to a ratio calculation. If, for example, the shelf space agreement contemplated that FTDI would pay $100,000 in cash to a broker-dealer for fund sales and assets, some broker-dealers would allow FTDI to satisfy the agreement with $130,000 in brokerage commissions pursuant to an agreed ratio of 1:1.3. If the brokerage commission payments did not cover the specified amount for shelf space, FTDI would pay the balance in cash. It was more beneficial for FTDI to pay for shelf space with brokerage commissions than cash because FTDI was able to avoid using its own assets for the marketing expense.

10. FA also benefited from the payment of directed brokerage commissions for shelf space agreements insofar as increased fund sales generated

increased assets under management, which in turn generated increased management fees for FA.

11. FTDI tracked compliance with the shelf space agreements, most of which were oral, though still definite and specific. FTDI recorded the terms and brokerage targets on a spreadsheet identifying all the broker-dealers who had agreed to accept brokerage in lieu of hard cash payments. FT's trading department established targets for brokerage commissions that would be directed to the various broker-dealers pursuant to the negotiated agreements. As the year progressed, the targets were circulated to the FT trading department as a monthly update showing progress toward the shelf space targets. Toward the end of the year, these reports were distributed weekly rather than monthly to ensure that the traders received up-to-date information on target completion. Toward the end of the fiscal year, the FTDI account managers responsible for maintaining specific broker-dealer relationships would sometimes tell the FT trading department that they were short of reaching that year's brokerage target for one of the broker-dealers. They would ask the FT traders to direct more brokerage to that broker-dealer in order to meet the target and subject to best execution, the FT traders were generally able to comply. The traders were aware of the targets, and FTDI's progress in meeting them, when allocating their trades.

**The Inadequately Disclosed Shelf Space Payments Created Potential Conflicts Of Interest**

12. Between 2001 and late 2003, FA did not adequately disclose to the FT Boards and FT Shareholders that brokerage commissions were being used as a credit for shelf space. As a fiduciary responsible for informing the FT Boards of important matters and approving the funds' written disclosures to FT Shareholders, FA had a duty to ensure adequate disclosures were made.

13. The Boards were not specifically advised of the practice of paying for shelf space with directed brokerage and were never made aware of several potential conflicts of interest, including that FTDI had a choice about whether to pay for the shelf space from its own assets or the funds' assets and that FA stood to profit from higher fees resulting from increased assets under management. As a result, the Boards were unable to adequately evaluate the funds' overall marketing expenses in approving the funds' marketing plans as required by the Commission pursuant to Rule 12b-1. Because they were not given the opportunity to approve the practice of using fund assets to pay for shelf space, the Boards could not adequately evaluate whether this use of fund assets was in accordance with the best interests of the FT shareholders. Nor could they evaluate the funds' overall marketing expenses.

14. The shelf space arrangements also were not adequately disclosed to the FT Shareholders. FA was responsible for ensuring that the disclosures made in the funds' prospectuses and Statements of Additional Information ("SAIs") accurately described how FTDI chose the broker-dealers with which it worked. Item 16(c) of the SEC's Form N-1A requires a description in the SAI of "how the Fund will select brokers to effect securities transactions in the Fund" and requires that "[i]f the Fund will consider the receipt of products or services other than brokerage or research services in selecting brokers, [the Fund should] specify those products or services."

15. In the "Dealer Compensation" section of its SAIs, FT disclosed, in pertinent part:

> Distributors and/or its affiliates may provide financial support to securities dealers that sell share of Franklin Templeton Investments. This support is based primarily on the amount of sales of fund shares and/or total assets with Franklin Templeton Investments. The amount of support may be affected by: total sales; net sales; levels of redemptions; the proportion of a securities dealer's sales and marketing efforts in Franklin Templeton Investments; a securities dealer's sales and marketing efforts in Franklin Templeton Investments; a securities dealer's support of, and participation in, Distributors' marketing programs; a securities dealer's compensation programs for its registered representatives; and the extent of a securities dealer's marketing programs relating to Franklin Templeton Investments. Financial support to securities dealers may be made by payments from Distributor's own resources, from Distributors' retention of underwriting concessions and, in the case of funds that have Rule 12b-1 plans, from payments to Distributors under such plans. In addition, certain securities dealers may receive brokerage commissions generated by fund portfolio transactions in accordance with the rules of the National Association of Securities Dealers, Inc.

