**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| In re: COLUMBIA ENTITIES LITIGATION | ) ) ) ) ) ) ) ) ) | Civil Action No. 04cv11704 (REK) |
|  |  | Consolidated Case Nos: |
|  |  | 04cv11750 |
|  |  | 04cv11760 |
|  |  | 04cv11953 |

**COLUMBIA DEFENDANTS'**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Frances S. Cohen (BBO #542811)
DECHERT LLP
200 Clarendon Street, 27th Floor
Boston, MA 02116
Tel: (617) 728-7100
Facsimile: (617) 426-6567

Michael S. Doluisio
Nory Miller
DECHERT LLP
1717 Arch Street
Philadelphia, PA 19103
Tel: (215) 994-4000
Facsimile: (215) 994-2222

Brien T. O'Connor (BBO #546767)
Giselle J. Joffre (BBO # 658047)
ROPES & GRAY LLP
One International Place
Boston, MA 02110-2624
(617) 951-7000

Richard J. Rosensweig (BBO# 639547)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110
(617) 482-1776

OF COUNSEL:
Phil C. Neal ARDC #2023369
Mark A. Rabinowitz ARDC #3122026
Dao L. Boyle ARDC #6269407
Jenny S. Kim ARDC #6277785
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
(312) 269-8000

*Counsel for FleetBoston Financial
Corporation, a/k/a Bank of America
Corporation, Columbia Management
Group, Inc., Columbia Management
Advisers, Inc., Columbia Wanger Asset
Management, L.P. and Columbia Funds
Distributor, Inc.*

*Counsel for Defendants Columbia
Funds Trusts and Columbia Funds,
excluding Columbia Acorn Trust
and Columbia Acorn Funds*

*Counsel for Defendants Charles P.
McQuaid and Ralph Wanger Inc.*

## TABLE OF CONTENTS

**Page**

I. THE CONCLUSORY ALLEGATIONS DO NOT SATISFY RULE 12(b)(6)............. 14

II. PLAINTIFFS LACK STANDING TO ASSERT CLAIMS REGARDING THE 79 FUNDS THEY DID NOT OWN OR TO SUE ON THEIR BEHALF ...................... 14

    A. Direct claims ................................................................................... 16

    B. Derivative claims ............................................................................ 16

III. COUNTS I AND II ALSO SHOULD BE DISMISSED BECAUSE NO PRIVATE RIGHT OF ACTION EXISTS UNDER SECTIONS 34(b) OR 36(a) OF THE ICA............................................................................................. 18

    A. Under the Analysis Required By Recent Supreme Court and First Circuit Decisions, No Private Right of Action Can Be Inferred Here............................. 18

    B. Congress Manifested No Intent to Confer a Private Right of Action to Enforce Section 34(b) .................................................................. 21

    C. Congress Manifested No Intent to Confer a Private Right of Action to Enforce Section 36(a) .................................................................. 23

IV. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF 36(b) .................. 25

V. COUNT IV SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 48(A) OF THE ICA.................. 36

    A. No Private Right of Action Exists Under Section 48(a) ....................................... 36

    B. Plaintiffs Have Failed To State a Claim for a Primary Violation of the ICA...... 37

    C. Plaintiffs Fail To Allege Facts Supporting Their Allegations of "Control."....... 37

VI. PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 215 OF THE IAA .................................................................................................... 38

VII. PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED BY SLUSA..................... 40

    A. The Five Criteria ............................................................................. 40

    B. Plaintiffs Allege Both Misrepresentation and Manipulative Contrivances In Connection With Purchases of Securities......................................... 41

    C. Plaintiffs' "Holder" Language Does Not Avoid SLUSA Preemption................. 43

    D. Plaintiffs Do Not Avoid SLUSA Preemption By Excising Parts of Allegations ................................................................................... 45

VIII. BY ASSERTING DIRECT CLAIMS AND FAILING TO MAKE A DEMAND ON THE FUNDS, PLAINTIFFS FAIL TO STATE CLAIMS UNDER STATE LAW, SECTIONS 34(b), 36(a), OR 48(a) OF THE ICA, OR SECTION 215 OF THE IAA.................................................................................... 47

**TABLE OF CONTENTS**
(continued)

**Page**

A.  The Excessive Fee/Commission Claims Can Only Be Brought
    Derivatively..................................................................................... 47

B.  Plaintiffs' Failure to Make Presuit Demands on the Funds Precludes the
    Derivative Claim and Conversion of Direct Claims to Derivative Ones............. 50

IX.  PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON LAW BREACH OF
     FIDUCIARY DUTY OR UNJUST ENRICHMENT ...................................................... 54

# TABLE OF AUTHORITIES

## CASES

In re Agent Orange Prod. Liability Litigation, 373 F. Supp. 2d 7
(E.D.N.Y. Mar. 28, 2005) ............................................................24

Alexander v. Sandoval, 532 U.S. 275 (2001) ..................................... *passim*

American Timber & Trading Co. v. Niedermeyer, 558 P.2d 1211 (Or. 1976)...............56

Araujo v. John Hancock Life Insurance Co., 206 F. Supp. 377 (E.D.N.Y. 2002)...........42

Baillie v. Columbia Gold Mining Co., 166 P. 965 (Or. 1917).........................51, 52

Behlen v. Merrill Lynch, 311 F.3d 1087 (11th Cir. 2002)............................40

Benak v. Alliance Capital Management L.P. 2004 WL 1459249 (D.N.J. 2004) ...........25

Bessette v. Bessette, 385 Mass. 806 (1982) .......................................47

Blasberg v. Oxbow Power Corp., 934 F. Supp. 21 (D. Mass. 1996)....................48

Blum v. Yaretsky, 457 U.S. 991 (1982) ...........................................15

Bonano v. East Caribbean Airline Corp., 365 F.3d 81 (1st Cir. 2004)................. *passim*

Boston Children's Heart Foundation v. Nadal-Ginard, 73 F.3d 429 (1st Cir. 1996) .........55

California v. Sierra Club, 451 U.S. 287 (1981) ...................................21

Cannon v. University of Chicago, 441 U.S. 677 (1979)..............................23

Cape Ann Investors LLC v. Lepone, No. 00-11531-RGS, 2003 U.S. Dist. LEXIS
22458 (D. Mass. Dec. 15, 2003) ..........................................44

Caplener v. U.S. National Bank of Oregon, 857  P.2d 830 (Or. 1993) .................49

Chamberlain v. Aberdeen Asset Management Ltd., CIV. No. 02 CV 5870 (SJ),
2005 WL 195520 (E.D.N.Y. Jan. 21, 2005) .................................24

Clark v. Nevis Capital Management, LLC, CIV. A. No. 04-2702, 2005 WL
488641 (S.D.N.Y. Mar. 2, 2005) ..........................................38

Cohen v. Citibank, N.A., 954 F. Supp. 621 (S.D.N.Y. 1996) .........................39

Correctional Services Corp. v. Malesko, 534 U.S. 61 (2001) ........................18

Dabit v. Merrill Lynch Pierce Fenner & Smith, 395 F.3d 25 (2d Cir. 2005) ...................43

Daily Income Fund, Inc. v. Fox, 464 U.S. 523 ...................................35

*In re Dean Witter Partnership Litigation*, No. Civ. A. 14816, 1998 WL 442456 (Del. Ch. July 17, 1998)............................................................................................16

*Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501 (1997) ........................56

*Deutschman v. Beneficial Corp.*, 761 F. Supp. 1080 (D. Del. 1991) ........................44

*Diamond v. Charles*, 476 U.S. 54 (1986)..................................................................15

*Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569 (S.D.N.Y. 2001)................22

*Dudek v. Prudential Securities, Inc.*, 295 F.3d 875 (8th Cir. 2002) ........................45

*Dull v Arch*, CIV. A. No. 05-140, 2005 U.S. Dist. LEXIS 14988 (N.D. Ill. July 27, 2005)............................................................................................24

*Durfee v. Durfee & Canning, Inc.*, 323 Mass. 187 (1948) ..................................56

*In re Eaton Vance Corp. Securities Litigation*, 220 F.R.D. 162 (D. Mass. 2004) ............15

*In re Eaton Vance Mutual Funds Fee Litigation*, No. 04-1144, 2005 U.S. Dist. LEXIS 15731 (S.D.N.Y. July 29, 2005)........................................................*passim*

*Feitelberg v. Merrill Lynch & Co.*, 353 F.3d 765 (9th Cir. 2003)..............................43

*Gartenberg v. Merrill Lynch Ready Assets Trust*, 694 F.2d 923 (2d Cir. 1982).........26, 27

*Gilliam v. Fidelity Management & Research Company*, 2005 U.S. Dist. LEXIS 10478, (D. Mass).........................................................................................28

*Glatzer v. Bear, Stearns & Co.*, No. 04-Civ.-8380, 2005 WL 1571981 (S.D.N.Y. July 5, 2005) ............................................................................14

*Gonzaga University v. Doe*, 536 U.S. 273 (2002)......................................*passim*

*Goodwin v. Agassiz*, 283 Mass. 358 (1933).................................................54

*Green v. Fund Asset Management*, 286 F.3d 682 (3d Cir. 2002).......................25, 30, 34

*Green v. Fund Asset Management, L.P.*, 147 F. Supp. 2d 318 (D.N.J. 2001)................35

*Green v. Nuveen Advisory Corp.*, 295 F.3d 738 (7th Cir. 2002) ............................25, 30

*Harhen v. Brown*, 431 Mass. 838 (2000).....................................................53, 57

*Heit v. Baird*, 567 F.2d 1157 (1st Cir. 1977)..................................................48

*Henry v. Circus Circus Casinos, Inc.*, 223 F.R.D. 541 (D. Nev. 2004)......................16

*ING Principal Protection Funds Derivative Litigation*, 369 F. Supp. 2d 163 (D. Mass. 2005)........................................................................27, 32, 51

Jacobs v. Brenner, CIV. A. No. 05-143, 2005 WL 1719307 (N.D. Ill. July 20, 2005) ................................................................................................................24

Jernberg v. Mann, 358 F.3d 131 (1st Cir. 2004) ........................................................49

Kahn v. Sprouse, 842 F. Supp. 423 (D. Or. 1993) ..........................................47, 54

Kamen v. Kemper Fin. Servs., 500 U.S. 90 (1991) ........................................47

Kamen v. Kemper Fin. Servs., 939 F.2d 458 (7th Cir. 1991) ..........................53

In re Kauffman Mutual Fund Actions, 479 F.2d 257 (1st Cir. 1973) ..............52

Kauffman v. The Dreyfuss Fund, Inc., 434 F.2d 727 (3d Cir. 1970) ......16, 17, 50

King v. Douglass, 973 F. Supp. 707 (S.D. Tex. 1996) ......................................20

Kircher v. Putnam Funds Trust, 403 F.3d 478 (7th Cir. 2005) .....................40, 43

Korsinsky v. Salomon Smith Barney Inc., 2002 WL 27775
    (S.D.N.Y. Jan. 10, 2002) ........................................................................45

Krantz v. Fidelity Mgmt. & Research Co., 98 F. Supp. 2d 150
    (D. Mass. 2000) .............................................................................. *passim*

Krantz v. Prudential Invs. Fund Mgmt. LLC, 305 F.3d 140 (3d Cir. 2002) ........... *passim*

Krinsk v. Fund Asset Management, Inc., 715 F. Supp. 472 (S.D.N.Y. 1988) ...............33

Lander v. Hartford Life & Annuity Insurance Co., 251 F.3d 101 (2d Cir. 2001) ...........39

Lessler v. Little, 857 F.2d 866 (1st Cir. 1988) ........................................................32

Levy v. Alliance Capital Mgmt., 1998 WL 744005 (S.D.N.Y. Oct. 26, 1998) ...............24

Lewis v. Chiles, 719 F.2d 1044 (9th Cir. 1983) .....................................................47

Lewis v. Graves, 701 F.2d 245 (2d Cir. 1983) .......................................................52

Loewen v. Galligan, 882 P.2d 104 (Or. Ct. App. 1994) .....................................47, 52

Marcus v. Putnam, 60 F.R.D. 441 (D. Mass. 1973) .............................................49

McConnell v. FEC, 540 U.S. 93 (2003) ...........................................................14, 15

McLachlan v. Simon, 31 F. Supp. 2d 731 (N.D. Cal. 1998),
    *aff'd in relevant part*, 262 F.3d 923 (9th Cir. 2001) ........................................37

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ..............................................22, 36

Meyer v. Oppenheimer Management Corp., 764 F.2d 76m (2d Cir. 1985) .................34

Meyer v. Oppenheimer Management Corp., 895 F.2d 861 (2d Cir. 1990) .......................32

Migdal v. Rowe Price-Fleming Int'l Inc., 248 F.3d 321 (4th Cir. 2001) ................... *passim*

Mills v. Electric Auto-Lite Co., 396 U.S. 375 (1970) .......................................................38

Mutchka v. Harris, 373 F. Supp. 2d 1021, (C.D. Cal. June 8, 2005)........................24, 35

Nenni v. Dean Witter Reynolds, Inc., No. 98-12454-REK, 1999 U.S. Dist.
    LEXIS 23351 (D. Mass. Sept. 29, 1999) ...................................................................15

North v. Union Savings & Loan Association, 117 P. 822 (Or. 1911) ...............................51

Nuveen Fund Litigation, CIV. A. No. 94-360, 1996 WL 328006
    (N.D. Ill. 1996)......................................................................................................25, 30

Olmsted v. Pruco Life Ins. Co. of New Jersey, 283 F.3d 429 (2d Cir. 2002)............ *passim*

In re Pharm. Indus. Average Wholesale Price Litig., 339 F. Supp. 2d 165
    (D. Mass. 2004)..........................................................................................................20

Prager v. Knight/Trimark Group Inc., 124 F. Supp. 2d 229 (D.N.J. 2000) .....................45

Press v. Quick & Reilly, Inc., 218 F.3d 121 (2d Cir. 2000) ...........................................8, 9

Prof. Mgmt. Assocs., Inc. v. KPMG, 355 F.3d 800 (8th Cir. 2003)................................43

Ramos v. Patrician Equities Corp., 765 F. Supp. 1196 (S.D.N.Y. 1991) ........................15

Riley v. Merrill Lynch Pierce Fenner & Smith, 292 F.3d 1334 (11th Cir. 2002) ............43

Rowinski v. Salomon Smith Barney Inc., 398 F.3d 294 (3d Cir. 2005)................... *passim*

Russello v. United States, 464 U.S. 16 (1983)..................................................................24

SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963) ................................39

SEC v. Zandford, 535 U.S. 813 (2002)...........................................................................42

Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133 (2d Cir. 2004) .....................................52

Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg,
    405 Mass. 506 (1989) .................................................................................................55

Sears v. Orchards Water Co., 236 P. 502 (Or. 1925)......................................................55

Shapira v. Budish, 275 Mass. 120 (1931) ........................................................................48

Slomiak v. Bear Sterns & Co., 597 F. Supp. 676 (S.D.N.Y. 1984)..................................39

Smothers v. Benitez, 806 F. Supp. 299 (D.P.R. 1992) .....................................................24

Spiegel v. Beacon Participations, Inc., 297 Mass. 398 (1937) ........................................55

Symmons v. O'Keefe, 419 Mass. 288 (1995) ............................................................47, 57

Touche Ross & Co. v. Redington, 442 U.S. 560 (1979)........................................18, 19, 21

Transamerica Mtg. Advisors, Inc. v. Lewis, 444 U.S. 11 (1979) ................................19, 21

United States v. Melrose Wakefield Hospital, 360 F.3d 220 (1st Cir. 2004) ...................13

In re Van Wagoner Funds, Inc. Sec. Litig., No. 02-03383, 2004 WL 2623972
    (N.D. Cal. July 27, 2004)........................................................................................22

Verkouteren v. Blackrock Fin. Mgmt., Inc., 37 F. Supp. 2d 256 (S.D.N.Y. 1999),
    *aff'd without op,* 208 F.3d 204 (2d Cir. 2000) ......................................................53

Werbowsky v. Collomb., 766 A.2d 123 (2001)................................................................53

White v. Heartland High-Yield Municipal Bond Fund, 237 F. Supp. 2d 982 (E.D.
    Wis. 2002)..............................................................................................................22

Wicks. v. Putnam, C.A. No. 04-10988 GAO, 2005 U.S. Dist. LEXIS 4892
    (March 28, 2005) ...................................................................................................27

Williams v. Bank One Corp., No. 03 C 8561, 2003 WL. 22964376 (N.D. Ill.
    2003) ......................................................................................................................17

In re Worldcom, Inc., 263 F. Supp. 2d 745 (S.D.N.Y. 2003)............................................45

Yampolsky v. Morgan Stanley Investment Advisers, CIV. A. No. 03-5710, 2004
    WL 1065533 (S.D.N.Y. May 12, 2004) ............................................................27, 28

Zerman v. Jacobs, 510 F. Supp. 132 (S.D.N.Y. 1981) .....................................................39

