# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ———————————————— x | | |
| **In re COLUMBIA ENTITIES LITIGATION** | : | **CIVIL ACTION NO.: 04-11704 (REK)** |
| | : | **ALL CASES** |
| | : | |
| | : | **Consolidated Case Nos.:** |
| | : | **04cv11750** |
| | : | **04cv11760** |
| | : | **04cv11953** |
| | : | |
| ———————————————— x | | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**MOULTON & GANS, P.C.**
Nancy Freeman Gans (BBO #184540)
33 Broad Street, Suite 1100
Boston, Massachusetts  02109-4216
(617) 369-7979

*Proposed Liaison Counsel*

**MILBERG WEISS BERSHAD**
 **& SCHULMAN LLP**
Jerome M. Congress
Janine L. Pollack
Kim E. Miller
Michael R. Reese
One Pennsylvania Plaza
New York, New York  10119-0165
(212) 594-5300

*Proposed Co-Lead Counsel*

**STULL, STULL & BRODY**
Jules Brody
Mark Levine
6 East 45th Street
New York, New York  10017
(212) 687-7230

*Proposed Co-Lead Counsel*

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...........................................................................................................8

I.    PLAINTIFFS HAVE PROPERLY ALLEGED A VIOLATION OF INVESTMENT COMPANY ACT § 36(b) ...........................................8

    A.    Plaintiffs Allege that Defendants' Fees Were Excessive Because They Did Not Benefit the Funds or their Shareholders in Violation of § 36(b)...........................................................8

    B.    Plaintiffs Have Alleged that Defendants' Rule 12b-1 Fees Were Excessive, in Violation of § 36(b) ...........................................15

    C.    Plaintiffs Have Alleged that Defendants' Soft Dollar Practices Violated § 36(b) .........................................................18

    D.    Plaintiffs Have Alleged that Defendants' Directed Brokerage Practices Violated § 36(b)...................................................20

    E.    Defendants Are Liable for Violating § 36(b) for the Charging of Excessive Fees Even for Monies that Were Paid to Third-Party Brokers.............................................................22

    F.    Plaintiffs' § 36(b) Claims Are Properly Brought Against the Trustee/Officer Defendants.........................................25

    G.    Plaintiffs Have Properly Brought Their § 36(b) Claims on Behalf of the Funds.........................................................29

II.    PLAINTIFFS HAVE STANDING TO ASSERT ALL OF THEIR CLAIMS .........................................................................30

    A.    Plaintiffs Have Standing to Assert Direct Claims on Behalf of All Columbia Funds Shareholders ...................................31

        1.    Courts Have Held That a Plaintiff Need Not Have Invested in Each Fund to Satisfy the Standing Requirement ......................31

        2.    Plaintiffs Have Standing to Assert Direct Claims under § 36(b) on Behalf of Shareholders of All Columbia Funds...........35

            a.    Supreme Court Rulings and Legislative History Confirm that § 36(b) Claims Are Direct Rather than Derivative.........................................................35

        b.      The Language of § 36(b) Confirms that the Fund Shareholders Have a Primary and Direct Right of Action Under § 36(b) .........................................................38

        c.      The Mere Fact that the Stockholders Assert their § 36(b) Claims for the Benefit of the Mutual Fund Does Not Render the Claim "Derivative" and Does Not Preclude Class Treatment ..........................................41

    3.      Plaintiffs also Have Standing to Pursue Their Direct Claims on Behalf of Shareholders in All of the Columbia Funds Pursuant to the Juridical Link Doctrine .........................................41

    4.      Plaintiffs Have Standing Due to their Ongoing Financial Interest in the Outcome of the Litigation Regarding All Funds..................................................................................................45

  B.     Plaintiffs Have Standing to Pursue Claims "On Behalf Of" All of the Columbia Funds as Members of an Unincorporated Association Pursuant to Fed. R. Civ. P. 23.1 and 23.2 ..................................................47

III.   PLAINTIFFS HAVE PROPERLY PLEADED DIRECT (NOT DERIVATIVE) CLAIMS UNDER STATE LAW AND INVESTMENT COMPANY ACT §§ 34(b), 36(a), AND 48(a) .....................................................50

IV.   A PRIVATE RIGHT OF ACTION EXISTS UNDER INVESTMENT COMPANY ACT §§ 34(b), 36(a) AND 48(a) .....................................................59

  A.     Congress Intended that a Private Right of Action Exist under §§ 34(b) and 36(a).....................................................................................59

  B.     *Jackson*, the Most Recent Supreme Court Decision on this Issue, Supports a Private Right of Action under §§ 34(b) and 36(a) ..................66

V.    PLAINTIFFS HAVE ADEQUATELY ALLEGED A VIOLATION OF INVESTMENT COMPANY ACT § 48(a).........................................................70

VI.   PLAINTIFFS HAVE PROPERLY ALLEGED A VIOLATION OF THE INVESTMENT ADVISERS ACT ....................................................................72

  A.     Defendants' Performance of the Advisory Contract Violated § 206 .........72

  B.     Plaintiffs Have Adequately Pleaded Demand Futility for Their IAA Claim................................................................................................................74

    1.      Plaintiffs Have Established Demand Futility under Oregon Law ............................................................................................................75

2.  Plaintiffs Have Established Demand Futility under
Massachusetts Law .................................................................78

VII.  PLAINTIFFS HAVE PROPERLY ALLEGED VIOLATIONS OF STATE
LAW ...............................................................................................80

A.  Plaintiffs' State Claims Are Not Preempted by SLUSA ..........................80

B.  Plaintiffs Have Properly Pleaded a Breach of Fiduciary Duty .................85

1.  Plaintiffs State a Claim for Breach of Fiduciary Duty
Against the Investment Adviser Defendants................................85

2.  Plaintiffs State a Claim for Breach of Fiduciary Duty
Against the Trustee/Officer Defendants .......................................87

C.  Plaintiffs Have Properly Pleaded Unjust Enrichment...............................89

CONCLUSION..............................................................................................90

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Adair v. Sorenson*,
    134 F.R.D. 13 (D. Mass. 1991) ........................................................................43

*Albemarle Paper Co. v. Moody*,
    422 U.S. 405 (1975) ........................................................................................64

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ........................................................................59, 65, 67, 70

*Alves v. Harvard Pilgrim Health Care, Inc.*,
    204 F. Supp. 2d 198 (D. Mass. 2002) .............................................................42

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
    794 F. Supp. 1424 (D. Ariz. 1992) ..................................................................34

*Araujo v. John Hancock Life Ins. Co.*,
    206 F. Supp. 2d 377 (E.D.N.Y. 2002) .............................................................86

*Associated Students of U.C. Riverside v. Kleindienst*,
    60 F.R.D. 65 (C.D. Cal. 1973) ........................................................................48

*Atencio v. Smith Barney*,
    2005 U.S. Dist. LEXIS 1526, 2005 WL 267556 (S.D.N.Y. Feb. 2, 2005) ...........83

*Bachman v. A.G. Edwards*,
    2005 WL 2346896 (E.D. Mo. Sept. 26, 2005) .............................82, 83, 84, 85, 86

*Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc.*,
    825 F.2d 731 (3d Cir. 1987) ............................................................................66

*Batra v. Investors Research Corp.*,
    1991 U.S. Dist. LEXIS 14773 (W.D. Mo. Oct. 4, 1991) ...................................46

*Baum v. Investors Diversified Servs., Inc.*,
    409 F.2d 872 (7th Cir. 1969) ..........................................................................56

*Bingham v. Zolt*,
    66 F.3d 553 (2d Cir. 1995) ..............................................................................55

*Blasberg v. Oxbow Power Corp.*,
    934 F. Supp. 21 (D. Mass. 1996) ...............................................................52, 53

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975)..................................................................................83

*Bogart v. Shearson Lehman Bros., Inc.*,
    1993 U.S. Dist. LEXIS 1182 (S.D.N.Y. Feb. 3, 1993)..........................73

*Bonano v. East Caribbean Airline Corp.*,
    365 F.3d 81 (1st Cir. 2004).....................................................................65

*Brown v. Bullock*,
    294 F.2d 415 (2d Cir. 1961)....................................................................66

*Burks v. Lasker*,
    441 U.S. 471 (1979)................................................................................39

*Ceribelli v. Elghanayan*,
    990 F.2d 62 (2d Cir. 1993)......................................................................55

*Chinn v. Belfer*,
    2002 U.S. Dist. LEXIS 20343 (D. Or. June 19, 2002) ..........................83

*Cohen v. Beneficial Loan Corp.*,
    337 U.S. 541 (1949)................................................................................36

*Cross v. Oneida Paper Products Co.*,
    117 F. Supp. 919 (D.N.J. 1954) .............................................................48

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    395 F.3d 25 (2d Cir. 2005)......................................................................83

*Daily Income Fund, Inc. v. Fox*,
    464 U.S. 523 (1984)......................................................................... passim

*Davis v. Kozlowski*,
    2005 U.S. Dist. LEXIS 4481 (D.N.H. Mar. 17, 2005) ..........................83

*Delaware & Hudson Co. v. Albany & Susquehanna R. Co.*,
    213 U.S. 435 (1909)................................................................................36

*Deutschman v. Beneficial Corp.*,
    761 F. Supp. 1080 (D. Del. 1991)..........................................................85

*Donatelli v. Nat'l Hockey League*,
    893 F.2d 459 (1st Cir. 1990)...................................................................48

*Dowling v. Narragansett Capital Corp.*,
    735 F. Supp. 1105 (D.R.I. 1990).............................................................71

*In re Dreyfus Aggressive Growth Mut. Fund Litigation*,
  2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 19, 2000)......................................................32

*Dull v. Arch*,
  2005 U.S. Dist. LEXIS 14988 (N.D. Ill. July 27, 2005)........................................................69

*In re Eaton Vance Corp. Sec. Litig.*,
  219 F.R.D. 38 (D. Mass. 2003).............................................................................32, 42, 43

*In re Eaton Vance Corp. Sec. Litig.*,
  220 F.R.D. 162 (D. Mass. 2004)................................................................................13, 53

*In re Eaton Vance Mutual Funds Fee Litig.*,
  380 F.Supp.2d 222 (S.D.N.Y. 2005)....................................................................13, 53, 69

*Esplin v. Hirschi*,
  402 F.2d 94 (10th Cir. 1968) .......................................................................................66

*Estates of Unger v. Palestinian Auth.*,
  304 F. Supp. 2d 232 (D.R.I. 2004)...............................................................................48

*Exxon Mobil Corp. v. Allapattah Services, Inc.*,
  125 S. Ct. 2611 (2005)................................................................................................69

*Falkowski v. Imation Corp.*,
  309 F.3d 1123 (9th Cir. 2002) ....................................................................................83

*Fallick v. Nationwide Mutual Insurance Co.*,
  162 F.3d 410 (6th Cir. 1998) ......................................................................................34

*Feitelberg v. Merrill Lynch & Co., Inc.*,
  234 F. Supp. 2d 1043 (N.D. Cal. 2002) aff'd *without* opinion, 353 F.3d 765 ......................85

*Feitelberg v. Credit Suisse First Boston LLC*,
  2003 U.S. Dist. LEXIS 19116 (N.D. Ca. Oct. 21, 2003)...........................................81, 83, 84

*Fogel v. Chestnutt*,
  533 F.2d 731 (2d Cir. 1975).....................................................................................22, 23

*Foman v. Davis*,
  371 U.S. 178 (1962).....................................................................................................92

*Fox v. Reich & Tang, Inc.*,
  692 F.2d 250 (2d Cir. 1982)....................................................................................37, 38

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  694 F.2d 923 (2d Cir. 1982)....................................................................................11, 17

*Gilliam v. Fidelity Management & Research Co.*,
   2005 U.S. Dist. LEXIS 10478 (D. Mass. May 3, 2005) ......................................14

*Goldberger v. Bear Stearns & Co.*,
   2000 U.S. Dist. LEXIS 18714 (S.D.N.Y. Dec. 28, 2000) ......................................30

*Gollust v. Mendell*,
   501 U.S. 115 (1991)...........................................................................................46

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002)...........................................................................................59

*Goodman v. Lukens Steel Co.*,
   777 F.2d 113 (3d Cir. 1985), *aff'd on other grounds*, 482 U.S. 656 (1987) ...........................31

*Grabow v. PriceWaterhouseCoopers LLP*,
   313 F. Supp. 2d 1152 (N.D. Okla. 2004) ......................................83

*Gratz v. Bollinger*,
   539 U.S. 244 (2003)...........................................................................................31

*Green v. Ameritrade, Inc.*,
   279 F.3d 590 (8th Cir. 2002) ......................................82, 83, 84, 85, 86

*Green v. Fund Asset Management, L.P.*,
   19 F. Supp. 2d at 234 (D.N.J. 1998) ......................................12

*Green v. Nuveen Advisory Corp.*,
   295 F.3d 738 (7th Cir. 2002) ......................................11

*Gutierrez v. Deloitte & Touche, LLP*,
   147 F. Supp. 2d 584 (W.D. Tex. 2001)......................................81, 83

*Halligan v. Standard & Poor's/Intercapital, Inc.*,
   434 F. Supp. 1082 (E.D.N.Y. 1977) ......................................24, 26, 27, 29

*Hawes v. Oakland*,
   104 U.S. 450 (1882)...........................................................................................36

*Heffler v. U.S. Fidelity & Guar. Ins. Co.*,
   1992 U.S. Dist. LEXIS 3090 (E.D. Pa. Mar. 10, 1992)......................................42

*Henry v. Circus Circus Casinos*,
   223 F.R.D. 541 (D. Nev. 2004) (Def. Brf. at 16)......................................35

*Hicks v. Morgan Stanley & Co.*,
   2003 U.S. Dist. LEXIS 11972 (S.D.N.Y. July 16, 2003) ......................................31

*Hoffenberg v. Fed. Bureau of Prisons*,
  2004 U.S. Dist. LEXIS 19424 (D. Mass. Sept. 14, 2004) ....................................................65

*ING Principal Prot. Funds Deriv. Litig.*,
  369 F. Supp. 2d 163 (D. Mass. 2005) .................................................................11, 12, 15, 80

*J.I. Case v. Borak*,
  377 U.S. 426 (1964).............................................................................................................63

*Jackson v. Birmingham Board of Education*,
  125 S. Ct. 1497 (2005).................................................................................................. *passim*

*Jacobs v. Bremner*,
  2005 U.S. Dist. LEXIS 14762 (N.D. Ill. July 20, 2005)......................................................69

*Jones v. Harris Assocs., L.P.*,
  2005 WL 831301 (N.D. Ill. Apr. 7, 2005) ...............................................................6, 10, 14

*Kahn v. Sprouse*,
  842 F. Supp. 423 (D. Or. 1993) ..........................................................................................90

*Kamen v. Kemper Financial Services, Inc.*,
  500 U.S. 90 (1991)................................................................................37, 47, 51, 52, 75

*Kauffman v. Dreyfus Fund Inc.*,
  434 F.2d 727 (3d Cir. 1970)..........................................................................................40, 44

*Kircher v. Putnam Funds Trust*,
  403 F.3d 478 (7th Cir. 2005) ..............................................................................................85

*Kitchens v. U.S. Shelter Corp.*,
  1983 U.S. Dist. LEXIS 12812 (D.S.C. Oct. 13, 1983) ........................................................34

*Koster v. Lumbermens Mutual Casualty Co.*,
  330 U.S. 518 (1947)............................................................................................................36

*Krinsk v. Fund Asset Management, Inc.*,
  875 F.2d 404 (2d Cir. 1989)................................................................................................17

*Krome v. Merrill Lynch & Co.*,
  637 F. Supp. 910 (S.D.N.Y. 1986)......................................................................................66

*Lalondriz v. USA Networks, Inc.*,
  68 F. Supp. 2d 285 (S.D.N.Y. 1999)...................................................................................81

*Lessler v. Little*,
  857 F.2d 866 (1st Cir. 1988)..........................................................................................18, 66

*Levitt v. Johnson,*
    334 F.2d 815 (1st Cir. 1964) ................................................................66

*In re Lord Abbett Mutual Funds Fee Litigation,*
    2005 WL 2090517 (D.N.J. Aug. 30, 2005) ...........................................32

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..............................................................................46

*Luyando v. Bowen,*
    124 F.R.D. 52 (S.D.N.Y. 1989) ...........................................................41

*In re ML-Lee Acquisition Fund II L.P.,*
    848 F. Supp. 527 (D. Del. 1994) ...............................................33, 66, 71

*Malmros v. Jones,*
    2004 U.S. Dist. LEXIS 4371 (E.D. Pa. Feb. 27, 2004) ........................55

*Margaret Hall Found, Inc. v. Atlantic Fin. Mgmt., Inc.,*
    572 F. Supp. 1475 (D. Mass. 1983) ......................................................75

*Maywalt v. Parker & Parsley Petroleum Co.,*
    147 F.R.D. 51 (S.D.N.Y. 1993) ...........................................................33

*McLachlan v. Simon,*
    31 F. Supp. 2d 731 (N.D. Cal. 1998) ....................................................66

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
    456 U.S. 353 (1982) ..............................................................................65

*Meyer v. Oppenheimer Mgmt. Corp.,*
    764 F.2d 76 (2d Cir. 1985) .............................................................16, 66

*Meyer v. Oppenheimer Mgmt. Corp.,*
    895 F.2d 861 (2d Cir. 1990) .......................................................8, 17, 28

*Meyer v. Putnam Int'l Voyager Fund,*
    220 F.R.D. 127 (D. Mass. 2004) ..........................................................83

*Mgmt. Television Sys., Inc. v. Nat'l Football League,*
    52 F.R.D. 162 (E.D. Pa. 1971) .............................................................48

*Millenco L.P. v. meVC Advisors, Inc.,*
    2002 U.S. Dist. LEXIS 19512 (D. Del. Aug. 12, 2002) .......................12

*In re MobileMedia Sec. Litig.,*
    28 F. Supp. 2d 901 (D.N.J. 1998) ........................................................35

*Moore v. Comfed Sav. Bank*,
    908 F.2d 834 (11th Cir. 1990) ...................................................................45

*Morris v. Wachovia Sec., Inc.*,
    277 F. Supp. 2d 622 (D. Va. 2003) ..........................................................74

*Motta v. Samuel Weiser, Inc.*,
    768 F.2d 481 (1st Cir. 1985) ....................................................................48

*In re Mut. Funds Inv. Litig. (In re Janus Subtrack)*,
    2005 U.S. Dist. LEXIS 18083 (D. Md. Aug. 25, 2005) .....................12, 32

*Mutchka v. Harris*,
    373 F. Supp. 2d 1021 (C.D. Cal. 2005) ...................................................30

*Nenni v. Dean Witter Reynolds, Inc.*,
    No. 98-12454 (REK), 1999 U.S. Dist. LEXIS 23351 (D. Mass. Sept. 29, 1999) .................35

*Newby v. Enron Corp.*,
    2004 U.S. Dist. LEXIS 8158 (S.D. Tex. Feb. 24, 2004) ..........................42

*Norman v. Salomon Smith Barney Inc.*,
    350 F. Supp. 2d 382 (S.D.N.Y. 2004) ........................................74, 75, 86

*In re Nuveen Fund Litigation*,
    1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996) ...........................61

*Olmsted v. Pruco Life Ins. Co. of N.J.*,
    134 F. Supp. 2d 508 (E.D.N.Y. 2000), *aff'd*, 283 F.3d 429, 432 (2d Cir. 2002) ..............59, 70

*Olmsted v. Pruco Life Ins. Co. of New Jersey*,
    283 F.3d 429 (2d Cir. 2002) .............................................59, 60, 68, 70

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) .................................................................................35

*Payton v. County of Kane*,
    308 F.3d 673 (7th Cir. 2002) ...................................................................42

*Pfeiffer v. Bjurman, Barry & Assocs.*,
    2004 U.S. Dist. LEXIS 16924 (S.D.N.Y. Aug. 26, 2004) ...........11, 12, 15, 17, 18

*Price v. Gurney*,
    324 U.S. 100 (1945) .................................................................................36

*Professional Management Associates, Inc. Employees' Profit Sharing Plan v. KPMG LLP*,
    335 F.3d 800 (8th Cir. 2003) ............................................................84, 85

*Prostic v. Xerox Corp.*,
  1991 U.S. Dist. LEXIS 15950 ........................................................................41

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  163 F.R.D. 200 (S.D.N.Y. 1995) ...................................................................33

*Ramos v. Patrician Equities Corp.*,
  765 F. Supp. 1196 (S.D.N.Y. 1991)..............................................................35

*Resolution Trust Corp. v. DeLoitte & Touche*,
  822 F. Supp. 1512 (D. Colo. 1993)...............................................................49

*Riley v. Merrill Lynch, Pierce, Fenner & Smith*,
  292 F.3d 1334 (11th Cir. 2002) ...............................................................83, 84

*Ripon Soc'y v. Nat'l Republican Party*,
  525 F.2d 567 (D.C. Cir. 1975) ......................................................................49

*Risinger v. Concannon*,
  201 F.R.D. 16 (D. Me. 2001) ........................................................................41

*Ross v. Bernhard*,
  396 U.S. 531 (1970)......................................................................................36

*Rowinski v. Salomon Smith Barney, Inc.*,
  398 F.3d 294 (3d Cir. 2005)..........................................................................86

*SEC v. Capital Gains Research Bureau, Inc.*,
  375 U.S. 180 (1963).................................................................................73, 74

*SEC v. Happ*,
  392 F.3d 12 (1st Cir. 2004)...........................................................................61

*SEC v. Zanford*,
  535 U.S. 813 (2002)......................................................................................85

*Securities Investor Protection Corp. v, Barbour*,
  421 U.S. 412 (1975)......................................................................................62

*Shaev v. Claflin*,
  2001 U.S. Dist. LEXIS 6677 (N.D. Cal. May 17, 2001) .............................81

*Smith v. Sperling*,
  354 U.S. 91 (1957)........................................................................................77

*Strigliabotti v. Franklin Res., Inc.*,
  2005 U.S. Dist. LEXIS 9625 (N.D. Cal. Mar. 7, 2005)....................... passim

*Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*,
  964 F. Supp. 783 (S.D.N.Y. 1997)..........................................................................61, 65, 66

*Strougo v. Bassini*,
  282 F.3d 162 (2d Cir. 2002)......................................................................... *passim*

*Sutton v. Med. Serv. Ass'n*,
  1993 U.S. Dist. LEXIS 9763 (E.D. Pa. July 20, 1993).........................................31

*Tannenbaum v. Zeller*,
  552 F.2d 402 (2d Cir. 1977)..........................................................................39, 64

*Taussig v. Wellington Fund, Inc.*,
  313 F.2d 472 (3d Cir. 1963)..........................................................................66

*Tedesco v. Mishkin*,
  689 F. Supp. 1327 (S.D.N.Y. 1988)..........................................................................34

*Transamerica Mortg. Advisors, Inc.(TAMA) v. Lewis*,
  444 U.S. 11 (1979)..........................................................................73

*United States v. Cartwright*,
  411 U.S. 546 (1973)..........................................................................52

*Watterson v. Page*,
  987 F.2d 1 (1st Cir. 1993)..........................................................................75

*Wellington Int'l Commerce Corp. v. Retelny et. al*,
  727 F. Supp. 843 (S.D.N.Y. 1989)..........................................................................73, 75

*Wicks v. Putnam Inv. Mgmt.*,
  2005 U.S. Dist. LEXIS 4892 (Mar. 28, 2005) ................................................. *passim*

*Williams v. Bank One Corp.*,
  2003 U.S. Dist. LEXIS 23522 (N.D. Ill. Dec. 11, 2003).......................................35

*Woodard v. Online Info. Servs.*,
  191 F.R.D. 502 (E.D.N.C. 2000) ..........................................................................41

*Young v. Nationwide Life Ins. Co.*,
  2 F. Supp. 2d 914 ..........................................................................63

*Zimmerman v. Bell*,
  585 F. Supp. 512 (D. Md. 1984)..........................................................................77

## STATE CASES

*Alsea Veneer, Inc. v. State*,
  318 Ore. 33 (1993)..........................................................................77

*Baillie v. Columbia Gold Mining Co.*,
    166 P. 965 (1917)....................................................................................................76

*Cal. Pub. Emples. Ret. Sys. v. Coulter*,
    2002 Del. Ch. LEXIS 144 (Del. Ch. May 28, 2002) ............................................75

*In re Conduct of Kinsey*,
    294 Ore. 544 (1983)..............................................................................................76

*In re Dean Witter Partnership Litig.*,
    1998 Del. Ch. LEXIS 133 (July 17, 1998) (Def. Brf. at 15)................................35

*Goodwin v. Agassiz*,
    283 Mass. 358 (1993) ...........................................................................................90

*Harhen v. Brown*,
    730 N.E.2d 859 (Mass. 2000) ..............................................................................80

*Loewen v. Galligan*,
    130 Or. App. 222 (Or. Ct. App. 1994) .................................................................52

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) .........................................................................................54

*Mann v. Kemper Fin. Co.*,
    618 N.E.2d 317 .....................................................................................................55

*North v. Union Sav. & Loan Ass'n*,
    59 Ore. 483 (1911)................................................................................................76

*Paskowitz v. Wohlstadter*,
    822 A.2d 1272 (Md. Ct. Spec. App. 2003)...........................................................57

*Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.*,
    405 Mass. 506 (1989) ...........................................................................................90

*Simon v. Solomon*,
    431 N.E.2d 556 (Mass. 1982) ..............................................................................79

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d at 1033 (Del. 2004) ..............................................................................59

*White v. Panic*,
    783 A.2d 543 (Del. 2001) .....................................................................................81

*Wills v. Nehalem Coal Co.*,
    52 Ore. 70 (1908).............................................................................................76, 78

# FEDERAL STATUTES

5 U.S.C. §§ 80a-2(a)(3)(A) ........................................................................80

15 U.S.C. § 47(a) ......................................................................................70

15 U.S.C. § 78bb ...............................................................................19, 20, 81

15 U.S.C. § 78bb(f) ...................................................................................82

15 U.S.C. § 80a-1(b)(2) ..........................................................................52, 62

15 U.S.C. § 80a-2(a)(9) ..............................................................................71

15 U.S.C. § 80a-15(c) .................................................................................28

15 U.S.C. § 80a-21 .....................................................................................71

15 U.S.C. § 80a-30(a) .................................................................................61

15 U.S.C. § 80a-33(b) .................................................................................60

15 U.S.C. § 80a-35(b) ........................................................................... passim

15 U.S.C. § 80a-47(a) .................................................................................59

15 U.S.C. § 80a-8(a) ...................................................................................61

15 U.S.C. § 80b-6 .......................................................................................73

20 U.S.C. § 1681(a) ....................................................................................67

Department of Justice under Title VI of the Civil Rights Act of 1964,
    42 U.S.C. § 2000d ................................................................................68

Fed. R. Civ. P. 15(a) ..................................................................................92

Fed. R. Civ. P. 23 ......................................................................................30

Fed. R. Civ. P. 23.1 ...................................................................30, 47, 48, 49

Fed. R. Civ. P. 23.2 ...................................................................................49

H.R. Rep. No. 1341, 96th Cong. 2d Sess. 28-29 (1980) ............................65, 66

Investment Company Amendments Act of 1969, S. Rep. No. 91-184, at 15
    (May 21, 1969) ..........................................................................40, 50, 64

Investment Company Institute-Rule 12b-1,
    1998 S.E.C. No- Act ...............................................................................18

Prohibition on the Use of Brokerage Commissions to Finance Distribution,
  SEC Release No. IC-26356, 69 Fed. Reg. 9726, 9728-29......................................................22

Prohibition on the Use of Brokerage Commissions to Finance Distribution,
  SEC Release No. IC-26591, 69 Fed. Reg. 54728, 54728-29..................................................21

S. Rep. No. 1760, 86th Cong., 2d Sess. 4 (1960) ........................................................73

Securities and Exchange Commission, Public Policy Implications of Investment
  Company Growth, H.R. Rep. No. 2337, 89th Cong., 2d Sess. 144 (1966) ...........................17

## STATE STATUTES

Cal. Bus. & Prof. Code § 17200 ......................................................................53

Cal. Bus. & Prof. Code § 17500 ......................................................................53

Mass. Gen. Laws ch. 156D, § 7.42 ..................................................................79

Mass. Gen. Laws ch. 182, § 2B (2005)............................................................80

Mass. Code Ch. 182, § 5A ..............................................................................58

Massachusetts Code Ch. 182, § 5A ................................................................58

Plaintiffs submit this memorandum of law in opposition to the motions of Defendant Columbia Management Advisors, Inc. and its related entities ("Def. Brf."), the Independent Trustee Defendants ("Tr. Brf.") and the Columbia Acorn Trust ("Acorn Brf.") (collectively "Columbia" or "Defendants") to dismiss the Consolidated Amended Complaint ("Complaint"). The Complaint meets all applicable pleading standards and should be sustained.

