UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re:  COLUMBIA ENTITIES LITIGATION | Civil Action No. 04cv11704(REK)<br><br>Consolidated Case Nos.:<br>04cv11750<br>04cv11760<br>04cv11953 |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Frances S. Cohen (BBO #542811)
DECHERT LLP
200 Clarendon Street, 27th Floor
Boston, MA 02116-5021
Phone:  (617) 728-7100
Fax:     (617) 426-6567

Michael S. Doluisio
Nory Miller
DECHERT LLP
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA 19103-2793
Phone: (215) 994-4000
Fax: (215) 994-2222

Brian T. O'Connor (BBO #546767)
Giselle J. Joffre (BBO #658047)
ROPES & GRAY LLP
One International Place
Boston, MA 02110-2624
(617) 951-7000

Richard J. Rosensweig (BBO#639547)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110
(617) 482-1776

OF COUNSEL:
Phil C. Neal ARDC #2023369
Mark A. Rabinowitz ARDC 3122026
Dao L. Boyle ARDC #6269407
Jenny S. Kim ARDC #6277785
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
(312) 269-8000

*Counsel for FleetBoston Financial Corporation, a/k/a Bank of America Corporation, Columbia Management Group, Inc., Columbia Management Advisers, Inc., Columbia Wanger Asset Management, L.P. and Columbia Funds Distributor, Inc., J. Kevin Connaughton, P. Zachary Egan, Kevin S. Jacobs, Kenneth A. Kalina, Bruce H. Lauer, Jean Loewenberg, Robert A. Mohn, Louis J. Mendes, Todd Narter, Christopher Olson, Jon H. Park, Vincent P. Pietropaolo, Joseph Turo, and Leah J. Zell*

*Counsel for Defendants Columbia Funds Trusts and Columbia Funds, excluding Columbia Acorn Trust and Columbia Acorn Funds*

*Counsel for Defendant Charles P. McQuaid and Ralph Wanger*

## TABLE OF CONTENTS

**Page**

I.     COUNTS I AND II SHOULD BE DISMISSED BECAUSE NO PRIVATE
       RIGHT OF ACTION EXISTS UNDER  SECTION 36(A) OR 34(B) OF THE
       INVESTMENT COMPANY ACT ..................................................................... 2

       A.     There Is No Private Right Of Action Under Section 34(b) .................................. 3

       B.     There Is No Private Right Of Action Under Section 36(a).................................. 5

              1.     Plaintiffs' Arguments Regarding Section 36(a)'s Text And
                     Structure Fail.......................................................................................... 5

              2.     Plaintiffs' Reliance on Strougo Fails ..................................................... 7

              3.     Plaintiffs Cannot Rely On Legislative History ......................................... 8

              4.     Jackson Does Not Support Finding An Implied Private Right Of
                     Action...................................................................................................... 9

II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 36(B) OF THE
       ICA................................................................................................................. 11

       A.     Plaintiffs Must Plead Facts Showing That The Advisory Fees Were
              Disproportionate To The Services Provided...................................................... 12

       B.     Plaintiffs Fail To Plead Facts Showing That The Advisory Fees Were
              Disproportionate To The Services Provided...................................................... 13

       C.     Plaintiffs Reliance On Wicks And Jones Is Misplaced ...................................... 16

       D.     Plaintiffs' Allegations Regarding 12b-1 Fees, Excessive Commissions
              And Soft Dollars Fail To State A Section 36(b) Claim ...................................... 17

              1.     Plaintiffs Cannot Assert A Claim Based Upon The 12b-1 Fees.............. 18

              2.     Plaintiffs Fail To Make Allegations Showing That The 12b-1 Fees
                     Were Excessive..................................................................................... 18

       E.     Allegations Regarding Excessive Commissions And Soft Dollars Fail To
              State A Section 36(b) Claim ............................................................................. 20

       F.     The Complaint Fails To State A Claim Against The Individual Defendants ....... 21

       G.     The Section 36(b) Claim Fails Because Plaintiffs Do Not Seek To Recover
              On Behalf Of The Funds.................................................................................... 23

III.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 48(A) ....... 24

       A.     There Is No Private Right Of Action Under Section 48(a)................................. 25

       B.     Plaintiffs Fail To Allege A Primary Violation Of The ICA And Thus Their
              Section 48(a) Claim Fails.................................................................................. 25

       C.     Plaintiffs Fail To Allege Facts Supporting Their Allegations Of Control........... 25

# TABLE OF CONTENTS
(continued)

Page

IV.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 215 OF THE IAA ............................................................................................................... 26

V.    PLAINTIFFS' LITANY OF ARGUMENTS FAILS TO ESTABLISH A BASIS FOR STANDING BEYOND THE FUNDS PLAINTIFFS OWNED AND PLAINTIFFS MAY ONLY SUE DERIVATIVELY ON BEHALF OF THOSE FUNDS .......................................................................................................... 28

    A.   Direct Standing ............................................................................... 29

        1.   This Court's Decision In Nenni And Other Cases Cannot Be Distinguished .................................................................... 29

        2.   The Supreme Court Has Not Endorsed Plaintiffs' Standing Arguments.............................................................................. 29

        3.   Article III Requirements Cannot Be Overridden By The So-Called "Juridical Link" Doctrine............................................. 30

    B.   Standing To Sue On A Fund's Behalf – Section 36(b) And Rule 23.1 .............. 32

        1.   Section 36(b) Claims Must Be Asserted On A Fund's Behalf ............... 33

        2.   Neither The Constitution Nor Section 36(B) Permits 36(B) Claims On Behalf Of The 79 Funds In Which Plaintiffs Did Not Invest ........... 34

        3.   Neither The Constitution Nor Rule 23.1 Permits Section 215 Or Other Claims On Behalf Of The 79 Funds In Which Plaintiffs Did Not Invest.............................................................................. 36

        4.   Plaintiffs Cannot Bootstrap Rules 23.1 And 23.2 To Gain Statutory Standing Congress Did Not Provide Or Intend......................... 36

VI.   INCLUSION OF SHAREHOLDERS ALLEGEDLY MISLED INTO PURCHASING REQUIRES DISMISSAL UNDER SLUSA ........................ 38

    A.   The "Holder" Class Here Necessarily Includes Purchasers.................. 38

    B.   The Allegations Here Include Misrepresentations, Omissions and Manipulative Schemes Involving the Purchase and Sale of Securities .............. 42

        1.   Share Value And Purchase.......................................................... 42

        2.   Damages....................................................................................... 43

        3.   Sister Courts ................................................................................ 44

VII.  NOTHING PRESENTED SUPPORTS THE STATE LAW, SECTION 34(B), 36(A) OR 48(A) COUNTS AS DIRECT CLAIMS AND NO DEFENSE IS OFFERED FOR FAILING TO MAKE A PRESUIT DEMAND FOR THE SECTION 215 COUNT. .................................................................................. 46

## TABLE OF CONTENTS
### (continued)

**Page**

A.     The Cases Plaintiffs Cite Do Not Supports Their Argument That All These Counts Are Properly Asserted As Direct Claims................................................... 46

B.     The ICA's Recognition that Investors May Be Adversely Affected Has No Bearing On This Question ...................................................................................... 48

C.     Plaintiffs' Stretched Analogies And False Policy Arguments Are Unavailing. ......................................................................................................... 49

D.     Plaintiffs Offer No Defense For Failing To Make A Presuit Demand ................ 51

VIII.     PLAINTIFFS DO NOT STATE COGNIZABLE CLAIMS UNDER STATE LAW ........................................................................................................................ 51

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alexander v. Sandoval,
    532 U.S. 275 (2001)................................................................... passim

Alves v. Harvard Pilgrim Health Care, Inc.,
    204 F. Supp. 2d 198 (D. Mass. 2002), *aff'd on other grounds*, 316 F.3d 290 (1st
    Cir. 2003) ........................................................................31, 32

Amchem Products, Inc. v. Windsor,
    521 U.S. 591 (1997)...............................................................30, 31

Batra v. Investors Research Corp.,
    1991 U.S. Dist. LEXIS 14773 (W.D. Mo. Oct. 4, 1991)...........................35

Baum v. Investors Diversified Servs., Inc.,
    409 F.2d 872 (7th Cir. 1969) ........................................................49

Bonano v. East Caribbean Airline Corp.,
    365 F.3d 81 (1st Cir. 2004) .......................................................3, 4, 6

Burks v. Lasker,
    441 U.S. 471 (1979)...............................................................48, 49

Cape Ann Investors v. Lepone,
    296 F. Supp. 2d 4 (D. Mass. 2003) ...............................................39, 40

Central Bank v. First Interstate Bank of Denver,
    511 U.S. 164 (1994)..................................................................9

Chamberlain v. Aberdeen Asset Mgmt. Ltd.,
    No. 02cv5870, 2005 WL. 195529 (E.D.N.Y. Jan. 21, 2005).........................2

Clark v. Nevis Capital Mgmt., LLC,
    No. 04-2702, 2005 WL. 488641 (S.D.N.Y. March 2, 2005) ........................27

Dabit v. Merrill Lynch Pierce Fenner & Smith,
    395 F.3d 25 (2d Cir.) *cert. granted*, 2005 U.S. LEXIS 5414 (September 27, 2005)
    ..............................................................................39, 40, 42

Daily Income Fund, Inc. v. Fox,
    464 U.S. 523 (1984)..............................................................24, 33, 34

Deutschman v. Beneficial Corp.,

761 F. Supp. 1080 (D. Del. 1991)............................................................38, 39

Dorchester Investors v. Peak Int'l Ltd.,
    134 F. Supp. 2d 569 (S.D.N.Y. 2001)........................................................2, 5

Dowling v.  Narragansett Capital Corp.,
    735 F. Supp. 1105 (D.R.I. 1990).................................................................25

Dull v. Arch,
    2005 U.S. Dist. LEXIS 14988 (N.D. Ill. July 27, 2005)........................2, 8, 10

Exxon Mobil Corp. v. Allapattah Services Inc.,
    125 S. Ct. 2611 (2005)............................................................................8, 9

Fogel v. Chestnutt,
    533 F.2d 731 (2d Cir. 1975).......................................................................20

Fogel v. Chestnutt,
    668 F.2d 100 (2nd Cir. 1981).....................................................................20

Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,
    528 U.S. 167 (2000).................................................................................29

Garcia v. United States,
    469 U.S. 70 (1985).....................................................................................8

Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,
    694 F.2d 923 (2nd Cir. 1982)............................................................ passim

GFL Advantage Fund Ltd. v. Colkitt,
    272 F.3d 189 (3d Cir. 2001).......................................................................28

Gonzaga University v. Doe,
    536 U.S. 273 (2002)................................................................................5, 6

Green v. Ameritrade, Inc.,
    279 F.3d 590 (8th Cir. 2002) .....................................................................39

Green v. Fund Asset Management,
    147 F. Supp. 2d 318 (D.N.J. 2001) ...........................................................23

Green v. Fund Asset Management L.P.,
    286 F.3d 682 (3d Cir. 2002)..................................................................14, 21

Green v. Nuveen Advisory Corp,
    295 F.3d 738 (7th Cir. 2002) .....................................................................14

Halligan v. Standard & Poor's/Intercapital,
    434 F. Supp. 1082 (E.D.N.Y. 1977) ................................................................23

Hamilton v. Allen,
    No. 05-110, 2005 WL 2660356 (E.D. Pa. October 14, 2005) ................................2, 10, 27

Hawes v. Oakland,
    104 U.S. 450 (1908)................................................................................34

ING Principal Protection Funds Derivative Litig.,
    369 F. Supp. 2d 163 (D. Mass. 2005) ..........................................................19

In re AllianceBernstein Mutual Fund Excessive Fee Litigation,
    No. 04-4885, 2005 WL. 2677753 (S.D.N.Y.)..........................................11, 15, 22

In re Davis Selected Mutual Funds Litigation,
    No. 04-4186, 2005 U.S. Dist. LEXIS 23203 (S.D.N.Y. October 11, 2005).............. passim

In re Dreyfus Mutual Funds Fee Litig.,
    No. 2:04-00128 slip op. (W.D. Pa. Sept. 30, 2005) .................................... passim

In re Eaton Vance Corp. Securities Litig.,
    220 F.R.D. 162 (D. Mass. 2004)..............................................................29, 32

In re Eaton Vance Mutual Funds Fee Litig.,
    380 F. Supp. 2d 222 2005 U.S. Dist. LEXIS 15731 (S.D.N.Y. Aug. 1, 2005).......... passim

In re Franklin Mutual Funds Excessive Fee Litigation,
    No. 04-982, 2005 U.S. Dist. LEXIS 20106 (D.N.J. September 9, 2005) ................. passim

In re Lord Abbett Mutual Funds Fee Litig.,
    No. 04-0559, 2005 WL. 2090517 (D.N.J. Aug. 30, 2005) ......................... passim

In re ML-Lee Acquisition Fund II, L.P.,
    848 F. Supp. 527 (D.Del. 1994)..............................................................25, 26

In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)........................................................2, 5, 25

In re Mutual Funds Investment Litigation, (In re Janus Subtrack),
    2005 U.S. Dist. LEXIS 19083 (2005)........................................................3, 7, 10

In re Nuveen Fund Litig.,
    No. 94-360, 1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996).............................4, 15

In re Pharm. Indus. Average Wholesale Price Litig.,
    339 F. Supp. 2d 165 (D.Mass. 2004) ................................................................6

In re Van Wagoner Funds, Inc. Sec. Litig.,
    No. 02-03383, 2004 WL. 2623972 (N.D. Cal. July 27, 2004) .........................2, 5

Jackson v. Birmingham Board of Education,
    125 S. Ct. 1497 (2005)..............................................................................9, 10, 11

Jacobs v. Bremner,
    378 F. Supp. 2d 865 (2005) ................................................................... passim

Kamen v. Kemper Financial Services, Inc.,
    500 U.S. 90 (1991)........................................................................................46, 49

Kauffman v. The Dreyfus Fund, Inc.,
    434 F.2d 727 (3d Cir. 1970)...................................................................... passim

King v. Douglass,
    973 F. Supp. 707 (S.D. Tex 1996) ...............................................................15, 21

Kircher v. Putnam Funds Trust,
    403 F.3d 478 (7th Cir. 2005) ......................................................................41, 50

Krantz v. Prudential Investments Finds Management, LLC,
    305 F.3d 140 (3d Cir. 2002)........................................................................12, 13

La Mar v. H & B Novelty & Loan Co.,
    489 F.2d 461 (9th Cir. 1973) ...........................................................................31

Lalondriz v. USA Networks, Inc.,
    68 F. Supp. 910 (S.D.N.Y. 1986) ....................................................................39

McConnell v. FEC,
    540 U.S. 93 (2003)............................................................................................31

Meyer v. Oppenheimer,
    764 F.2d 76 (2d Cir. 1985)...............................................................................18

Meyer v. Oppenheimer,
    895 F.2d 861 (2d Cir. 1990).............................................................................18

Migdal v. Rowe Price-Fleming International Inc.,
    248 F.3d 321 (4th Cir. 2001) ...........................................................................13

Mills v. Electric Auto-Lite Co.,

396 U.S. 375 (1970)..................................................................27

Mutchka v. Harris,
    373 F. Supp. 2d 1021 (C.D. Cal. 2005) ...................................2, 10, 24

Nenni v. Dean Witter Reynolds, Inc.,
    1999 U.S. Dist. LEXIS 23351 (D. Mass. Sept. 29, 1999) .................29

