### III.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 48(A).

As defendants' initial memorandum makes clear, plaintiffs' Section 48(a) claim fails for three independent reasons:  (1)  there is no private right of action under Section 48(a); (2) no underlying violation of the ICA has been alleged; and (3) plaintiffs fail to allege facts to support their unsupported conclusion that the advisers "controlled" the trustees and distributor and "caused" them to violate the ICA.  None of plaintiffs arguments in opposition save their claim.  Accordingly, as other courts have recently done, this court should dismiss plaintiffs' Section 48(a) claim.

#### A.    There Is No Private Right Of Action Under Section 48(a).

Buried in a footnote to their brief, plaintiffs argue that a private right of action exists under Section 48(a).  Plaintiffs' Opp. at 59 n.57.  Plaintiffs do not, however, distinguish *Eaton Vance*, 380 F. Supp. 2d at 232, a case defendants cited which holds that there is no private right of action under Section 48(a).  Of even more significance, plaintiffs do not claim that Section 48(a) contains rights creating language or provides for a private remedy.  Accordingly, as *Eaton Vance* – and, more recently, *Davis* -- held, Section 48(a) cannot be enforced via a private right of action.  *Davis*, 2005 U.S. Dist. LEXIS 23203, at *8-*10.

#### B.    Plaintiffs Fail To Allege A Primary Violation Of The ICA And Thus Their Section 48(a) Claim Fails

"Section 48(a) is a secondary liability section."  Franklin, 2005 U.S. Dist. LEXIS 20106, at *44.  Because, as stated above, plaintiffs' claims under Section 34(b), 36(a) and 36(b) fail as a matter of law, plaintiffs' Section 48(a) claim "necessarily fail[s]."  *Merrill Lynch*, 272 F. Supp. 2d at 264; *see also Franklin*, 2005 U.S. Dist. LEXIS 20106, at *45 (same).

### C.    Plaintiffs Fail To Allege Facts Supporting Their Allegations Of Control.

Finally, plaintiffs fail to adequately plead a violation of Section 48(a) because their allegations are insufficient to establish control and that the advisers caused any violation of the ICA by the distributor or trustees.

As explained in defendants' opening brief, "control" is a defined term in the ICA. *See* Defendants' Mem. at 36-37 (citing 15 U.S.C. § 80a-2(a)(9)). Under this definition, defendants are presumed not to be control persons "until a determination to the contrary [is] made by the Commission." 15 U.S.C. § 80a-2(a)(9). Plaintiffs fail to plead any such determination by the Commission or any other reason to rebut the presumption of a lack of control. Instead, plaintiffs cite *In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527 (D.Del. 1994) and *Dowling v. Narragansett Capital Corp.*, 735 F. Supp. 1105, 1110, 1122 (D.R.I. 1990), for the proposition that the definition of "control" in 15 U.S.C. §80a-2(a)(9) has no bearing on Section 48(a). But these cases hold no such thing. In *ML-Lee*, the court found that allegations of control under Section 2(a)(9) do not, by themselves, give rise to liability. *ML-Lee*, 848 F. Supp. at 545. The court did not, however, hold that such allegations were irrelevant to a claim under Section 48(a). To the contrary, the court made clear that allegations of control are essential under Section 48(a), explaining: "[I]nsofar as Plaintiffs allege that the transactions at issue in the Complaint were illegally undertaken between 'affiliated' entities and that the alleged *controlling* Defendants caused those actions to be taken, the Court concludes that those *controlling* Defendants can possibly be held accountable under section 48(a)." 848 F. Supp. at 545 (emphasis added). Thus, rather than supporting plaintiffs' argument, *ML-Lee* makes clear that Section 48(a) requires both control and causation. *Id.* Because plaintiffs do not properly allege control control, their claim fails.

Even if plaintiffs had adequately alleged control, they have not alleged that the advisers *caused* any violation of the ICA. Plaintiffs do not allege a single fact showing that the advisers caused the distributor or any of the trustees, much less all of them, to do any illegal acts. In their brief, plaintiffs now claim that "the Investment Adviser Defendants 'caused' the Trustee/Officer Defendants to violate the ICA by allowing the investment advisor to increase Fund assets without passing on the benefits to investors." Plaintiffs' Opp. at 71. But merely "allowing" something to happen is not to "cause" it. For this additional reason, therefore, plaintiffs' claim should be dismissed.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 215 OF THE IAA.

As explained in defendants' opening brief, plaintiffs' Section 215 claim fails because they do not allege that "the formation or performance of the [advisory] contract violates the Advisors Act." *Clark v. Nevis Capital Mgmt., LLC*, No. 04-2702, 2005 WL 488641 (S.D.N.Y. March 2, 2005). In response, plaintiffs argue, first, that because they alleged a "fraud or deceit" which would violate Section 206 of the IAA, they have stated a claim for relief under Section 215. Plaintiffs' Opp. at 72. Plaintiffs are wrong. Not all conduct that violates Section 206 gives rise to a rescission claim under Section 215. Rather, Section 215 only allows for the rescission of a contract which, as written or necessarily performed, violates the IAA.[15] Indeed, just two months ago, the court in *Lord Abbett*, 2005 WL 2090517, dismissed a Section 215 claim for just this reason, explaining:

---

[15]    Plaintiffs appear to concede this point. *See* Plaintiffs' Opp. at 72 (the "general rule is that any *contract which violates § 206* of the IAA is void under § 215.") (emphasis added). The cases they cite also acknowledge this rule. *See Wellington Int'l Commerce Corp. v. Retelny*, 727 F. Supp. 843, 845 (S.D.N.Y. 1989) ("Section 215 provides that *contracts whose formation or performance would violate* the Investment Advisers Act 'shall be void'.") (emphasis added) (citation omitted).

> Because Lord Abbett's advisory contracts are voidable under
> Section 215 only if by their terms they violate some other
> provision of the IAA or if their performance necessarily results in
> the violation of some other provision of the IAA, Plaintiffs'
> contention that Lord Abbett's advisory contracts are voidable
> because they were 'part of Lord Abbett's overall scheme to
> defraud the investors and potential investors'. . . holds no water."

*Id.* at 491. This principle is also made clear in cases interpreting Section 29(b) of the Exchange

Act and Section 47(b) of the ICA -- provisions the Supreme Court has identified as Section 215's

"counterpart[s]." *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387 (1970). *See e.g.*, *GFL*

*Advantage Fund Ltd. v. Colkitt*, 272 F.3d 189, 200-202 (3d Cir. 2001) (Section 29(b)); *Hamilton*

*v. Allen*, 2005 WL 2660356, at *22-*23 (Section 47(b)).[16]

Next, plaintiffs argue that courts "frequently" permit claims to proceed for violations of

Section 215 where the conduct has no relation to a contract. *See* Plaintiffs' Opp. at 74. Once

again, plaintiffs are wrong. Plaintiffs cite only three cases to support their argument. *Id*. Not

only are two of these cases more than 15 years old, but *none* addresses the argument made by

defendants here. None of the three cases expressly holds that Section 215 remedies are

appropriate where the alleged wrongdoing does not concern the contract itself. Accordingly,

none is persuasive authority here.

