UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In Re: COLUMBIA ENTITIES LITIGATION

Civil Action No. 04cv11704(REK)

Consolidated Case Nos.:
04cv11750
04cv11760
04cv11953

**DEFENDANTS' FURTHER REPLY BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT**

Frances S. Cohen (BBO#542811)
DECHERT LLP
200 Clarendon Street, 27th Floor
Boston, MA 02116-5021
Phone: (617) 728-7100
Fax: (617) 426-6567

Michael Doluisio
Nory Miller
DECHERT LLP
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA 19103-2793
Phone: (215) 994-4000
Fax: (215) 994-2222

*Counsel for FleetBoston Financial Corporation,
a/k/a Bank of America Corporation,
Columbia Management Group, Inc.,
Columbia Management Advisers, Inc.,
Columbia Wanger Asset Management, L.P. and
Columbia Funds Distributor, Inc.
Kevin Connaughton, P. Zachary Egan, Kevin S. Jacobs,
Kenneth A. Kalina, Bruce H. Lauer, Jean Loewenberg,
Robert A. Mohn, Louis J. Mendes, Todd Narter,
Christopher Olson, Jon H. Park, Vincent P. Pietropaolo,
Joseph Turo, and Leah J. Zell*

## INTRODUCTION

Plaintiffs' attempted end-run around Congress' regulatory scheme for the securities industry is not permitted under federal or state law and should be dismissed in its entirety, with prejudice. Plaintiffs' counsel virtually conceded at the hearing that some − or many − of their claims cannot survive the motions to dismiss under the prevailing law. Plaintiffs have instead concentrated their efforts on salvaging their Section 36(b) claim. As demonstrated below, that claim also cannot be maintained.

## I.   WINNOWING DOWN THE CLAIMS

### A.   Standing

To begin with, plaintiffs do not have constitutional standing broad enough to encompass the suit they have brought. They allege ownership in only two funds, both of which are managed by Columbia Wanger Asset Management and governed by the separate Columbia Acorn Trust board of trustees, along with only four other funds.[1] Def. Mem. 14-17; Def. Reply 29-33. Because they claim no injury traceable to conduct with respect to any other funds, and because they cannot claim to be indirect beneficiaries of any relief provided to other funds, they lack Article III standing to bring claims with respect to, or on behalf of, the funds they do not own.[2]

---

[1] *See, e.g.,* May 1, 2003 Statement of Additional Information, Liberty Acorn Trust (n/k/a Columbia Acorn Trust) ("SAI") at 1, cited in the complaint and attached as Exhibit B to Columbia Defendants' Memorandum In Support of Their Motion to Dismiss ("Def. Mem.") and the chart, attached hereto as Exhibit A, previously introduced by defendants at the oral argument on this motion.

[2] Plaintiffs' claim that sharing of expenses among funds provides a sufficient basis for finding standing, at least as to derivative claims on behalf of funds they do not own, fails both legally

The lack of constitutional standing is determinative.  In addition, however, plaintiffs lack

statutory standing to bring their Section 215 claim or any other derivative claim under Rule 23.1

on behalf of funds they do not own, because Rule 23.1 expressly limits such statutory standing to

shareholders.  Def. Mem. 17; Def. Reply 36-38.  Plaintiffs' lack of constitutional and statutory

standing is not an inadequacy they can cure by amendment.  Therefore, all claims with respect to

funds plaintiffs do not own should be dismissed with prejudice.

### B.    State Law Claims

Substantive law precludes the remaining state law claims.  Plaintiffs have not avoided

SLUSA's express preemption of state law securities claims by using the word "holders,"

because they did not limit the plaintiff class to those who only held, and did not buy or sell, fund

shares during the class period.  Indeed, plaintiffs themselves purchased fund shares during the

class period.  And their definition of the putative class – as "all persons" who held shares in an

almost five-year period – necessarily includes many who purchased shares during that time.  All

six Courts of Appeals that have addressed whether SLUSA preempts claims brought on behalf of

"holders," which necessarily include purchasers or sellers among the holders, have ruled that

such claims are preempted.  Def. Mem. 42-44; Def. Reply 38-42.  Not surprisingly, each of the

district courts that have decided this question in the recent spate of cases with virtually identical

complaints has reached the same conclusion.  (These cases are shown on the chart previously

_____

and factually.  Even if plaintiffs had, in fact, alleged that all 81 funds shared expenses, plaintiffs
would still benefit only from the share attributable to the fund(s) they own and therefore have
standing to sue only on behalf of the two funds in which they invested.  Here, however, the
factual predicate is absent.  Plaintiffs have not alleged that the funds shared expenses.  Rather,
the Columbia Acorn funds are separate, as demonstrated in the SAI they cite, and the expenses
paid by each fund are already known, as plaintiffs themselves allege.  Compl. ¶¶ 158-160.

introduced at the oral argument, attached as Exhibit B). This is not an insufficiency plaintiffs can cure by repleading a different class definition because plaintiffs themselves satisfy any purchaser-seller requirement – if SLUSA, in fact, includes one.[3]

Plaintiffs also have not avoided SLUSA by attempting to carve out "any allegations of deception" included in the allegations realleged in their state law counts. Compl. at 73-74. Their complaint is so thoroughly riddled with allegations that defendants failed to disclose material information in order to manipulate investors into buying fund shares, that it is unclear what they intend to "un-allege" by that description, and they have not specified. Def. Mem. 40-42, 44-46; Def. Reply 42-46. Because SLUSA's preclusion of state law actions is defined in terms of the allegations set forth in the action, 15 U.S.C. § 78bb(f)(1), and because plaintiffs' action undisputedly alleges omissions and manipulative conduct in connection with the purchase or sale of securities, SLUSA should be read to preempt plaintiffs' state law claims.

However, even if plaintiffs' attempt at artful pleading were considered successful – *i.e.*, if this Court determines that it is appropriate to disregard the extensive allegations of misrepresentations, omissions and manipulative schemes and consider solely plaintiffs' attempt

---

[3] Nor is this an area of law presently in flux. Plaintiffs' counsel was in error when he stated during the hearing that the United States Supreme Court granted *certiorari* to decide whether SLUSA reaches alleged holder actions when the holders include purchasers and sellers. The issue before the United States Supreme Court in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, No. 04-1371, is whether SLUSA reaches holder actions when the alleged class of holders does *not* include purchasers or sellers – *i.e.*, does SLUSA, which includes no provision expressly adopting a purchaser-seller limitation, nonetheless preempt claims only if they are brought by a purchaser or seller? *See* http://www.supremecourtus.gov/docket/ 04-1371.htm. This Court need not reach that issue here because, regardless of its resolution, SLUSA preempts the state law claims brought by the plaintiffs here, who themselves are purchasers.

to redefine their state law claims as claims for excessive fees and commissions – their state law claims still fail. Under Massachusetts law, which undisputedly applies to the funds in the Columbia Acorn Trust because it is organized under the laws of Massachusetts (*see* SAI at 1), excessive fee and commissions claims are corporate waste claims that must be brought derivatively, if at all. Def. Mem. 46-49; Def. Reply 46-51.

The fees and commissions, according to plaintiffs' own allegations, were paid directly by the funds, Compl. ¶113, and any right to recover, therefore, belongs to the funds.[4] Plaintiffs' lament that *ultimately* the shareholder bears the expenses simply accords them standing to bring a derivative action on behalf of the funds in which they are shareholders – *if* they comply with Massachusetts law in doing so.

Plaintiffs have failed to comply with Massachusetts law in two ways. First, they did not bring the state law counts as derivative claims. Second, they admittedly did not make the required pre-suit demand on the board before filing this suit. By statute, Massachusetts law does not excuse failure to make such a demand under any circumstances. *See* Mass. Gen. Laws. ch. 156D, § 7.42[5]; Def. Mem. 50-53; Def. Reply 51. Their failure to comply with the statutory

---

[4] Plaintiffs' bald assertion at the hearing that investment advisers owe fiduciary duties directly to shareholders is directly contrary to Massachusetts law. *See, e.g. Jernberg v. Mann*, 358 F.3d 131, 135 (1st Cir. 2004) (even a director or officer "does not occupy a fiduciary relation to individual stockholders"); *Goodwin v. Agassiz*, 293 Mass. 358, 361 (1933) ("The contention that directors also occupy the position of trustee toward individual stockholders in the corporation is plainly contrary to repeated decisions of this court and cannot be supported.").

