UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------  x
**In re COLUMBIA ENTITIES LITIGATION**  :  CIVIL ACTION NO.: 04-11704 (MBB)
: ALL CASES
: Consolidated Case Nos.:
: 04cv11750
: 04cv11760
: 04cv11953
:
:
---------------------------------------------------------  x

# MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S MOTION FOR ATTORNEYS' FEES AND <u>REIMBURSEMENT OF EXPENSES</u>

    Nancy Freeman Gans (BBO #184540)
    MOULTON & GANS, P.C.
    55 Cleveland Road
    Wellesley, Massachusetts 02481
    (781) 235-2246

    *Counsel for Plaintiffs and the Class and Liaison Counsel*

    Jerome M. Congress
    Janine L. Pollack
    MILBERG WEISS LLP
    One Pennsylvania Plaza
    New York, New York 10119
    (212) 594-5300

    Jules Brody
    Mark Levine
    STULL STULL & BRODY
    6 East 45th Street
    New York, New York 10017
    (212) 687-7230

    *Counsel for Plaintiffs and the Class*

## **INTRODUCTION**

Counsel for Plaintiffs respectfully submit this memorandum in support of their application for an award of attorneys' fees and reimbursement of expenses. As discussed below and in the joint declaration of Plaintiffs' counsel in support of the settlement and fee application, this litigation has produced substantial benefits for the Settling Funds (as defined in Appendix A to the Stipulation and Settlement Agreement dated January 19, 2007) (also referenced herein as "the Funds") and for their securityholders who are members of the class on whose behalf this action was brought. Although the Complaint was dismissed, Defendants have acknowledged that this litigation was one of the factors that caused them to reduce the advisory fees they charge certain of the Settling Funds, resulting in savings to the Funds and their securityholders of an estimated $97.4 million from 2004 to 2007. In addition, this litigation was also a factor in Defendants' decision in 2006 to begin an ongoing program to enhance securityholder communications, including disclosures regarding revenue sharing - one of the central issues in Plaintiffs' litigation. Defendants have also agreed, as a part of this settlement, to make a $100,000 "hard dollar" contribution to research expenses, and the resulting research purchased will be available to all of the Settling Funds. Finally, Defendants agreed to, and did, bear the costs of the Notice program up to $1 million.

As compensation for the efforts that produced the above described benefits, Plaintiffs' counsel request an award of $450,000, encompassing reimbursement of out-of-pocket expenses as well as attorneys' fees. Counsels' request is eminently reasonable in light of the benefits achieved and the fact that counsel only seek to recover less than 35% of their aggregate lodestar.

**I.   BACKGROUND**

The following is a summary of the background of this litigation. Plaintiffs respectfully refer the Court to the Declaration of Mark Levine, Janine Pollack and Nancy Freeman Gans in

Support of Approval of Settlement of this Action and Application for an Award of Attorneys' Fees and Reimbursement of Expenses to Plaintiffs' Counsel ("Dec.") filed herewith for a full description of the history of the litigation and Plaintiffs' claims (Dec. Par. 10-28), the Settlement (Dec. Par. 29-36), the substantial risks and uncertainties that faced the Class (Dec. Par. 40-48), and the other factors that support the Settlement and this fee application (Dec. Par. 49-78).

### A.     History of the Litigation

In August and September, 2004, four Plaintiffs filed class action suits against the Defendants in this action, which were consolidated on March 3, 2005. The Defendants were: Columbia Management Advisors, Inc. ("CMA") and Columbia Wanger Asset Management, L.P. ("CWAM"), the advisers to the Settling Funds (the "Advisor Defendants"); Columbia Funds Distributor, Inc. (now known as Columbia Management Distributors, Inc.), the distributor of the Settling Funds (the "Distributor Defendant"); FleetBoston Financial Corporation (now known as Bank of America Corporation), and Columbia Management Group, Inc., the present and former corporate parents of the advisors and the distributor, respectively; certain individuals named as defendants by reason of their current or former employment by the advisers or distributors and certain individuals who were trustees of one or more of the Settling Funds. The Settling Funds were named only as nominal defendants.

On June 9, 2005, Plaintiffs filed a Consolidated Amended Complaint (the "Complaint") alleging Defendants' violations of the Investment Company Act of 1940 ("ICA"), the Investment Advisers Act of 1940 and state law on behalf of a class of all persons or entities who held one or more shares or other ownership units of the Columbia Funds,[1] during the period August 2, 1999

---

[1] The Columbia Funds named as nominal defendants in Plaintiffs' Complaint are the same funds identified as the "Settling Funds" in Appendix A of the Stipulation and Settlement Agreement in this action.

to March 22, 2004.  The Complaint alleged claims on behalf of both the Settling Funds and their securityholders under Section 36(b) of the ICA.