The "Portfolio Transactions" section of FT's SAIs sates, in pertinent part:

> If the Funds' officers are satisfied that the best execution is obtained, the sale of Fund shares, as well as shares of other funds in Franklin Templeton Investments, also may be considered a factor in the selection of broker-dealers to execute the Funds' portfolio transactions.

Although the SAIs stated that FT could consider a broker-dealer's sales of fund shares when selecting a broker-dealer to execute portfolio transactions, they did not describe FTDI's practice of annually negotiating shelf space arrangements with certain broker-dealers. They did not make clear to fund shareholders that brokerage commissions were used to offset shelf space payment obligations under at least some of these shelf space arrangements. They also did not make clear that use of brokerage payments in this manner was not specifically authorized by the funds' distribution plans approved by the FT Fund Boards pursuant to Rule 12b-1.

### Respondents Engaged In Improper Joint Arrangements

16. Each time FT directed a fund's brokerage commissions to obtain credit for the shelf space arrangements, they made no effort to ensure that these commissions came from the specific fund promoted by the broker-dealer in connection with a shelf space arrangement. Accordingly, Respondents made no efforts to ensure that the directed brokerage commissions from any given fund were used to promote the sale of that fund, as opposed to the sale of other funds. As a result, some funds may have been improperly disadvantaged in that the assets of those funds were used for the benefit of other funds. FTDI and FA thus participated in a joint distribution arrangement whereby they improperly pooled and directed brokerage from the FT Funds.

### Respondents' Remedial Actions

17. In November 2003, Respondents voluntarily stopped the practice of paying for shelf space with directed brokerage, citing uncertainty in the industry regarding the appropriateness of the practice. Respondents continued to pay for shelf space with cash payments from FTDI.

## Violations

18. As a result of the conduct described above:

a.  FA:

    i.  Willfully[3] violated Section 206(2) of the Advisers Act, which provides that it is "unlawful for any investment adviser, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly ... to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

    ii.  Willfully violated Section 34(b) of the Investment Company Act, which provides in pertinent part that it is "unlawful for any person to make any untrue statement of a material fact in any registration statement ... filed or transmitted pursuant to" the Investment Company Act and to "omit to state therein any fact necessary in order to prevent the statements made therein, in light of the circumstances under which they were made, from being materially misleading."

    iii.  Willfully violated Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder, which provide in pertinent part that it is unlawful for any "affiliated person of or principal underwriter for any registered investment company ..., acting as principal, [to] participate in, or effect any transaction in connection with, any joint enterprise or other joint arrangement or profit-sharing plan in which any such registered company ... is a participant ... unless an application regarding such joint enterprise or profit-sharing plan has been filed with the Commission and has been granted by an order entered prior to the submission of such plan[.]"

b.  FTDI:

    i.  Willfully[1] aided and abetted and caused FA's violation of Section 206(2) of the Advisers Act.

    ii.  Willfully violated Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder.

## Undertakings

19. In determining to accept the Offer, the Commission considered the following efforts to be voluntarily undertaken by FA and FTDI:

A.  FA and FTDI shall use their best efforts; (i) to cause all other registered investment adviser subsidiaries of Franklin Resources, Inc.

to perform the undertakings set forth in paragraph 20 below; and (ii) to cause Franklin Resources, Inc. and its subsidiaries to provide such cooperation as may be needed to facilitate the performance of the undertakings in paragraph 19.B. below.

B.  Subject to the FT Fund Boards' approval, FA and FTDI will cause the funds to include disclosure in the prospectuses or SAIs about payments made by FA or FTDI to broker-dealers in addition to dealer concessions, shareholder servicing payments, and payments for services that Respondents otherwise would provide, such as subaccounting, and that such payments are intended to compensate broker-dealers for various services, including without limitation, placement on the broker-dealers' preferred or recommended fund list, access to the broker-dealers' registered representatives, assistance in training and education of personnel, marketing support, and other specified services.