Zoren v. Genesis Energy, L.P., 195 F. Supp. 2d 598 (D. Del. 2002) ...............................42

Zurich Capital Mkts. Inc. v. Cogliese, 332 F. Supp. 2d 1087 (N.D. Ill. 2004)..............54

# STATUTES AND LEGISLATIVE MATERIALS

Securities Litigation Uniform Standards Act, 15 U.S. C. §§77p, 78bb(f) ................. *passim*

National Securities Markets Improvement Act, 15 U.S.C. § 77r(a)(2) ........................... 42

Private Securities Litigation Reform Act, 15 U.S.C. §§ 77z-1, 78u-4 ............................... 4

Securities Exchange Act of 1934, 15 U.S.C. § 78bb(e) ........................................... *passim*

Investment Advisors Act of 1940, 15 U.S.C. § 78cc(b) ........................................... 5

15 U.S.C. § 80a-2(a)(9) ........................................................................... 36

15 U.S.C. § 80(a)-2 ........................................................................... 37

15 U.S.C. § 80a-33(b) ........................................................................... 20

15 U.S.C. § 80a-35(a) ........................................................................... *passim*

15 U.S.C. § 80a-35(b) ........................................................................... *passim*

15 U.S.C. § 80a-47(a) ........................................................................... 3-36

15 U.S.C. § 80b-15(b) ........................................................................... 38

H.R. Rep. No. 105-803 (1998) ........................................................................... 39

S. Rep. No. 91-184 (1969) ........................................................................... 24

Mass. Gen. Laws ch. 156B, § 65 ........................................................................... 55

Mass. Gen. Laws ch. 156D, § 7.42 ........................................................................... 50

Mass. Gen. Laws ch. 156D, § 8.30 ........................................................................... 55

Mass. Gen. Laws ch. 156D, § 8.42 ........................................................................... 55

ORS § 60.357 ........................................................................... 55

ORS § 60.261 ........................................................................... 51

# REGULATIONS AND ADMINISTRATIVE MATERIALS

17 C.F.R. § 240.10b-10 ........................................................................... *passim*

17 C.F.R. § 270.12b-1 ........................................................................... 10, 11

17 C.F.R. § 270.17d-3(a) ........................................................................... 31

Fed. R. Civ. P. 23.1 ........................................................................... 17

Inv. Co. Act Rel. No. IC. 26591, 69 Fed. Reg. 54728 (Oct. 14, 2004) ..............................12

Inv. Co. Act Rel. No. 26356, 69 Fed. Reg. 9701 (Mar. 1, 2004)..................................8, 10

Inv. Co. Act Rel. No. IC. 26341, 69 Fed. Reg. 6438 (Feb. 10, 2004) ................................7

Inv. Co. Act Rel. No IC. 16431, 53 Fed. Reg. 23258 (June 21, 1988)..............................29

Rel. No. 34-23170, 51 Fed. Reg. 16004 (Apr. 30, 1986) .................................................12

Inv. Co. Act. Rel. No. 11622, 46 Fed. Reg. 16012 (Mar. 10, 1981)...................................10

Inv. Co. Act Rel. No. IC. 11414, 45 Fed. Reg. 73898 (Nov. 7, 1980) ................................8

SEC, Fed. Sec. L. Rep. *(CCH)* ¶ 86,211 (Oct. 14, 1999) ..................................................53

## MISCELLANEOUS

Testimony Concerning The Mutual Funds Integrity and Fee Transparency Act of
2003 of Paul F. Roye, http://www.sec.gov/news/testimony/061803tspfr.htm ..............8

1 ALI, *Principles of Corporate Governance: Analysis and Recommendations*
§ 1.23 (1994).........................................................................................................52, 57

O'Neal, *Purchase and Redemption Patterns of US Equity Mutual Funds,*
Financial Management 63 (April 1, 2004)..................................................................44

The Columbia defendants submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Class Action Complaint ("Compl.") pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## INTRODUCTION

Using a "prototype" complaint filed against more than a dozen mutual fund families, plaintiffs ask this Court to fashion new remedies that Congress chose not to provide, in order to penalize industry-wide conduct that both Congress and the SEC chose not to prohibit.[2] Not surprisingly, motions to dismiss have been filed in many of these cases. The first and only decision to rule on sufficiency of the prototype complaint, *In re Eaton Vance Mutual Funds Fee Litigation*, 2005 U.S. Dist Lexis 15371, at *59 (S.D.N.Y.), decided on July 29, 2005, dismissed the complaint in its entirety. For the reasons set forth below, this Court should do so, as well.

The complaint objects to the practices known as "revenue sharing," "directed brokerage," "12b-1 payments," and "soft dollars," which have been the subject of considerable coverage in the press in recent years. To construct the prototype complaint, plaintiffs and their counsel rely

---

[1] The following defendants join this memorandum: Bank of America Corporation, Columbia Management Group, Inc., Fleet Boston Financial Corporation, Columbia Management Advisors, Inc., Columbia Wanger Asset Management, Inc., Columbia Funds Distributor, Inc., Columbia Funds Trust, Columbia Funds, and Columbia Acorn Funds, and Ralph Wanger and Charles P. McQuaid. Individual defendants, Joseph R. Palombo, J. Kevin Connaughton, P. Zachary Egan, Kevin S. Jacobs, Kenneth A. Kalina, Bruce H. Lauer, Jean Loewenberg, Robert A. Mohn, Louis J. Mendes, Todd Narter, Christopher Olson, Jon H. Park, Vincent P. Pietropaolo, Joseph Turo, and Leah J. Zell, have not yet been served. These defendants are current or former employees of the Columbia defendants and, at the request of plaintiffs, the Columbia defendants are in the process of contacting the individual defendants to determine whether Columbia defendants' counsel may accept service on their behalf. The remaining individual defendants are independent trustees and have filed a separate motion to dismiss and memorandum.

[2] Using the prototype complaint, plaintiffs have filed one or more actions against the following mutual fund complexes, in addition to this suit against the Columbia funds: AIM/INVESCO, Alliance, Capital Group, Davis, Deutsche Bank, Dreyfus, Eaton Vance, Evergreen, Federated, Fidelity, Franklin, Hartford, Lord Abbett, MFS, Oppenheimer and PIMCO. Exhibit A to this memorandum identifies these cases by federal court and docket number.

heavily on popular and editorial commentary on these practices in general, and reports that some broker-dealers and fund companies -- not any of the defendants in this case -- have reached settlement agreements with the SEC relating to the way they have disclosed specific distribution practices. Predictably, given the sources, the complaint suffers from confusion about both the laws that govern mutual fund distribution and the relevant facts. In addition, the use of the prototype complaint has lead to an utter lack of specificity regarding the Columbia defendants.

Defendants move to dismiss because of plaintiffs' failure to properly plead a single valid cause of action, and this brief will address each alleged cause of action and the relevant case law. At the outset, however, it may be useful to identify, and dispel, a few of the fundamental mutual fund "myths" that are at the heart of the complaint, and that might otherwise cloud the procedural and pleading issues.

The myths emerge in the critical portion of the complaint captioned "Substantive Allegations." Compl. ¶¶75-103. These paragraphs outline the basic "substance" of the charges as follows: The defendants "used improper means to acquire 'shelf-space' at brokerages," "paid brokerages to push unwitting clients into Columbia Funds," and "concealed their practices from investors;" finally, the "shelf space program created undisclosed conflicts of interest." The bulk of these paragraphs do no more than quote the websites of eight broker-dealers to the effect that the brokers receive payments from a number of mutual fund sponsors (including the defendants) whose funds the brokers sell.

In general, these myths arise from the complaint's failure to recognize that Congress and the SEC have always been fully aware that the sponsorship and distribution of mutual funds raise serious conflicts of interest. Still, when faced with the option of outlawing mutual funds because of them, Congress decided that the conflicts were not, as plaintiffs allege, "insurmountable," and

instead decided to adopt a carefully calibrated regulatory scheme that controls these conflicts by assigning different duties and responsibilities to various industry participants, depending on the role they play.

**Myth No. 1**: It is illegal for mutual fund sponsors to "pay for shelf space" or make "revenue sharing" payments to the broker-dealers who sell their funds.

**Reality**: It has been and remains legal -- indeed it is an essential and SEC- sanctioned part of the broker sold fund business - for fund sponsors to use their legitimate profits to pay selling broker dealers for "shelf space."

**Myth No. 2**: SEC rules require mutual fund sponsors to disclose that they pay for shelf space.

**Reality**: There is no SEC rule requiring such disclosure by mutual fund sponsors. Broker dealers that sell mutual funds, like Morgan Stanley, may have an obligation under the Securities Exchange Act of 1934 and SEC Rule 10b-10, the SEC's confirmation rule, to tell their customers that they received compensation in connection with the sale of mutual funds. Rule 10b-10 was adopted, in part, because the *selling broker* may have a conflict of interest when he or she is being paid extra to sell a particular security, and the customer should know about it.

Even though they are not required to do so, funds have traditionally provided in their offering documents some disclosure that their sponsors make revenue sharing payments to selling broker-dealers, as Plaintiffs concede Defendants have done. Sometimes broker-dealers seek to fulfill their own disclosure obligation by reference to the funds' disclosure, which may or may not be adequate to fulfill the broker's independent disclosure obligation. The SEC settlements with broker-dealers thus sometimes address the funds' disclosure of revenue sharing in the context of the adequacy of the broker's disclosure, not any obligation of the fund sponsors.

**Myth No. 3:**  Directed brokerage, that is, a fund's use of portfolio commissions to recognize the sale of fund shares, was illegal during the period covered by the complaint.

**Reality:**  Until last year, directed brokerage was widespread, well-known to the SEC, and expressly contemplated under NASD rules approved by the SEC.  There were limits, of course, and in 2004 the SEC prohibited the practice.  This rule-making action, however, only serves to emphasize that, absent the change, the practice as contemplated by the NASD rule was legal.

**Myth No. 4:**  The SEC has sued mutual fund sponsors for making revenue sharing payments and not disclosing them to shareholders.

**Reality:**  As explained above, this is not the case, because revenue sharing is not illegal and SEC rules do not require fund sponsors to disclose these payments.  The SEC has settled enforcement charges *against broker dealers* for not disclosing revenue sharing payments under rule 10b-10 and other disclosure rules.  The charges that the SEC has brought against fund sponsors relate to certain specific aspects of the use of *"directed brokerage"* practices, primarily related to the disclosure of those practices.

**Myth No. 5:**  Mutual fund shareholders have the right to sue fund sponsors for any violation of law.

**Reality:**  To guard against meritless strike suits, Congress has taken a number of steps that strictly limit the remedies available to mutual fund shareholders.  Congress has imposed strict pleading requirements on disclosure related suits under  Section 10 of the Securities Act of 1934 and SEC Rule 10b-5.  Presumably, plaintiffs have dispensed with those causes of action because they cannot meet the heightened pleading and other anti-strike suit requirements imposed on such claims by the Private Securities Litigation Reform Act, 15 U.S.C. §§ 77z-1 and 78u-4.  In attempting an end run around this legal framework, plaintiffs attempt to shoehorn their

- 4 -

case into federal claims under the 1940 Investment Advisers' Act ("IAA") and Investment

Company Act ("ICA") and to assert state causes of action that Congress has expressly preempted

in the Securities Litigation Uniform Standards Act of 1988 ("SLUSA").

None of plaintiffs' claims survive.  Plaintiffs lack standing to sue with respect to, or on

behalf of, 79 of the 81 funds at issue because they allege ownership in only two of the funds.

Part II.  As to the two funds remaining, plaintiffs cannot recover under three of the  federal

causes of action alleged, under Sections 34(b), 36(a), and 48(a) of the ICA because Congress did

not expressly or impliedly provide a private right of action.  Parts III, V.  Moreover, the

allegations with regard to Sections 36(b) and 48(a) of the ICA, and Section 215 of the IAA are

insufficient to support the elements of the claims they assert – parroting instead the words of the

statutory provisions or common law causes of action they invoke without alleging facts

suggesting that the provisions or causes of action apply here.  Parts I, IV, V, VI, IX.

Plaintiffs' state law claims not only fail to state any recognizable claim under state law,

but are also expressly preempted by SLUSA.  Parts VII, IX.  Plaintiffs also cannot recover

alleged overpayments by the funds on behalf of themselves and a class of shareholders because

such claims belong to the funds.  Part VIII.  Yet plaintiffs have precluded themselves from

bringing derivative claims, including the one claim they assert derivatively under the IAA, by

declining to make the required presuit demand on the boards of the funds.  Part VIII (B).

For the reasons below, plaintiffs' complaint should be dismissed with prejudice.

## THE ALLEGATIONS OF THE COMPLAINT

**The Plaintiffs.**  Four Columbia fund shareholders purport to bring this case on behalf of

a class "consisting of all persons or entities who held shares, units, or like interests in any of the

Columbia Funds between August 2, 1999 and March 22, 2004 inclusive . . . and who were

damaged thereby." Compl. ¶¶18-21, 163.  Plaintiffs seek to represent class members as to claims

involving 81 separate Columbia Funds (the "Funds"), managed by two different advisers and

governed by two wholly separate boards of trustees.  The four plaintiffs, however, collectively

allege ownership in only two Funds, the Columbia Acorn Fund and the Columbia Acorn Select

Fund.  *Id.* ¶¶18-21.  Both of *these* Funds are managed by Columbia Wanger Asset Management

and governed by the "Acorn" funds board of trustees, as are four others of the 81 funds named in

the complaint.  The remaining 75 funds are managed by Columbia Management Advisors.

*Compare, e.g.,* May 1, 2003 Statement of Additional Information, Liberty Acorn Trust (n/k/a

Columbia Acorn Trust) at 1 ("Columbia Acorn SAI"), attached as Appendix B; *with* Feb. 1, 2004

Statement of Additional Information, Series of Columbia Funds Trust XI, at 2, 26 ("Columbia

Trust XI SAI"), attached as Appendix C.  There are no overlapping trustees between the two

fund groups.  *Compare* Columbia Acorn SAI at 31-33 *with* Columbia Trust XI SAI at w-bb.

    **The Defendants.**  The Columbia defendants include the two separate mutual fund

advisers, Columbia Management Advisors, Inc. and Columbia Wanger Asset Management, Inc.;

their common distributor, Columbia Funds Distributor, Inc., and their present and former

corporate parents, Fleet Boston Financial Corporation, n/k/a defendant Bank of America

Corporation, and Columbia Management Group, Inc.  *Id.* ¶¶22-27.[3]

    Plaintiffs also sue 81 Columbia Funds to the extent "they may be deemed necessary and

indispensable parties" and to "ensure the availability of adequate remedies."  *Id.* ¶69.  The 81

---

[3] Contrary to plaintiffs' suggestion, the SEC has never concluded that revenue sharing is illegal.
To the contrary, in 2004 the SEC merely proposed – but has never adopted – a rule requiring
fund prospectuses to include a "brief disclosure" regarding revenue sharing that would direct
investors to disclosures by broker-dealers.  *See* Rel. No. IC. 26341, 69 Fed. Reg. 6438, 6463
(Feb. 10, 2004).  Thus, even the SEC's tentative position has been that if more detailed
disclosure is needed, it should be made by brokers at the time of sale.  *See id.* at 6438-39.
Current law imposes the responsibility for disclosure on brokers.  *See* 17 C.F.R. § 240.10b-10.

Funds identified by plaintiffs are not a homogenous group. As explained above, and inconsistently conceded in the complaint, the Columbia Acorn Funds are separately advised by Columbia Wanger; the remaining 75 Funds are advised by Columbia Management, and the two fund groups have wholly separate boards of trustees. *See, supra,* at 3; Compl. ¶¶25n.3, 29-51. Plaintiffs have also sued 23 individuals they allege were trustees of Funds, *id.* ¶¶29-51, and 14 additional individuals they allege were officers of Funds. *Id.* ¶¶53-66. Plaintiffs lump the 37 current and former inside directors, outside directors, and officers together as the "Trustee/Officer Defendants." *Id.* ¶67.

**The Alleged Misconduct.** Plaintiffs claims are based on allegations involving four practices: (1) revenue sharing; (2) directed brokerage; (3) 12b-1 fees; and (4) soft dollars. Although the complaint is larded with references to "kickbacks," "insurmountable, unmanageable conflicts of interest," and an undisclosed motivation to increase assets under management in order to increase advisory fees, *id.* ¶¶2, 3, 12, these four distribution practices have been industry-wide means of distributing broker-sold funds and expressly sanctioned by authorities, including the SEC, the courts, and the NASD, and by industry commentators. The following briefly describes the practices at issue and their regulatory context.