## PRELIMINARY STATEMENT

This is a class action on behalf of holders of Columbia mutual funds ("Columbia Funds" or the "Funds"), during the period August 2, 1999 through March 22, 2004 (the "Class" and "Class Period," respectively) arising from the receipt of excessive compensation and fees by Defendants. Defendants are liable because the investment adviser fees, administrative fees, 12b-1 fees, and the director compensation received by Defendants from the Funds were grossly disproportionate to the value of services provided, and were not within the bounds of what would have been negotiated at arm's-length. During the relevant time frame, compensation and fees to the Adviser and Distributor Defendants rose even though the services provided by these Defendants remained the same, and no additional benefits were provided to the Funds in return for the additional fees.

A major reason for the dramatic increase in compensation to the Investment Adviser and Distributor Defendants was the growth in the size of the Funds resulting from Defendants' use of Fund assets to promote the sale of Fund shares. Among other things, those programs included: (a) cash payments to brokers in return for the brokers' agreement to promote sales of Fund shares; (b) the directing of Fund portfolio brokerage to brokerage firms in return for agreements by the brokers to promote the shares of the Funds; and (c) "soft dollar" commission arrangements with brokers. These payments resulted in the growth of the Funds, which benefited the Investment Adviser and Distributor Defendants because it allowed their

management fees and other asset-based fees to increase. The aforesaid Defendants engaged in those programs in an effort to generate increased compensation even though many of those programs were in violation of Securities and Exchange Commission ("SEC") and National Association of Securities Dealers ("NASD") rules and regulations. They engaged in such improper activity despite ample evidence that the increase in their compensation was not justified by any increase in the quality or nature of the services which they provided to the Funds, or by additional benefits to the Funds. In light of Defendants' scheme to increase the Funds' assets under management, the Trustee/Officer Defendants breached their duties to negotiate with the Investment Adviser and Distributor Defendants to lower their fees, and were otherwise instrumental in the implementation of Defendants' scheme. Defendants also omitted material facts from investors regarding their excessive fees and commissions charged to investors and the Funds.

Plaintiffs allege that, as a result of such conduct, Defendants are liable under §§ 34(b), 36(a), 36(b) and 48(a) of the Investment Company Act of 1940 (the "Investment Company Act" or "ICA"); under § 215 of the Investment Advisers Act of 1940 (the "Investment Advisers Act" or "IAA") for violations of IAA § 206; for unjust enrichment; and for breaches of their fiduciary duties to the Class.

The improper and undisclosed practice of charging excessive fees in order to increase assets under management to retain the benefits of economies of scale by paying undisclosed kickbacks to brokers as compensation for pushing mutual fund shares of the sort Defendants have engaged in here ("shelf-space programs") has been widespread throughout the mutual fund industry. On November 17, 2003, the SEC brought an action against the brokerage house

Morgan Stanley for accepting undisclosed kickbacks from certain mutual fund companies. ¶ 7.[1]
The SEC concluded that such an arrangement violated § 17(a)(2) of the Securities Act of 1933.
¶ 9. In a similar enforcement action announced on the same day, the NASD also condemned the
practices engaged in by certain mutual funds and Morgan Stanley, concluding that such
payments violated NASD Rule 2830(k).[2] ¶ 10.

As a result of the regulatory actions against Morgan Stanley, scores of brokerage houses
publicly disclosed that substantial payments were received from certain mutual fund companies
for pushing brokerage clients into funds and thereby increasing the fund companies' assets under
management. Over the last year, the SEC has issued cease and desist orders against a number of
mutual fund advisers and distributors for conduct virtually identical to the wrongdoing
complained of herein.[3]

---

[1] All references to "¶ __" are to the Complaint, unless otherwise noted.

[2] On March 23, 2005, the SEC instituted and simultaneously settled an enforcement action
against Citigroup Global Markets, Inc. ("CGMI") for, *inter alia*, failing to fully disclose that
CGMI was receiving revenue sharing payments from various mutual fund complexes in
exchange for access to "shelf space." Exhibit A to the accompanying Declaration of Janine L.
Pollack ("Pollack Decl.") (March 23, 2005 Order Instituting Administrative and Cease-and-
Desist Proceedings, Making Findings, and Imposing Remedial Sanctions In the Matter of
Citigroup Global Markets, Inc.

[3] In parallel proceedings against the mutual fund companies Massachusetts Financial Services
("MFS"), PA Distributors ("PIMCO"), Franklin-Templeton Distributors ("Franklin"), American
Funds Distributors ("American Funds") and Lord Abbett Distributor LLC, the SEC, as well as
other regulators, have repeatedly made clear that such undisclosed kickback schemes as that
engaged in by Columbia are illegal. *See* ¶¶ 117, 119-123; Pollack Decl. Ex. B (March 31, 2004
SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and
Imposing Remedial Sanctions In the Matter of Massachusetts Financial Services Co.); Pollack
Decl. Ex. C (September 15, 2004 SEC Order Instituting Administrative and Cease-and-Desist
Proceedings, Making Findings, and Imposing Remedial Sanctions In the Matter of PA Fund
Management LLC et al.); Pollack Decl. Ex. D (December 13, 2004 SEC Order Instituting
Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial
Sanctions In the Matter of Franklin Advisers, Inc. and Franklin/Templeton Distributors, Inc.);
Pollack Decl. Ex. E (February 16, 2005 NASD Disciplinary Proceeding against American Funds

The truth about Columbia Management's and the other Defendants' use of kickbacks to grow the assets in the Funds began to emerge on March 22, 2004 when Salomon Smith Barney disclosed it had engaged in a revenue sharing scheme by selling shelf space to mutual fund companies in return for additional payments to push those companies' funds—a scheme in which Columbia Management and the other Defendants had participated. ¶ 6. Columbia also had improper shelf space arrangements with, among others, Linsco Private Ledger Corp., RBC Dain Rauscher, Inc., FSC Securities Corp., and SunAmerica Securities, Inc., each of which the NASD recently fined for violation of the NASD's Anti-Reciprocal Rule (Rule 2830(k)), which prohibits firms from favoring the sale of shares of particular mutual funds on the basis of brokerage commissions received by the firm. *See* ¶¶ 90-92, 95-100; Pollack Decl. Ex. I (Press Release, NASD Charges 15 Firms With Directed Brokerage Violations, Imposes Fines Totaling More Than $34 Million (June 8, 2005)). In connection with this action, NASD Vice Chairman Mary L. Schapiro added that,

> When recommending mutual fund investments, firms must act on the basis of the merits of the funds and the investment objectives of the customers and not because of other benefits the brokerage firm will receive. NASD's prohibition on the receipt of directed brokerage is designed to eliminate these conflicts of interest.

---

Distributors, Inc.); Pollack Decl. Ex. F (March 23, 2005 Press Release re: *People v. State of California v. American Funds Distributors et al.*, filed by the California Attorney General's Office March 24, 2005); Pollack Decl. Ex. G (October 10, 2005 NASD Press Release, "NASD Charges Eight Firms [Including Lord Abbett Distributor LLC] With Directed Brokerage Violations, Imposes Fines Totaling More Than $7.75 Million"). The SEC, NASD and NYSE have also settled an action against mutual fund distributor Edward D. Jones & Co., L.P. ("Edward Jones") for its receipt of undisclosed kickbacks from mutual funds. Pollack Decl. Ex. H (Jones Financial Companies, L.L.L.P., Current Report (Form 8-K) (Dec. 27, 2004) and accompanying exhibits of settlement agreements between Edward D. Jones & Co., L.P. and the SEC, NASD, New York Stock Exchange, Inc., and the United States Attorney's Office for the Eastern District of Missouri).

*Id.*[4]

The Investment Adviser and Distributor Defendants were motivated to engage in this undisclosed scheme because the fees they collected for managing and advising the Columbia Funds were calculated as a percentage of assets under management and, therefore, increased as Columbia Fund assets grew.  By contrast, Plaintiffs and the Class members received no benefit from Defendants' expansion of the Funds' gross assets through their "shelf space" programs because economies of scale from the enlargement of Fund assets were not passed on by Defendants to the Funds and their investors.  As Judge O'Toole recently held in a case presenting a virtually identical scenario, these facts state an actionable claim under the Investment Company Act.  *See Wicks v. Putnam Inv. Mgmt.,* 2005 U.S. Dist. LEXIS 4892 (Mar. 28, 2005).  Plaintiffs now seek recovery of the millions of dollars of excessive fees and charges used to finance Defendants' kickback scheme.

Defendants have moved to dismiss the Complaint on numerous unavailing grounds. First, Defendants argue that Plaintiffs have not stated a claim under § 36(b) of the ICA.  Def. Brf. at 24-35; Tr. Brf. at 19-23.  Not only does this assertion directly conflict with the law in this

---

[4]  As early as September 9, 1999, the SEC issued a Cease and Desist Order against Fleet Investment Advisors, Inc. (as successor to Shawmut Investment Advisers, Inc. ("Shawmut")), a predecessor of Defendant Columbia Management, for the same type of conduct alleged in Plaintiffs' complaint.  *See In re Fleet Investment Advisors Inc. (as successor to Shawmut Investment Advisers, Inc.),* IAA Release No. 1821 (Sept. 9, 1999) (Pollack Decl. Ex. J). Shawmut had failed to disclose to its clients that it was directing advisory client commissions to compensate brokers for client referrals.  The SEC found that Shawmut's conduct violated IAA §§ 206(1) and 206(2), and ICA § 17(e)(1).  In so finding, the SEC stated that an investment adviser "has a duty to disclose to clients all material information which might incline an investment adviser consciously or unconsciously to render advice which is not disinterested." *Id*. (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963)).  The SEC further explained that "[i]nformation regarding an investment adviser's directed brokerage arrangements is material and must be disclosed to clients." *Id*. (citing *Sheer Asset Mgmt., Inc. and Arthur Sheer,* Advisers Act Rel. No. 1459, 1995 SEC LEXIS 10 (Jan. 3, 1995)).

Circuit, as discussed by Judge O'Toole in *Wicks*, 2005 U.S. Dist. LEXIS 4892, it also conflicts

with numerous recent decisions which have upheld § 36(b) claims based on allegations similar to

the allegations in this case.  *See, e.g., In re Dreyfus Mutual Funds Fee Litig.*, Master File No. 04-

0128 (W.D. Pa. Sept. 30, 2005) (Slip Op.) ("*Dreyfus* Sept. 28 Slip Op.") (Pollack Decl. Ex. K);

*Jones v. Harris Assocs., L.P.*, 2005 WL 831301, at *6-7 (N.D. Ill. Apr. 7, 2005); *Strigliabotti v.

Franklin Res., Inc.*, 2005 U.S. Dist. LEXIS 9625, at *12 (N.D. Cal. Mar. 7, 2005).  In all four of

these cases, the court upheld allegations that the defendants were growing the fund (*e.g.*, through

kickbacks or soft dollars, etc.) without reducing their fees from the benefits of economies of

scale or providing additional services, making the fees excessive.  *See, e.g., Jones*, 2005 WL

831301, at *3 (a fee that can be characterized as paying "something for nothing" is actionable

under § 36(b)).  Here, Plaintiffs similarly allege excessive fees because Defendants got

"something for nothing".

    Second, Defendants suggest that Plaintiffs do not have standing to bring claims on behalf

of investors in Funds within the Columbia Funds complex other than those in which Plaintiffs

invested, despite the fact that courts consistently have framed this issue as one of compliance

with Federal Rule of Civil Procedure 23, not Article III standing.  Def. Brf. at 14-17; Tr. Brf. at

13-14.  Moreover, in the recent decision in *Dreyfus*, which is substantially similar to the instant

case, the court held at the motion to dismiss stage that the plaintiffs could go forward even

though they held only two of 155 Dreyfus mutual funds.  In this regard, the court stated, "[t]o be

clear, we do not find that this is an issue of Constitutional standing."  *Dreyfus* Sept. 28 Slip Op.

at 17, n.7.

    Third, Defendants' argument that Plaintiffs' "excessive fee/commission claims" can only

be brought derivatively (Def. Brf. at 47-49) conflicts with the legislative history of the ICA and

case law.  The Supreme Court has held that a § 36(b) claim is direct.  *Daily Income Fund, Inc. v.*

*Fox*, 464 U.S. 523, 528-29 (1984). *Accord, e.g., Dreyfus* Sept. 28 Slip Op. at 17, n.7. Plaintiffs'

other ICA and state law claims are also direct because the ICA claims allege harms arising from

omissions made directly to the shareholders; and the breach of fiduciary duty ICA and state law

claims allege breaches of duties through excessive fees charged directly to shareholders. In the

context of a mutual fund, which is a pooling of investor assets, such as claims are direct.

*Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at *25.

Fourth, Defendants argue that Plaintiffs' sole derivative claim brought under IAA § 215

should be dismissed because Plaintiffs did not allege that the advisory contracts were illegal or

that the performance of the contract would violate the IAA. Def. Brf. at 38-39. District courts

frequently permit private claims seeking to void investment adviser contracts under IAA § 215

for violations of § 206 to proceed where the contract, not illegal on its face, is performed in

violation of the IAA. Here, Plaintiffs have adequately alleged that the Investment Adviser

Defendants' performance of the advisory contract was in violation of the IAA, including by

virtue of their charging of excessive fees to extract assets from the Funds and their shareholders

to finance their kickback scheme. Plaintiffs have also adequately pleaded that Defendants'

failure to disclose their kickback scheme amounted to a "device, scheme or artifice to defraud"

within the terms of IAA § 206. Defendants' argument that this derivative claim should also be

dismissed because Plaintiffs did not make a pre-suit demand ignores the allegations in the

Complaint demonstrating that demand would have been futile. Def. Brf. at 50-54; Tr. Brf. at 9-

12; Acorn Brf. at 1.

Fifth, Defendants argue that Plaintiffs have no private rights of action under ICA

§§ 34(b), 36(a) and 48(a). Def. Brf. at 18; Tr.Brf. at 15-19. To the contrary, as the court

recognized in *Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.* 964 F. Supp. 783

(S.D.N.Y. 1997), the existence of implied rights of action under these sections has a long,

established history.  Defendants' position, which is essentially that no federal statutory right of

action can exist unless it is expressly referenced in the language of the statute, was recently

rejected by the Supreme Court in *Jackson v. Birmingham Board of Education*, 125 S. Ct. 1497

(2005).

Finally, Defendants' argument that Plaintiffs' state law claims are preempted under the

Securities Litigation Uniform Standards Act of 1998 ("SLUSA") (Def. Brf. at 39-46; Tr. Brf. at

24), runs counter to the plain language of the statute and the weight of authority.  These state law

claims properly plead breach of fiduciary duty and unjust enrichment.

Accordingly, Defendants' motion to dismiss should be denied in its entirety.

## ARGUMENT

I.    **PLAINTIFFS HAVE PROPERLY ALLEGED A VIOLATION OF INVESTMENT
COMPANY ACT § 36(B)**

A.    **Plaintiffs Allege that Defendants' Fees Were Excessive Because They Did Not
Benefit the Funds or their Shareholders in Violation of § 36(b)**

Contrary to Defendants' arguments (Def. Brf. at 25-35; Tr. Brf. at 19-23), Plaintiffs have

sufficiently alleged facts stating a § 36(b) claim under the ICA.  Section 36(b) imposes a

fiduciary duty on investment advisers and others "with respect to the receipt of compensation for

services, or of payments of a material nature," and creates an express private right of action "for

breach of fiduciary duty in respect of such compensation."  15 U.S.C. § 80a-35(b); *see also*

*Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990).  This action alleges that

Defendants received excessive compensation due to the growth in assets of the Funds through

their asset-based fees, without any corresponding benefit to shareholders, including the failure to

pass on economies of scale, all of which led to a disparity between the fees paid and the services

rendered.  Although an increase in mutual fund assets can benefit investors through economies of

scale that decrease the expenses of operating such funds on a per share basis, Defendants failed

to reduce their fees to pass on the economies of scale to the Funds.  Instead, they retained the economies of scale for their own benefit.

As Judge O'Toole recently held in *Wicks*, the type of conduct alleged in the Complaint is subject to challenge under § 36(b).  In *Wicks*, the plaintiff sued the investment manager for certain Putnam Funds based upon the allegation that "[*t]he defendants . . . direct the payment of excessive commissions to securities broker-dealers to execute trades for the Funds in exchange for 'soft dollars' (said to be a form of kickback) that benefit the defendants and not the Funds.*"  2005 U.S. Dist. LEXIS 4892, at *3 (emphasis added).  The *Wicks* defendants (and not the investors) benefited because, as the plaintiffs alleged, "[a]lthough assets held by the Funds [] increased significantly over time, the nature and quality of the services rendered by the defendants to the Funds has not substantially changed[, creating] benefits from *economies of scale* which the defendants [] failed to share with the Funds."  *Id.* (emphasis added).  As the plaintiffs alleged, the "defendants continue[d] to receive *larger fees* from the Funds, capturing all benefits from the *economies of scale* for themselves."  *Id*. (emphasis added).  In denying the defendants' motion to dismiss, the court held that such allegations are sufficient to survive a motion to dismiss for failure to state a claim upon which relief can be granted.  *Id*. at *13.

As in *Wicks*, Plaintiffs here have alleged that Defendants violated the § 36(b) proscription against payment of excessive management and other fees to the Investment Adviser Defendants and their affiliates because Plaintiffs and the Funds did not receive the benefits of increased fees, including economies of scale.[5]  Plaintiffs have alleged the fees were excessive because they and

---

[5]  Defendants have improperly attempted to distinguish the instant case from *Wicks* by arguing that Plaintiffs have not made similar economies of scale allegations.  Def. Brf. at 27 n.12. Plaintiffs, however, have made substantially similar allegations here.  *See, e.g.*, ¶ 129 (alleging that, "as the Funds were marketed and the number of Fund investors increased, the economies of scale thereby created, if any, were not passed on to Columbia Funds investors," giving the

other Fund investors were paying increasing amounts of money as the funds grew with no corresponding benefit to the Funds or their shareholders--*i.e.*, they were paying "something for nothing." *Jones*, 2005 WL 831301, at *3. For instance, as the Funds' assets grew, the advisory fees remained fixed (meaning that the dollar amounts increased substantially), when they should have been decreasing as a result of the economies of scale arising from the increase in the Funds' asset base. *E.g.*, ¶¶ 129-132. *See Daily Income*, 464 U.S. at 537 ("The [SEC] determined that, as a fund's assets grew, this form of payment could produce unreasonable fees in light of the economies of scale realized in managing a larger portfolio").

Defendants grew the Columbia Funds through such undisclosed practices as excessive Rule 12b-1 fees (much of which was paid directly to the Distributor Defendant), soft dollar payments and directed brokerage commissions which benefited Defendants rather than the Fund owners. *See*, *e.g.*, ¶¶ 75, 78-79, 114-15, 123-25, 133, 136-38. Defendants failed to reduce their management fees to reflect the benefits obtained by Defendants from such payments, ¶¶ 129-32, and charged management fees that were wrongfully inflated to cover other improper revenue sharing payments that were ostensibly made from the assets of the Investment Adviser and Distributor Defendants. ¶ 132.

Numerous courts in addition to *Wicks* have upheld similar § 36(b) claims as those presented here. *See, e.g., Dreyfus* Sept. 28 Slip Op. at 16 (§36(b) claim upheld alleging that savings realized from economies of scale were not passed on to investors where growth of fund was due to kickbacks for shelf space paid to brokers to push funds); *Jones*, 2005 WL 831301, at *6-7 (§ 36(b) claim upheld where plaintiffs alleged investment advisers retained unearned fees);

_____

example of the Columbia Acorn International Select Fund (Class B shares)). *See also, e.g.*, ¶¶ 130-132.

*Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at *12 (§ 36(b) claim upheld alleging that defendants

charged plaintiffs much higher fees than other clients for equivalent advisory services and

retained excess profits resulting from economies of scale); *Pfeiffer v. Bjurman, Barry & Assocs.*,

No. 03 Civ. 9741, 2004 U.S. Dist. LEXIS 16924, at *14 (S.D.N.Y. Aug. 26, 2004) (§ 36(b) claim

upheld where plaintiffs alleged that defendants violated their fiduciary duty by receiving

excessive promotion, distribution and servicing fees).[6]

These cases have held that there is not a heightened pleading standard for § 36(b) claims,

as Defendants' wrongly suggest.  In fact, it is beyond dispute that Rule 8 governs the § 36(b)

claims.  *See ING Principal Prot. Funds Deriv. Litig.*, 369 F. Supp. 2d 163, 168 (D. Mass. 2005);

*Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at *12; *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924, at

*11.  Plaintiffs here plainly meet that standard.  Thus, Defendants' contention that Plaintiffs must

satisfy in their Complaint the factors enumerated under *Gartenberg v. Merrill Lynch Asset*

*Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982) (Def. Brf. at 26; Tr. Brf. at 22), is erroneous.  As

explained by the *Wicks* court:

> *Gartenberg* … does not establish a heightened pleading
> requirement for § 36(b) excessive fee claims.  A plaintiff's failure
> to plead certain *Gartenberg* factors is not itself grounds for
> dismissal.  The Court's focus in reviewing the defendants' motion
> to dismiss is on whether the allegations in the complaint set forth
> "a short and plain statement of the claim showing that the
> pleader[s] [are] entitled to relief."

---

[6]  Defendants' citation (Def. Brf. at 25) to *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 742
(7th Cir. 2002), for the proposition that § 36(b) provides a narrow remedy, is against the great
weight of authority.  *See also*, n. 14, *infra*.  Moreover, in *Green*, the plaintiffs alleged that the
investment adviser had a duty to avoid "a fee structure that creates an incentive [for the
investment adviser] to consider its own interests when making leverage decisions for the funds."
*Nuveen*, 295 F.3d at 742.  The court disagreed with this proposition, finding that, "while an
abuse of this inherent conflict may violate § 36(b), its mere existence does not."  *Id*.  Here,
Plaintiffs have alleged the "abuse" of a "conflict of interest" from the Defendants' method of
growing the assets in the Funds without any corresponding benefits to shareholders.

2005 U.S. Dist. LEXIS 4892, at *13 (citation omitted); *see also Pfeiffer*, 2004 U.S. Dist. LEXIS 16924, at *18; *Millenco L.P. v. meVC Advisors, Inc.*, 2002 U.S. Dist. LEXIS 19512, at *9-10 (D. Del. Aug. 12, 2002).[7]  As further explained in *Pfeiffer*:

> To prevail in this [§ 36(b)] action, the plaintiff will have to demonstrate that the fees were in fact excessive … ***Whether the plaintiff can meet this burden will be decided at a later stage of this action. The plaintiff's failure to do so in his pleading is not a ground for dismissal***.