Norman v. Salomon Smith Barney Inc.,
    350 F. Supp. 2d 382 (S.D.N.Y. 2004)........................................39

Olmsted v. Pruco Life Insurance Company of New Jersey,
    283 F.3d at 433 (2001)................................................. passim

Ortiz v. Fibreboard Corp.,
    527 U.S. 815 (1999)...............................................................30

Pfeiffer v. Bjurman, Barry & Assoc.,
    No. 03-9741, 2004 WL 1903075 (S.D.N.Y. Aug. 26, 2004)................17, 18, 21

Pinter v. Dahl,
    486 U.S. 622 (1988)...............................................................49

Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    292 F.3d 1334 (11th Cir. 2002) ................................................39

Rowinski v. Salomon Smith Barney Inc.,
    398 F.3d 294 (3d Cir. 2005).....................................................39

SEC v. Capital Gains Research Bureau, Inc.,
    375 U.S. 180 (1963)...............................................................28

Sosna v. Iowa,
    419 U.S. 393 (1975)............................................................29, 30

Stegall v. Ladner,
    No. 05- 0062, 2005 WL 2709127 (D. Mass. Oct. 14, 2005) ..................... passim

Stragliabotti v. Franklin Resources, Inc.,
    No. 04-00883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005) .............17

Strougo v. Bassini,
    282 F.3d 162 (2d Cir. 2002).................................................7, 47

Transamerica Mortgage Advisers, Inc. v. Lewis,
    444 U.S. 11 (1979).................................................................28

Wellington Int'l Commerce Corp. v. Retelny,
        727 F. Supp. 843 (S.D.N.Y. 1989) (citation omitted)......................................................27

White v. Heartland High-Yield Municipal Bond Fund,
        237 F. Supp. 2d 982 (E.D. Wis. 2002)...........................................................................2, 5

Wicks v. Putnam,
        No. 04-10988 GAO, 2005 U.S. Dist. LEXIS 4892 (2005)........................................16, 17

Yameen v. Eaton Vance Distributors, Inc.,
        No. 03-12437 2005 WL 2709116 (D. Mass. October 14, 2005) ............................2, 10, 18

### STATE CASES

Symmons v. O'Keefe,
        419 Mass. 288 (1995) ....................................................................................................52

### FEDERAL STATUTES

Fed. R. Civ. P. 23 ................................................................................................... passim

Fed. R. Civ. P. 23.2 Advisory Committee Notes ...................................................36, 37

105 P.L. 353, 112 Stat. 3227 § 2(2) .............................................................................40

Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)..........................38, 43

15 U.S.C. § 80a-2(a)(9)...............................................................................................25, 26

15 U.S.C. 80a-35(b)(3) ..............................................................................................22, 33, 34

15 U.S.C. §801-35(a) ......................................................................................................6

The Columbia defendants submit this reply memorandum in further support of their motion to dismiss the Consolidated Amended Class Action Complaint ("Compl.").[1]

Plaintiffs' ninety page opposition to defendants' motion to dismiss does not cure their failure to state -- in their seventy-eight page complaint -- a legally cognizable theory under which this Court could grant relief for their grievances regarding purportedly wrongful distribution practices such as "revenue sharing", "directed brokerage", "12b-1 payments" and "soft dollars". Not surprisingly, plaintiffs have not asserted claims under the Securities Act of 1933, or the Securities Exchange Act of 1934; undoubtedly plaintiffs' claims could not withstand the heightened pleading standards required under those statutes. Instead, plaintiffs allege various theories in a vain effort to force-fit their claims within the requirements of either the 1940 Investment Company Act (the "ICA"), the Investment Advisers' Act (the "IAA"), or state law. For the reasons set forth below, each of these theories fails.

In Parts I through IV, below, defendants address plaintiffs' failure to state a claim under the ICA and the IAA. In Part V, the defendants discuss plaintiffs' lack of standing. In Part VI, defendants reply to plaintiffs' arguments regarding the preemption of the state law claims under SLUSA. In Part VII, defendants respond to plaintiffs' claims regarding their assertion of certain claims as direct, rather than derivative claims. Finally, in Part VIII, defendants reply to plaintiffs' assertions that they have stated cognizable claims under state law.

---

[1]    The following defendants join this memorandum: Bank of America Corporation, Columbia Management Group, Inc., Fleet Boston Financial Corporation, Columbia Management Advisors, Inc., Columbia Wanger Asset Management, Inc., Columbia Funds Distributor, Inc., Columbia Funds Trust, Columbia Funds, and Columbia Acorn Funds, and Ralph Wanger and Charles P. McQuaid. Individual defendants, J. Kevin Connaughton, P. Zachary Egan, Kevin S. Jacobs, Kenneth A. Kalina, Bruce H. Lauer, Jean Loewenberg, Robert A. Mohn, Louis J. Mendes, Todd Narter, Christopher Olson, Jon H. Park, Vincent P. Pietropaolo, Joseph Turo, and Leah J. Zell, have now been served, and join the motion to dismiss.

I.     **COUNTS I AND II SHOULD BE DISMISSED BECAUSE NO PRIVATE RIGHT OF ACTION EXISTS UNDER SECTION 36(a) OR 34(b) OF THE INVESTMENT COMPANY ACT**

Prior to defendants' filing of their motion to dismiss on August 8, 2005, five courts had held that there is no implied private right of action under Section 34(b) in light of the Supreme Court's 2001 decision in *Alexander v. Sandoval. See* Defendants' Memorandum of Law in Support of Motion to Dismiss ("Defendants' Mem.") at 21-22 (citing *In re Eaton Vance Mutual Funds Fee Litig.*, 380 F. Supp. 2d 222, *22-30 (S.D.N.Y. Aug. 1, 2005); *In re Van Wagoner Funds, Inc. Sec. Litig.*, No. 02-03383, 2004 WL 2623972, at *11-12 (N.D. Cal. July 27, 2004); *In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*, 272 F.Supp.2d 243 (S.D.N.Y. 2003); *White v. Heartland High-Yield Municipal Bond Fund*, 237 F. Supp. 2d 982, 986-88 (E.D. Wis. 2002); *Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp.2d 569, 581 (S.D.N.Y. 2001)).

Five courts had also held that there is no private right of action under Section 36(a). *See* Defendants' Br. at 24 (citing *In re Eaton Vance Mutual Funds Fee Litig.*, 380 F. Supp. at *22-30; *Dull v. Arch*, No. 05-140, 2005 U.S. Dist. Lexis 14988, *8 (N.D. Ill. July 27, 2005); *Jacobs v. Bremner*, 378 F. Supp. 2d 865 (2005); *Mutchka v. Harris*, 373 F.Supp.2d 1021 (C.D. Cal. 2005); *Chamberlain v. Aberdeen Asset Mgmt. Ltd.*, No. 02cv5870, 2005 WL 195529, *4 (E.D.N.Y. Jan. 21, 2005)).

In just the few months since defendants filed their motion, eight additional courts have addressed the question. Each has applied *Sandoval* and held that there is no private right of action under either Section 34(b) or 36(a). *See Stegall v. Ladner*, No. 05- 0062, 2005 WL 2709127 at 19-25 (D. Mass. Oct. 14, 2005)(36(a)); *Yameen v. Eaton Vance Distributors, Inc.*, No. 03-12437 2005 WL 2709116 at 2 n.1 (D. Mass. October 14, 2005)(36(a)); *Hamilton v. Allen*, No. 05-110, 2005 WL 2660356 (E.D. Pa. October 14, 2005)(36(a)); *In re Davis Selected Mutual Fund Litig.*, No. 04-4186, 2005 U.S. Dist. Lexis 23203 (S.D.N.Y. Oct. 11, 2005) (34(b) and

- 2 -

36(a)); *In re Dreyfus Mutual Funds Fee Litig.*, No. 04-0128, slip op. (W.D. Pa. Sept. 28, 2005) (34(b) and 36(a)); *In re Franklin Mutual Funds Excessive Fee Litig.*, No. 04-982, 2005 U.S. Dist. Lexis 20106 (D.N.J. Sept. 9, 2005) (34(b) and 36(a)); *In re Lord Abbett Mutual Funds Fee Litig.*, No. 04-00559, 2005 WL 2090517 (D.N.J. Aug. 30, 2005) (34(b) and 36(a)); *In re Mutual Fund Investment Litig.*, MDL-1586, No. 04-15863, 2005 U.S. Dist. Lexis 19083 (D. Md. Aug. 25, 2005)(34(b) and 36(a)).

Plaintiffs make almost no attempt to distinguish any of these cases. Instead, plaintiffs rely on outdated reasoning and numerous arguments that were expressly rejected in the cases cited above.[2] For the reasons set forth in defendants' initial memorandum and below, this Court should follow these recent decisions and find that there is no implied private right of action under either Section 34(b) or Section 36(a).

## A.    There Is No Private Right Of Action Under Section 34(b).

As the First Circuit has held, rights creating language is missing where a statute is "the kind of general ban which carries with it no implication of an intent to confer rights on a particular class of persons." *Bonano v. East Caribbean Airline Corp.*, 365 F.3d 81, 85 (1st Cir. 2004).[3] Section 34(b) is just that kind of statute. Section 34(b) makes no mention of investors. Instead, it "focuses exclusively on the person regulated, and not the persons benefited." *Dreyfus*, slip op. at 12. As such, it fails to contain any rights creating language.

---

[2]    Four of the eight cases decided after defendants filed their motion to dismiss involved the same plaintiffs' attorneys who brought this case. In each of those cases, plaintiffs' arguments were flatly rejected. *See Davis*, 2005 U.S. Dist. Lexis. 23202; *Dreyfus*, slip op.; *Franklin*, 2005 U.S. Dist. Lexis. 20106; *Mutual Funds*, 2005 U.S. Dist. Lexis 19083.

[3]    Plaintiffs' attempt to distinguish *Bonano* is unavailing. Although *Bonano* concerned a different statute than those at issue here, it embraced *Sandoval's* approach to determining whether there is a private right of action.

Moreover, Section 34(b) does not provide for a private remedy -- an issue plaintiffs appear to ignore altogether. Indeed, Congress's decision to provide an express private right of action under Section 36(b) and for SEC enforcement under Section 42 strongly suggests that implying a private right of action "would be wrong." *Bonano*, 365 F.3d at 85. *See also Sandoval*, 532 U.S. at 289-90; *Olmsted*, 283 F.3d at 433.

In an attempt to avoid the clear language and structure of the statute, plaintiffs argue, first, that Section 34(b) contains rights creating language because it cross-references Section 31(a). Section 31(a), however, merely provides that the SEC has a duty to establish appropriate holding periods for various records for the protection of investors. This cross-reference does not demonstrate that Section 34(b) is unmistakably focused on investors. *See Sandoval*, 532 U.S. at 288 (for implied right of action to arise, statute must use "rights-creating" language with an "unmistakable focus on the benefited class"). Nor does it demonstrate an intent to create a private remedy. Not surprisingly, therefore, the *Dreyfus* court recently rejected this precise argument. *Dreyfus*, slip op. at 13.

Next, plaintiffs argue that Section 8 of the ICA states that the purpose of having a registration statement is "for the protection of investors." However, as one court recently held, "a cross-reference to another statute that happens to mention the phrase 'for the protection of investors' is not enough to transform an unambiguous 'person regulated' section into a 'person benefit[ed]' section." *Dreyfus*, slip op. at 13, . Once again, plaintiffs' argument fails.

Finally, plaintiffs rely on a single case in which a court found a private right of action under 34(b) – *In re Nuveen Fund Litig.*, No. 94-360, 1996 U.S. Dist. Lexis 8071 (N.D. Ill. June 11, 1996). *See* Plaintiffs' Opposition to Motion to Dismiss ("Plaintiffs' Opp.") at 61. But *Nuveen* pre-dates *Sandoval* and was specifically identified by the Second Circuit as an example

of the now-discredited "*ancien regime*." *Olmsted*, 283 F.3d at 434 n.4. Moreover, *Nuveen's* reasoning is flatly contradicted by the myriad cases decided after *Sandoval* which have found no such private right of action under Section 34(b). *See Davis*, 2005 U.S. Dist. Lexis 23203; *Dreyfus*, slip. op.; *Franklin*, 2005 U.S. Dist. Lexis 20106; *Lord Abbett*, 2005 WL 2090517; *Eaton Vance*, 380 F.Supp.2d 222; *Van Wagoner*, 2004 WL 2623972 at *11-12; *Merrill Lynch*, 272 F.Supp.2d 243; *White*, 237 F. Supp. 2d at 986-88; *Dorchester*, 134 F. Supp.2d at 581.[4]

For all of these reasons and those discussed in defendants' opening memorandum, Count I should be dismissed with prejudice.

**B.      There Is No Private Right Of Action Under Section 36(a).**

As set forth in defendants' opening memorandum, plaintiffs have failed to establish that a private right of action should be implied under Section 36(a). Section 36(a) does not contain any rights creating language. *See* Defendants' Mem. at 22-23. Nor does it provide for a private remedy. To the contrary, it expressly provides for enforcement by the SEC. *Id.* at 23. Count II should therefore be dismissed.

In response to defendants' motion, plaintiffs raise a host of arguments. As discussed below, none of plaintiffs' arguments is persuasive. In fact, each of their arguments has been rejected in recent cases holding that there is no private right of action under Section 36(a).

---

[4]      Plaintiffs also argue that Congressional intent to create a private right of action can be gleaned from Section 34(b)'s prohibition on reports that are "materially misleading." Plaintiffs claim that this phrase "only makes sense in the context of protecting investors" and thus implies the rationale of the statute was to protect investors. Plaintiffs' Opp. at 60. However, such an attenuated connection is hardly the "unmistakable focus on the benefited class" required under Supreme Court precedent. *Gonzaga*, 536 U.S. at 284 (emphasis in original). Nor does it support an argument that the statute provides a private remedy.

### 1.    Plaintiffs' Arguments Regarding Section 36(a)'s Text And Structure Fail.

Initially, plaintiffs raise two arguments regarding the text and structure of Section 36(a). They argue, first, that because Section 36(a) "discusses" the individuals to be protected, a private right of action can be implied. Plaintiffs' Opp. at 59. Plaintiffs are wrong. A statute must do more than "discuss" the plaintiffs; it must have an "unmistakable focus" on the benefited class. *See Gonzaga*, 536 U.S. at 284 (emphasis in original). And, rather than focusing on individual rights, Section 36(a) explicitly states that "[t]he *Commission* is authorized to bring an action." 15 U.S.C. §801-35(a) (emphasis added). Indeed, the sole reference to investors appears in a portion of the statute dealing with the relief than can be granted in connection with an action *by the SEC*. Thus, rather than having an unmistakable focus on investors, the statute makes clear than enforcement by the SEC, and not by other plaintiffs, is intended. *See Lord Abbett*, 2005 WL 2090517 at *15 (rejecting plaintiffs' argument and holding that "the text of Section 36(a) does not contain 'rights-creating language' but instead merely describes prohibited conduct"); *see also Franklin*, 2005 U.S. Dist. Lexis 20106 at *40.[5]

Second, plaintiffs argue that the "SEC's express right to enforce § 36(a) in no way forecloses the possibility of an implied right of action." Plaintiffs' Opp. at 62. But plaintiffs' argument is based entirely on a 30 year old case that is clearly part of the *ancien regime*. *Id.* (citing *Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412 (1975)). Recent cases have

---

[5]    Plaintiffs also argue that because Section 36(a) incorporates Section 1(b)'s reference to the "interests of investors," a private right of action should be implied. But such a general reference to purpose is insufficient under *Sandoval*. *See Olmsted*, 283 F.3d at 434 ("Past decisions reflecting judicial willingness to 'make effective [statutory] purpose' in the context of implied rights of action belong to an 'ancien regime'") (quoting *Sandoval*, 532 U.S. at 287). In fact, because the ultimate purpose of virtually all securities laws is to protect investors, under plaintiffs' reasoning, all securities laws would imply a private right of action. Obviously, that is not the case.

made clear that the express provision of an enforcement scheme is strong evidence that a private

remedy should not be implied. *Sandoval*, 532 U.S. at 290; *Bonano*, 365 F.2d at 85; *In re Pharm.*

*Indus. Average Wholesale Price Litig.*, 339 F. Supp.2d 165, (D.Mass. 2004). Indeed, numerous

courts have specifically held that Section 36(a)'s reference to suit by the SEC makes clear that

Congress did not intend a private right of action. *See Dreyfus*, slip op. at 13-14, ("This statutory

text actually evidences a legislative intent to preclude the relief sought by its clear indication of

one, and only one, entity that has the power to enforce its provisions."); *Franklin*, 2005 U.S.