---

[16]    Plaintiffs' attempts to distinguish cases interpreting Section 29 based on the different
purposes of the IAA and Exchange Act miss the mark. Even if the Exchange Act and IAA have
different purposes, that does not mean these two particular sections – with nearly identical
language – should be interpreted differently, especially where the Supreme Court has held that
"Congress intended the [IAA] to be construed like other securities litigation enacted for the
purpose of avoiding frauds." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195
(1963). *See also Transamerica Mortgage Advisers, Inc. v. Lewi*s, 444 U.S. 11, 18-21 (1979)
(observing that Section 29(b) and 215 are "comparable" provisions and interpreting them
consistently).

## V. PLAINTIFFS' LITANY OF ARGUMENTS FAILS TO ESTABLISH A BASIS FOR STANDING BEYOND THE FUNDS PLAINTIFFS OWNED AND PLAINTIFFS MAY ONLY SUE DERIVATIVELY ON BEHALF OF THOSE FUNDS.

Plaintiffs concede that they invested in only two of the 81 funds at issue.[17] Plaintiffs allege no direct or indirect injuries in their Complaint to support their standing to sue -- either on their own behalf or on a fund's behalf -- on claims other than those involving the two funds in which they invested. In their opposition, they similarly fail to allege any direct or palpable injury -- to them, or to the two funds they invested in -- caused by defendants' conduct and redressable by a favorable decision with respect to the other 79 funds.[18]

Instead, plaintiffs offer a litany of creative back-up arguments for direct standing, for postponing a decision about direct standing, and for derivative standing. None provides a basis to avoid dismissal of the claims that are beyond these plaintiffs' reach.

---

[17]     Moreover, at least thirteen of the trustee defendants were not trustees of the funds plaintiffs owned, one of the officer defendants was not an officer of the funds they owned, one of the adviser defendants did not advise the funds they owned, and seventy-nine of the fund defendants were not funds they owned. *See* Defendants' Mem. 6-7.

[18]     Plaintiff's memorandum does include an ancillary suggestion that, as shareholders with an "exchange privilege" within the family of funds, they have a tangible interest in ensuring that all related funds follow the law. This aside may be intended to assert a basis for direct standing, although its placement in a footnote in a section discussing derivative standing suggests otherwise. Plaintiffs' Opp. 47 n.37. In any event, it is unavailing. First, the alleged interest is inherently speculative -- plaintiffs do not, for example, allege that they plan to exchange shares in the immediate future -- and has no limiting principle. Plaintiffs may not only sell shares in the two funds they own and buy shares in other Columbia funds, they may sell shares in the funds they own and buy shares in other mutual funds altogether or stock or bonds. Second, plaintiffs have no basis for standing to recover damages and restitution of money -- the relief they are requesting -- with respect to the funds they did not own, because any money due is money they did not, even indirectly, lose. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 185 (2000) ("a plaintiff must demonstrate standing separately for each form of relief sought").

- 29 -

### A.    Direct Standing

#### 1.    Prior Decisions By This Court And Others Cannot Be Distinguished.

Plaintiffs disagree with the decisions ruling that plaintiffs cannot maintain a class action

with respect to funds in which they did not invest or against defendants who caused them no

injury, but have utterly failed to distinguish them. *Cf.* Mem. at 15-16 *with* Opp. 35 n.29 (arguing

that this Court was wrong in *Nenni v. Dean Witter Reynolds, Inc.*, 1999 U.S. Dist. LEXIS 23351

(D. Mass. Sept. 29, 1999)).  Meanwhile, *In re Eaton Vance Corp. Securities Litig.*, 220 F.R.D.

162 (D. Mass. 2004) ("*Eaton Vance* (D. Mass)"), has confirmed this Court's conclusion by

ruling that named plaintiffs have Article III standing only with respect to the funds in which they

invested.  220 F.R.D. at 164.  On that basis, *Eaton Vance* (D. Mass). decided they could not

represent investors who invested in additional funds.

#### 2.    The Supreme Court Has Not Endorsed Plaintiffs' Standing Arguments.

Plaintiffs' reliance on *Sosna v. Iowa*, 419 U.S. 393 (1975), to support their claim that

named plaintiffs need not have standing with respect to each claim against each defendant is

wholly misplaced.  *Sosna*'s plaintiff challenged a residency requirement in a state divorce law on

behalf of herself and others who did not meet the requirement but sought a divorce in the state.

*Sosna* concluded that *because* the plaintiff personally *had* standing to bring the only claim in the

case – a challenge to the law – against both defendants, the focus shifted to whether she was an

adequate class representative.  Rather than support plaintiffs' proposition, *Sosna* makes clear that

standing to bring claims is a prerequisite to suit, and its determination precedes a consideration

of class certification.

The only situation in which the Supreme Court has indicated that consideration of class

certification should precede consideration of standing is when standing issues are raised, not

because of the plaintiff's position, but because of the inclusion of certain members of the class. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (standing challenge aimed at exposure-only class members in an asbestos case); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612 (1997) (same) (explaining that the standing issues "would not exist but for the class action certification") (quotation omitted). Plaintiffs' characterization of *Ortiz* as deciding that courts should wait to address standing issues after having decided class certification issues, Plaintiffs' Opp. 35 n.29, misreads the decision. *Ortiz* actually said: "Ordinarily, of course, this or any other Article III court must make sure of its own jurisdiction before getting to the merits." 527 U.S. at 831. It was only because the class certification issues in *Ortiz*, as in *Amchem*, were "logically antecedent" to Article III concerns – because the standing issues did not exist until the class was certified – that class certification could be treated before Article III standing in that instance. *Id.*

### 3. Article III Requirements Cannot Be Overridden By The So-Called "Juridical Link" Doctrine.

Finally, although plaintiffs are not the first to attempt to apply the so-called "juridical link" doctrine to cover the gaps between a plaintiff's alleged injuries and the breadth of his complaint, the framework of our legal system does not permit the argument to prevail. The "'irreducible constitutional minimum' of standing" is required by Article III of the United States Constitution. *McConnell v. FEC*, 540 U.S. 93, 224 (2003) (quotation omitted).

The so-called "juridical link" doctrine – a doctrine fashioned by the courts applying a federal statute, Fed. R. Civ. P. 23 – necessarily lacks the power to make exceptions to Article III standing requirements. No judicially-fashioned doctrine, or even statute, can do so. *See, e.g., Amchem*, 521 U.S. at 612 (explaining that "Rule 23's requirements must be interpreted in keeping with Article III constraints"). Article III's requirements can be supplanted or amended

only by supplanting or amending Article III's case or controversy requirement, which even plaintiffs do not claim has occurred.