[5] Plaintiffs' counsel's assertion at the hearing that *ING Principal Protection Funds Derivatives Litigation* did not rule that Section 7.42 applies to Massachusetts business trusts, but merely said so in *dicta*, is irreconcilable with that decision. *ING*, 369 F. Supp. 2d 163, 171 (D. Mass. 2005) (dismissing Count V on the ground "that Massachusetts courts will apply the requirement of

requirement of making a pre-suit demand cannot be cured now, and therefore renders any opportunity to replead meaningless.

Thus, plaintiffs' state law claims should be dismissed with prejudice whether they are read as based on allegations that defendants misled investors or as based on allegations that defendants induced the funds to pay excessive fees and commissions.

## C. Section 34(b), 36(a) and 48(a) of the Investment Company Act

Court after court addressing whether Sections 34(b), 36(a) and 48(a) provide a private right of action after *Alexander v. Sandoval*, 532 U.S. 275 (2001), have determined that they do not, as plaintiffs' counsel conceded at the hearing. As the First Circuit has recognized, "the Supreme Court's decision in *Sandoval* changed the legal landscape." *Bonano v. East Caribbean Airline Corp.*, 365 F.3d 81, 86 n.4 (1st Cir. 2004). Sections 34(b), 36(a) and 48(a) focus on the parties regulated rather than the individuals protected. The statute provides a remedial scheme relying on the SEC for enforcement. And the absence of any express private right of action in these sections stands in stark contrast to the express private right of action provided to enforce

---

universal, pre-suit demand to derivative actions brought on behalf of business trusts"). *ING* also ruled that other claims, filed earlier and therefore subject to prevailing Massachusetts common law before the statute became effective, must also be dismissed as failing to demonstrate futility because a majority of the trustees were considered independent under the ICA, as is true here, and "[u]nder Massachusetts law, such trustees are deemed to be independent and disinterested." *Id.* (quotation omitted). Allegations that trustees voted to approve the fees is insufficient to "excus[e] demand on them." *Id.* at 172. The futility question does not arise here because Section 7.42 applies to these claims, which were filed after its effective date. As *ING* and many other decisions demonstrate, however, plaintiffs' asserted bases for futility would not excuse demand under Massachusetts law even if the statute did not apply.

another section of the statute. Under *Sandoval*, these textual and structural points are determinative. Def. Mem. 18-25, 36-37; Def. Reply 2-11, 25.

Plaintiffs' counsel's attempt at the hearing to distinguish *Sandoval* on the ground that a different rule applies to statutes and regulations wholly misreads the Supreme Court's opinion. *Sandoval* said, to the contrary, that it was "meaningless to talk about a separate cause of action to enforce the regulations apart from the statute." 532 U.S. at 284. Rather, it explained, "private rights of action to enforce federal law must be created by Congress" and the "judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* at 286.

The question before *Sandoval* was whether a private party could bring an action with respect to conduct that was prohibited by regulation but not by the governing statute. Because the substantive provision of the statute did not outlaw the conduct at issue, the Court considered whether the provision according the agency power to adopt regulations demonstrated Congress' intent to afford a private remedy because "[s]tatutory intent on this . . . point is determinative." *Id. Sandoval* concluded that the statutory provision did not provide a private remedy because it did not focus on those protected and it provided for enforcement by the agency. *Id.* at 288-90.

Plaintiffs reliance on *Jackson v. Birmingham Bd. of Ed.*, 125 S. Ct. 1497 (2005), as having modified or overruled *Sandoval* is mystifying. *Jackson* was written by a member of the majority in *Sandoval* and did not even consider whether the statute in question, Title IX, provided a private right of action. That Title IX did provide such a right was long-settled and not before the Court. *Id.* at 1502. The question at issue was whether Title IX prohibited the conduct

at issue.  Even the broadest reading of *Jackson* cannot shed *any* light on how to determine

whether Congress intended to confer a private remedy – the issue in *Sandoval* and here.

Thus, it is hardly surprising that courts considering virtually identical complaints to

plaintiffs' have looked to *Sandoval* and have concluded that the text and structure of the

Investment Company Act does not demonstrate Congress' intention to provide private parties

with the right to enforce Sections 34(b), 36(a) or 48(a).  Because no amendment to plaintiffs'

complaint could gain for them a private right of action that Congress did not provide, these

claims should also be dismissed with prejudice.[6]

### D.    Section 215 of the Investment Advisers Act

Plaintiffs' Section 215 claim should be dismissed because it does not state a cognizable

substantive claim under the IAA.  Plaintiffs do not allege that the contracts to which Section 215

could conceivably be applied are within the provision's reach as either contracts *made* in

violation of any provision of the IAA or contracts *the performance of which involves* the

violation of the IAA.  *See* 15 U.S.C. § 80b-15(b); Def. Mem. 38-39; Def. Reply 27-28.

Plaintiffs also do not allege an underlying violation of Section 206 which applies, by its

terms, only if advisers defraud their *clients*.  Although plaintiffs include a conclusory statement

that the advisers defrauded the funds, Compl. ¶ 212, they nowhere allege that those entrusted

---

[6] In addition, even if plaintiffs *were* able to bring claims under these provisions – which they are not – their claims to recover excessive fees and commissions would have had to be brought as derivative claims after a pre-suit demand on the Columbia Acorn Trust board.  *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90 (1991) (Rule 23.1 incorporates the law of the state in which the investment company is organized as to derivative and demand requirements).  Plaintiffs' failure to comply with these requirements provides an independent basis for dismissing with prejudice.

with making decisions on behalf of the funds, their trustees, were misled, or even unaware, of the fees the funds were paying the advisers or the uses to which the fees were put. Rather, plaintiffs' allegation is that defendants failed to disclose their manipulative scheme to *investors*. *See* Compl. ¶ 214, Opp. at 73. *That* is not conduct Sections 206 and 215 reach, and therefore plaintiffs' Section 215 claim must be dismissed.

Plaintiffs' recommendation to the Court, at the hearing, of a Virginia decision – *Morris v. Wachovia Securities, Inc.*, 277 F. Supp. 2d 622 (E.D. Va. 2003) – is unavailing. Although *Morris* expanded upon the statutory text of Section 215 to reach fraud generally – as plaintiffs' urge this Court to do in defiance of Congress' express enactment – even *Morris* provides no basis to apply Section 215 *here*. To the contrary, *Morris* recognized that the duty Section 206 imposes on advisers is only to their clients. *Id.* at 644 ("the IAA creates a fiduciary duty on the part of investment advisers to exercise good faith and fully and fairly disclose all material facts to their clients"). In *Morris*, that client *was* an investor. Here, however, the client is Columbia Acorn Trust. *Morris* does not support the notion that failure to disclose material facts to the client's *shareholders* violates Section 206, much less that it would support a derivative Section 215 claim on behalf of the funds themselves.

In addition, plaintiffs' Section 215 claim must be dismissed with prejudice for the independent reason that it was brought as a derivative claim without meeting the pre-suit demand requirement.

## II. COUNT III UNDER SECTION 36(b) OF THE INVESTMENT COMPANY ACT MUST BE DISMISSED

### A. Plaintiffs Lack Statutory Standing Under Section 36(b).

Plaintiffs' Section 36(b) claim must be dismissed in its entirety because it is brought on behalf of the plaintiffs individually and not on behalf of the funds, the only recovery that the statute affords. Section 36(b) plainly provides a remedy only to a "security holder of a registered investment company *on behalf of such company*." Consequently, the Supreme Court has explained that, "the right asserted by a shareholder suing under the statute is a right of the corporation" and "any recovery obtained in a § 36(b) action will go to the company rather than the plaintiff." *Daily Income Fund v. Fox*, 464 U.S. 523, 535 n.11 (1984) (quotations omitted). The plaintiffs confuse the question of whether the procedural requirements of Federal Rule of Civil Procedure 23.1 apply – they do not – with who is entitled to recover under the statute – only the investment company. The Supreme Court made clear in *Daily Income Fund* that although Rule 23.1 demand requirements do not apply, the shareholder may sue only on behalf of the corporation. *Id.* Thus, plaintiffs' claims, which seek recovery individually and on behalf of an investor class, must be dismissed. Def. Mem. at 35.