The Complaint alleged that Defendants made payments to broker-dealers to promote sales of Fund shares through their program involving revenue sharing, directed brokerage, soft dollars, and 12(b)(1) fees.  It further alleged that Defendants were failing to pass on to the Settling Funds the benefits of economies of scale as the Settling Funds grew larger.  Plaintiffs charged that such conduct by Defendants resulted in excessive advisory and distribution fees charged to the Funds.  Plaintiffs further complained that Defendants created undisclosed conflicts of interest that prevented them from acting in the securityholders' best interest, that Defendants had misled Fund investors by failing to adequately disclose such conflicts, and that the Defendant Trustees breached their fiduciary duties to manage and supervise the Funds in a way that would protect the Funds against overreaching by the Defendants.

Subsequent to commencement of the litigation, the law on a number of the key legal issues in the case developed adversely to Plaintiffs.  For example, one critical issue in the case was whether a private right of action exists under Sections 34(b) and 36(a) of the ICA.  The courts had split on this issue prior to the commencement of this action.[2]  However, after the action was filed, this issue was decided in a large number of cases, all of which ruled that no

---

[2] *Compare Fogel v. Chestnutt*, 668 F.2d 100, 110 (2d Cir. 1981) (explaining that "the cases in the courts of appeals upholding the private cause of action for damages for violation of the ICA go back to our decision in *Brown v. Bullock*, [294 F.2d 415 (2d Cir. 1961), *aff'd*, 194 F. Supp. 207, 218 (S.D.N.Y.)]."); *In re Nuveen Fund Litig.,* 94 C 360, 1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996) (private right of action exists under §34(b)) *with In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.* 272 F. Supp. 2d 243, 257-58 (S.D.N.Y. 2003) (no private right of action under §34(b)) *and Olmsted v. Pruco Life Ins. Co.,* 283 F.3d 429, 434 (2d Cir. 2002) (holding that no private right of action exists under ICA §§ 26(f) and 27(i)).  While the District Courts in footnote 3 below relied on *Olmsted* to hold that there is no private right of action under section 34(b) and 36(a), *Olmsted* never addressed those issues.

private right of action exists.[3]  Similarly, after Plaintiffs commenced this litigation, the law developed adversely with respect to their ability to successfully maintain their state law claims for breach of fiduciary duty and unjust enrichment[4] and with respect to obtaining a certification of the proposed class.[5]

---

[3] *See, e.g.*, *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 231 (S.D.N.Y. 2005) (no implied private right of action under §§ 34(b), 36(a)), *aff'd Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116-117 (2d Cir. 2007); *Gilliam v. Fidelity Management & Research Co.*, C.A. No. 04-11600-NMG (D. Mass 2006) (Report and Recommendation of Magistrate Bowler dated Sept. 18, 2006 (Docket No. 132); adopted by Judge Gertner Sept. 29, 2006) (same); *In re BlackRock Mut. Funds Fee Litig.*, 04 Civ. 164, 2006 U.S. Dist. LEXIS 13846, at *14-20 (W.D. Penn. Mar. 29, 2006) (same); *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 106-08 (D. Mass. 2006) (same); *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 845, 870 (D. Md. 2005) (same with regard to both §§ 34(b) and 36(a)).  All of these cases relied on the reasoning in *Olmsted* to hold that private rights of action did not exist under Section 34(b) and 36(a) of the ICA.