20. Respondents undertake the following:

A.  **General Compliance.** Respondents will appoint a senior level employee who shall be responsible for developing and implementing within 90 days of the entry of this Order and thereafter maintaining the following written compliance policies and procedures:

   1.  Procedures designed to ensure that when FT traders place trades with a broker-dealer that also sells FT Fund shares, the person responsible for selecting such broker-dealer is not informed by FA or FTDI of, and does not take into account, the broker-dealer's promotion or sale of fund shares;

   2.  Procedures requiring the documentation of all shelf space arrangements and requiring FTDI to use its best efforts to enter into written contracts memorializing the shelf space arrangements between FTDI and the broker-dealer or other intermediary. The documentation of each shelf space arrangement will set forth the payment schedule and the services that the broker-dealer or other intermediary will provide, and include a provision preventing the broker-dealer or other intermediary from accepting compensation for promoting or selling FT Fund shares in the form of commissions for brokerage transactions directed to it from an FT Fund portfolio transaction. The documentation of each shelf space arrangement will include a directive from FTDI that the broker-dealer or other intermediary provide point-of-sale disclosure documents, consistent with current legal requirements.

   3.  Procedures for obtaining the approval in writing of all shelf space arrangements by the General Counsel of FT, or his delegate, and subsequent presentation of the approved arrangements to the FT Fund Boards for approval prior to implementation.

   4.  FTDI will supplement its compliance manual to establish guidelines for entering into shelf space arrangements, which

shall not be inconsistent with the terms of this Order. FTDI will present the language of the guidelines to the FT Fund Boards and FT's General Counsel for approval.

5.  At least once per year, FTDI will make presentations to each of the FT Boards, including an overview of FTDI's shelf space arrangements and policies, any material changes to such policies, the number and types of such arrangements, the types of services received, the identity of participating broker-dealers and the total dollar amounts paid. FTDI will also provide the Boards with a summary quarterly report setting forth amounts paid by FTDI for shelf space arrangements and the broker-dealers that received such payments; and

6.  At least once per year for at least five years FA and FTDI will provide the FT Fund Boards with a best execution analysis performed by a recognized independent portfolio trading analytical firm. Respondents will include lists of (a) the top ten executing broker-dealers used by FT Trading and (b) the top ten selling broker-dealers conducting business with FTDI.

B.  **Independent Distribution Consultant.**

1.  Respondents shall retain, within 30 days of the date of the entry of the Order, the services of an Independent Distribution Consultant not unacceptable to the staff of the Commission and acceptable to the FT Fund Boards. The Independent Distribution Consultant's compensation and expenses shall be borne exclusively and jointly and severally by Respondents. Respondents shall require the Independent Distribution Consultant to develop a Distribution Plan for the distribution of the total disgorgement and penalty ordered in paragraph IV.C. below to the FT Funds managed by FT or its affiliates according to a methodology developed in consultation with Respondents and the Fund Boards and acceptable to the staff of the Commission.

2.  In the event that Respondents and the Independent Distribution Consultant are unable to agree on a Distribution Plan, Respondents shall abide by the recommendation of the Independent Distribution Consultant. The final Distribution Plan shall be submitted, and be acceptable, to the Commission staff.

3.  Within 60 days of the date of the entry of the Order, Respondents shall require the Independent Distribution Consultant to submit the Distribution Plan for the administration and distribution of disgorgement and penalty funds pursuant to Rule 610 [17 C.F.R. § 201.610] of the Commission's Rules of Practice. Following a Commission order approving a final Distribution Plan, as provided in Rule 613 [17 C.F.R. § 201.613] of the Commission's Rules of Practice, Respondents shall require that the Independent Distribution Consultant, with Respondents, take all necessary and appropriate steps to administer the final Distribution Plan.

4.  Within 90 days of the entry of the Order, based on this

Distribution Plan, the Respondents shall require the Independent Distribution Consultant to calculate the amount that should be distributed to the FT Funds. Respondents shall require the Independent Distribution Consultant to oversee the actual distribution of the monies to the FT Funds, which shall take place no later than 120 days from the entry of the Order.

5. Respondents shall cooperate fully with the Independent Distribution Consultant and shall provide the Independent Distribution Consultant with access to their files, books, records and personnel as reasonably requested by the IDC or required by the Distribution Plan. Respondents shall use their best efforts to provide the Independent Distribution Consultant access to the files, books, records and personnel of other Franklin Resources, Inc. subsidiaries as reasonably requested by the IDC or required by the Distribution Plan.

6. To ensure the independence of the Independent Distribution Consultant, Respondents: (i) shall not have the authority to terminate the Independent Distribution Consultant, without prior written approval of the Commission's staff; (ii) shall compensate the Independent Distribution Consultant, and persons engaged to assist the Independent Distribution Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; (iii) shall not be in and shall not have an attorney-client relationship with the Independent Distribution Consultant and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Distribution Consultant from transmitting any information, reports, or documents to the Commission or the Commission's staff.