*Revenue sharing.* Revenue sharing refers to the longstanding practice of a fund's adviser or distributor making payments from its own assets – *not* fund assets – to brokerage firms to distribute the funds' shares. *See* Inv. Co. Act. Rel. 26356, 69 Fed. Reg. 9701, 9726 (Mar. 1, 2004) (revenue sharing payments made by "fund advisers from their own assets"). Although the plaintiffs label them "kickbacks," the SEC has long recognized such payments as proper. In 1980, the SEC noted its "long standing position that an adviser may use its 'legitimate' or 'not excessive' profits to finance distribution." *See* Inv. Co. Act. Rel. No. IC. 11414, 45 Fed. Reg.

73898, 73900 (Nov. 7, 1980).  The SEC also noted that "there is no indirect use of fund assets if an adviser makes distribution related payments out of its own resources." *Id.*  Indeed, the Second Circuit has explained that "broker-dealers that sell funds to the public may be compensated" by, among other things, "payments from the fund adviser's own resources." *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 124 n.5 (2d Cir. 2000).

There is no requirement that fund sponsors disclose revenue sharing payments.  *See* Testimony Concerning The Mutual Funds Integrity and Fee Transparency Act of 2003, H.R. 2420 of Paul F. Roye, SEC Director of Investment Management (hereinafter "Roye Testimony") (June 18, 2003), available at http://www.sec.gov/news/testimony/061803tspfr.htm ("mutual funds are not required to disclose [revenue sharing] payments").  Nevertheless, the Funds did, in fact, make such disclosures.  As plaintiffs admit, Compl. ¶148, the May 1, 2003 Columbia Acorn Trust SAI, for example, disclosed that the Columbia Distributor may, "at its expense" make revenue sharing payments, including "cash payments," to brokers:

> LFD [the Distributor] may, at its expense, provide special sales incentives (such as cash payments in addition to the commissions specified in the Funds' SAI) to FSF's [Financial Service Firms] that agree to promote the sale of shares of the Funds or other funds that LFD distributes.  At its discretion, the Distributor may offer special sales incentives only to selected FSFs or to FSFs who have previously sold or expect to sell significant amounts of the Funds' shares.

This disclosure was clearly adequate.  In fact, *Quick & Reilly* held that a fund's general disclosure of revenue sharing satisfied a *broker's* specific obligation under Rule 10b-10 to provide customers with "written notification disclosing . . . the source and amount of any other remuneration received or to be received by the broker in connection with the transaction." *Quick & Reilly*, 218 F.3d at 129.  Thus, far from constituting "undisclosed kickbacks," the revenue sharing alleged here was consistent with SEC guidance and sufficiently disclosed to investors.

*Directed brokerage.*  Plaintiffs also allege that defendants engaged in "directed

brokerage," *i.e.*, that defendants "paid brokerages to push Columbia funds" by awarding brokerages "the business, and resulting commissions, for conducting transactions of the Funds' underlying securities." Compl. ¶2. Plaintiffs allege that directed brokerage "created an undisclosed conflict of interest and caused brokers to steer clients to Columbia Funds regardless of the Funds' investment quality relative to other investment alternatives. . . ." *Id.* ¶133. They also allege that directed brokerage is improper because the ability to award brokerage is a Fund asset that can be used to finance distribution of fund shares only pursuant to a "Rule 12b-1 plan," *i.e.*, a plan detailing how fund assets will be used to finance distribution of fund shares. *Id.* ¶134.

During the putative class period, directed brokerage arrangements were unquestionably legal. In 1981, the SEC – obviously aware of the practice – addressed whether directed brokerage arrangements should be governed by Rule 12b-1. The SEC determined that "it is not inappropriate for investment companies to seek to promote the sale of their shares through the placement of brokerage without the incurring of any additional expense." *See* Inv. Co. Act. Rel. No. 11622, 46 Fed. Reg. 16012, 16012 (Mar. 10, 1981). The SEC also concluded that "considering selling brokers' sales efforts when allocating brokerage would be addressed by the NASD rules governing broker dealers and advisers' fiduciary obligations to seek best execution rather than by . . . rules governing the use of fund assets for distribution," *i.e.*, Rule 12b-1. *See* Inv. Co. Act. Rel. No. IC. 26356, 69 Fed. Reg. 9726, 9728 n. 32 (Mar. 1, 2004).

The NASD, in turn, enacted rules regarding directed brokerage. Far from banning such practices, however, the NASD *permitted* its members to "sell shares of funds that follow a disclosed policy 'of considering sales of their shares as a factor in the selection of broker/dealers to execute portfolio transactions, subject to best execution.'" *Id.* (quoting NASD Conduct Rule 2830(k)(7)(B)). In approving the NASD's rule, the SEC decided that directed brokerage was

"essentially benign." *See id.*

*12b-1 Fees.* Rule 12b-1 allows a fund to use fund assets for distribution of fund shares so long as certain procedural requirements are met. *See* 17 C.F.R. § 270.12b-1(b). A fund is deemed to be a distributor if it engages, directly or indirectly, in financing any activity primarily intended to result in the sale of its shares. *Id.* § 270.12b-1(a)(2). Pursuant to Rule 12b-1, the use of fund assets for distribution must be pursuant to a written plan which describes all material aspects of the proposed financing of distribution. *Id.* § 270.12b-1(b). That plan must be approved, initially, by at least a majority of (1) the fund's outstanding voting securities, (2) the fund's board, and (3) the non-interested directors of the fund. *Id.* § 270.12b-1(b)(1), (2). Directors who vote to approve or continue a Rule 12b-1 plan must conclude, in the exercise of "reasonable business judgment and in light of their fiduciary duties," that there is a "reasonable likelihood" that "the plan will benefit the fund and its shareholders." *Id.* § 270.12b-1(e).[4]

Plaintiffs make two contentions regarding the Funds' 12b-1 plans. First, they contend that revenue sharing payments and directed brokerage involve the use of fund assets that should have been, but were not, included in the 12b-1 plans. Compl. ¶¶136, 146. SEC guidance in effect during the putative class period is contrary. *See* 45 Fed. Reg. at 73902 (revenue sharing payments made by advisers do not constitute an indirect use of fund assets for distribution); 69

---

[4] The Columbia Acorn SAI states, and plaintiffs do not dispute, that these procedural requirements were followed. At 48, it provides:

> The Trustees believe the [12b-1] Plan could be a significant factor in the growth and retention of Fund assets resulting in a more advantageous expense ratio and increased investment flexibility which could benefit each class of Fund shareholders. The Plan will continue in effect from year to tear so long as continuance is specifically approved at least annually by a vote of the Trustees, including the Trustees who are not interested persons of the Trust and have no direct or indirect financial interest in the operation of the Plan or in any agreement related to the Plan (Independent Trustees) cast in person at a meeting called for the purpose of voting on the Plan.

Fed. Reg. at 9728 n. 32 ("the practice of merely considering selling brokers' sales efforts when allocating brokerage" is not subject to "Commission rules governing the use of fund assets for distribution"). Second, plaintiffs contend that 12b-1 fees are never justified because they provide no benefits to fund shareholders. *See, e.g.*, Compl. ¶129. This contention is also contrary to the position of the SEC and the views of courts which have addressed the question, as discussed in detail below. These recognize 12b-1 fees as beneficial to shareholders by enabling them to buy shares without paying front-end sales loads, by leading to economies of scale, and by improving fund liquidity. Plaintiffs' contentions with respect to 12b-1 fees fail as a matter of law.

*Excessive Fees and Soft Dollars.* Plaintiffs' final challenge is to the common practice of advisers' paying brokerage commissions on portfolio transactions that include "soft dollars" – money for research and brokerage services provided by brokers in addition to executing the securities transactions. Compl. ¶¶136-38. "'Soft dollar' arrangements are permitted by securities law." *Krantz v. Fidelity Mgmt. & Research Co.*, 98 F. Supp.2d 150, 156 (D. Mass. 2000). Section 28(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(e) ("Exchange Act"), expressly provides a safe harbor for payment of "soft dollars" by an adviser who "determine[s] in good faith that [the] amount of commission was reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. § 78bb(e)(1). Section 28(e) further provides that no adviser "shall be deemed to have acted unlawfully or to have breached a fiduciary duty" for having done so. *Id.*

As plaintiffs' own complaint acknowledges, the Funds properly disclosed their brokerage allocation and soft dollar policies. *See* Compl. ¶150. The Columbia Acorn SAI provides, at 39:

> With respect to issues of securities involving brokerage commissions when more than one broker or dealer is believed to be capable of providing the best combination of price and execution with respect to a particular portfolio transaction for a Fund, the Adviser often selects a broker or dealer that has

furnished it with research products or services such as research reports, subscriptions to financial publications and research compilations, compilations of securities prices, earnings, dividends and similar data, and computer data bases, quotation equipment and services, research-oriented computer software and services, and services of economists and other consultants. Selection of brokers or dealers is not made pursuant to an agreement or understanding with any of the brokers or dealers; however, the Adviser uses an internal allocation procedure to identify those brokers or dealers who provide it with research products or services and the amount of research products or services they provide, and endeavors to direct sufficient commissions generated by its clients' accounts in the aggregate, including the Funds, to such brokers or dealers to ensure the continued receipt of research products or services that the Adviser feels are useful.

Plaintiffs do not dispute the SAI's disclosure. Instead, plaintiffs vaguely allege – as they have done have in virtually identical complaints against other fund families – that defendants paid commissions that were "excessive" and "on top of any legitimate Soft Dollars." Compl. ¶138. Plaintiffs do not identify any specific commission payments as "excessive." Their sole "factual" assertion regarding soft dollars is that the advisers used them to pay for "overhead costs (for items such as computer hardware and software)," *id.* ¶137. The SEC has stated that computer hardware and software may be purchased with soft dollars, so long as the equipment is used for research. *See* Rel. No. 34-23170, 51 Fed. Reg. 16004, 16006-07 (Apr. 30, 1986).

**The Counts Asserted.** In summary, plaintiffs have identified four practices that were legal, well known to regulators, and disclosed to investors.[5] They frame their allegations as eight claims: (1) violation of Section 34(b) of the ICA by the advisers, distributor, trustees and officers; (2) violation of Section 36(a) of the ICA by the advisers, distributor, trustees and officers; (3) violation of Section 36(b) of the ICA by advisers, distributor, trustees and officers;

---

[5] In late 2004, after the putative class period here, the SEC for the first time issued a rule banning directed brokerage. *See* Inv. Co. Act Rel. No. IC. 26591, 69 Fed. Reg. 54728 (Oct. 14, 2004). That rule is designed to ensure that the "selection of selling brokers for portfolio securities transactions is not influenced by considerations about the sale of fund shares." *Id.* at 54730. Mutual funds are not required to comply until December 13, 2004. *Id.* at 54731. The SEC has not changed the rules with respect to any of the other industry practices alleged by plaintiffs.

(4) violation of Section 48(a) of the ICA by the advisers; (5) for enforcement of Section 215 of

the IAA for violation of Section 206 of the IAA by the advisers, on behalf of the Funds; (6)

breach of fiduciary duty by the advisers; (7) breach of fiduciary duty by trustees and officers; and

(8) unjust enrichment by all defendants. None of the claims may be maintained.

## ARGUMENT

Plaintiffs' federal and state law claims are insufficient as a matter of law. Plaintiffs assert

only conclusory, not factual, allegations and, in each case, the claims are not even available to

plaintiffs. Plaintiffs lack standing to bring any claims with respect to 79 of the 81 funds they

have placed at issue. Most of the federal claims may not be raised in private actions at all. The

state law claims are preempted by federal law and, in any case, unavailable under state law. For

the reasons detailed below, the complaint should be dismissed in its entirety.

## I.    THE CONCLUSORY ALLEGATIONS DO NOT SATISFY RULE 12(b)(6).

As the First Circuit has held:

> even under the liberal pleading requirements of Rule 8(a), a plaintiff must set
> forth factual allegations, either direct or inferential, respecting each material
> element necessary to sustain recovery under some actionable legal theory. . . .
> Simply parroting the language of a . . . cause of action, without providing some
> factual support, is not sufficient to state a claim.

*United States v. Melrose Wakefield Hospital*, 360 F.3d 220, 240 (1st Cir. 2004) (internal

quotations and citation omitted). Thus, "more detail often is required than the bald statement by

plaintiff that he has a valid claim of some type against defendant." *Migdal v. Rowe Price-*

*Fleming Int'l Inc.*, 248 F.3d 321, 326 (4th Cir. 2001) (quoting 5A Charles A. Wright & Arthur R.

Miller, Federal Practice and Procedure § 1357 at 318 (2d ed. 1990)) (affirming dismissal of

shareholders' ICA claims against mutual funds' investment advisers); *see also Glatzer v. Bear,*

*Stearns & Co.*, No. 04-Civ.-8380, 2005 WL 1571981, *1, *5 (S.D.N.Y. July 5, 2005) ("bald

contentions, unsupported characterizations, and legal conclusions are not well-pleaded

allegations, and are insufficient to defeat a motion to dismiss") (internal quotation omitted). Indeed, "[t]his requirement serves to prevent costly discovery on claims with no underlying factual or legal basis." *Migdal*, 248 F.2d at 326.

Plaintiffs here are trying to bring a far-reaching lawsuit that will involve extensive discovery, on the basis of a cookie cutter complaint that makes no particularized claims against the myriad defendants within its sweep. Their "bad contentions, unsupported characterizations, and legal conclusions" for the reasons set forth below "are not well-pleaded allegations" and are insufficient to withstand this motion to dismiss.

## II.    PLAINTIFFS LACK STANDING TO ASSERT CLAIMS REGARDING THE 79 FUNDS THEY DID NOT OWN OR TO SUE ON THEIR BEHALF.

Plaintiffs' own allegations demonstrate that this Court has no basis to exercise jurisdiction under Article III over most of the claims asserted in the complaint. Although plaintiffs assert claims against the advisers, distributors, directors and officers of 81 funds – and nominally against the funds themselves – and on behalf of all 81 funds, plaintiffs allege that they owned shares in only two of these funds. Compl. ¶¶18-21. All claims with respect to the 79 funds in which plaintiffs did not invest should be dismissed because plaintiffs lack the requisite constitutional standing to assert them – as either direct or derivative claims. Plaintiffs also lack statutory standing to maintain derivative or Section 36(b) claims with respect to those 79 funds.

It is well-established that "Article III of the Constitution limits the 'judicial power' to the resolution of 'cases' and 'controversies.'" *McConnell v. FEC*, 540 U.S. 93, 225 (2003). A plaintiff's standing to sue is a bedrock element of the case-or-controversy requirement, *id.*, and a demonstration of the plaintiff's "actual or imminent . . . injury in fact" is one of "the three requirements that constitute the 'irreducible constitutional minimum' of standing." *Id.* Thus, in *McConnell*, the Supreme Court dismissed one of the Senator's claims because he would not be

affected by the statutory provision in question for six years. *Id.* at 226 ("This alleged injury in fact is too remote temporally to satisfy Article III standing.").

Plaintiffs here do not allege that they will *ever* be injured by any conduct with respect to the 79 funds in which they have not invested. They have no "direct stake in the outcome" with respect to those funds, but are merely "'concerned bystanders'" for whom judicial review is not available. *Diamond v. Charles*, 476 U.S. 54, 62 (1986). They also have no indirect stake in the outcome of a suit on behalf of any of the 79 funds in which they do not hold shares. *See, e.g., Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) (plaintiff "who has been subject to injurious conduct of one kind [does not] possess . . . the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.").

### A.    Direct claims

This court is one of several that has already addressed the specific standing issue here and concluded that investors do not have standing to bring claims involving mutual funds in which they did not invest on behalf of a class broad enough to include those who did. *See Nenni v. Dean Witter Reynolds, Inc.*, No. 98-12454-REK, 1999 U.S. Dist. LEXIS 23351, at *6 (D. Mass. Sept. 29, 1999) (class action plaintiff "cannot proceed on the merits of this case as to claims not based on [the] four funds . . . that he actually holds"). *Accord In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162, 169 (D. Mass. 2004) (class action plaintiffs lacked Article III standing to bring claims concerning two of the defendant mutual funds in which they had not invested); *Ramos v. Patrician Equities Corp.*, 765 F. Supp. 1196, 1199 (S.D.N.Y. 1991) ("A plaintiff, including one who is seeking to act as class representative, must have individual standing to assert the claims in the complaint against each defendant being sued by him.") (dismissing claims with respect to the 46 limited partnerships in which plaintiffs had not invested for lack of standing); *In re Dean Witter P'ship Litig.*, No. Civ. A. 14816, 1998 WL 442456, at *2 n.4 (Del.

- 15 -

Ch. July 17, 1998) (finding that class action "plaintiffs do not have standing to assert any claims with respect to" a fund in which they did not invest). *See also Henry v. Circus Circus Casinos, Inc.*, 223 F.R.D. 541, 544 (D. Nev. 2004) ("to establish Article III standing in a class action, at least one named plaintiff must have standing in his own right to assert a claim against each named defendant before he may purport to represent a class claim against that defendant") (dismissing claims for which no plaintiff had individual standing).

For the same reason, plaintiffs here lack standing to bring claims on behalf of a class as to the 79 funds in which they did not invest and with respect to which they have alleged no injury.