*Id.* at *18 (denying motion to dismiss § 36(b) claim) (emphasis added).[8]

        In an investor class decision issued recently in an MDL Proceeding similarly involving mutual funds, the Maryland District Court sustained plaintiffs' § 36(b) claim for excessive fees and expenses resulting from defendants' market timing and late trading schemes.  *See In re Mut. Funds Inv. Litig.* (*In re Janus Subtrack*), 2005 U.S. Dist. LEXIS 18083, at *45-47 (D. Md. Aug. 25, 2005).  The court did not apply a heightened pleading standard to the MDL plaintiffs' § 36(b) claims.  *Id.*  Instead, the court held that the plaintiffs' § 36(b) claim was supported by allegations that the "management fees, which were based upon the amount of funds under management, were increased excessively by late trades and market timed transactions that increased the funds

---

[7]  Defendants' reliance on *ING*, 369 F. Supp. 2d 163, is misguided.  Def. Brf. at 27 n.12. Although the *ING* court upheld a complaint relating the *Gartenberg* factors to specific allegations in the complaint, the *ING* court stated that, "[a] plaintiff's failure to plead these factors is not itself grounds for dismissal."  369 F. Supp. 2d at 168 (citing *Wicks*, 2005 U.S. Dist. LEXIS 4892).  Under *ING*, a complaint must simply "contain 'a short and plain statement' showing that the fee charged is so large that it bears no reasonable relationship to the relevant services actually provided."  *Id.*  Plaintiffs have made such allegations in their Complaint.  *See, e.g.*, ¶195.

[8]  Other courts have condoned an even more liberal standard than *Pfeiffer*.  In *Green v. Fund Asset Management, L.P.*, 19 F. Supp. 2d 227, 234 (D.N.J. 1998), the court sustained a § 36(b) claim where plaintiffs did not allege that the advisory fees were "excessive" or "disproportionate."  The court found that § 36(b) "is ***not expressly limited to situations in which the advisory fees received by an investment adviser were excessive, disproportionate or otherwise unreasonable.***"  *Id.*  (emphasis added).  Thus, "[t]he statute encompasses the receipt of fees by an investment adviser in violation of the adviser's fiduciary duty."  *Id.*

under management." *Id.* at 47.  Such allegations are similar to the § 36(b) allegations in this case.

Defendants rely on the court's dismissal of the complaint in *In re Eaton Vance Mutual Funds Fee Litig.*, 380 F. Supp. 2d 222, 237 (S.D.N.Y. 2005), contending that Plaintiffs have also argued "that the fees were excessive . . . based on their argument that the fees were used for improper purposes."  Def. Brf. at 28 n.13.  The *Eaton Vance* court had found that the plaintiffs' counsel in that action had made this concession, when, in fact, they made no such concession. *See Excerpt, Eaton Vance* July 8, 2005 Transcript ("Tr.") (Pollack Decl. Ex. L) at 86-93.  To the contrary, counsel for the plaintiffs in *Eaton Vance* argued that the fees were excessive because no benefit was received by the Funds or their shareholders.  Specifically, in response to the *Eaton Vance* court's inquiry at oral argument of "why [the payments] constitute an excessive 12(b)(1) fee," Tr. at 89, Plaintiffs' counsel responded that the fees were excessive ***"[b]ecause [they are] a payment for nothing … If it is a payment for nothing, because no benefit was received, then it seems to me almost by definition it is excessive.  It exceeds the value of what you are getting, because we say they weren't getting anything.  They were making the payments and they weren't getting anything back …"***  Tr. at 89-90 (emphasis added).

Plaintiffs' allegations here similarly allege excessive fees that were of no benefit to the shareholders.  *See, e.g.*, ¶ 111 (fees charged to shareholders were "of no benefit" to fund investors); ¶ 112 (practices alleged were "enormously profitable for Columbia Management and the other defendants at the expense of plaintiffs", citing *Forbes* article on economics of scale); ¶ 123 ("The undisclosed excessive commissions and directed brokerage business . . . ***did not fund any services that benefited the Columbia Funds' shareholders***.  These practices materially harmed Plaintiffs and other members of the Class from whom the illegitimate and improper fees were taken.") (emphasis added); ¶ 135 (same); ¶ 129 (fees charged to Fund shareholders did not

benefit them because any "economies of scale … were not passed on to Columbia Funds investors"). *See also* ¶¶ 3, 128, 130-132.

The court in *Jones* recently upheld very similar §36(b) allegations, stating:

> [While §36(b)] does not explicitly refer to excess profits, the scenario described in the complaint could indicate a setting in which [the defendant] is retaining unearned fees. ***In other words, if the money [the defendant] is receiving can be fairly characterized as a fee and it is in essence something for nothing, clearly that would represent an actionably disproportional relationship between the fees paid and the services rendered*** … Thus, we cannot say that this claim is so devoid of potential merit to warrant dismissal …

2005 WL 831301, at *3 (emphasis added).  In denying the defendants' motion to dismiss the plaintiffs' §36(b) claim, the *Jones* court noted that it is "in no position based on the allegations of the complaint to determine what services Plaintiffs received from [the defendant] or how much they can fairly be worth.  It is not inconceivable that the fees charged … were so disproportionate to the value of the services rendered that a violation of § 36(b) would lie." *Id.* at *2.  As such, the court found that the allegations were "sufficient to allow Plaintiffs' case to progress beyond the pleading stage." *Id.* at *3.  As in *Jones*, Plaintiffs here have adequately alleged how the fees charged were excessive (*i.e.*, "something for nothing") which "would represent an actionably disproportional relationship between the fees paid and the services rendered," *id.*, thereby stating a claim under § 36(b).[9]

---

[9] Defendants argue that in *Gilliam v. Fidelity Management & Research Co.*, 2005 U.S. Dist LEXIS 10478 at *8 (D. Mass. May 3, 2005), the court found that the gravamen of a complaint similar to the complaint filed here was based "not upon the excessive advisor fees charged to shareholders in comparison to the services rendered but upon the undisclosed fees paid to brokers of soft dollars and excessive commissions for pushing certain funds."  Def. Brf. at 27 n.12.  Defendants' reliance on *Gilliam* is improper.  The *Gilliam* court's holding was in an entirely different context—*i.e.*, determining whether to consolidate different actions, not whether to dismiss or sustain them—and was handed down before the amended complaint was filed in that action.  The *Gilliam* decision says nothing about the allegations here and is totally off point

**B.    Plaintiffs Have Alleged that Defendants' Rule 12b-1 Fees Were Excessive, in Violation of § 36(b)**

Contrary to the Trustee Defendants' assertions, Plaintiffs are not challenging the propriety of 12b-1 (distribution) fees *per se*.[10] Tr. Brf. at 23. Plaintiffs instead allege that the Rule 12b-1 fees were excessive due to the manner in which they were charged to the Funds and their shareholders and utilized by Defendants.[11] Rule 12b-1 was adopted so that funds could increase assets and bring the benefits of economies of scale to investors through decreased expenses. *See* Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11414 (Oct. 28, 1980). Here, though the distribution fees are being used to increase Fund assets, the fruits of the economies of scale were enjoyed by Defendants, not Plaintiffs.[12]

---

and irrelevant. Here, Plaintiffs have alleged excessive fees due to, *inter alia*, the charging of fees that were of no benefit to investors, including the improper retention of economies of scale achieved through growth of the Funds through improper and undisclosed shelf space arrangements with brokers. These allegations satisfy the pleading requirements of Rule 8.

[10]  Plaintiffs note that even 12b-1 fees that do not exceed NASD-established limits for 12b-1 fees may be deemed to be unreasonable and excessive. *See ING*, 369 F. Supp. 2d at 168 ("In this case, it is undisputed that the Rule 12b-1 fees at issue do not exceed these limits. This does not mean, however, that the distribution and service fees are per se reasonable.").

[11]  Rule 12b-1, promulgated by the SEC pursuant to the ICA, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met. In order to comply with Rule 12b-1, a mutual fund must issue a written distribution plan (a "Rule 12b-1 Plan") detailing "all material aspects of the proposed financing and distribution" of its shares. *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924, at *5 (quoting 17 C.F.R. § 270.12b-1(b)). The Rule 12b-1 Plan must be approved by a majority of the fund's board of directors, including a majority of the disinterested directors, and may be implemented or continued "only if the directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment and in light of their fiduciary duties under state law and under sections 36(a) and (b) (15 U.S.C. § 80a-35 (a) and (b)) of the [Investment Company] Act, that *there is a reasonable likelihood that the plan will benefit the company and its shareholders*." *Id*. (citing 17 C.F.R. § 270.12b-1 (e)) (emphasis added).

[12]  Defendants' further arguments that the Rule 12b-1 plans were essential to prevent an "enormous and rapid shrinkage in asset size" (Def. Brf. at 32), or that 12b-1 plans allow investors to purchase mutual funds without paying up front sales loads (Def. Brf. at 33), are

Defendants, who took a percentage of the Fund assets as their fee, increased their revenues by using investors' money to increase the size of the Funds' assets without a corresponding benefit to the Funds or their shareholders in the form of reduced fees or increased services. As Judge O'Toole has held, such conduct is actionable under § 36(b). *Wicks*, 2005 U.S. Dist. LEXIS 4892, at *13.

Defendants argue that the "addition of new shareholders created economies of scale," because "the management fee paid to the Advisers *decreased* on a percentage basis as the amount of assets in the Funds increased." Def. Brf. at 32. This completely unsupported allegation is incorrect. Defendants charged the Funds and their investors advisory fees as a percentage of assets under management. As the amount of assets under management increased, the fee percentages remained the same, leading to increased fees in dollar terms. For example, assume a mutual fund's advisory fee is 100 basis points (or 1%) and in the year 2003 the fund has $1 million under management. The total advisory fee would be $10,000. If the fund's assets grew to $100 million, the advisory fee would reach $1,000,000. Thus, although the *percentage* fee remained the same, the dollar amount paid to Defendants would substantially increase.[13]

Defendants also argue that excessive Rule 12b-1 payments are not actionable under §36(b). Def. Brf. at 31. However, courts have held to the contrary. In *Meyer v. Oppenheimer Mgmt. Corp.*, 764 F.2d 76, 82-83 (2d Cir. 1985), the Second Circuit ruled that 12b-1 payments

---

general truisms but irrelevant in this case in light of Plaintiffs' allegations that such fees were excessive.

[13] If Defendants are arguing that Columbia has implemented a "breakpoint" structure for management fees, which theoretically decreases the percentages of the fees as assets increase, this is not at all clear from their briefs. Defendants do not put forth any evidence of breakpoints and this issue cannot be considered because it is not part of the record and is, in any event, a factual issue not appropriate for a motion to dismiss.

16

can be challenged under § 36(b) and rejected similar arguments as Defendants make here.  In so

doing, the Second Circuit quoted favorably from positions taken by the SEC which had reached

the same conclusion.[14]  On a subsequent appeal, the Second Circuit reiterated that 12b-1

payments are actionable under § 36(b).  *Meyer*, 895 F.2d at 866.  The Second Circuit directed

that each type of fee, including 12b-1 fees, be examined individually to determine if it is

excessive.  As stated by the Second Circuit:

> 12b-1 plans ... as well as advisory fees are subject to review under
> Section 36(b).  Were such review not available, investment
> advisers might be able to extract additional compensation for
> advisory services by excessive distributions under a 12b-1 plan.
> [However,] ... ***12b-1 payments ... are [not] to be aggregated with
> advisory fees to determine the merits of a Section 36(b) claim***.
> The two kinds of payments are for entirely different services,
> namely advice on the one hand and sales and distribution on the
> other.

*Id.* at 866 (emphasis added).

Likewise, in a recent decision on this issue, the court held in *Pfeiffer*, 2004 WL 1903075

at *4, that 12b-1 payments are subject to § 36(b) and denied defendants' motion to dismiss.  In so

doing, the court found that many of the cases on which Defendants rely here—such as *Krinsk v.

Fund Asset Management, Inc.*, 875 F.2d 404 (2d Cir. 1989), and *Gartenberg*, 694 F.2d 923—

---

[14]  When first proposing § 36(b), the SEC indicated its intent that it be broadly applied stating
that it:

> would apply to *all forms of compensation* paid by all investment
> companies to their affiliated persons. . . .  Although advisory fees
> are the principal form of managerial compensation in the
> investment company industry, ***externally managed companies
> frequently pay fees for various nonadvisory services*** . . . .that
> preclude arm's-length bargaining.

Securities and Exchange Commission, Public Policy Implications of Investment Company
Growth, H.R. Rep. No. 2337, 89th Cong., 2d Sess. 144 (1966) (emphasis added; footnote
omitted).

actually support the application of § 36(b) to Rule 12b-1 payments. *Pfeiffer*, 2004 WL 1903075 at *4.

Additionally, advisory fees allocated to fund distribution practices, such as revenue sharing where the investment adviser and its affiliates claim to make payments from their own profits, are regulated under Rule 12b-1 and § 36(b). As the SEC explained, "Rule 12b-1 could apply . . . in certain cases in which the adviser makes distribution related payments out of its own resources….'if ***any allowance*** were made in the investment adviser's fee to provide money to finance distribution.'" Investment Company Institute-Rule 12b-1, 1998 SEC No-Act. LEXIS 976, at * 16 (emphasis added) (citing Payment of Asset-Based Sales Loads By Registered Open Ended Management Investment Companies, ICA Release No. 16431). Here, the Complaint plainly alleges this practice. *See, e.g.*, ¶ 80 ("To the extent revenue-sharing payments were made by the Investment Adviser, the Investment Adviser recouped these payments through their management fees, thereby directly diminishing investors' holdings in the Funds.").[15]

## C. Plaintiffs Have Alleged that Defendants' Soft Dollar Practices Violated § 36(b)

The charging of excessive commissions to the Funds used as kickbacks in exchange for soft dollar services, which benefited Defendants and not the Funds, as alleged in the Complaint

---

[15]  Defendants argue that since § 36(b) excludes suits for fees covered by ICA § 17 and that 12b-1 fees are covered by § 17, § 36(b) therefore does not cover 12b-1 fees. Under SEC regulations, 12b-1 fees under a proper Rule 12b-1 plan are ***not covered by ICA § 17***. *See* SEC Reg. § 270.17d-3 (stating that an agreement "made in compliance with the provisions of § 270.12b-1 [*i.e.*, Rule 12b-1]" is excluded from § 17). However, that does not mean that payments made under an improper 12b-1 plan are necessarily subject to § 17 (and therefore not covered by § 36(b)). Defendants have offered no reason why the alleged wrongful payments here are covered by § 17. The 12b-1 payments alleged herein are thus covered by § 36(b). Defendants' reliance on *Lessler v. Little*, 857 F.2d 866, 868 (1st Cir. 1988), is unavailing. Def. Brf. at 31. That action alleged violation of the § 17 subsection prohibiting an "'affiliated person' knowingly from purchasing the assets of a registered investment company." *Id.* (citing 15 U.S.C. § 80a-17(a)(2)). This bears no resemblance to the allegations here.

is actionable under §36(b).  The *Wicks* court denied the defendants' motion to dismiss the

plaintiffs' §36(b) claim arising from, *inter alia*, the allegation that the defendants "direct[ed] the

payment of excessive commissions to securities broker-dealers to execute trades for the Funds in

exchange for '***soft dollars***' (said to be a form of kickback) that benefit the defendants and not the

Funds."  *Wicks*, 2005 U.S. Dist. LEXIS 4892, at *3 (emphasis added).[16]  Plaintiffs have made

substantially similar allegations here and, accordingly, Defendants' motion to dismiss those

allegations should be denied.

Mutual funds are allowed to pay brokerage commission amounts that exceed "best

execution" costs in order to obtain certain additional services, which the SEC has defined to

include any service that "provides lawful and appropriate assistance to the money manager in the

performance of his investment decision-making responsibilities."  15 U.S.C. § 78bb, Interpretive

Notes and Decisions.  The commission amounts charged by brokerages for selling the underlying

securities in a mutual fund that are in excess of the purchase and sale charges are known within

the industry as "soft dollars."  The soft dollar component of such commission payments is

typically paid to obtain for the fund services or products that are traditionally provided to the

fund by the investment adviser out of its own resources, such as investment research.  By paying

for such services out of fund assets through soft dollar commissions, the Investment Adviser

Defendants shifted to the Funds substantial expenses that they would otherwise have borne.

---

[16]  This Court should accordingly reject the Trustee Defendants' argument that, "Plaintiffs' soft
dollar and brokerage commission claims are not cognizable under Section 36(b) because they do
not allege that these fees were paid to the Investment Adviser Defendants or their affiliates.
Rather, Plaintiffs allege that [] both types of fees were paid *by* the Investment Adviser
Defendants to *third-party brokers*."  Tr. Brf. at 23 (emphasis added).  The soft dollar "services,"
such as research, are "compensation" received by Defendants, as the Court found in *Wicks*.
*Wicks*, 2005 U.S. Dist. LEXIS 4892, at *3; *see also* Section I.E, *infra* (discussing how
Defendants are liable for excessive fee payments, including payments made to brokers).

¶ 132. However, they failed to reduce their advisory fee in an amount that compensated the Funds for the fact that the Funds were now paying expenses that are normally borne by the adviser. *Id*. The advisory fees were therefore excessive to the extent that they were not adjusted down to compensate the Funds for bearing such additional costs. *Id*.[17]

### D.    Plaintiffs Have Alleged that Defendants' Directed Brokerage Practices Violated § 36(b)

Directed brokerage involves the use of an asset belonging to the fund and its investors–brokerage commissions—as a kickback to the brokers selling the mutual funds. Plaintiffs allege that the real purpose of such arrangements was to cause brokers to push the Funds' shares so that the assets of the Funds would increase and so would Defendants' management fees. *E.g.,* ¶¶ 2-3. By failing to reduce their management fees to reflect the benefit they were obtaining from the directed brokerage, Defendants were improperly inflating their management fees, thus economically harming the Funds and the Class members. *E.g.,* ¶ 132. Defendants' directed brokerage practices thus violated § 36(b) by using fund assets only to benefit themselves through the growth of the Funds without a corresponding reduction in advisory fees.

As stated by the SEC in October 2004 when it promulgated its final rule prohibiting the use of *any* brokerage commissions to finance distribution:

> In 1981, shortly after we adopted rule 12b-1 and in light of its adoption, we concluded that "it is not inappropriate for investment companies to seek to promote the sale of their shares through the placement of brokerage **without the incurring of any additional expense**."

---

[17]  Furthermore, as alleged by Plaintiffs, Defendants' payments "went far beyond" the soft dollar safe harbor (15 U.S.C. §78bb(e)(1)) because such payments were undisclosed kickbacks rather than *bona fide* compensation for "research services." ¶ 137 ("The Investment Adviser Defendants' actions went far beyond what is permitted by the Section 28(e) safe harbor by routinely using soft dollars to pay brokers to push unwitting clients into Columbia Funds.").

> After reviewing the current directed brokerage practices described
> above, in February 2004, we proposed to amend rule 12b-1 to
> prohibit the use of fund brokerage to compensate broker-dealers
> for selling fund shares. Our proposal was intended to end practices
> that we concluded were inconsistent with the rationale of our 1981
> decision and involved unmanageable conflicts of interest.

Prohibition on the Use of Brokerage Commissions to Finance Distribution, SEC Release No. IC-

26591, 69 Fed. Reg. 54728, 54728-29 (effective Oct. 14, 2004) (emphasis in original Internet

version, available at *http://www.sec.gov/rules/final/ic-26591.htm*). Plaintiffs have specifically

alleged that, in contravention of the SEC's long-standing rules, Defendants were paying extra for

brokerage services to compensate brokers for pushing their shares. ¶¶ 114-16.

Additionally, when proposing amendments to the ICA that prohibit all payments for the

distribution of fund shares with brokerage commissions, the SEC made clear that the type of

kickback scheme engaged in by Defendants creates conflicts of interest that harm investors:

> Broker-dealers may not . . . condition their promotion or sale of
> fund shares on the receipt of brokerage commissions from the
> fund . . .
>
> We believe that the way brokerage has been used to pay for
> distribution involves *unmanageable conflicts of interest* that may
> harm funds and fund shareholders . . . We are also concerned
> about the effect of this practice on the relationship between broker-
> dealers and their customers. Receipt of brokerage commissions by
> a broker-dealer in exchange for shelf space creates an incentive for
> the broker to recommend funds that best compensate the broker
> rather than ones that meet the customer's investment needs.

Prohibition on the Use of Brokerage Commissions to Finance Distribution, SEC Release No. IC-

26356, 69 Fed. Reg. 9726, 9728-29. Thus, the governmental agency having paramount expertise

and authority with respect to mutual funds has specifically found that directed brokerage

practices violate the federal securities laws and may "harm funds and fund shareholders."[18]

---

[18] Contrary to Defendants' erroneous contention (Def. Brf. at 1), the fact that Plaintiffs' counsel
have filed similar complaints against numerous mutual fund families only demonstrates that the

E.    **Defendants Are Liable for Violating § 36(b) for the Charging of Excessive Fees Even for Monies that Were Paid to Third-Party Brokers**

Defendants argue that "plaintiffs cannot recover against defendants for payments made to brokers," because actions under § 36(b) may only be brought against the "recipient of [the] compensation or payments." Def. Brf. at 34 (quoting 15 U.S.C. 80a-35(b)); *see also* Tr. Brf. at 23.[19]  However, although some of the improper payments alleged in the Complaint were paid to brokers, the Complaint alleges that the Distributor and Adviser Defendants reaped large benefits in the form of excessive advisory fees from the expansion of the Funds that was generated by the kickback programs, and that their charges to Fund investors were inflated because their fees were not reduced in consideration of the additional benefits generated by the expansion of the Funds. *E.g.,* ¶ 132.

The courts have broadly interpreted § 36(b) to apply whenever a designated recipient under § 36(b) receives a benefit from a breach of fiduciary duty.  For example, in *Fogel v. Chestnutt*, 533 F.2d 731 (2d Cir. 1975), the investment adviser diverted commission payments to brokers who, as here, assisted the adviser in growing the fund's assets (and the adviser's fees based upon the size of the fund's assets) and/or by doing research for which the adviser was paid.

---

improper conduct alleged here was widespread throughout the mutual fund industry—a fact recognized by regulators and legislators.

[19]  The Trustee Defendants mischaracterize the Complaint as "bizarrely focus[ing] on conflicts of interest between brokers and their clients arising from receipt [of soft dollars and brokerage commissions]." Tr. Brf. at 23.  As Plaintiffs have alleged, Defendants received excessive advisory fees by failing to pass on the benefits of the economies of scale to investors or provide additional services as the size of the Funds and their fees grew.  The growth of the Funds was accomplished by Defendants' inducing brokers to increase the amount of investments in Columbia Funds through various types of charges, including directed brokerage.  *See* ¶ 5.  While such practices do create conflicts of interest between brokers and clients, that is not the "focus" of the § 36(b) claim but rather one of its factual supporting allegations.

In holding the advisers liable with respect to amounts that went directly to the brokers, the court

favorably cited an SEC release which concluded that:

> [d]iversion of such commissions to benefit an investment company
> manager may be *viewed as additional compensation to the*
> *manager* for handling the portfolio transactions of the fund.

*Id.* at 739 (emphasis added).  While the SEC's analysis there was in the context of a § 17

violation, the court in *Fogel* adopted its reasoning in holding that the defendant advisers had

received excessive compensation in violation of § 36(b) with respect to the money paid directly

from the funds to the brokers.  *Id.* at 745.  As in *Fogel*, Plaintiffs allege here that Defendants

received excessive compensation by an enlargement of their fees resulting from the improper

revenue sharing and directed brokerage payments to brokers that increased the size of the Funds,

a claim properly brought under § 36(b).

Section 36(b) governs excessive distribution payments made to third party brokers when

defendants use excessive advisory fees to indirectly cover the costs of distribution.  The Rule

12b-1 Adopting Release states that the indirect use of fund assets occurs when the adviser

extracts profits from mutual fund shareholders that are not "legitimate" or that are "excessive"

and thus violate § 36(b).  In this respect, the Adopting Release states the following:

> In determining whether there is an indirect use of fund assets, it is
> appropriate to relate a fund's payments pursuant to the advisory
> contract to the adviser's expenditures for distribution and to view
> such expenditures as having been made from the adviser's profits,
> if any, from the advisory contract.  *To the extent that such profits*
> *are "legitimate" or "not excessive", the adviser's distribution*
> *expenses are not an indirect use of fund assets. . . .  Profits which*
> *are legitimate or not excessive are simply those which are derived*
> *from an advisory contract which does not result in a breach of*
> *fiduciary duty under section 36 of the [ICA]*.

Rule 12b-1 Adopting Release (emphasis added).

In other words, where Plaintiffs have alleged that an investment adviser has reaped excessive or illegitimate advisory fees from mutual fund investors in breach of its fiduciary duties under § 36(b), the adviser may be held liable for a violation of Rule 12b-1 for indirectly using fund assets for distribution.  This is the case here, as Plaintiffs have brought claims under § 36(b) for Defendants' breach of fiduciary duty resulting from receiving excessive compensation from Columbia Fund investors.[20]  Plaintiffs have also specifically alleged that "the Investment Adviser Defendants and/or the Distributor Defendants compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements."  ¶¶ 149(e), 153(d), 180(b); *see also* ¶ 132 ("Defendants shifted to the Funds or investors expenses which were the responsibility of the Investment Advisers without any corresponding reduction in the advisory fees.").

Plaintiffs' allegations are sufficient to sustain a § 36(b) claim.  Indeed, in *Halligan v. Standard & Poor's/Intercapital, Inc.*, 434 F. Supp. 1082, 1084 (E.D.N.Y. 1977), the court held that the simple allegation that "[a]ll of the defendants have directly or indirectly received from [defendants] compensation or payments of a material nature" was sufficient to bring plaintiff's claim within the requirement of §36(b)(3) that the action be against "the recipient of . . . compensation or payments."

---

[20]  *See also* Memorandum of Paul F. Roye, SEC Division of Investment Management, to Chairman William H. Donaldson, SEC Chairman at 66 (June 9, 2003) , *available at* http://financialservices.house.gov/media/pdf/061803kanememo.pdf ("[R]evenue-sharing payments do not involve an indirect use of a fund's assets for distribution if the fund's investment adviser makes the payments from the profits of its investment advisory fee that are 'legitimate' or 'not excessive,' *i.e.*, if they are derived from an investment advisory contract that does not result in a breach of the investment adviser's fiduciary under section 36(b) of the 1940 Act.").