Dist. Lexis 20106 at *40 (finding no private right of action in Section 36(a) based in part on

comparison with language creating private right of action in Section 36(b)); *Eaton Vance*, 380

F.Supp.2d at 232 (finding that "the existence of an alternative method of enforcement, and the

existence of an explicit private right of action for another provision of the statute creates the

strong presumption that Congress did not intend to create private rights of action under §§ 34(b),

36(a) or 48(a))").

### 2.    Plaintiffs' Reliance on *Strougo* Fails.

Plaintiffs' next argument is that a private right of action was upheld in *Strougo v. Bassini*,

282 F.3d 162 (2d Cir. 2002). Plaintiffs' Opp. at 62. The only question presented in *Strougo*,

however, was whether claims under Section 36(a) for coercion could be brought in a direct or

derivative action, and in particular, whether "Maryland's law of shareholder standing would

frustrate the specific federal policy objectives underlying the ICA." *Id.* at 165. Thus, the Second

Circuit did not consider or decide whether Section 36(a) gives rise to a private right of action; in

fact, it does not appear that dismissal on this basis was even requested. When the Second Circuit

did squarely address the issue of implied rights of action under the ICA a week after *Strougo*, in

*Olmsted*, it laid down the analytical framework that should be followed here.[6] *See Mutual Fund*, 2005 U.S. Dist. Lexis 19083 at *48 (rejecting plaintiffs' argument based upon *Strougo* and explaining that the *Strougo* court reversed the dismissal of the 36(a) claim "without considering whether a private right of action exists under that section").

### 3.    Plaintiffs Cannot Rely On Legislative History.

Finding no help in the text or structure of the ICA, plaintiffs argue that a legislative intent to create a private right of action under Section 36(a) may be gleaned from the "judicial posture" at the time of the amendments to the ICA that created Section 36(a) and from comments made by members of Congress ten years later.  For several reasons, plaintiffs' resort to legislative history fails.

First, because Section 36(a) is unambiguous, there is no need to examine legislative history. *Exxon Mobil Corp. v. Allapattah Services Inc.*, 125 S.Ct. 2611, 2625 (2005).  *See also Olmsted*, 283 F.3d at 435 ("Where the text of a statute is unambiguous, 'judicial inquiry is complete[] except in rare and exceptional circumstances'") (quoting *Garcia v. United States*, 469 U.S. 70, 75 (1985)).  Numerous courts have rejected plaintiffs' resort to legislative history on this basis.  *See, e.g., Dreyfus*, Slip op. at 11 ("We are to consult the legislative history only in order to shed light on ambiguous statutory text"); *Dull*, 2005 U.S. Dist. LEXIS 14988 at *8 (finding that because "[Section 36(a)] is unambiguous, the Court need not look to the legislative history"); *Jacobs*, 378 F. Supp. 2d at 865 (finding "even affirmative statements of specific intent in congressional committee reports are impotent in the face of unambiguous statutory language").

---

[6]    Although *Strougo* was "amended" on March 11, 2002, it was actually decided on February 28, 2002, before the decision in *Olmsted*.

Moreover, even if the Court were to consider the legislative history, there is no support for implying a private right of action. Plaintiffs argue, for instance, that for thirty years prior to the creation of Section 36(a) in 1970 courts had implied a private right of action under former Section 36 and that, Congress, therefore, must have intended this purported implied right of action to continue. *See* Plaintiffs' Opp. at 63. But use of the so-called "contemporary legal context" was flatly rejected by the Supreme Court in *Sandoval*. *Sandoval*, 532 U.S. at 288 (rejecting the argument that the "cases interpreting statutes enacted prior to *Cort v. Ash* have given 'dispositive weight' to the 'expectations' that the enacting Congress had formed 'in light of the 'contemporary legal context.'"). As a result, courts have rejected recent attempts by plaintiffs to revive such arguments in the context of Section 36(a). *See Stegall*, 2005 WL 2709127 at 25 (plaintiff cannot "sidestep[]" *Sandoval* by relying on contemporary legal context); *Jacobs*, 378 F. Supp. 2d at 865 ("*Sandoval* establishes that the text of the statute –and not any 'contemporary legal context' – must be the touchstone of any private right of action.").

Plaintiffs also attempt to rely on remarks made in a House committee report during consideration of other amendments to the ICA. *See* Plaintiffs' Opp. at 65. But these remarks were made more than *ten years* after Section 36(a)'s creation and have no bearing on the relevant question. As the Supreme Court has held, "the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute." *Central Bank v. First Interstate Bank of Denver*, 511 U.S. 164, 185 (1994); *Exxon Mobil*, 125 S.Ct. at 2628 (noting that "the views of the 2005 Congress are not relevant to our interpretation of a text enacted in 1990"). Thus, none of plaintiffs' arguments based on legislative history is sufficient to establish a private right of action.

### 4.    *Jackson* Does Not Support Finding An Implied Private Right Of Action.

Plaintiffs' final argument is that the Supreme Court's recent decision in *Jackson v. Birmingham Board of Education*, 125 S.Ct. 1497 (2005), supports a private right of action under Section 36(a). Specifically, plaintiffs claim that *Jackson* clarified that "*Sandoval* stood for the simple proposition that a private right to enforce a statute does not necessarily include a private right to enforce regulations promulgated thereunder." Plaintiffs' Opp. at 67. Plaintiffs' interpretation of *Jackson* is flawed.

*Jackson* involved the interpretation of Title IX – a statute the Supreme Court had already held gives rise to a private right of action for discrimination. The Court was asked simply to determine whether retaliatory discharge constituted discrimination within the meaning of that statute. It was not asked to create, and did not find, a new implied private right of action.

Moreover, the Court in *Jackson* did not limit or circumscribe the Supreme Court's decision in *Sandoval*. Rather, it emphasized that the keystone to implied rights of action, laid down in *Sandoval*, was the statute itself. It stated, "In step with *Sandoval*, we hold that Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex." *Jackson*, 125 S.Ct. at 1507 (footnote omitted). Thus, *Jackson* only *reinforces* the *Sandoval* rule, as applied by the First Circuit in *Bonano*, the Second Circuit in *Olmsted,* and by numerous district courts. Indeed, twelve courts have decided the question of whether there is a private right of action under Section 36(a) after *Jackson*. Every single one has applied *Sandoval* and found no private right of action. *See Hamilton*, 2005 WL 2660356 at 15, ("Considering the actual text of Section 36(a) in light of *Sandoval*, the Court concludes that no private right of action was intended by Congress."); *Stegall*, 2005 WL 2709127 at 19-25, (applying *Sandoval* and *Olmsted* to find no

private right of action under Section 36(a)); *Yameen*, 2005 WL 2709116 at 2 n.1, (same); *Dreyfus*, slip op. at 11-14 (same); *Franklin*, 2005 U.S. Dist. Lexis. 20106 at *31-*41 (same); *Lord Abbett*, No. 04-cv-00559, 2005 WL 2090517 at *15 (same); *Mutual Funds*, 2005 U.S. Dist. Lexis 18083 at *48-*55 (same); *Eaton Vance*, 380 F.Supp.2d at 231-233 (same); *Dull*, 2005 U.S. Dist. LEXIS 14988 at *8 (same); *Jacobs*, 378 F. Supp. 2d at 865 (same); *Mutchka v. Harris*, 373 F.Supp 2d 1021, (same); *see also Davis*, 2005 U.S. Dist. Lexis 23203 at *8-*10 (finding no private right of action under Sections 34(b), 36(a), and 48(a) based on Judge Koeltl's reasoning in the *Eaton Vance* decision).[7]

For all of these reasons, plaintiffs fail to state a claim under Section 36(a). Count II should therefore be dismissed with prejudice.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 36(b) OF THE ICA.

As the defendants discuss in their initial brief, the plaintiffs rely on a "prototype" complaint, filed in substantially similar form by the same counsel against more than a dozen mutual fund complexes.  Defendants' Mem. at 1 and fn. 2.  When defendants filed their opening brief, only a single court, in *Eaton Vance*, 380 F. Supp. 2d 222, had ruled on the sufficiency of the complaint, dismissing it in its entirety.  Since that time, additional courts have addressed motions to dismiss in similar cases.  In *Davis*, 2005 U.S. Dist. LEXIS 23203 (S.D.N.Y.), the court dismissed all claims, finding *Eaton Vance* persuasive.  In two cases, *Franklin*, 2005 U.S. Dist. Lexis 20106 (D.N.J.) and *Lord Abbett*, 2005 WL 2090517 (D.N.J.), the court dismissed the

---

[7]     As plaintiffs concede, the *Eaton Vance* court was well aware of plaintiffs' argument regarding *Jackson* when holding that Section 36(a) does not give rise to a private right of action. *See* Plaintiffs' Opp. at 68-69.  That *Eaton Vance* did not cite *Jackson* does not mean that the Court "did not even consider the Supreme Court's decision." *Id.*  Rather, because *Jackson* did not change the applicable test established by *Sandoval*, it is not surprising that the court in *Eaton Vance* had no need to discuss *Jackson*.

§36(b) claim without prejudice, on the grounds that it could be asserted, if at all, only as a derivative claim.[8]

As is discussed below, the rationale in *Eaton Vance* and *Davis* warrants dismissal. The plaintiffs' allegations are insufficient to state a claim under Section 36(b) because their claim is predicated on improper distribution practices, and not a breach of fiduciary duty in connection with the receipt of advisory fees. Other than to recite in conclusory fashion that economies of scale were not passed on to investors, plaintiffs fail to allege a factual predicate for their claim that defendants breached a fiduciary duty in connection with the receipt of fees. As the plaintiffs' opposition makes clear, the gist of their purported Section 36(b) allegations is that defendants engaged in improper distribution practices to increase assets under management and thereby to increase advisory fees. Such allegations are insufficient to state a claim under *Eaton Vance*, as well as under the long line of prior cases which hold that, to state a claim under Section 36(b), a plaintiff must allege facts relating to the "negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds". *Eaton Vance* 380 F. Supp. 2d 222 at *13.

**A.    Plaintiffs Must Plead Facts Showing That The Advisory Fees Were Disproportionate To The Services Provided.**

Plaintiffs argue that there is no "heightened pleading" standard for Section 36(b) claims. Although plaintiffs' reference to "heightened pleading" is vague, defendants understand the plaintiffs' argue that they need not plead facts to support each of the *Gartenberg* factors to

---

[8]    In two cases, the courts have allowed the §36(b) claims to go forward. *See Dreyfus* (W.D. Pa. Sept. 28, 2005)(noting that the sufficiency of the pleadings presented a "close case") and *AllianceBernstein Mutual Fund Excessive Fee Litigation*, No. 04 Civ. 4885 (SWK), 2005 WL 2677753, *6 (S.D.N.Y.)(distinguishing the complaint before it from *Eaton Vance)*. For the reasons set forth below, the rationales in *Davis, Eaton Vance, Franklin* and *Lord Abbett* require dismissal here.

withstand a motion to dismiss. Plaintiffs' Opp. at 11. Without regard to whether plaintiffs must

plead each element of *Gartenberg,* however, the plaintiffs fail to go beyond conclusory

allegations to allege specific facts on which they claim that the advisory fees were excessive, *i.e.*,

facts showing that the fees are so large that they bear no reasonable relationship to the services

rendered.

In *Krantz v. Prudential Investments Finds Management, LLC*, 305 F.3d 140 (3d Cir.

2002), for instance, the court acknowledged that "the pleading requirements . . . are very

liberal," but held that "more detail is often required than the bald statement by plaintiff that he

has a valid claim of some type against defendant." *Id.* at 142-43 (citation omitted). The court

dismissed the Section 36(b) claim because the plaintiffs "failed to allege any facts indicating that

the fees received were disproportionate to services rendered." *Id.* at 143. Similarly, in *Migdal v.*

*Rowe Price-Fleming International Inc.*, 248 F.3d 321, 327 (4th Cir. 2001), the court affirmed the

dismissal of a Section 36(b) claim, explaining: "To survive a motion to dismiss, a complaint

may not simply allege in a conclusory manner that advisory fees are 'excessive.' Instead, a

plaintiff must allege facts that, if true, would support a claim that the fees at issue are excessive."

*Id.* at 327. Accordingly, dismissal was warranted because "plaintiffs have failed to allege any

facts pertinent to [the] relationship between fees and services." *Id.* Thus, whether *Gartenberg*

applies strictly or not, plaintiffs must allege facts showing that the fees received were

disproportionate to the services provided.

**B.** **Plaintiffs Fail To Plead Facts Showing That The Advisory Fees Were Disproportionate To The Services Provided.**

Plaintiffs' chief grievance is that defendants allegedly used wrongful distribution

practices. In an effort to fit this grievance under Section 36(b), plaintiffs have larded their

complaint with conclusory references to *Gartenberg* elements such as "economies of scale".

Plaintiffs, thus, cite their allegation that "as the Funds were marketed and the number of Fund investors increased, the economies of scale thereby created, *if any* were not passed on to Columbia Funds investors." Compl. ¶129, cited by plaintiffs, Opp. at 9 n.5 (emphasis added). This noncommittal pleading regarding economies of scale, "*if any*", is not a sufficient predicate for a claim that defendants breached a fiduciary duty in connection with the receipt of advisory fees.  For example, the plaintiffs fail to identify the advisory fees that were paid by any particular fund.  They do not compare those fees to the fees paid by other funds to other advisers.  And they do not identify the services that were provided in return for those fees or explain why such fees were excessive.   Accordingly, the claim should be dismissed.

In similar circumstances, the courts in *Eaton Vance* and *Davis* have dismissed virtually identical Section 36(b) claims in the past few months.  *See In re Eaton Vance Mutual Funds Fee Litigation*, 380 F. Supp. 2d 222 and *In re Davis Selected Mutual Funds Litigation*, CIV. A. No. 04-4186 (S.D.N.Y. Oct. 11, 2005).  In each of these cases, the courts held that allegations regarding improper 12b-1 fees, soft dollars, and excessive brokerage commissions were insufficient to state a Section 36(b) claim because they failed to show that the advisory fees were disproportionate to the services provided.  As the *Davis* court concluded just a few weeks ago:

> [A]llegations of 'improper 12b-1 fees, soft dollar payments, and commissions to brokers are insufficient to allege a claim under 36(b), which addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds. *Eaton Vance*, 380 F. Supp. 2d at 277.  *The complaint contains no allegations from which it can be inferred that the investment advisory fees paid to defendants were 'so disproportionately large' that they bore "no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."* Id. at 236.