The so-called "juridical link" doctrine has had a muddled history. It is generally attributed to *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973), which considered whether a defendant class was "juridically related" in deciding whether to certify under Fed. R. Civ. P. 23(b)(1). The Ninth Circuit did not apply the doctrine with respect to standing, which it assumed *arguendo* in the process of dismissing the claims on statutory grounds. 489 F.2d at 464, 466. Occasionally, a court has applied the doctrine, as plaintiffs urge, to consider carving "exceptions" to Article III standing requirements. *See, e.g., Alves v. Harvard Pilgrim Health Care, Inc.*, 204 F. Supp. 2d 198 (D. Mass. 2002), *aff'd on other grounds*, 316 F.3d 290 (1st Cir. 2003). *Alves*, however, having relied on the doctrine to find standing, nonetheless dismissed the claims on the merits, and it was the court's dismissal on the merits that the First Circuit affirmed. Indeed, the First Circuit took pains to explain that the trial court's standing decision was not before it, and it was not commenting on that. 316 F.3d at 290.

More recently, courts have moved away from applying the doctrine to standing questions. *See, e.g., Eaton Vance* (D. Mass), 220 F.R.D. at 170 (declining to import the doctrine into Article III analysis and noting Supreme Court exhortations that an Article III standing analysis cannot be abandoned for the sake of convenience and efficiency) (quotation and citation omitted);[19] *Franklin*, 2005 U.S. Dist. LEXIS 20106 (ruling last month, in a case asserting as here excessive

---

[19]    Plaintiffs citation of *Eaton Vance* to support their argument for standing pursuant to the so-called "juridical link" doctrine is mistaken. *Eaton Vance* did not decide, as plaintiffs imply, that the doctrine affords standing in certain situations. *Eaton Vance* concluded that the "doctrine should be confined to an analysis of Rule 23(a)." 220 F.R.D. at 171. With respect to standing, *Eaton Vance* noted that the Supreme "Court has rejected, in the context of Article III standing, the basic concept supporting the juridical link doctrine," *Id.* at 170. It concluded: "In short, the 'juridical links doctrine' is not relevant to the issue of standing." *Id.* at 171 (quotation omitted).

fee and commission claims, that "[t]he juridical link doctrine has no bearing on standing"). In any event, regardless of the occasional outlier decision considering exceptions to Article III standing, Article III admits of no exceptions absent the full formalities of constitutional amendment.

**B.      Standing To Sue On A Fund's Behalf – Section 36(b) And Rule 23.1**

It is undisputed that plaintiffs have standing to bring claims under Section 36(b) on behalf of the two funds in which they invested. What is disputed is whether plaintiffs have standing to bring any claims under Section 36(b) on their *own* behalf, and whether plaintiffs have standing to bring claims under Section 36(b) and Rule 23.1 on behalf of the 79 funds in which they did not invest. The Article III requirements are identical as to each claim. The statutory standing requirements are determined by the applicable language from Section 36(b) or Rule 23.1, but each provides a right of action only to an entity's shareholders and only on behalf of the entity. Finally, plaintiffs' argument that they may somehow combine Rules 23.1 and 23.2 to bring claims on behalf of the remaining 79 funds is untenable under the language and the purposes of those provisions.

**1.      Section 36(b) Claims Must Be Asserted On A Fund's Behalf.**

Plaintiffs defend their assertion of standing to bring 36(b) claims on their own behalf by arguing that these claims are direct not derivative, but it is unclear – despite the number of pages devoted to the discussion – what plaintiffs believe turns on the semantic distinction with respect to a 36(b) claim, as plaintiffs concede that a 36(b) claim must be brought on behalf of a fund. Plaintiffs' Opp. at 36.

In any event, plaintiffs mischaracterize the Supreme Court's ruling in *Daily Income Fund*. The Supreme Court did not decide, as plaintiffs claim, that suits under Section 36(b) are not derivative. Rather, the Court distinguished between the broad category of all derivative suits

– those brought on behalf of an entity (including those brought by shareholders under Section 36(b)) – and the narrower category of derivative suits to which Rule 23.1 applies.[20] The salient point was that, under Section 36(b), Rule 23.1's demand requirement does not apply. *Id.* at 535.

In any case, even plaintiffs concede that Section 36(b) requires suits to be brought on a fund's behalf. Plaintiffs' Opp. at 36. The statute expressly provides that they must, 15 U.S.C. § 80a-35(b); and the Supreme Court has so interpreted it, *Daily Income Fund,* 464 U.S. at 535 n.11. Accordingly, plaintiffs' Section 36(b) claims fail, even with respect to the two funds in which they invested.

**2.    Neither The Constitution Nor Section 36(B) Permits 36(B) Claims On Behalf Of The 79 Funds In Which Plaintiffs Did Not Invest.**

Plaintiffs have Article III standing to sue only on behalf of funds in which they have invested. "Standing is justified only by [the] proprietary interest created by the stockholder relationship and the possible indirect benefits the nominal plaintiff may acquire qua stockholder of the corporation which is the real party in interest." *Kauffman v. The Dreyfus Fund, Inc.*, 434 F.2d 727, 735-36 (3d Cir. 1970); *accord Hawes v. Oakland*, 104 U.S. 450, 462 (1908).

Section 36(b) also limits statutory standing for private parties to "a security holder of such registered investment company on behalf of such company." § 80a-35(b) (emphasis added). This language confines plaintiffs to bringing Section 36(b) claims solely on behalf of funds of which they themselves were shareholders.

---

[20]    *See, e.g., Daily Income Fund,* 464 U.S. 523, 528 (1984) (noting that "any action in which a shareholder asserts the rights of a corporation could be characterized as 'derivative,'" but "the type of derivative action governed by the Rule [23.1] is one in which a shareholder claims a right that could have been, but was not, 'asserted' by the corporation in court"); *id.* at 535 n.11 ("In this respect, a § 36(b) action is undeniably 'derivative' in the broad sense of that word. . . however, Rule 23.1 applies by its terms only to 'a derivative action brought by one or more shareholders . . . to enforce a right of a corporation when the corporation has *failed to enforce a right which may properly be asserted by it*.'") (quotation omitted).

Even if plaintiffs' assertion that the statute "refuses to treat the shareholders and the fund as distinct and separate entities," were true, it would not change the express limitation contained in the statute. Plaintiffs' Opp. at 39. But, in any event, it is not true. The statute carefully distinguishes between shareholders and funds by providing that the action must be brought on behalf of the company, that "the right asserted by a shareholder suing under the statute is a right of the corporation," and that "any recovery obtained in a § 36(b) action will go to the company rather than the plaintiff." *Daily Income Fund*, 464 U.S. at 535 n.11.

The statute also does not support plaintiffs' final argument for broadening its Section 36(b) reach beyond the limits Congress enacted: that plaintiffs are fiduciaries such as executors or guardians. Plaintiffs' Opp. at 41. Nor is it clear what such a conclusion would offer them, as they certainly cannot – and do not – claim a fiduciary relationship to funds for which they have no position of responsibility and in which they have not even invested.

Plaintiffs' only suggestion that they have an interest in the outcome of claims on behalf of the other 79 funds is that the funds shared the expenses at issue and an accounting is necessary to award relief to any. Plaintiffs' Opp. at 46. Sharing of expenses between separate companies is insufficient in any event to confer standing, but as their own complaint makes clear, there is no factual basis here even for the assertion. The accounting has already been done. As they repeatedly allege, these expenses were allocated to specific funds before being passed on to each fund's shareholders. *See, e.g.,* Compl. ¶¶ 158-160.