If plaintiffs were to recast their Section 36(b) claims in an amended pleading, they only have standing – under the constitution or the statute – to bring a Section 36(b) claim on behalf of funds that they own. Def. Reply Mem. at 34-36. However, this is not a case in which the plaintiffs should be allowed to replead, even to seek recovery on behalf of the two funds in which they do own shares, because their challenge is outside the scope of Section 36(b), as discussed below.

**B.    The Complaint Fails To State A Claim On Which Relief Can Be Granted.**

Section 36(b) provides a limited private right of action for breach of "fiduciary duty *with respect to the receipt of compensation for services*." *Migdal v. Rowe Price-Fleming*, 248 F.2d 321, 328 (4th Cir. 2001), *quoting* 15 U.S.C. §80a-35(b). It "grants individual investors a private right of action only for 'breach of fiduciary duty *in respect of such compensation*.'" Id. The action may be brought only against the recipient of the challenged fees and only for actual damages limited to the amount of compensation received.

The private right of action in Section 36(b) contrasts with the broad enforcement powers conferred on the SEC under Section 36(a) for any "breach of fiduciary duty involving personal misconduct." 15 U.S.C. §80a-35(a). "Section 36(b) was enacted to address a narrow area of concern: the negotiation and enforcement of payment arrangements between the investment adviser and its fund." *In re Nuveen Fund Litigation*, 1196 U.S. Dist. LEXIS 8071 (N.D.Ill. 1996). As the Seventh Circuit Court of Appeals noted in *Green v. Fund Asset Management, L.P.*, 286 F.3d 682, 685 (2002), "the fiduciary duty imposed by §36(b) is significantly more circumscribed than common law fiduciary duty doctrines" as "demonstrated by §36(b) limitations on recovery." [7]

The focus of a Section 36(b) action is whether defendants charged "a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and

---

[7] On similar grounds, in *Fogel v. Chestnutt*, 668 F.2d 100, 111-112 (2d Cir. 1981), the Second Circuit affirmed the holding that Section 36(b) did not apply to claims that a fund adviser improperly used fund brokerage for distribution: "[t]hat §36(b) was addressed only to cases where the advisory fee was attacked as such is demonstrated by the provision in §36(b)(3) whereby any recovery is limited to the amount of compensation received."

could not have been the product of arm's length bargaining." *See Gartenberg v. Merrill Lynch Asset Management, Inc.*, 644 F.2d 923, 928 (2d Cir. 1982). In applying that standard, the Courts of Appeals have repeatedly affirmed the dismissal of claims where plaintiffs fail "to allege any facts indicating that the fees received were disproportionate to services rendered." *Krantz v. Prudential Investments Funds Management,* LLC, 305 F. 3d 140, 143 (3d Cir. 2002)(dismissing complaint). *See also Migdal*, 248 F.3d 327 (dismissing complaint for failure to allege any relationship between fees and services). Notwithstanding these requirements, the complaint, already amended once in this case, and itself a latter day refinement of the prototype complaint filed in more than a dozen similar actions filed by plaintiffs' counsel, says nothing about the relationship between the fees charged by the defendants and the services rendered other than the conclusory recitation of the *Gartenberg* standard.

Plaintiffs cannot dress up this failure to plead facts about the nature and quality of the services provided as "notice pleading" or a dispute as to whether "heightened pleading" is required by *Gartenberg*. See Def. Mem. 12-13. Irrespective of the liberal pleading permitted by Rule 8, plaintiffs have failed to plead the basic facts that would put defendants on notice of their claim, such as facts relating to the nature and quality of services provided, to the adviser's level of profit, or to comparable fees charged to other funds, among others. *Id.* *See Gartenberg*, 694 F.2d at 929-930.

As this Court has held, "[m]odern notions of 'notice pleading' notwithstanding, a plaintiff is 'required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some applicable legal theory'". *Cuddy v. City of*

*Boston*, 765 F. Supp. 775, 776-77 (D. Mass. 1991), *quoting Gooley v. Mobil Oil Corp.*, 851 F. 2d 513, 517 (1st Cir. 1988). "[W]here a plaintiff alleges that a mutual fund charged excessive fees, "a complaint must state more than a legal conclusion that a fee is excessive in order to survive a motion to dismiss." *Yameen v. Eaton Vance Distributors, Inc.*, 2005 WL2709116 (D. Mass. Oct. 14, 2005). In *Migdal* the Court of Appeals affirmed dismissal in precisely these circumstances, because the complaint failed "to address in any way the relationship between the fees that the advisers received and the services which they provided in return."

The gist of the complaint is that defendants used wrongful distribution practices. To bring the claim within Section 36(b) and the *Gartenberg* standard, the plaintiffs allege that the defendants used improper distribution practices to increase assets under management, thereby increasing the management fees and, purportedly creating benefits for the adviser that were not shared with the fund. Opp. at 16 and Complaint at ¶195. This argument, however, which simply states that distribution practices increased assets and thereby increased fees, fails to explain why fees thereby were excessive in relation to services. Indeed, assets under management may grow, with a concomitant increase in fees, in a variety of circumstances. What plaintiffs fail to explain is what is the factual basis for the claim that the fee charged was so "disproportionately large that it bears no reasonable relationship to services rendered and could not have been the product of arm's length bargaining."

Indeed, plaintiffs were investors in funds that expressly provided advisory fee reductions -- known as "breakpoints" -- at pre-determined thresholds as assets under management increased. Each of the funds owned by plaintiffs had breakpoints at which advisory fees were reduced, as a

percentage of net assets, once assets under management reached certain thresholds. Def. Reply Mem. at 19, fn. 13. The plaintiffs do not allege why such advisory fee reductions at increased levels of assets under management did not represent an appropriate sharing of economies of scale. Instead, plaintiffs assert that the issue of breakpoints "is not part of the record and is, in any event, a factual issue not appropriate for a motion to dismiss." Opp. at 161, n.13. In fact, the official fund disclosure documents which show the breakpoints, the statements of additional information to the prospectuses, referenced throughout the complaint, are, indeed, "properly before the Court" on this motion to dismiss. *Bedale v. State Street Bank & Trust Company*, 137 F.3d 12, 17 (1st Cir. 2001). In deciding a motion to dismiss, courts may consider "undisputed documents alleged or referenced in the complaint." Id., The complaint fails to allege any facts to support a claim that the breakpoints were not a satisfactory method of allocating economies of scale or did not account for the sharing of economies of scale as assets under management grew.

More fundamentally, the complaint, which alleges virtually nothing about the nature and quality of the services provided, presents only one half of the *Gartenberg* equation. The plaintiffs allege that advisory fees increased with the growth in funds, but do not allege any factual basis for the claim that the fees were disproportionate to services. Thus, at oral argument, plaintiffs referred to ¶129 of their complaint as alleging specific facts relating to economies of scale. That paragraph, however, alleges only that although net assets increased at a time when the net asset value of fund shares declined, the ratio of expenses to net assets increased slightly from 2.33% in 2000 to 2.45% in 2003. Complaint, ¶129. That allegation is

wholly irrelevant to whether shareholders received the benefit of economies of scale or to the

nature and quality of services provided.[8]

In precisely these circumstances, courts have dismissed for failure to state a claim under

Section 36(b). In *Migdal*, dismissal was warranted because: "Plaintiffs ha[d] failed to allege any

facts pertinent to this relationship between fees and services. Specifically, while plaintiffs have

challenged the fees that defendants charged, they have failed to allege sufficient facts about the

services that defendants offered in return for those fees." Id. *See also Krantz v. Prudential*

*Investments Funds LLC*, 305 F.3d 140, 143 (3d. Cir. 2002) (affirming dismissal on the ground

that plaintiff failed to allege any facts to show that fees received were disproportionate to

services rendered). In *In re Eaton Vance Mutual Funds Fee Litigation*, 2005 U.S. Dist. LEXIS