[4] Plaintiffs' ability to bring state law claims in this litigation was governed by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").  To close a perceived loophole in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress enacted SLUSA to make federal courts the exclusive venue "for most class actions involving the purchase and sale of securities."  *Green v. Ameritrade, Inc.*, 279 F.3d 590, 595 (8th Cir. 2002).  At the time Plaintiffs filed this litigation, a number of courts had held that SLUSA was not applicable to state law claims, such as those Plaintiffs alleged in their Complaint, which were brought on behalf of a class of **holders** of funds.  *See, e.g.*, *Green*, 279 F.3d at 590; *Meyer v. Putnam Int'l Voyager Fund*, 220 F.R.D. 127 (D. Mass. 2004); *Feitelberg v. Credit Suisse First Boston LLC*, C-03-3451, 2003 U.S. Dist. LEXIS 19116, at *15-16 (N.D. Ca. Oct. 21, 2003); *Gutierrez v. Deloitte & Touche, LLP*, 147 F. Supp. 2d 584, 593 (W.D. Tex. 2001).  After Plaintiffs brought this action, however, courts began to dismiss under SLUSA similar state law claims to those in Plaintiffs' Complaint.  *See, e.g.*, *In re Am. Funds Fee Litig*, CV 04-5593-GAF, 2005 U.S. Dist. LEXIS 41884, at *25-29 (C.D. Cal. Dec. 16, 2005); *BlackRock*, 2006 U.S. Dist. LEXIS 13846, at *45-50.  The U.S. Supreme Court resolved the split of authority on the issue of the scope of SLUSA's preemption by *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006).  In *Dabit*, the Supreme Court held that courts must read SLUSA broadly so that it covers not only purchasers and sellers of securities but also holders of securities where "the fraud alleged 'coincide[s]' with a securities transaction - whether by the plaintiff or by someone else." *Dabit,* 547 U.S. at 85.

[5] When Plaintiffs brought this litigation, case law existed that supported the certification of the class Plaintiffs had defined in their complaint.  *See, e.g.*, *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 98 Civ. 4318, 2000 U.S. Dist. LEXIS 13469, at *8 (S.D.N.Y. Sept. 19, 2000) (certifying class of plaintiffs who invested in one mutual fund to represent purchasers in another fund); *In re ML-Lee Acquisition Fund II L.P.*, 848 F. Supp. 527, 561 (D. Del. 1994) (certifying class upon finding that the fund securities were "substantially identical" and "marketed pursuant to the same Prospectus which [was] the subject of many of Plaintiffs' allegations of

In August, 2005, Defendants moved to dismiss Plaintiffs' Complaint and on November 30, 2005, the Court entered final judgment dismissing all claims as to all parties. On December 29, 2005, Plaintiffs filed a notice of appeal from that final judgment.

### B. The Settlement

Although Plaintiffs filed a notice of appeal, counsel for Plaintiffs were cognizant that developments in the case law subsequent to the commencement of the litigation would make it extremely difficult to be successful on appeal. They were also aware that crucial objectives of the action had been partly achieved (and that it had become even more difficult to prove that Defendants were charging excessive fees) when, in November 2004, Defendants implemented a substantial reduction in advisory fees, initially through a fee waiver and thereafter by reduction in advisory fee breakpoints, and in 2006 also began improving their disclosure to security holders with respect to their program of revenue sharing.

Although Defendants agreed to that advisory fee reduction as a part of their settlement of claims that had been brought against them by the SEC and the Attorney General of the State of New York ("NYAG"), the SEC and NYAG claims had focused on the propriety and disclosure of Defendants' market timing practices. Unlike this litigation, the SEC and NYAG did not claim, prior to their settlements, that the percentage formula at Columbia that controlled the amount of advisory fees had become excessive as a result of the Funds' growth in size. The SEC and NYAG did not allege any claim regarding revenue sharing and, with respect to fees, alleged only that the Columbia advisers had an incentive to cooperate with market timers because those advisers earned additional fees when market timers placed assets in the Columbia Funds. *See*

---

wrongdoing"). After Plaintiffs brought this litigation, however, several courts ruled that on similar facts, there was no standing to represent security holders who bought securities in other funds. *See, e.g.*, *Forsythe*, 417 F. Supp. 2d at 118-120; *Siemers v. Wells Fargo & Co.*, C-05-4518 WHA, 2006 U.S. Dist. LEXIS 81097, at * 16-22 (N.D. Cal. Oct. 24, 2006).

*New York v. Columbia Management Advisors, Inc.*, Complaint, *available at* http://www.oag.state.ny.us/press/2004/feb/feb24b_04_attach.pdf; *In re Columbia Management Advisors, Inc., and Columba Funds Distributor, Inc.*, Order Instituting Administrative and Cease-And-Desist Proceedings, *available at* http://www.sec.gov/litigation/admin/33-8534.htm. It was only in the instant litigation that an excessive fee structure and the inadequacy of Defendants' communication to security holders concerning revenue sharing were the prime focus of the litigation. By agreeing to a general rollback in advisory fees without tying that reduction to the impact of market timing practices on fees, Defendants effectively addressed the claims asserted in this litigation, even though they entered into those agreements in separate actions. *See New York v. Columbia Management Advisors, Inc.*, Settlement, *available at* http://www.oag.state.ny.us/ press/2005/feb/Columbia.pdf; *In re Columbia Management Advisors, Inc., and Columba Funds Distributor, Inc.*, Order Instituting Administrative and Cease-And-Desist Proceedings, *available at* http://www.sec.gov/litigation/admin/33-8534.htm.