7. To further ensure the independence of the Independent Distribution Consultant for the period of the engagement and for a period of two years from completion of the engagement, Respondents shall require that the Independent Distribution Consultant not enter into any employment, consultant, attorney-client, auditing or other professional relationship with FT, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity. Respondents shall further require that any firm with which the Independent Distribution Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the Commission's staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with FT, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement. The foregoing to the contrary notwithstanding, Respondents may retain the same Independent Distribution Consultant that FA has retained in connection with the order styled In the Matter of Franklin Advisers, Inc., Rel. No. IA-2271 (the "Market Timing Settlement"), to fulfill the obligations set forth in this Section.

C. **Certification.** No later than twenty-four months after the date of

entry of the Order, the Presidents of FA and FTDI shall certify to the Commission in writing that FA and FTDI have fully adopted and complied in all material respects with the undertakings set forth in this section or, in the event of material non-adoption or non-compliance, shall describe such material non-adoption and non-compliance.

D. **Recordkeeping.** Respondents shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record of their compliance with the undertakings set forth in this section.

E. **Deadlines.** For good cause shown, the Commission's staff may extend any of the procedural dates set forth above.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions specified in the Offer submitted by Respondents.

Accordingly, it is hereby ORDERED that:

A. FA and FTDI are censured.

B. FA shall cease and desist from committing or causing any violations and any future violations of Sections 206(2) of the Advisers Act,and Sections 17(d) and 34(b) of the Investment Company Act and Rule 17d-1 thereunder.

C. FTDI shall cease and desist from committing or causing any violations and any future violations of Section 206(2) of the Advisers Act and Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder.

D. FTDI shall pay, within 30 days of the entry of the Order, disgorgement in the amount of $1 ("Disgorgement"). FTDI and FA shall each pay, within 30 days of the entry of the Order, civil money penalties in the amount of $10 million ("Penalties"), for a total payment of $20,000,001. Such payments shall be: (1) made by wire transfer, United States postal money order, certified check, bank cashier's check or bank money order; (2) made payable to the Securities and Exchange Commission; (3) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Alexandria, Stop 0-3, VA 22312; and (4) submitted in connection with a cover letter that identifies FA and FTDI as Respondents in these proceedings, the file number of these proceedings, a copy of which cover letter and wire confirmation, money order or check shall be sent to Helane Morrison, District Administrator, San Francisco District Office, U.S. Securities and Exchange Commission, 44 Montgomery, Suite 2600, San Francisco, CA 94104. Such civil money penalty may be distributed pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 ("Fair Fund distribution"). Regardless of whether any such

Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that they shall not, after offset or reduction in any Related Investor Action based on Respondent's payment of disgorgement in this action, further benefit by offset or reduction of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

E.  Respondents shall comply with the undertakings enumerated in paragraph 20 above.


By the Commission.


Jonathan G. Katz
Secretary


**Endnotes**

---

[1] The findings herein are made pursuant to Respondents' Offer and are not binding on any other person or entity in this or any other proceeding.

[2] FA and FTDI are wholly owned subsidiaries of Franklin Resources, Inc., a Delaware corporation headquartered in San Mateo, California, which has securities registered under Section 12(g) of the Securities Exchange Act of 1934 and files periodic reports with the Commission. Franklin Resources, Inc. and its subsidiaries operate under the name "Franklin Templeton Investments," here shortened to "FT." Through its subsidiaries, FT provides a broad range of investment advisory, investment management, and related services to open-end investment companies, including a family of over 100 retail mutual funds, referred to herein as the "FT funds."

[3] "Willfully" as used with respect to the direct violations in this Order means intentionally committing the act that constitutes the violation. *See Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000); *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965). There is no requirement that the actor also be aware that it is violating one of the Rules or Act.

[4] "Willfully" as used with respect to the aiding and abetting violations in this Order means knowingly committing the act which constitutes the violation,

see *Wonsover v. SEC*, 205 F.3d 408, 418 (D.C. Cir. 2000); *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965)."

*http://www.sec.gov/litigation/admin/34-50841.htm*

---

Home | Previous Page                                    Modified: 12/13/2004