### B.    Derivative claims

Even more importantly in this case, plaintiffs also lack standing to bring claims *on behalf of* the funds they did not own. Plaintiffs purport to bring only one claim derivatively – their Section 215 claim. However, as discussed in detail below, plaintiffs' claims to recover alleged overpayments are required to be brought, if at all, on behalf on the funds to which they pertain. *See, infra,* Part V(D) (§ 36(b)), Pt. VIII (remaining claims). Plaintiffs lack both constitutional and statutory standing to bring claims on behalf of 79 of the 81 funds.

Derivative standing is justified only by "the possible indirect benefits the nominal plaintiff may acquire qua stockholder of the corporation which is the real party in interest." *Kauffman v. The Dreyfuss Fund, Inc.*, 434 F.2d 727, 735-36 (3d Cir. 1970). "Without this relationship, there can be no standing. . . . A secondary right is limited; it is co-extensive with plaintiff's need as a shareholder to protect an interest which allegedly has been impaired." *Id.* at 736-37. Plaintiffs lack this relationship with 79 of the funds because they are not shareholders with interests to protect. They therefore lack the requisite standing to bring *any* of their claims, except with respect to the two funds in which they are shareholders.

In addition to lacking Article III standing, plaintiffs also fail to meet the prerequisites to

- 16 -

suit specified by Fed. R. Civ. P. 23.1 and Section 36(b), except with respect to the two funds in which they held shares. Rule 23.1 requires plaintiffs to allege, and verify, that they were shareholders at the time of the transaction of which they complain or that shares devolved upon them afterward by operation of law. Similarly, Section 36(b) provides a right of action only to a private plaintiff who is "a security holder of such registered investment company on behalf of such company." 15 U.S.C. § 80a-35(b). Here, plaintiffs do not even allege that they were shareholders of 79 of the funds during the relevant time period. Thus, for this additional reason, plaintiffs are precluded from maintaining *any* claims on behalf of those funds.

In light of both Article III and Rule 23.1, the Third Circuit in *Kauffman v. The Dreyfuss Fund* reversed the district court's decision to permit plaintiffs to maintain class action derivative suits on behalf of funds in which they had not invested. It ruled instead that: "the attempt to bring a class action on behalf of all funds, by virtue of appellee's entitlement to bring derivative suits on behalf of each of the funds in which he holds shares, must fall." 434 F.3d at 736.

The Northern District of Illinois reached the same conclusion in a case involving multiple funds organized as beneficial interests in one Massachusetts business trust. The plaintiff argued that an investor in two funds could sue on behalf of all. Judge Milton Shadur concluded that this arrangement was analogous to separate subsidiaries with a common parent and that "any notion of [plaintiff] being able to bootstrap upstream to the business trust and thence downstream to the other separate funds clearly has nothing at all to commend it." *Williams v. Bank One Corp.*, No. 03 C 8561, 2003 WL 22964376, at *1 (N.D. Ill. 2003). He therefore ruled that "any purported derivative action" on behalf of all the funds "is rejected." *Id.* Here, where each fund is a *separate* business trust or corporation, the question is even more easily decided. Plaintiffs may not maintain claims on behalf of the 79 funds in which they do not own shares.

**III.    COUNTS I AND II ALSO SHOULD BE DISMISSED BECAUSE NO PRIVATE RIGHT OF ACTION EXISTS UNDER SECTIONS 34(b) OR 36(a) OF THE ICA.**

In Count I, plaintiffs seek to bring a private action against the advisers, distributor, trustees and officers for violating Section 34(b) of the ICA by creating and distributing materially false and misleading Registration Statements, Prospectuses, and SAIs. Compl. ¶¶178-184. In Count II, plaintiffs allege a private claim against these same defendants for violating Section 36(a) of the ICA by breaching their fiduciary duties. *Id.* ¶¶185-191. Both claims fail as a matter of law because there is no private right of action under either provision of the ICA.

**A.    Under the Analysis Required By Recent Supreme Court and First Circuit Decisions, No Private Right of Action Can Be Inferred Here.**

Neither Section 34(b) nor Section 36(a) expressly grants a cause of action to private litigants. *See* 15 U.S.C. §§ 80a-33(b), 80a-35(a). Whether a private right of action is *implied* by a federal statute is "limited solely to determining whether Congress intended to create [a] private right of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979). Thus, if a statute lacks language reflecting such Congressional intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) (internal citations omitted). Accordingly, decisions that inferred a private right of action merely to effectuate statutory purposes now belong to an "*ancien regime.*" *Id.* at 287; *see also Correctional Services Corp. v. Malesko*, 534 U.S. 61, 67 (2001) ("[W]e have retreated from our previous willingness to imply a cause of action where Congress has not provided one."); *Bonano v. East Caribbean Airline Corp.*, 365 F.3d 81, 86 n. 4 (1st Cir. 2004) ("the Supreme Court's decision in *Sandoval* changed the legal landscape"). "Where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit. . . ." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286 (2002).

To confer individual rights, Congress must use "rights-creating" language. *Sandoval*, 532 U.S. at 288. That is, the text of the statute must be phrased "with an *unmistakable focus* on the benefited class." *Gonzaga*, 536 U.S. at 284 (emphasis in original). By contrast, "[s]tatutes that focus on the person regulated rather than the individual protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289. And, there is "far less reason to infer a private remedy in favor of individual persons" where the statute focuses "neither on the individuals protected nor even on the [person] being regulated, but on the agencies that will do the regulating." *Id.*

Moreover, "even where a statute is phrased in such explicit rights-creating terms," a plaintiff "still must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" *Gonzaga*, 536 U.S. at 284 (citing *Sandoval*, 532 U.S. at 286) (emphasis in original). Thus, a court deciding whether a right of action is implied must consider, among other things, whether Congress provided its own "remedial scheme" in the statute. *Sandoval*, 532 U.S. at 290. As the Supreme Court has explained, the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id. See also Transamerica Mtg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) ("[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."). This is especially true where Congress expressly granted a private right of action in another statutory provision. *See, e.g., Touche Ross*, 442 U.S. at 571-74 (declining to infer private right of action when section was "flanked by provisions . . . that explicitly grant private causes of action").

No court within the First Circuit has considered private rights of action under the ICA since *Gonzaga* and *Sandoval* were decided. The Second Circuit has ruled that no private right of action exists to enforce Sections 26(f) and 27(i) of the ICA. *See Olmsted v. Pruco Life Ins. Co.*

*of New Jersey*, 283 F.3d 429, 432-36 (2d Cir. 2002). First, these provisions "do not contain rights-creating language" because they "focus on the person regulated rather than the individuals protected." *Id.* at 433. Second, the ICA provides for SEC enforcement of the ICA, § 42, which weakens any implication that Congress intended to create a private remedy because the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* (quoting *Sandoval*, 532 U.S. at 290). Third, Congress expressly provided a private right of action to enforce Section 36(b), which "suggests that omission of an explicit private right to enforce other sections was intentional." *Id.*[6]

For the same reasons, Congress cannot be understood as having intended to provide a private right of action under Sections 34(b) and 36(a) of the ICA.

### B.    Congress Manifested No Intent to Confer a Private Right of Action to Enforce Section 34(b).

Section 34(b) does not expressly provide for a private right of action.[7] And there is no

---

[6] The First Circuit relied upon *Sandoval* and *Gonzaga* to decide in *Bonano* that a private right of action could not be implied under the Federal Aviation Act ("FAA") because the statute's text did not demonstrate Congress intended such an action. 365 F.3d at 85. *Bonano* relied on the fact that the FAA's "core function is to furnish directives to a federal agency" and "does not focus on a benefited class;" that "the scheme of enforcement actually spelled out in the [FAA] counsels persuasively against implying a private right of action;" and that the FAA contains many provisions allowing the Secretary of Transportation to sue and therefore "plainly exhibits Congress's preference for public enforcement." *Id.* In addition, the FAA contains a single provision that expressly allows for private enforcement, which bolsters the conclusion that recognizing a private right of action to enforce other provisions "would be wrong." *Id. See also In re Pharm. Indus. Average Wholesale Price Litig.*, 339 F. Supp. 2d 165 (D. Mass. 2004) (holding that a private right of action cannot be implied under the Best Prices Statute because the statute "contains an extensive remedial scheme").

[7] Section 34(b), 15 U.S.C. §80a-33(b), states in pertinent part:

It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this Act or the keeping of which is required pursuant to section 80a-30(a) of this title. It shall be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the

basis to find that Congress implied one. First, Section 34(b) contains no "rights-creating language." It merely prohibits certain actions. *See Bonano v. East Caribbean Airline Corp.*, 365 F.3d 81, 85 (1st Cir. 2004) (declining to find implied private right of action where the statute was "the kind of general ban which carries with it no implication of an intent to confer rights on a particular class of persons") (citing *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). As the Supreme Court has held, "whether Congress intended to create a private right of action is *definitively answered in the negative* where a statute by its terms grants no private rights to any identifiable class." *Gonzaga*, 536 U.S. at 283-84 (quotation omitted) (emphasis added).

Second, Congress' inclusion of Section 42, which expressly provides for SEC enforcement of the ICA, further undermines any implication that Congress intended a private remedy. *Olmsted*, 283 F.3d at 433; *see also Sandoval*, 532 U.S. at 289-90; *Transamerica*, 444 U.S. at 19; *Bonano*, 365 F.3d at 85.

Finally, Congress' provision of a private right of action elsewhere – in Section 36(b) – "serves only to bolster [the] conclusion that implying a private right of action here would be wrong." *Bonano*, 365 F.3d at 85. "Obviously. . . when Congress wished to provide a private damage remedy, it knew how to do so and it did so expressly." *Touche Ross*, 442 U.S. at 572; *see also Olmsted*, 283 F.3d at 433 (express private right of action under Section 36(b) of the ICA "suggests that omission of an explicit private right to enforce other sections was intentional").

Following *Sandoval* and *Olmsted*, courts have increasingly held that Section 34(b) does not contain an implied private right of action. For example, in *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003), Judge Pollack held that there is no private action under Section 34(b) because (1) the "text does not contain 'rights-creating

---

light of the circumstances under which they were made, from being materially misleading.

language;'" (2) the express provision of SEC enforcement remedies in Section 42 "suggests that

Congress intended to preclude others;" and (3) Congress' creation of an express private right of

action under Section 36(b) "suggests that omission of an explicit private right to enforce other

sections was intentional." *Id.* at 257-58.  *Accord Eaton Vance Mutual Funds Fees Litigation,*

2005 U.S. Dist. LEXIS 15731, at *22-30; *In re Van Wagoner Funds, Inc. Sec. Litig.*, No. 02-

03383, 2004 WL 2623972, at *11-12 (N.D. Cal. July 27, 2004); *White v. Heartland High-Yield*

*Municipal Bond Fund*, 237 F. Supp. 2d 982, 986-88 (E.D. Wis. 2002); *Dorchester Investors v.*

*Peak Int'l Ltd.*, 134 F. Supp.2d 569, 581 (S.D.N.Y. 2001) (all holding no implied cause of action

under § 34(b)).

    Because plaintiffs have no right to enforce section 34(b), Count I should be dismissed.

**C.    Congress Manifested No Intent to Confer a Private Right of Action to Enforce Section 36(a).**

    The Court should also dismiss plaintiffs' Section 36(a) claim because Congress similarly

manifested no intent to confer a private remedy under that provision.[8]  Like Section 34(b),

Section 36(a) contains no "rights-creating language."  The statute is not phrased with an

_____

[8] Section 36(a), 15 U.S.C. § 80a-35(a), states in relevant part:

    The Commission is authorized to bring an action . . ., alleging that a person serving or acting in one or more of the following capacities has engaged . . . or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts

    (a) as officer, director, member of any advisory board, investment adviser, or depositor . . .

    If such allegations are established, the court may enjoin such persons from acting in any or all such capacities either permanently or temporarily and award such injunctive relief or other relief against such person as may be reasonable and appropriate in the circumstances, having due regard to the protection of investors and to the effectuation of the policies declared in section 80a-1(b) of this title.

"unmistakable focus" on granting "individual rights" or "entitlements." *See Gonzaga*, 536 U.S. at 284-85, 287; *see also Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979) (listing statutes that confer individual rights). To the contrary, the text of the statute expressly empowers "[t]he Commission" alone to file suit for violations of its provisions. *See* 15 U.S.C. § 80a-35(a). Thus, the statute is "twice removed" from conferring individual rights because "[i]t focuses neither on the individuals protected nor even on the [person] being regulated, but on the agencies that will do the regulating." *Sandoval*, 532 U.S. at 289; *see also Gonzaga*, 536 U.S. at 287 (statute directing the Secretary of Education not to disburse funds to educational institutions that release records to unauthorized persons was "two steps removed from the interests of individual students and parents" and "[did] not confer" any "individual entitlement").[9]

Second, Section 36(a) is not merely silent with regard to who may enforce it. Rather, Congress expressly stated that "*[t]he Commission* is authorized to bring an action" for injunctive or other relief. 15 U.S.C. § 80a-35(a) (emphasis added). Again, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290; *see also Bonano*, 365 F.3d at 85; *Olmsted*, 283 F.3d at 433.

Third, to the extent that reference to the drafting history of Section 36(a) is considered, such history belies a congressional intent to create a private right of action. In 1970, Congress added a new subsection, Section 36(b), which creates a fiduciary duty on the part of investment advisers with respect to the receipt of compensation for services. *See* Pub. L. No. 91-547, 84 Stat. 113 (1970) (codified at 15 U.S.C. § 80a-35(b)). It also designated the original Section 36 as

---

[9] While Section 36(a) makes a stray reference to "investors," it does so only in the context of stating that, if the *SEC* establishes a violation of Section 36(a), a court may give "due regard to the protection of investors" in formulating appropriate relief *in that action*. *See* 15 U.S.C. § 80a-35(a). Obviously, it is one thing to say that a court may consider the "protection of investors" when awarding relief in an SEC action, and quite another to say that individual investors may bring their own actions.

subsection 36(a), and made substantive changes to the type of conduct it covered and the relief available to the SEC. *Id.*; *see also* S. Rep. No. 91-184 (1969), at 33. Significantly, while Congress expressly provided for a private right of action under Section 36(b), it did *not* do so for Section 36(a). *Compare* 15 U.S.C. § 80a-35(b) (action may be brought "by a security holder . . . .") *with* § 80a-35(a) ("The Commission is authorized to bring an action . . . ."). That Congress used different language in the two subsections is clear evidence that it intended different results. *See, e.g., Russello v. United States*, 464 U.S. 16, 23 (1983) (refusing to conclude "that differing language in the two subsections has the same meaning in each.").

In light of the Supreme Court's recent precedent and *Olmsted*, a growing number of courts have held that Section 36(a) may not be enforced in a private action. *See Eaton Vance Mutual Funds Fees Litigation*, 2005 U.S. Dist. LEXIS 15731, at *22-30; *Dull v Arch*, CIV. A. No. 05-140, 2005 U.S. Dist. LEXIS 14988 at *8 (N.D. Ill. July 27, 2005); *Jacobs v. Brenner*, CIV. A. No. 05-143, 2005 WL 1719307 at *2-5 (N.D. Ill. July 20, 2005); *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 2005 WL 1414304 (C.D. Cal. June 8, 2005); *Chamberlain v. Aberdeen Asset Mgmt. Ltd.*, CIV. No. 02 CV 5870 (SJ), 2005 WL 195520, at *4 (E.D.N.Y. Jan. 21, 2005).[10]

Plaintiffs' Section 36(a) claim here fails for the same reason; no private right of action exists. Accordingly, the Court should dismiss Count II.

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF 36(b).

---

[10] On March 31, 2005, the parties in *Chamberlain* (as a condition of settlement) moved to vacate the court's January 21, 2005 Opinion. The court granted the motion on April 6, 2005, but noted that "this does not constitute a reconsideration of the merits of the case or a negation of the substance of the previously issued Order; rather, the Motion is granted simply in order to permit the parties to proceed to settlement." *See* Chamberlain Order at 2. Accordingly, the court's opinion remains persuasive authority. *See, e.g., Smothers v. Benitez*, 806 F. Supp. 299, 307 n. 12 (D.P.R. 1992) (even where a case is vacated "the reasoning remains persuasive"); *In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 2005 WL 729177, at *66 (E.D.N.Y. Mar. 28, 2005) ("That the opinion was later vacated does not deprive its reasoning of persuasive power.").

Count III of the complaint, which purports to state a claim for violations of Section 36(b), must be dismissed, because the complaint alleges conduct outside the limited remedy provided by the statute. Section 36(b) relates to breach of fiduciary duty in connection with the receipt of fees or compensation by the adviser and its affiliates.[11] Plaintiffs' grievance is not the receipt of the fees, but that defendants purportedly used these fees improperly in distribution payments to brokers such as revenue sharing, 12(b)-1 payments, soft dollars and directed brokerage commissions. Moreover, the plaintiffs cannot bring Section 36(b) claims as to funds in which they are not shareholders; against the individual defendants, who were not the recipients of the fees, or to seek a remedy other than actual damages limited to the compensation received one year before the action was instituted.