**F.      Plaintiffs' § 36(b) Claims Are Properly Brought Against the Trustee/Officer
          Defendants**

Defendants argue that the § 36(b) claim can only, under the language of the statute, be

brought "against individuals who received fees ***for advisory services***."  Def. Brf. at 34; Tr. Brf. at

19-20 (emphasis added).  Defendants thus argue that the Trustee/Officer Defendants were not

recipients of the allegedly excessive fees and therefore are not proper defendants.  *Id*.  This

argument fails.  Under the clear language of the statute, the Complaint adequately pleads that the

Trustee/Officer Defendants violated § 36(b) because they had a fiduciary duty concerning

compensation or payments paid by the Columbia Funds and their shareholders to the Investment

Adviser and Distributor Defendants, which they breached by approving the excessive fees

charged to the Funds and their shareholders.

The Trustee/Officer Defendants' compensation was excessive because they were paid for

services they did not perform.  A mutual fund's Board has a duty to ensure that fees paid to the

fund's investment adviser and distributor are not excessive.  The Trustee Defendants'

responsibility was to insist during negotiations with the Investment Adviser and Distributor

Defendants that their fees be scaled back, that meaningful break-points in the advisory and

distribution fee structure should be implemented, that the shifting of research and similar costs

from the Investment Adviser Defendants to the Funds through "soft dollar" commissions should

be accompanied by a corresponding reduction in the advisory fee, and that the advisory fee

should not be structured in a way that effectively treated the Defendants' "shelf space" payments

to brokers as a legitimate component of the expenses to be covered by the advisory fee.  ¶ 132.

By failing to insist on such changes in the advisory and distribution fee structures, the Trustee

Defendants failed to perform the services for which they were being paid.  SEC, Division of

Investment Management: Report on Mutual Fund Fees and Expenses, at B1 (Dec. 2000) ("SEC

Report on Mutual Fund Fees"), *available at* http://www.sec.gov/ news/studies/feestudy.htm. ("if the fund or fund family is experiencing economies of scale, fund directors have an obligation to ensure that fund shareholders share in the benefits of the reduced costs.")

Similarly, the Officers' responsibility is to execute the Trustees' policies and take care of the day-to-day operations of the Funds. They are compensated through advisory fees or administrative fees (alleged herein to be excessive) received by the Investment Adviser Defendants.[21] The Officer Defendants breached their fiduciary duties when executing the Trustees' policies and taking care of the day-to-day activities of the Funds. They thus failed to perform the services for which they were being paid. As a consequence, the compensation of the Trustee/Officer Defendants' was grossly disproportionate to the value of any services they provided to the Funds.

Section 36(b) is clear that there can be liability against a director or officer of a mutual fund:

> An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

15 U.S.C. § 80a-35(b). Subsection (a) of § 36 enumerates an "officer, director, [or] member of any advisory board" as potentially liable under § 36. Based on this language, courts have upheld claims against directors or trustees of mutual funds. *See, e.g.*, *Halligan*, 434 F. Supp. at 1084. In

---

[21] Under § 36(b), the Officer Defendants are liable as "affiliated person[s]" of the Investment Adviser Defendants and as described under § 36(a) as an "officer."

*Halligan*, the court upheld the plaintiff's § 36(b) claim against the director defendants where the plaintiff alleged "defendants have directly or indirectly received from [the Corporation] compensation or payments of a material nature." 434 F. Supp. at 1084. The *Halligan* court further stated that the allegation was "sufficient to bring plaintiff's claim within the requirement of § 36(b)(3) that the action be against 'the recipient of … compensation or payments.'" *Id.*

Here, as in *Halligan*, Plaintiffs have alleged that the Trustee/Officer Defendants "directly or indirectly received from [the Funds] compensation or payments of a material nature" that are "sufficient to bring plaintiff's claim within the requirement of § 36(b)(3) that the action be against 'the recipient of … compensation or payments [for investment advisory services].'" *Id.* The duties of the Trustee Defendants (the approval of the advisory contract, the supervision of advisers' management, review of distribution arrangements, and providing information regarding these advisory services to shareholders) and of the Officer Defendants (executing the Trustees' policies and taking care of the day-to-day operations of the Funds) are part of what shareholders pay for in obtaining advisory services. ¶¶ 106-107. The Trustee/Officer Defendants' substantial compensation is for these advisory services provided to shareholders.[22]

Significantly, Defendants do not dispute that the Complaint adequately alleges the Trustee Defendants' breach of their fiduciary duties. Section 15(c) of the ICA explains:

> It shall be the duty of the directors of a registered investment
> company to request and evaluate, and the duty of an investment
> adviser to such a company to furnish, such information as may
> reasonably be necessary to evaluate the terms of any contract
> whereby a person undertakes regularly to serve or act as
> investment adviser of such company.

---

[22] This disposes of Defendants' erroneous assertion that "the individual defendants received no such fees [*i.e.*, fees for advisory services]." Def. Brf. at 34; *see* Tr. Brf. at 20.

15 U.S.C. § 80a-15(c); *see also* Bearing of Distribution Expenses of Mutual Funds, ICA No.

11414, 1980 SEC LEXIS 444, at *29 (Oct. 28, 1980) ("Under sections 15(a) and (c) of the Act

[the Directors] are also responsible for evaluating and deciding whether to approve the advisory

contract.").

      The Complaint alleges that the Trustee Defendants approved Rule 12b-1 plans despite the

fact that Defendants were not passing economies of scale on to shareholders and there was no

reasonable likelihood that the plans would benefit the Funds and their shareholders. *E.g.*,

¶¶ 129-132.  While the Trustee Defendants continually rubber-stamped 12b-1 fees despite

numerous red flags showing the Net Asset Values ("NAV"s) of the Funds decreasing while

assets and expenses were increasing (*see* ¶ 133), only Defendants benefited. *Id.*  In the face of

these red flags, the Trustee Defendants should have negotiated with the Investment Adviser

Defendants for a reduction in fees.  The Officer Defendants had access to the information

showing such red flags and failed to protect the investors by calling the Trustees' attention to

them.

      The Trustee/Officer Defendants' breach of their fiduciary duties led directly to the

excessive fees paid to the Investment Adviser and Distributor Defendants, as well as to the

excessive payments in the form of 12b-1 fees, directed brokerage and soft dollars made by these

Defendants to purchase shelf space.  Claims for a breach of fiduciary duty concerning 12b-1 fees

and other excessive fees are proper under § 36(b).  *See Meyer*, 895 F.2d at 866 ("costs of 12b-1

plans . . . as well as advisory fees are subject to review under Section 36(b).  Were such review

not available, investment advisers might be able to extract additional compensation for advisory

services by excessive distributions under a 12b-1 plan").

      Defendants' contention that only brokers who received kickbacks can be liable turns

§ 36(b) on its head.  It is irrelevant who the recipient of the improper fees is.  What matters is

whether the Trustee/Officer Defendants received compensation or other material payments in

violation of § 36(b).  As alleged in the Complaint and discussed herein, the Trustee/Officer

Defendants received monies in violation of § 36(b).  The Trustee/Officer Defendants received

the benefit of the excessive fees as the assets of the Funds grew and the Trustee/Officer

Defendants continued to receive substantial compensation for their part in allowing the excessive

fees and compensation to continue.  *E.g.,* ¶¶ 174-75.  Accordingly, Plaintiffs have properly

alleged a claim under § 36(b) against the Trustee/Officer Defendants.  *See Halligan*, 434 F.

Supp. at 1084.

### G.    Plaintiffs Have Properly Brought Their § 36(b) Claims on Behalf of the Funds

Plaintiffs do not dispute that, as Defendants point out, a § 36(b) claim must be brought

"on behalf of" an investment company, 15 U.S.C. 80a-35(b), or that, "any recovery obtained in a

§ 36(b) action will go to the company rather than the plaintiff."  *Daily Income*, 464 U.S. at 535.

Here, Plaintiffs have brought their § 36(b) claim "on behalf of themselves and the Class" in order

to provide recovery to all of the Columbia Funds harmed by Defendants' misconduct.  ¶ 193.

Although § 36(b) states that an action may be brought by shareholders "on behalf of such

company," that language simply describes the individual claim that may be asserted by a mutual

fund investor on behalf of funds in which he or she has invested.  Nothing in the language of

§ 36(b) states or suggests that in addition to their direct, individual claims, Plaintiffs may not also

assert claims on behalf of a class consisting of similarly situated investors in related Funds, all of

whom have § 36(b) claims against the Defendants in this action based on a common course of

wrongful conduct.  Plaintiffs here seek such class-wide relief, on behalf of the Columbia Funds

and their investors.  Plaintiffs are thus not recovering only "for themselves" (Def. Brf. at 35), but on behalf of all Columbia Funds.[23]

## II.    PLAINTIFFS HAVE STANDING TO ASSERT ALL OF THEIR CLAIMS

Defendants argue that Plaintiffs lack standing to assert claims regarding the Funds they did not own.  Def. Brf. at 14-17; Tr. Brf. at 12-15.  However, Plaintiffs do have standing to assert direct claims (*i.e.*, all claims except the IAA claim) with respect to shareholders of all of the Columbia Funds, including all classes of such Funds.  Defendants do not deny that Plaintiffs have standing to assert their individual claims in connection with their own Columbia Fund holdings.  Plaintiffs' ability to assert claims as class representatives on behalf of shareholders in all of the Columbia Funds is thus not an issue of standing, but rather an issue for class certification pursuant to Fed. R. Civ. P. 23, and therefore premature at this time.[24]  Nevertheless, as discussed below, considerable authority supports Plaintiffs' ability to assert direct, class claims on behalf of shareholders in the other Columbia Funds.

Plaintiffs also have standing to pursue all claims "on behalf of" all of the Funds, which includes Plaintiffs' expressly derivative claim under IAA §§ 206 and 215, and their direct claim "on behalf of" the Funds under ICA § 36(b), as an unincorporated association pursuant to Fed. R. Civ. P. 23.1 and 23.2.

---

[23]  Defendants' reliance on *Mutchka v. Harris*, 373 F. Supp. 2d 1021 (C.D. Cal. 2005), is unavailing because its conclusion that a § 36(b) claim may only be brought derivatively is contrary to governing Supreme Court precedent holding that § 36(b) claims are direct rather than derivative.  *See Daily Income*, 464 U.S. at 535 ("The fact that derivative suits are brought on behalf of a corporation does not mean, however, that all suits brought on behalf of a corporation are derivative.").

[24]  For example, in *Goldberger v. Bear Stearns & Co.*, 2000 U.S. Dist. LEXIS 18714, at *4 n.1 (S.D.N.Y. Dec. 28, 2000), the court recognized that the question of whether a purchaser of a certain security may represent purchasers of other securities regarding the same course of conduct is a question for the class certification stage of the case, stating that this "question is not presently before the Court because Plaintiffs have not moved for class certification."

A.    **Plaintiffs Have Standing to Assert Direct Claims on Behalf of All Columbia Funds Shareholders**

1.    **Courts Have Held That a Plaintiff Need Not Have Invested in Each Fund to Satisfy the Standing Requirement**

Defendants incorrectly argue that, "[a]ll claims with respect to the 79 funds in which plaintiffs did not invest should be dismissed because plaintiffs lack the requisite constitutional standing to assert them." Def. Brf. at 14; *see also* Tr. Brf. at 13. It is axiomatic that standing is a prerequisite in any action, including a class action, and a potential class representative must possess standing to assert an individual claim. *See Gratz v. Bollinger*, 539 U.S. 244, 285 (2003). However, once the plaintiff's standing to assert his or her individual claim has been established, the plaintiff's ability to represent the class depends solely on whether the requirements of Rule 23 are met. As stated by the Supreme Court in *Sosna v. Iowa*:

> A named plaintiff in a class action must show that the threat of injury in a case such as this is "real and immediate," not "conjectural" or "hypothetical." . . . This conclusion does not automatically establish that appellant is entitled to litigate the interests of the class she seeks to represent, ***but it does shift the focus of examination from the elements of justiciability to the ability of the named representative to "fairly and adequately protect the interests of the class***."

419 U.S. 393, 402-03 (1975) (emphasis added); *see also Goodman v. Lukens Steel Co.*, 777 F.2d 113, 122 (3d Cir. 1985) ("[C]ontrary to the defendants' contentions, the issue here is one of compliance with the provisions of Rule 23, not one of Article III standing. Each of the named plaintiffs has presented claims of injury to himself and has alleged facts which present a case or controversy under the Constitution"), *aff'd on other grounds*, 482 U.S. 656 (1987); *accord Hicks v. Morgan Stanley & Co.,* 2003 U.S. Dist. LEXIS 11972, at *19-20 (S.D.N.Y. July 16, 2003).[25]

_____

[25] Even where courts have addressed this issue in terms of standing, the outcome has been the same, permitting a plaintiff to represent other securities, ERISA plans and mutual funds in addition to his or her own. *Sutton v. Med. Serv. Ass'n*, 1993 U.S. Dist. LEXIS 9763, at *13 (E.D.

Thus, although Plaintiffs here did not invest in all of the Columbia Funds, they have standing to assert individual claims, and may represent similarly situated investors through a Rule 23 class action.  This issue was recently addressed in *Dreyfus*, a case similar to this one,[26] where the court rejected the same argument raised by Defendants here and explained:

> We do not decide at this stage of the case [*i.e.*, the motion to dismiss stage] how the fact that the named plaintiffs are only "security holders" (as required by statute) in two of the Dreyfus Funds might affect this case.  To be clear, ***we do not find that this is an issue of Constitutional standing***.

*Dreyfus* Sept. 28 Slip Op. at 17, n.7 (emphasis added).

In *In re Dreyfus Aggressive Growth Mutual Fund Litigation*, 2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 19, 2000), in granting the plaintiffs' motion for class certification, the court certified plaintiffs who invested in one mutual fund to represent purchasers in another fund:

> Courts have repeatedly held that on allegations such as these, class representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security.  Courts have not addressed this concern vis a vis the doctrine of standing, but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement.

*Id*. at *8.  In *Dreyfus Aggressive Growth*, certification was supported by the same factors that exist in this case:

---

Pa. July 20, 1993); *see also In re Lord Abbett Mutual Funds Fee Litigation*, 2005 WL 2090517, at *7 (D.N.J. Aug. 30, 2005) ("Given the named Plaintiffs' undisputed standing to bring some claim against each Defendant, … their lack of standing to assert other (obviously closely related) claims on behalf of shareholders of specific Lord Abbett Funds in which the named Plaintiffs lack an ownership interest does not warrant dismissal of any claims at this time.").

[26]  Similarly, in *In re Mutual Funds Investment Litigation (In re Janus Subtrack)*, 2005 U.S. Dist. LEXIS 18083, at *7 n.4 (D. Md. Aug. 28, 2005), even though "Defendants contend[ed] that plaintiffs who own shares in a particular fund lack Article III standing to assert claims in connection with other funds in the same family," the court deferred ruling on the standing issue at the motion to dismiss stage.  The court in *In re Eaton Vance Corp. Sec. Litig.,* 220 F.R.D. 162, 169 (D. Mass. 2004), on which Defendants rely, also did not address defendants' standing argument at the motion to dismiss stage.

> Here, the claims of the named plaintiffs and prospective class members derive from the same course of events. The plaintiffs have alleged that both Funds made similar misrepresentations and omissions in the Registration Statements, Prospectuses, Statements of Additional Information and annual and semi-annual reports used to sell the Funds. . . . And indeed the claims of the named plaintiffs and prospective class members are based on the same legal theories.

*Id*. at *14.

Similarly, in *In re ML-Lee Acquisition Fund II L.P.*, 848 F. Supp. 527 (D. Del. 1994), the defendants argued in opposition to the plaintiffs' motion for class certification that the proposed class representatives could not represent investors in a mutual fund that they did not own. The court rejected this contention due to the similarity of the related mutual funds and of the wrongdoing that impacted both funds at issue. *Id*. at 561 (certifying class upon finding that the fund securities were "substantially identical" and "marketed pursuant to the same Prospectus which [was] the subject of many of Plaintiffs' allegations of wrongdoing").

In addition to such case law in the mutual funds context, other relevant decisions support Plaintiffs' ability to represent investors in the other Funds, in light of the similarity of the claims of all Class members against all Defendants and the close interrelationship between the Defendants. *See, e.g., In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995) (finding that "plaintiffs [were] in the same position as absent Class Members, regardless of the specific [limited] partnership in which they invested, because of the uniform course of improper conduct and standardized sales approach applied by defendants"); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993) (plaintiffs who invested in three limited partnerships could represent persons who had invested in two other limited

partnerships, where, as here, the complaint alleged that investors in all five limited partnerships were victims of a single pattern of fraud by defendants).[27]

In *Fallick v. Nationwide Mutual Insurance Co.*, 162 F.3d 410 (6th Cir. 1998), the plaintiff alleged that Nationwide breached its fiduciary duties with respect to his ERISA plan, as well as other ERISA plans of which he was not a member. The district court dismissed the claims as to all ERISA plans other than the plaintiff's plan on standing grounds. *Id.* at 411-12. The Sixth Circuit reversed, finding the district court's reasoning "fundamentally flawed" for confusing the issue of the plaintiff's Article III standing with his ability to bring a class action under Rule 23. *Id.* at 422. The court concluded that, "once a potential ERISA class representative establishes his individual standing to sue his own ERISA-governed plan, there is no additional constitutional standing requirement related to his suitability to represent the putative class of members of other plans to which he does not belong." *Id.* at 424.[28]

Similarly, many courts have held that a plaintiff who purchased one type of a corporation's securities may represent persons who purchased other types of the corporation's securities, when purchasers of both types of securities were subjected to a common course of wrongful conduct. *See, e.g., In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1461 (D. Ariz. 1992) (explaining how "plaintiffs need not name a representative of

---

[27] *See also Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335-36 (S.D.N.Y. 1988) (investors in various companies and partnerships controlled by defendants could represent a class including investors in other companies and partnerships); *Kitchens v. U.S. Shelter Corp.*, 1983 U.S. Dist. LEXIS 12812 (D.S.C. Oct. 13, 1983) (permitting named plaintiffs to represent purchasers of interests in 12 separate limited partnerships, even though representatives held interests in only three of the partnerships).

[28] The *Fallick* court also cited with approval authority holding that when a single defendant offers a range of ERISA plans, an individual in one plan can represent a class of plaintiffs – including some belonging to other plans – as long as "the gravamen of the plaintiff's challenge is to the general practices [of the defendant] which affect all of the plans." 162 F.3d at 422.

the class for each subgroup of securities, where common issues predominate as to all securities"); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 911 n.7 (D.N.J. 1998) (stock purchasers could represent note purchasers).[29]  Plaintiffs here allege such a common course of conduct across all of the Funds.

    **2.**    **Plaintiffs Have Standing to Assert Direct Claims under § 36(b) on Behalf of Shareholders of All Columbia Funds**

        **a.**    **Supreme Court Rulings and Legislative History Confirm that § 36(b) Claims Are Direct Rather than Derivative**

Defendants argue that Plaintiffs "lack statutory standing to maintain derivative or Section 36(b) claims with respect to" the 79 funds in which Plaintiffs did not invest.  Def. Brf. at 14, 16-17.  In arguing that a § 36(b) claim is derivative, Defendants have misinterpreted the statutory text and the Supreme Court's opinion in *Daily Income*, 464 U.S. 523, upon which they rely.  Def.

---

[29]  The cases relied upon by Defendants are distinguishable.  In *Nenni v. Dean Witter Reynolds, Inc.*, No. 98-12454 (REK), 1999 U.S. Dist. LEXIS 23351, at *6 (D. Mass. Sept. 29, 1999) (Def. Brf. at 15; Tr. Brf. at 13-14, 16-17), the court improperly viewed the issue of whether the plaintiff could bring an action on behalf of other funds as a standing issue, rather than one of typicality, and did not address the applicability of the juridical link doctrine, discussed *infra*, to the facts of that case.  Additionally, the court only addressed the standing issue regarding plaintiffs' §§ 11(a) and 12 claims, which are not at issue here.  Moreover, the claim being made involved a Contingent Deferred Sales Charge which, unlike the claims made here, did not impact all funds.  *Id.* at *3 ("Nenni purchased shares in five MSDW mutual funds, four of which were subject to a CDSC (and are at issue in this case).")  Finally, no court has cited to *Nenni* with approval.  Another of Defendants' cases, *Ramos v. Patrician Equities Corp.*, 765 F. Supp. 1196 (S.D.N.Y. 1991) (Def. Brf. at 15; Tr. Brf. at 14), stands for the proposition that plaintiffs do need standing against defendants, but does not hold that a plaintiff has to have purchased every security that is the subject of the suit.  *Henry v. Circus Circus Casinos*, 223 F.R.D. 541, 544 (D. Nev. 2004) (Def. Brf. at 16) does not follow, or even address, the Supreme Court opinion in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), which explained that a court should wait to address standing issues after having decided class certification issues.  *Id.* at 831.  *Williams v. Bank One Corp.*, 2003 U.S. Dist. LEXIS 23522 (N.D. Ill. Dec. 11, 2003) (Def. Brf. at 17; Tr. Brf. at 14) was a derivative action and therefore inapplicable in the class context.  Finally, in *In re Dean Witter Partnership Litigation*, 1998 Del. Ch. LEXIS 133 (July 17, 1998) (Def. Brf. at 15), the Delaware Chancery Court found that the plaintiffs lacked standing to assert claims with respect to a limited partnership in which they had not invested.  *Id.* at *7 n.4.  In that action, unlike here, there were no allegations that the limited partnerships shared fees and expenses and the court did not address the juridical link doctrine.

Brf. at 35. Although § 36(b) claims are brought "on behalf of" the mutual fund (15 U.S.C.

§ 80a-35(b)), not all claims on behalf of a corporation are derivative. Rather, as the Supreme

Court has held, § 36(b) claims are direct. *Daily Income*, 464 U.S. at 528-29.

In *Daily Income*, the Supreme Court reviewed its prior decisions and concluded that it

had always used the term "derivative action" to refer to a situation in which the corporation was

entitled to assert the claim in court on its own behalf:

> This interpretation of the Rule is consistent with the understanding
> we have expressed, in a variety of contexts, of the term "derivative
> action." In *Hawes v. Oakland*, 104 U.S. 450, 460 (1882), for
> instance, the Court explained that a derivative suit is one "founded
> on a right of action existing ***in the corporation itself, and in which
> the corporation itself is the appropriate plaintiff***." Similarly,
> *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949), stated
> that a derivative action allows a stockholder "to step into the
> corporation's shoes and to seek in its right the restitution he could
> not demand in his own"; and the Court added that such a
> stockholder "brings suit on a cause of action derived from the
> corporation." *Id.*, at 549. Finally, *Ross v. Bernhard*, 396 U.S. 531,
> 534 (1970), described a derivative action as "a suit to enforce a
> ***corporate*** cause of action against officers, directors, and third
> parties" (emphasis in original) and viewed the question there
> presented – whether the Seventh Amendment confers a right to a
> jury in such an action – as the same as whether the corporation,
> had it brought the suit itself, would be entitled to a jury. *Id.*, at
> 538-539. ***In sum, the term "derivative action," which defines the
> scope of Rule 23.1, has long been understood to apply only to
> those actions in which the right claimed by the shareholder is
> one the corporation could itself have enforced in court***. *See also,
> Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 522
> (1947); *Price v. Gurney*, 324 U.S. 100, 105 (1945); *Delaware &
> Hudson Co. v. Albany & Susquehanna R. Co.*, 213 U.S. 435, 447
> (1909) n4.

*Id.* at 528-29 (emphasis added). As the above quotation indicates, this definition of "derivative

action" existed well before Rule 23.1 or any of its predecessors was in existence.

The Supreme Court held in *Daily Income* that, "Congress intended the unique right

created by § 36(b) to be enforced solely by the SEC and security holders of the investment

company." *Id.* at 536.  Therefore, the primary or direct right to bring such claim is held by the

security holder, not the mutual fund.  This conclusion was subsequently confirmed by the

Supreme Court in *Kamen v. Kemper Financial Services, Inc.*, in which the Supreme Court stated

that "a shareholder action 'on behalf of' the company under § 36(b) is direct rather than

derivative…"  500 U.S. 90, 108 (1991); *see also Dreyfus* Sept. 28 Slip Op. at 17 n. 7

(specifically holding that a § 36(b) claim is not derivative).

Defendants rely on the "on behalf of" language in § 36(b) to support their argument that

Plaintiffs' § 36(b) claim should have been brought derivatively.  Def. Brf. at 16, 35.  But, as

explained by the Supreme Court in *Daily Income*:

> The fact that derivative suits are brought on behalf of a corporation
> does not mean, however, that all suits brought on behalf of a
> corporation are derivative.

464 U.S. at 535.[30]

Furthermore, the overwhelming thrust of the Supreme Court's discussion in *Daily Income*

is that in deciding whether the proper party plaintiff to a lawsuit is the shareholder or the

corporation, the determining factor is whether the corporation itself is entitled to assert that claim

in court.  In *Daily Income*, the Supreme Court specifically stated, "a shareholder action that the

corporation cannot control raises no proper party concerns."  *Id.* at 533 n.9.

---

[30]  In the Second Circuit decision that *Daily Income* affirmed, the court stated, "[t]he words 'on
behalf of' do not create by implication a statutory right of the company itself to sue, from which
the stockholders' right may be said to be 'derivative.'  These words . . . signify only that either
party so entitled to bring an action under § 36(b) must do so to seek return of excessive
management fees to the company treasury and not to individual or governmental coffers."  *Fox v.
Reich & Tang, Inc.*, 692 F.2d 250, 255 (2d Cir. 1982).

The legislative history shows that Congress specifically considered and rejected proposed

language stating that a security holder action under § 36(b) would be brought in a "derivative"

capacity.  As described by the Supreme Court in *Daily Income*:

> [T]he Senate bill required a security holder to make demand on the
> SEC before bringing suit and provided that, if the Commission
> refused or failed to bring an action within six months, ***the security
> holder could maintain a suit against the adviser in a "derivative"
> or representative capacity***.  *Ibid*.  Like the original SEC proposal,
> however, the Senate bill provided that the SEC could intervene in
> any action brought by the company or by a security holder on its
> behalf.  *Id.*, § 22.
>
> After the bill was reintroduced in the 91st Congress, further
> hearings and consultations with the industry led to the present
> version of § 36(b). . . .  The new bill further provided that "either
> the SEC or a shareholder may sue in court on a complaint that a
> mutual fund's management fees involve a breach of fiduciary
> duty."  *Id.*, at 7.  ***The reference in the previous bill to the
> derivative or representative nature of the security holder action
> was eliminated***, as was the earlier provision for intervention by the
> SEC in actions brought by the investment company itself.  *See* S.
> 2224, supra, § 22.