*Davis*, 2005 U.S.Dist. LEXIS 23202 at *9-*10 (Emphasis added.

The substantial section 36(b) jurisprudence that preceded *Dreyfus* and *Davis* dictated the result in these cases. The prior Section 36(b) cases, discussed in defendants' initial memorandum, held that allegations that the adviser and its affiliates acted to increase assets under management so as to increase advisory fees, without specific facts to support a claim that a fee was excessive, were insufficient to state a claim. *See* Mem. at 29-31, *discussing Green v. Nuveen Advisory Corp*, 295 F.3d 738, 742 (7th Cir. 2002)(allegations of a potential conflict of interest are insufficient to state a claim under Section 36(b)); *Green v. Fund Asset Management L.P.*, 286 F. 3d 682, 684-85 (3d Cir. 2002) ("a fee arrangement in which a fund's investment advisers have an incentive to maximize leverage in order to increase their advisory fees is not a *per se* breach or an investment adviser's fiduciary duties under Section 36(b)"); *Nuveen Fund Litigation,* 1996 WL 328006, at *12 (N.D.Ill. 1996)(Section 36(b) does not apply to a "claim that accuses an investment advisor of imposing a transaction on the investment company only to generate fees for itself"); and *King v. Douglass*, 973 F.Supp. 707, 722-223 (S.D. Tex 1996)(dismissing a complaint where plaintiffs alleged that defendants improperly increased fund assets and fees through a coercive rights offering).

At most, plaintiffs allege that the defendants' purported misconduct increased the assets under management, which in turn increased the advisory fees. Such allegations are insufficient because the plaintiffs fail to allege any breach of fiduciary duty in connection with the fees themselves. *See Stegall v. Ladner*, *supra*, 2005 WL 2709127 at 32 (dismissing Section 36(b) claim: "[a]t a minimum, plaintiff must demonstrate some nexus between the alleged violation and the excessiveness of the fees charged"). The plaintiffs' allegations offer no basis on which this Court can find that the fees were excessive. The focus of the plaintiffs' allegations is that

the distribution practices that resulted in greater fund sales were improper, not that fees were excessive.[9]

In this case, as in *Eaton Vance*, the plaintiffs simply use the *Gartenberg* factors to dress a complaint about distribution practices in the guise of a section 36(b) claim. Instead of pleading any specific factual predicate for their conclusory allegations, plaintiffs' premise is that advisory fees were "excessive" because the defendants allegedly made payments that were designed to grow the Funds. Indeed, under plaintiffs' construct, any time the Funds grew, defendants were obligated to refund any additional advisory fees that resulted from such growth. But plaintiffs cannot show that advisory fees were "excessive" merely by pointing to an increase in the size of the Funds or the amount of fees or by reciting that economies of scale "if any" were not passed along to investors.

**C.    Plaintiffs Reliance On *Wicks* And *Jones* Is Misplaced.**

Equally unavailing is plaintiffs' reliance on *Wicks v. Putnam*, C.A.No. 04-10988 GAO, 2005 U.S. Dist. LEXIS 4892 (2005) and *Jones v. Harris Associates, L.P.*, CIV. A. No. 04-8305, 2005 WL 831301 (N.D. Ill. April 7, 2005). Those cases, in which the allegations of the complaint focus on advisory fees, and not distribution practices, are inapposite.

---

[9]    For that reason, this Court should find the decisions in *Dreyfus* and *AllianceBernstein* to be unpersuasive in this case. *In re Dreyfus Mutual Funds Fee Litig*, Master File No. 04-0128 (W.D. Pa. Sept. 30, 2005), slip op. at 16, the Court stated that allegations that "center on the 'wrongfulness' of the compensation paid to these defendants, without regard to the services rendered", would "not support a section 36(b) claim". The Court nonetheless denied the motion to dismiss where plaintiffs alleged that defendants collected fees "in excess of standard charges, and in violation of SEC rules", noting that it was a "close case". Similarly in *In re AllianceBernstein Mutual Fund Excessive Fee Litigation*, No. 04 Civ. 4885 at *6 (S.D.N.Y. October 19, 2005), the Court distinguished *Eaton Vance* as a case in which the "plaintiffs' allegations 'contain no specific facts that would demonstrate that the compensation paid to the defendants was disproportionate to the services rendered'".

Unlike the plaintiffs here, the plaintiffs in *Wicks* alleged numerous facts regarding the specific services that had been provided by the adviser. Specifically, plaintiffs alleged that the nature and quality of services provided by the adviser had not changed, even though the assets held by the Funds had increased significantly. They also alleged that the defendants' institutional clients were able to negotiate and pay lower fees than the mutual funds. *Id.* at *1.[10]

Similarly, in *Jones*, the plaintiffs made numerous factual allegations to support their claim that the advisory fees were excessive in relation to the services provided. Specifically, plaintiffs alleged that there had been a "43-fold" increase in advisory fees over 10 years, that the adviser charged lower fees to other clients for identical services, and that technological improvements within the industry allowed the adviser to provide the services at a lower cost than was previously possible. *Id.* at *1.[11]

Here, unlike in these cases, there are no factual allegations which support plaintiffs' conclusion that the advisory fees were excessive. Plaintiff do not identify the amount of fees paid by any Fund, the market rate for advisory services, the profitability of the advisers' work for the Funds, or the nature or cost of the services provided to the Funds. Therefore, the Court

---

[10]    Plaintiffs claim that they have made allegations which are similar to those made in *Wicks*. *See* Plaintiffs' Opp. at 9 n. 5. The paragraph of the Complaint plaintiffs cite, however, fails to allege any specific facts and instead alleges in wholly conclusory terms that defendants failed to pass along economies of scale. *Id.* (citing Compl. ¶129).

[11]    Plaintiffs also try to excuse their failure to plead facts by relying on *Stragliabotti v. Franklin Resources, Inc.*, CIV. A. No. 04-00883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005), and *Pfeiffer v. Bjurman, Barry & Assoc.*, No. 03-CV-9741, 2004 WL 1903075 (S.D.N.Y. Aug. 26, 2004). Neither case is on point. In *Stragliabotti*, the plaintiffs alleged "that defendants charge plaintiffs much higher fees than other clients for equivalent advisory services, and offer[ed] an example of the lower fee schedule utilized in a contract with New York State." *Stragliabotti*, 2005 WL 645529 at *3. In *Pfeiffer*, plaintiffs alleged that the 12b-1 distribution fees were continued after a fund was closed to new investors. *Pfeiffer*, 2004 WL 1903075 at *3. Here, by contrast, plaintiffs do not allege that the 12b-1 fee charged to each Fund were excessive in relation to the services provided.

- 17 -

should decline to follow *Wicks* and *Jones*. Instead, the Court should follow *Davis* and *Eaton Vance* and dismiss plaintiffs' Section 36(b) claim.

> **D.    Plaintiffs' Allegations Regarding 12b-1 Fees, Excessive Commissions And Soft Dollars Fail To State A Section 36(b) Claim.**

Plaintiffs' Section 36(b) claim fails in its entirety for the reasons set forth above. As set forth in defendants' initial memorandum, however, plaintiffs' allegations regarding 12b-1 fees, soft dollars and excessive commissions fail to state a claim for additional, independently sufficient reasons. Accordingly, for these additional reasons, Count III should be dismissed.

> **1.    Plaintiffs Cannot Assert A Claim Based Upon The 12b-1 Fees.**

Section 36(b)(4) provides that payments are exempt from Section 36(b) if they are covered by Section 17. As plaintiffs concede, 12b-1 fees are not covered by Section 17 if they were paid under a "proper Rule 12b-1 plan." Plaintiffs' Opp. at 18. Because plaintiffs allege that the 12b-1 fees were not paid pursuant to a proper 12b-1 plan, plaintiffs have effectively alleged that the fees are covered by Section 17. As such, the fees are not subject to Section 36(b).

In response to this argument, plaintiffs claim that the 12b-1 fees are subject to Section 36(b) because "defendants" have offered no reason why the alleged wrongful payments are subject to Section 17. *Id.* Plaintiffs miss the point. Defendants' argument is based upon plaintiffs' own allegations: it is plaintiffs who allege that the 12b-1 fees were not paid pursuant to a valid Rule 12b-1 plan. Compl. ¶ 125. Thus, it is plaintiffs who have already made allegations rendering the 12b-1 fees exempt from Section 36(b).[12]

---

[12]    Plaintiffs cite a number of cases holding that 12b-1 fees can be considered under Section 36(b). *See* Plaintiffs' Opp. at 16-17 (citing *Meyer v. Oppenheimer*, 764 F.2d 76 (2d Cir. 1985); *Meyer v. Oppenheimer*, 895 F.2d 861 (2d Cir. 1990); and *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924 (S.D.N.Y. Aug. 26, 2004)). None of those cases, however, addressed allegations that the 12b-1 fees were not paid pursuant to a valid 12b-1 plan and, thus, none is relevant to defendants'

### 2.    Plaintiffs Fail To Make Allegations Showing That The 12b-1 Fees Were Excessive.

Even if the 12b-1 fees were subject to Section 36(b), plaintiffs have failed to state a claim because plaintiffs nowhere describe the services that were provided in return for the 12b-1 fees and allege no facts showing that the fees were excessive in relation to such services. Indeed, two cases decided by the District of Massachusetts have dismissed Section 36(b) claims based upon 12b-1 fees for this very reason. *See Yameen*, 2005 WL 2709116 at 10, 16-17 (dismissing Section 36(b) claim based upon 12b-1 fees where the plaintiff alleged that fees did not benefit shareholders but failed to make allegations showing that the fees were disproportionate to the services ); *ING Principal Protection Funds Derivative Litig.*, 369 F. Supp. 2d 163, 169 (D. Mass. 2005) (dismissing Section 36(b) claim alleging excessive 12b-1 fees where plaintiffs failed to allege that the "distribution fees are disproportionate and unrelated to the sales-related services actually provided when shares of he funds were marketed and sold").

Rather than making these necessary factual allegations, plaintiffs launch a wholesale assault on 12b-1 fees. Specifically, plaintiffs allege that the 12b-1 fees provided no benefit whatsoever to investors or the Funds. Compl ¶ 129. As described in defendants' brief, however, 12b-1 fees do, in fact, provide benefits to shareholders. Indeed, as plaintiffs now concede as "truisms," Plaintiffs' Opp. at 15 n. 12, 12b-1 fees were "essential to prevent an 'enormous and rapid shrinkage in asset size'" *Id.* (*citing* Def. Brf. at 32). Moreover, "12b-1 plans allow investors to purchase mutual funds without paying up front sales loads." *Id.*[13]

---

argument that, because the 12b-1 fees are subject to Section 17, they are exempt from Section 36(b).

[13]    Plaintiffs claim that there is no support for defendants' argument that the addition of new shareholders led to economies of scale. *See* Plaintiffs' Opp. at 16. As set forth in defendants' public disclosures, however, the advisory fees declined on a percentage basis as the funds grew in size. The SAI for the Columbia Acorn trust provides, for instance, that the adviser would

In light of these concessions, there is nothing left to plaintiffs' claim other than their unsupported and conclusory allegation that the 12b-1 fees were "excessive." Plaintiffs cannot proceed on the theory that 12b-1 fees provide no benefits to shareholders, because they have admitted that benefits exist. And they allege no facts showing that the fees were disproportionate to the services rendered (and the benefits provided). Accordingly, plaintiffs' allegations regarding 12b-1 fees fail to state a claim under Section 36(b).

### E.    Allegations Regarding Excessive Commissions And Soft Dollars Fail To State A Section 36(b) Claim.

In defendants' opening memorandum, defendants established that plaintiffs' allegations regarding excessive commissions and soft dollars failed to state a Section 36(b) claim because plaintiffs do not plead facts showing that the commissions were excessive. Defendants specifically noted that plaintiffs had "fail[ed] to identify a single transaction where an allegedly excessive commission was paid to a particular broker." Defendants' Mem. at 34. In their response, plaintiffs continue to fail to identify any such transaction. Accordingly, because there is no factual support for plaintiffs' conclusion that brokerage commissions were "excessive," plaintiffs' allegations regarding excessive commissions and soft dollars fail to state a Section 36(b) claim.

In addition, plaintiffs' allegations regarding excessive commissions and soft dollars fail because brokers -- and not defendants -- were the recipients of those payments. *See* Defendants' Mem. at 34. In response, plaintiffs claim that courts interpret "§ 36(b) to apply whenever a designated recipient under §36 receives a benefit from a breach of fiduciary duty." Plaintiffs' Opp. at 22. But the case upon which plaintiffs primarily rely, *Fogel v. Chestnutt*, 533 F.2d 731

---

receive 0.75% of the first $700 million of the fund's daily net assets; 0.70% of the next $1.3 billion; and 0.65% of the amount in excess of $2 billion. Thus, as the fund grew larger, the advisory fee declined on a per share basis.

(2d Cir. 1975), was not a Section 36(b) case and does not support their argument.  As the Second

Circuit explained in *Fogel II*:

> That Section 36(b) was addressed only to cases where the advisory
> fee was attacked as such is demonstrated by the provision in
> Section 36(b) whereby any recovery is limited to the amount of
> compensation received. . . .  The present action is not one . . . to
> which Section 36(b) applies.  It is rather for breach of the fiduciary
> duty to make a full disclosure to the independent directors of
> opportunities available to the Fund, even though a motivation for
> and the effect of the nondisclosure were to increase the gross fees
> by stimulating growth of the Fund . . . .

*Fogel v. Chestnutt*, 668 F.2d 100 (2nd Cir. 1981) at 112.

Thus, as *Fogel II* makes clear, Section 36(b) is addressed only to cases involving

advisory fees "as such."  *Id*.  It does not apply to allegations that an adviser breached its duties

with the motivation of increasing advisory fees.  As such, it does not support plaintiffs' argument

that shareholders may recover based solely upon allegations regarding payments made to third

parties.  *See also, Green v. Fund Asset Management*, 286 F.3d 682, 684-85 (3d Cir. 2002 ) ("a

fee arrangement in which a fund's investment advisors have an incentive to maximize leverage

in order to increase their advisory fees is not a per se breach of" Section 36(b)); *King v.

Douglass*, 973 F. Supp. 707 (dismissing complaint where plaintiffs alleged that defendants

increased fund assets but failed to allege that advisory fee was disproportionate to the services

provided).

In summary, plaintiffs' allegations regarding excessive commissions and soft dollars fail

to state a claim.  Not only do such allegations fail to show that the fees were disproportionate to

the services provided, but plaintiffs cannot recover against defendants for payments made to

others.  *Green v. Fund Asset Management, L.P.*, 286 F. 3d at 685; *see e.g.  Pfeiffer v. Bjurman,

Barry & Assoc.*, No. 03-CV-9741, 2004 WL 1903075, at *4 n.11 (S.D.N.Y. Aug. 26, 2004)

(dismissing Section 36(b) claim alleging that a fund incurred excessive expenses where plaintiff

did not sue the company that received such compensation). Accordingly, plaintiffs' allegations

regarding excessive commissions and soft dollars fail to state a Section 36(b) claim.