Even the decision plaintiffs rely on as the sole support for their legal proposition, *Batra v. Investors Research Corp.*, 1991 U.S. Dist. LEXIS 14773 (W.D. Mo. Oct. 4, 1991), does not help them. *Batra*'s conclusion as to standing was based on the corporate structure of the fund complex before it. It was one corporation that issued a series of securities, one of which Batra

purchased. *Id.* at *5. *Batra* expressly distinguished its situation from a family of funds in which each fund is a separate company, as plaintiffs identify here.[21] *Batra*'s view was that standing is *not* available to sue on behalf of multiple funds, on the basis of purchasing one of them, when the "funds [a]re separate corporations, each possessing its own body of stockholders and separate board of directors" and each is "a registered investment company." *Id.* at 8. Thus, to the extent *Batra* is persuasive, it supports *defendants'* position on standing in this case.

### 3. Neither The Constitution Nor Rule 23.1 Permits Section 215 Or Other Claims On Behalf Of The 79 Funds In Which Plaintiffs Did Not Invest.

Plaintiffs lack the same constitutional standing to sue under Rule 23.1 on behalf of the 79 funds in which they have not invested. *See, e.g., Stegall*, 2005, 2709127 at *7-*8 (ruling that a plaintiff could not bring a derivative shareholder suit on behalf of funds in which he had not invested, even when "each fund is not separately incorporated," because the plaintiff's beneficial interest extends only to the decisions of the fund he owned "and does not permit him to bootstrap claims arising out of [] decisions made in relation to other funds in which he was not a participant").

In addition, Rule 23.1 expressly limits statutory standing to a plaintiff who can allege that he "was a shareholder . . . at the time of the transaction of which the plaintiff complains or that the plaintiff's share . . . thereafter devolved on the plaintiff by operation of law." Fed. R. Civ. P. 23.1. Plaintiffs here are thus confined by the statute as well as the constitution to suing only on behalf of the two funds in which they were shareholders. Thus, plaintiffs lack standing to bring their Section 215 claim, which is overtly brought under Rule 23.1, or to have any other claim treated as if it had been brought under Rule 23.1.

---

[21]    *See* Compl. ¶ 71.

### 4.     Plaintiffs Cannot Bootstrap Rules 23.1 And 23.2 To Gain Statutory Standing Congress Did Not Provide Or Intend.

Plaintiffs' unincorporated association argument appears to contend that the federal rules permit it to sue under Rule 23.1, as shareholders, on behalf of the two funds in which they invested, and then – treating the two funds as members of an unincorporated association of Columbia funds – on behalf of all 81 funds under Rule 23.2. However inventive, it is not access the federal rules have provided.

Nothing in the rules provides for such bootstrapping. And doing so is entirely inconsistent with Congress' intent in enacting these rules. Rule 23.1 provides a mechanism for shareholders of *a* corporation to bring suit on its behalf under specified circumstances. The rule is carefully limited to shareholders of a specific corporate or equivalent entity. Rule 23.2 provides a mechanism for unincorporated associations to sue or be sued because Rule 17 does not provide for this. *See* Fed. R. Civ. P. 23.2 Advisory Committee Notes (rule provides "entity treatment"). The funds at issue are not otherwise incapable of pursuing rights or being held responsible for liabilities. Each trust or corporation is already a legally-cognizable entity. Regardless of whether it shares resources with other entities, each has individual responsibility for its actions and it or its board can sue and be sued. No actions are precluded by the organizational framework. Rule 23.2 is a gap-filling rule and there is no gap here to be filled – plaintiffs' desire to officiously intermeddle notwithstanding.

Not surprisingly, plaintiffs are unable to cite any support for either treating a family of funds as an unincorporated association for Rule 23.2 purposes or for bootstrapping Rules 23.1 and 23.2 to provide a means of access to the federal courts not provided under either. Plaintiffs' overreading of the ICA's legislative history is unavailing. The committee's recognition that it may be necessary, in certain circumstances, to consider adviser services to other funds in a fund

complex, Plaintiffs' Opp. at 50, was necessarily addressed to SEC enforcement. Congress did

not even attempt to provide for shareholders in one or two funds to sue on behalf of entire fund

complexes. Instead, it provided for the SEC enforcement generally and for shareholders to be

able to sue the company that issued their shares with respect to violations of Section 36(b). Any

ambiguity plaintiffs extract from the Senate Report is clarified and displaced by the text of the

statute itself.

Thus, plaintiffs lack constitutional and statutory standing to sue on behalf of the 79 funds

in which they have not invested. And they lack statutory standing to sue under Section 36(b) on

their own behalf.

## VI.    INCLUSION OF SHAREHOLDERS ALLEGEDLY MISLED INTO PURCHASING REQUIRES DISMISSAL UNDER SLUSA.

Plaintiffs have brought their state law claims squarely within SLUSA's preemptive reach

by defining the class as everyone who held shares during the class period – which necessarily

includes the many people plaintiffs allege were lured unwittingly into buying shares by the very

scheme and misrepresentations they complain of in this suit.[22]  Indeed, plaintiffs themselves are

such purchasers. According to their original complaints, they acquired their shares during the

class period. *See* Defendants' Mem. at 44. Plaintiffs' allegations that these members of the class

were misled by misrepresentations and omissions in the fund prospectuses and/or were the

victims of the defendants' manipulative scheme to spur brokers to sell them the shares requires

immediate dismissal of these claims under SLUSA. See 15 U.S.C. § 78bb(f)(A)&(B).

---

[22]    SLUSA stands for the Securities Litigation Uniform Standards Act, 112 Stat. 3227, *codified at* 15 U.S.C. § 78bb(f).

A.    The "Holder" Class Here Necessarily Includes Purchasers.

Plaintiffs do not claim that they have defined the class in a manner that excludes purchasers. Their argument is that by calling it a class of "holders" and refraining from mentioning purchases or sales of securities in the class definition itself – however central purchases are to their allegations – they have imposed blinders on the Court and prevented it from determining, on its own, whether this is a case Congress intended to preempt under SLUSA. *See, e.g.*, Plaintiffs' Opp. at 81. That position, although successful with an occasional trial court, has been soundly rejected by most trial courts and by every one of the six Courts of Appeals to address it. *See* Defendants' Mem. at 42-44.[23]

As the Pennsylvania district court deciding a SLUSA challenge, in a case involving allegations virtually identical to those asserted here, recently explained: "a preemption determination is not a 'name game'; the fact that a plaintiff calls its case a 'holder class action' does not make it so." *Dreyfus*, *slip op.* at 29. Courts "must make a[n] independent assessment of