15731, at *42-43 (S.D.N.Y. 2005), the court dismissed an earlier version of the prototype

complaint on precisely these grounds: "allegations that defendants authorized improper 12b-1

fees, soft dollar payments, and commissions to brokers are insufficient to allege a claim under

---

[8] Not surprisingly, plaintiffs have cherry-picked a single fund to make even this limited
presentation. Plaintiffs do not use data from either of the two funds owned by plaintiffs
(Columbia Acorn Fund and Columbia Acorn Select Fund), but instead use data from The
Columbia Acorn International Select Fund ("International"), which none of the plaintiffs owns.
International is a small fund, with $43.4 million in net assets as of December 31, 2003, compared
to Columbia Acorn Fund, which had $11.2 *billion* in net assets at that time. *See* December 31,
2003 Columbia Acorn Funds Annual Report ("Annual Report") at 52. The annual reports,
referenced throughout the Complaint, are also "part of the record" on this motion to dismiss. A
copy of the relevant pages are attached as Exhibit C. Unlike the funds that the plaintiffs own,
International does not have advisory fee breakpoints. *See* SAI at 46. Moreover, while the NAV
of International decreased, the NAV of both funds owned by plaintiffs *increased*. *Compare*
Annual Report at 58, 61, 62. Finally, plaintiffs never establish that the ratio of expenses to net
assets, which may include expenses beyond the scope of this litigation and not controlled by the
adviser or its affiliates, is an appropriate indicator of disproportionate advisory fee levels relative
to services provided.

§36(b), which addresses only the negotiation and enforcement of payment arrangements . . . not whether investment advisers acted improperly in the use of the funds." *Accord In re Davis Selected Mutual Funds Litigation*, 2005 U.S. Dist. LEXIS 23203.

The two sets of cases plaintiffs rely on to defend their 36(b) claim are either insufficient or irrelevant. The two decisions denying motions to dismiss similar complaints filed by plaintiffs' counsel against other fund families[9] are contrary to the far more persuasive reasoning of the Second, Third and Fourth Circuits and the text of the statute itself. *See* Def. Rep. Mem. at 11-16. The second line of cases is entirely distinguishable from this case. In those cases, the complaints were sustained because they included specific allegations about the disproportionate relationship between fees charged and services provided.

Thus, in *Strigliabotti v. Franklin Resources, Inc.*, 2005 U.S. Dist. LEXIS 9625 (N.D. Cal. 2005), the Court noted the following allegations in the complaint: (1) "defendants charge plaintiffs much higher fees than other clients for equivalent advisory services" – the complaint "offers an example of the lower fee schedule utilized in a contract with New York State" and (2) the funds had grown in size from $2 billion in assets in 1983 to $300 billion in assets in 2003, while the nature of the services rendered has not changed, resulting in disproportionately large advisory fees." *Id.*, at *12. In *Strigliabotti*, the excess profits were alleged to result not only from purportedly improper marketing practices, but also from "Defendants' ability to provide the

---

[9] *See In re AllianceBernstein Mutual Fund Excessive Fee Litigation*, 2005 WL 2677753 (S.D.N.Y. 2005) and *In re Dreyfus Mutual Funds Fee Litigation*, 2005 U.S. Dist. LEXIS 29152 (W.D. Pa. 2005).

identical investment advisory services they provide Plaintiffs to other clients at little or no additional costs."

In finding these allegations sufficient, the Court specifically distinguished *Migdal*, "where the plaintiffs alleged only half of the equation (facts about the high fees but no facts about the services)". *Id.* at *12-13. The complaint, the court found, alleged specific facts about the services provided:

> Unlike the allegations in both *Migdal* and *Krantz*, the complaint specifically describes the disproportionate relationship between these services and the fees charged according to the *Gartenberg* factors.

*Id.* at *12-13. (citations omitted).

Similarly, in *Jones v. Harris Associates, L.P.*, 2005 WL 831801, at * 1 (N.D.Ill. 2005), the plaintiffs alleged that: "[i]n 2003, the fund complex paid approximately $104.8 million more than it paid in 1993 for the same services from Harris, an almost 43-fold increase"; that Harris charged lower fees to other clients for services identical to the funds; and that "technological improvements within the industry and savings from economies of scale allow Harris to render the service in question at a significantly lower cost than was previously possible, making the gap between the value of Harris's services and the price paid by the fund complex even greater." In light of these allegations, the Court found that "the complaint does not solely advance legal conclusions or contentions devoid of factual content specifically attributable to the relationship between Harris and the funds in which the Plaintiffs invested." *Id.* at *2. Plaintiffs, here, offer this Court no basis on which to make a similar finding.

*Wicks v. Putnam*, 2005 U.S. Dist. Lexis 4892 (D. Mass. 2005) and *ING Principal*

*Protection Funds Derivative Litigation*, 369 F.Supp. 2d 163, (D. Mass. 2005), are equally

unhelpful to the plaintiffs. In *Wicks*, as the court observed, the complaint alleged that fees had

had risen while the "nature and quality of the service rendered by the defendants to the Funds has

not substantially changed"' and that the defendants gave the same advisory services to their

institutional clients for substantially lower fees or no fees at all.[10]

Similarly, *in ING*, the court allowed the claim to stand, because the plaintiffs alleged

sufficient facts to state a claim that the fees are so disproportionately large that they bear no

reasonable relationship to services rendered.   The complaint alleged that the defendants charged

the plaintiffs' funds higher fees than other clients for equivalent services. *Id.* at 168-69.

Although the court allowed the claim regarding the advisory fees to stand, the court dismissed

the claim with regard to the distribution fees, charged under a 12b-1 plan, because the plaintiffs

made "no comparison" between the sales-related services "actually provided" and the

distribution fees: "plaintiffs must also allege that the distribution fees are disproportionate and

unrelated to the sales-related services actually provided when shares of the funds were marketed

and sold to the general public."

---

[10] A copy of the *Wicks* complaint is included in the appendix in support of the motion to dismiss. The complaint includes specific allegations concerning the fees charged to institutional clients (¶8, p.3) and the differential treatment of "Y" shares, a class of shares for institutional investors within the same funds (¶48, p.13).  Moreover, the overall look and feel of the *Wicks* complaint is entirely different – taken as a whole the allegations pertain to the relationship between fees and services and not to purportedly improper distribution practices.

Most courts since *Gartenberg* have required plaintiffs to plead a specific factual predicate to meet the requirement under section 36(b) to allege that defendants charged "a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Gartenberg*, 644 F.2d at 928. The complaint , which alleges only that defendants received fees increased allegedly by wrongful distribution practices, does not allege any facts about the nature and quality of services provided, or about the relationship, disproportionate or otherwise, between fess and services. At most, the plaintiffs have alleged that the defendants, in the words of the *Eaton Vance* court, dismissing a similar, prototype complaint concerns "whether investment advisers acted improperly in the use of the funds", and not the negotiation and enforcement of fee in relation to services. 380 F. Supp. 2d at 237.

## CONCLUSION

For the reasons set forth above, and in defendants' prior memoranda, the complaint should be dismissed in all respects and plaintiffs denied leave to further replead their claims.

**Dated:  November 30, 2005**

/s/ Frances S. Cohen
Frances S. Cohen (BBO#542811)
DECHERT LLP
200 Clarendon Street, 27th Floor
Boston, MA 02116-5021
Phone:  (617) 728-7100
Fax:      (617) 426-6567

Michael Doluisio
Nory Miller
DECHERT LLP
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA 19103-2793
Phone:  (215) 994-4000
Fax: (215) 994-2222

*Counsel for FleetBoston Financial
Corporation a/k/a Bank of America
Corporation, Columbia Management
Group, Inc., Columbia Management
Advisers, Inc., Columbia Wanger Asset
Management, L.P. and Columbia Funds
Distributor, Inc., Kevin Connaughton, P.
Zachary Egan, Kevin S. Jacobs,
Kenneth A. Kalina, Bruce H. Lauer,
Jean Loewenberg, Robert A. Mohn,
Louis J. Mendes, Todd Narter,
Christopher Olson, Jon H. Park, Vincent
P. Pietropaolo, Joseph Turo, and Leah
J. Zell*

## CERTIFICATE OF SERVICE

I, Frances S. Cohen, certify that I served a copy of the foregoing document upon all counsel by ECF filing on this 30th day of November, 2005.