Against this background, Plaintiffs' counsel entered into discussions with counsel for Defendants to explore the possibility of a settlement of the matter. Settlement negotiations occurred pursuant to the First Circuit's Civil Appeals Management Program ("CAMP"). The settlement ultimately achieved was the product of arms length negotiations between counsel for the parties before the Honorable Neil Lynch, Settlement Counsel for CAMP. Judge Lynch conducted a full day mediation with counsel for the parties, at which time the parties reached an agreement on the settlement's principal terms. The parties engaged in extensive additional negotiations before the full detailed Stipulation of Settlement was ultimately executed.

The settlement has three major components: (1) the prior implementation of "breakpoints" for many of the Settling Funds which has reduced the fees charged to those funds by an aggregate of approximately $69.6 million from 2004 to 2006, and are projected to save an

additional $27.8 million in 2007 for a projected total of $97.4 million as of the end of this year:[6] the Adviser Defendants acknowledge that those reductions resulted, in part, from Plaintiffs' litigation; (2) enhanced shareholder communications, including disclosures regarding revenue sharing payments, on the Columbia Funds' website and in their prospectuses and Statements of Additional Information: the Adviser Defendants also acknowledge that they took these steps, in part, as a result of Plaintiffs' litigation; and (3) the Adviser Defendants' agreement to contribute $100,000 as a "hard dollar" contribution to expenses for research, the benefits of which would be available to the Settling Funds.[7] *See* Dec. Par. 29-33.  The Adviser and/or the Distributor Defendants are bearing the expense of notice to the Settlement Class of the proposed settlement and fee and expense application from their own assets up to $1 million, and will not be reimbursed for those expenses by the Settling Funds.  Dec. Par. 30(c).  *See also* Joint Memorandum in Support of Joint Motion for Final Approval of Class Action Settlement at 24 n.5 (costs of Notice procedure are estimated to amount to several hundreds of thousands of dollars).

## II.  PLAINTIFFS' COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE AND SHOULD BE APPROVED BY THE COURT

Plaintiffs' counsel request that the Court award attorneys' fees and expenses based upon the substantial benefit created through their efforts in litigating and settling their claims against

---

[6] This figure also does not account for additional savings that shareholders will experience post-2007 from these breakpoints.

[7] This "hard dollar" contribution will be used, under the auspices of the Columbia Funds' Trading Committee's governance process, to purchase external research.  Affidavit of J. Kevin Connaughton ("Connaughton Aff.") at Par. 6. The "hard dollar" contribution to research expenses will benefit some or all of the Settling Funds because the Adviser Defendants pool research expenses and once external research is purchased, the research is available to all of the Columbia Funds (at the option of the respective portfolio manager(s)).  *Id.*

Defendants. The requested award is $450,000, inclusive of both fees and expenses.[8] After deducting out-of-pocket expenses of $70,103.73, the requested amount representing an award of fees is less than 35% of Plaintiffs' counsels' aggregate lodestar of $1,148,767.15 in this case. Dec. Par. 56-57. The fee will not in any way diminish the benefit resulting from the settlement, and it will be paid by the Adviser Defendants and not the Settling Funds or their security holders. *See* Stipulation and Settlement Agreement (Docket No. 99, Attachment #1) at Par. 8.1. For these reasons, and for reasons set forth below, the fee request is both reasonable and appropriate under the applicable standards, and should be approved.

### A. The Law Awards Plaintiffs' Counsel Fees Based on the Benefit Created through their Efforts

Courts have long recognized that when a party maintains a suit that results in the creation of a fund for the benefit of a class, the costs of the litigation, including an award of reasonable attorneys' fees, should be recovered from the fund created by the litigation. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980). In common fund cases, monetary recovery is obtained on behalf of a class and is then distributed to the class members. *See, e.g.*, *In re Thirteen App. Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995).