Section 36(b) "was not 'intended to provide a basis . . . to undertake a general revision of the practices or structures of the investment company industry.'" *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 742 (7th Cir. 2002), quoting H.R. Rep. No. 91-1382 (1970). The statute is "intended to provide a very narrow specific federal remedy that" relates to the receipt of compensation by the adviser and its affiliates. *Green v. Fund Asset Management*, 286 F.3d 682, 685 (3d Cir. 2002). The language of Section 36(b) "indicates a standard of care that only runs to the terms and receipt of compensation and not one that broadly governs an investment adviser's performance." *In re Nuveen Fund Litigation*, 1996 U.S. Dist. LEXIS 8071 *39 (N.D. Ill. 1996) (dismissing Section 36(b) claim).

The statute specifies: 1) who may sue – a fund shareholder seeking to recover on behalf of the fund; 2) the cause of action created – for a breach of fiduciary duty "with respect to the

---

[11] Section 36(b) provides in pertinent part that the "investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the securities holders thereof. . ." 15 U.S.C. § 80a-35(b).

receipt of compensation for services or of payments of a material nature" paid by the fund to the

investment advisor or its affiliates; 3) who may be a defendant – only the recipient of the

challenged compensation or payments; 4) the damages available – only the challenged fees or

compensation received in the one year before the action was instituted. For the reasons set forth

below, plaintiffs fail to bring their claims within the narrow remedy set forth in Section 36(b).

**A.      The Plaintiffs Fail To State A Claim That The Fees Were Excessive**

Plaintiffs fail to state a claim that any of the fees received by defendants were excessive

in relation to the services rendered. *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694

F.2d 923 (2d Cir. 1982). In *Gartenberg,* affirming a judgment for defendants following trial of a

Section 36(b) claim relating to the receipt of advisory fees, the Second Circuit ruled that to prove

a violation of Section 36(b), a plaintiff must prove that the fees received by an investment

advisor were "so disproportionately large that it bears no reasonable relationship to the services

rendered and could not have been the product of arm's length bargaining." *Id.* at 928. In

weighing an excessive fee claim, the courts consider the *Gartenberg* factors, including: 1) the

nature and quality of the services provided by the advisors to the shareholders; 2) the

profitability of the mutual fund to the adviser-manager; 3) the "fall-out" benefits; 4) the

economies of scale achieved by the mutual fund and whether such savings were passed on to the

shareholders; 5) comparative fee structures with other similar funds; and 6) the independence

and conscientiousness of the mutual fund's outside trustees. 694 F.2d at 929-30.

Courts have not hesitated to dismiss a Section 36(b) claim where the plaintiffs fail to

support their claim of excessive fees with specific factual allegations. *See, e.g. Krantz v.*

*Prudential Invs. Fund Mgmt. LLC,* 305 F.3d 140, 143 (3d Cir. 2002) (affirming dismissal "since

Plaintiff failed to allege any facts indicating that the fees received were disproportionate to

services rendered."); *Migdal*, 248 F.2d at 327(affirming dismissal). The complaint is wholly

- 26 -

insufficient to meet this standard.

Although Count III parrots and cites the *Gartenberg* standard, Compl. ¶195, plaintiffs

allege no facts that would support a conclusion or even an inference that the compensation

received was "so disproportionately large that it bears no reasonable relationship to the services

rendered." The complaint is silent as to the "nature and quality of the services provided by the

advisers to the shareholders" or the *overall* nature and quality of the services provided by the

investment adviser." *Benak v. Alliance Capital Management L.P.* 2004 WL 1459249, at *8-9

(D.N.J. 2004), Plaintiffs allege that the fees paid by the fund were excessive in relation to those

paid by other funds. The plaintiffs' "speculation, inference and generalized observations about

the securities industry," including quotations from Senator Peter Fitzgerald and a September 15,

2003 Forbes article describing "the average net profit margin at publicly held mutual funds", add

nothing relevant to the facts. *See Yampolsky v. Morgan Stanley*, 2004 U.S. Dist. LEXIS 8573, at

*6 (S.D.N.Y. 2004); Compl. ¶112.[12]

---

[12] In that respect, the complaint is very different from those at issue in two recent District of
Massachusetts cases allowing Section 36(b) claims to go forward. In one, *Wicks. v. Putnam*,
C.A. No. 04-10988 GAO, 2005 U.S. Dist. LEXIS 4892 (2005), the complaint alleged: 1) that
although assets held by the Funds have increased significantly over time, the nature and quality
of the services rendered by the defendants to the Funds has not substantially changed, creating
economies of scale that the defendants purportedly failed to share with the funds and 2)the
defendants institutional clients were able to negotiate and paid lower fees than the mutual funds.
See Appendix at Tab. D. *Id.* at *3. Similarly, in *ING Principal Protection Funds Derivative
Litigation*, C.A. No. 03-12198 JLT, 369 F.Supp.2d 163 (2005), the complaint the court found
"sufficient. . . to state a claim that these fees are so disproportionately large that they bear no
reasonable relationship to the advisory services rendered," *Id.* at 170, related specific
*Gartenburg* factors to factual allegations describing fee structures for various fund within the
complex. See Appendix at Tab E. Both complaints are in marked contrast to the "prototype"
distribution practices complaint at issue here. Indeed, *Gilliam v. Fidelity Management &
Research Company*, 2005 U.S. Dist. LEXIS 10478, (D. Mass), in ruling on a consolidation
motion, expressly distinguished between a "prototype" complaint, similar to the one at issue
here, and actions purporting to allege *Gartenberg* claims: the "gravamen of the § 36(b) claim" in
the prototype complaints "is not upon the excessive advisor fees charged to shareholders in
comparison to the services rendered but upon the undisclosed fees paid to brokers of soft dollars

Plaintiffs' grievance is not is not that advisory fees were excessive, but rather that defendants improperly used the fees in distribution practices such as revenue sharing, directed brokerage commissions, soft dollars and 12b-1 fees. Mere repetition of the *Gartenberg* standard will not save that claim:

> [t]o survive a motion to dismiss, a complaint may not simply allege in a conclusory manner that advisory fees are 'excessive.' Instead, a plaintiff must allege facts that, if true, would support a claim that the fees are excessive.

*Migdal*, 248 F.3d at 328 (dismissing complaint). *Accord, In re Eaton Vance*, (dismissing 36(b) claim based on improper distribution practices). *Yampolsky v. Morgan Stanley Investment Advisers*, at *6 (dismissing 36(b) claim where "factual allegations as to the actual fee negotiations or management and distribution services rendered by these defendants were conspicuously absent").

*Eaton Vance*, decided on July 29, 2005, is directly on point and, indeed, dismisses an earlier model of the "prototype" complaint at issue here. (The complaint, and decision, are attached at Appendix A.) Like the one before this Court, the *Eaton Vance* complaint, as the court found, did "not allege any facts that would demonstrate that the compensation paid to the defendants was disproportionate to the services rendered." *Id.* at *42.[13] The court distinguished between excessive advisory fees *received by the adviser and its affiliates* and improper distribution payments:

> The allegations that the defendants authorized improper 12b-1 fees, soft dollar payments, and commissions to brokers are insufficient to allege a claim under 36(b), which addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds.

and excessive commissions for pushing certain funds." *Id.* at *8.

[13] In *Eaton Vance* the Court noted the plaintiffs' concession, at oral argument, that "their argument that the fees were excessive was based on their argument that the fees were used for improper purposes." That necessary concession accurately describes the complaint.

- 28 -

*Id.* at *42-43 (citing *Meyer v. Oppenheimer* and *Gartenberg*).

The *Eaton Vance* complaint was different in one respect – it did not recite the words of *Gartenberg*. But the insertion of a quotation from *Gartenberg* would not have saved the Section 36(b) claim. In dismissing, the court made clear that the complaint's failure was a failure to allege "*specific facts* that would provide a factual basis for an allegation that the fees were 'so disproportionately large' that the[y] bore no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining," and for that reason, "the plaintiffs have failed to state a claim upon which relief can be granted." *Id.* at *43 (emphasis added). Similarly in *Migdal,* the Fourth Circuit affirmed dismissal at the pleadings stage notwithstanding a conclusory allegation of the *Gartenberg* standard because: "[t]o survive a motion to dismiss, a complaint may not simply allege in a conclusory manner that advisory fees are 'excessive.' Instead, a plaintiff must allege facts that if true, would support a claim that the fees at issue are excessive." 248 F.3d at 327. Plaintiffs here rely only on a conclusory recitation from *Gartenberg,* but similarly fail to do not allege specific facts that would support a Section 36(b) claim for excessive fees .

**B.      Plaintiffs Do Not State A Claim By Alleging That Certain Transactions Had The Effect of Increasing Management Fees.**

Plaintiffs' reliance instead on allegations that defendants' allegedly improper distribution practices were designed to increase the management fees, Compl. ¶¶2-3, 195, even if true, fail to state a claim. Congress was "well aware", when it created Section 36(b), "that the most common investment company adviser compensation scheme was based on a percentage of assets." *Green v. Nuveen*, 295 F.3d at 742 (dismissing 36(b) claims on summary judgment for failure to state an actual breach of fiduciary duty). Allegations of a potential conflict of interest are insufficient to state a claim under Section 36(b). *See, e.g., Green v. Fund Asset Mgmt, supra; Green v. Nuveen,*

*supra; King v. Douglass*, 973 F. Supp. 707, 722-23 (S.D. Tex. 1996); and *Eaton Vance Mutual Funds Fees Litigation*, 2005 U.S. Dist. LEXIS 15731, at *43-45.

In *Green v. Fund Asset Mgmt.*, for example, plaintiffs alleged that defendants had an incentive to leverage fund assets to maximize their advisory fees. The court rejected the claim, explaining that "a fee arrangement in which a fund's investment advisers have an incentive to maximize leverage in order to increase their advisory fees is not a *per se* breach of an investment adviser's fiduciary duties under Section 36(b)." 286 F.3d at 684-85. Rather, plaintiffs must "allege and prove an actual breach of fiduciary duty." *Id.* at 686.

Similarly, in *Nuveen Fund Litig.*, plaintiff alleged that the fund issued new shares "only for the purpose of generating fees for the Funds' investment adviser . . . ." 1996 U.S. Dist. Lexis 8071, at *1. The court granted defendants' motion to dismiss, explaining that Section 36(b) does not apply to a "claim that accuses an investment adviser of imposing a transaction on the investment company only to generate fees for itself." *Id.* at *12. *See also King v. Douglass, supra* (dismissing complaint where plaintiffs alleged that defendants improperly increased fund assets and fees through a coercive rights offering, but failed to allege that the advisory fee was not commensurate with the services provided); and *Eaton Vance, supra* "allegations that the defendants authorized improper 12b-1 fees, soft dollar payments, and commissions to brokers are insufficient to allege a claim under 36(b), which addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds") *Id.* at .

Here, plaintiffs allege that defendants engaged in transactions for the purpose of increasing advisory fees. But there is nothing about an adviser's alleged use of revenue sharing, excessive commissions, or directed brokerage which means that the advisory fees were too large.

Rather, to state a claim, plaintiffs must allege facts showing that the fees were excessive in comparison to services. As set forth above, plaintiffs have failed to make such allegations. Accordingly, their claim fails.

**C.     Plaintiffs' 12b-1 Allegations Fail To State A Section 36(b) Claim.**

For the reasons set forth above in Parts A and B, plaintiffs have failed to state a claim with respect to any of the fees that defendants received. There are additional reasons to hold that the allegations relating to the 12b-1 payments, excessive commissions and soft dollars did not state a claim. Specifically, plaintiffs allege that defendants violated Section 36(b) by causing the Fund to make 12b-1 payments that did not benefit shareholders. Compl. ¶195. Plaintiffs also allege that defendants caused the Funds to pay excessive commissions and soft dollars to brokers in violation of Rule 12b-1. *Id.*

**1.     In Light of Their Own Allegations, Plaintiffs Cannot Assert a Section 36(b) Claim Based Upon the 12b1- Fees.**

As an initial matter, plaintiffs' allegations regarding 12b-1 fees fail to state a Section 36(b) claim because, under plaintiffs' own theory, the 12b-1 fees are not subject to Section 36(b). Section 36(b)(4) provides that Section 36(b) "shall not apply to compensation or payments made in connection with transactions" subject to Section 17 – a section dealing with "joint transactions." Under Rule 17d-3, a 12b-1 plan will be exempt from Section 17 only if it is "made in compliance with the provisions of [Rule 12b-1]." 17 C.F.R. § 270.17d-3(a). Here, plaintiffs allege that defendants "violated Section 12 . . . because neither the reported 12b-1 payments nor the other payments were made pursuant to a valid Rule 12b-1 Plan." Compl. ¶125. Based on plaintiffs' allegations, the allegedly non-compliant 12b-1 plans are not exempt from Section 17, but are exempt from Section 36(b). *See, e.g., Lessler v. Little*, 857 F.2d 866, 874 (1st Cir. 1988) (where violation of Section 17 is alleged, a Section 36(b) claim cannot proceed).

**2.    Plaintiffs' Conclusory Allegation That 12b-1 Fees Do Not Benefit The Funds Does Not State A Section 36(b) Claim.**

Even if Section 36(b) applied here, plaintiffs' conclusory allegation that the Funds' 12b-1 fees provided no benefit to the shareholders fails because plaintiffs nowhere describe the types of services that were provided in return for the 12b-1 fees and allege no facts showing that the fees were excessive in relation to such services. *See e.g.*, *ING Principal Protection Funds Derivative Litig.*, 369 F. Supp. 2d 163, 169 (D. Mass. 2005) (dismissing Section 36(b) claim based upon allegedly excessive 12b-1 fees and explaining that plaintiffs must "allege that the distribution fees are disproportionate and unrelated to the sales-related services actually provided when shares of the funds were marketed and sold. . . "). It also fails because case law, SEC guidance, and the Funds' public disclosures make clear that the growth in the Funds caused by their use of 12b-1 plans benefited shareholders in a number of ways.

As an initial matter, the addition of new shareholders to the Funds created economies of scale. As the Funds' disclosures make clear, the management fee paid to the Advisers *decreased* on a percentage basis as the amount of assets in the Funds increased. Shareholders benefit from these economies. *Cf. Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 865 (2d Cir. 1990) ("Lower total assets would also result in higher effective advisory charge to remaining shareholders because of the economies of scale of fund management.").

Moreover, a 12b-1 plan can be "essential to the financial well being of the Fund" because a decrease in the overall number of shareholders might require a fund to sell off assets at inopportune times. *Meyer*, 895 F.2d at 865 ("it cannot be denied that an enormous and rapid shrinkage in asset size is potentially very damaging. The Fund might, for example, be forced to dispose of assets prematurely or to make other decisions reducing the financial return in order to meet redemption calls"); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 500 (S.D.N.Y.

1988) (". . . an inflow of assets to a fund has a positive effect on investment performance regardless of the fund's absolute size. . . . Conversely, when a fund is losing assets due to increased redemptions, the fund is more difficult to manage."). As the SAI makes clear, the Columbia Acorn Trust trustees concluded that the 12b-1 plan could "be a significant factor in the growth and retention of Fund assets resulting in a more advantageous expense ratio and increased investment flexibility which could benefit each class of Fund shareholders." Columbia Acorn SAI at 48.

Of perhaps even more significance, 12b-1 plans allow shareholders to invest in mutual funds without paying up front sales loads. For instance, investors in the Columbia Acorn Fund were able to purchase Class A shares, which included an up front sales charge (but lower 12b-1 fees), or Class B and C shares, which include no up front sales charges (but higher 12b-1 fees). *See, e.g.,* Columbia Acorn Prospectus at "Sales Charges" and "Distribution and Service Fees," at 8, 13. Thus, 12b-1 fees open up the professional money management offered by mutual funds to investors without the financial means or desire to pay sales charges. *See* Payment of Asset-Based Sales Loads by Registered Open-End Management and Investment Companies, Inv. Co. Act Rel. No IC. 16431, 53 Fed. Reg. 23258, 23275 (June 21, 1988) ("[a]dopting or continuing a 12b-1 plan as an alternative to a front-end sales load may benefit shareholders whose payment is thereby postponed. A number of funds have justified the implementation or continuation of a 12b-1 plan on the basis of this benefit.").

As plaintiffs admit, the "appreciation of a mutual fund's assets is one of the keys to its survival." Compl. ¶174. That the Funds' payments of 12b-1 fees here contributed to such growth, and survival, does not give rise to a Section 36(b) claim that those fees were so "disproportionately large" that they bore "no reasonable relationship to the services rendered."