*Id.* at 538-39 (emphasis added).  Section 36(b) claims are thus direct and a class action may be

brought on behalf of all investors in all Columbia Funds.

### b.    The Language of § 36(b) Confirms that the Fund Shareholders Have a Primary and Direct Right of Action Under § 36(b)

Section 36(b) states that the "investment adviser of a registered investment company shall

be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of

payments of a material nature, paid by such registered investment company, ***or by the security

holders thereof***."  15 U.S.C. § 80a-35(b) (emphasis added).  As stated by the Supreme Court in

*Daily Income*, "[t]he fiduciary duty imposed on advisers by § 36(b) is owed to the company itself

***as well as its shareholders***…."  464 U.S. at 535, n.11 (emphasis added).

Additionally, although § 36(b) provides that an action may be brought by a security

holder "in respect of such compensation or payments paid by such registered investment

company or by the security holders thereof," the statute requires that any recovery go to the mutual fund regardless of whether the excessive payments were made by the mutual fund itself or by the security holders. In so doing, § 36(b) obliterates the historic distinction between the rights of security holders on the one hand and the rights of their corporation as a separate entity on the other. Rather, § 36(b) inextricably intertwines the rights of shareholders and the corporate entity. It creates a unique federal right that only the shareholders and the SEC may assert, even though that right is asserted for the benefit of the mutual fund. It expressly provides that the benefit must go to the mutual fund even if the excessive payments at issue were made by the security holders rather than from fund assets.

Thus, the statute refuses to treat the shareholders and the fund as distinct and separate entities. Rather, the language and structure of § 36(b) manifest a recognition that, in substance, mutual funds are pools of assets owned by the shareholders, so that a suit for the benefit of the fund will automatically be a suit for the shareholders' own benefit even if the payments giving rise to the cause of action are made by the shareholders themselves.

This same concept of the relationship between mutual funds and their shareholders has been recognized repeatedly by the courts. In *Burks v. Lasker*, 441 U.S. 471 (1979), the Supreme Court stated, "[a] mutual fund is a pool of assets, consisting primarily of portfolio securities, belonging to the individual investors holding shares in the fund." Similarly, in *Tannenbaum v. Zeller*, 552 F.2d 402, 405 (2d Cir. 1977), the court stated,

> The mutual fund industry is many ways unique… A mutual fund is a "mere shell," a pool of assets consisting mostly of portfolio securities that belongs to the individual investors holding shares in the fund.

The above analysis is consistent with the legislative history of § 36(b).  The Senate

Report on this legislation uses the terms "shareholders" and "fund" interchangeably.  For

example, it states:

> [Y]our committee has adopted the basic principle that, in view of
> the potential conflicts of interest involved in the setting of
> [management] fees, there should be effective means for the courts
> to act where ***mutual fund shareholders [or] the SEC believe there
> has been a breach of fiduciary duty***.  This bill would make it clear
> that, as a matter of Federal law, the investment adviser or mutual
> fund management company has a fiduciary duty with respect to
> ***mutual fund shareholders***.  It provides an effective method
> whereby the courts can determine whether there has been a breach
> of this duty by the adviser or by certain other persons with respect
> to their compensation ***from the fund***.

S. Rep. No. 91-184, at 2 (emphasis added).  The Senate Report adds that,

> Your committee believes that the investment adviser should be a
> ***fiduciary of the fund*** in such matters as the handling of the fund's
> assets and investments.  Therefore, we have added a new section
> 36(b) to the Investment Company Act to specify that the adviser
> has a fiduciary duty with respect to compensation for services or
> other payments ***paid by the fund or its shareholders*** to the adviser
> or to affiliated persons of the adviser.

*Id*. at 6 (emphasis added).  The Senate Report states elsewhere that, under § 36(b), "The advisor

is a fiduciary for all of his beneficiaries, in this case all of the ***shareholders***."  *Id*. at 87 (emphasis

added).  The Senate Report thus supports the notion that Congress saw little distinction between

the fund and its shareholders in terms of the rights created and the intended beneficiaries of

§ 36(b).[31]

---

[31]  In light of the above analysis, Defendants' reliance on *Kauffman v. Dreyfus Fund Inc.*, 434
F.2d 727 (3d Cir. 1970), is misplaced.  Def. Brf. at 16-17; Tr. Brf. at 14.  *Kauffman* was decided
prior to the enactment of § 36(b), and therefore was not addressing the unique federal right that
Congress created in passing that legislation.  Rather *Kauffman* involved a garden variety
derivative suit, and the *Kauffman* court emphasized the "separate identities" of the corporation
and the stockholder as the reason for holding that the claims involved were derivative.  *Id* at 733.
In light of its unique intertwining of the rights and remedies of the shareholders and their mutual

c.    **The Mere Fact that the Stockholders Assert their § 36(b) Claims for the Benefit of the Mutual Fund Does Not Render the Claim "Derivative" and Does Not Preclude Class Treatment**

The fact that any recovery on a § 36(b) claim goes to the fund rather than to the individual shareholder does not render the suit "derivative" rather than direct. This situation is analogous to when a fiduciary such as an executor or a guardian sues for the benefit of his or her beneficiary, which does not make that suit derivative merely because the plaintiff is not the beneficiary of any recovery in the lawsuit. Indeed, many such fiduciaries have been certified to represent a class, despite the fact that the plaintiff's individual claim is asserted on behalf of the plaintiff's beneficiary.[32]

3.    **Plaintiffs also Have Standing to Pursue Their Direct Claims on Behalf of Shareholders in All of the Columbia Funds Pursuant to the Juridical Link Doctrine**

Defendants and all the Columbia Funds are juridically linked with one other, making collective prosecution of this action the most efficient means for resolution of the dispute. As explained in *Luyando v. Bowen*, 124 F.R.D. 52 (S.D.N.Y. 1989), the "juridical link" doctrine allows a plaintiff to bring a class claim against a defendant as to which he or she lacks standing if there exists a "legal relationship which relates all defendants in a way such that single resolution of the dispute is preferred to a multiplicity of similar actions." *Id*. at 58; *Heffler v. U.S. Fidelity*

---

fund, § 36(b) does not embody that "concept of separate identities" that was the basis upon which the *Kaufmann* decision was rendered.

[32] *See, e.g., Risinger v. Concannon*, 201 F.R.D. 16 (D. Me. 2001) (parents on behalf of their disabled children); *Woodard v. Online Info. Servs.*, 191 F.R.D. 502 (E.D.N.C. 2000) (guardian of legally incompetent plaintiff); *Prostic v. Xerox Corp.*, 1991 U.S. Dist LEXIS 15950 (D. Conn. July 19, 1991) (securities fraud class action brought by representative of the estate of deceased investor). "[T]here is nothing inherent in this status that would preclude fiduciaries or trustees from serving as class representatives on behalf of their own beneficiaries as well as others similarly situated, and many courts have so held." *Woodard*, 191 F.R.D. at 506 (quoting Newberg on Class Actions, § 3.34 (3d ed. 1992)).

& *Guar. Ins. Co.*, 1992 U.S. Dist. LEXIS 3090, at *11 (E.D. Pa. Mar. 10, 1992) (noting that a "juridical link," or legal relationship, would make single resolution of the dispute preferable over multiple actions).

The juridical link doctrine is properly applied where efficiency and expediency allow plaintiffs to join together to address common wrongs by a group of defendants. "The doctrine is a powerful tool that can allow a [plaintiff] to force many defendants (and what might otherwise be numerous class actions) into a single lawsuit at a substantially reduced cost." *Newby v. Enron Corp.*, 2004 U.S. Dist. LEXIS 8158, at *108 (S.D. Tex. Feb. 24, 2004); *see also Payton v. County of Kane*, 308 F.3d 673, 678-79 (7th Cir. 2002) ("if the plaintiffs as a group - named and unnamed - have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or otherwise 'juridically related in a manner that suggests a single resolution of the dispute would be expeditious,' the claim could go forward") (quoting *La Mar v. H&B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973)).

In *Alves v. Harvard Pilgrim Health Care, Inc.*, 204 F. Supp. 2d 198 (D. Mass. 2002), *aff'd*, 316 F.3d 290 (1st Cir. Mass. 2003), two class representatives brought an ERISA class action against five defendants. Even though neither plaintiff was ever a member of an ERISA plan that the defendants sponsored, Judge Saris employed the juridical link doctrine to conclude that "plaintiffs' claims against [defendants] should not be dismissed for lack of standing. Because these defendants [were] wholly[-]owned affiliates of [the corporate defendant], in which plaintiffs were participants, and the copayment plan provisions [were] substantially the same, a single resolution of the dispute would be expeditious." *Id.* at 205.

Defendants' citation to *In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162, to argue that Plaintiffs must have invested in all of the funds at issue, is misplaced. Def. Brf. at 15; Tr. Brf. at 14. First, the court in *Eaton Vance* dealt with a class certification motion, not a motion to

dismiss.[33]  *Id.*  This fact underscores that it is inappropriate for this Court to rule on the issue at the motion to dismiss stage, as Defendants suggest.  Second, the district court in *Eaton Vance* held that the plaintiffs could not represent all four funds because they "failed to demonstrate that their claims are typical of that class."  *Id.* at 169.  Plaintiffs here will not have that same problem on class certification because Plaintiffs have more than adequately shown how their claims are typical of the claims of all shareholders in all of the Funds.[34]

Notably, the court in *Eaton Vance* recognized that the juridical link doctrine does apply in certain situations.  *Id*. at 171.  In *Eaton Vance*, however, the court explained that the funds that the plaintiffs had purchased were "not sufficiently juridically linked to the other mutual funds" because the plaintiffs had not alleged that the other funds at issue had identical false and misleading statements in the prospectuses.  *Id*. at 171.  Here, by contrast, Plaintiffs have alleged in the Complaint that "[e]ach of the prospectuses issued during the Class Period contained substantially the same materially false and misleading statements in that they omitted key information regarding the Funds' strategy for growth of assets, revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars."  ¶ 142.

Moreover, all the Columbia Funds are intertwined as the Defendants pool together the fees and expenses collected from the Columbia Fund shareholders (the same fees and expenses that are challenged as improper in the Complaint), such that the Columbia Funds share expenses with one another.  ¶ 72.  The Funds, essentially pools of investor assets, are managed and

---

[33]  *See also In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38 (D. Mass. 2003); *Adair v. Sorenson*, 134 F.R.D. 13, 16 (D. Mass. 1991) (decided on class certification by the same judge who decided *Eaton Vance*).  Tr. Brf. at 14.

[34]  *See* Plaintiffs' Opening Memorandum of Law in Support of Their Motion for Class Certification, filed June 9, 2005, at 12-15.

administered by a common body of officers and employees of the Defendants. *Id*. The

Columbia Funds share the same investment advisers and distributor. *Id*. Hence, the Columbia

Funds have no independent will and are totally dominated by the Investment Adviser

Defendants, their affiliates and the common body of Trustees established by them. *Id*. The

Columbia Funds thus function as components of one unitary organization. *Id*. Accordingly,

Plaintiffs in the instant action have demonstrated sufficient juridical links, even under the *Eaton*

*Vance* standard.[35]

Indeed, the wrongdoing alleged here was only possible because of such juridical links.

The Investment Adviser and Distributor Defendants' access to and use of the entire fund

complex's assets were what made their kickback programs possible and significant in their

impact.[36] Notably, on March 23, 2005, the SEC fined and censured Citigroup for kickbacks its

subsidiary Smith Barney had received from Columbia (*i.e.*, the Defendants herein) and other

mutual fund companies. In the Cease-and-Desist Order, the SEC noted that the prospectuses

"did not specifically disclose the ***magnitude of the revenue sharing payments that CGMI***

***received from fund complexes*** or that certain ***fund complexes*** had greater access to, or increased

---

[35] Again, Defendants incorrectly rely on *Kauffman*, 434 F.2d at 734-37 (Def. Brf. at 16; Tr. Brf. at 14). In *Kauffman* the plaintiff was bringing a derivative claim on behalf of a fund and seeking to use that derivative claim as a basis to bring a class action on behalf of other funds. *Id.* at 735. As discussed herein, Plaintiffs here are asserting direct claims, and therefore *Kauffman* is inapplicable. Additionally, like *Eaton Vance, Kauffman* dealt with a class certification motion, not a motion to dismiss. This underscores that it is premature for this Court to rule on the issue now at the motion to dismiss stage.

[36] Further emphasizing the juridical links present here is that: "[t]he amount of commissions that a broker-dealer earns through portfolio brokerage arrangements often is based on its total sales of all funds issued by that mutual fund complex." Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds, 69 Fed. Reg. 6438.

visibility in, CGMI's retail network." *See* Pollack Decl. A at ¶ 13 (emphasis added) (March 23,

2005 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings,

and Imposing Remedial Sanctions in *In the Matter of Citigroup Global Markets, Inc.*).  Because

of these inadequate disclosures, the customers "***were not provided with sufficient information to***

***appreciate the dimension of the conflict of interest*** the revenue sharing program created."  *Id.*

(emphasis added).  This language illustrates that the conflict of interest not only arises from the

inappropriate relationship between advisers and brokers, but also from the amounts that were

involved.  This undisclosed magnitude was only possible due to the Investment Adviser and

Distributor Defendants' access to the entire Fund complex and, as a result, impacted the entire

complex.

        Under the juridical link doctrine, the issues involving the Columbia Funds would be

assured of efficient and consistent treatment.  *See Moore v. Comfed Sav. Bank*, 908 F.2d 834,

838 (11th Cir. 1990) (While "[o]ther named plaintiffs could be supplied to match with each

named defendant . . . it would be unwieldy to do so . . . .  The case is simpler and more

economical with the class of plaintiffs and the named defendants").

### 4.    Plaintiffs Have Standing Due to their Ongoing Financial Interest in the Outcome of the Litigation Regarding All Funds

        Additionally, Plaintiffs have an ongoing financial interest in the resolution of this action

regarding all Funds.  The United States Supreme Court has stated that standing consists of the

following three elements:

> First, the plaintiff must have suffered an "injury in fact" -- an
> invasion of a legally protected interest which is (a) concrete and
> particularized . . . and (b) "actual or imminent, not 'conjectural' or
> 'hypothetical.'" . . . Second, there must be a causal connection
> between the injury and the conduct complained of -- the injury has
> to be "fairly . . . trace[able] to the challenged action of the
> defendant, and not . . . the result [of] the independent action of
> some third party not before the court." . . . Third, it must be

> "likely," as opposed to merely "speculative," that the injury will be
> "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Under *Gollust v. Mendell*, 501

U.S. 115, 126 (1991), standing is grounded in a plaintiff's "distinct and palpable injury to

himself," and his or her ability to "maintain a 'personal stake' in the outcome of the litigation...."

*Id.*  As pointed out by at least one court in the mutual funds context, *Gollust* contradicts

Defendants' argument that a mutual fund shareholder may not assert claims regarding funds in

which he did not invest (Def. Brf. at 14; Tr. Brf. at 13), as long as the shareholder has some

financial interest in the claims involving the other funds.  *See Batra v. Investors Research Corp.*,

1991 U.S. Dist. LEXIS 14773, at *10 (W.D. Mo. Oct. 4, 1991).

In *Batra*, Twentieth Century Investors ("TCI") was the registrant of 12 different funds or

"series."  *Id.* at *1.  The court held that by holding shares in one fund, the plaintiff had standing

to sue on behalf of other funds because, as a shareholder in the fund, the plaintiff benefited from

any recovery of excessive fees from the other mutual funds.  The court stated:

> [T]he *Gollust* holding nullifies the defendants' contention that the
> plaintiff cannot maintain an action on behalf of other funds where
> he held solely Cash Reserve securities.  *Gollust* provides that
> where a plaintiff satisfies the statutory requirements, he need not
> continue to hold shares ***so long as he holds some financial interest
> in the outcome of the litigation … As a shareholder in [series he
> owned or in] any other series, he benefits from any recovery of
> excessive fees by TCI***.

*Id.* at *10 (emphasis added).  Here, Plaintiffs have a financial interest in the outcome with

respect to all the Funds because all the Funds are alleged to be alter egos of each other, and have

shared the expenses at issue in the litigation.  An accounting with respect to all Funds is thus

necessary to award relief to any of the Funds.  ¶¶ 69-73.  In other words, Plaintiffs here are not

attempting to challenge conduct from which they suffered no injury.[37]  Plaintiffs were injured by

all of Defendants' improper practices (which impacted *all* of the Columbia Funds), and they thus

have standing to bring claims challenging all such practices.

    **B.**    **Plaintiffs Have Standing to Pursue Claims "On Behalf Of" All of the Columbia Funds as Members of an Unincorporated Association Pursuant to Fed. R. Civ. P. 23.1 and 23.2**

Defendants argue that Plaintiffs lack standing to assert derivative claims—*i.e.*, Plaintiffs'

IAA §§ 206/215 claim—on behalf of funds that Plaintiffs did not own, because Fed. R. Civ. P.

23.1 requires a plaintiff to allege that he or she was a shareholder "at the time of the transaction."

Def. Brf. at 17; Tr. Brf. at 12.  Moreover, as Defendants note, § 36(b) claims must be brought by

security holders "on behalf of" their mutual funds (15 U.S.C. § 80a-35(b)), although §36(b)

claims are direct.  *See Daily Income*, 464 U.S. at 528-29; *Kamen,* 500 U.S. at 108.  Defendants

thus argue that § 36(b) claims may only be brought on behalf of those Columbia Funds which

plaintiffs held.  Def. Brf. at 17.  Plaintiffs, however, have standing to bring their claims "on

behalf of" all of the Columbia Funds—*i.e.*, under IAA §§ 206/215 and § 36(b)—as members of

an unincorporated association pursuant to Fed. R. Civ. P. 23.1 and 23.2 respectively.

Plaintiffs' IAA claim (Count V) is the sole claim that is brought derivatively.  Because

this claim, along with the § 36(b) claim, involve substantive federal rights, a federal court must

apply federal law to determine what constitutes an unincorporated association for standing

---

[37]  An investor holding a single fund within a family has a tangible interest in ensuring that the funds in the entire complex are handled consistently with applicable law, as the investor bargained for.  One of the identified benefits of having holdings in a fund family is the ability, without additional sales charges, to switch between funds within a family.  *See, e.g.,* Pollack Decl. Ex. M (Excerpt, May 1, 2002 Registration Statement for the Liberty Acorn Trust). Therefore, a typical customer in a fund has an inherent interest in the concept that all Funds available to the investor not charge excessive fees or pay excessive commissions, because part of the benefit of the bargain in holding a Fund within a particular fund family is the ability to change Funds without incurring additional sales charges.

purposes.  *See Associated Students of U.C. Riverside v. Kleindienst*, 60 F.R.D. 65, 67 (C.D. Cal.

1973).  The Columbia Funds constitute an unincorporated association for standing purposes

under federal law.  *See* ¶¶ 69-74.

      An unincorporated association is defined as a body of persons acting together pursuant to

a common purpose and/or enterprise.  *See Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 486 (1st

Cir. 1985); *Estates of Unger v. Palestinian Auth.*, 304 F. Supp. 2d 232, 258 (D.R.I. 2004).  Even

if the Columbia Funds were individual, distinct legal entities, that would *not* be dispositive of the

principle that the Columbia Funds, together, constitute an unincorporated association for the

constituents of an unincorporated association may be individually incorporated or otherwise

organized as business entities.  *See Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 461 (1st Cir.

1990); *Mgmt. Television Sys., Inc. v. Nat'l Football League*, 52 F.R.D. 162, 164 (E.D. Pa. 1971).

      As discussed above, Plaintiffs allege that the individual Funds comprising the Columbia

Fund complex acted with a common purpose and/or as a common enterprise, and function as

components of one unitary organization.  The goodwill of the Columbia Funds has been

diminished and impaired by the wrongful acts described in the Complaint.  *See Cross v. Oneida

Paper Products Co.*, 117 F. Supp. 919, 921 (D.N.J. 1954) (recognizing, for federal representative

party purposes, that "members of a[n] . . . unincorporated association[] clearly have a joint or

common right in its trade-mark").  Moreover, the Columbia Fund family is commonly known by

the brand name "Columbia."  Defendants use this to brand the mutual fund family name to the

public and entice people to purchase Columbia Funds.  *See* Pollack Decl. Ex. N (*Brand Name

Value Among Mutual Funds*, Morningstar).  This is another illustration of the Columbia

Defendants' strategy to treat the entire family of Funds as a single, brandable, synergistic unit, in order to maximize the benefits to themselves.[38]

Under the foregoing principles, Plaintiffs have standing as to the IAA and § 36(b) claims to bring such claims "on behalf of" all of the Columbia Funds.[39]  In effect, Plaintiffs bring the IAA and the § 36(b) claims on behalf of the individual fund invested in and on behalf of the unincorporated association of all Columbia Funds in which Plaintiffs' Funds are members.  *See* Fed. R. Civ. P. 23.1 and 23.2, respectively.  Under these rules, it is clear that any member of the unincorporated association can bring a claim on behalf of all the members thereof.  Accordingly, because the IAA and § 36(b) claims are brought "on behalf of" certain members of such an association, these claims can be brought on behalf of all members of that association.  The Columbia Fund family is commonly viewed as a single entity and fairness dictates that it be treated as an unincorporated association here.  *See Ripon Soc'y v. Nat'l Republican Party*, 525 F.2d 567, 571-72 (D.C. Cir. 1975).

Moreover, the legislative history of § 36(b) of the ICA demonstrates why prosecution of this action regarding all of the Columbia Funds is appropriate.  The legislative history confirms that where funds pool and share expenses imposed on them by their advisers (as the Columbia Funds do), § 36(b) requires the courts to evaluate the impact of defendants' wrongful conduct on the entire complex of funds:

---

[38]  These "branding" expenses are marketing costs that constitute 12b-1 fees.  The fact that these fees are used to market the Funds as a single commodity emphasizes the significance of the pooling of assets by Defendants and the numerous juridical links that provide yet another basis for Plaintiffs' standing, discussed herein.

[39]  *See Resolution Trust Corp. v. DeLoitte & Touche*, 822 F. Supp. 1512, 1515 (D. Colo. 1993) (discussing representative principles of Fed. R. Civ. P. 23.2, and certifying defendant subclasses of individual partners of an accounting firm as an unincorporated association).

> In the event that court action is brought to enforce this fiduciary
> duty of the investment adviser as to compensation or payments
> received by him, it is intended that the court look at all the facts in
> connection with the determination and receipt of such
> compensation, including all services rendered to the fund or its
> shareholders and all compensation and payments received, in order
> to reach a decision as to whether the adviser has properly acted as
> a fiduciary in relation to such compensation. ***In the case of fund
> complexes, this could, under certain circumstances, include
> consideration of services rendered by such investment advisers to
> other funds in such complex and compensation or payments
> made by such other funds for such services***.

Investment Company Amendments Act of 1969, S. Rep. No. 91-184, at 15 (May 21, 1969)

(emphasis added).  Congress thus recognized that the interrelatedness of mutual fund complexes

requires courts to examine an adviser's activity vis-à-vis the entire complex in order to determine

whether the adviser was obtaining excessive compensation for itself or its affiliates in breach of

its fiduciary duties under § 36(b).[40]

## III.  PLAINTIFFS HAVE PROPERLY PLEADED DIRECT (NOT DERIVATIVE) CLAIMS UNDER STATE LAW AND INVESTMENT COMPANY ACT §§ 34(b), 36(a), AND 48(a)

Defendants claim that, under Massachusetts and Oregon law, Plaintiffs' state law and

ICA claims are derivative in nature and, therefore, must be dismissed.[41]  As demonstrated below,

---

[40]  Additionally, the ICA defines the term "security" broadly and does not limit such definition to a specific class of securities.  Under § 36(b), a plaintiff may bring a claim with respect to a registered investment company by virtue of his being a "security holder of such *registered investment company*." 15 U.S.C. § 80a-35(b) (emphasis added).  The statute does not require a plaintiff to be a holder of an individual portfolio of the investment company, or a specific share class of such portfolio.  Here, Plaintiffs need only have invested in a "security" from a registered investment company in order to bring a claim regarding all fees paid by such company or its shareholders.  Section 34(b) of the ICA likewise does not limit its remedy to untrue statements in documents pertaining only to certain classes or portfolios of a registered investment company.  Section 36(a) of the ICA similarly authorizes actions to remedy breaches of fiduciary duty "*in respect of any registered investment company*," without limiting the remedy to specific portfolios or classes of such investment company.  15 U.S.C. § 80a-35(a) (emphasis added).

[41]  Defendants refer to Plaintiffs' § 36(b) claim as being "derivative" (Def. Brf. at 16-17) but, as discussed herein, the Supreme Court has held otherwise.

Defendants are wrong, because courts have held that claims similar to those in the instant action are direct.

 As an initial matter, whether claims under the ICA are direct or derivative is decided by the fund's state of incorporation, unless application of those rules would frustrate the specific federal policy objectives underlying the ICA. *See Kamen*, 500 U.S. at 108 ("[W]here a gap in the federal securities laws must be bridged by a rule that bears on the allocation of governing powers within the corporation, federal courts should incorporate state law into federal common law *unless the particular state law in question is inconsistent with the policies underlying the federal statute*.") (emphasis added).

 In describing the "specific federal policy objectives underlying the ICA," § 1 of the ICA states the following, *inter alia*:

> [I]t is hereby declared that the national public interest and *the interest of investors* are adversely affected -- . . .
>
> (2) *when investment companies are organized, operated, managed, or their portfolio securities are selected, in the interest of directors, officers, investment advisers, depositors, or other affiliated persons thereof, in the interest of underwriters, brokers, or dealers, in the interest of special classes of their security holders, or in the interest of other investment companies or persons engaged in other lines of business, rather than in the interest of all classes of such companies' security holders*. . .