### F.    The Complaint Fails To State A Claim Against The Individual Defendants.

As Section 36(b) itself makes clear, a Section 36(b) claim can be brought only against an

entity or person who received compensation for providing advisory services.  Section 36(b)(3)

provides:

> No such action shall be brought or maintained against any person
> other than the recipient of such compensation or payments and no
> damages or other relief shall be granted against any person other
> than the recipient of such compensation or payments.

15 U.S. C. 80a-35(b)(3).  Here, plaintiffs argue that a Section 36(b) claim can be brought against

the trustees and officers because those individuals were "paid for services they did not perform."

Plaintiffs' Opp. at 25.  Specifically, plaintiffs allege that the fees paid to directors were excessive

because the directors failed to ensure that the advisory fees were scaled back as the funds grew

larger. *Id.*  With regard to the officers, plaintiffs allege that they failed to take care of the "day-

to-day activities of the Funds." *Id.* at 26.  Putting aside the utter failure of plaintiffs to plead any

facts to support their theories, their Section 36(b) claim fails because they nowhere allege that

the directors or officers received advisory fees.

In a case directly on point, the Western District of Pennsylvania recently dismissed a

virtually identical Section 36(b) claim that had been brought against directors of a mutual fund.

In reasoning fully applicable here, the court explained:

> Plaintiffs . . . argue that the Director Defendants should be or
> could possibly be, liable under section 36(b) because they were
> paid high salaries in order to induce them to breach their fiduciary
> duties to investors.  However, this argument ignores the plain text
> of the statute.  The statute does not provide for the recovery of any
> and all monies from anyone who may have been involved in a
> breach of fiduciary duty owed to mutual fund investors.  Instead,

> the statute allows for recovery of advisory compensation from the
> person or entity who received it.

*Dreyfus*, slip op. at 19.  Accordingly, because plaintiffs had failed to make the "fundamental

allegation that the Directors Defendants received compensation for advisory services," the court

dismissed the claim. *Id.* at 20-21.  *See also In re AllianceBernstein Mutual Fund Excessive Fee

Litigation*, No. 04 Civ. 4885 (SWK), 2005 WL 2677753, *6 (S.D.N.Y.) (dismissing Section

36(b) claim against directors and explaining that "Plaintiffs' pleadings fail to delineate how the

basic compensation packages of the Directors can be accurately characterized as advisory

commissions"); *Eaton Vance*, 380 F. Supp. 2d at 35-37 (dismissing Section 36(b) claim against

directors and rejecting the argument that a Section 36(b) claim can be brought against an indirect

recipient of advisory fees); *Green v. Fund Asset Management*, 147 F. Supp.2d 318, 329-30

(D.N.J. 2001) (dismissing Section 36(b) claim against officers).[14]

Here, as in *Dreyfus,* the Complaint does not allege that officers and directors received

advisory fees.  At most, plaintiffs now claim that the individual defendants performed services

that were related to the advisers' work, *e.g.*, that the directors approved the advisory contract and

the officers oversaw the "day to day operations of the Funds."  Plaintiffs' Opp. at 27.  But there

is a huge difference between serving as an adviser (and receiving advisory fees) and merely

approving an advisory contract (and receiving directors' fees).  Therefore, because plaintiffs do

not allege that the individual defendants received advisory fees, the Section 36(b) claim against

the individual defendants should be dismissed.

---

[14]    The sole case plaintiffs cite, *Halligan v. Standard & Poor's/Intercapital*, 434 F. Supp.
1082 (E.D.N.Y. 1977), is not to the contrary.  It provides that Section 36(b) "must be narrowly
read to mean that only those who receive money paid by the investment company for investment
advisory services may be held liable for breach of their fiduciary duty with respect to such
payments." *Id.* at 1085.

**G.      The Section 36(b) Claim Fails Because Plaintiffs Do Not Seek To Recover On Behalf Of The Funds.**

Lastly, plaintiffs' Section 36(b) claim should be dismissed "because plaintiffs do not seek to recover on behalf of the Funds." Defendants' Mem. at 35.  In two very recent decisions, *In re Lord Abbett Mutual Funds Fee Litigation*, Master File No. 04-0559 (D.N.J. Aug. 30, 2005), and *In re Franklin Mutual Funds Excess Fee Litigation*, Master File No. 04-CV-982 (D.N.J. Sept. 9, 2005), the District of New Jersey dismissed Section 36(b) claims for just this reason.  The *Lord Abbett* court held that, under Section 36(b)'s express language and the Supreme Court case of *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984), "Section 36(b) confers only a derivative right." *In re Lord Abbett*, No. 04-0559, 2005 WL. 2090517 (D.N.J. Aug. 30, 2005) at 27. Therefore, the court held that a direct Section 36(b) claim -- such as the one alleged here -- cannot proceed. *See also Daily Income Fund*, 464 U.S. at 535 n. 11 (explaining that the "right asserted by a shareholder suing under the statute is a 'right of the corporation'" and that "a § 36(b) action is undeniably 'derivative' in the broad sense of the word"); *Olmsted*, 283 F.3d at 433 (noting that Congress provided for a "private right of derivative action" under Section 36(b)).

In response, plaintiffs confusingly argue that they "have brought their § 36(b) claim 'on behalf of themselves and the class' in order to provide recovery to all of the Columbia Funds harmed by Defendants' misconduct." Plaintiffs' Opp. at 29.  Plaintiffs' argument makes no sense.  Under Section 36(b), any recovery "will go to the company rather than the plaintiff." *Daily Income*, 464 U.S. at 535.  Here, however, plaintiffs do not seek recovery on behalf of the Funds, choosing, instead, to seek recovery on behalf of a class of shareholders.  Thus, for this independent reason, plaintiffs' claim fails. *In re Lord Abbett*, 2005 WL. 2090517 at 27-28;

*Mutchka*, 2005 WL 1414304 at *3 (dismissing Section 36(b) claim which was not brought on behalf of the fund).

## III.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 48(A).

As defendants' initial memorandum makes clear, plaintiffs' Section 48(a) claim fails for three independent reasons:  (1)  there is no private right of action under Section 48(a); (2) no underlying violation of the ICA has been alleged; and (3) plaintiffs fail to allege facts to support their unsupported conclusion that the advisers "controlled" the trustees and distributor and "caused" them to violate the ICA.  None of plaintiffs arguments in opposition save their claim. Accordingly, as other courts have recently done, this court should dismiss plaintiffs' Section 48(a) claim.

### A.    There Is No Private Right Of Action Under Section 48(a).

Buried in a footnote to their brief, plaintiffs argue that a private right of action exists under Section 48(a).  Plaintiffs' Opp. at 59 n.57.  Plaintiffs do not, however, distinguish *Eaton Vance*, 380 F.Supp.2d at 232, a case defendants cited which holds that there is no private right of action under Section 48(a).  Of even more significance, plaintiffs do not claim that Section 48(a) contains rights creating language or provides for a private remedy.  Accordingly, as *Eaton Vance* – and, more recently, *Davis* -- held, Section 48(a) cannot be enforced via a private right of action.  *Davis*, 2005 U.S. Dist. Lexis 23203 at *8-*10.

### B.    Plaintiffs Fail To Allege A Primary Violation Of The ICA And Thus Their Section 48(a) Claim Fails

"Section 48(a) is a secondary liability section."  Franklin, 2005 U.S. Dist. Lexis at *44. Because, as stated above, plaintiffs' claims under Section 34(b), 36(a) and 36(b) fail as a matter of law, plaintiffs' Section 48(a) claim "necessarily fail[s]."  *Merrill Lynch*, 272 F.Supp.2d at 264; *see also Franklin*, 2005 U.S. Dist. Lexis at *45 (same).

C.    Plaintiffs Fail To Allege Facts Supporting Their Allegations Of Control.

Finally, plaintiffs fail to adequately plead a violation of Section 48(a) because their allegations are insufficient to establish control and that the advisers caused any violation of the ICA by the distributor or trustees.

As explained in defendants' opening brief, "control" is a defined term in the ICA. *See* Defendants' Mem. at 36-37 (citing 15 U.S.C. § 80a-2(a)(9)). Under this definition, defendants are presumed not to be control persons "until a determination to the contrary [is] made by the Commission." 15 U.S.C. § 80a-2(a)(9). Plaintiffs fail to plead any such determination by the Commission or any other reason to rebut the presumption of a lack of control. Instead, plaintiffs cite *In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527 (D.Del. 1994) and *Dowling v. Narragansett Capital Corp.*, 735 F.Supp. 1105, 1110, 1122 (D.R.I. 1990), for the proposition that the definition of "control" in 15 U.S.C. §80a-2(a)(9) has no bearing on Section 48(a). But these cases hold no such thing. In *ML-Lee*, the court found that allegations of control under Section 2(a)(9) do not, by themselves, give rise to liability. *ML-Lee*, 848 F. Supp. at 545. The court did not, however, hold that such allegations were irrelevant to a claim under Section 48(a). To the contrary, the court made clear that allegations of control are essential under Section 48(a), explaining: "[I]nsofar as Plaintiffs allege that the transactions at issue in the Complaint were illegally undertaken between 'affiliated' entities and that the alleged *controlling* Defendants caused those actions to be taken, the Court concludes that those *controlling* Defendants can possibly be held accountable under section 48(a)." 848 F.Supp. at 545 (emphasis added). Thus, rather than supporting plaintiffs' argument, *ML-Lee* makes clear that Section 48(a) requires both control and causation. *Id*. Because plaintiffs do not properly allege control control, their claim fails.

Even if plaintiffs had adequately alleged control, they have not alleged that the advisers *caused* any violation of the ICA. Plaintiffs do not allege a single fact showing that the advisers caused the distributor or any of the trustees, much less all of them, to do any illegal acts. In their brief, plaintiffs now claim that "the Investment Adviser Defendants 'caused' the Trustee/Officer Defendants to violate the ICA by allowing the investment advisor to increase Fund assets without passing on the benefits to investors." Plaintiffs' Opp. at 71. But merely "allowing" something to happen is not to "cause" it. For this additional reason, therefore, plaintiffs' claim should be dismissed.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 215 OF THE IAA.

As explained in defendants' opening brief, plaintiffs' Section 215 claim fails because they do not allege that "the formation or performance of the [advisory] contract violates the Advisors Act." *Clark v. Nevis Capital Mgmt., LLC*, No. 04-2702, 2005 WL 488641 (S.D.N.Y. March 2, 2005). In response, plaintiffs argue, first, that because they alleged a "fraud or deceit" which would violate Section 206 of the IAA, they have stated a claim for relief under Section 215. Plaintiffs' Opp. at 72. Plaintiffs are wrong. Not all conduct that violates Section 206 gives rise to a rescission claim under Section 215. Rather, Section 215 only allows for the rescission of a contract which, as written or necessarily performed, violates the IAA.[15] Indeed, just two months ago, the court in *In re Lord Abbett Mutual Funds Fee Litigation*, 2005 WL. 2090517, dismissed a Section 215 claim for just this reason, explaining:

---

[15]    Plaintiffs appear to concede this point. *See* Plaintiffs' Opp. at 72 (the "general rule is that any *contract which violates § 206* of the IAA is void under § 215.") (emphasis added). The cases they cite also acknowledge this rule. *See Wellington Int'l Commerce Corp. v. Retelny*, 727 F.Supp. 843, 845 (S.D.N.Y. 1989) ("Section 215 provides that *contracts whose formation or performance would violate* the Investment Advisers Act 'shall be void'.") (emphasis added) (citation omitted).

> Because Lord Abbett's advisory contracts are voidable under
> Section 215 only if by their terms they violate some other
> provision of the IAA or if their performance necessarily results in
> the violation of some other provision of the IAA, Plaintiffs'
> contention that Lord Abbett's advisory contracts are voidable
> because they were 'part of Lord Abbett's overall scheme to
> defraud the investors and potential investors'. . . holds no water."

*Id.* at 32. This principle is also made clear in cases interpreting Section 29(b) of the Exchange

Act and Section 47(b) of the ICA -- provisions the Supreme Court has identified as Section 215's

"counterpart[s]." *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387 (1970). *See e.g., GFL*

*Advantage Fund Ltd. v. Colkitt*, 272 F.3d 189, 200-202 (3d Cir. 2001) (Section 29(b)); *Hamilton*

*v. Allen*, 2005 WL 2660356 at 22-23 (Section 47(b)).[16]

Next, plaintiffs argue that courts "frequently" permit claims to proceed for violations of

Section 215 where the conduct has no relation to a contract. *See* Plaintiffs' Opp. at 74. Once

again, plaintiffs are wrong. Plaintiffs cite only three cases to support their argument. *Id.* Not

only are two of these cases more than 15 years old, but *none* addresses the argument made by

defendants here. None of the three cases expressly holds that Section 215 remedies are

appropriate where the alleged wrongdoing does not concern the contract itself. Accordingly,

none is persuasive authority here.

---

[16]     Plaintiffs' attempts to distinguish cases interpreting Section 29 based on the different
purposes of the IAA and Exchange Act miss the mark. Even if the Exchange Act and IAA have
different purposes, that does not mean these two particular sections – with nearly identical
language – should be interpreted differently, especially where the Supreme Court has held that
"Congress intended the [IAA] to be construed like other securities litigation enacted for the
purpose of avoiding frauds." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195
(1963). *See also Transamerica Mortgage Advisers, Inc. v. Lewis*, 444 U.S. 11, 18-21 (1979)
(observing that Section 29(b) and 215 are "comparable" provisions and interpreting them
consistently).

**V.    PLAINTIFFS' LITANY OF ARGUMENTS FAILS TO ESTABLISH A BASIS FOR STANDING BEYOND THE FUNDS PLAINTIFFS OWNED AND PLAINTIFFS MAY ONLY SUE DERIVATIVELY ON BEHALF OF THOSE FUNDS.**

Plaintiffs concede that they invested in only two of the 81 funds at issue.[17]  Plaintiffs allege no direct or indirect injuries in their Complaint to support their standing to sue – either on their own behalf or on a fund's behalf – on claims other than those involving the two funds in which they invested.  In their opposition, they similarly fail to allege any direct or palpable injury – to them, or to the two funds they invested in – caused by defendants' conduct and redressable by a favorable decision with respect to the other 79 funds.[18]

Instead, plaintiffs offer a litany of creative back-up arguments for direct standing, for postponing a decision about direct standing, and for derivative standing.  None provides a basis to avoid dismissal of the claims that are beyond these plaintiffs' reach.

---

[17]    Moreover, at least thirteen of the trustee defendants were not trustees of the funds plaintiffs owned, one of the officer defendants was not an officer of the funds they owned, one of the adviser defendants did not advise the funds they owned, and seventy-nine of the fund defendants were not funds they owned.  *See* Defendants' Mem. 6-7.

[18]    Plaintiff's memorandum does include an ancillary suggestion that, as shareholders with an "exchange privilege" within the family of funds, they have a tangible interest in ensuring that all related funds follow the law.  This aside may be intended to assert a basis for direct standing, although its placement in a footnote in a section discussing derivative standing suggests otherwise.  Plaintiffs' Opp. 47 n.37.  In any event, it is unavailing.  First, the alleged interest is inherently speculative – plaintiffs do not, for example, allege that they plan to exchange shares in the immediate future – and has no limiting principle.  Plaintiffs may not only sell shares in the two funds they own and buy shares in other Columbia funds, they may sell shares in the funds they own and buy shares in other mutual funds altogether or stock or bonds.  Second, plaintiffs have no basis for standing to recover damages and restitution of money – the relief they are requesting – with respect to the funds they did not own, because any money due is money they did not, even indirectly, lose.  *See, e.g., Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 185 (2000) ("a plaintiff must demonstrate standing separately for each form of relief sought").