---

[23]    Indeed, many of the courts plaintiffs cite for support did not, in fact, accept their position. Some rejected SLUSA preemption because the class definition expressly excluded anyone who had purchased or sold the security during the class period, which the class definition here does not do. *See, e.g.*, *Davis v. Kozlowski*, 2005 DNH 49 (D.N.H. Mar. 17, 2005). *Lalondriz v. USA Networks, Inc.*, 68 F. Supp. 910 (S.D.N.Y. 1986), found the case before it expressly saved under SLUSA's Delaware carve-out rule, which is unrelated to the arguments plaintiffs make here. *Green v. Ameritrade, Inc.*, 279 F.3d 590 (8th Cir. 2002) and *Norman v. Salomon Smith Barney Inc.*, 350 F. Supp. 2d 382 (S.D.N.Y. 2004), concerned allegations that defendants had not delivered the type of research services plaintiffs had contracted for – allegations unrelated to the misrepresentations in prospectuses and schemes to sell fund shares that plaintiffs assert here. Other cases cited found state law claims before them preempted by SLUSA. *See, e.g.*, *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334 (11th Cir. 2002) (SLUSA preempted because the action swept in both purchase and retention claims). In addition, it is unclear what point plaintiffs are making in attempting to distinguish *Deutschman v. Beneficial Corp.*, 761 F. Supp. 1080 (D. Del. 1991). *Deutschman* was cited in the motion to dismiss solely for the proposition that courts treat automatic reinvestments as purchases under the securities laws. Plaintiffs do not take issue with that position. Any view on SLUSA adopted by *Deutschman* was superceded by the Third Circuit's decision in *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294 (3d Cir. 2005) (ruling that SLUSA preempts state law claims brought on behalf of a class that necessarily includes purchasers and sellers).

all the allegations of the complaint." *Id.* (ruling that SLUSA preempted the state law claims asserted). If it finds that "the class definition includes persons with SLUSA-preempted claims and does not permit the court to distinguish any non-preempted subclass, SLUSA requires that the claim be dismissed." *Dabit v. Merrill Lynch Pierce Fenner & Smith*, 395 F.3d 25, 47 (2d Cir. 2005) (dismissing state law claims because the class defined as holders "failed to distinguish between those who dame to hold . . . before any relevant misrepresentation and those who purchased it in reliance on such representation," id. at 45).

The Third, Seventh, Eighth, Ninth, and Eleventh Circuits have reached the same conclusion. *See* Defendants' Mem. at 43; *see also Cape Ann Investors v. Lepone*, 296 F. Supp. 2d 4 (D. Mass. 2003) (same). As *Cape Ann Investors* and *Dabit* noted, "if a class representative could give purchasers and sellers a free ride by salting into the class a member or two with holding claims, it would be a rare case in which SLUSA applied at all." 296 F. Supp. 2d at 12 & n.6; 395 F.3d at 47 n.15 (quotation omitted).

The class defined here as those who held shares between August 2, 1999 and March 22, 2004, Compl. ¶ 163, similarly includes those who allegedly purchased in reliance on the misrepresentations or omissions in the prospectuses and/or as a result of the manipulative "shelf-space" scheme. Plaintiffs made no effort to exclude those who purchased their shares during the class period. If they had, they would have excluded themselves.

Plaintiffs cannot avoid SLUSA preemption by artfully drafting the amended complaint without expressly stating that they themselves, as well as many members of the class, purchased and held shares during the class period. Congress did not leave SLUSA preemption in the hands of savvy plaintiffs and their counsel. Savvy litigation maneuvers are what drove Congress to enact SLUSA in the first place. *See* 112 Stat. 3227 § 2(2) (explaining that SLUSA was enacted

in response to the shift "from Federal to State courts" of "a number of securities class action lawsuits"). Thus, even assuming SLUSA does not preempt actions brought by pure holder classes, SLUSA assuredly preempts the state law claims here because plaintiffs and many members of the class are not pure holders. They are purchasers. And if the allegations are to be taken as true, they are purchasers who were misled or manipulated into buying shares by the very misconduct plaintiffs complain of.

Whether SLUSA also preempts state law claims coinciding with securities transactions when the plaintiff class does not include purchasers or sellers – *i.e.* pure holder claims – is a separate question, currently pending before the United States Supreme Court. The Supreme Court granted *certiorari* to review a different part of the Second Circuit's decision in *Dabit* – its decision that two breach of contract claims were not preempted by SLUSA because the plaintiff class for those claims did not include purchasers or sellers. *See* 2005 U.S. LEXIS 5414 (Sept. 27, 2005). Here, in light of plaintiffs' own purchases, and their class definition, it is unnecessary for this Court to reach that question to find these state law claims preempted.

Plaintiffs, however, are mistaken in claiming that *Kircher v. Putnam Funds Trust*, 403 F.3d 478 (7th Cir. 2005), did not reach this question. Plaintiffs' Opp. at 83. The complaint in *Kircher* did not, as plaintiffs assert, contend that the arbitrageurs reaped profits from plaintiff's purchases; it contended that arbitrageurs harmed them as holders. *Kircher* expressly held that the class in one of the consolidated cases did not include purchasers or sellers, *id.* at 483, and ruled that SLUSA preempted the state law claims anyway because the misconduct alleged coincided with securities transactions. 403 F.3d at 484 ("plaintiffs' effort to define non-purchaser-non-seller class is designed to evade PSLRA . . . . It is the very sort of maneuver that SLUSA is designed to prevent") (instructing the district court to dismiss the plaintiff's state-law

claims on remand). Thus, *Kircher* provides an additional basis for dismissing the state law claims here, because the misconduct alleged coincides with sales of fund shares regardless of the membership of the class.

**B.    The Allegations Here Include Misrepresentations, Omissions and Manipulative Schemes Involving the Purchase and Sale of Securities.**

**1.    Share Value And Purchase**

Plaintiffs' *ipse dixit* defense of their allegations as outside SLUSA on the ground that they are unrelated to misrepresentations of the value of securities and to purchases of securities, Plaintiffs' Opp. at 84, is wholly at odds with the complaint they filed. In their complaint, dozens of paragraphs allege that material facts were not disclosed to investors, in prospectuses, other sales literature or otherwise. *See, e.g.,* Compl. ¶¶ 2, 3, 12, 16, 75, 84, 102, 103, 113, 114, 115, 123, 133, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 167; *see also* Defendants' Mem. at 40-41. Defendants are alleged not to have disclosed charges and fees that lower the return on class members' investments – *i.e.*, facts related to the *value* of the securities. *Id.* Additional paragraphs reiterate the same allegations by likening defendants to those discussed by the SEC. *See* Compl. ¶¶ 9, 11, 13, 115, 120, 121, 117, 118, 119, 120, 121; Mem. 41.

More than 20 paragraphs in plaintiffs' complaint allege that defendants were engaged in a manipulative scheme to pay brokers "to push Columbia Funds on unwitting investors." *See, e.g.,* Compl. ¶¶2, 3, 4, 75, 76, 77, 80, 81, 82, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 98, 99, 101, 103, 114, 115, 133, 137, 138, 147, 153. The scheme is alleged to have induced investors to purchase fund shares "regardless of the Funds' investment quality relative to other investment alternatives." *See, e.g.,* Compl. ¶ 114. In other words, plaintiffs allege that investors were

manipulated into purchasing fund shares on the mistaken belief that the quality – *i.e., value* – of the investment was better than it was.