/s/ Frances S. Cohen
Frances S. Cohen

**EXHIBIT A**

**EXHIBIT A TO THE CONSOLIDATED AMENDED COMPLAINT**
**The Columbia Funds**

1. **Columbia Acorn Fund**[1]
2. **Columbia Acorn Select Fund**[2]
3. **Columbia Acorn USA Fund**
4. Columbia Asset Allocation Fund
5. Columbia Balanced Fund
6. Columbia Common Stock Fund
7. Columbia Disciplined Value Fund
8. Columbia Dividend Income Fund
9. Columbia Growth & Income Fund
10. Columbia Growth Fund
11. Columbia Growth Stock Fund
12. Columbia Large Cap Core Fund
13. Columbia Large Cap Growth Fund
14. Columbia Large Company Index Fund
15. Columbia Liberty Fund
16. Columbia Mid Cap Growth Fund
17. Columbia Mid Cap Value Fund
18. Columbia Real Estate Equity Fund
19. Columbia Small Cap Fund
20. Columbia Small Cap Value Fund
21. Columbia Small Company Equity Fund
22. Columbia Small Company Index Fund
23. Columbia Strategic Investor Fund
24. Columbia Tax-Managed Aggressive Growth Fund
25. Columbia Tax-Managed Growth Fund
26. Columbia Tax-Managed Growth Fund II
27. Columbia Tax-Managed Value Fund
28. Columbia Technology Fund
29. **Columbia Thermostat Fund**
30. Columbia Utilities Fund
31. Columbia Young Investor Fund
32. **Columbia Acorn International Fund**
33. **Columbia Acorn International Select Fund**
34. Columbia Europe Fund
35. Columbia Global Equity Fund
36. Columbia International Equity Fund
37. Columbia International Stock Fund
38. Columbia Newport Asia Pacific Fund
39. Columbia Newport Japan Opportunities Fund
40. Columbia Newport Greater China Fund
41. Columbia Newport Tiger Fund
42. Columbia Contrarian Income Fund
43. Columbia Corporate Bond Fund
44. Columbia Federal Securities Fund
45. Columbia Fixed Income Securities Fund
46. Columbia Floating Rate Advantage Fund
47. Columbia Floating Rate Fund
48. Columbia High Yield Fund
49. Columbia High Yield Opportunity Fund
50. Columbia Income Fund
51. Columbia Intermediate Bond Fund
52. Columbia Intermediate Government Income Fund
53. Columbia Money Market Fund
54. Money Market Fund
55. Columbia National Municipal Bond Fund
56. Columbia Quality Plus Bond Fund
57. Columbia Short Term Bond Fund
58. Columbia Strategic Income Fund
59. Columbia US Treasury Index Fund
60. Columbia California Tax-Exempt Fund
61. Columbia Connecticut Intermediate Municipal Bond Fund
62. Columbia Connecticut Tax-Exempt Fund
63. Columbia Florida Intermediate Municipal Bond Fund
64. Columbia High Yield Municipal Fund
65. Columbia Intermediate Tax-Exempt Bond Fund
66. Columbia Managed Municipals Fund
67. Columbia Massachusetts Intermediate Municipal Bond Fund
68. Columbia Massachusetts Tax-Exempt Fund
69. Columbia Municipal Bond Fund
70. Columbia New Jersey Intermediate Municipal Bond Fund
71. Columbia New York Intermediate Municipal Bond Fund
72. Columbia New York Tax-Exempt Fund
73. Columbia Oregon Municipal Bond Fund
74. Columbia Pennsylvania Intermediate Municipal Bond Fund
75. Columbia Rhode Island Intermediate Municipal Bond Fund
76. Columbia Tax-Exempt Fund
77. Columbia Tax-Exempt Insured Fund
78. Columbia Small Cap Growth Fund
79. Columbia European Thematic Equity Fund
80. Columbia Global Thematic Equity Fund
81. Columbia Daily Income Company Fund

---

[1] Plaintiffs Paula Slicker, Jean S.B. Simmonds and R.L. Simmonds allegedly held fund shares during the Class Period.
[2] Plaintiffs Joan Cohen and Gene F. Osburn allegedly held fund shares during the Class Period.

**Note:** Bold, red type denotes funds advised by Columbia Wanger Asset Management, L.P. Those funds are series of the Columbia Acorn Trust.

**EXHIBIT B**

# MUTUAL FUND CASES SINCE JUNE 2005

| Case | Private Right - §34(b) §36(a)? | Direct/ Derivative | SLUSA Preemption? | Pleaded basis to excuse demand? |
|---|---|---|---|---|
| *In re Davis Selected Mutual Funds Litig.*, 2005 WL 2509732 (S.D.N.Y. Oct. 11, 2005) | No | Derivative (Md. law) | - | No (Md. law) |
| *In re Dreyfus Mutual Funds Fee Litig.*, No. 04-0128 (W.D. Pa Sept. 28, 2005) | No | - | Yes | No (Md. law) |
| *In re Eaton Vance Mutual Funds Fee Litig.*, 380 F. Supp. 2d 222 (S.D.N.Y. Aug. 1, 2005) | No | Derivative (Mass. law) | Yes | No (Md. law) |
| *In re Franklin Mutual Funds Excess Fee Litig.*, 388 F. Supp. 2d 451 (D.N.J. 2005) | No | Derivative (Mass. and Md. law) | Yes | No (Md. law) |
| *In re Lord Abbett Mutual Funds Fee Litig.*, 385 F. Supp. 2d 471 (D.N.J. 2005) | No | Direct due to one particular injury | Yes | - |
| *In re Alliance Bernstein Mutual Fund Excessive Fee Litig.* 2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005) | - | Derivative (Mass. Law) | - | No (Mass. law) |
| *Dull v. Arch*, 2005 WL 1799270 (N.D. Ill. July 27, 2005) | No | - | - | - |
| *Hamilton v. Allen* 2005 WL 2660356 (E.D.Pa. Oct. 14, 2005) | No | Derivative (Mass. and Ohio law) | - | - |
| *Hogan v. Baker*, 2005 WL 1949476 (N.D. Tex. Aug. 12, 2005) | No | Derivative (Del. law) | - | No |
| *In re Mutual Funds Investment Litig.*, 384 F. Supp. 2d 845 (D. Md. Aug. 25, 2005) 384 F. Supp. 2d 873 (D. Md. Aug. 25, 2005) | No | - | Yes | No |
| *Jacobs v. Bremner*, 378 F. Supp. 2d 861 (N.D. Ill. July 20, 2005) | No | - | - | - |
| *Mutchka v. Harris*, 373 F. Supp. 2d 1021 (C.D. Cal. June 8, 2005) | No | Derivative (Mass. law) | - | - |
| *Stegall v. Ladner*, 2005 WL 2709127 (D. Mass. Oct. 14, 2005) | No | Derivative (Mass. Law) | - | - |
| *Yameen v. Eaton Vance Distributors, Inc.* 2005 WL 2709116 (D. Mass. Oct. 14, 2005) | No | - | - | - |

*Cases alleging improper distribution practices are printed in red.