The Supreme Court has recognized the rationale for the common-fund doctrine "must logically extend, not only to litigation that confers a monetary benefit on others, but also to litigation 'which corrects or prevents an abuse which would be prejudicial to the rights and interests' of those others." *Hall v. Cole*, 412 U.S. 1, 5 n.7 (1973) (quoting *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 396 (1970)). In *Mills*, one of the questions before the Court was whether

---

[8] In Paragraph 8.1 of the Stipulation and Settlement Agreement, Defendants stated that they would not oppose an application by counsel for Plaintiffs for attorneys' fees and expenses of up to $450,000, which Defendants will pay from their own funds. Connaughton Aff. Par. 3. Importantly, the parties agreed upon the principle terms of the settlement before negotiating an agreement regarding Plaintiffs' counsels' fees. Dec. Par. 56.

Plaintiffs' suit had conferred a benefit on the class that justified an award of attorneys' fees. In concluding the lower court had erred in not awarding attorneys' fees, the *Mills* Court found that the result achieved in that case was "corporate therapeutics" that corrected or prevented an abuse and which conferred a benefit on the class, making an award of attorneys' fees appropriate. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 396 (1970).[9]

In *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518 (1st Cir. 1991), the First Circuit expressly recognized that the "common fund" doctrine includes a situation where, as here, a "common benefit" is received directly by the beneficiaries, rather than created as part of a fund established to settle the litigation before being paid out to the beneficiaries. *Weinberger,* 925 F.2d at 522 n.6 (citing *Reiser v. Del Monte Properties Co.*, 605 F.2d 1135 (9th Cir. 1979) (holding that attorneys' fees may be paid when the litigation confers a benefit on others)). In such a situation, *Weinberger* held, the beneficiaries can be required to pay plaintiffs' counsel an attorneys' fee to compensate counsel for the benefits received. *Id.*

Plaintiffs' litigation and the settlement of this action have resulted in a benefit analogous to those in the "common benefit" cases.[10] For example, the enhanced shareholder communications concerning revenue sharing payments that the litigation generated are the type of "corporate therapeutics" that *Mills* found justified an attorney fee award. *See also Reiser*, 605

---

[9] *See also Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1194 (6th Cir. 1974) (services performed by plaintiffs' attorneys can justify an award of fees even though "it may be impossible to assign an exact monetary value to the benefit"); *Kahan v. Rosenstiel*, 424 F.2d 161 (3rd Cir. 1970) (same).

[10] Even if this Court finds that this case does not squarely fit into the "common benefit" category, it still may use its equitable powers to exercise discretion over attorney fee applications. *In re Fleet Norstar Sec. Litig.*, 935 F. Supp. 99, 113 (D.R.I. 1996), *citing Weinberger,* 925 F.2d at 523. While the district court in the *Fleet* and *Weinberger* cases ultimately decided not to award attorneys' fees, the non-pecuniary and speculative "benefit" discussed in those cases is inapposite to the concrete, pecuniary benefits resulting from the litigation in this case, such as the estimated $97.4 million resulting from the implementation of breakpoints from 2004 to 2007 and the $100,000 "hard dollar" contribution to research expenses.

F.2d at 1137 (finding attorneys' fees may be awarded when litigation regarding an alleged false and misleading proxy statement resulted in withdrawal of the challenged proxy statement, postponement of shareholders' meeting and issuance of a new and improved proxy statement). Yet, unlike the typical non-pecuniary benefit in a derivative action, here most of the benefits resulting from Plaintiffs' counsels' efforts in the instant litigation and settlement do have easily quantifiable pecuniary value and can therefore also be analogized to the "common fund" cases. First, Defendants' acknowledge that Plaintiffs' litigation was a factor in their decision to implement "breakpoints" for many of the Settling Funds which will reduce the fees charged to those funds by an estimated $97.4 million as of the end of 2007. Dec. Par. 30(a). Second, Defendants agreed to contribute $100,000 as a "hard dollar" contribution to research expenses. Thus, Plaintiffs' efforts have conferred a substantial benefit to the Funds and their security holders.

   **B.**  **Plaintiffs' Counsel's Fee Request Is Reasonable in Light of the Value of the Settlement and Counsel's Request for a Fee Award Substantially Below Their Lodestar**

As described above, the amount sought by Plaintiffs' class counsel is a small fraction of the value of the benefit provided by this Settlement. Moreover, the fee award sought here -- $379,896.27 after deducting the out-of-pocket expenses of Plaintiffs' counsel from the $450,000 requested -- is far less than the cumulative lodestar for just the two Class Counsel firms (which exceeds $1 million). *See* Compendium of Counsel's Declarations In Support of Award of Attorneys' Fees and Reimbursement of Expenses, Tab A, B. That fact amply confirms the reasonableness of the fees requested.