**D.     Plaintiffs' Allegations Regarding Excessive Commissions and Soft Dollars Fail To State a Section 36(b) Claim.**

Plaintiffs also fail to state allegations sufficient to support their theory that defendants violated Section 36(b) by making payments to brokers of excessive commissions.[14]

Initially, plaintiffs fail to satisfy the *Gartenberg* standard by alleging facts showing that the commissions were excessive in relation to the services provided.  In fact, plaintiffs fail to identify a single transaction where an allegedly excessive commission was paid to a particular broker.  Instead, plaintiffs simply allege that unspecified "commissions" were "excessive."  Such allegations fail to state a claim.  *See, e.g., Krantz* and *Migdal.*

Moreover, plaintiffs cannot recover against defendants for payments made to brokers.  As Section 36(b)(3) itself makes clear: "No such action shall be brought or maintained . . . against any person other than the recipient of such compensation or payments." *See* 15 U.S.C. 80a-35(b); *see also Green v. Fund Asset Mgmt., L.P.,* 286 F.3d 682,685 (3d Cir. 2002) ("Under section 36(b), a shareholder may only sue the recipient of the fees").  Here, plaintiffs allege claims against defendants based upon excessive commissions that were allegedly paid to brokers.  Because defendants did not receive those fees, plaintiffs' claim fails.

**E.     The Complaint Fails To State A Claim Against the Individual Defendants**

The Section 36(b) claim against the individual defendants fails for an addition reason.  As the statute makes plain, a Section 36(b) claim may be brought only against individuals who received fees for advisory services.  Because the individual defendants received no such fees, the

---

[14] Plaintiffs appear to allege that these payments were improper because they were not part of the adopted rule 12b-1 plan.  Even if true, such allegations do not state a claim under Section 36(b). *See Meyer v. Oppenheimer Management Corp.,* 764 F.2d 76, 85 (2d Cir. 1985) ("[I]f, as appears likely, appellant claims only that liability arises under section 36(b), then the pertinent inquiry becomes whether any deviation from the Rule [12b-1] or from the Plan, is so substantial as to constitute a breach of fiduciary obligations.  We do not understand section 36(b) to be an enforcing mechanism for every SEC regulation or every action authorized thereunder").

claim against them fails. *See, e.g., Green v. Fund Asset Mgmt., L.P.*, 147 F. Supp. 2d 318, 329-330 (D.N.J. 2001).

**F.     Plaintiffs Have No Section 36(b) Right To Monetary Relief.**

Finally, the Section 36(b) claim fails because plaintiffs do not seek to recover on behalf of the Funds. As the statute itself makes clear, a Section 36(b) claim must be brought "on behalf of" an investment company. Thus, "any recovery obtained in a § 36(b) claim will go to the company rather than the plaintiff." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 535 n. 11. (1984). Tellingly, plaintiffs here do not seek to recover on behalf of the Funds, choosing, instead, to recover for themselves. *See* Compl. ¶200. As such, they have for this reason as well failed to state a claim under Section 36 (b). *See, e.g., Mutchka*, 2005 WL 1414304, at *3 (dismissing Section 36(b) claim which was not brought on behalf of the fund).

**V.     COUNT IV SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 48(A) OF THE ICA.**

In Count IV, plaintiffs purport to allege a "control person" claim against the advisers. *See* Comp. ¶¶201-206. Specifically, plaintiffs allege that the advisers were "control persons" of the trustees and distributor, and "caused" them to violate Sections 34(b), 36(a), and 36(b) of the ICA. *Id.* ¶202. Plaintiffs' claim fails for three reasons: (1) there is no private right of action under Section 48(a); (2) plaintiffs have failed to state an underlying violation of the ICA; and (3) plaintiffs have not alleged facts to support their conclusory allegations that the advisers "controlled" the trustees and distributor, and "caused" them to violate the ICA.

**A.     No Private Right of Action Exists Under Section 48(a).**

Section 48(a) states that "[i]t shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter. . . ." 15 U.S.C. § 80a-

47(a). Because the text and structure of Section 48(a) do not manifest a congressional intent to grant a private right of action, the Court may not imply one.

The analysis under Section 48(a) is nearly identical to the analysis under Sections 34(b) and 36(a). First, Section 48(a) does not contain any "rights-creating language." To the contrary, like the provisions in *Olmsted*, Section 48(a) merely prohibits conduct. *Id.* at 433. Second, as in *Olmsted*, the existence of Section 42, which explicitly provides for SEC enforcement of all ICA provisions, including Section 48(a), further "suggests that Congress intended to preclude" other remedies. *Id.* Finally, the fact that Congress created an express right of action under Section 36(b) is further support that the "omission of an explicit private right to enforce other sections," including Section 48(a), "was intentional." *Id.* *See also Eaton Vance Mutual Funds Fees Litigation*, 2005 U.S. Dist. LEXIS 15731, at *22-30 (finding no private right of action under Section 48(a)).

**B.    Plaintiffs Have Failed To State a Claim for a Primary Violation of the ICA.**

In addition, plaintiffs' Section 48(a) claim fails because plaintiffs have not stated an underlying violation of the ICA. As discussed above, plaintiffs' claims under Sections 34(b), 36(a), and 36(b) of the ICA fail as a matter of law. Thus, plaintiffs' Section 48(a) claim "necessarily fail[s]." *Merrill Lynch Research Reports*, 272 F. Supp.2d at 264.

**C.    Plaintiffs Fail To Allege Facts Supporting Their Allegations of "Control."**

Finally, plaintiffs have failed to allege facts to support their conclusory allegations that the advisers "controlled" the trustees and distributor and "caused" them to violate the ICA.

"Control" is a defined term under the ICA. *See* 15 U.S.C. § 80a-2(a)(9). The statutory definition provides that "any person who owns beneficially, either directly or thorough one or more controlled companies, more than 25 per centum of the voting securities of a company shall be presumed to control such company. Any person who does not own more than 25 per centum

of the voting securities of any company shall be presumed not to control such company." 15

U.S.C. § 80a-2. A natural person "shall be presumed not to be a controlled person within the

meaning of this subchapter." Finally, any presumption under this definition "may be rebutted by

evidence, but except as hereinafter provided, *shall* continue until a determination to the contrary

[is] made by the Commission by order . . . ." *Id.* (emphasis added).

Here, plaintiffs allege that the advisers control the distributor. Plaintiffs do not allege,

however, that the advisers owned more than 25% of the distributor's voting stock. They do not,

and cannot allege, that the SEC has issued an order finding that the advisers control the

distributor. Accordingly, the presumption of non-control continues and plaintiffs' claim with

regard to the distributor fails.

Likewise, plaintiffs allege that the advisers controlled the trustees. The trustees,

however, are "natural persons" who are presumed "not to be a controlled person." Plaintiffs do

not allege that the SEC has issued an order to the contrary. Thus, the part of Count IV that

relates to the trustees should be dismissed. *See McLachlan v. Simon*, 31 F. Supp.2d 731, 739

(N.D. Cal. 1998) (dismissing Section 48(a) claim alleging that adviser controlled trustees), *aff'd*

*in relevant part*, 262 F.3d 923, 936 (9th Cir. 2001).[15]

Finally, plaintiffs' allegations that the advisers "caused" the trustees and the distributor to

violate the ICA are so conclusory as to be meaningless. Plaintiffs do not allege a single fact

showing that the advisers caused the distributor or any of the trustees, much less all of them, to

do any illegal acts. Accordingly, plaintiffs have failed to state a § 48(a) claim.

---

[15] Even without the presumption, the facts plaintiffs allege are insufficient to show that the
advisers controlled the trustees. *See, e.g., Krantz v. Fidelity Mgmt. & Research Co.*, 98 F.
Supp.2d 150 (control claim not stated by allegations that trustees were well compensated by
serving on multiple boards within fund complex managed by a single adviser).

## VI.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 215 OF THE IAA.

In Count V, plaintiffs allege that the advisers violated Section 215 of the IAA. Section

215 provides in pertinent part that "every contract made in violation of any provision" of the

IAA and every contract "the performance of which involves the violation" of the IAA, "shall be

void." 15 U.S.C. § 80b-15(b). Plaintiffs' Section 215 claim fails because they do not allege that

"the formation or performance of the [advisory] contract violates the Advisers Act." *Clark v.*

*Nevis Capital Mgmt., LLC*, CIV. A. No. 04-2702, 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005).

There are few decisions interpreting Section 215. Section 215 is, however, virtually

indistinguishable from Section 29(b) of the Exchange Act – another federal securities provision

setting forth the circumstances under which contracts "shall be void."[16] *See Mills v. Electric*

*Auto-Lite Co.*, 396 U.S. 375, 387 (1970) (Section 215 is Section 29(b)'s IAA "counterpart[]");

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) ("Congress intended the

[IAA] to be construed like other securities legislation enacted for the purpose of avoiding

frauds"). Under Section 29, a plaintiff states a claim only by alleging that the contract itself

violates the federal securities laws. In *Cohen v. Citibank, N.A.*, 954 F. Supp. 621 (S.D.N.Y.

1996), for instance, the court dismissed a Section 29(b) claim, explaining that the plaintiff had

not alleged that the "contract evidencing the loan" was illegal. *Id.* at 627. *See also Slomiak v.*

*Bear Sterns & Co.*, 597 F. Supp. 676, 681-82 (S.D.N.Y. 1984) (dismissing Section 29(b) claim

---

[16] Section 215 provides that "every contract made in violation of any provision of this subchapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation or order thereunder, shall be void. . . ." 15 U.S.C. § 80b-15(b). Section 29 provides that "every contract made in violation of any provisions of this title or of any rule or regulation thereunder, and every contract . . . heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title or any rule or regulation thereunder, shall be void. . . ." 15 U.S.C. § 78cc(b).

where plaintiff did not allege that the contracts "were themselves unlawful"); *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y. 1981) (dismissing Section 29(b) claim because "only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts").

Here, plaintiffs do not allege that the advisory contracts are illegal or that the performance of the contract would violate the IAA. Rather, they allege merely that the advisers violated various duties. Compl. ¶¶212-25. Accordingly, their Section 215 claim fails.

## VII.    PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED BY SLUSA.

Plaintiffs' state law claims – Counts VI, VII, and VIII – are expressly preempted by SLUSA, *codified at* 15 U.S.C. § 77p and § 78bb(f).[17]  Congress enacted SLUSA to ensure that private securities fraud class actions are exclusively governed by federal law. SLUSA does so by preempting class actions that allege what amounts to securities fraud under state law causes of action. *See* H.R. Rep. No. 105-803 (1998); *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 107-08 (2d Cir. 2001).

### A.    The Five Criteria

SLUSA's preemptive scope is defined by five criteria: (1) any "covered class action," (2) asserting claims under "the statutory or common law of any State," (3) involving a "covered security," and (4) alleging "a misrepresentation or omission of a material fact" or "that the defendant used or employed any manipulative or deceptive device or contrivance" (5) "in connection with the purchase or sale of" that security. §78bb(f)(1). All five are met here.

Plaintiffs' lawsuit qualifies as a "covered class action" by seeking damages on behalf of a class "so numerous that joinder of all members is impracticable" and by asserting that "[c]ommon questions of law or fact exist as to all members of the Class and predominate over

---

[17] SLUSA amended two statutes and its provisions were therefore added to two different code provisions. As the additions are identical, only one, §78bb(f), will be cited here.

any questions solely affecting individual members of the Class."  Compl. ¶¶164, 167;

§78bb(f)((5)(B)(i) (defining "covered class action"); *Behlen v. Merrill Lynch*, 311 F.3d 1087,

1092 (11th Cir. 2002) (prospective class action is "covered class action" within SLUSA).

      Counts VI, VII, and VIII purport to assert claims under state common law:  breach of

fiduciary duty and unjust enrichment.  Compl. ¶¶217-226.  The claims also allege misconduct in

connection with mutual funds, which are "covered securities."  *See* § 78bb(f)(5)(E) (borrowing

definition from Securities Act of 1933, which includes securities issued by investment

companies registered under the Investment Company Act and subject to its strictures,

§ 77r(b)(2)); Compl. ¶¶24-25, 70; *Kircher v. Putnam Funds Trust*, 403 F.3d 478, 481 (7th Cir.

2005) ("Investments in mutual funds are 'covered securities'").

### B.    Plaintiffs Allege Both Misrepresentation and Manipulative Contrivances In Connection With Purchases of Securities.

      SLUSA's final criteria also applies.  SLUSA preemption requires only that the action

allege either material misrepresentations/omissions or a manipulative scheme in connection with

securities transactions.  § 78bb(f)(1)(A), (B).  Plaintiffs here repeatedly allege both – providing

two independent grounds for dismissal under SLUSA.

      Dozens of paragraphs in the complaint aver that material facts were not disclosed to

investors.  *See, e.g.,* Compl. ¶¶2 ("undisclosed" payments "material to any reasonable person

deciding whether to invest in Columbia Funds"), 3 ("undisclosed plan"), 12 ("Defendants

purposefully omitted to disclose"), 16 ("failure to disclose"), 75 ("Unbeknownst to Plaintiffs and

the other members of the Class"), 84 ("None . . . was disclosed"), 102 ("Rather than disclosing

this material information"), 103 ("undisclosed"), 113 ("Plaintiffs and the other members of the

Class never knew, nor could they have known, from reading the Fund prospectuses"), 114

("undisclosed financial incentives [and] conflict of interest"), 115 (same), 123 (same), 133

(same), 138 (same), 139-153 ("The Prospectuses Were Materially False and Misleading"), 167 (common question of law and fact for the class is "whether statements made by Defendants to the investing public during the Class Period misrepresented materials facts").

Moreover, plaintiffs further allege that the "actions of the Columbia Defendants described herein are substantially the same as those already condemned by the SEC," *id.* ¶13 – and describe the actions condemned by the SEC as misrepresentations and omissions. *See, e.g., id.* ¶¶9 ("untrue statement of a material fact or any omission to state a material fact"), 11 ("undisclosed" revenue-sharing and brokerage arrangements); 115 ("undisclosed use of excessive commissions and directed brokerage"), 120 (use of assets "without proper disclosure"), 121 ("failed to adequately disclose" revenue-sharing payments). Plaintiffs further rely on the SEC's own descriptions of the actions it has "condemned," which express the gravamen of the misconduct as omission of material information. *See id.* ¶¶117 ("did not adequately disclose"), 118 ("two distinct disclosure failures"), 119 ("failing to disclose"), 120 ("required, but failed, to disclose adequately"), 121 ("undisclosed").

Plaintiffs, in addition, repeatedly allege that defendants were engaged in a manipulative scheme to pay brokers "to push Columbia Funds on unwitting investors," *id.* ¶81. *See, e.g., id.* ¶¶2, 3, 4, 75, 76, 77, 80, 81, 82, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 98, 99, 101, 103, 114, 115, 133, 137, 138, 147, 153.

Both the alleged omissions/misrepresentations and the alleged manipulative scheme "coincide [with] the sale of securities." *SEC v. Zandford*, 535 U.S. 813, 822 (2002).[18] The

---

[18] *Zandford* ruled that the "in connection with" purchases or sales of securities requirement of Section 10(b) and Rule 10b-5 is met when "securities transactions and breaches of fiduciary duty coincide." *Id.* at 825. The Courts of Appeals have uniformly held that Congress' borrowing of Section 10(b) language for SLUSA indicates its intention to delineate the same statutory reach. *See, e.g., Rowinski*, 398 F.3d at 299 (noting cases and applying *Zandford* to SLUSA).

omissions and misrepresentations plaintiffs allege here "coincide" with purchases of securities because they are alleged to be in the Funds' Prospectuses – documents prepared and distributed to potential investors to help them determine whether to invest – and because they are alleged to misrepresent the value of the Funds as investments by hiding a practice of paying excessive fees and commissions. *See, e.g., Araujo v. John Hancock Life Ins. Co.*, 206 F. Supp. 377, 383 (E.D.N.Y. 2002) (the "in connection with" element is met when a plaintiff alleges a misrepresentation concerning the value of the securities sold) (dismissing claims on SLUSA grounds). The manipulative scheme plaintiffs allege "coincides" with purchases of securities because its alleged goal is to induce "unwitting investors" to purchase Fund shares. *See, e.g., Zoren v. Genesis Energy, L.P.*, 195 F. Supp. 2d 598, 605 (D. Del. 2002) (unitary scheme that began before purchase and continues afterward meets "in connection with" requirement) (dismissing claims on SLUSA grounds).