15 U.S.C. § 80a-1(b)(2) (emphasis added). As stated by ICA § 1, the federal policy underlying the ICA is the protection of mutual fund investors from fund directors, investment advisers, distributors, brokers and others who organize, operate and manage mutual funds in their own, rather than the shareholders', best interests. Under Supreme Court authority, this Court cannot determine whether Plaintiffs' claims are direct or derivative under state law in a manner that contradicts this express federal policy. *Kamen*, 500 U.S. at 108-09; *see also Strougo*, 282 F.3d at

176 (finding that plaintiff's bringing ICA claims directly, pursuant to Maryland shareholder standing law, comported with the policies underlying the ICA).

Defendants argue that Massachusetts and Oregon law apply to this issue because the registrants of the Columbia Funds are organized under these states' laws. Def. Brf. at 46. Under Massachusetts and Oregon law, "[w]hat differentiates a direct from a derivative suit is … the source of the claim of right itself. . . . If the right flows from the breach of a duty owed directly to the plaintiff independent of the plaintiff's status as a shareholder, investor, or creditor of the corporation, the suit is direct." *Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass. 1996); *accord Trabucco v. Carlile*, 57 F. Supp. 2d 1074, 1077 (D. Or. 1999) (in a breach of fiduciary duty claim, plaintiff may bring claim directly if plaintiff has alleged a special injury distinct from any harm to the value of the corporation).

In *Strigliabotti*, which is directly on point, the court found that numerous state law claims (including those asserted by Plaintiffs here) alleging excessive fees and overcharges were direct. 2005 U.S. Dist. LEXIS 9625, at *25. [42] The *Strigliabotti* court discussed the fact that the unique nature and structure of mutual funds reveals that "financial harm from overcharges is harm to the individual investors, who own the Funds' assets and bear its expenses directly on a pro rata basis." *Id*. Citing *United States v. Cartwright*, 411 U.S. 546 (1973), the *Strigliabotti* court noted that a mutual fund issues redeemable securities, and the value of mutual fund shares is computed daily "by taking the market value at the time of all portfolio securities, adding the value of other

---

[42] In *Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at *5-6, the state law claims upheld as direct were breach of fiduciary duty under California law; civil conspiracy to breach fiduciary duty under California law; common law aiding and abetting breaches of fiduciary duty; "acting in concert" under § 876(b) of the Restatement (Second) of Torts; breach of Cal. Bus. & Prof. Code § 17200; breach of Cal. Bus. & Prof. Code § 17500; and common law unjust enrichment. Plaintiffs here likewise allege state law breaches of fiduciary duty and unjust enrichment. *See* ¶¶ 217-226.

assets and structuring liabilities, and dividing the result by the number of shares outstanding."
*Id.* at \*24 (citing *Cartwright*, 411 U.S. at 548); *see also* ¶ 158 (describing how the Columbia
Funds issue "redeemable securities").  Each dollar of expense borne by the fund is incurred by
shareholders as a *pro rata* deduction from the net asset value per share.  Fees, similarly, are paid
by individual investors.  *Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at \*25.  As a result of this
financial structure, the investors—rather than the funds themselves—have paid the fees and
overcharges and are directly injured thereby.  *Id.*; *see also* ¶¶ 154-162.

In *Eaton Vance*, 380 F. Supp. 2d at 235 n.5, upon which Defendants repeatedly rely,
although the court dismissed the plaintiffs' ICA § 34(b) claim for lack of a private right of
action, the court recognized that claims for material omissions allege a direct, rather than a
derivative harm:

> The Independent Trustee Defendants' argument that Count One
> [(the § 34(b) claim)] must be brought as a derivative suit is
> unavailing. Count One alleges that the defendants made material
> misrepresentations or omissions regarding their management of the
> Eaton Vance Funds. Count One alleges an injury directly to the
> investors who, based on the alleged misrepresentations and
> omissions, continued to invest in the Eaton Vance Funds and were
> thereby injured. Count One alleges an injury to the investors
> separate and distinct from any injury to the Eaton Vance Funds and
> it is properly brought as a direct claim rather than a derivative
> claim.

Such a claim is therefore direct.  *See Blasberg*, 934 F. Supp. at 26 ("[I]f a plaintiff alleges
that she, as an individual investor, was misled or defrauded in the purchase of her investment,
this kind of claim is a 'direct' one.").

Similarly, as the Second Circuit has found under Maryland law, the growth of a mutual
fund that is accompanied by harm to shareholders states a direct, not derivative claim.  *Strougo v.
Bassini*, 282 F.3d 162, 169 (2d Cir. 2002).  In *Strougo*, the Second Circuit upheld direct claims
brought pursuant to §§ 36(a) (for breach of fiduciary duty) and 48 of the ICA where there had

been a "reduction in the net equity value of the shares," as is alleged here. *Id*. at 174. *Strougo* also makes clear that shareholders may bring a direct action even when all shareholders were injured in the same manner:

> There may be acts that injure shareholders equally but do not injure the corporation at all; indeed they might be seen as benefitting [sic] the corporation in the sense that they might increase its assets. The shareholders, despite their undifferentiated harm, could not bring a derivative suit -- nor could the corporation recover for them -- because no such suit could succeed without a showing of injury to the corporation. In such circumstances, only a direct suit by shareholders can redress the harm to them, even though the harm was suffered by the shareholders equally.

*Strougo*, 282 F.3d at 172.

Furthermore, in *Strougo*, the Second Circuit stated that a direct claim exists where, as here, shareholders suffered injury, although the conduct complained of might have actually increased the assets of the mutual funds:

> Indeed, with reference to the shareholders that purchased new shares in order to avoid dilution, ***the acts that allegedly harmed the shareholders increased the Fund's assets.*** And as for the non-participating shareholders, the reduced value of their equity did not derive from a reduction in the value of the Fund's assets, but rather from a reallocation of equity value to those shareholders who did participate.
>
> Thus, in the case of both the participating and non-participating shareholders, it would appear that the alleged injuries were to the shareholders alone and not to the Fund. These harms therefore constitute "distinct" injuries supporting direct shareholder claims under Maryland law. The corporation cannot bring the action seeking compensation for these injuries because they were suffered by its shareholders, not itself.

*Id.* at 175 (emphasis added); *see also Mann v. Kemper Fin. Co.*, 618 N.E.2d 317, 325. (Ill. Ct. App. 1992) ("A plaintiff shareholder's injury may not be unique to that particular shareholder, but a plaintiff's cause of action could still be individual instead of derivative.").[43]

Here, Plaintiffs have alleged both state and ICA breach of fiduciary duty claims for the payment of excessive fees, and § 34(b) omission claims. Under the foregoing authorities, Plaintiffs have plainly alleged direct claims.

Moreover, as alleged in the Complaint, the Class members have sustained direct and distinct injury from Defendants' wrongful utilization of shareholder and Fund assets to effectuate their kickback scheme. Defendants' own prospectuses, SAIs, and annual reports acknowledge that the cost of investing in a Fund is not limited to the initial price of purchasing shares. ¶ 159. That cost also includes additional fees and expenses subsequently imposed on the investors in connection with the service aspect of mutual fund investing. *Id.* "For example, as stated in the Annual Report for the Columbia Acorn Funds dated December 31, 2004: "***As a fund shareholder, you incur two types of costs. There are transaction costs … There are also***

_____

[43] It is well-settled that a plaintiff's allegations of a breach of fiduciary duty to the shareholders allows that plaintiff to bring a direct cause of action. *Malmros v. Jones*, 2004 U.S. Dist. LEXIS 4371, at *12 (E.D. Pa. Feb. 27, 2004). As the United States Court of Appeals for the Second Circuit has explained:

> We have . . . permitted a shareholder to sue directly when the defendant owes a direct legal duty to the shareholder. *See Ceribelli v. Elghanayan*, 990 F.2d 62, 64 (2d Cir. 1993). Zolt and Steinberg, Bob Marley's accountant and lawyer, owed fiduciary duties directly to him and his estate. Their actions in diverting estate assets and income breached that duty. Consequently, even in the schemes where the estate was injured only as a shareholder, defendants' breaches of their fiduciary duty as well as equitable considerations confer standing on plaintiff in this action.

*Bingham v. Zolt*, 66 F.3d 553, 562 (2d Cir. 1995).

*continuing costs*, which generally include investment advisory fees, Rule 12b-1 fees, and other fund expenses." ¶ 160 (emphasis added).

Defendants argue that, "[u]nder both Massachusetts and Oregon law, a claim is direct only where the shareholder alleges an injury distinct from that suffered by shareholders generally, ***or the alleged wrong involves a contractual right of shareholders***, such as the right to vote." Tr. Brf. at 7-8 (emphasis added). As shown above, Plaintiffs have alleged a distinct injury to shareholders, thereby satisfy both Massachusetts and Oregon law under Defendants' own arguments. Moreover, in the mutual funds context, a quasi-contractual relationship exists between shareholders and the investment company because:

> [a] mutual fund share represents a fractional ownership in a large investment account. ***It is, in essence, a service contract between the investor and the investment company whereby the investor places his money in the hands of the investment company in expectation of realizing a financial gain***.

*Baum v. Investors Diversified Servs., Inc.*, 409 F.2d 872, 874 (7th Cir. 1969) (emphasis added). Where the fund's investment adviser and trustees and officers have breached this contract with the investor to manage and service the investor's account in a reasonable manner without charging excessive fees, the investors have suffered a direct injury. This service element of a mutual fund is not present in the traditional context of corporate stock, and this distinction warrants the finding of direct claims here.[44]

---

[44] Defendants characterize Plaintiffs' harm as almost exclusively a derivative claim for the waste of corporate assets. Def. Brf. at 49. However, even if the Court were to credit Defendants' characterization of Plaintiffs' claims as derivative (which it should not), as well as Plaintiffs' arguments that they have alleged direct harm, it should be noted that, "[w]hen a shareholder's complaint states a cause of action that is both direct and derivative, the shareholder may proceed with the direct action." *Paskowitz v. Wohlstadter*, 822 A.2d 1272, 1277 (Md. Ct. Spec. App. 2003).

Further bolstering Plaintiffs' position that their claims are direct is the fact that 66 of the 81 Columbia mutual funds named as nominal defendants are organized as series of Massachusetts business trusts.  *See* Tr. Brf. at 7; Def. Brf. at 46.  Massachusetts law provides that those involved with rendering professional services to a trust have direct liability to those receiving such services.

> If a trust is formed under this chapter for the purpose of rendering one or more ***professional services*** as defined in chapter one hundred and fifty-six A, ***the relationship between the trust or a trustee or employee thereof rendering professional service and the person receiving such service shall be the same as if such trust or trustee or employee rendered such service to said person as an individual practitioner, including any liability arising out of the rendering of such service***.

Mass. Code Ch. 182, § 5A (emphasis added).

Under Massachusetts Code chapter 156A, "professional service" includes:

> ***any [  ] type of service which may be rendered only pursuant to a license pursuant to the laws of the commonwealth***, if the applicable regulating boards permit the licensed person to incorporate his profession under this chapter, or if such licensed person elects to incorporate his profession under this chapter and such incorporation is not prohibited by law or by regulations….

Mass. Code Ch. 156A, § 2(b) (emphasis added).

Here, under Mass. Code Ch. 182, § 5A, the Trustee/Officer Defendants are "trustees," and the Investment Adviser and Distributor Defendants are "employees" of the trust (hired by the Trustee/Officer Defendants and paid out of the trust Funds).  They all provide "professional services" because they provide the "type of service which may be rendered only pursuant to a license" under Mass. Code Ch. 156A, § 2(b), because the "type of service" involved is

investment advisory-type services.[45]  Therefore, under Mass. Code Ch. 182, § 5A, the relationship between the Columbia Fund shareholders receiving these services and the trustees and employees of the Funds providing the professional services – *i.e.*, the Trustee/Officer and Investment Adviser and Distributor Defendants – is one, "***as if such trust or trustee or employee rendered such service to said person as an individual practitioner, including any liability arising out of the rendering of such service***."  Plaintiffs therefore may bring direct claims against the Defendants.

Moreover, a direct action is necessary because a derivative action would not fully redress the harms Defendants caused.  Although in certain instances the fees may have in some manner increased fund assets, at the same time they injured the individual shareholders, who bore the cost of the fees but received no benefit in return.  For this reason, only a direct action will fully vindicate the shareholders' rights.  *See Strougo*, 282 F.3d at 175.  Furthermore, as the Class Period ended on March 22, 2004, numerous members of the proposed Class who paid the excessive fees and expenses no longer hold their shares of the Funds and would not be protected if the Court required this case to proceed as a derivative action.[46]  Only a direct action would cover these Class members.

---

[45]  Under Mass. Code Ch. 110A, § 201, "[i]t is unlawful for any person to transact business in this commonwealth as an investment adviser or as an investment adviser representative unless he is so registered under this chapter."

[46]  If, as Defendants argue, these claims are properly derivative claims, then the recovery from such claims would go solely to the Funds, which would create a windfall for whomever happens to own Fund shares at the time of recovery and would deprive those who were Fund shareholders during the wrongdoing – *i.e.*, those who were actually harmed – of any remedy for the harm they suffered.  *See, e.g., Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d at 1033 (Del. 2004) (stating that to decide whether action is properly direct or derivative, the court should consider who will receive the benefit of remedy, the corporation or the individual stockholders).

## IV.    A PRIVATE RIGHT OF ACTION EXISTS UNDER INVESTMENT COMPANY ACT §§ 34(b), 36(a) AND 48(a)

Defendants argue that there is no private right of action under §§ 34(b), 36(a) or 48(a) of the ICA.  Def. Brf. at 35-36.  As demonstrated below, this is erroneous because under recent Supreme Court and lower court jurisprudence, it is appropriate to find an implied private right of action under those sections of the ICA.[47]

### A.    Congress Intended that a Private Right of Action Exist under §§ 34(b) and 36(a)

As Defendants recognize (Def. Brf. at 18), courts must "***look to the intent of Congress*** in determining whether a federal private right of action exists for violations of a federal statute." *Olmsted v. Pruco Life Ins. Co. of N.J.*, 134 F. Supp. 2d 508, 516-17 (E.D.N.Y. 2000) (emphasis added), *aff'd*, 283 F.3d 429, 432 (2d Cir. 2002).  In making this determination, an important factor is whether the statute discusses "the individuals [to be] protected."  *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001).  If it does not, there exists "no implication of an intent to confer rights on a particular class of persons" and, consequently, no implied right of action.  *Id*.  However, a discussion of the group of "individuals [to be] protected," is an indication of an implied right of action. *Id*.; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (noting that an implied right of action exists if the text of the statute is "phrased in terms of the persons benefited").  As discussed below, the language of the statutory schemes of §§ 34(b) and 36(a) state that Congress

---

[47]  Defendants argue that there is no implied private right of action under ICA § 48(a).  Def. Brf. at 35.  Defendants are wrong.  ICA § 48(a) makes it unlawful for "any person, directly or indirectly, to cause to be done ***any act or thing*** through or by means of any other person ***which it would be unlawful for such person to do under the provisions of [the ICA]***."  15 U.S.C. § 80a-47(a) (emphasis added).  A private right of action therefore exists under § 48(a) to the same extent it exists under other sections of the ICA, including § 36(b), which has an express private right of action.  *See Dreyfus* Sept. 28 Slip Op. (upholding plaintiffs' § 36(b) claim and therefore, Plaintiffs' § 48(a) claim as well).  Should this Court find that §§ 34(b) and 36(a) provide for a private right of action, a private right likewise exists for § 48(a).

intended for §§ 34(b) and 36(a) to be *for the protection of investors* -- language that is supportive of a private right of action under §§ 34(b) and 36(a).[48]

Section 34(b) makes it "unlawful for any person to make any untrue statement of a material fact any registration statement…or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to section 31(a)."  15 U.S.C. § 80a-33(b).  Section 31(a) of the ICA states that its requirements are intended "*for the protection of investors*."  15 U.S.C. § 80a-30(a) (emphasis added.)  Likewise, § 8 of the ICA, which sets out the reporting requirements for the registration statement discussed in § 34(b), SEC Form N-1A, states that the purpose of such a registration statement is "*for the protection of investors*."  15 U.S.C. § 80a-8(a) (emphasis added).  Specifically, as stated in Form N-1A, the purpose of its reporting requirements is to "provide essential information about the Fund in a way that will help *investors* to make informed decisions about whether to purchase the Fund's shares described" therein.  SEC Form N-1A at C.2.(a), *available at* http://www.sec.gov/about/forms/formn-1a.pdf (emphasis added).

That § 34(b) is aimed at protecting investors is also evident from the fact that it proscribes omission of facts "necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being *materially misleading*." (Emphasis added.)  The phrase "materially misleading" only makes sense in the context of protecting investors, as the test for materiality focuses on providing accurate information to the

---

[48]  In contrast, following the logic of the Supreme Court in *Sandoval*, the court in *Olmsted* refused to recognize a private right of action for §§ 26(f) and 27(i) of the ICA because, "[t]he language of these sections only describes actions by insurance companies that are prohibited; *it does not mention* [an intent to protect] investors such as the plaintiffs."  *Olmsted*, 283 F.3d at 433 (emphasis added).  Here, §§ 34(b) and 36(a) do, in fact, *expressly* state that investors are the group to be protected by the conduct proscribed in §§ 34(b) and 36(a).

investor.  *See*, *e.g.*, *SEC v. Happ*, 392 F.3d 12, 21 (1st Cir. 2004) (noting that a fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable ***investor*** as having significantly altered the 'total mix' of information made available") (quoting *Basic Inc*. *v*. *Levinson*, 485 U.S. 224, 231-32 (1988) (emphasis added)).

Courts have specifically found private rights of action under § 34(b).  In *In re Nuveen Fund Litigation,* 1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996), as here, the plaintiffs alleged that the defendants violated § 34(b) by not acting in the best interests of mutual fund shareholders in trying to increase the funds' assets and therefore increased advisory fees with no corresponding benefit to the shareholder through any economies of scale.  The court in *Nuveen* held that shareholders had a private right of action under § 34(b) because "***the language and structure of the statute***" demonstrated that a private right of action existed.  *Id*. at *12 (emphasis added).  The court concluded that "[i]n light of the ICA's remedial purposes, the substantial line of precedent recognizing implied private rights of action under the ICA . . . the legislative intent attendant to two subsequent amendments to the ICA," and the plain "language and structure of the statute," a private cause of action existed under § 34(b).  *Id*. at *11.

Section 36(a) states that if a breach of fiduciary duty thereunder is established, the court may enter reasonable relief against the wrongdoers, "having due regard to the protection of investors and to the effectuation of the policies declared in section 1(b) of this title [15 U.S.C. § 80a-1(b)]."  15 U.S.C. § 80a-35(a).  A private right of action for § 36(a) "is supported by the text of [§] 36."  *Strougo v. Bassini*, 964 F. Supp. 783, 796 (S.D.N.Y. 1997).  Specifically, § 36(a) states that, like § 34(b), it is for "***the protection of investors***."  (Emphasis added.)  Moreover, § 36(a) incorporates § 1(b) of the ICA which states that the purpose of sections such as 36(a) is to protect the "***interests of investors***."  15 U.S.C. § 80a-1 (emphasis added.).

An implied right of action under § 36(a) was reaffirmed in *Strougo v. Bassini*, 282 F.3d

162 (2d Cir. 2002), a case decided almost simultaneously with the decision in *Olmsted*.[49]  In

*Strougo*, the Second Circuit held that mutual fund shareholders had standing to bring direct

actions asserting private rights of action under §§ 36(a) and 48 of the ICA.  In doing so, the

Second Circuit emphasized that "the general policy statement of the ICA" regarding mutual

funds includes the objectives of "protecting all classes of investment company security holders

from the special interests of directors, officers … and preventing investment companies from

failing to protect 'the preferences and privileges of the holders of their outstanding securities.'"

*Id*. at 176 (citing ICA § 1(b)).  In light of *Strougo*, it is clear that the Second Circuit has not

rejected private rights of action under the ICA, as Defendants incorrectly argue.  (Tr. Brf. at 16.)

The SEC's express right to enforce § 36(a) in no way forecloses the possibility of an

implied private right of action thereunder.  In *Securities Investor Protection Corp. v, Barbour*,

421 U.S. 412 (1975), the Supreme Court stated in language that is fully consistent with current

Supreme Court authority, "[i]t goes without saying ... that the inference of [] a private cause of

action not otherwise authorized by the statute must be consistent with the evident legislative

intent and, of course, with the effectuation of the purposes intended to be served by the Act." *Id.*

at 418.  While "express statutory provision for one form of proceeding ordinarily implies that no

other means of enforcement was intended by the Legislature," "***[t]hat implication would yield,***

***however, to 'clear contrary evidence of legislative intent.'"*** *Id.* at 419 (emphasis added).  Here,

the intent of Congress as manifest in the language and structure of the statute is, at a minimum,

---

[49]  *Strougo* was amended on March 11, 2002, **after** the March 7, 2002 *Olmsted* decision,
confirming that courts have recognized implied rights of action under the ICA in light of
*Olmsted*.

ambiguous.  Therefore, the Court should yield to strong legislative intent supporting a private right of action.

From the late 1940's to the mid-1970's, courts were open to implying a private right of action under federal statutory law whenever doing so would appear to further the legislative purpose, which was easily justified under the securities laws.  The Supreme Court's decision in *J.I. Case v. Borak,* 377 U.S. 426 (1964), implying a private right of action for violations of § 14(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), stood for this proposition, and the reasoning was consistently extended throughout the ICA.[50]  As of 1970 -- the year that Congress amended the ICA to subdivide § 36 into subsections (a) and (b) -- the case law strongly supported the implication of private rights of action under many different provisions of the ICA.  Also, the committee reports indicated that the change to subsection (b) to create an express litigation right "should not be read by implication to affect subsection (a)."  S. Rep. No. 91-184, at 166 (1969).[51]  Given the judicial posture at the time, especially in light of the clear language in the committee reports, it was virtually certain that a private right of action would be implied.

---

[50]  In *Borak*, the Supreme Court concluded that § 27 of the Exchange Act, 15 U.S.C. § 78aa, authorized a federal cause of action for rescission or damages to respondent, a corporate shareholder, with respect to a consummated merger that was authorized pursuant to the use of a proxy statement alleged to contain false and misleading statements violative of § 14(a) of the Exchange Act.  Under the circumstances, the Supreme Court held that it was the duty of the judiciary to be alert to provide such remedies as were necessary to make effective congressional purpose, namely, to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation and, accordingly, implied a private right of action under § 27 to bring suit for violation of § 14(a) of the Act.

[51]  *See also Young v. Nationwide Life Ins. Co.*, 2 F. Supp. 2d 914. 925 (S.D. Tex. 1998) ("[W]hen § 36 was amended ... and an express private remedy was added to subsection (b), the legislative history indicates that 'the fact that subsection (b) specifically provides for a private right of action should not be read by implication to affect subsection (a).'").

The legislative history was the principal justification courts gave after 1970 for affording investors a right to sue under § 36(a).  *See, e.g., Tannenbaum v. Zeller, 552* F.2d 402 (2d Cir. 1977).  The legislative history clearly and unambiguously supported the implication of a private right of action.  In 1980, when Congress discussed the amendment of § 36 in 1970 that gave the SEC the ability to enforce § 36(a), Congress emphatically stated that this addition to the SEC's powers did not in any way preclude the ability of private investors from also bringing a claim under § 36(a):

> ***The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation,*** where the plaintiff falls within the class of persons protected by the statutory provision in question.  Such a right would be consistent with and further Congress' intent in enacting that provision, and where such actions would not improperly occupy an area traditionally the concern of state law.  In appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under Section 36(a) of the Investment Company Act.  With respect to business development companies, the Committee contemplates suits by shareholders as well as by the Commission, since these are the persons the provision is designed to protect, and such private rights of action will assist in carrying out the remedial purposes of Section 36.

H.R. REP. NO. 1341, 96th Cong. 2d Sess. 28-29 (1980) (emphasis added).

Finally, Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414, n. 8 (1975); *see also Jackson,* 125 S. Ct. at 1506 (noting that "it is not only appropriate but also realistic to presume that Congress was thoroughly familiar with [the relevant case law] and that it expected its enactment [of the statute] to be interpreted in conformity with [it].")  Congress has made numerous amendments to the ICA over the years, and it is proper to presume that Congress was aware of private rights of action recognized by courts under the ICA.  Even though Congress has revisited the sections of the ICA

involving mutual funds three times since courts began to imply such causes of action, it has never indicated any concern regarding the practice of recognizing implied rights of action that protected mutual fund investors.  *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) (affirming the lower courts' allowance of actions under the Commodity Exchange Act (CEA) after an examination of the CEA's legislative history). Moreover, when Congress amended the ICA in 1980 to expand protection for mutual fund investors, the House Committee report made clear that it intended that private causes of action be recognized.  *See* H.R. REP. NO. 1341, 96th Cong. 2d Sess. 28-29 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4800, 4810-11, *supra*; *see also Strougo*, 964 F. Supp. at 798.  Congress' awareness of the courts' decisions and its failure to amend the relevant statutory text to narrow protection ratifies the private rights of action that plainly exist under the ICA.