A.    **Direct Standing**

1.    **Prior Decisions By This Court And Others Cannot Be Distinguished.**

Plaintiffs disagree with the decisions ruling that plaintiffs cannot maintain a class action

with respect to funds in which they did not invest or against defendants who caused them no

injury, but have utterly failed to distinguish them.  *Cf.* Mem. at 15-16 *with* Opp. 35 n.29 (arguing

that this Court was wrong in *Nenni v. Dean Witter Reynolds, Inc.*, 1999 U.S. Dist. LEXIS 23351

(D. Mass. Sept. 29, 1999)).  Meanwhile, *In re Eaton Vance Corp. Securities Litig.*, 220 F.R.D.

162 (D. Mass. 2004), has confirmed this Court's conclusion by ruling that named plaintiffs have

Article III standing only with respect to the funds in which they invested.  220 F.R.D. at 164.  On

that basis, *Eaton Vance* decided they could not represent investors who invested in additional

funds.

2.    **The Supreme Court Has Not Endorsed Plaintiffs' Standing Arguments.**

Plaintiffs' reliance on *Sosna v. Iowa*, 419 U.S. 393 (1975), to support their claim that

named plaintiffs need not have standing with respect to each claim against each defendant is

wholly misplaced.  *Sosna*'s plaintiff challenged a residency requirement in a state divorce law on

behalf of herself and others who did not meet the requirement but sought a divorce in the state.

*Sosna* concluded that *because* the plaintiff personally *had* standing to bring the only claim in the

case – a challenge to the law – against both defendants, the focus shifted to whether she was an

adequate class representative.  Rather than support plaintiffs' proposition, *Sosna* makes clear that

standing to bring claims is a prerequisite to suit, and its determination precedes a consideration

of class certification.

The only situation in which the Supreme Court has indicated that consideration of class

certification should precede consideration of standing is when standing issues are raised, not

because of the plaintiff's position, but because of the inclusion of certain members of the class.
*See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (standing challenge aimed at exposure-only
class members in an asbestos case); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612
(1997) (same) (explaining that the standing issues "would not exist but for the class action
certification") (quotation omitted). Plaintiffs' characterization of *Ortiz* as deciding that courts
should wait to address standing issues after having decided class certification issues, Plaintiffs'
Opp. 35 n.29, misreads the decision. *Ortiz* actually said: "Ordinarily, of course, this or any
other Article III court must make sure of its own jurisdiction before getting to the merits." 527
U.S. at 831. It was only because the class certification issues in *Ortiz*, as in *Amchem*, were
"logically antecedent" to Article III concerns – because the standing issues did not exist until the
class was certified – that class certification could be treated before Article III standing in that
instance. *Id.*

### 3. Article III Requirements Cannot Be Overridden By The So-Called "Juridical Link" Doctrine.

Finally, although plaintiffs are not the first to attempt to apply the so-called "juridical
link" doctrine to cover the gaps between a plaintiff's alleged injuries and the breadth of his
complaint, the framework of our legal system does not permit the argument to prevail. The
"'irreducible constitutional minimum' of standing" is required by Article III of the United States
Constitution. *McConnell v. FEC*, 540 U.S. 93, 224 (2003) (quotation omitted).

The so-called "juridical link" doctrine – a doctrine fashioned by the courts applying a
federal statute, Fed. R. Civ. P. 23 – necessarily lacks the power to make exceptions to Article III
standing requirements. No judicially-fashioned doctrine, or even statute, can do so. *See, e.g.,*
*Amchem*, 521 U.S. at 612 (explaining that "Rule 23's requirements must be interpreted in
keeping with Article III constraints"). Article III's requirements can be supplanted or amended

only by supplanting or amending Article III's case or controversy requirement, which even plaintiffs do not claim has occurred.

The so-called "juridical link" doctrine has had a muddled history. It is generally attributed to *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973), which considered whether a defendant class was "juridically related" in deciding whether to certify under Fed. R. Civ. P. 23(b)(1). The Ninth Circuit did not apply the doctrine with respect to standing, which it assumed *arguendo* in the process of dismissing the claims on statutory grounds. 489 F.2d at 464, 466. Occasionally, a court has applied the doctrine, as plaintiffs urge, to consider carving "exceptions" to Article III standing requirements. *See, e.g., Alves v. Harvard Pilgrim Health Care, Inc.*, 204 F. Supp. 2d 198 (D. Mass. 2002), *aff'd on other grounds*, 316 F.3d 290 (1st Cir. 2003). *Alves*, however, having relied on the doctrine to find standing, nonetheless dismissed the claims on the merits, and it was the court's dismissal on the merits that the First Circuit affirmed. Indeed, the First Circuit took pains to explain that the trial court's standing decision was not before it, and it was not commenting on that. 316 F.3d at 290.

More recently, courts have moved away from applying the doctrine to standing questions. *See, e.g., Eaton Vance*, 220 F.R.D. at 170 (declining to import the doctrine into Article III analysis and noting Supreme Court exhortations that an Article III standing analysis cannot be abandoned for the sake of convenience and efficiency) (quotation and citation omitted);[19] *In re Franklin Mutual Funds Excessive Fee Litig.*, 2005 U.S. Dist. LEXIS 20106 (D.N.J. Sept. 9,

---

[19]     Plaintiffs citation of *Eaton Vance* to support their argument for standing pursuant to the so-called "juridical link" doctrine is mistaken. *Eaton Vance* did not decide, as plaintiffs imply, that the doctrine affords standing in certain situations. *Eaton Vance* concluded that the "doctrine should be confined to an analysis of Rule 23(a)." 220 F.R.D. at 171. With respect to standing, *Eaton Vance* noted that the Supreme "Court has rejected, in the context of Article III standing, the basic concept supporting the juridical link doctrine," *Id*. at 170. It concluded: "In short, the 'juridical links doctrine' is not relevant to the issue of standing." *Id*. at 171 (quotation omitted).

2005) (ruling last month, in a case asserting as here excessive fee and commission claims, that "[t]he juridical link doctrine has no bearing on standing").  In any event, regardless of the occasional outlier decision considering exceptions to Article III standing, Article III admits of no exceptions absent the full formalities of constitutional amendment.

### B.     Standing To Sue On A Fund's Behalf – Section 36(b) And Rule 23.1

It is undisputed that plaintiffs have standing to bring claims under Section 36(b) on behalf of the two funds in which they invested.  What is disputed is whether plaintiffs have standing to bring any claims under Section 36(b) on their *own* behalf, and whether plaintiffs have standing to bring claims under Section 36(b) and Rule 23.1 on behalf of the 79 funds in which they did not invest.  The Article III requirements are identical as to each claim.  The statutory standing requirements are determined by the applicable language from Section 36(b) or Rule 23.1, but each provides a right of action only to an entity's shareholders and only on behalf of the entity.  Finally, plaintiffs' argument that they may somehow combine Rules 23.1 and 23.2 to bring claims on behalf of the remaining 79 funds is untenable under the language and the purposes of those provisions.

### 1.     Section 36(b) Claims Must Be Asserted On A Fund's Behalf.

Plaintiffs defend their assertion of standing to bring 36(b) claims on their own behalf by arguing that these claims are direct not derivative, but it is unclear – despite the number of pages devoted to the discussion – what plaintiffs believe turns on the semantic distinction with respect to a 36(b) claim, as plaintiffs concede that a 36(b) claim must be brought on behalf of a fund.  Plaintiffs' Opp. 36.

In any event, plaintiffs mischaracterize the Supreme Court's ruling in *Daily Income Fund*, 464 U.S. 523.  The Supreme Court did not decide, as plaintiffs claim, that suits under Section 36(b) are not derivative.  Rather, the Court distinguished between the broad category of

- 33 -

all derivative suits – those brought on behalf of an entity (including those brought by shareholders under Section 36(b)) – and the narrower category of derivative suits to which Rule 23.1 applies.[20] The salient point was that, under Section 36(b), Rule 23.1's demand requirement does not apply. *Id.* at 535.

In any case, even plaintiffs concede that Section 36(b) requires suits to be brought on a fund's behalf. Plaintiffs' Opp. 36; the statute expressly provides that they must, 15 U.S.C. § 80a-35(b); and the Supreme Court has so interpreted it, *Daily Income Fund*, 464 U.S. at 535 n.11. Accordingly, plaintiffs' Section 36(b) claims fail, even with respect to the two funds in which they invested.

> ### 2.    Neither The Constitution Nor Section 36(B) Permits 36(B) Claims On Behalf Of The 79 Funds In Which Plaintiffs Did Not Invest.

Plaintiffs have Article III standing to sue only on behalf of funds in which they have invested. "Standing is justified only by [the] proprietary interest created by the stockholder relationship and the possible indirect benefits the nominal plaintiff may acquire qua stockholder of the corporation which is the real party in interest." *Kauffman v. The Dreyfus Fund, Inc.*, 434 F.2d 727, 735-36 (3d Cir. 1970); *accord Hawes v. Oakland*, 104 U.S. 450, 462 (1908).

Section 36(b) itself limits statutory standing for private parties to "a security holder of such registered investment company on behalf of such company." § 80a-35(b) (emphasis

---

[20]    *See, e.g., Daily Income Fund*, 464 U.S. at 528 (noting that "any action in which a shareholder asserts the rights of a corporation could be characterized as 'derivative,'" but "the type of derivative action governed by the Rule [23.1] is one in which a shareholder claims a right that could have been, but was not, 'asserted' by the corporation in court"); *id.* at 535 n.11 ("In this respect, a § 36(b) action is undeniably 'derivative' in the broad sense of that word. . . however, Rule 23.1 applies by its terms only to 'a derivative action brought by one or more shareholders . . . to enforce a right of a corporation when the corporation has *failed to enforce a right which may properly be asserted by it*.'") (quotation omitted).

added).  This language also confines plaintiffs to bringing Section 36(b) claims solely on behalf of funds of which they themselves were shareholders.

Even if plaintiffs' assertion that the statute "refuses to treat the shareholders and the fund as distinct and separate entities," were true, it would not change the express limitation contained in the statute.  Plaintiffs' Opp. 39.  But, in any event, it is not true.  The statute carefully distinguishes between shareholders and funds by providing that the action must be brought on behalf of the company, that "the right asserted by a shareholder suing under the statute is a right of the corporation," and that "any recovery obtained in a § 36(b) action will go to the company rather than the plaintiff."  *Daily Income Fund*, 464 U.S. at 535 n.11.

The statute also does not support plaintiffs' final argument for broadening its Section 36(b) reach beyond the limits Congress enacted:  that plaintiffs are fiduciaries such as executors or guardians.  Plaintiffs' Opp. 41.  Nor is it clear what such a conclusion would offer them, as they certainly cannot − and do not − claim a fiduciary relationship to funds for which they have no position of responsibility and in which they have not even invested.

Plaintiffs' only suggestion that they have an interest in the outcome of claims on behalf of the other 79 funds is that the funds shared the expenses at issue and an accounting is necessary to award relief to any.  Plaintiffs' Opp. 46.  Sharing of expenses between separate companies is insufficient in any event to confer standing, but as their own complaint makes clear, there is no factual basis here even for the assertion.  The accounting has already been done.  As they repeatedly allege, these expenses were allocated to specific funds before being passed on to each fund's shareholders.  *See, e.g.,* Compl. ¶¶ 158-160.

Even the decision plaintiffs rely on as the sole support for their legal proposition, *Batra v. Investors Research Corp.*, 1991 U.S. Dist. LEXIS 14773 (W.D. Mo. Oct. 4, 1991), does not help

them. *Batra*'s conclusion as to standing was based on the corporate structure of the fund complex before it. It was one corporation that issued a series of securities, one of which Batra purchased. *Id.* at *5. *Batra* expressly distinguished its situation from a family of funds in which each fund is a separate company, as plaintiffs identify here.[21] *Batra*'s view was that standing is *not* available to sue on behalf of multiple funds, on the basis of purchasing one of them, when the "funds [a]re separate corporations, each possessing its own body of stockholders and separate board of directors" and each is "a registered investment company." *Id.* at 8. Thus, to the extent *Batra* is persuasive, it supports *defendants'* position on standing in this case.

### 3. Neither The Constitution Nor Rule 23.1 Permits Section 215 Or Other Claims On Behalf Of The 79 Funds In Which Plaintiffs Did Not Invest.

Plaintiffs lack the same constitutional standing to sue under Rule 23.1 on behalf of the 79 funds in which they have not invested. *See, e.g., Stegall v. Ladner*, 2005 WL 2709127 at 7-8 (ruling that a plaintiff could not bring a derivative shareholder suit on behalf of funds in which he had not invested, even when "each fund is not separately incorporated," because the plaintiff's beneficial interest extends only to the decisions of the fund he owned "and does not permit him to bootstrap claims arising out of [] decisions made in relation to other funds in which he was not a participant").

In addition, Rule 23.1 expressly limits statutory standing to a plaintiff who can allege that he "was a shareholder . . . at the time of the transaction of which the plaintiff complains or that the plaintiff's share . . . thereafter devolved on the plaintiff by operation of law." Fed. R. Civ. P. 23.1. Plaintiffs here are thus confined by the statute as well as the constitution to suing only on behalf of the two funds in which they were shareholders. Thus, plaintiffs lack standing to bring

---

[21]    *See* Compl. ¶ 71.

their Section 215 claim, which is overtly brought under Rule 23.1, or to have any other claim treated as if it had been brought under Rule 23.1.

### 4. Plaintiffs Cannot Bootstrap Rules 23.1 And 23.2 To Gain Statutory Standing Congress Did Not Provide Or Intend.

Plaintiffs' unincorporated association argument appears to contend that the federal rules permit it to sue under Rule 23.1, as shareholders, on behalf of the two funds in which they invested, and then – treating the two funds as members of an unincorporated association of Columbia funds – on behalf of all 81 funds under Rule 23.2. However inventive, it is not access the federal rules have provided.

Nothing in the rules provides for such bootstrapping. And doing so is entirely inconsistent with Congress' intent in enacting these rules. Rule 23.1 provides a mechanism for shareholders of *a* corporation to bring suit on its behalf under specified circumstances. The rule is carefully limited to shareholders of a specific corporate or equivalent entity. Rule 23.2 provides a mechanism for unincorporated associations to sue or be sued because Rule 17 does not provide for this. *See* Fed. R. Civ. P. 23.2 Advisory Committee Notes (rule provides "entity treatment"). The funds at issue are not otherwise incapable of pursuing rights or being held responsible for liabilities. Each trust or corporation is already a legally-cognizable entity. Regardless of whether it shares resources with other entities, each has individual responsibility for its actions and it or its board can sue and be sued. No actions are precluded by the organizational framework. Rule 23.2 is a gap-filling rule and there is no gap here to be filled – plaintiffs' desire to officiously intermeddle notwithstanding.

Not surprisingly, plaintiffs are unable to cite any support for either treating a family of funds as an unincorporated association for Rule 23.2 purposes or for bootstrapping Rules 23.1 and 23.2 to provide a means of access to the federal courts not provided under either. Plaintiffs'

overreading of the ICA's legislative history is unavailing. The committee's recognition that it may be necessary, in certain circumstances, to consider adviser services to other funds in a fund complex, Plaintiffs' Opp. 50, was necessarily addressed to SEC enforcement. Congress did not even attempt to provide for shareholders in one or two funds to sue on behalf of entire fund complexes. Instead, it provided for the SEC enforcement generally and for shareholders to be able to sue the company that issued their shares with respect to violations of Section 36(b). Any ambiguity plaintiffs extract from the Senate Report is clarified and displaced by the text of the statute itself.