Thus, under each category of allegation, investors are alleged to have been deceived as to the value of fund shares. More important, the alleged misconduct is asserted to be aimed at, and to result in, purchases of fund shares. The allegations, therefore, coincide with a purchase of securities within the meaning of SLUSA.

### 2.    Damages

Even if plaintiffs *were* forgoing damages generated by their purchases of securities and seeking instead only damages generated by retention of the securities, that would not avoid SLUSA. *See Dabit*, 395 F.3d at 45 ("a plaintiff who . . . forswears *damages* from the purchase and seeks only 'holding damages' has still run afoul of SLUSA"). SLUSA provides that claims alleging fraud in connection with the purchase or sale of securities are preempted. 15 U.S.C. § 78bb(f)(1)(A)&(B). It is not limited to "claims seeking damages specifically traceable to the initial purchase." *Dabit*, 395 F.3d at 45; *accord Dreyfus, slip op.* at 29 ("SLUSA's preemption language is not limited to cases involving damages that were suffered as a result of the purchase or sale of securities.").

Here, however, plaintiffs are in fact seeking compensation for the difference in the value of the securities they purchased and the value of the securities plaintiffs claim were represented – *i.e.*, securities for which expenses would not be incurred for excessive fees and commissions. *That* is the compensation plaintiffs have requested, and it arises – if at all – from the plaintiffs' purchase of misrepresented securities and/or plaintiffs' manipulation into purchasing these securities.[24] In addition, any fees and commissions paid to encourage sales of fund shares and

---

[24]    That the alleged diminution of value occurred after purchase, while plaintiffs held their shares, does not change anything. In every case of an investor purchasing a security based on

any excess commissions charged for portfolio sales, which plaintiffs request, are costs which were generated in connection with the purchase and sale of securities – fund shares or securities held by the funds.

### 3.    Sister Courts

All three district courts that have addressed these shelf-space excessive fee and commission allegations have ruled that they are preempted by SLUSA. *Lord Abbett*, dismissed similar excessive fee and commission state law claims against mutual fund defendants under SLUSA, after finding that the "gravamen" of the complaint was that the funds "made improper, undisclosed, and excessive payments to brokers to induce them to aggressively market the Funds" which harmed shareholders but boosted the defendants' management fees. 2005 WL 2090517, at *19. The court found the state law claims within SLUSA because: (1) for this scheme to work and cause harm to plaintiffs, new investors must purchase shares, so the scheme "necessarily 'coincides' with the purchase or sale of securities;" (2) the complaint alleged "material misrepresentations or omission[s] 'disseminated to the public in a medium upon which a reasonable investor would rely' – prospectuses; (3) plaintiffs' relationship with defendants necessarily involves the purchase or sale of securities; and (4) the proposed class is not limited to non-purchasers and non-sellers "and, therefore, necessarily encompasses claims by investors who purchased or sold [] shares during the class period." *Id*. at 19-21.

*Franklin*, similarly dismissed equivalent state law claims under SLUSA a week later. The court found the excessive fee and commission claims preempted because the fraudulent scheme alleged could only succeed if investors purchased securities; the claims were "based, in

---

misrepresentations that hid weaknesses, the diminution of value occurs after purchase. For example, an investor buys shares of a company which has not disclosed that it is losing money. It is therefore after the investor purchases the shares, while he holds his shares, that the company declares bankruptcy and the value of his stock plummets.

part on material misrepresentations and/or omissions conveyed to the public in the funds'
prospectuses"; the scheme included relationships involving the trading of securities; and "the
fees, charges, and compensatory damages sought encompass charges incurred in connection with
the purchase of securities." 2005 U.S. Dist. LEXIS, at *55-*58.

Like *Lord Abbett*, the court expressly rejected the argument plaintiffs assert here, that
drafting their complaint in terms of "holders" avoids SLUSA. The court explained that: "It is
well-established that an artfully drafted complaint cannot circumvent SLUSA preemption . . . .
Rather, a court is required to look at the essence of a complaint." 2005 WL 2090517, at *58
(relying on decisions from the Second and Eighth Circuits). Thus, the court found the state law
claims before it preempted even though the "class definition scrupulously refers only to
'holders'" because it was "drawn broadly enough . . . to include any investor who purchased
shares of the defendant funds [during the class period] and thereby became holders." *Id.* at *59.

Most recently, *Dreyfus* dismissed the same type of excessive fees and commissions state
law claims under SLUSA. The court quickly dispensed with plaintiffs' contention that defining
their class in terms of "holders" ended the analysis. *slip op.* at 28. It found the allegations "in
connection with" the purchase or sale of securities because "[w]ithout a sale of a security, the
scheme would have been an exercise in futility," because plaintiffs alleged misrepresentations or
omissions in the prospectus and other sales and marketing materials, and because plaintiffs'
recovery was connected to sales or purchases of securities in that the fees "were calculated based
on sales commissions." Thus, the court concluded that "[r]egardless of how plaintiffs have
defined their Proposed Class or worded their pleadings, their complaint is about sales and
marketing schemes that were used to steer investors into the Dreyfus Funds in order to boost
defendants' fees and charges" and are therefore "preempted by SLUSA." *Id.* at 31.

Plaintiffs' virtually identical allegations in this case are likewise "in connection with" the purchase or sale of securities and SLUSA therefore requires the state law claims to be dismissed.

## VII. NOTHING PRESENTED SUPPORTS THE STATE LAW, SECTION 34(b), 36(a) OR 48(a) COUNTS AS DIRECT CLAIMS AND NO DEFENSE IS OFFERED FOR FAILING TO MAKE A PRESUIT DEMAND FOR THE SECTION 215 COUNT.

### A. The Cases Plaintiffs Cite Do Not Supports Their Argument That All These Counts Are Properly Asserted As Direct Claims.

It appears to be undisputed that Rule 23.1 questions as to whether an ICA claim may be brought directly or derivatively, and when demand may be excused, are resolved by looking to the law of the state in which the fund is organized. Plaintiffs' Opp. at 50; *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991). It also appears to be undisputed that the applicable law is that of Massachusetts and Oregon – or at least that of Massachusetts. Plaintiffs' Opp. at 52.[25] And plaintiffs do not dispute that the same state's law governs whether state law claims may be brought directly or derivatively, and whether demand may be excused.

Under that undisputed, and well-settled, legal framework, plaintiffs' counts – under state law and under Sections 34(b), 36(a), and 48(a) of the ICA – alleging that defendants' misconduct resulted in the funds paying excessive fees and commissions, are derivative claims. In each count, they assert injuries directly to the funds – which are alleged to have been caused to make improper payments – which harms them indirectly as shareholders when the funds' expenses are subsequently allocated among them. *See* Defendants' Mem. at 47-49.

Plaintiffs have been unable to find any decisions that are inconsistent with that conclusion. Their reliance on a California decision applying *California* law, Plaintiffs' Opp. at 52, is beside the point because it sheds no light on Massachusetts or Oregon law, which govern.