**EXHIBIT C**

Columbia Acorn Family of Funds
>Statements of Assets and Liabilities

| DECEMBER 31, 2003 | COLUMBIA ACORN FUND | COLUMBIA ACORN INTERNATIONAL | COLUMBIA ACORN USA | COLUMBIA ACORN INTERNATIONAL SELECT | COLUMBIA ACORN SELECT |
|---|---|---|---|---|---|
| [IN THOUSANDS] | | | | | |
| **ASSETS** | | | | | |
| Investments, at Cost | $ 7,343,798 | $ 1,227,501 | $ 533,849 | $ 30,495 | $ 626,611 |
| Investment, at Value | $ 11,164,160 | $ 1,667,062 | $ 691,240 | $ 43,249 | $ 730,823 |
| Cash | 6,064 | -- | 1 | 1 | -- |
| Foreign currency (cost: Columbia Acorn Fund $5,413; Columbia Acorn International $13,096; Columbia Acorn International Select $7) | 5,405 | 13,251 | -- | 7 | -- |
| Receivable for: | | | | | |
| Investments sold | 812 | -- | 206 | -- | -- |
| Fund shares sold | 28,319 | 1,278 | 1,764 | 123 | 10,986 |
| Dividends and interest | 4,645 | 2,632 | 83 | 123 | 43 |
| Expense reimbursement due from Advisor | -- | -- | -- | 29 | -- |
| Deferred Trustees' Compensation Investments | 924 | 396 | 64 | -- | -- |
| Other assets | -- | -- | 2 | -- | 7 |
| Total Assets | 11,208,329 | 1,684,619 | 694,360 | 43,531 | 741,859 |
| **LIABILITIES** | | | | | |
| Payable for: | | | | | |
| Investments purchased | 14,534 | 2,601 | 162 | 27 | -- |
| Fund shares redeemed | 18,617 | 2,125 | 623 | 45 | 879 |
| Foreign capital gains tax | 1,515 | 813 | -- | -- | -- |
| Custodian | 58 | 58 | 2 | 6 | 1 |
| Management fee | -- | 4 | -- | -- | -- |
| 12b-1 Service & Distribution fees | 2,524 | 65 | 111 | 5 | 245 |
| Legal & audit fees | 109 | 66 | 25 | 17 | -- |
| Reports to shareholders | 282 | 53 | 23 | 14 | 22 |
| Deferred Trustees' fees | 924 | 396 | 64 | -- | 25 |
| Transfer agent fee | 884 | 103 | 74 | 8 | 65 |
| Other liabilities | 97 | 3 | 2 | 3 | 3 |
| Total Liabilities | 39,514 | 6,287 | 1,086 | 125 | 1,240 |
| **NET ASSETS** | $ 11,168,815 | $ 1,678,332 | $ 693,274 | $ 43,406 | $ 740,619 |
| **COMPOSITION OF NET ASSETS** | | | | | |
| Paid in capital | $ 7,331,293 | $ 1,462,493 | $ 548,134 | $ 68,842 | $ 630,664 |
| Undistributed net investment income (Accumulated net investment loss) | 6,955 | 16,493 | 92 | 162 | (21) |
| Accumulated net realized gain (loss) | 11,734 | (238,525) | (13,352) | (38,346) | (236) |
| Net unrealized appreciation (depreciation) on: | | | | | |
| Investments (net of unrealized PFIC gains of $1,215 for Columbia Acorn International) | 3,820,362 | 438,346 | 158,400 | 12,754 | 110,212 |
| Foreign currency transactions | (1,529) | (475) | -- | (6) | -- |
| **NET ASSETS** | $ 11,168,815 | $ 1,678,332 | $ 693,274 | $ 43,406 | $ 740,619 |
| Net asset value per share -- Class A (a) | $ 22.20 | $ 22.45 | $ 20.74 | $ 14.45 | $ 18.01 |
| (Net assets/shares) | ($1,982,260/89,282) | ($52,872/2,355) | ($89,650/4,322) | ($2,557/177) | ($264,679/14,700) |
| Maximum offering price per share -- Class A (b) (Net asset value per share/front-end sales charge) | $ 23.55 | $ 23.82 | $ 22.01 | $ 15.33 | $ 19.11 |
| | ($22.20/.9425) | ($22.45/.9425) | ($20.74/.9425) | ($14.45/.9425) | ($18.01/.9425) |
| Net asset value and offering price per share -- Class B (a) | $ 21.75 | $ 22.07 | $ 20.36 | $ 14.12 | $ 17.64 |
| (Net assets/shares) | ($1,221,931/56,168) | ($39,800/1,803) | ($66,175/3,250) | ($3,162/224) | ($118,064/6,694) |
| Net asset value and offering price per share -- Class C (a) | $ 21.75 | $ 22.06 | $ 20.36 | $ 14.14 | $ 17.64 |
| (Net assets/shares) | ($900,016/41,377) | ($22,990/1,042) | ($35,662/1,752) | ($3,691/261) | ($64,213/3,641) |
| Net asset value, offering price and redemption price per share -- Class Z | $ 22.56 | $ 22.66 | $ 21.01 | $ 14.58 | $ 18.20 |
| (Net assets/shares) | ($7,064,608/313,127) | ($1,562,670/68,955) | ($501,787/23,886) | ($33,996/2,331) | ($293,664/16,138) |

(a) Redemption price per share is equal to net asset value less any applicable contingent deferred sales charge.

(b) On sales of $50,000 or more the offering price is reduced.

See accompanying notes to financial statements.

See accompanying notes to financial statements.
1-800-922-6769

Columbia Acorn Family of Funds
>Financial Highlights

COLUMBIA ACORN FUND

| Class A Shares | YEAR ENDED DECEMBER 31, | | | |
|---|---|---|---|---|
| SELECTED DATA FOR A SHARE OUTSTANDING THROUGHOUT EACH PERIOD | 2003 | 2002 | 2001 | 2000(a) |
| NET ASSET VALUE, BEGINNING OF PERIOD | $ 15.34 | $ 17.80 | $ 17.19 | $ 17.88 |
| INCOME FROM INVESTMENT OPERATIONS | | | | |
| Net investment income (loss) (b) | (0.07) | (0.07) | (0.05) | 0.01 |
| Net realized and unrealized gain (loss) | 6.95 | (2.39) | 1.01 | 1.22 |
| Total from Investment Operations | 6.88 | (2.46) | 0.96 | 1.23 |
| LESS DISTRIBUTIONS DECLARED TO SHAREHOLDERS | | | | |
| From net investment income | -- | -- | -- | (0.06) |
| From net realized gains | (0.02) | -- | (0.35) | (1.86) |
| Total Distributions Declared to Shareholders | (0.02) | -- | (0.35) | (1.92) |
| NET ASSET VALUE, END OF PERIOD | $ 22.20 | $ 15.34 | $ 17.80 | $ 17.19 |
| Total Return (c) | 44.85% | (13.82)% | 5.56% | 7.40%(d) |
| RATIOS TO AVERAGE NET ASSETS | | | | |
| Expenses (e) | 1.33% | 1.42% | 1.42% | 1.25%(f)(g) |
| Net investment income (loss) (e) | (0.36)% | (0.45)% | (0.33)% | 0.17%(f)(g) |
| Portfolio turnover rate | 10% | 13% | 20% | 29%(d) |
| Net assets at end of period (000's) | $ 1,982,260 | $ 724,121 | $ 306,405 | $ 18,252 |

(a) Class A Shares were initially offered on October 16, 2000. Per share data reflects activity from that date.

(b) Per share data was calculated using average shares outstanding during the period.

(c) Total return at net asset value assuming all distributions reinvested and no initial sales charge or contingent deferred sales charge.

(d) Not annualized.

(e) The benefits derived from custody fees paid indirectly had no impact.

(f) Annualized.

(g) The ratios of expenses and net investment loss to average net assets, previously reported as 1.03% and 0.39% respectively, were revised to reflect all class specific expenses in this period.

| CLASS B SHARES | YEAR ENDED DECEMBER 31, | | | |
|---|---|---|---|---|
| SELECTED DATA FOR A SHARE OUTSTANDING THROUGHOUT EACH PERIOD | 2003 | 2002 | 2001 | 2000(a) |
| NET ASSET VALUE, BEGINNING OF PERIOD | $ 15.13 | $ 17.67 | $ 17.17 | $ 17.88 |
| INCOME FROM INVESTMENT OPERATIONS | | | | |
| Net investment loss (b) | (0.18) | (0.17) | (0.16) | (0.01) |
| Net realized and unrealized gain (loss) | 6.82 | (2.37) | 1.01 | 1.22 |
| Total from Investment Operations | 6.64 | (2.54) | 0.85 | 1.21 |
| LESS DISTRIBUTIONS DECLARED TO SHAREHOLDERS | | | | |
| From net investment income | -- | -- | -- | (0.06) |
| From net realized gains | (0.02) | -- | (0.35) | (1.86) |
| Total Distributions Declared to Shareholders | (0.02) | -- | (0.35) | (1.92) |
| NET ASSET VALUE, END OF PERIOD | $ 21.75 | $ 15.13 | $ 17.67 | $ 17.17 |
| Total Return (c) | 43.89% | (14.37)% | 4.92% | 7.27%(d) |
| RATIOS TO AVERAGE NET ASSETS | | | | |
| Expenses (e) | 1.98% | 2.07% | 2.07% | 1.90%(f)(g) |
| Net investment loss (e) | (1.01)% | (1.10)% | (0.98)% | (0.48)%(f)(g) |
| Portfolio turnover rate | 10% | 13% | 20% | 29%(d) |
| Net assets at end of period (000's) | $ 1,221,931 | $ 618,727 | $ 286,422 | $ 15,951 |

(a) Class B Shares were initially offered on October 16, 2000. Per share data reflects activity from that date.