As articulated by the First Circuit, the "lodestar/multiplier" method entails a two-step analysis. First, the Court multiplies the number of hours spent on the case by each professional's hourly rate. *See Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir. 1992); *Grendel's Den, Inc. v.*

*Larkin* 749 F.2d 945, 950-51 (1st Cir. 1984). Second, the Court adjusts the lodestar figure by applying a multiplier to reflect such factors as the risks, the contingent fee arrangement, the result obtained, and the quality of the attorneys' work. *See generally M. Berenson Co. v. Faneuil Hall MarketPlace & Faneuil Gallery, Inc.*, 671 F. Supp. 819 (D. Mass. 1987). In calculating the lodestar, "[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998).[11]

Plaintiffs' Counsel collectively devoted more than 2,300 hours of professional time to the prosecution of this case for an aggregate lodestar of $1,148,767.15. Dec. Par. 57, 63. Every effort was made to avoid unnecessary duplication and repetition of tasks. This litigation was conducted in a coordinated and well-organized fashion under the direction of Class Counsel to ensure efficiency.

Notwithstanding the risks of this litigation, the complexity of the issues, the fully contingent nature of the engagement and the skill of the attorneys in pursuing a litigation that Defendants acknowledge was a factor in their massive fee reduction, as well as obtaining a settlement in the face of a host of unfavorable rulings and the dismissal of Plaintiffs' own litigation (Dec. Par. 35-36, 40-52), Plaintiffs' Counsel are seeking a fee that is only 33.07% of their cumulative lodestar, one that results in a "negative multiplier" of .33. See Dec. Par. 56, 57. Courts have acknowledged that a negative multiplier is an indicator of the reasonableness of the fees. *See, e.g.*, *Young v. Polo Retail, LLC*, C-02-4546, 2007 U.S. Dist. LEXIS 27269 (N.D. Cal.

---

[11] Courts in this Circuit have also recognized that where "the complexities of [the] case require the particular expertise of non-local counsel," the normal billing rates of out-of-town counsel should be used, even though they may be higher than the customary rates charged in the local district. *R.I. Med. Soc'y v. Whitehouse*, 323 F. Supp. 2d 283, 292 (D.R.I. 2004) (Lagueux, S. J.) (quoting *Williams v. Poulos*, No. 94-2057 & 94-2058, 1995 U.S. App. LEXIS 10667, at *11 (1st Cir. May 12, 1995)).

Mar. 28, 2007) (negative multiplier demonstrated that a fee award of 25% of common fund was reasonable).

### C. The Limited Number Of Objections Also Supports the Requested Award

Courts have recognized that a paucity of objections from members of the class is one of the most important factors in determining an appropriate fee award. *See*, *e.g.*, *Foley v. City of Lowell, Mass.*, 948 F.2d 10, 19-20 (1st Cir. 1991); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 327 (E.D.N.Y. 1993); *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 533 (E.D. Pa. 1990).

To date, over 875,000 copies of the Notice have been mailed to Settlement Class Members. Dec. Par. 53. In addition, Class Counsel posted the Notice on their websites on June 29, 2007, and the Notice was kept on the website through at least August 27, 2007. *Id.*; *see also* Affidavit of T. Peter R. Pound Regarding Notice Procedure ("Pound Aff.") Par. 5. A copy of the Notice was also posted on the Columbia Funds website. Dec. Par. 53. A summary notice, as approved by the Court, was also published on *Business Wire* on June 29, 2007. Pound Aff. Par. 6. The deadline for submitting comments/objections was August 27, 2007. Only 14 objections have been submitted that address the Fee Application.[12] Dec. Par. 72. The 23 objections to the Fee Application and the Settlement, and the 14 objections to the Fee Application amount to less than 0.0026% and 0.0016%, respectively, of the over 875,000 individual mailed Notices sent to Class members. Dec. Par. 54. Given the low rate of objection, the foregoing statistics indicate a very favorable reaction of the Settling Funds security holders to the Fee Application.

---

[12] *See* Yared Ltr (Docket No. #110); Miller Ltr. (#111); Hoyer Ltr. (#115); Stone Ltr. (#116); Randall Ltr. (#118); Ouzsts Ltr. (#119); Arsuaga/Merheb Ltr. (#120); Semin Ltr. (#123); Moellenhoff Ltr. (#124); Monette (#125); Osei-Bonsu Ltr. (#121); Seidel Ltr.; Fuller Ltr. (the Seidel and Fuller letters are attached as Exhibit C to the Pound Aff.).