There are thus two independent bases for dismissing these state law claims under SLUSA. The allegations of material omissions fall within SLUSA's preemptive scope under Section 78bb(f)(1)(A), and the allegations of a manipulative scheme fall within its scope under Section 78bb(f)(1)(B). Both require dismissal at the earliest stage of litigation.[19]

### C.    Plaintiffs' "Holder" Language Does Not Avoid SLUSA Preemption.

Plaintiffs' tactic of describing the named plaintiffs as having "held" Fund shares during the class period, and of defining the class as "all persons or entities who held shares" during the class period – does not place this suit outside of SLUSA's scope. This tactic has been tried

---

[19] To the extent plaintiffs allege that state fiduciary law imposes a duty to provide information about commissions, fees, or practices in Prospectuses, their claims are also preempted by the National Securities Markets Improvement Act of 1996 ("NSMIA"), *codified at* 15 U.S.C. § 77r(a)(2) (express preemption of state laws that "directly or indirectly prohibit, limit, or impose any conditions upon the use of . . . any offering document"). NSMIA does not preempt state law actions with respect to fraud or deceit. However, those actions *are* preempted by SLUSA.

before and roundly rejected. As the Seventh Circuit recently explained, defining the class as those who held shares "is a flop" as "an effort to evade SLUSA" because "some of the investors who held shares during the class period must have purchased their interest (or increased it) during that time." *Kircher*, 403 F.3d at 482 (recognizing that each "fund has substantial daily turnover, so the class of 'all holders' during even a single day contains many purchasers" and dismissing the claims at issue under SLUSA).

Five other circuits had already reached the same conclusion. The Second Circuit ruled that "holding" plaintiffs must expressly "exclude from the class claimants who purchased in connection with the fraud" in order to avoid preemption under SLUSA. *Dabit v. Merrill Lynch Pierce Fenner & Smith*, 395 F.3d 25, 46 (2d Cir. 2005). *See also Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 303 (3d Cir. 2005) (SLUSA preempts claims on behalf of class that "is not limited to non-purchasers and non-sellers"); *Prof. Mgmt. Assocs., Inc. v. KPMG*, 355 F.3d 800, 803 (8th Cir. 2003) ("PMA cannot avoid preemption by asserting it is only claiming damages suffered as a result of holding its stock"); *Feitelberg v. Merrill Lynch & Co.*, 353 F.3d 765 (9th Cir. 2003) (affirming dismissal under SLUSA for reasons stated by district court, which found claims preempted because they involved misrepresentations as to value and the class purchased the securities during the class period, 234 F. Supp. 2d 1043, 1051-52 (N.D. Cal. 2002)); *Riley v. Merrill Lynch Pierce Fenner & Smith*, 292 F.3d 1334, 1345 (11th Cir. 2002) (ruling that SLUSA preempts claim that "sweeps within its ambit actual purchases"); *Cape Ann Investors LLC v. Lepone*, No. 00-11531-RGS, 2003 U.S. Dist. LEXIS 22458, at *15 (D. Mass. Dec. 15, 2003) (finding SLUSA preemption when class included purchasers).

For the same reasons, plaintiffs' description of themselves and class members as "holders" does not avoid SLUSA preemption here. Their purported class of "all persons or

entities who held shares, units, or like interests in any of the Columbia Funds between August 2, 1999 and March 22, 2004," Compl. ¶163, necessarily includes first-time purchasers of fund shares. It also necessarily includes those who initially invested before the class period but who purchased fund shares through exchanges between funds or through automatic reinvestment of dividends. Almost 90% of mutual funds investors automatically reinvest dividends. *See* O'Neal, *Purchase and Redemption Patterns of US Equity Mutual Funds*, Financial Management 63 (Apr. 1, 2004); *see also Deutschman v. Beneficial Corp.*, 761 F. Supp. 1080, 1087 (D. Del. 1991) (noting that courts treat such reinvestments as "purchases" under the securities laws).

Plaintiffs have not excluded any of these purchasers from the class. Moreover, in their initial complaints, plaintiffs asserted that they *themselves* had purchased shares during the class period. *See* Osburn Complaint ¶11, Simmonds Complaint ¶11, Slicker Complaint ¶11, Cohen Complaint ¶11. Plaintiffs' allegations that defendants misrepresented or omitted material information about the impact of improper fees and commissions on their investment returns *and* their allegations that defendants engaged in a manipulative scheme to lure unsuspecting investors during the class period necessarily are brought on behalf of many who purchased shares after such misinformation and/or manipulation occurred. They are therefore allegations "in connection with" the purchase of securities under SLUSA.

**D.    Plaintiffs Do Not Avoid SLUSA Preemption By Excising Parts of Allegations.**

Plaintiffs also fail to avoid SLUSA by rephrasing their allegations for purposes of the state law claims as limited to payment of excessive fees and commissions "without regard to any deception, misrepresentation or omission." Compl. ¶¶217, 221, 225. It is well-settled that plaintiffs may not avoid SLUSA by *pleading* around it because that "would allow artful pleading to undermine SLUSA's goal of uniformity – a result manifestly contrary to congressional intent." *Rowinski*, 398 F.3d at 300 ("SLUSA stands as an express exception to the well-pleaded

complaint rule, and its preemptive force cannot be circumvented by artful drafting," *id.* at 304).

Other courts that have addressed the question have reached the same conclusion. *See, e.g., Dabit*, 395 F.3d at 34 ("Under SLUSA, then, we must look beyond the face of the complaint to analyze the substance of the allegations made."); *Dudek v. Prudential Securities, Inc.*, 295 F.3d 875, 879 (8th Cir. 2002) (disregarding artful pleading because "gravamen" of complaint was within SLUSA); *In re Worldcom, Inc.*, 263 F. Supp. 2d 745, 769-70 (S.D.N.Y. 2003) (dismissing negligence claim that alleged auditor of retirement plan should have known WorldCom stock price was inappropriate for valuing plan investment because SLUSA does not require express allegations of misrepresentation or deception); *Korsinsky v. Salomon Smith Barney Inc.*, 2002 WL 27775, *4-*5 (S.D.N.Y. Jan. 10, 2002) (SLUSA preempts allegation that analyst misrepresented value of securities to general public even though claim was styled as breach of fiduciary duty); *Prager v. Knight/Trimark Group Inc.*, 124 F. Supp. 2d 229, 235 (D.N.J. 2000) (SLUSA preempts breach of contract, breach of fiduciary duty, and unjust enrichment claims because allegations described a pattern of manipulative conduct – executing company's own trades in light of customer trade orders before executing customers' trades).

Similarly, the complaint here is replete with allegations of misrepresentations, omissions, and manipulative schemes. They are an inextricable ingredient of every action complained of.[20] The gravamen of the allegations is that investors were manipulated into buying shares and misled as to practices (fees and commissions) that would materially affect their value. Nondisclosure to

---

[20] Indeed, it is unclear what plaintiffs are alleging constitutes the claimed breach of fiduciary duty under state law if all allegations of deception, misrepresentation and omission are excised. Even plaintiffs treat such deceptions as essential to their breach of fiduciary duty under *federal* law. *See* Complaint ¶195 (breach of fiduciary duty under § 36(b) of the ICA) ("undisclosed"); ¶212 (breach of fiduciary duty under § 215 of the IAA) ("by engaging in a deceptive contrivance, scheme, practice and course of conduct"), ¶214 (failure of duty to disseminate accurate and truthful information "in order to prevent the Columbia Fund shareholders from knowing . . .").

existing and potential investors was essential to the success of the alleged scheme. *See Rowinski*, 398 F.3d at 302. These are classic securities fraud allegations brought under the guise of state law claims – *exactly* what Congress enacted SLUSA to preempt.

It is conceivable, of course, that notwithstanding plaintiffs' recurring emphasis on omissions and manipulations in their allegations, they might intend their state law claims – "limited to the wrongful payment of excessive fees and commissions," Compl. ¶¶217, 221, 225 – to allege a waste of corporate assets. If it were possible to read these allegations through a sufficiently opaque filter to recognize *that* claim, it *would* be beyond SLUSA's reach. However, that would still not save the state law counts because it is not a claim plaintiffs can bring on their own behalf. *See, infra*, Part VIII. In either case, Counts VI through VIII should be dismissed.

## VIII.   BY ASSERTING DIRECT CLAIMS AND FAILING TO MAKE A DEMAND ON THE FUNDS, PLAINTIFFS FAIL TO STATE CLAIMS UNDER STATE LAW, SECTIONS 34(b), 36(a), OR 48(a) OF THE ICA, OR SECTION 215 OF THE IAA.

Plaintiffs have no right to bring any excessive fee and commission claims on their own behalf. They have also failed to satisfy the required precondition for bringing derivative claims on behalf of the Funds – a presuit demand. Plaintiffs' failure to make a presuit demand also defeats the one claim they assert derivatively – Count V.

Whether direct state law claims are available to shareholders is governed by the law of the state in which the Funds were formed. The same rules apply, through incorporation, to the claims brought under Sections 34(b), 36(a), and 48(a) of the ICA and Section 215 of the IAA. *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 108-09 (1991) (when ICA does not expressly provide a direct right of action to shareholders, federal law incorporates state law as to the availability of a direct action and the prerequisites for bringing a derivative one). Thus, Massachusetts law applies as to 66 of the funds, including the only two funds in which plaintiffs allege they invested. Oregon law applies as to 15 of the funds. *See* n.2, *supra*.

- 46 -

**A.    The Excessive Fee/Commission Claims Can Only Be Brought Derivatively.**

"It is a basic principle of corporate law," in Massachusetts as elsewhere, that if corporate

assets are wasted by the corporation making excessive payments, "the right to recover the

overpayments belongs to the corporation." *Bessette v. Bessette*, 385 Mass. 806, 809 (1982)

(affirming dismissal where shareholder brought direct claims for overpayments by corporation);

*accord Symmons v. O'Keefe*, 419 Mass. 288, 298 (1995) (claims that defendant wasted trust

assets as a corporate officer and director belonged to the corporation not the plaintiffs who could

assert them only in a shareholders' derivative suit).

Oregon also follows this rule. *See Loewen v. Galligan*, 882 P.2d 104, 111 (Or. Ct. App.

1994) ("The general rule is that a shareholder may not assert a direct claim against directors or

officers who have defrauded or mismanaged a corporation if the only alleged injury is a

diminution of stock value") (affirming dismissal of breach of fiduciary duty claims because they

had been asserted as direct claims); *Lewis v. Chiles*, 719 F.2d 1044, (9th Cir. 1983) (applying

Oregon law to affirm dismissal of direct claims for breach of fiduciary duty where claim was for

wasting of corporate assets); *Kahn v. Sprouse*, 842 F. Supp. 423, 425 (D. Or. 1993) ("shareholder

can bring a direct action only . . . when there is a special duty, such as a contractual duty . . .or

when the shareholder suffers injury separate and distinct from that suffered by other

shareholders") (dismissing plaintiffs' claims because they could "only be asserted, if at all, as

derivative claims," *id.* at 427).

Thus, even if plaintiffs' attempt to surgically remove their repeated allegations of

deception leaves them with state law claims against those alleged to have caused the funds to pay

excessive fees and commissions, such claims belong to the funds. They can only be brought

derivatively. Likewise, even if plaintiffs' had private rights of action under Sections 34(b),

36(a), and 48(a) to bring their federal breach of fiduciary duty claims, plaintiffs could only bring

such claims to recover excessive fees and commissions through a derivative suit.

Plaintiffs' argument that they can avoid such well-settled law because mutual funds are different, Compl. ¶¶154-158, has no basis in legal theory or precedent. Plaintiffs' allegations are that defendants "were using so-called 12b-1 fees, directed brokerage, and excessive commissions to improperly siphon assets from the Funds," *id.* ¶113, "directly diminishing investors' holdings in the Funds." *Id.* ¶80. As this Court has reiterated, such allegations of "mismanagement of funds" or "breach of fiduciary duty resulting in a diminution of the value" of shares or assets are claims "held by the corporation itself" and thus "derivative if brought by an investor." *Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass. 1996) (limited partnership).

This established rule applies in Massachusetts and Oregon whether the entity in question is a corporation, a partnership, or a mutual fund. For example, it has long been Massachusetts law that a partner could not "rest his case on a personal claim" when the claim belonged to the partnership – even when the partnership did not conduct a business but existed solely "for the purpose of collecting and administering the firm assets." *Shapira v. Budish*, 275 Mass. 120, 126 (1931). Oregon follows the same rule. *See, e.g., Caplener v. U.S. Nat'l Bank of Oregon*, 857 P.2d 830, 836 (Or. 1993) (partners may not bring direct claims when "the damages alleged by the individuals are derivative of the damages to the partnership").

Because partners are aligned even more closely with their partnerships than shareholders with their funds, it follows *a fortiori* that if the distinction between direct and derivative claims applies to partnerships, it necessarily applies to mutual funds. Like mutual funds, a partnership's income and expenses directly determines the value of a partner's share because partnership proceeds, whether or not distributed, belong to and are taxed to partners, just as fund income and expenses determine the value of its investors' holdings. But general partners are also directly

liable for the partnership's contractual obligations or tortious conduct – a closer identity than exists between mutual funds and their shareholders.

Indeed, *Marcus v. Putnam*, 60 F.R.D. 441, 443 (D. Mass. 1973), has already applied the traditional derivative versus direct claim rule to mutual funds, after expressly rejecting the argument plaintiffs make here. In *Marcus*, mutual fund shareholders, who filed direct claims challenging directed brokerage and advisory fees, argued "that a mutual fund is a unique entity that cannot be equated with a business corporation" and that fund holders may sue directly. The court rejected that argument on the ground that "[t]he shareholder of a mutual fund does not attain a primary right to sue because the value of his share reflects the net asset value of the fund. Rather, it is the nature of the right sought to be enforced that determines the proper way to bring suit." *Id*. (citations omitted). Thus, the court held that "recapture of give-ups [directed brokerage] and excessive advisory fees are all claims which belong to the Funds and to all shareholders in general" and "are enforceable derivatively" not directly. *Id*. at 444. *See also Eaton Vance Mutual Funds Fee Litigation*, 2005 U.S. Dist. LEXIS 15731, at *32 ("the injury asserted – the misuse of [fund] assets to provide excessive compensation to brokers, improper 12b-1 plans, and soft dollar compensation to brokers – is an injury to the [] Funds that adversely affects the plaintiffs only indirectly through their status as investors") (applying Massachusetts law to dismiss "shelf-space" payment claims because they were not brought derivatively).

Likewise, plaintiffs' claims here that defendants misused Fund assets – for excessive advisory fees, directed brokerage arrangements, and improper use of 12b-1 fees and soft dollars – belong to the Funds and are enforceable by plaintiffs only through a derivative suit.[21]

---

[21] *See also Kauffman v. The Dreyfuss Fund, Inc.*, 434 F.2d 727, 732-33 (3d Cir. 1970) (rejecting the argument that plaintiffs' urge here – that mutual fund investors may bring direct rather than derivative suits because "the redemptive value of a mutual fund share bears a direct relationship

**B.    Plaintiffs' Failure to Make Presuit Demands on the Funds Precludes the Derivative Claim and Conversion of Direct Claims to Derivative Ones.**

Plaintiffs have failed to comply with the presuit demand requirement of Fed. Rule of Civ. Proc. 23.1, as it incorporates the law of either Massachusetts or Oregon. Massachusetts, by statute, requires a presuit demand for derivative claims that cannot be excused. Section 7.42 of the Massachusetts Business Corporation law provides that: "No shareholder may commence a derivative proceeding until: (1) a written demand has been made upon the corporation to take suitable action" and a set period of days has elapsed or the shareholder is earlier informed that the demand has been rejected. Mass. Gen. Laws ch. 156D, § 7.42. The statutory provision took effect on July 1, 2004, *id.* – before this action was filed[22] – and overruled that part of Massachusetts' Rule of Civil Procedure 23.1 which had previously provided an exception when such demand would be futile and futility was adequately pleaded.

Plaintiffs here concede they have not complied with this requirement, even with respect to the one claim they assert derivatively. Compl. ¶169 ("Plaintiffs have not made any demand on the Boards of Trustees (the 'Boards') to institute this action for their derivative claim"). Plaintiffs were required to make such a demand under Section 7.42, which governs derivative suits brought on behalf of Massachusetts Business Trusts. *See ING Principal Protection Funds Derivative Litig.*, 369 F. Supp. 2d at 171 (rejecting plaintiffs' argument that the new universal demand requirement apply only to derivative suits brought on behalf of corporations and dismissing a derivative claim on behalf of a Massachusetts business trust because plaintiffs had

---

to the total net assets owned by the fund" – and ruling that this fact in no way "alter[s] the basic shareholder-corporation relationship" or destroys the "separate and distinct" entity of the fund "which is the basis for distinguishing the rights, responsibilities, and immunities of the shareholders from the rights and obligations of the corporation").

[22] The original complaints in this case were filed, respectively, August 2, 2004 (Cohen), August 10, 2004 (Osburn), August 11, 2004 (Slicker), and September 8, 2004 (Simmonds).

failed to make a presuit demand on the Board of Trustees).

With respect to the Oregon funds, Rule 23.1's requirement that a presuit demand be made before bringing a derivative suit in a federal court also applies, but demand may be excused if it would be futile. *See* ORS § 60.261. Here, however, nothing plaintiffs have alleged constitutes a showing of futility. Oregon recognizes a "presumption" that directors "will do their duty." *See Baillie v. Columbia Gold Mining Co.*, 166 P. 965, 971 (Or. 1917). A majority of the trustees of these funds are also independent under the ICA, *see* 15 U.S.C. § 80a-2(a)(19), and plaintiffs do not contend otherwise.[23] *See ING*, 369 F. Supp. 2d at 171 (trustees considered "independent" under the ICA are presumed to be independent and disinterested).