Defendants cite *Bonano v. East Caribbean Airline Corp.*, 365 F.3d 81, 86 n. 4 (1st Cir. 2004)[52], for the assertion that *Sandoval* "changed the legal landscape," (Def. Brf. at 18), arguing essentially that after *Sandoval*, private rights of action no longer exist unless they are expressly set forth in the statute.  However, *Sandoval* makes clear that it only changed the legal landscape to the extent that private rights of action cannot be implied from *regulations*.  *Sandoval*, 532 U.S. 275; *see also Hoffenberg v. Fed. Bureau of Prisons*, 2004 U.S. Dist. LEXIS 19424, at *5 (D. Mass. Sept. 14, 2004) (*quoting Bonano*, 365 F.3d at 84, for the proposition that "a regulation, on

---

[52]  Defendants' citation to *Bonano*, 365 F.3d 81 (Def. Brf. at 20 n.6) is inapposite.  *Bonano* dealt with the Federal Aviation Act, which is not analogous to the statute at issue here.  Moreover, in *Bonano*, the court specifically noted that "it is abundantly clear that Congress, in crafting the [Federal Aviation Act], intended public, not private, enforcement.  Consequently, we join a long list of other courts that have concluded that neither the Act nor the regulations create implied private rights of action."  *Bonano*, 365 F.3d at 86.  Furthermore, the court also explicitly noted that the Act does "not focus on a benefited class." *Id.* at 85.  As discussed herein, §§ 34(b) and 36(a) do, in fact, focus on a benefited class—*i.e.*, mutual fund investors.

its own, cannot create a private right of action."). As discussed below, the Supreme Court's

decision in *Jackson*, which is post-*Sandoval*, reiterates that there is a private right of action if one

can be implied from the *statute*. In *Jackson*, the Supreme Court recognized a private right of

action in a statute that does not expressly provide for it.

> **B.    *Jackson*, the Most Recent Supreme Court Decision on this Issue, Supports a Private Right of Action under §§ 34(b) and 36(a)**

The recent Supreme Court decision of *Jackson v. Birmingham Board of Education*, 125

S. Ct. 1497 (2005), makes clear that a private right of action should be implied under §§ 34(b)

and 36(a) of the ICA. *Jackson* shows that the long precedent of private rights of action under the

ICA as recognized both within the First Circuit and other courts for more than 30 years still

stands, despite Defendants' representations to the contrary. *See Lessler*, 857 F.2d at 871

(affirming a private right of action under the ICA and criticizing defendants for ignoring First

Circuit precedent that clearly states implied rights of action exist under the ICA); *Levitt v.

Johnson*, 334 F.2d 815 (1st Cir. 1964) (affirming a private right of action under the ICA); *see

also Strougo*, 964 F. Supp. at 796 ("[c]ourts have long held that a private litigant may commence

an action under Section 36(a) of the ICA"); *Brown v. Bullock*, 294 F.2d 415 (2d Cir. 1961)

(affirming finding of a private right of action under § 36); *Taussig v. Wellington Fund, Inc.*, 313

F.2d 472, 476 (3d Cir. 1963) (finding a private right of action under the ICA); *Esplin v. Hirschi*,

402 F.2d 94, 102 (10th Cir. 1968) (private right of action under § 36).[53]

---

[53] The substantial line of precedent recognizing implied rights of action under the ICA also includes, but is not limited to, the following: *Meyer*, 764 F.2d at 88 (2d Cir. 1985); *In re ML-Lee*, 848 F. Supp. at 539-45 (D. Del. 1994); *Krome v. Merrill Lynch & Co.*, 637 F. Supp. 910, 917-20 (S.D.N.Y. 1986); *Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc.*, 825 F.2d 731, 735 (3d Cir. 1987); *McLachlan v. Simon*, 31 F. Supp. 2d 731, 737 (N.D. Cal. 1998).

In *Jackson*, the Supreme Court recognized that an implied right of action existed under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a).[54]  In so holding, the Supreme Court clarified the limited nature of the holding in *Sandoval*, the very case relied upon by Defendants to argue that no implied rights of action exist under the ICA,[55] stating that *Sandoval* stood for the simple proposition that a private right to enforce a **statute** does not necessarily include a private right to enforce **regulations** promulgated thereunder, especially when the enabling statute explicitly forbids one type of activity (*e.g.*, the intentional misconduct alleged in *Sandoval*) and the private right claimed under the regulations is based upon a different theory absent from the text of the statute (*e.g.*, the "disparate-impact" theory in *Sandoval*). *Jackson*, 125 S. Ct. at 1506.  The *Jackson* Court noted that the school board "misses the point" in arguing that Jackson, like the petitioners in *Sandoval,* sought an "impermissible extension of the statute," stating, "[w]e do not rely on regulations extending Title IX's protection beyond its

---

[54]  In *Jackson*, the petitioner sued under Title IX, alleging that the school board had retaliated against him for complaining about sex discrimination against others.  The statute states in relevant part: "[n]o person . . . shall, on the basis of sex, be . . . subjected to discrimination under any education program . . . receiving Federal financial assistance." 125 S. Ct. at 1510.  The Supreme Court found an implied private right of action under Title IX for a claim of retaliation, even though such a private cause of action was not expressly stated in the text of the statute, because it was encompassed within the concept of sex discrimination.

[55]  In *Sandoval*, plaintiffs sued to enjoin an English-only policy of the Alabama Department of Public Safety on the ground that it impacted non-English speakers in violation of regulations promulgated by the Department of Justice under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*.  The statute provides, in relevant part, that no person shall "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI.  *Sandoval,* 532 U.S. at 303 (citing 42 U.S.C. § 2000d).  Title VI authorizes federal agencies to effectuate the provisions in the statute by enacting regulations.  *Id.*  A regulation was promulgated forbidding funding recipients from adopting policies that had "the effect of subjecting individuals to discrimination because of their race, color, or national origin." *Sandoval,* 532 U.S. at 278 (citing 28 C.F.R. § 42-l04(b)(2) (l999)).  Thus, the plaintiff in *Sandoval* had sued under the regulations of the statute, not the statute itself.

statutory limits: indeed, we do not rely on the Department of Education's regulation at all, because the statute *itself* contains the necessary prohibition [i.e., discrimination "on the basis of sex"]." *Id.* at 1506-07 (emphasis in original).

Consistent with *Sandoval* and *Jackson*, Plaintiffs in this case allege ICA **statutory** violations, not violations under ICA rules or regulations. In fact, the alleged conduct falls squarely within the conduct proscribed by the ICA, and the ICA counts in Plaintiffs' Complaint do not rely upon novel theories of liability outside the scope of the plain statutory language of the ICA. Accordingly, the Court should find private rights of action under ICA §§ 34(b) and 36(a).[56]

Defendants cite *Eaton Vance*, 2005 U.S. Dist. LEXIS 15731, and *Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429 (2d Cir. 2002), for their argument that courts are unwilling to imply a cause of action based on the *Sandoval* decision. Def. Brf. at 24. In *Eaton Vance*, although the plaintiffs' counsel raised the newly-decided and controlling Supreme Court precedent of *Jackson*, 125 S. Ct. 1497, in a letter to the Court, and also addressed the case at oral argument, the court did not even consider the Supreme Court's decision, much less treat it as

---

[56] The recently-decided cases of *Jacobs v. Bremner*, 2005 U.S. Dist LEXIS 14762 (N.D. Ill. July 20, 2005), and *Dull v. Arch*, 2005 U.S. Dist LEXIS 14988 (N.D. Ill. July 27, 2005), which hold that there is no private right of action under § 36(a), ignore the implication of *Jackson* which strongly supports Plaintiffs' position that a private right of action be implied under § 36(a). Moreover, those cases improperly rely upon *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 125 S. Ct. 2611 (2005), which does not address the issue of private rights of action but rather discusses the relevance of legislative history when the text of a statute is clear on its face. Here, as discussed above, the text of the ICA sections at issue, at minimum, leave room for the possibility of an implied private right of action. Thus, a review of the legislative history is warranted, and such review leaves no doubt that a private right of action was intended to be implied. In addition, in *Exxon*, even though the Court held that the statute in question was clear on its face, the Court nevertheless reviewed the legislative history and noted that because it was confusing and contradictory it could not provide guidance. *Id.* at 2626-28. By contrast, here, the legislative history is clear and instructive.

controlling precedent with respect to the issue of whether a private right of action should be implied under §§34(b), 36(a) and 48(a) of the ICA.  Instead of looking to *Jackson*, the *Eaton Vance* court erroneously relied upon the reasoning of the Supreme Court in *Sandoval*, 532 U.S. 275, as articulated in *Olmsted*, 283 F.3d 429.[57]  As discussed above, *Sandoval* is inapplicable for the reasons stated by the Supreme Court in *Jackson*.

*Olmsted* is questionable authority after *Jackson* and, in the alternative, is not instructive because it dealt with different sections of the ICA which had different language, goals, and legislative history.  In *Olmsted*, the Second Circuit refused to recognize a private right of action for ICA §§ 26(f) and 27(i), which deal with variable insurance contracts, because these sections stood in stark contrast to other sections of the ICA that had rights-creating language and had been widely construed to create implied rights of action for decades.  As explained by the district court in *Olmsted*, upon which the Second Circuit relied, in looking at the legislative history, §§ 26(f) and 27(i) addressed exceptions to the statute rather than provisions that embodied the basic purposes of the ICA.  *Olmsted*, 134 F. Supp. 2d at 516-17.  By contrast, here, §§ 34(b), 36(a), and 48(a) are for the *protection of investors* and do contain *rights-creating language.  See, e.g.*, § 36(a) (for the "protection of investors"); § 34(b) (expressly incorporating § 31(a) which states that its purpose is for the protection of investors).

---

[57]  Certain of plaintiffs' counsel in *Eaton Vance* are the same counsel as in the present action. On August 22, 2005, the plaintiffs in *Eaton Vance* filed a motion for reconsideration detailing controlling precedent, including *Jackson*, that the court had overlooked in issuing its decision dismissing the complaint.  There has been no ruling on that motion to date.

## V.    PLAINTIFFS HAVE ADEQUATELY ALLEGED A VIOLATION OF INVESTMENT COMPANY ACT § 48(a)

Defendants argue that Plaintiffs have failed to allege facts supporting an allegation of

"control" under § 48(a) of the ICA[58] by the Investment Adviser Defendants over the Distributor

and Trustee/Officer Defendants.  Def. Brf. at 36.  However, Defendants have misunderstood the

use of that term.  Instead, under relevant case law, Plaintiffs have adequately alleged that the

Investment Adviser Defendants caused the Trustee/Officer and Distributor Defendants to violate

ICA § 48(a).

Defendants argue that "control" is a defined term in the ICA, 15 U.S.C. § 80a-2(a)(9),

which requires a 25% ownership of voting securities for a presumption of control, without which

there is a presumption of no control.  Def. Brf. at 36-37.  However, the word "control" is not

used in § 48(a) and, therefore, the definition of "control" on which Defendants rely is not

relevant to § 48(a).  *In re ML-Lee*, 848 F. Supp. at 545-546 (recognizing a difference between the

definition of "control" in 15 U.S.C. § 80a-2(a)(9) and imposing liability under a § 48(a) claim).

Although § 48(a) is informally referred to as a "control person" claim, the type of control

contemplated by § 48(a), which does not use the word "control," is different from the definition

of control in 15 U.S.C. § 80a-2(a)(9).  This is evidenced by the fact that the word "control" does

appear in the text of other sections of the ICA.  For example, 15 U.S.C. § 80a-21 provides that

"[i]t shall be unlawful for any registered management company to lend money or property to any

person, directly or indirectly, if…such person controls or is under common control with such

registered company."  Obviously, the definition of "control" makes much more sense in this

---

[58]  Section 48(a) provides:  "It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this title or any rule, regulation, or order thereunder." 15 U.S.C. § 47(a).

context and is applicable because the word "control" actually appears in the text.  Courts have

held that this definition is not applicable to a § 48(a) claim.  *In re ML-Lee*, 848 F. Supp. at 545

(allegations "that the transactions at issue in the Complaint were undertaken illegally between

'affiliated' entities and that the alleged controlling Defendants caused those actions to be taken"

were sufficient to establish a § 48(a) claim); *Dowling v. Narragansett Capital Corp.*, 735 F.

Supp. 1105, 1110, 1123 (D.R.I. 1990) (finding that § 48(a) broadly "makes it unlawful to do

indirectly that which one could not do directly").  Accordingly, the 25% rule does not apply, as

Defendants wrongly contend.

     In alleging that the Investment Adviser Defendants "caused" the Distributor and

Trustee/Officer Defendants to violate the ICA under the terms of § 48(a), the Complaint states

that the Distributor Defendant is controlled by the Investment Adviser Defendants (¶ 204; *see

also* ¶¶ 26 and 22, stating that the Distributor Defendant is a subsidiary of Defendant Fleet, n/k/a

Defendant Bank of America Corp., which is the ultimate parent of the Investment Adviser

Defendants); and the Trustee/Officer Defendants are controlled by and beholden to the

Investment Adviser Defendants (¶¶ 170-77).  For example, Plaintiffs allege that the Investment

Adviser Defendants "caused" the Trustee/Officer Defendants to violate the ICA by allowing the

Investment Adviser Defendants to increase Fund assets without passing on the benefits to

investors through lower advisory fees.  *See, e.g.*, ¶¶ 108, 170-77.  Plaintiffs also allege that the

Investment Adviser Defendants caused the Distributor Defendant to charge excessive 12b-1 fees.

¶¶ 128, 204.  Plaintiffs have thus adequately alleged their § 48(a) claim.[59]

---

[59]  If the Court sustains the § 34(b), 36(a) or 36(b) claims under the ICA, Defendants' argument
of a lack of underlying primary violation for the § 48(a) claim will be moot.  Def. Brf. at 36.

VI.    **PLAINTIFFS HAVE PROPERLY ALLEGED A VIOLATION OF THE INVESTMENT ADVISERS ACT**

A.    **Defendants' Performance of the Advisory Contract Violated § 206**

Count V of the Complaint is brought derivatively against the Investment Adviser Defendants on behalf of the Columbia Funds under IAA § 215 for violation of IAA § 206. Defendants contend that Plaintiffs do not allege that the formation or performance of the advisory contract violated the IAA. Def. Brf. at 38. This ignores the plain allegations of the Complaint.

The primary purpose of the IAA is to protect mutual fund investors against those "who may give [investors] biased advice or misuse their funds or securities." *See* S. Rep. No. 1760, 86th Cong., 2d Sess. 4 (1960). The Supreme Court has held that the IAA reflects a "congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which was not disinterested." *Capital Gains*, 375 U.S. at 191-92. The IAA prohibits acts, practices, and courses of business that are fraudulent or deceptive and creates fiduciary standards for investment advisers. 15 U.S.C. § 80b-6.

The general rule is that any contract which violates § 206 of the IAA is void under § 215 of the IAA. *Wellington Int'l Commerce Corp. v. Retelny et. al*, 727 F. Supp. 843, 845 (S.D.N.Y. 1989) (*citing Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979)); *see also Bogart v. Shearson Lehman Bros., Inc.*, 1993 U.S. Dist. LEXIS 1182, at *6-7 (S.D.N.Y. Feb. 3, 1993). Section 206 makes it unlawful for any investment adviser "to employ any device, scheme or artifice to defraud . . . [or] to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." *See* 15 U.S.C. § 80b-6. Here, Plaintiffs allege, *inter alia*, that the Investment Adviser Defendants and their affiliates

charged the Columbia Funds and Columbia Funds investors excessive fees and commissions to pay and induce brokers to steer investors into the Columbia Funds, which payments were undisclosed, to the sole benefit of themselves as described more fully hereinabove. *See, e.g.*, ¶¶ 207-216. These activities constitute "a fraud or deceit" under § 206. Such allegations sufficiently allege that the Advisers' performance of their advisory duties under the advisory contract violated the IAA.

Relying on cases interpreting § 29 of the Exchange Act, Defendants contend that Plaintiffs' § 215 rescission claim should be dismissed because it does not allege that "the contract itself violates federal securities laws." Def. Brf. at 38. Putting aside the fact that Defendants admit, as they must, that the statute states that violative ***performance*** of the contract suffices, Defendants' alternative position that unless Plaintiffs can plead that investment adviser contracts themselves are illegal or defective, they can not be voided, misstates the law. Defendants do not cite a single authority that directly supports their position that the contracts themselves must be illegal. The § 29(b) cases on which Defendants rely do not draw a direct nexus between § 29(b) of the Exchange Act and IAA claims. They do not grant license to apply the holding of a § 29(b) case to a § 215 case.

The only other case Defendants cite is *Capital Gains*, 375 U.S. 180, which recognizes that the language of § 29(b) and § 215(b) is similar in that the fundamental purpose of both the Exchange Act and the IAA is to "substitute a philosophy of full disclosure for the philosophy of caveat emptor." *Id.* at 186. However, the two acts have distinctly dissimilar characteristics that are important here. *See Norman v. Salomon Smith Barney Inc.*, 350 F. Supp. 2d 382, 391 (S.D.N.Y. 2004) ("The IAA's purpose is much broader, reflecting a 'congressional intent to eliminate, or at least to expose, all conflicts of interest.'"). Unlike Rule 10(b)-5 of the Exchange Act, which addresses any fraud, IAA § 206(2) under § 215 is more than an anti-fraud statute as it

establishes fiduciary duties for investment advisers.  *See Norman*, 350 F. Supp 2d at 391; *Morris v. Wachovia Sec., Inc.*, 277 F. Supp. 2d 622, 644 (D. Va. 2003).

Defendants' failure to cite a single case that draws a direct nexus between § 29(b) of the Exchange Act and § 215 of the IAA is explained by the fact that no federal court has ever dismissed IAA claims on that basis.  In fact, district courts frequently permit private claims seeking to void investment adviser contracts under IAA § 215 for violations of § 206 to proceed where the contract, not illegal on its face, is performed in violation of the IAA.  *See, e.g.*, *Wellington*, 727 F. Supp. at 845 (sustaining a § 206 claim where broker charged excessive fees); *Norman*, 350 F. Supp. 2d at 391-92; *Margaret Hall Found. Inc. v. Atlantic Fin. Mgmt., Inc.*, 572 F. Supp. 1475, 1484-85 (D. Mass. 1983).  Accordingly, for the reasons stated above, Plaintiffs have adequately alleged that the Investment Adviser Defendants' performance of the advisory contract violated the IAA.

### B.    Plaintiffs Have Adequately Pleaded Demand Futility for Their IAA Claim

In considering a motion to dismiss, the Court must take all facts alleged in a well-pled complaint as true and make all reasonable inferences in favor of Plaintiffs.  *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).  Defendants attempt to defeat Plaintiffs' demand futility allegations by treating each allegation in isolation, but this is not the law.  Rather, the Court must consider the Complaint as a whole when deciding demand futility.  Even if no single allegation would suffice on its own to raise a reasonable doubt about director independence, when taken together, Plaintiffs' allegations show that the Trustees participated in the wrongdoing or were otherwise interested so as to excuse demand.  *Cal. Pub. Emples. Ret. Sys. v. Coulter*, 2002 Del. Ch. LEXIS 144, at *29 (Del. Ch. May 28, 2002).

74

### 1.    Plaintiffs Have Established Demand Futility under Oregon Law[60]

Defendants argue that, under Oregon law, Plaintiffs have failed to adequately allege that, for Plaintiffs' derivative claim, a pre-suit demand on the Columbia Funds Trustees would have been futile.  Def. Brf. at 51-53; Tr. Brf. 10-12.  However, Plaintiffs have adequately alleged demand futility under Oregon law.  Under Oregon law, a derivative claim:

> [M]ay be maintainable without showing any notice, request, or demand to the managing body, or any actual refusal by them to prosecute; in other words, the refusal may be virtual.  ***If the facts as alleged show that the defendants charged with the wrongdoing, or some of them, constitute a majority of the directors or managing body at the time of commencing the suit, or that the directors or a majority thereof are still under the control of the wrongdoing defendants***, so that a refusal of the managing body, if requested to bring a suit in the name of the corporation, may be inferred with reasonable certainty, then an action by a stockholder may be maintained without alleging or proving any notice, request, demand, or express refusal.  In like manner, if the plaintiff's pleading discloses any other condition of fact which renders it reasonably certain that a suit by the corporation would be impossible, and that a demand therefore would be nugatory, the action may be maintained without averring a demand or any other similar proceeding on the part of the stockholder plaintiff.

*Wills v. Nehalem Coal Co.*, 52 Ore. 70, 87-88 (1908) (emphasis added).

The continued validity of "the liberal rule announced by [the Supreme Court of Oregon] in *Wills v. Nehalem Coal Co.* was affirmed by *Baillie v. Columbia Gold Mining Co.*, 166 P. 965, 970 (1917), the case relied upon by Defendants.  Def. Br. at 51, Tr. Br. at 10.  In *North v. Union Savings & Loan Association*, 59 Ore. 483 (1911), the court explained that the stockholders were not obligated to have first requested that the board of directors proceed in the name of the corporation against the wrongdoers before filing their lawsuit because an application to the

---

[60] "[A] court that is entertaining a derivative action under [the IAA] must apply the demand futility exception as it is defined by the law of the State of incorporation."  *Kamen.*, 500 U.S. at 108-109.  Here, both Oregon and Massachusetts are the states of incorporation.

directors would have been futile because the complaint set forth sufficiently that the directors, the trustee, and the majority stockholders were engaged in a conspiracy to unlawfully make away with the assets of the corporation. *Id.* at 489.

Oregon courts recognize that "often…the majority stockholders-directors are hostile and antagonistic to the prosecution of [a derivative] claim." *In re Conduct of Kinsey*, 294 Ore. 544, 555-556 (1983) (quoting Justice Douglas in *Smith v. Sperling*, 354 U.S. 91, 97 (1957) ("[w]henever the management refuses to take action … or whenever, as in this case, it so solidly approves it that any demand to rescind would be futile, antagonism is evident.")).  The Trustee Defendants' failure to recoup for the Funds the excessive fees paid to the Investment Adviser Defendants as the Funds grew in size, in the face of numerous red flags, evidences the futility of demand. *See Alsea Veneer, Inc. v. State*, 318 Ore. 33, 44 (1993) (finding that the State Accident Insurance Fund Corporation's failure to request from the state the return of money to the Insurance Accident Fund that might have benefited employers covered by the Fund made the case, "[i]n a practical sense . . . like a shareholder's derivative action against a corporation that refuses to act").

Specifically, Plaintiffs have alleged that the Trustee/Officer Defendants are acting in the interests of the Investment Adviser Defendants, are being compensated "substantial[ly]," and typically control several Columbia Funds portfolios.  ¶¶ 169-177.[61]  For example, the Complaint alleges:

---

[61]  *See Zimmerman v. Bell*, 585 F. Supp. 512, 514 (D. Md. 1984) ("While it is true that merely naming the directors is not enough to establish that a demand would be futile . . . , the complaint sufficiently alleges that the defendants as a body actively participated in the alleged wrongdoing in order to perpetuate their control over the corporation.").

- Each of the Trustee/Officer Defendants was appointed by, and is beholden to, the Investment Adviser Defendants for his or her position and substantial compensation as a Trustee/Officer. ¶ 170.

- The Trustee/Officer Defendants wrongfully approved the improper kickbacks to brokers and the materially misleading disclosures in the Columbia Funds Prospectuses in each of the years they served as Trustees/Officers, prejudicing the Columbia Funds and investors. ¶171, 173.

- Each of the Trustee/Officer Defendants knowingly participated in, approved, and/or recklessly disregarded the wrongs complained of herein in beach of their fiduciary duties and their duty to exercise good faith business judgment. ¶172.

- The Trustee/Officer Defendants benefited from the Columbia Funds' increases in assets, because the growth and survival of the Funds made it far less likely that they would lose their positions as Trustees/Officers of the Funds. ¶174.

- Each of the Trustee/Officer Defendants received substantial monetary and non-monetary benefits by virtue of his or her membership on one or more Boards and his or her control of Columbia Funds. ¶175.

In totality, these facts clearly show that the allegations meet Oregon's liberal demand futility standards, because "the directors or a majority thereof are still under the control of the wrongdoing defendants." *Wills*, 52 Ore. at 87-88. In fact, these allegations show that demand would be futile because a majority of the Trustees was engaged in a conspiracy with the other Defendants to make away with the assets of the Funds. *See North v. Union Sav. & Loan Ass'n.*, 59 Ore. at 489. Given such serious, inherent conflicts in this case, courts excuse pre-suit demand. *See Strougo*, 964 F. Supp. 783. As each Trustee/Officer Defendant participated in and benefited from the wrongdoing, based on the combination of all of the factors above, a majority of the Boards (indeed, all members of the Boards) are incapable of evaluating a demand independently and disinterestedly. Plaintiffs sufficiently allege that the Trustees were captive to, controlled, and induced by the Investment Adviser Defendants, who recruited and overpaid them for their services as part of an illegal agreement to misappropriate fund assets. Plaintiffs allege how and why the directors were interested in sufficient detail to comply with the Federal Rules

of Civil Procedure and Oregon law.  *Wills*, 52 Ore. at 87-88.  Plaintiffs have thus pled specific

facts for finding that demand was excused under the laws of Oregon.

### 2.    Plaintiffs Have Established Demand Futility under Massachusetts Law

Defendants wrongly argue that Plaintiffs have failed to satisfy the Massachusetts demand

requirement.  Def. Brf. at 50; Tr. Brf. at 9-10.[62]  First, contrary to Defendants' contention, the

newly-enacted Massachusetts universal demand requirement does not apply to mutual funds such

as the Columbia Funds.  The Massachusetts demand requirement, Mass. Gen. Laws ch. 156D,

§ 7.42, provides that:

> No shareholder may commence a derivative proceeding until:
> (1) a written demand has been made upon the ***corporation*** to take suitable action; and
> (2) 90 days have elapsed from the date the demand was made, or, if the decision whether to reject such demand has been duly submitted to a vote of the shareholders, not including the holders of those shares referred to in section 7.44(b)(3), within 60 days from the date when demand was made, 120 days have elapsed from the date the demand was made, unless in either case the shareholder has earlier been notified that the demand has been rejected by the corporation or irreparable injury to the corporation would result by waiting for the expiration of such 90-day or 120-day period.