Thus, plaintiffs lack constitutional and statutory standing to sue on behalf of the 79 funds in which they have not invested. And they lack statutory standing to sue under Section 36(b) on their own behalf.

## VI.   INCLUSION OF SHAREHOLDERS ALLEGEDLY MISLED INTO PURCHASING REQUIRES DISMISSAL UNDER SLUSA.

Plaintiffs have brought their state law claims squarely within SLUSA's preemptive reach by defining the class as everyone who held shares during the class period – which necessarily includes the many people plaintiffs allege were lured unwittingly into buying shares by the very scheme and misrepresentations they complain of in this suit.[22]   Indeed, plaintiffs themselves are such purchasers. According to their original complaints, they acquired their shares during the class period. *See* Defendants' Mem. 44. Plaintiffs' allegations that these members of the class were misled by misrepresentations and omissions in the fund prospectuses and/or were the victims of the defendants' manipulative scheme to spur brokers to sell them the shares requires immediate dismissal of these claims under SLUSA. See 15 U.S.C. § 78bb(f)(A)&(B).

---

[22]   SLUSA stands for the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f).

### A.    The "Holder" Class Here Necessarily Includes Purchasers.

Plaintiffs do not claim that they have defined the class in a manner that excludes purchasers. Their argument is that by calling it a class of "holders" and refraining from mentioning purchases or sales of securities in the class definition itself – however central purchases are to their allegations – they have imposed blinders on the Court and prevented it from determining, on its own, whether this is a case Congress intended to preempt under SLUSA. *See, e.g.,* Plaintiffs' Opp. 81. That position, although successful with an occasional trial court, has been soundly rejected by most trial courts and by every one of the six Courts of Appeals to address it. *See* Defendants' Mem. 42-44.[23]

As the Pennsylvania district court deciding a SLUSA challenge, in a case involving allegations virtually identical to those asserted here, recently explained: "a preemption determination is not a 'name game'; the fact that a plaintiff calls its case a 'holder class action' does not make it so." *In re Dreyfus Mutual Funds Fee Litig.*, No. 2:04-cv-00128-GLL, slip op.

---

[23]    Indeed, many of the courts plaintiffs cite for support did not, in fact, accept their position. Some rejected SLUSA preemption because the class definition expressly excluded anyone who had purchased or sold the security during the class period, which the class definition here does not do. *See, e.g., Davis v. Kozlowski*, 2005 DNH 49 (D.N.H. Mar. 17, 2005). *Lalondriz v. USA Networks, Inc.*, 68 F. Supp. 910 (S.D.N.Y. 1986), found the case before it expressly saved under SLUSA's Delaware carve-out rule, which is unrelated to the arguments plaintiffs make here. *Green v. Ameritrade, Inc.*, 279 F.3d 590 (8th Cir. 2002), and *Norman v. Salomon Smith Barney Inc.*, 350 F. Supp. 2d 382 (S.D.N.Y. 2004), concerned allegations that defendants had not delivered the type of research services plaintiffs had contracted for – allegations unrelated to the misrepresentations in prospectuses and schemes to sell fund shares that plaintiffs assert here. Other cases cited found state law claims before them preempted by SLUSA. *See, e.g., Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334 (11th Cir. 2002) (SLUSA preempted because the action swept in both purchase and retention claims). In addition, it is unclear what point plaintiffs are making in attempting to distinguish *Deutschman v. Beneficial Corp.*, 761 F. Supp. 1080 (D. Del. 1991). *Deutschman* was cited in the motion to dismiss solely for the proposition that courts treat automatic reinvestments as purchases under the securities laws. Plaintiffs do not take issue with that position. Any view on SLUSA adopted by *Deutschman* was superceded by the Third Circuit's decision in *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294 (3d Cir. 2005) (ruling that SLUSA preempts state law claims brought on behalf of a class that necessarily includes purchasers and sellers).

at 29 (W.D. Pa. Sept. 30, 2005). Courts "must make a[n] independent assessment of all the allegations of the complaint." *Id.* (ruling that SLUSA preempted the state law claims asserted). If it finds that "the class definition includes persons with SLUSA-preempted claims and does not permit the court to distinguish any non-preempted subclass, SLUSA requires that the claim be dismissed." *Dabit v. Merrill Lynch Pierce Fenner & Smith*, 395 F.3d 25, 47 (2d Cir. 2005) (dismissing state law claims because the class defined as holders "failed to distinguish between those who came to hold . . . before any relevant misrepresentation and those who purchased it in reliance on such representation," id. at 45).

The Third, Seventh, Eighth, Ninth, and Eleventh Circuits have reached the same conclusion. *See* Defendants' Mem. 43; *see also Cape Ann Investors v. Lepone*, 296 F. Supp. 2d 4 (D. Mass. 2003) (same). As *Cape Ann Investors* and *Dabit* noted, "if a class representative could give purchasers and sellers a free ride by salting into the class a member or two with holding claims, it would be a rare case in which SLUSA applied at all." 296 F. Supp. 2d at 12 & n.6; 395 F.3d at 47 n.15 (quotation omitted).

The class defined here as those who held shares between August 2, 1999 and March 22, 2004, Compl. ¶ 163, similarly includes those who allegedly purchased in reliance on the misrepresentations or omissions in the prospectuses and/or as a result of the manipulative "shelf-space" scheme. Plaintiffs made no effort to exclude those who purchased their shares during the class period. If they had, they would have excluded themselves.

Plaintiffs cannot avoid SLUSA preemption by artfully drafting the amended complaint without expressly stating that they themselves, as well as many members of the class, purchased and held shares during the class period. Congress did not leave SLUSA preemption in the hands of savvy plaintiffs and their counsel. Savvy litigation maneuvers are what drove Congress to

enact SLUSA in the first place. *See* 105 P.L. 353, 112 Stat. 3227 § 2(2) (explaining that SLUSA was enacted in response to the shift "from Federal to State courts" of "a number of securities class action lawsuits"). Thus, even assuming SLUSA does not preempt actions brought by pure holder classes, SLUSA assuredly preempts the state law claims here because plaintiffs and many members of the class are not pure holders. They are purchasers. And if the allegations are to be taken as true, they are purchasers who were misled or manipulated into buying shares by the very misconduct plaintiffs complain of.

Whether SLUSA also preempts state law claims coinciding with securities transactions when the plaintiff class does not include purchasers or sellers – *i.e.* pure holder claims – is a separate question, currently pending before the United States Supreme Court. The Supreme Court granted *certiorari* to review a different part of the Second Circuit's decision in *Dabit* – its decision that two breach of contract claims were not preempted by SLUSA because the plaintiff class for those claims did not include purchasers or sellers. *See* 2005 U.S. Lexis 5414 (Sept. 27, 2005). Here, in light of plaintiffs' own purchases, and their class definition, it is unnecessary for this Court to reach that question to find these state law claims preempted.

Plaintiffs, however, are mistaken in claiming that *Kircher v. Putnam Funds Trust*, 403 F.3d 478 (7th Cir. 2005), did not reach this question. Plaintiffs' Opp. 83. The complaint in *Kircher* did not, as plaintiffs assert, contend that the arbitrageurs reaped profits from plaintiff's purchases; it contended that arbitrageurs harmed them as holders. *Kircher* expressly held that the class in one of the consolidated cases did not include purchasers or sellers, *id*. at 483, and ruled that SLUSA preempted the state law claims anyway because the misconduct alleged coincided with securities transactions. 403 F.3d at 484 ("plaintiffs' effort to define non-purchaser-non-seller class is designed to evade PSLRA . . . . It is the very sort of maneuver that

- 41 -

SLUSA is designed to prevent") (instructing the district court to dismiss the plaintiff's state-law claims on remand). Thus, *Kircher* provides an additional basis for dismissing the state law claims here, because the misconduct alleged coincides with sales of fund shares regardless of the membership of the class.

**B.    The Allegations Here Include Misrepresentations, Omissions and Manipulative Schemes Involving the Purchase and Sale of Securities.**

**1.    Share Value And Purchase**

Plaintiffs' *ipse dixit* defense of their allegations as outside SLUSA on the ground that they are unrelated to misrepresentations of the value of securities and to purchases of securities, Plaintiffs' Opp. 84, is wholly at odds with the complaint they filed. In their complaint, dozens of paragraphs allege that material facts were not disclosed to investors, in prospectuses, other sales literature or otherwise. *See, e.g.,* Compl. ¶¶ 2, 3, 12, 16, 75, 84, 102, 103, 113, 114, 115, 123, 133, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 167; *see also* Defendants' Mem. 40-41. Defendants are alleged not to have disclosed charges and fees that lower the return on class members' investments – *i.e.*, facts related to the *value* of the securities. *Id.* Additional paragraphs reiterate the same allegations by likening defendants to those discussed by the SEC. *See* Compl. ¶¶ 9, 11, 13, 115, 120, 121, 117, 118, 119, 120, 121; Mem. 41.

More than 20 paragraphs in plaintiffs' complaint allege that defendants were engaged in a manipulative scheme to pay brokers "to push Columbia Funds on unwitting investors." *See, e.g.,* Compl. ¶¶2, 3, 4, 75, 76, 77, 80, 81, 82, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 98, 99, 101, 103, 114, 115, 133, 137, 138, 147, 153. The scheme is alleged to have induced investors to purchase fund shares "regardless of the Funds' investment quality relative to other investment alternatives." *See, e.g.,* Compl. ¶ 114. In other words, plaintiffs allege that investors were

manipulated into purchasing fund shares on the mistaken belief that the quality – *i.e.*, *value* – of the investment was better than it was.

Thus, under each category of allegation, investors are alleged to have been deceived as to the value of fund shares. More important, the alleged misconduct is asserted to be aimed at, and to result in, purchases of fund shares. The allegations, therefore, coincide with a purchase of securities within the meaning of SLUSA.

### 2.    Damages

Even if plaintiffs *were* forgoing damages generated by their purchases of securities and seeking instead only damages generated by retention of the securities, that would not avoid SLUSA. *See Dabit*, 395 F.3d at 45 ("a plaintiff who . . . forswears *damages* from the purchase and seeks only 'holding damages' has still run afoul of SLUSA"). SLUSA provides that claims alleging fraud in connection with the purchase or sale of securities are preempted. 15 U.S.C. § 78bb(f)(1)(A)&(B). It is not limited to "claims seeking damages specifically traceable to the initial purchase." *Dabit*, 395 F.3d at 45; *accord In re Dreyfus Mutual Funds Fee Litig., slip op.* at 29 ("SLUSA's preemption language is not limited to cases involving damages that were suffered as a result of the purchase or sale of securities.").

Here, however, plaintiffs are in fact seeking compensation for the difference in the value of the securities they purchased and the value of the securities plaintiffs claim were represented – *i.e.*, securities for which expenses would not be incurred for excessive fees and commissions. *That* is the compensation plaintiffs have requested, and it arises – if at all – from the plaintiffs' purchase of misrepresented securities and/or plaintiffs' manipulation into purchasing these securities.[24] In addition, any fees and commissions paid to encourage sales of fund shares and

---

[24]    That the alleged diminution of value occurred after purchase, while plaintiffs held their shares, does not change anything. In every case of an investor purchasing a security based on

any excess commissions charged for portfolio sales, which plaintiffs request, are costs which were generated in connection with the purchase and sale of securities – fund shares or securities held by the funds.

### 3.    Sister Courts

All three district courts that have addressed these shelf-space excessive fee and commission allegations have ruled that they are preempted by SLUSA. *In re Lord Abbett Mutual Funds Fee Litig.*, 2005 WL. 2090517, dismissed similar excessive fee and commission state law claims against mutual fund defendants under SLUSA, after finding that the "gravamen" of the complaint was that the funds "made improper, undisclosed, and excessive payments to brokers to induce them to aggressively market the Funds" which harmed shareholders but boosted the defendants' management fees. *Id.*, 2005 WL. 2090517 at 19.  The court found the state law claims within SLUSA because:  (1) for this scheme to work and cause harm to plaintiffs, new investors must purchase shares, so the scheme "necessarily 'coincides' with the purchase or sale of securities;" (2) the complaint alleged "material misrepresentations or omission[s] 'disseminated to the public in a medium upon which a reasonable investor would rely' – prospectuses; (3) plaintiffs' relationship with defendants necessarily involves the purchase or sale of securities; and (4) the proposed class is not limited to non-purchasers and non-sellers "and, therefore, necessarily encompasses claims by investors who purchased or sold [] shares during the class period." *Id.* at 19-21.

*In re Franklin Mutual Funds Excessive Fee Litig.*, 2005 U.S. Dist. LEXIS 20106, similarly dismissed equivalent state law claims under SLUSA a week later.  The court found the

---

misrepresentations that hid weaknesses, the diminution of value occurs after purchase.  For example, an investor buys shares of a company which has not disclosed that it is losing money. It is therefore after the investor purchases the shares, while he holds his shares, that the company declares bankruptcy and the value of his stock plummets.

excessive fee and commission claims preempted because the fraudulent scheme alleged could only succeed if investors purchased securities; the claims were "based, in part on material misrepresentations and/or omissions conveyed to the public in the funds' prospectuses"; the scheme included relationships involving the trading of securities; and "the fees, charges, and compensatory damages sought encompass charges incurred in connection with the purchase of securities." *Id.* at \*55-58.

Like *In re Lord Abbett Mutual Funds Fee Litig.*, the court expressly rejected the argument plaintiffs assert here, that drafting their complaint in terms of "holders" avoids SLUSA. The court explained that: "It is well-established that an artfully drafted complaint cannot circumvent SLUSA preemption . . . . Rather, a court is required to look at the essence of a complaint." 2005 WL. 2090517 at 58 (relying on decisions from the Second and Eighth Circuits). Thus, the court found the state law claims before it preempted even though the "class definition scrupulously refers only to 'holders'" because it was "drawn broadly enough . . . to include any investor who purchased shares of the defendant funds [during the class period] and thereby became holders." *Id.* at \*59.

Most recently, *In re Dreyfus Mutual Funds Fee Litig.* dismissed the same type of excessive fees and commissions state law claims under SLUSA. The court quickly dispensed with plaintiffs' contention that defining their class in terms of "holders" ended the analysis. *Slip op.* at 28. It found the allegations "in connection with" the purchase or sale of securities because "[w]ithout a sale of a security, the scheme would have been an exercise in futility," because plaintiffs alleged misrepresentations or omissions in the prospectus and other sales and marketing materials, and because plaintiffs' recovery was connected to sales or purchases of securities in that the fees "were calculated based on sales commissions." Thus, the court

concluded that "[r]egardless of how plaintiffs have defined their Proposed Class or worded their pleadings, their complaint is about sales and marketing schemes that were used to steer investors into the Dreyfus Funds in order to boost defendants' fees and charges" and are therefore "preempted by SLUSA." *Id.* at 31.

Plaintiffs' virtually identical allegations in this case are likewise "in connection with" the purchase or sale of securities and SLUSA therefore requires the state law claims to be dismissed.

## VII.    NOTHING PRESENTED SUPPORTS THE STATE LAW, SECTION 34(b), 36(a) OR 48(a) COUNTS AS DIRECT CLAIMS AND NO DEFENSE IS OFFERED FOR FAILING TO MAKE A PRESUIT DEMAND FOR THE SECTION 215 COUNT.