---

[25]    Plaintiffs allege that the funds are all organized under Massachusetts law. Compl. ¶ 71. Defendants have referred the Court to public documents that indicate most are organized under Massachusetts law but some are incorporated in Oregon. Defendants' Mem. 6.

Their reliance on *Strougo* is similarly beside the point because *Strougo* applies Maryland law. In addition, *Strougo* does not stand for the proposition that growth of a mutual fund accomplished by harm to shareholders states a direct claim. *Cf.* Plaintiffs' Opp. at 53-55. Rather, *Strougo* decided that a closed-end fund offering non-transferable rights to its shareholders directly harmed those shareholders who did not exercise the rights by diluting their shares, and that *this* injury did not derive from any injury to the fund because the fund was not injured. *Strougo,* 282 F.3d at 34-35. Thus, even if *Strougo* had been decided under Massachusetts or Oregon law, it would not support plaintiffs' direct claims here which allege that the funds themselves were maneuvered into paying excessive fees and commissions, that harmed plaintiffs only when the payments were "subsequently imposed" on shareholders. Plaintiffs' Opp. at 55. Unlike the plaintiffs in *Strougo*, the injuries alleged here were to the funds and only indirectly to their shareholders.

Plaintiffs also mischaracterize the only decision applying Massachusetts law they cite on this issue, *Eaton Vance*, 380 F. Supp. 2d 222. The Southern District, applying Massachusetts law, dismissed six counts because they should have been brought as derivative claims. 380 F. Supp. 2d at 234. Those were the counts alleging excessive compensation to brokers, improper 12b-1 plans, and soft dollar compensation to brokers. *Id.* The only count the Southern District ruled could be brought directly was a claim under Section 34(b) that plaintiffs, based on alleged misrepresentations and omissions, continued to invest in the funds. *Id.* at 235 n.5. At best, therefore, the decision would support plaintiffs' 34(b) claim, *if* Section 34(b) provided a private right of action to bring suit – which it does not.

Interestingly, another sister court applied Massachusetts law a month later to conclude that all the alleged excessive fee injuries were derivative, dismissing all the direct claims

including the 34(b) count. *Franklin*, 2005 U.S. Dist. LEXIS 20106, at *24. Like the case at bar,

plaintiffs had complained about excessive advisory fees, excessive 12b-1 fees, excessive director

compensation, and payments to brokerage firms (directed brokerage, excessive commissions,

soft dollars, revenue sharing). *Id*. at *26-27. *See also Stegall*, 2005 WL 2709127, at *15-*17

(ruling, in a different context, that claims that assets of a mutual fund were wasted must be

brought derivatively under Massachusetts law).

**B.    The ICA's Recognition that Investors May Be Adversely Affected Has No Bearing On This Question.**

Confusingly, plaintiffs quote *Kamen*'s statement of the basic rule that courts may not

incorporate state law into a federal statute if it would be inconsistent with the statute, then quote

a passage from the ICA's preamble generally recognizing the conflict of interest issues that

prompted the particular regulatory choices Congress enacted, but never actually assert that

Massachusetts or Oregon law as to derivative suits runs afoul of ICA policy. Opp. 51. Rather,

they seem to suggest that this Court should interpret state law so that it does not contradict ICA

policy. *Id*.

It is a very odd proposition. Certainly, courts are expected to assume legislatures intend

to follow the constitution and to interpret statutes in a manner consistent with constitutional

dictates. But it is quite something else to suggest that *state* courts and legislatures, as they

developed general corporation law over centuries, should be assumed to have intended to follow

a specific federal statute governing only investment companies enacted in 1940 and amended at

various times thereafter. *Kamen* certainly never indicated anything along *those* lines. *Kamen*

simply recognized that there might be some state law rules that cannot be incorporated into

specific federal statutes under certain circumstances. In the absence of actual inconsistency,

however, the state rules are incorporated.

As plaintiffs apparently realize, there is no inconsistency here. Congress recognized potential conflicts of interest and "consciously chose to address the conflict-of-interest problem through the Act's independent-directors" requirement. *Burks v. Lasker*, 441 U.S. 471, 483 (1979). However, Congress enacted the ICA "against the background of existing state law." *Id.* at 412. And the "ICA embodies a congressional expectation that the independent directors would look after the interests of the investment company by exercising the authority granted to them *by state law.*" *Kamen*, 500 U.S. at 107. That authority includes the authority to control, in the first instance, which suits for recovery of an injury to the company are brought, and to ensure that the company recovers for injuries it suffers, through the states' derivative and demand rules.[26] Massachusetts' and Oregon's rules requiring injuries to the funds, such as the alleged payment of excessive fees and commissions, to be undertaken only on behalf of the funds is not inconsistent with any provision of the ICA nor with its overall policy of safeguarding investors by ensuring the presence of independent directors with all the authority granted to directors under state law.[27]

**C.    Plaintiffs' Stretched Analogies And False Policy Arguments Are Unavailing.**

Notwithstanding plaintiffs' yeoman efforts, the relationship between fund shareholders and fund advisers, trustees, *et al.* is not a contract for professional services. Plaintiffs' Opp. at 56. And the Seventh Circuit decision plaintiffs rely on did not conclude otherwise. *Baum v.*

---

[26]    Thus, *Kamen* found incorporation of state law demand rules consistent with the ICA. *Burks v. Lasker* found that state law rules conferring authority on independent directors to discontinue derivative suits not facially inconsistent with the ICA, including the authority to discontinue non-frivolous actions.

[27]    Moreover, the federal securities laws have long been recognized as establishing a carefully balanced scheme serving varied goals. Thus, courts have recognized that although a rule permitting investors to sue "serves on some level to protect investors," it may also risk "over-deterring activities related to lawful securities sales," and interfere with Congress' chosen regulatory scheme. *Pinter v. Dahl*, 486 U.S. 622, 654 n.29 (1988).

*Investors Diversified Servs., Inc.*, 409 F.2d 872 (7th Cir. 1969), analogized mutual funds to professional services in order to dispense with an entirely different, but equally imaginative, argument by class action plaintiffs who brought suit under the Clayton Act on the ground that a mutual fund share is a "commodity" within the meaning of *that* Act. *Id.* at 872. The court held that the word "commodity" in that Act "is restricted to products, merchandise or other tangible goods," and did not include shares which represent "fractional ownership in a large investment account," which provides shareholders with rights to investment services and redemption. *Id.* at 875.