(b) Per share data was calculated using average shares outstanding during the period.

(c)  Total return at net asset value assuming all distributions reinvested and
     no initial sales charge or contingent deferred sales charge.

(d)  Not annualized.

(e)  The benefits derived from custody fees paid indirectly had no impact.

(f)  Annualized.

(g)  The ratios of expenses and net investment loss to average net assets,
     previously reported as 1.68% and (0.26)% respectively, were revised to
     reflect all class specific expenses in this period.

**Class C Shares**

| SELECTED DATA FOR A SHARE OUTSTANDING THROUGHOUT EACH PERIOD | YEAR ENDED DECEMBER 31, | | | |
|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2000(a) |
| NET ASSET VALUE, BEGINNING OF PERIOD | $  15.12 | $  17.66 | $  17.17 | $  17.88 |
| INCOME FROM INVESTMENT OPERATIONS | | | | |
| Net investment loss (b) | (0.18) | (0.17) | (0.17) | (0.01) |
| Net realized and unrealized gain (loss) | 6.83 | (2.37) | 1.01 | 1.22 |
| Total from Investment Operations | 6.65 | (2.54) | 0.84 | 1.21 |
| LESS DISTRIBUTIONS DECLARED TO SHAREHOLDERS | | | | |
| From net investment income | -- | -- | -- | (0.06) |
| From net realized gains | (0.02) | -- | (0.35) | (1.86) |
| Total Distributions Declared to Shareholders | (0.02) | -- | (0.35) | (1.92) |
| NET ASSET VALUE, END OF PERIOD | $  21.75 | $  15.12 | $  17.66 | $  17.17 |
| Total Return (c) | 43.99% | (14.38)% | 4.86% | 7.27%(d) |
| RATIOS TO AVERAGE NET ASSETS | | | | |
| Expenses (e) | 1.98% | 2.07% | 2.07% | 1.90%(f)(g) |
| Net investment loss (e) | (1.01)% | (1.10)% | (0.98)% | (0.48)%(f)(g) |
| Portfolio turnover rate | 10% | 13% | 20% | 29%(d) |
| Net assets at end of period (000's) | $ 900,016 | $ 376,024 | $ 150,727 | $  8,510 |

(a)  Class C Shares were initially offered on October 16, 2000. Per share
     data reflects activity from that date.

(b)  Per share data was calculated using average shares outstanding during
     the period.

(c)  Total return at net asset value assuming all distributions reinvested
     and no initial sales charge or contingent deferred sales charge.

(d)  Not annualized.

(e)  The benefits derived from custody fees paid indirectly had no impact.

(f)  Annualized.

(g)  The ratios of expenses and net investment loss to average net assets,
     previously reported as 1.68% and (0.26)% respectively, were revised to
     reflect all class specific expenses in this period.

1-800-922-6769
See accompanying notes to financial statements

Columbia Acorn Family of Funds
    >Financial Highlights continued

COLUMBIA ACORN SELECT

| Class A Shares | Year Ended December 31, | | | |
|---|---|---|---|---|
| SELECTED DATA FOR A SHARE OUTSTANDING THROUGHOUT EACH PERIOD | 2003 | 2002 | 2001 | 2000(a) |
| NET ASSET VALUE, BEGINNING OF PERIOD | $ 13.93 | $ 15.17 | $ 14.12 | $ 13.47 |
| INCOME FROM INVESTMENT OPERATIONS | | | | |
| Net investment loss (b) | (0.20) | (0.16) | (0.10) | (0.01) |
| Net realized and unrealized gain (loss) | 4.37 | (1.08) | 1.18 | 0.86 |
| Total from Investment Operations | 4.17 | (1.24) | 1.08 | 0.85 |
| LESS DISTRIBUTIONS DECLARED TO SHAREHOLDERS | | | | |
| From net investment income | -- | -- | -- | (0.01) |
| From net realized gains | (0.09) | -- | (0.03) | (0.19) |
| Total Distributions Declared to Shareholders | (0.09) | -- | (0.03) | (0.20) |
| NET ASSET VALUE, END OF PERIOD | $ 18.01 | $ 13.93 | $ 15.17 | $ 14.12 |
| Total Return (c) | 29.95% | (8.17)%(d) | 7.65%(d) | 6.32%(e) |
| RATIOS TO AVERAGE NET ASSETS | | | | |
| Expenses | 1.63%(f) | 1.70%(f) | 1.70% | 1.61%(f)(g)(h) |
| Net investment loss | (1.15)%(f) | (1.11)%(f) | (0.79)% | (0.62)%(f)(g)(h) |
| Reimbursement | -- | 0.10% | 0.18% | -- |
| Portfolio turnover rate | 16% | 40% | 82% | 116%(e) |
| Net assets at end of period (000's) | $264,679 | $ 31,742 | $ 11,900 | $ 3,267 |

(a)  Class A Shares were initially offered on October 16, 2000. Per share data
     reflects activity from that date.

(b)  Per share data was calculated using average shares outstanding during the
     period.

(c)  Total return at net asset value assuming all distributions reinvested
     and no initial sales charge or contingent deferred sales charge.

(d)  Had the Advisor not reimbursed a portion of expenses, total return would
     have been reduced.

(e)  Not annualized.

(f)  The benefits derived from custody fees paid indirectly had no impact.

(g)  Annualized.

(h)  The ratios of expenses and net investment loss to average net assets,
     previously reported as 0.76% and 0.23% respectively, were revised to
     reflect all class specific expenses in this period.

| Class B Shares | YEAR ENDED DECEMBER 31, | | | |
|---|---|---|---|---|
| SELECTED DATA FOR A SHARE OUTSTANDING THROUGHOUT EACH PERIOD | 2003 | 2002 | 2001 | 2000(a) |
| NET ASSET VALUE, BEGINNING OF PERIOD | 13.73 | $ 15.05 | $ 14.10 | $ 13.47 |
| INCOME FROM INVESTMENT OPERATIONS | | | | |
| Net investment loss (b) | (0.29) | (0.25) | (0.20) | (0.01) |
| Net realized and unrealized gain (loss) | 4.29 | (1.07) | 1.18 | 0.84 |
| Total from Investment Operations | 4.00 | (1.32) | 0.98 | 0.83 |
| LESS DISTRIBUTIONS DECLARED TO SHAREHOLDERS | | | | |
| From net investment income | -- | -- | -- | (0.01) |
| From net realized gains | (0.09) | -- | (0.03) | (0.19) |
| Total Distributions Declared to Shareholders | (0.09) | -- | (0.03) | (0.20) |

| | | | | |
|---|---|---|---|---|
| NET ASSET VALUE, END OF PERIOD | $ 17.64 | $ 13.73 | $ 15.05 | $ 14.10 |
| Total Return (c) | 29.14% | (8.77)%(d) | 6.95%(d) | 6.17%(e) |
| RATIOS TO AVERAGE NET ASSETS | | | | |
| Expenses | 2.28%(f) | 2.35%(f) | 2.35% | 2.26%(f)(g)(h) |
| Net investment loss | (1.80)%(f) | (1.76)%(f) | (1.44)% | (1.27)%(f)(g)(h) |
| Reimbursement | — | 0.10% | 0.18% | — |
| Portfolio turnover rate | 16% | 40% | 82% | 116%(e) |
| Net assets at end of period (000's) | $ 118,064 | $ 33,106 | $ 13,358 | $ 4,249 |

(a)  Class B Shares were initially offered on October 16, 2000. Per share data reflects activity from that date.

(b)  Per share data was calculated using average shares outstanding during the period.