The objections to the fee request fall into two related categories. First, certain objectors argue that the fund security holders are getting either no benefit from the settlement or only the benefit of the $100,000 "hard dollar" contribution to research expenses, and thus counsel for Plaintiffs should not get their requested $450,000. *See* Seidel Ltr. (only benefit to funds is $100,000 so $450,000 in fees should not be awarded);[13] Ouzts Ltr. (same); Moellenhoff Ltr. (shareholder receives no benefit but attorneys get fee); Yared Ltr. (shareholders received no benefit from settlement); Arsuaga Ltr. (same); Miller Ltr. (same); Randall Ltr. (since Plaintiffs' counsel did not get a "financial settlement," fees should not be awarded); Fuller Ltr. (only interests served are those of Plaintiffs' counsel and Fund management); Hoyer Ltr. (since settlement not beneficial to shareholders, Plaintiffs' counsel should receive 1% of cash paid to shareholders).

---

[13] Ms. Seidel's letter also expresses a concern "about the motivation of the class representatives in filing this case," citing the Milberg Weiss indictment and David Bershad's plea agreement. Counsel for Plaintiffs have discussed this issue with Ms. Seidel and confirmed to her that: (1) this litigation was not on a list of cases that prosecutors allege involved wrongdoing, nor were these lead plaintiffs identified by prosecutors as being involved in the scheme alleged in the indictment and (2) the firm of Stull, Stull & Brody is also co-lead counsel and was not indicted or implicated in any way with any of the alleged wrongdoing. Furthermore, subsequent to the indictment, the attorneys at Milberg Weiss who have worked on the matter have not included any attorneys who have been accused of any wrongdoing. Milberg Weiss has also taken affirmative, voluntary steps to ensure that no portion of any future fee is shared with any plaintiff. These steps include a mandatory review and approval process enforced in all cases by an independent monitor, Bart Schwartz, who is a highly respected former Chief of the Criminal Division of the U.S. Attorney's Office, Southern District of New York. Courts have very recently found Ms. Seidel's concerns to be unfounded after and despite the plea agreement by David Bershad. *See, e.g., In re CMS Energy Securities Litig.*, 02 CV 72004 (E.D. Mich. Sept. 6, 2007) (appointing Milberg Weiss sole Class Settlement Counsel and approving settlement) (Declaration of John R. S. McFarlane, Ex. A); *In re Flag Telecom Holdings, Ltd. Securities Litig.*, 02 CV 3400 WCC, at 23-26 (S.D.N.Y. Sept. 4, 2007) (appointing Milberg Weiss sole Class Counsel on class certification motion) (Declaration of John R. S. McFarlane, Ex. B); *In re Beazer Homes USA Inc. Securities Litig.,* 07 CV 725 CC (N.D. Ga. Aug. 8, 2007) (Milberg Weiss appointed Co-lead Counsel under Private Securities Litigation Reform Act of 1995) (Declaration of John R. S. McFarlane, Ex. C); *In re American Express Financial Advisors Securities Litig.*, 04 CV 1773 (S.D.N.Y. Jul. 18, 2007) (appointing Milberg Weiss Class Co-Counsel for settlement purposes and approving settlement) (Declaration of John R. S. McFarlane, Ex. D).

These objections should be overruled because they ignore or misunderstand the full value of the benefits resulting from this litigation. As explained above, the benefit of the settlement and litigation is not simply the $100,000 "hard dollar" contribution to research expenses but also the role this action played in achieving an estimated $97.4 million advisory fee reduction - a clear benefit to the Settling Funds and their securityholders that must be taken into account when determining fees. As discussed above and in the Dec., although the advisory fee reductions were implemented through the mechanism of Defendants' settlement with the SEC and the NYAG, it was this action, rather than the investigations and allegations of the SEC and the NYAG, that focused principally on the problem of excessive advisory fees and inadequate communications with respect to revenue sharing. Defendants have confirmed that this action was one of the factors that lead them to implement a fee reduction and the improved revenue sharing disclosures. *See* Stipulation of Settlement §5.2(a). Moreover, Plaintiffs have also demonstrated the reasonableness of their fees under a lodestar analysis which demonstrates that Plaintiffs are recovering less than 35% of their lodestar.