Plaintiffs allege no specific facts to overcome these presumptions, such as that any trustee transferred fund assets to a company owned by himself or a relative. *Cf. North v. Union Savings & Loan Ass'n.*, 117 P. 822 (Or. 1911) (detailed allegations of conspiracy by directors to grab corporate assets for themselves excused demand on board). Instead, plaintiffs set forth only general allegations which are insufficient as a matter of law. For example, plaintiffs' conclusory allegations that the trustees are all controlled by the advisers, Compl. ¶170, do not excuse demand. *See Baillie*, 166 P. at 971 ("The mere fact that directors are elected by the vote of [an entity] against whom suit should be brought, does not raise a presumption that they will refuse to order a suit brought or will conduct such suit collusively. . . . A general statement that the corporation or its board of directors is in control of the guilty party will not suffice").

Likewise, plaintiffs' other bases for asserting futility do not come close to what *North* and *Baillie* require. Plaintiffs assert only vague allegations applicable to any board of directors –

---

[23] The Columbia Acorn Fund board, for example, included two interested trustees and eight non-interested trustees. *See* Columbia Acorn SAI at 35. The SAI also discloses that trustees "affiliated with the Adviser serve without any compensation from the Trust." *Id.*

allegations that have been roundly rejected in jurisdictions that have addressed them and by the American Law Institute in its *Principles of Corporate Governance*, which Oregon relies on to resolve such questions. *See Loewen*, 882 P.2d at 113.

Plaintiffs' assertion that demand is excused because the trustees approved the actions they challenge, Compl. ¶171, has been rejected by the ALI and routinely rejected by courts. *See* 1 ALI, *Principles of Corporate Governance: Analysis and Recommendations* § 1.23 (1994) ("*ALI*") (a director is not "interested" simply because "the director approved of or acquiesced in the transaction or conduct that is the subject of the action"); *Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir. 1983) (same); *In re Kauffman Mutual Fund Actions*, 479 F.2d 257, 265 (1st Cir. 1973) (same) (approval of advisory fees); *ING*, 369 F. Supp. 2d at 172 (same) (advisory fees).

Plaintiffs' assertion that the trustees' compensation for serving as trustees excuses demand or even renders them "interested," Compl. ¶174-75, has been expressly rejected by the ALI and multiple courts. *See, e.g., ALI* § 1.23 (defining "interested" as including material pecuniary interest "other than usual and customary directors' fees and benefits"); *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133 (2d Cir. 2004) (rejecting argument that "very large director's salaries" of mutual fund directors excuse compliance with the demand requirement); *Kamen v. Kemper Fin. Servs.*, 939 F.2d 458, 460 (7th Cir. 1991) (the fact that directors are compensated handsomely does not render them "interested"); *Werbowsky v. Collomb.*, 766 A.2d 123, 145-46 (2001) (directors' receipt of large fees and their desire to retain their directorships are insufficient to demonstrate demand futility); *Harhen v. Brown*, 431 Mass. 838, 843 & n.5 (2000).

Service on multiple boards, even though it multiplies compensation, does not yield a different result. *See, e.g., Krantz v. Prudential Inv. Fund Mgmt.*, 305 F.3d at 143-44 (ruling that service on multiple fund boards with compensation between $45,000 and $135,000 per year does

not overcome presumption that independent directors are not "interested"); *Migdal*, 248 F.3d at 330 (rejecting argument that directors' service on dozens of funds establishes they are "interested" parties and noting that "membership on the boards of several funds within a mutual fund complex is the prevailing practice in the industry"); *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 37 F. Supp. 2d 256, 258-59 (S.D.N.Y. 1999), *aff'd without op.*, 208 F.3d 204 (2d Cir. 2000) (service on 21 boards with compensation between $140,000 and $160,000 did not establish "control"); *Krantz v. Fidelity Mgmt. & Research Co.*, 98 F. Supp. 2d at 157 ("the directors' well-compensated multiple board membership is insufficient to rebut the statutory presumption against control"). The SEC has consistently taken the same position. *See, e.g.,* SEC, Fed. Sec. L. Rep. *(CCH)* ¶86,211, at 82,440 (Oct. 14, 1999) ("a director of a fund who also is a director of another fund managed by the same adviser generally would not be viewed as an interested person of the fund . . . solely as a result of this relationship").

Plaintiffs' final argument for futility – that trustees are named as defendants, Compl. ¶177 – would permit any defendant to eliminate the demand requirement by naming directors as defendants. Not surprisingly, this basis has also met with unequivocal rejection. *See, e.g., Heit v. Baird*, 567 F.2d 1157, 1162 (1st Cir. 1977).

By choosing not to comply with the necessary precondition for bringing a derivative claim, plaintiffs have precluded themselves from maintaining Count V, their one derivative claim. *See, e.g., Zurich Capital Mkts. Inc. v. Coglianese*, 332 F. Supp. 2d 1087, 1115 (N.D. Ill. 2004) (dismissing a § 215 derivative claim because plaintiffs had not complied with the demand requirement). They have also precluded the Court from converting their direct claims into derivative claims. Thus, Counts I, II, IV, V, VI, VII and VIII should be dismissed.

## IX.  PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON LAW BREACH OF FIDUCIARY DUTY OR UNJUST ENRICHMENT.

Plaintiffs have not, and cannot, state any basis for their premise that the trustees, officers, advisers or distributors owe an enforceable fiduciary duty to them or to other shareholders. Shareholders have a contractual relationship with the funds themselves, but no direct relationship with the trustees, officers, advisers or distributors.  Any duty owed by the trustees, officers, advisers or distributors is owed directly to the funds with whom they are affiliated, not to those who merely own shares of the funds with whom they have no relationship. *See Jernberg v. Mann*, 358 F.3d 131, 135 (1st Cir. 2004) (noting it is hornbook law in Massachusetts that a "director or officer of a corporation does not occupy a fiduciary relation to individual stockholders" and that although "it is sometimes said that directors and officers owe a fiduciary duty to the corporation and its shareholders, any responsibility to the latter is anchored in the duty to the former"). *See also Goodwin v. Agassiz*, 283 Mass. 358, 361 (1933) ("The contention that directors also occupy the position of trustee toward individual stockholders in the corporation is plainly contrary to repeated decisions of this court and cannot be supported.").

The same rule governs in Oregon. *See, e.g., Kahn v. Sprouse*, 842 F. Supp. at 426 (noting that directors' special duty to shareholders of closely-held corporations does not apply "to an open market situation" where shareholders can easily sell their shares) (dismissing claims).

Advisers and distributors, who are subcontractors to the funds, are even further removed from the shareholders.  Massachusetts and Oregon have never recognized a fiduciary duty owed by a third party subcontractor to its client's shareholders. *See Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg*, 405 Mass. 506, 572 (1989) (recognizing that no such duty had been found, reserving judgment as to whether such a duty might be recognized in the special case of an attorney for a close corporation, and concluding that, even if such a duty were

recognized, claims for overpayment by the corporation must be brought derivatively).

Furthermore, plaintiffs have not pleaded facts sufficient to state a claim that the trustees

or officers breached their fiduciary duties to the funds themselves because plaintiffs have not

pleaded facts sufficient to overcome the business judgment rule. This rule, long recognized at

common law,[24] and now codified by statute in both Massachusetts and Oregon, provides a

complete defense to the officers and trustees so long as they performed their duties in good faith,

in a manner they reasonably believed to be in the best interest of the corporation and with the

care of an ordinarily prudent person. *See* Mass. Gen. Laws. ch. 156B, § 65; ch. 156D,

§ 8.30(a)&(c), § 8.42(a)&(c); ORS § 60.357. Officers and trustees "are not responsible for mere

errors of judgment or want of prudence in the performance of their duties." *Boston Children's*

*Heart Found. v. Nadal-Ginard*, 73 F.3d 429, 433(1st Cir. 1996).

Plaintiffs have not alleged here that the officers or trustees engaged in fraud, nor have

they pleaded the specific facts required of a fraud allegation under Fed. R. Civ. P. 9(b), such as

what precisely these defendants are alleged to have known at relevant times and the facts from

which plaintiffs conclude that they had such knowledge. Plaintiffs also have not alleged that any

trustee or officer engaged in self-dealing or availed himself of a business opportunity that should

have first been offered to the funds. There are no allegations that personal loans or gifts were

---

[24] *See Spiegel v. Beacon Participations, Inc.*, 297 Mass. 398, 433 (1937) ("It is no part of the judicial function to substitute its business view for that of those vested by law with the control of corporate affairs.") (finding no breach of fiduciary duty); *Sears v. Orchards Water Co.*, 236 P. 502, 504 (Or. 1925) ("The court will not substitute its judgment for the judgment of the directors of the corporation.") (affirming dismissal of claims).

Individual defendants, Joseph R. Palombo, J. Kevin Connaughton, P. Zachary Egan, Kevin S. Jacobs, Kenneth A. Kalina, Bruce H. Lauer, Jean Loewenberg, Robert A. Mohn, Louis J. Mendes, Todd Narter, Christopher Olson, Jon H. Park, Vincent P. Pietropaolo, Joseph Turo, and Leah J. Zell, have not yet been served. These defendants are current or former employees of the Columbia defendants and, at the request of plaintiffs, the Columbia defendants are in the process of contacting the individual defendants to determine whether Columbia defendants' counsel may accept service on their behalf.

provided or that transactions were undertaken with companies under any officer's or trustee's control. There are not even allegations that officers or trustees were provided compensation inappropriate to their responsibilities or prevailing rates.

In short, there are no allegations of any of the types of behavior that have previously been recognized in Massachusetts or Oregon as a breach of fiduciary duty. *See, e.g., Demoulas v. Demoulas Super Mkts., Inc.*, 424 Mass. 501 (1997) (affirming breach of fiduciary duty findings where a trustee had usurped used corporate assets and personnel to acquire and develop competing companies owned by members of his immediate family and caused the company to sell properties to his family's companies at less than market value); *Durfee v. Durfee & Canning, Inc.*, 323 Mass. 187 (1948) (director breached fiduciary duty by causing corporation to purchase supplies at above market prices from company he controlled); *Amer. Timber & Trading Co. v. Niedermeyer*, 558 P.2d 1211, 1215, 1217 (Or. 1976) (director breached fiduciary duty by substituting his own company on American Timber's contract with a supplier and reselling the supplies to American Timber at a substantial profit and various other "schemes to siphon off money" from American Timber to his own use).

Rather than setting forth any basis for concluding that these trustees and officers were engaged in *self*-dealing, plaintiffs make clear that the actions they complain of were undertaken in order to market the funds successfully. Compl. ¶¶2, 3, 4, 75, 76, 77, 80, 81, 82, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 98, 99, 101, 103, 114, 115, 133, 137, 138, 147, 153. Plaintiffs demonstrate, in their own complaint, that this goal is in the best interest of the funds when they allege: "Appreciation of a mutual fund's assets is one of the keys to its survival, for if a mutual fund's assets stagnate or decrease, there is a great likelihood that the fund will be disbanded or merged with another fund." *Id.* ¶174. It can hardly be considered self-dealing to work toward

- 56 -

keeping the business you have been charged with protecting *in business*.

Plaintiffs also cannot eke self-dealing out of allegations that the trustees and officers are paid fees for the services they provide or that they approved or allowed the business practices plaintiffs challenge. Such claims do not even establish that a trustee or officer is "interested," much less engaged in self-dealing. *See Harhen*, 431 Mass. at 843 & n.5 (a director is "deemed 'disinterested'" if his only pecuniary interest is the "usual and customary directors' fees and benefits" or if the allegations are "based only on the fact that the director approved of or acquiesced in the transaction or conduct that is the subject of the action"); *ALI* §1.23 (same).

Plaintiffs' failure to state a cognizable claim for breach of fiduciary duty under state law, therefore, provides additional grounds for dismissing Counts VI and VII. Plaintiffs' separate Count VIII, entitled "Unjust Enrichment," asks for disgorgement of improper fees. Because the count simply "request[s] equitable relief for the alleged wrongs" and does "not set forth a separate legal theory," dismissal of the common law breach of fiduciary duty claims requires dismissal of this common law count as well. *Symmons*, 419 Mass. at 289.

## CONCLUSION

For the foregoing reasons, movants request that all claims against them be dismissed in their entirety with prejudice.

August 8, 2005                          Respectfully submitted,

                                        By: /s/ _____
                                            Frances S. Cohen (BBO #542811)
                                            DECHERT LLP
                                            200 Clarendon Street, 27th Floor
                                            Boston, MA 02116
                                            Tel: (617) 728-7100
                                            Facsimile: (617) 426-6567

Michael S. Doluisio
Nory Miller
DECHERT LLP
1717 Arch Street
Philadelphia, PA 19103
Tel:  (215) 994-4000
Facsimile: (215) 994-2222

*Counsel for Defendants Bank of America Corporation,
Fleet Boston Financial Corporation, Columbia
Management Group, Inc., Columbia Management
Advisors, Inc., Columbia Wanger Asset Management,
Inc., and Columbia Funds Distributor, Inc.*

/s/
_____
Brien T. O'Connor (BBO # 546767)
Giselle J. Joffre  (BBO # 658047)
ROPES & GRAY LLP
One International Place
Boston, MA 02110-2624
(617) 951-7000

*Counsel for Defendants Columbia Funds Trust and
Columbia Funds, excluding Columbia Acorn Trust and
Columbia Acorn Funds*

/s/
_____
Richard J. Rosensweig  (BBO# 639547)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA  02110
(617) 482-1776

OF COUNSEL:
Phil C. Neal  ARDC #2023369
Mark A. Rabinowitz  ARDC #3122026
Dao L. Boyle  ARDC #6269407
Jenny S. Kim  ARDC #6277785
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 2200
Chicago, IL  60602
(312) 269-8000

*Counsel for Defendants Charles P. McQuaid
and Ralph Wanger*

- 58 -

# EXHIBIT A

# OTHER "EXCESSIVE FEE" CASES
# FILED BY CERTAIN OF PLAINTIFFS' COUNSEL

1. Boyce v. AIM Mgmt. Group Inc., 4:04-cv-2587 (S.D. Tex) (concerning the AIM/Invesco Funds)

2. In re: AllianceBernstein Mutual Funds Excessive Fee Litigation, 1:04-cv-4885 (S.D.N.Y.) (concerning the Alliance Funds)

3. Corbi v. The Capital Group Companies Inc., 2:04-cv-5593 (C.D. Cal.) (concerning the Capital Group Funds)

4. In re: Columbia Entities Litigation, 1:04-cv-11704 (D. Mass) (concerning the Columbia Funds)

5. Alexander IRA v. Davis Investments, LLC, 1:04-cv-4186 (S.D.N.Y.) (concerning the Davis Funds)

6. Icardo v. Deutsche Bank AG, 1:04-cv-3637 (S.D.N.Y.) (concerning the Deutsche Funds)

7. Mazza v. Deutsche Bank AG, 1:04-cv-3501 (S.D.N.Y.) (concerning the Deutsche Funds)

8. Walker v. Deutsche Bank AG, 1:04-cv-1921 (S.D.N.Y.) (concerning the Deutsche Funds)

9. Hayes v. Mellon Financial Corp., 2:04-cv-0128 (W.D.Pa.) (concerning the Dreyfus Funds)

10. Bellikoff v. Eaton Vance Corp., 1:04-cv-1144 (S.D.N.Y) (concerning the Eaton Vance Funds)

11. In re: Evergreen Mutual Funds Fee Litigation, 1:04-cv-4453 (S.D.N.Y.) (concerning the Evergreen Funds)

12. Spahn IRA v. Federated Investors, Inc., 2:04-352 (W.D. Pa) (concerning the Federated Funds)

13. Gilliam v. Fidelity Investments, 1:04-cv-11600 (D. Mass) (concerning the Fidelity Funds)

14. Alexander IRA v. Franklin Resources, Inc., 2:04-cv-982 (D.N.J.) (concerning the Franklin Funds)

15. Smith v. Hartford Financial Services Group Inc., 3:04-cv-0344 (D. Conn.) (concerning the Hartford Funds)

**EXHIBIT A**

16. <u>White v. Lord Abbett & Co LLC</u>, 2:04-cv-559 (D.N.J.) (concerning the Lord Abbett Funds)

17. <u>Forsythe v. Sun Life Financial. Inc.</u>, 1:04-cv-10584 (D. Mass.) (concerning the MFS Funds)

18. <u>In re: Oppenheimer Funds Fee Litigation</u>, 1:04-cv-7022 (S.D.N.Y.) (concerning the Oppenheimer Funds)

19. <u>Alexander v. Allianz Dresdner Asset Management of America LP</u>, 3:04-cv-280 (D. Conn.) (concerning the PIMCO Funds)