(Emphasis added.)  By its own terms, the newly enacted Massachusetts universal demand

requirement applies only to derivative suits brought on behalf of a ***corporation***, not mutual

funds.  Moreover, the law of demand futility survives the enactment of the Massachusetts

universal demand statute because the legislature is presumed to legislate against the common law

background.  *Simon v. Solomon*, 431 N.E.2d 556, 565 (Mass. 1982) (holding that statutes using

---

[62]   The brief submitted by the Columbia Acorn Trust joins in the arguments of the Columbia Defendants and the Independent Trustees, and specifically argues that all of Plaintiffs' claims are derivative in nature and subject to dismissal for failure to make pre-suit demand on the Columbia Acorn Trust and the Columbia Funds Trusts.  Acorn Brf. at 1.  For the reasons discussed herein, the Columbia Acorn Trust's arguments are without merit.

common law wording incorporate common law). As a result, § 7.42, which necessarily

incorporates Massachusetts common law demand requirements, should be interpreted in

conjunction with the common law. *Harhen v. Brown*, 730 N.E.2d 859, 865 (Mass. 2000).

By their allegations, Plaintiffs meet common law Massachusetts demand futility

standards by showing that the Trustee/Officer Defendants were interested. In order to determine

whether a defendant is "interested," the Supreme Judicial Court of Massachusetts adopted the

definition stated in the ALI Principles of Corporate Governance. *Harhen*, 730 N.E.2d at 865.

Relevant to this case is the following definition of the term by the ALI:

> (a) A director…is "interested" in a transaction or conduct
> if…
> (4) The director…is subject to a controlling influence by a
> party to the transaction or conduct or a person who has a material
> pecuniary interest in the transaction or conduct, and that
> controlling influence could reasonably be expected to affect the
> director's… judgment with respect to the transaction or conduct in
> a manner adverse to the corporation.

*Id*. at 865 n.5 (quoting the ALI Principles of Corporate Governance: Analysis and

Recommendations § 1.23 (1994) (the "ALI Principles")).[63]

The specific facts alleged in the Complaint show that each of the Trustee/Officer

Defendants must be considered "interested persons" under the ALI definition because each of

them was captive to and "subject to a controlling influence by" the Investment Adviser

Defendants who had a "material pecuniary interest" in recruiting and overpaying the

Trustee/Officer Defendants for their services as part of a plan to misappropriate Fund assets, and

---

[63] Massachusetts law looks to the ICA to determine whether an investment company trustee
should be deemed independent or interested when making any determination or taking any action
as a trustee. Mass. Gen. Laws ch. 182, § 2B (2005); *see also ING*, 369 F. Supp. 2d at 171. The
ICA's definition of "interested person" includes "any person directly or indirectly controlling,
controlled by, or under common control with, such other person," 5 U.S.C. §§ 80a-2(a)(3)(C),
(19)(A)(i), which is consistent with the ALI definition.

the Trustees/Officers benefited from the challenged transactions.  *E.g.,* ¶¶ 169-177.  Plaintiffs

thus adequately allege under Massachusetts law that the Trustee/Officer Defendants were

controlled by and beholden to the Investment Adviser Defendants so that a majority of the

Boards could not have independently and disinterestedly considered whether to bring this claim.

Demand should therefore be held excused.

## VII.    PLAINTIFFS HAVE PROPERLY ALLEGED VIOLATIONS OF STATE LAW

### A.    Plaintiffs' State Claims Are Not Preempted by SLUSA

In this Complaint, Plaintiffs include state law claims against the Defendants for common

law breach of fiduciary duty (Counts VI and VII) and unjust enrichment (Count VIII).

Defendants incorrectly argue that these claims are preempted by SLUSA.  *See* Def. Brf. at 40-45;

Tr. Brf. at 26.  Defendants are incorrect because SLUSA is not applicable to state law claims

which are brought on behalf of a class of ***holders*** of funds.  The Complaint specifically limited

the definition of the Class to "all persons or entities who held one or more shares or other

ownership units of Columbia Funds, as set forth in Exhibit A [to the Complaint], during the

period August 2, 1999 to March 22, 2004." ¶ 1.[64]  SLUSA does not preempt claims that do not

allege purchases or sales made by the plaintiff or the alleged class members. *Bachman v. A.G.*

_____

[64] *See also Lalondriz v. USA Networks, Inc.*, 68 F.Supp.2d 285, 286 (S.D.N.Y. 1999) ("Since plaintiffs' claim does not allege that misrepresentations were made 'in connection with the purchase or sale of a security,' 15 U.S.C. § 78bb(f)(1), it does not fall within the prohibition of the federal statute [SLUSA]."); *Feitelberg v. Credit Suisse First Boston LLC*, 2003 U.S. Dist. LEXIS 19116, at *15-16 (N.D. Ca. Oct. 21, 2003) ("Plaintiff expressly limited the class to individuals who held shares during the class period, and therefore we cannot find that this claim arises 'in connection with' the purchase or sale of a covered security."); *Gutierrez v. Deloitte & Touche, LLP*, 147 F. Supp. 2d 584, 593 (W.D. Tex. 2001) (finding claim not precluded by SLUSA and endorsing plaintiffs' argument that "they have 'expressly carved out and excluded [purchasers] when they elected to allege only claims for holding covered securities, not the purchase or sale of covered securities'"); *Shaev v. Claflin*, 2001 U.S. Dist. LEXIS 6677, at *17 (N.D. Cal. May 17, 2001) (finding claim not preempted by SLUSA and stating "[t]his purported injury arose from the mere holding of 3Com stock, and not from any trading of 3Com securities.").

*Edwards*, 2005 WL 2346896 (E.D. Mo. Sept. 26, 2005). SLUSA only preempts claims that

could otherwise have been brought under the Securities Exchange Act of 1934 or the Securities

Act of 1933. Plaintiffs' state law claims are based solely on fees paid because of their holder

status—no purchases or sales are alleged. The method and time in which Plaintiffs acquired the

funds is irrelevant to their claims as Plaintiffs seek no damages as a result of a purchase or sale.

To close a perceived loophole in the PSLRA, Congress enacted SLUSA to make federal

courts the exclusive venue "for most class actions involving the purchase and sale of securities."

*Ameritrade*, 279 F.3d at 595. SLUSA's preemption provision specifically states that:

> No covered class action based upon the statutory or common law
> of any State or subdivision thereof may be maintained in any State
> or Federal court by any private party alleging-
>
> (1) a untrue statement or omission of a material fact ***in connection
> with the purchase or sale of a covered security***; or
>
> (2) that the defendant used or employed any manipulative or
> deceptive device or contrivance ***in connection with the purchase
> or sale of a covered security***.

*See* 15 U.S.C. § 78bb(f)(i) (emphasis added).

Federal courts have interpreted SLUSA's requirement that the allegations be "in

connection with the purchase or sale of a covered security" to mean that claims made by

"holders" of covered securities that do not allege purchases or sales are not preempted by

SLUSA. *Bachman*, 2005 WL 2346896, at *5; *Green v. Ameritrade, Inc.*, 279 F.3d at 590.

SLUSA will preempt only those state class actions which could be brought as federal

actions subject to the heightened requirements of the PSLRA. As the Supreme Court held in

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 748 (1975), actions under § 10(b) of the

Exchange Act may only be brought by actual purchasers and sellers of securities. District Courts

in the First Circuit have ruled that "holders" of securities do not fall within the ambit of SLUSA.

*Davis v. Kozlowski*, 2005 U.S. Dist. LEXIS 4481, at *5 (D.N.H. Mar. 17, 2005);[65] *Meyer v. Putnam Int'l Voyager Fund*, 220 F.R.D. 127 (D. Mass. 2004) (ruling that the language of the complaint was sufficiently clear to exclude claims asserted in connection with the purchase or sale of the funds because the investor limited the proposed class definition to holders of the funds). Since Plaintiffs' claims have not been brought by purchasers and sellers, and they do not fall within the parameters of *Blue Chip Stamps*, SLUSA cannot preempt Plaintiffs' state law claims, as they do not involve misrepresentations or omissions in connection with the purchase or sale of a security.[66]

The *Bachman* action, although brought against a brokerage house rather than a mutual fund family, arises from the same type of conduct alleged here. The *Bachman* case arose from "Defendants' secretly collecting millions and millions of dollars in undisclosed and improper

---

[65] As the *Davis* court stated, "[a]ll of the circuit courts that have ruled on this issue, including panels of the Second, Eighth, Ninth and Eleventh Circuit Courts of Appeals, have concluded that misconduct is committed 'in connection with the purchase or sale of a security,' only if a defendant's malfeasance has induced a class of plaintiffs to actually purchase or sell securities." 2005 U.S. Dist. LEXIS 4481, at *5-6 (citing *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 43 (2d Cir. 2005) (noting that its holding "aligns [it] with every circuit court that has considered the question thus far"); *Green*, 279 F.3d at 597-99; *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1131 (9th Cir. 2002); *Riley v. Merrill Lynch, Pierce, Fenner & Smith*, 292 F.3d 1334, 1342-43 (11th Cir. 2002); *Atencio v. Smith Barney*, 2005 U.S. Dist. LEXIS 1526, 2005 WL 267556, *4 (S.D.N.Y. Feb. 2, 2005); *Grabow v. PriceWaterhouseCoopers LLP*, 313 F. Supp. 2d 1152, 1156 (N.D. Okla. 2004); *Feitelberg*, 2003 U.S. Dist. LEXIS 19116; *Gutierrez*, 147 F. Supp. 2d at 595; *Chinn v. Belfer*, 2002 U.S. Dist. LEXIS 20343, at *5 (D. Or. June 19, 2002).

[66] *See also Feitelberg*, 2003 U.S. Dist. LEXIS 19116, at *16 ("We are bound by the plain language of [SLUSA], and that language provides that only those covered class actions which allege misrepresentations in connection with the purchase or sale of a covered security shall be removable to federal court."); *Riley*, 292 F.3d at 1343-45 (11th Cir. 2002) (holding that under *Blue Chip Stamps*, SLUSA does not apply to claims dealing solely with the retention of securities rather than with their purchase or sale); *Green*, 279 F.3d at 598 (interpreting *Blue Chip Stamps* to mean that "nonsellers and nonpurchasers of securities are not covered by SLUSA's preemption provision").

kickbacks paid to the [brokerage house] Defendants by certain preferred mutual fund families." 2005 WL 2346896, at *1 (quoting Petition ¶ 2). The plaintiffs alleged that such kickbacks "created unmanageable and continuing conflicts of interest and breaches of fiduciary duties by [the brokerage house] Defendants and allowed Defendants to profit secretly from the assets they hold in trust for their clients." *Id.* (quoting Petition ¶ 3). The *Bachman* court found that the Petition's allegations did not arise in connection with the purchase or sale of a covered security, and the state law claims were therefore not preempted by SLUSA. *Id.* at *5.

Defendants' reliance on *Professional Management Associates, Inc. Employees' Profit Sharing Plan v. KPMG LLP*, 335 F.3d 800 (8th Cir. 2003), is misplaced. The plaintiffs in *Professional Management* alleged that they "***bought*** and retained their . . . shares" in reliance on the relevant misrepresentation. *Id.* at 802 (emphasis added). The court held that in light of their allegation of a purchase in reliance on the misrepresentation, the plaintiffs could not "avoid preemption by . . . claiming [only] damages suffered as a result of holding its stock." *Id.* at 803. In this case, Plaintiffs' state law claims do not involve a purchase in reliance on misrepresentations. Instead, as stated in the Complaint, the allegations of breach of fiduciary duty are "limited to the wrongful payment of excessive fess and commissions, without regard to any deception, misrepresentation or omission." ¶¶ 217, 221. Plaintiffs allege that they were holders of securities whose fees were being used to pay improper kickbacks to brokerages – allegations that fall outside the ambit of SLUSA. *Green*, 279 F.3d at 595-598; *Bachman*, 2005 WL 2346896, at *5.

Defendants' other cases are similarly distinguishable. In *Kircher v. Putnam Funds Trust*, 403 F. 3d 478 (7th Cir. 2005), the plaintiffs contended that the mutual funds failed to block arbitrageurs from reaping profits from plaintiffs' ***purchases***. *SEC v. Zanford*, 535 U.S. 813 (2002), is also factually different from this case because, as the Court put it:

> The securities sales and respondent's fraudulent practices were not independent events. This is not a case in which, after a lawful transaction had been consummated, a broker decided to steal the proceeds and did so. Nor is it a case in which a thief simply invested the proceeds of a routine conversion in the stock market. Rather, ***respondent's fraud coincided with the sales*** themselves.

*Id.* at 820 (emphasis added).

Similarly, the two subclasses in *Deutschman v. Beneficial Corp.*, 761 F. Supp. 1080 (D. Del. 1991), on which Defendants also rely, were both defined to encompass "[a]ll persons who purchased the common stock of Beneficial … or who purchased call option contracts thereon during the Class Period, and have or will sustain losses as a result." 761 F. Supp. at 1082. Defendants also cite *Feitelberg v. Merrill Lynch & Co., Inc.*, 234 F. Supp. 2d 1043, *aff'd without opinion*, 353 F.3d 765 (9th Cir. 2003) (Def. Brf. at 43), in which the plaintiffs tried to establish that "defendants misrepresented the value of stock in order to further the interests of their investment banking division and that such misrepresentation affected the value of stock." *Feitelberg*, 234 F. Supp. 2d at 1052. The court thus found that since such allegations necessarily involved the purchase and sale of stock, "it is clear that the scheme to defraud and the sale of securities coincide." *Id. Araujo v. John Hancock Life Ins. Co.*, 206 F. Supp 2d 377 (E.D.N.Y. 2002) and *Rowinski v. Salomon Smith Barney, Inc.*, 398 F.3d 294 (3d Cir. 2005), likewise dealt with allegations of securities sold and/or purchased. Such is not the case here, where the class definition does not include purchasers. *See Norman*, 350 F. Supp. 2d at 387-388 ("The fact that the actions underlying the alleged breach could also form the factual predicate for a securities fraud action by different plaintiffs cannot magically transform every dispute between broker-dealers and their customers into a federal securities claim -- the mere 'involvement of securities [does] not implicate the anti-fraud provisions of the securities laws.'").

Simply stated, SLUSA only preempts state law claims of fraud in connection with the purchase or sale of a covered security. The wrong alleged by Plaintiffs does not coincide with the purchase of shares of Columbia Funds, whenever that may have been. Since no claims "in connection with the purchase or sale" of a covered security have been raised in the Complaint, SLUSA does not preempt any of Plaintiffs' state law claims. The class is unmistakably limited to holders, beyond the reach of SLUSA. *Green*, 279 F.3d at 595-598; *Bachman* 2005 WL 2346896, at * 9-10.

**B.    Plaintiffs Have Properly Pleaded a Breach of Fiduciary Duty**

Defendants argue that Plaintiffs fail to state a claim for breach of fiduciary duty because they do not show that there was any fiduciary relationship between the Plaintiffs and Defendants. Def. Brf. at 54; Tr. Brf. at 28. Defendants' argument is baseless. The Complaint properly alleges that the Investment Adviser and Trustee/Officer Defendants had a fiduciary duty to the Plaintiffs and other members of the Class to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor, and that they breached such duty.[67] *See, e.g.*, ¶¶ 2-5, 29-51, 75-79, 104-6, 108-11, 127, 136-37, 149, 172, 180, 218-24.

**1.    Plaintiffs State a Claim for Breach of Fiduciary Duty Against the Investment Adviser Defendants**

Defendants argue that, while they admittedly have fiduciary duties to the Funds themselves, there is no duty owed directly by the Investment Adviser Defendants to shareholders

---

[67]  Although the Independent Trustee Defendants argue that Plaintiffs' breach of fiduciary duty claims sound in fraud and, therefore, must comply with the pleading requirement of Rule 9(b) (Tr. Brf. at 27), Plaintiffs' claims are not subject to Rule 9(b) because Plaintiffs have expressly disclaimed allegations of fraud or deception in the state claims. *See* ¶¶ 217, 221 (limiting claims to "the wrongful payment of excessive fess and commissions, without regard to any deception, misrepresentation or omission"). As the Columbia Defendants point out, "[p]laintiffs have not alleged here that the officers or trustees engaged in fraud." Def. Brf. at 55. Nonetheless, even if this Court were to hold Plaintiffs' allegations of breach of fiduciary duty to the higher Rule 9(b) pleading requirements, Plaintiffs have met that standard, as described above.

of the Funds, and that Plaintiffs therefore have not pleaded a breach of fiduciary duty against

them.  Def. Brf. at 54.  In *Strigliabotti*, plaintiffs likewise alleged that the funds' investors had

"not benefitted [sic] from the economies of scale" despite "significant growth in the [f]unds since

1983," and investors instead "have been charged advisory and distribution fees that are

disproportionately large in relation to the services provided."  2005 U.S. Dist. LEXIS 9625, at

*4.  The court found that the breach of fiduciary duty claims alleged against the investment

advisers were direct rather than derivative (*id*. at *25), and that the plaintiffs had properly alleged

such breaches by the advisers and their parent corporation.  *Id*. at *25-26.  The *Strigliabotti* court

summarized the arguments as follows:

> Defendants contend that Count V [for breach of fiduciary duty]
> should be dismissed because it claims a breach by all defendants of
> duties to all plaintiffs, without further allegations of where the
> fiduciary relationships run.  Plaintiffs argue that Rule 8 does not
> require this level of detail, that their allegations are sufficiently
> specific, and that fiduciary duties are alleged for each defendant to
> each Fund for which it provided advisory services.  The Court
> agrees with plaintiffs that the claim comports with the
> requirements of notice pleading.

*Id*.  The *Strigliabotti* court thus denied the defendants' motion to dismiss the breach of fiduciary

duty claim against the investment advisers to the Franklin Funds and their parent corporation.

*Id*.

Plaintiffs here have likewise properly alleged a breach of fiduciary duty by the

Investment Adviser Defendants.  *See* ¶¶ 24-25, 217-20.  The Investment Adviser Defendants

were required to act with the highest obligations of good faith, loyalty, fair dealing, due care and

candor.  ¶ 218.  Instead, they breached their fiduciary duties to Class members by failing to

manage the companies entrusted to their care in the best interests of the Class and by causing the

Funds and their shareholders to bear costs that served only the interest of the Investment Adviser

and Distributor Defendants.  ¶ 219.

### 2. Plaintiffs State a Claim for Breach of Fiduciary Duty Against the Trustee/Officer Defendants

Defendants similarly argue that the Trustee/Officer Defendants do not owe a fiduciary duty directly to investors in the mutual funds that they are charged with overseeing. Def. Brf. at 54; Tr. Brf. at 28. However, the SEC has made clear that:

> The board of directors of a mutual fund has significant responsibility to protect investors. By law, directors generally are responsible for the oversight of all of the operations of a mutual fund. . . .
>
> The role of fund directors is particularly critical in the mutual fund context because almost all funds are organized and operated by external money-management firms, thereby creating inherent conflicts of interest and potential for abuse. Money-management firms operating mutual funds want to maximize their profits through fees provided by the funds, but the fees, of course, paid to these firms, reduce the returns to fund investors.
>
> Independent directors, in particular, should serve as "independent watchdogs" guarding investors' interests — and helping to protect fund assets from uses that will be of primary benefit to management companies. These interests must be paramount, for it is the investors who own the funds and for whose sole benefit they must be operated.

¶ 104 (citing Speech, William Donaldson, Mutual Funds Directors Forum (Jan. 7, 2004), *available at* http://www.sec.gov/news/speech/spch010704whd.htm).

The SEC has further stated that:

> if the fund or fund family is experiencing economies of scale, *fund directors have an obligation to ensure that fund shareholders share in the benefits of the reduced costs* by, for example, requiring that the adviser's fees be lowered, breakpoints be included in the adviser's fees, or that the adviser provide additional services under the advisory contract… If the fund or fund family is not experiencing economies of scale, then the directors may seek to determine from the adviser how the adviser might operate more efficiently in order to produce economies of scale as fund assets grow.

SEC, Division of Investment Management: Report on Mutual Fund Fees and Expenses, at B1 (Dec. 2000) ("SEC Report on Mutual Fund Fees"), *available at* http://www.sec.gov/news/ studies/feestudy.htm (emphasis added). Thus, as the "watchdogs" of investors' interests in the Funds, the Trustee/Officer Defendants owed fiduciary duties to the shareholders.

Plaintiffs have sufficiently alleged that the Trustee/Officer Defendants had a fiduciary duty to shareholders and breached it. For example, Plaintiffs allege that these Defendants did not ensure that investors shared in the benefits of economies of scale due to the growth in the Funds, but instead allowed the Investor Adviser Defendants to continue to charge the same advisory fee without providing additional services. ¶¶ 130-132. In fact, the Trustee/Officer Defendants ignored red flags suggesting that more monies were being paid to the Investment Adviser and Distributor Defendants without a corresponding increase in services or reduction in fees, including that economies of scale were not being passed on to shareholders. As Plaintiffs have alleged, "[t]he rise in fees and simultaneous fall in the NAV of the Fund[s], and the failure to reduce 12b-1 fees, were red flags that the Trustee/Officer Defendants disregarded." ¶ 131.

The Columbia Defendants' cases are inapposite to the facts presented in the Complaint. This is not the situation where the Trustees' duties to shareholders are "anchored" solely in their duties to the corporation. Def. Brf. at 54 (citing *Jernberg v. Mann*, 358 F.3d 131, 135 (1st Cir. 2004)). Rather, the Trustee/Officer Defendants failed ensure that the shareholders were not being charged excessive fees and that they were receiving the direct benefits of economies of scale. As stated by the SEC, this duty is owed directly to shareholders. *See* SEC Report on Mutual Fund Fees. Accordingly, Plaintiffs have stated claims for breaches of fiduciary duty. [68]

---

[68] Cases cited by Defendants dealing with close corporations are irrelevant here. *See* Def. Brf. at 54-55 (citing *Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.*, 405 Mass. 506, 513 (1989) (recognizing that counsel for a closely held corporation owes each shareholder a

### C.    Plaintiffs Have Properly Pleaded Unjust Enrichment

Plaintiffs have satisfied the pleading requirement of unjust enrichment.  In analyzing claims of unjust enrichment, courts look to see if there was: "1) [a] benefit conferred upon the defendant by the plaintiff; 2) [a]n appreciation or knowledge by the defendant of the benefit; and 3) [t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable . . . for the defendant to retain the benefit without payment of its value." *Hessleton v. BankNorth, N.A.*, 18 Mass. L. Rep. 7, 8 (May 11, 2004).

Plaintiffs allege that they suffered injury due to the excessive fees imposed on them by Defendants.  *See*, *e.g.*, ¶¶ 2-5, 124-138.  Defendants used these fees to receive a benefit of increased fees for themselves as a result of the growth of the funds.  *Id*.  It would be inequitable for Defendants to retain this benefit.  Plaintiffs have thus satisfied the requirements of notice pleading.  As summarized by the *Strigliabotti* court:

> As for [the unjust enrichment Count], defendants contend that the claim is vague and fails to allege which specific defendants were unjustly enriched at the expense of which plaintiffs, and by how much.  The Court rejects this contention, finding that [this Count] complies with Rule 8's liberal notice pleading requirement.

2005 U.S. Dist. LEXIS 9625, at *31.  Plaintiffs here have likewise satisfied the notice pleading requirements for an unjust enrichment claim.[69]

---

fiduciary duty); *Kahn v. Sprouse*, 842 F. Supp 423, 425 (D. Or. 1993) (dealing with whether in a close corporation "a special duty exists between 'those in control of corporate affairs,' including the majority shareholder and corporate directors, and the minority shareholders").

[69]  Defendants' argument that Plaintiffs have not adequately pleaded their unjust enrichment claim because they do not set forth "a separate legal theory" should be disregarded, because unjust enrichment is its own legal theory.  *See Hessleton*, 18 Mass. L. Rep. at 8-9 (quoting 12 Williston on Contracts § 1479 (3d ed.1957)).  Moreover, Plaintiffs' unjust enrichment claim is based in part on the unjust enrichment that arose from Defendants' breaches of fiduciary duty.

## CONCLUSION

For the foregoing reasons, the Complaint should be sustained in its entirety.[70]

Dated:  October 11, 2005

Respectfully submitted,

**MOULTON & GANS, P.C.**

By:___/s/ Nancy Freeman Gans_____
Nancy Freeman Gans (BBO #184540)
33 Broad Street, Suite 1100
Boston, Massachusetts  02109-4216
(617) 369-7979

*Counsel for Plaintiffs Joan Cohen, Gene F. Osburn, Jean S.B. Simmonds and R.L. Simmonds and Proposed Liaison Counsel*

**MILBERG WEISS BERSHAD
  & SCHULMAN LLP**
Jerome M. Congress
Janine L. Pollack
Kim E. Miller
Michael R. Reese
One Pennsylvania Plaza
New York, New York  10119-0165
(212) 594-5300

*Counsel for Plaintiff Joan Cohen and Proposed Co-Lead Counsel*

---

[70]  In the event that all or any portion of Plaintiffs' Complaint is dismissed, Plaintiffs respectfully request leave to replead pursuant to Fed. R. Civ. P. 15(a).  Such leave is freely granted.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

**STULL, STULL & BRODY**
Jules Brody
Mark Levine
6 East 45th Street
New York, New York  10017
(212) 687-7230

*Counsel for Plaintiffs Gene F. Osburn, Jean S.B.
Simmonds and R.L. Simmonds and Proposed Co-
Lead Counsel*

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
Marshall N. Perkins
The World Trade Center – Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland  21202
(410) 332-0030

*Counsel for Plaintiff Joan Cohen*

**WEISS & LURIE**
Joseph H. Weiss
Richard A. Acocelli
551 Fifth Avenue, Suite 1600
New York, New York  10176
(212) 682-3025

*Counsel for Plaintiffs Gene F. Osburn, Jean S.B.
Simmonds and R.L. Simmonds*

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
280 King of Prussia Road
Radnor, Pennsylvania  19087
(610) 667-7706

*Counsel for Plaintiff Paul Slicker*

**GILMAN AND PASTOR, LLP**
David Pastor (BBO #391000)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts  01906
(781) 231-7850

***Counsel for Plaintiff Paul Slicker***

## CERTIFICATE OF SERVICE

I, Adam H. Wierzbowski, hereby certify that I served a copy of the foregoing document upon counsel for all parties by mailing a copy of the same, postage prepaid, to each attorney of record, this 11th day of October, 2005.

/s/ Adam H. Wierzbowski_____
Adam H. Wierzbowski