### A.    The Cases Plaintiffs Cite Do Not Supports Their Argument That All These Counts Are Properly Asserted As Direct Claims.

It appears to be undisputed that Rule 23.1 questions as to whether an ICA claim may be brought directly or derivatively, and when demand may be excused, are resolved by looking to the law of the state in which the fund is organized. Plaintiffs' Opp. 50; *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991). It also appears to be undisputed that the applicable law is that of Massachusetts and Oregon – or at least that of Massachusetts. Plaintiffs' Opp. 52.[25] And plaintiffs do not dispute that the same state's law governs whether state law claims may be brought directly or derivatively, and whether demand may be excused.

Under that undisputed, and well-settled, legal framework, plaintiffs' counts – under state law and under Sections 34(b), 36(a), and 48(a) of the ICA – alleging that defendants' misconduct resulted in the funds paying excessive fees and commissions, are derivative claims. In each count, they assert injuries directly to the funds – which are alleged to have been caused to make

---

[25]    Plaintiffs allege that the funds are all organized under Massachusetts law. Compl. ¶ 71. Defendants have referred the Court to public documents that indicate most are organized under Massachusetts law but some are incorporated in Oregon. Defendants' Mem. 6.

improper payments – which harms them indirectly as shareholders when the funds' expenses are subsequently allocated among them. *See* Defendants' Mem. 47-49.

Plaintiffs have been unable to find any decisions that are inconsistent with that conclusion. Their reliance on a California decision applying *California* law, Plaintiffs' Opp. 52, is beside the point because it sheds no light on Massachusetts or Oregon law, which govern. Their reliance on *Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002), is similarly beside the point because *Strougo* applies Maryland law. In addition, *Strougo* does not stand for the proposition that growth of a mutual fund accomplished by harm to shareholders states a direct claim. *Cf.* Plaintiffs' Opp. 53-55. Rather, *Strougo* decided that a closed-end fund offering non-transferable rights to its shareholders directly harmed those shareholders who did not exercise the rights by diluting their shares, and that *this* injury did not derive from any injury to the fund because the fund was not injured. *Strougo*, 282 F.3d at 34-35. Thus, even if *Strougo* had been decided under Massachusetts or Oregon law, it would not support plaintiffs' direct claims here which allege that the funds themselves were maneuvered into paying excessive fees and commissions, that harmed plaintiffs only when the payments were "subsequently imposed" on shareholders. Plaintiffs' Opp. 55. Unlike the plaintiffs in *Strougo*, the injuries alleged here were to the funds and only indirectly to their shareholders.

Plaintiffs also mischaracterize the only decision applying Massachusetts law they cite on this issue, *In re Eaton Vance Mutual Funds Fee Litig.*, 380 F. Supp. 2d 222 (S.D.N.Y. 2005). The Southern District, applying Massachusetts law, dismissed six counts because they should have been brought as derivative claims. 380 F. Supp. 2d at 234. Those were the counts alleging excessive compensation to brokers, improper 12b-1 plans, and soft dollar compensation to brokers. *Id.* The only count the Southern District ruled could be brought directly was a claim

under Section 34(b) that plaintiffs, based on alleged misrepresentations and omissions, continued

to invest in the funds. *Id*. at 235 n.5. At best, therefore, the decision would support plaintiffs'

34(b) claim, *if* Section 34(b) provided a private right of action to bring suit – which it does not.

Interestingly, another sister court applied Massachusetts law a month later to conclude

that all the alleged excessive fee injuries were derivative, dismissing all the direct claims

including the 34(b) count. *In re Franklin Mutual Funds Excessive Fee Litig.*, 2005 U.S. Dist.

LEXIS at *24. Like the case at bar, plaintiffs had complained about excessive advisory fees,

excessive 12b-1 fees, excessive director compensation, and payments to brokerage firms

(directed brokerage, excessive commissions, soft dollars, revenue sharing). *Id*. at *26-27. *See

also Stegall v. Ladner*, 2005 WL 2709127 at 15-17 (ruling, in a different context, that claims that

assets of a mutual fund were wasted must be brought derivatively under Massachusetts law).

### B. The ICA's Recognition that Investors May Be Adversely Affected Has No Bearing On This Question.

Confusingly, plaintiffs quote *Kamen*'s statement of the basic rule that courts may not

incorporate state law into a federal statute if it would be inconsistent with the statute, then quote

a passage from the ICA's preamble generally recognizing the conflict of interest issues that

prompted the particular regulatory choices Congress enacted, but never actually assert that

Massachusetts or Oregon law as to derivative suits runs afoul of ICA policy. Opp. 51. Rather,

they seem to suggest that this Court should interpret state law so that it does not contradict ICA

policy. *Id*.

It is a very odd proposition. Certainly, courts are expected to assume legislatures intend

to follow the constitution and to interpret statutes in a manner consistent with constitutional

dictates. But it is quite something else to suggest that *state* courts and legislatures, as they

developed general corporation law over centuries, should be assumed to have intended to follow

- 48 -

a specific federal statute governing only investment companies enacted in 1940 and amended at various times thereafter. *Kamen* certainly never indicated anything along *those* lines. *Kamen* simply recognized that there might be some state law rules that cannot be incorporated into specific federal statutes under certain circumstances. In the absence of actual inconsistency, however, the state rules are incorporated.

As plaintiffs apparently realize, there is no inconsistency here. Congress recognized potential conflicts of interest and "consciously chose to address the conflict-of-interest problem through the Act's independent-directors" requirement. *Burks v. Lasker*, 441 U.S. 471, 483 (1979). However, Congress enacted the ICA "against the background of existing state law." *Id.* at 412. And the "ICA embodies a congressional expectation that the independent directors would look after the interests of the investment company by exercising the authority granted to them *by state law.*" *Kamen*, 500 U.S. at 107. That authority includes the authority to control, in the first instance, which suits for recovery of an injury to the company are brought, and to ensure that the company recovers for injuries it suffers, through the states' derivative and demand rules.[26] Massachusetts' and Oregon's rules requiring injuries to the funds, such as the alleged payment of excessive fees and commissions, to be undertaken only on behalf of the funds is not inconsistent with any provision of the ICA nor with its overall policy of safeguarding investors by ensuring the presence of independent directors with all the authority granted to directors under state law.[27]

---

[26]     Thus, *Kamen* found incorporation of state law demand rules consistent with the ICA. *Burks v. Lasker*, 441 U.S. 471 (1979), found that state law rules conferring authority on independent directors to discontinue derivative suits not facially inconsistent with the ICA, including the authority to discontinue non-frivolous actions.

[27]     Moreover, the federal securities laws have long been recognized as establishing a carefully balanced scheme serving varied goals. Thus, courts have recognized that although a rule permitting investors to sue "serves on some level to protect investors," it may also risk

- 49 -

C.     **Plaintiffs' Stretched Analogies And False Policy Arguments Are Unavailing.**

Notwithstanding plaintiffs' yeoman efforts, the relationship between fund shareholders

and fund advisers, trustees, *et al.* is not a contract for professional services.  Plaintiffs' Opp. 56.

And the Seventh Circuit decision plaintiffs rely on did not conclude otherwise.  *Baum v.*

*Investors Diversified Servs., Inc.*, 409 F.2d 872 (7th Cir. 1969), analogized mutual funds to

professional services in order to dispense with an entirely different, but equally imaginative,

argument by class action plaintiffs who brought suit under the Clayton Act on the ground that a

mutual fund share is a "commodity" within the meaning of *that* Act.  *Id.* at 872.  The court held

that the word "commodity" in that Act "is restricted to products, merchandise or other tangible

goods," and did not include shares which represent "fractional ownership in a large investment

account," which provides shareholders with rights to investment services and redemption.  *Id.* at

875.

Plaintiffs read too much into *Baum*'s descriptive analogy for addressing a different

question altogether.  The Seventh Circuit did not conclude that the trustees, officers, advisers, or

distributors of mutual funds owed a contractual obligation to the funds' shareholders or that

mismanagement of mutual funds imposed a distinct injury on shareholders that could be

recovered through a direct suit.  To the contrary, the Seventh Circuit recently noted that "a claim

based on mismanagement [of a mutual fund] likely would need to be cast as a derivative action."

*Kircher*, 403 F.3d at 483.[28]

---

"over-deterring activities related to lawful securities sales," and interfere with Congress' chosen
regulatory scheme.  *Pinter v. Dahl*, 486 U.S. 622, 654 n.29 (1988).

[28]     Because the state law claims before it did not purport to be derivative actions, the court
concluded that the gravamen of the complaint, despite the drafting, was deceit or manipulation,
and ruled the claims were preempted by SLUSA.  *Id.*

Plaintiffs' appeal on policy grounds – their claim that those who have since sold shares would be denied recovery if these claims must be brought derivatively – is not only irrelevant but false. Plaintiffs' Opp. 58. Courts will not, and cannot, set aside long-established state law governing direct and derivative suits in order to further policies of their own devise, as plaintiffs urge. It is also not true that shareholders who sold their shares are deprived of an opportunity for recovery. If they have meritorious claims that, as a result of defendants' misrepresentations and manipulations, they were defrauded when they sold their shares at a price diminished by allegedly excessive fees and commissions, that is a direct injury for which Congress provided a right of action.

### D.    Plaintiffs Offer No Defense For Failing To Make A Presuit Demand.

Plaintiffs have apparently conceded that their failure to make presuit demands on the appropriate fund boards is not excused under either Massachusetts or Oregon law. They do not attempt to revive their futility claims despite more than 90 pages of opposition. In any event, Massachusetts law no longer excuses demand as futile, and Oregon does not excuse demand on these facts. *See* Defendants' Mem. 50-53. By not complying with this prerequisite, plaintiffs have precluded themselves from maintaining the one claim they brought derivatively, under Section 215 of the IAA, and have precluded the Court from converting their direct claims under state law or Sections 34(b), 36(a), or 48(a) of the ICA, into derivative claims.

## VIII.  PLAINTIFFS DO NOT STATE COGNIZABLE CLAIMS UNDER STATE LAW.

Plaintiffs' defense of their state law claims misunderstands the challenge that has been asserted. The reason their state law counts fail to state a claim is not simply that their factual allegations are vague or missing, it is that their factual allegations undermine any contention that the elements of these claims are met under applicable state law. For example, their identifications of the plaintiffs and defendants makes clear that these defendants do not owe a

fiduciary duty to these plaintiffs under applicable state law. Whether the claims are considered under Massachusetts or Oregon law, they are not available to plaintiffs.

Neither Massachusetts nor Oregon recognizes a fiduciary duty owed by directors to shareholders, or by third party subcontractors to their client's shareholders. *See* Defendants' Mem. 54-55. Plaintiffs' reliance on a district court decision from California applying California law, Plaintiffs' Opp. 86, is unavailing. Whether or not California recognizes such claims under these circumstances, Massachusetts and Oregon do not, and plaintiffs have been unable to provide any applicable law to support their contention otherwise.

Similarly, the SEC speeches and reports which plaintiffs' include, Plaintiffs' Opp. 87, have no bearing. Even if the SEC had actually incorporated such an obligation and a means to redress a breach into SEC regulations – which, unlike speeches and reports, have the force of law – these would not affect Massachusetts or Oregon *state* law. The SEC is authorized under certain circumstances to supplant state law. It has *no* authority to promulgate it.

Plaintiffs' reliance on the same California case with respect to their unjust enrichment count is unavailing for the same reason. Although it is undisputed that Massachusetts and Oregon recognize a cause of action for unjust enrichment when products or services are provided and not paid for, notwithstanding the absence of a specific promise or contract, Plaintiffs' Opp. 89, plaintiffs' allegations do not state this cause of action. Plaintiffs had a contract with the funds or with their brokers under which they paid a purchase price and were provided with shares. The terms of the purchase, provided in the prospectus, also requires them to reimburse their fund(s) for expenses. It is the funds, as they admit, which directly provided fees or other benefits to the funds' advisers and distributor, and to brokers.

Plaintiffs' attempt to shoehorn their allegations into the cause of action does a quick shuffle among the various defendants to mask facts the allegations concede. Moreover, they are unable to state, and for good reason, what benefit plaintiffs intended to confer, for which they expected payment, that they are now demanding to be paid for. The complaint makes clear that plaintiffs had no intention of providing the alleged benefits to any of the defendants, nor are these benefits for which people are ordinarily paid. Rather, plaintiffs' position is that they were defrauded and they want the money back.

That does not state a *separate legal theory* of unjust enrichment. That is a request for the equitable relief of disgorgement of the allegedly improper fees and commissions, styled as an unjust enrichment count. It must, therefore, be dismissed if the legal theory underlying it is dismissed. *See Symmons v. O'Keefe*, 419 Mass. 288, 289 (1995). Because the underlying breach of fiduciary duty claim must be dismissed, the unjust enrichment count must also. *Id.*

**CONCLUSION**

For the foregoing reasons, movants' request should be granted and all claims against them dismissed in their entirety with prejudice.

October 31, 2005                              Respectfully submitted,

Dated:  October 31, 2005

/s/ Frances S. Cohen
Frances S. Cohen (BBO#542811)
DECHERT LLP
200 Clarendon Street, 27th Floor
Boston, MA 02116-5021
Phone:  (617) 728-7100
Fax:      (617) 426-6567

Michael Doluisio
Nory Miller
DECHERT LLP
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA 19103-2793
Phone:  (215) 994-4000
Fax:  (215) 994-2222

*Counsel for FleetBoston Financial
Corporation, a/k/a Bank of America
Corporation, Columbia Management
Group, Inc., Columbia Management
Advisers, Inc., Columbia Wanger Asset
Management, L.P. and Columbia Funds
Distributor, Inc., Kevin Connaughton,
P. Zachary Egan, Kevin S. Jacobs,
Kenneth A. Kalina, Bruce H. Lauer,
Jean Loewenberg, Robert A. Mohn,
Louis J. Mendes, Todd Narter,
Christopher Olson, Jon H. Park, Vincent
P. Pietropaolo, Joseph Turo, and Leah J.
Zell*

/s/ Brian T. O'Connor
Brian T. O'Connor (BBO #546767)
Giselle J. Joffre (BBO #658047)
ROPES & GRAP LLP
One International Place
Boston, MA 02110-2624
(617) 951-7000

*Attorneys for Defendants Columbia*

*Funds Trusts and Columbia Funds,
excluding Columbia Acorn Trust and
Columbia Acorn Funds*


/s/ Richard J. Rosensweig
Richard J. Rosensweig (BBO #639547)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
(617) 482-1776


Of Counsel:
Phil C. Neal, ARDC #2023369
Mark A. Rabinowitz ARDC 3122026
Dao L. Boyle ARDC #6269407
Jenny S. Kim ARDC #6277785
NEAL, GERBER & EISENGERG LLP
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
(312) 269-8000

*Attorneys for Defendant Charles P.
McQuaid and Ralph Wanger*


## LOCAL RULE 7.1 CERTIFICATE

I, Frances S. Cohen, counsel for Defendants Columbia Entities certify that all counsel conferred in a good faith effort to resolve the issues and assent to this motion.

Dated: October 31, 2005

/s/ Frances S. Cohen
Frances S. Cohen


## CERTIFICATE OF SERVICE

I, Frances S. Cohen, certify that I served a copy of the foregoing document upon all counsel by email on this 31st day of October, 2005.

/s/ Frances S. Cohen
Frances S. Cohen