Plaintiffs read too much into *Baum*'s descriptive analogy for addressing a different question altogether. The Seventh Circuit did not conclude that the trustees, officers, advisers, or distributors of mutual funds owed a contractual obligation to the funds' shareholders or that mismanagement of mutual funds imposed a distinct injury on shareholders that could be recovered through a direct suit. To the contrary, the Seventh Circuit recently noted that "a claim based on mismanagement [of a mutual fund] likely would need to be cast as a derivative action." *Kircher*, 403 F.3d at 483.[28]

Plaintiffs' appeal on policy grounds – their claim that those who have since sold shares would be denied recovery if these claims must be brought derivatively – is not only irrelevant but false. Plaintiffs' Opp. at 58. Courts will not, and cannot, set aside long-established state law governing direct and derivative suits in order to further policies of their own devise, as plaintiffs urge. It is also not true that shareholders who sold their shares are deprived of an opportunity for recovery. If they have meritorious claims that, as a result of defendants' misrepresentations and

---

[28]    Because the state law claims before it did not purport to be derivative actions, the court concluded that the gravamen of the complaint, despite the drafting, was deceit or manipulation, and ruled the claims were preempted by SLUSA. *Id.*

manipulations, they were defrauded when they sold their shares at a price diminished by allegedly excessive fees and commissions, that is a direct injury for which Congress provided a right of action.

**D.    Plaintiffs Offer No Defense For Failing To Make A Presuit Demand.**

Plaintiffs have apparently conceded that their failure to make presuit demands on the appropriate fund boards is not excused under either Massachusetts or Oregon law. They do not attempt to revive their futility claims despite more than 90 pages of opposition. In any event, Massachusetts law no longer excuses demand as futile, and Oregon does not excuse demand on these facts. *See* Defendants' Mem. at 50-53. By not complying with this prerequisite, plaintiffs have precluded themselves from maintaining the one claim they brought derivatively, under Section 215 of the IAA, and have precluded the Court from converting their direct claims under state law or Sections 34(b), 36(a), or 48(a) of the ICA, into derivative claims.

## VIII.    PLAINTIFFS DO NOT STATE COGNIZABLE CLAIMS UNDER STATE LAW.

Plaintiffs' defense of their state law claims misunderstands the challenge that has been asserted. The reason their state law counts fail to state a claim is not simply that their factual allegations are vague or missing, it is that their factual allegations undermine any contention that the elements of these claims are met under applicable state law. For example, their identifications of the plaintiffs and defendants makes clear that these defendants do not owe a fiduciary duty to these plaintiffs under applicable state law. Whether the claims are considered under Massachusetts or Oregon law, they are not available to plaintiffs.

Neither Massachusetts nor Oregon recognizes a fiduciary duty owed by directors to shareholders, or by third party subcontractors to their client's shareholders. *See* Defendants' Mem. 54-55. Plaintiffs' reliance on a district court decision from California applying California law, Plaintiffs' Opp. at 86, is unavailing. Whether or not California recognizes such claims

under these circumstances, Massachusetts and Oregon do not, and plaintiffs have been unable to provide any applicable law to support their contention otherwise.

Similarly, the SEC speeches and reports which plaintiffs' include, Plaintiffs' Opp. at 87, have no bearing. Even if the SEC had actually incorporated such an obligation and a means to redress a breach into SEC regulations – which, unlike speeches and reports, have the force of law – these would not affect Massachusetts or Oregon *state* law. The SEC is authorized under certain circumstances to supplant state law. It has *no* authority to promulgate it.

Plaintiffs' reliance on the same California case with respect to their unjust enrichment count is unavailing for the same reason. Although it is undisputed that Massachusetts and Oregon recognize a cause of action for unjust enrichment when products or services are provided and not paid for, notwithstanding the absence of a specific promise or contract, Plaintiffs' Opp. at 89, plaintiffs' allegations do not state this cause of action. Plaintiffs had a contract with the funds or with their brokers under which they paid a purchase price and were provided with shares. The terms of the purchase, provided in the prospectus, also requires them to reimburse their fund(s) for expenses. It is the funds, as they admit, which directly provided fees or other benefits to the funds' advisers and distributor, and to brokers.

Plaintiffs' attempt to shoehorn their allegations into the cause of action does a quick shuffle among the various defendants to mask facts the allegations concede. Moreover, they are unable to state, and for good reason, what benefit plaintiffs intended to confer, for which they expected payment, that they are now demanding to be paid for. The complaint makes clear that plaintiffs had no intention of providing the alleged benefits to any of the defendants, nor are these benefits for which people are ordinarily paid. Rather, plaintiffs' position is that they were defrauded and they want the money back.

That does not state a *separate legal theory* of unjust enrichment.   That is a request for the equitable relief of disgorgement of the allegedly improper fees and commissions, styled as an unjust enrichment count.   It must, therefore, be dismissed if the legal theory underlying it is dismissed.  *See Symmons v. O'Keefe*, 419 Mass. 288, 289 (1995).  Because the underlying breach of fiduciary duty claim must be dismissed, the unjust enrichment count must also.  *Id.*

## CONCLUSION

For the foregoing reasons, movants' request should be granted and all claims against them dismissed in their entirety with prejudice.

Dated:  October 31, 2005
(Corrected Date:  November 2, 2005)

Respectfully submitted,


/s/ Frances S. Cohen_____
Frances S. Cohen (BBO#542811)
DECHERT LLP
200 Clarendon Street, 27th Floor
Boston, MA 02116-5021
Phone:  (617) 728-7100
Fax:      (617) 426-6567

Michael Doluisio
Nory Miller
DECHERT LLP
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA 19103-2793
Phone:  (215) 994-4000
Fax:  (215) 994-2222

*Counsel for FleetBoston Financial
Corporation, a/k/a Bank of America
Corporation, Columbia Management
Group, Inc., Columbia Management
Advisers, Inc., Columbia Wanger Asset
Management, L.P. and Columbia Funds
Distributor, Inc.*



/s/ Brian T. O'Connor_____
Brian T. O'Connor (BBO #546767)
Giselle J. Joffre (BBO #658047)
ROPES & GRAP LLP
One International Place
Boston, MA 02110-2624
(617) 951-7000

*Attorneys for Defendants Columbia
Funds Trusts and Columbia Funds,
excluding Columbia Acorn Trust and
Columbia Acorn Funds*

/s/ Richard J. Rosensweig_____
Richard J. Rosensweig (BBO #639547)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
(617) 482-1776


Of Counsel:
Phil C. Neal, ARDC #2023369
Mark A. Rabinowitz ARDC 3122026
Dao L. Boyle ARDC #6269407
Jenny S. Kim ARDC #6277785
NEAL, GERBER & EISENGERG LLP
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
(312) 269-8000

*Attorneys for Defendant Charles P.*
*McQuaid and Ralph Wanger*


## LOCAL RULE 7.1 CERTIFICATE

I, Frances S. Cohen, counsel for Defendants *FleetBoston Financial Corporation, a/k/a Bank of America Corporation, Columbia Management Group, Inc., Columbia Management Advisers, Inc., Columbia Wanger Asset Management, L.P. and Columbia Funds Distributor, Inc.* certify that all counsel conferred in a good faith effort to resolve the issues and assent to this motion.

Dated:  November 2, 2005                     /s/ Frances S. Cohen_____
                                             Frances S. Cohen


## CERTIFICATE OF SERVICE

I, Frances S. Cohen, certify that I served a copy of the foregoing document upon all counsel by ECF and email on this 2nd day of November, 2005.

                                             /s/ Frances S. Cohen_____
                                             Frances S. Cohen