(c)  Total return at net asset value assuming all distributions reinvested and no initial sales charge or contingent deferred sales charge.

(d)  Had the Advisor not reimbursed a portion of expenses, total return would have been reduced.

(e)  Not annualized.

(f)  The benefits derived from custody fees paid indirectly had no impact.

(g)  Annualized.

(h)  The ratios of expenses and net investment loss to average net assets, previously reported as 1.41% and (0.42)% respectively, were revised to reflect all class specific expenses in this period.

1-800-922-6769
See accompanying notes to financial statements

62

COLUMBIA ACORN INTERNATIONAL SELECT

| Class A Shares | YEAR ENDED DECEMBER 31, | | | |
|---|---|---|---|---|
| SELECTED DATA FOR A SHARE OUTSTANDING THROUGHOUT EACH PERIOD | 2003 | 2002 | 2001 | 2000(a) |
| NET ASSET VALUE, BEGINNING OF PERIOD | $ 10.24 | $ 12.07 | $ 17.15 | $ 17.71 |
| INCOME FROM INVESTMENT OPERATIONS | | | | |
| Net investment income (loss) (b) | 0.03 | (0.01) | (0.09) | (0.03) |
| Net realized and unrealized gain (loss) | 4.18 | (1.82) | (4.90) | (0.53) |
| Total from Investment Operations | 4.21 | (1.83) | (4.99) | (0.56) |
| LESS DISTRIBUTIONS DECLARED TO SHAREHOLDERS | | | | |
| From net investment income | -- | -- | (0.01) | -- |
| From net realized gains | -- | -- | (0.08) | -- |
| Total Distributions Declared to Shareholders | -- | -- | (0.09) | -- |
| NET ASSET VALUE, END OF PERIOD | $ 14.45 | $ 10.24 | $ 12.07 | $ 17.15 |
| Total Return (c) | 41.11%(d) | (15.16)%(d) | (29.17)%(d) | (3.16)%(e) |
| RATIOS TO AVERAGE NET ASSETS | | | | |
| Expenses (f) | 1.80% | 1.80% | 1.80% | 1.68%(g)(h) |
| Net investment income (loss) (f) | 0.24% | (0.09)% | (0.67)% | (1.18)%(g)(h) |
| Reimbursement | 0.44% | 0.33% | 0.23% | -- |
| Portfolio turnover rate | 69% | 102% | 82% | 79%(e) |
| Net assets at end of period (000's) | $ 2,557 | $ 2,612 | $ 2,861 | $ 3,172 |

(a)   Class A Shares were initially offered on October 16, 2000. Per share data reflects activity from that date.

(b)   Per share data was calculated using average shares outstanding during the period.

(c)   Total return at net asset value assuming all distributions reinvested and no initial sales charge or contingent deferred sales charge.

(d)   Had the Advisor not reimbursed a portion of expenses, total return would have been reduced.

(e)   Not annualized.

(f)   The benefits derived from custody fees paid indirectly had no impact.

(g)   Annualized.

(h)   The ratios of expenses and net investment loss to average net assets, previously reported as 1.29% and (0.79)% respectively, were revised to reflect all class specific expenses in this period.

| Class B Shares | YEAR ENDED DECEMBER 31, | | | |
|---|---|---|---|---|
| SELECTED DATA FOR A SHARE OUTSTANDING THROUGHOUT EACH PERIOD | 2003 | 2002 | 2001 | 2000(a) |
| NET ASSET VALUE, BEGINNING OF PERIOD | $ 10.08 | $ 11.96 | $ 17.13 | $ 17.71 |
| INCOME FROM INVESTMENT OPERATIONS | | | | |
| Net investment loss (b) | (0.06) | (0.08) | (0.18) | (0.05) |
| Net realized and unrealized gain (loss) | 4.10 | (1.80) | (4.90) | (0.53) |
| Total from Investment Operations | 4.04 | (1.88) | (5.08) | (0.58) |
| LESS DISTRIBUTIONS DECLARED TO SHAREHOLDERS | | | | |
| From net investment income | -- | -- | (0.01) | -- |
| From net realized gains | -- | -- | (0.08) | -- |
| Total Distributions Declared to Shareholders | -- | -- | (0.09) | -- |
| NET ASSET VALUE, END OF PERIOD | $ 14.12 | $ 10.08 | $ 11.96 | $ 17.13 |

| Total Return (c) | 40.08%(d) | (15.72)%(d) | (29.73)%(d) | (3.27)%(e) |
|---|---|---|---|---|
| RATIOS TO AVERAGE NET ASSETS | | | | |
| Expenses (f) | 2.45% | 2.45% | 2.45% | 2.33%(g)(h) |
| Net investment loss (f) | (0.52)% | (0.74)% | (1.32)% | (1.83)%(g)(h) |
| Reimbursement | 0.44% | 0.33% | 0.23% | -- |
| Portfolio turnover rate | 69% | 102% | 82% | 79%(e) |
| Net assets at end of period (000's) | $ 3,162 | $ 1,835 | $ 2,069 | $ 1,551 |

(a)  Class B Shares were initially offered on October 16, 2000. Per share data reflects activity from that date.

(b)  Per share data was calculated using average shares outstanding during the period.

(c)  Total return at net asset value assuming all distributions reinvested and no initial sales charge or contingent deferred sales charge.

(d)  Had the Advisor not reimbursed a portion of expenses, total return would have been reduced.

(e)  Not annualized.

(f)  The benefits derived from custody fees paid indirectly had no impact.

(g)  Annualized.

(h)  The ratios of expenses and net investment loss to average net assets, previously reported as 1.94% and (1.44)% respectively, were revised to reflect all class specific expenses in this period.

| Class C Shares | YEAR ENDED DECEMBER 31, | | | |
|---|---|---|---|---|
| SELECTED DATA FOR A SHARE OUTSTANDING THROUGHOUT EACH PERIOD | 2003 | 2002 | 2001 | 2000(a) |
| NET ASSET VALUE, BEGINNING OF PERIOD | $ 10.09 | $ 11.97 | $ 17.14 | $ 17.71 |
| INCOME FROM INVESTMENT OPERATIONS | | | | |
| Net investment loss (b) | (0.05) | (0.08) | (0.18) | (0.05) |
| Net realized and unrealized gain (loss) | 4.10 | (1.80) | (4.90) | (0.52) |
| Total from Investment Operations | 4.05 | (1.88) | (5.08) | (0.57) |
| LESS DISTRIBUTIONS DECLARED TO SHAREHOLDERS | | | | |
| From net investment income | -- | -- | (0.01) | -- |
| From net realized gains | -- | -- | (0.08) | -- |
| Total Distributions Declared to Shareholders | -- | -- | (0.09) | -- |
| NET ASSET VALUE, END OF PERIOD | $ 14.14 | $ 10.09 | $ 11.97 | $ 17.14 |
| Total Return (c) | 40.14%(d) | (15.71)%(d) | (29.71)%(d) | (3.22)%(e) |
| RATIOS TO AVERAGE NET ASSETS | | | | |
| Expenses (f) | 2.45% | 2.45% | 2.45% | 2.33%(g)(h) |
| Net investment loss (f) | (0.41)% | (0.74)% | (1.32)% | (1.83)%(g)(h) |
| Reimbursement | 0.44% | 0.33% | 0.23% | -- |
| Portfolio turnover rate | 69% | 102% | 82% | 79%(e) |
| Net assets at end of period (000's) | $ 3,691 | $ 2,915 | $ 3,885 | $ 3,399 |

(a)  Class C Shares were initially offered on October 16, 2000. Per share data reflects activity from that date.

(b)  Per share data was calculated using average shares outstanding during the period.

(c)  Total return at net asset value assuming all distributions reinvested and no initial sales charge or contingent deferred sales charge.

(d)  Had the Advisor not reimbursed a portion of expenses, total return would have been reduced.

(e)  Not annualized.

(f)  The benefits derived from custody fees paid indirectly had no impact.

(g)  Annualized.

(h)  The ratios of expenses and net investment loss to average net assets,
     previously reported as 1.94% and (1.44)% respectively, were revised to
     reflect all class specific expenses in this period.

See accompanying notes to financial statements

61