Second, some objectors contend that attorneys who work on a contingent basis should not receive any fees if the litigation is not decided in the plaintiffs' favor. *See* Monette Ltr. (attorneys should assume responsibility for contingent case), Fuller Ltr. (failure to prove allegations "beyond a reasonable doubt" should preclude counsel for Plaintiffs from recovering fees), Balfour Ltr. (Plaintiffs' counsel litigated on contingent basis and if not successful, "the risk was theirs to expenses as well"). These objections should be overruled because they do not take into account that attorneys may obtain fees for their efforts in a contingent case under the "substantial benefit doctrine," which holds that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. *See Mills*, 396 U.S. at 392. The standard is not whether or not Plaintiffs' counsel were able to

"prove" their allegations or sustain their complaint, but whether their efforts in litigating the case produced a substantial benefit. As explained above, this litigation was one of the factors that resulted in an estimated $97.4 in fee reductions, a $100,000 "hard dollar" contribution to research expenses and enhanced shareholder communications.[14]

### III. PLAINTIFFS' COUNSEL SHOULD BE REIMBURSED FOR THE EXPENSES THEY INCURRED IN PROSECUTING THIS ACTION

It is well-settled that plaintiffs who have created a common fund for the benefit of a class are entitled to be reimbursed for their out-of-pocket expenses incurred in creating the fund. *See*, *e.g.*, *Mills*, 396 U.S. at 389-98; *Gottlieb v. Wiles*, 150 F.R.D. 174, 185 (D. Colo. 1993) ("An award of expenses is warranted to class counsel under the common fund doctrine."); *SmithKline*, 751 F. Supp. at 534. As set forth above, the common benefits generated by the settlement here are analogous to the creation of a "common fund," and thus the reimbursement of attorneys' expenses is appropriate.

Plaintiffs' Counsel seek reimbursement of $70,103.73 in expenses that they have advanced to prosecute this litigation. The expenses include, *inter alia*: (a) copying costs; (b) travel and lodging costs to attend Court conferences; and (c) fees of Plaintiffs' experts and consultants, all of which are the sorts of expenses for which "the paying, arms' length market" reimburses attorneys. *See In re San Juan Dupont Plaza Hotel Fire Litig.*, 111 F.3d 220, 220 (1st

---

[14] The remaining objections are simply general objections to the fee award. *See* Osei-Bonsu Ltr. (objecting to fee on basis that "according to my observations" it is unknown whether there was a conflict of interest between counsel for plaintiffs and defendants and "Columbia Entities Investment"); Stone Ltr. ("lawyers should be paid by the four plaintiffs, not Columbia Acorn shareholders"); Semin Ltr. (objecting to Plaintiffs' counsels' fee based on her not believing Plaintiffs' allegations regarding distribution practices and the resulting conflict of interest). These summary objections which are devoid of explanation or authority should be overruled. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 378 (D.D.C. 2002) (rejecting broad, unsupported objections because "[they] are of little aid to the Court."). Plaintiffs have demonstrated herein that their requested fees are fair and reasonable under applicable standards.

Cir. 1997); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992); *Miltland Raleigh-Durham v. Myers*, 840 F. Supp. 235, 239 (S.D.N.Y. 1993) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they 'were incidental and necessary to the representation of those clients.") (citation omitted). The submitted expenses were all reasonable, necessary, and directly related to the prosecution of this action.

## CONCLUSION

For the reasons set forth above, Counsel for Plaintiffs respectfully request the Court to approve the fee and expense Motion and enter an order awarding Counsel for Plaintiffs attorneys' fees and reimbursement of out-of-pocket expenses in the amount of $450,000.

Dated: September 12, 2007

        Respectfully submitted,

        **MOULTON & GANS, P.C.**

        By: __/s/ Nancy Freeman Gans_____
        Nancy Freeman Gans (BBO #184540)
        55 Cleveland Road
        Wellesley, Massachusetts 02481
        (781) 235-2246

        *Counsel for Plaintiffs and the Class*
        *and Liaison Counsel*

        Jules Brody
        Mark Levine
        **STULL STULL & BRODY**
        6 East 45th Street
        New York, New York 10017
        (212) 687-7230

        Jerome M. Congress
        Janine L. Pollack
        **MILBERG WEISS LLP**
        One Pennsylvania Plaza
        New York, New York 10119
        (212) 594-5300

        *Counsel for Plaintiffs and the Class*

## **CERTIFICATE OF SERVICE**

     I hereby certify that a true copy of the above document was served upon counsel of record for each other party via the ECF/CM system on September 12, 2007.

                                                       /s/ Nancy Freeman Gans
                                                       Nancy Freeman Gans (BBO #184540)
                                                       MOULTON & GANS, P.C.
                                                       55 Cleveland Road
                                                       Wellesley, Massachusetts 02481
                                                       (781) 235-2246