## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | x | |
| **In re COLUMBIA ENTITIES LITIGATION** | : | **CIVIL ACTION NO.: 04-11704 (MBB)** |
| | : | **ALL CASES** |
| | : | **Consolidated Case Nos.:** |
| | : | **04cv11750** |
| | : | **04cv11760** |
| | : | **04cv11953** |
| | : | |
| | : | |
| | x | |

## DECLARATION OF MARK LEVINE, JANINE POLLACK AND NANCY FREEMAN GANS IN SUPPORT OF APPROVAL OF SETTLEMENT OF THIS ACTION AND APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES TO PLAINTIFFS' COUNSEL

**MARK LEVINE, JANINE POLLACK AND NANCY FREEMAN GANS**, declare under penalty of perjury of the laws of the United States, as follows:

## I.     INTRODUCTION

1.     Mark Levine is a senior attorney at Stull, Stull & Brody, Janine Pollack is a partner at Milberg Weiss LLP and Nancy Freeman Gans is the principal of Moulton & Gans P.C. Those three firms were appointed by the Court as Counsel for the Settlement Class.

2.     This Declaration is submitted in support of Plaintiffs' application for approval of the Settlement of this action (the "Settlement") and their counsels' application for an award of $379,896.27 in attorneys' fees and $70,103.73 in unreimbursed expenses for a total of $450,000. To the extent the Court awards attorneys' fees or expenses, they will be paid by the Adviser Defendants, not the Columbia Funds themselves. Connaughton Aff. Par. 3.[1]

---

[1]  The reference to "Connaughton Aff." is to the affidavit of J. Kevin Connaughton which has been submitted to the Court in connection with the Final Approval Hearing.

3.    We have collectively actively participated in all aspects of the litigation and are fully familiar with the facts set forth herein.

4.    The proposed Settlement represents an excellent result for current Columbia Funds shareholders when all of the facts and circumstances are taken into account. When measured against the criteria for approval of class action settlements, this Settlement more than satisfies the relevant legal standards and should be approved by the Court as fair, reasonable and adequate.

5.    The deadline established by the Court for the filing of objections to the proposed Settlement expired on August 27, 2007. Over 875,000 copies of the Notice of Settlement and Final Approval Hearing (the "Notice") were mailed to Class members in accordance with the procedures set forth in the Preliminary Approval Order. Pound Aff. Par. 3, Kane Aff. Par. 2-4,[2] Krogman Aff. Par. 4-7. The Notice was made available on the Milberg Weiss and Stull, Stull & Brody websites starting on June 29, 2007. The notice was also available on the Columbia Funds website from June 29, 2007 to the present. Kane Aff. Par. 6. A summary notice, as approved by the Court, was also published on *Business Wire* on June 27, 2007. Pound Aff. Par. 6. Out of these hundreds of thousands of settlement class members who were notified of the Settlement, only 23 objections were received with respect to the settlement of this action or the award of attorneys' fees and expenses.[3] In addition, only 239 persons excluded themselves from the Class. Pound Aff. Par. 11.

---

[2] The reference to "Kane Aff." Is to the Affidavit of Joanne Kane Regarding Notice Procedure which has been submitted to the Court in connection with the Final Approval Hearing.

[3] Certain objections were not made in conformance with the procedure set by the Court. *See* Affidavit of T. Peter R. Pound Regarding Notice Procedure ("Pound Aff."), at paragraph 9, which has been submitted to the Court in connection with the Final Approval Hearing.

6.     The Settlement was obtained by Plaintiffs' Counsel working on a contingent-fee basis. By obtaining the Settlement, Plaintiffs' Counsel overcame enormous risks and logistical difficulties that made the likelihood of any success uncertain. The Settlement is the result of vigorous prosecution, investigation and settlement negotiations by tenacious counsel, and was reached despite the action having been dismissed following a decision on a motion to dismiss and scheduled for appeal.

7.     Moreover, given the substantial efforts expended by Plaintiffs' Counsel in this Action on an entirely contingent-fee basis and the result achieved for the Settlement Class, the request for attorneys' fees and reimbursement of costs and expenses is fair and reasonable. The fee requested, if granted, will only award a fraction of the loadstar incurred by counsel.

8.     In light of the foregoing and as detailed below, we respectfully submit that the Settlement achieved is worthy of final approval and that the requested attorneys' fees and expenses should be awarded in full.

9.     Legal support for approval of the Settlement and Fee Applications, in light of the factors addressed herein, is set forth in the accompanying Joint Memorandum of Law in Support of Final Approval of Settlement and in Plaintiffs' Memorandum in Support of Joint Application for An Award of Attorneys' Fees and Reimbursement of Expenses to Plaintiffs' Counsel.

## II.     HISTORY OF THE LITIGATION

10.     This litigation was commenced on August 2, 2004 in this District with the filing of the action captioned *Joan Cohen v. FleetBoston Financial Corporation et al.*, Civil Action No. 04-11704-REK, and followed by, *Gene F. Osburn v. FleetBoston Financial Corporation et al.*, Civil Action No. 04-11750-REK, on August 10, 2004, *Paula Slicker v. FleetBoston Financial Corporation et al.*, Civil Action No. 04-11760-REK, on August 11, 2004, and *Jean*

*S.B. Simmonds and R.L. Simmonds  v. FleetBoston Financial Corporation et al.*, Civil Action No. 04-11953-REK, on September 8, 2004.

11.    The Defendants in this action were: Columbia Management Advisors, Inc. ("CMA") and Columbia Wanger Asset Management, L.P. ("CWAM"), the advisers to the Settling Funds; Columbia Funds Distributor, Inc., (now known as Columbia Management Distributors, Inc.), the distributor of the Settling Funds; FleetBoston Financial Corporation, (now known as Bank of America Corporation), and Columbia Management Group, Inc., the present and former corporate parents of the advisors and the distributor, respectively; certain individuals named as defendants by reason of their current or former employment by the advisers or distributors[4]; and certain individuals who were trustees of one or more of the Settling Funds[5]. The Settling Funds were named only as nominal defendants.

12.    On September 10, 2004, Plaintiffs filed a motion for consolidation and a motion to appoint co-lead counsel and liaison counsel (the "Consolidation Motion" and "Lead Counsel Motion," respectively), and on September 24, 2004, counsel for certain of the Defendants filed an opposition to the Lead Counsel Motion.  On March 3, 2005, Plaintiffs' Consolidation Motion was granted and the Court consolidated the Action under the caption *In re Columbia Entities Litigation*, Civil Action No. 04-11704-REK.

---

[4] These employees were the following officers:  J. Kevin Connaughton, P. Zachary Egan, Kevin S. Jacobs, Kenneth A. Kalina, Bruce H. Lauer, Jean Loewenberg, Robert A. Mohn, Louis J. Mendes, Todd Narter, Christopher Olson, John H. Park, Vincent P. Pietropaolo, Joseph Turo, and Leah J. Zell.

[5] These trustees were:  Charles P. McQuaid, Ralph Wanger, Joseph R. Palombo, Margaret Eisen, Leo A. Guthart, Irving B. Jerome Kahn, Jr., Steven Kaplan, David C. Kleinman, Allan B. Muchin, Robert R. Nason, John A. Wing, Douglas A. Hacker, Janet Langford Kelly, Richard W. Lowry, Salvatore Macera, William E. Mayer, Charles R. Nelson, John J. Neuhauser, Patrick J. Simpson, Thomas E. Stitzel, Thomas C. Theobald, Anne-Lee Verville, and Richard L. Woolworth.

13.    On April 6, 2005, Plaintiffs filed a reply memorandum in further support of the Lead Counsel Motion (the "Reply Memorandum"). The Reply Memorandum addressed the issues raised by the Defendants in their September 24, 2004 opposition. On April 7, 2005, the Court held a hearing, and for the reasons outlined at the hearing, denied, without prejudice, Plaintiffs' Lead Counsel Motion.

14.    On June 9, 2005, a Consolidated Amended Complaint was filed, alleging claims under the Investment Company Act of 1940 ("ICA"), the Investment Advisors Act of 1940 ("IAA"), and common law, thereby superseding all prior complaints.

15.    Plaintiffs alleged that they were damaged because, among other things, the investment adviser fees, administrative fees, 12b-1 fees, and the director compensation received by Defendants from the various Columbia mutual funds ("Funds") were disproportionate to the value of services provided, and were not within the bounds of what would have been negotiated at arm's-length. During the relevant timeframe, compensation and fees to the Adviser and Distributor Defendants rose dramatically even though the services provided by these Defendants remained the same, and no additional benefits were provided to the Funds in return for the additional fees.

16.    Plaintiffs further alleged that a major reason for the dramatic increase in compensation to the Investment Adviser and Distributor Defendants was the growth in the size of the Funds resulting from "revenue sharing," that is, Defendants' use of Fund assets to pay brokers-dealers to promote the sale of Fund shares. Among other things, those programs included: (a) cash payments to brokers in return for the brokers' agreement to promote sales of Fund shares; (b) the directing of Fund portfolio brokerage to brokerage firms in return for agreements by the brokers to promote the shares of the Funds; and (c) "soft dollar" commission

arrangements with brokers.  These payments resulted in the growth of the Funds, which benefited the Investment Adviser and Distributor Defendants because it allowed their management fees and other asset-based fees to increase.  The aforesaid Defendants engaged in those programs in an effort to generate increased compensation even though many of those programs were in violation of SEC and NASD rules and regulations.  They engaged in such activity despite ample evidence that the increase in their compensation was not justified by any increase in the quality or nature of the services which they provided to the Funds, or by additional benefits to the Funds.  Plaintiffs further charged that Defendants misled the Funds' security holders by failing to disclose revenue sharing and other programs implemented, and the resulting conflicts of interest of the defendants and the broker/dealers that were marketing Columbia mutual funds.

17.    Plaintiffs alleged that, as a result of such conduct, Defendants are liable under §§ 34(b), 36(a), 36(b) and 48(a) of the ICA; under § 215 of the IAA for violations of IAA § 206; for unjust enrichment; and for breaches of their common law fiduciary duties to the Class.

18.    Prior to filing the initial Complaint, the Consolidated Amended Complaint and throughout the course of the litigation, Plaintiffs' counsel performed an investigation which included interviews with persons with knowledge of the conduct complained of herein and a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, advisories, press releases, media reports, news articles, academic literature, and academic studies.

## III.    THE MOTIONS TO DISMISS

### A.    Grounds for Defendants' Motions

19.    On or about August 5, 2005, all of the Defendants filed motions to dismiss.  The motions were based on various grounds.  First, all Defendants asserted that plaintiffs could not

bring claims on behalf of funds or shareholders of funds that they did not own even if they were within the same fund family. Because Plaintiffs only held shares in a few funds within the Columbia family, under Defendants' theory, they would not be able to bring claims on behalf of shareholders of the dozens of other Columbia funds. The Adviser Defendants asserted that Sections 34(b), 36(a) and 48(a) of the ICA confer no right of private action upon shareholders of mutual funds.[6] The Adviser Defendants asserted that the claim for violation of Section 36(b) did not state a claim because Plaintiffs did not adequately allege excessive fees under the criteria of *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F. 2d 923 (2d Cir. 1982).[7] With respect to the Section 36(b) claim against the Independent Trustee Defendants, those defendants asserted that no claim was stated because those defendants did not receive the fees.

20.    With respect to the claim under Section 48(a) of the ICA, Defendants also asserted that Plaintiffs did not state a claim because they did not state a claim for a primary violation of the ICA.

21.    As to the Section 215 claim under the IAA, Defendants argued that it did not state a claim because Plaintiffs did not allege that the contract itself was void.

22.    With respect to the common law claims, Defendants argued, first that such claims should be dismissed because they were preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). Even if they were not pre-empted, defendants urged that such claims and the Section 215 claim were derivative, not direct, and should be dismissed for failure to make a pre-suit demand on the boards of trustees.

---

[6] The Independent Trustee Defendants also made the same argument.

[7] The Independent Trustee Defendants also made the same argument.

23.    Defendants also sought dismissal of the breach of fiduciary duty and unjust enrichment claims because they asserted that there was no enforceable relationship between them and the shareholders of the funds.[8]

**B.    The Ruling on the Motion to Dismiss**

24.    On November 30, 2005, Judge Keeton issued a decision on the motions to dismiss.  While Judge Keeton did not rule on the assertion by Defendants that there was no private right of action for the Section 34(b) claim, he ruled that the claim was derivative and, thus, subject to the requirement that a demand on the board of directors (or trustees) be made. Judge Keeton further ruled that while Section 34(b) does not have a private right of action that is not necessarily the case for Section 36(a).  Applying Massachusetts and Oregon law, the Court determined that the Section 36(a) claim only alleges an injury to the Columbia funds and this is derivative, not direct.  Under Massachusetts law, with respect to all of the funds organized under the law of Massachusetts, demand may never be excused because of the universal demand statute.  While Judge Keeton ruled that demand would have been excused under Oregon law, that holding was moot because Judge Keeton ruled that the action could only be maintained as to those funds for which a plaintiff held stock.  All of the funds held were Massachusetts funds, thus, the claim was dismissed in full because there is no exception to the universal demand statute.[9]

25.    Judge Keeton dismissed the Section 36(b) claim because plaintiffs did not "allege that defendants themselves received compensation of any sort as required by Section 36(b)."

---

[8] The Independent Trustee Defendants also made the same argument.

[9] The Section 36(a) claim was dismissed for being redundant of the Section 36(b) claim.

The Section 48(a) claim was dismissed by Judge Keeton because the primary claims had been dismissed.

26.    Judge Keeton dismissed the IAA Section 215 claim for violation of Section 206 because plaintiffs failed to make demand, and, in any event, the claim would have been limited to a claim on behalf of the few funds held by the plaintiffs. The claims for common law breach of fiduciary duty and unjust enrichment were dismissed for the same reason.

### C.    Discovery, Investigation and Research

27.    While Plaintiffs did not have the opportunity to conduct discovery, they had prepared discovery requests and were ready to move forward on that front should they have survived a motion for dismissal. Despite the lack of formal discovery, Plaintiffs' counsel were able to conduct a substantial investigation using a combination of access to publicly available documents and interviews with witnesses with knowledge of the conduct which Plaintiffs allege to be in violation of the law. Thus, they had sufficient information to assess the settlement.

## IV.    EVALUATION OF THE SETTLEMENT

### A.    The Mediation Process

28.    Settlement was initially discussed at the mediation scheduled by the United States Court of Appeals for the First Circuit and conducted by Judge Neil Lynch on April 26, 2006. Judge Lynch helped the parties arrive at a frame-work for settlement and in many meetings with Judge Lynch that day, the sides moved closer together to resolution of the case. At the end of the full day of mediation, the parties had signed a term sheet outlining the broad principles of a settlement with the understanding that the details would need to be worked out in a formal stipulation of settlement following further negotiation.

**B.    Negotiation of the Terms of the Settlement**

29.    Following the mediation session with Judge Lynch, much additional work needed to be done.  The parties needed to bridge gaps on a number of significant issues which had not been addressed in detail at the mediation such as the scope of the release, the definition of the class and the procedures to be used to provide notice to persons whose claims would be released.  At times it seemed that those issues would hold up the settlement and in fact at times there were questions as to whether the parties would ever be able to resolve their differences. Over the course of many months, the parties conducted numerous telephonic meetings to discuss ways to iron out their differences and proposed many forms of language to one another in an attempt to resolve those issues.

30.    On or about November 19, 2006, the parties entered into a Stipulation of Settlement which provided, consistent with the settlement term sheet, the consideration of the settlement as follows:

a.    Breakpoints:    The Adviser Defendants have taken certain actions regarding "break points," *i.e.*, a reduction in the overall rate charged as advisory fees when the mutual funds advised by the Adviser Defendants reach certain levels of assets under management.  In or about October or November, 2004, the Adviser Defendants implemented certain breakpoints for many of the Settling Funds.  The Adviser Defendants acknowledge that this Action was a factor in the implementation of such breakpoints.

b.    Shareholder Communications:    The Adviser Defendants will enhance shareholder communications, including the following:  the Adviser Defendants shall post disclosures on the relevant website(s) and may make certain other public disclosures regarding third-party revenue sharing payments, including stating the range of fees paid in basis points or

appropriate financial equivalents. The Adviser Defendants acknowledge that this Action was a factor in the decision to enhance such shareholder communications.

        c.    <u>Research Expenses</u>: Since the Action was filed, the Adviser Defendants have reduced the Settling Funds' soft dollar spending from approximately $20 million per year to approximately $5 million per year. In calendar year 2007, the Adviser Defendants agree further:

        (i)    to contribute, subject to the Court approval of the Settlement, $100,000 in total as a "hard dollar" contribution to research expenses for the benefit of some or all of the Settling Funds; and

        (ii)    to confirm by letter to counsel for Named Plaintiffs that they have done so.

Defendants also agreed to pay the costs of the notice program so long as the total cost did not exceed $1 million.

31.    The institution of the break points has resulted in a significant benefit to Columbia Funds' shareholders. For example, in 2004, they resulted in a savings of approximately $15.8 million, to shareholders of Columbia Funds. Since that time, the amount of saving to Columbia Funds shareholders has increased to a level of savings of $25.7 million in 2005, $28.1 million for 2006 and a projected savings of approximately $27.8 million in 2007. Connaughton Aff. Par. 5.

32.    Similarly, the communications enhancement program has significantly improved the transparency of transactions with Columbia Funds. This program has resulted in disclosures of revenue sharing practices in 2006; particularly in terms of stating the range of fees paid in

basis points or appropriate financial equivalents. Bordewick Aff. Par. 3.[10] The revision process is scheduled to continue until June 1, 2008. *Id.* Additional enhancements include the inclusion on the Columbia Funds webpage on May 18, 2007 of "Payment to Intermediaries" section disclosing the revenue sharing activities of Defendants. *Id.* Par. 4.

33.     With respect to the $100,000 in total "hard dollar" contribution required under the settlement, that contribution will benefit some or all of the Settling Funds because the Adviser Defendants pool research expenses and once external research is purchased, the research is available to all Columbia Funds at the option of the respective portfolio managers. Connaughton Aff. Par. 6.

34.     At the time the mediation was conducted, Plaintiffs' counsel were also aware that crucial objectives of the action had been partly achieved when, in November 2004, Defendants implemented a substantial reduction in advisor fees, initially through a fee waiver and thereafter by reduction in advisory fee breakpoints. Although Defendants agreed to that advisory fee reduction as a part of their settlement of claims that had been brought against them by the SEC and the Attorney General of the State of New York ("NYAG"), the SEC and NYAG claims had focused on the propriety and disclosure of Defendants' market timing practices and not the improprieties of revenue sharing and the excessive fees resulting from it. Unlike this litigation, the SEC and NYAG did not claim, prior to their settlements, that the percentage formula at Columbia Funds that controlled the amount of advisory fees had become excessive as a result of the Funds' growth in size. Rather, as to fees, they alleged only that the Columbia advisers had an incentive to cooperate with the market timers because those advisers earned additional fees when market timers placed assets in the Columbia Funds. By agreeing to reduce advisory fees

---

[10]   The reference to "Bordewick Aff." is to the affidavit of James R. Bordewick, Jr. which has

generally, Defendants effectively addressed those claims asserted in this litigation, even though they entered into those agreements in separate actions.

35.    The Settlement was negotiated at arm's length by experienced counsel with the assistance of a skilled mediator appointed by the Court and is an excellent result considering the posture of the case.  Beyond the uncertainties and risks in litigation, especially in complex actions such as this litigation, and the inherent problems of proof under, and possible defenses to, the violations asserted in the Consolidated Amended Complaint (the "Complaint"), Plaintiffs were confronted by the difficulties of proceeding when the Complaint had already been dismissed by the District Court and numerous similar actions filed at or around the same time had been dismissed by courts in various districts around the country.[11]  The wisdom of the settlement was confirmed when the United States Court of Appeals for the Second Circuit, in *Bellikoff v. Eaton Vance Corp.,* 481 F.3d 110 (2d Cir. 2007), affirmed the dismissal of an action containing virtually identical claims to those pled in this action and held, consistent with every district court that has considered the issue, that there is no private right of action under Sections 34(b) and 36(a) and 48(a) of the ICA.   Moreover, it affirmed the dismissal of the Section 36(b)

---

been submitted to the Court in connection with the Final Approval Hearing.

[11] *See In re Eaton Vance Mut. Funds Fee Litig.,* 380 F. Supp. 2d 222, 231 (S.D.N.Y. 2005) (no private right of action for § 34(b), 36(a) and dismissing Section 36(b) claim), *aff'd Bellikoff v. Eaton Vance Corp.,* 481 F.3d 110, 116-117 (2d Cir. 2007); *In re BlackRock Mut. Funds Fee Litig.,* 04 Civ.164, 2006 U.S. Dist. LEXIS 13846, at *14-20 (W.D. Pa. Mar. 29, 2006) (no implied private right of action under §§ 34(b), 36(a)); *Forsythe v. Sun Life Fin., Inc.,* 417 F. Supp. 2d 100, 106-08 (D. Mass. 2006) (same); *In re Mut. Funds Inv. Litig.,* 384 F. Supp. 2d 845, 870 (D. Md. 2005) (same with regard to both §§ 34(b) and 36(a)); *In re AllianceBernstein Mutual Funds Excessive Fee Litig.,* 1:04-04885-SWK (S.D.N.Y. Jan. 11, 2006) (no private right of action for § 34(b), 36(a) and dismissing Section 36(b) claim); *In re Davis Selected Mutual Funds Litig.,* 1:04-cv-4186-MGC (S.D.N.Y. Nov. 11, 2005); *In re Franklin Mut. Funds Fee Litig.,* 388 F. Supp. 2d 451 (D.N.J. Sept. 9, 2005) (dismissing ICA §§ 34(b), 36(a), 36(b) and 48(a) claims and IAA and state law claims).

claim in that case and established that the threshold for sustaining such a claim was very high, particularly without the benefit of discovery.

36.     Plaintiffs' Counsel believes that Plaintiffs' claims were meritorious when filed. Subsequent to commencement of the litigation, however, as set forth in paragraph 35 above, the law on a number of the key legal issues in the case began to develop adversely to Plaintiffs. For example, the courts had previously split on the issue of whether a private right of action exists under sections 34(b) and 36(a) of the ICA prior to the commencement of this action.[12] They became increasingly aware over time that the legal landscape was becoming more difficult with respect to the law and the facts. In addition to the risks concerning liability, there also exists a serious question concerning the amount of damages that was caused by the conduct of which Plaintiffs complain.

**C.     Class Certification in Connection with the Settlement**

37.     In reaching the terms of a Settlement of this action, the parties agreed to the certification of a Settlement Class of all persons or entities who held one or more shares of any of the Settling Funds (identified in the Stipulation of Settlement) at any time during the period August 2, 1999 through May 31, 2007.

---

[12] *Compare Fogel v. Chestnutt*, 668 F.2d 100, 110 (2d Cir. 1981) (explaining that "the cases in the courts of appeals upholding the private cause of action for damages for violation of the ICA go back to our decision in *Brown v. Bullock*, [294 F.2d 415 (2d Cir. 1961), *aff'd*, 194 F. Supp. 207, 218 (S.D.N.Y.)]."); *In re Nuveen Fund Litig.*, No. 94-360, 1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996) (private right of action exists under §34(b)) *with In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.* 272 F. Supp. 2d 243, 257-58 (S.D.N.Y. 2003) (no private right of action under §34(b)) *and Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429, 434 (2d Cir. 2002) (holding that no private right of action exists under ICA §§ 26(f) and 27(i)). This Court has taken a similar position on the issues raised by this action in *Gilliam v. Fidelity Mgmt. and Research Co.*, 04-11600-NG (D. Mass. Sept. 18, 2006) (recommending the dismissal of complaint alleging violation of Sections 34(b), 36(a), 36(b) and 48(a) of the ICA and following the same approach as Judge Keeton with respect to the issue of standing to represent holders of other mutual funds).

38.     In the Court's Preliminary Approval Order, dated May 17, 2007, consistent with the agreement of the parties, Named Plaintiffs Joan Cohen, Gene F. Osburn, Paula Slicker, Jean S.B. Simmonds, and R. L. Simmonds were certified as class representatives (for settlement purposes) and counsel for the Named Plaintiffs, Moulton & Gans, P.C., Milberg Weiss & Bershad LLP (now Milberg Weiss LLP), and Stull, Stull, & Brody, were appointed as counsel for the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs request that the Court grant final certification of a Settlement Class at the Settlement hearing.

**D.      Criteria for Evaluation of the Settlement**

39.     The pertinent criteria for evaluating the fairness of a proposed Settlement of a class action in this Circuit include the following factors: the risks of establishing liability, the risks of establishing damages, the range of reasonableness of the Settlement in light of the best recovery possible and all attendant risks of litigation, the complexity, expenses and likely duration of the litigation, the stage of the proceedings, the risks of maintaining the class through trial and the reaction of the class to the Settlement.  Based on an analysis of these factors as shown below, it is clear that the Settlement before the Court is fair, reasonable and adequate and should be approved pursuant to Rule 23 of the Federal Rules of Civil Procedure.

**E.      The Risks of Establishing Liability**

40.     Litigation, such as this, which arises under the ICA and IAA and common law, generally involves complex issues of fact and law, and this case is no exception.  With respect to the claims under Sections 34(b), 36(a) and 48(a) of the ICA, it is not just the issue of alleging and proving a breach of fiduciary duty or non-disclosure or misrepresentation of a material fact that stymied Plaintiffs' efforts but the fact that, as indicated in Paragraph 35, subsequent to Plaintiffs filing this action, every court that has considered the issue, including the United States

Court of Appeals for the Second Circuit, has concluded that there is no private right of action under those statutes.

41.     Of course, the wisdom of entering into the settlement was further confirmed on March 15, 2007, when the United States Court of Appeals for the Second Circuit decided *Bellikoff v. Eaton Vance Corp.*, 481 F. 3d 110 (2d Cir. 2007), which affirmed the district court's finding that there is no private right of action under Sections 34(b), 36(a) and 48(a), affirmed the dismissal of a Section 36(b) claim for failure to "specifically allege that the fees were so disproportionately large that they bore no relationship to the services rendered," and affirmed the denial of a motion to amend the complaint. Although the *Eaton Vance* appellate decision is not binding on this Court or the Court of Appeals for the First Circuit, it would certainly be persuasive authority. When the complaint in the instant action and that in *Eaton Vance* are compared it becomes even clearer that the risk in going forward with the appeal was far outweighed by the benefits of entering into a settlement.

42.     Plaintiffs' Counsel recognizes that this action presented enormous procedural, legal, and factual difficulties upon which Defendants, even if dismissal of any of the claims had been reversed on appeal, would mount a strong defense and that there were substantial risks in proving the claims asserted. These risks strongly militate in favor of the instant Settlement.

**F.     Risks of Establishing Damages**

43.     In addition to defenses on liability, Defendants would surely have raised substantial defenses regarding damages.

44.     Although there is little guidance in terms of previous rulings on damages at trial, on the Section 36(b) claim, Plaintiffs would have to prove by how much the fees charged to shareholders of the funds for which plaintiffs had standing were excessive and beyond the value of the services rendered. It would be difficult to prove the amount by which the fees for any

particular fund exceeded a reasonable amount. That would lead to a battle of the experts who would testify at what level they believed the fees (perhaps on a fund by fund basis) were reasonable. Thus, damages on the Section 36(b) claim were subject to serious dispute.

45.     Because of the sparse track record of Section 36(b) claims, it is difficult to set forth what the formula would be for establishing damages, making the pursuit of such claims inherently risky. Common law claims for breach of fiduciary duty in the context of mutual funds are similarly subject to little guidance and thus the risk in proving damages was extraordinarily high.

46.     No matter what evidence was presented by the Plaintiffs, it is predictable that Defendants would take the position, with the Court as the fact finder on the Section 36(b) claim could have found, that the fees charged represented a reasonable profit over the costs of managing a vast empire of mutual funds considering the administrative costs and the costs of research and management and thus were not excessive.

47.     The determination of damages, like the determination of liability, is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of the Court to such expert testimony can not be predicted. Expert testimony about damages could rest on many subjective assumptions, any one of which could be rejected by the Court as speculative or unreliable and even subject to a *Daubert* challenge. Conceivably, the Court could find that there were no damages or that they were only a small fraction of the amount that Plaintiffs contended.

48.     Consequently, while Plaintiffs believe that their claims were meritorious, the fairness and reasonableness of the proposed Settlement in light of the risks, burdens and uncertainties of continued litigation is manifest.

G.    **The Range of Reasonableness of the Settlement in Light of**
**The Likely Recovery and All the Attendant Risks of Litigation**

49.    Plaintiffs believe that the evidence in this action would consist of documents and testimony which, when pieced together, would indicate a course of conduct supportive of Plaintiffs' claims. However, as described more fully throughout this Declaration, the outcome of this litigation was extremely uncertain, particularly in view of the fact that the District Court had granted the motions to dismiss and that since the filing of this action, there have been numerous decisions dismissing similar actions and very few sustaining such actions even at the pleading stage.    In view of such risks, the proposed Settlement falls well within the range of reasonableness when compared to the likely recovery from further litigation.

H.    **The Complexity, Expense and Likely Duration of the Litigation**

50.    As the preceding paragraphs have shown, this action is replete with complexity in both establishing liability and in proving damages. If any part of the dismissal of this action had been reversed on appeal, significant document discovery would need to be conducted, depositions would have to be taken, experts would have to be designated and expert discovery conducted. Defendants would likely file a motion for summary judgment which would have to be briefed and argued, a pretrial order would have to be prepared, motions *in limine* would have to be filed and argued, and a lengthy trial conducted.

51.    Moreover, whatever the outcome of trial, further appeals could be taken to the First Circuit, and perhaps even the United States Supreme Court. All of the foregoing would have extended the case and delayed the ability of either the Class or the funds to reap any benefits from the litigation for years. Settlement at this juncture avoids such delays.

**I.      The Stage of the Proceedings**

52.      The Settlement was reached after significant investigation by Plaintiffs' Counsel, the motions to dismiss were granted, a notice of appeal had been filed, a briefing schedule on the appeal had been set and Judge Lynch had been assigned to try to mediate a resolution. Accordingly, the litigation had proceeded to a juncture where the Settlement could be properly evaluated and it was determined to be in the best interests of the Class.

**J.      The Reaction of the Class to the Settlement**

53.      Notice of this proposed Settlement, in the form approved by the Court, was mailed as per the procedure approved by the Court, a summary notice published on Business Wire, and the notice made available on the websites of Columbia and two of plaintiffs' counsel, Stull, Stull & Brody and Milberg Weiss. More than 875,000 Notices were mailed by Columbia directly to shareholders. *See* Pound Aff. Par. 3; Kane Aff. Par. 2-4, Krogman Aff. Par. 4-5. For shareholders who held or hold shares in "street name," the Adviser Defendants caused copies of the Notice of Settlement to be sent to the broker-dealers who are the nominal owners of the shares. *See* Pound Aff. Par. 4; Kane Aff. Par. 5. The Adviser Defendants also made extra copies of the Notice of Settlement available to the relevant broker-dealers upon request. *See* Pound Aff. Par. 5. A summary of the Notice of Settlement was published on Business Wire. *See id.*, Par. 6. The full Notice of Settlement was posted on the Milberg Weiss LLP website, and the Stull, Stull & Brody website on June 29, 2007 and remained posted through at least August 27, 2007. *See id.*, Par. 7; *see also,* Kane Par. 6. The notice was also posted on the Columbia Funds website from June 29, 2007 to the present. Kane Aff. Par. 6. The toll-free telephone number shareholders could to call to request that a copy of the Notice of Settlement be mailed to them was available and in response to such requests, copies of the Notice were mailed out. *See* Pound Aff., Par. 8; Kane Aff., Par. 7.

54.    Members of the Settlement Class had until August 27, 2007 to object to the proposed Settlement, Plaintiffs' Counsel's application for fees and expenses or to opt out of the Class.  It is an overwhelming endorsement of this Settlement and Fee Application that only 12 members of the class objected to the Settlement and followed the procedures required for objecting to the settlement.  There were six other objection letters filed with the Court which did not comply with the requirements and five other objection letters were received by counsel for either Plaintiffs or Defendants but not filed with the Court for a grand total of twenty-three (23) objections letters (or .0026%) out of over 875,000 notices mailed.  Only 239 persons excluded themselves in accordance with the procedures by the Court.  *See* Pound Aff. Par. 11.

55.    Moreover, the objections by certain Settlement Class members do not present sufficient grounds to justify the denial of approval of the settlement.  The reasons that this Court should overrule the objections are set forth in detail in the Joint Memorandum in Support of Joint Motion for Final Approval of Class Action Settlement in Section VI and in the Memorandum of Law in Support of Class Counsels' Motion for Attorneys' Fees and Reimbursement of Expenses in Section II(C).

## V.    THE FEE APPLICATION

### A.    General Statement

56.    Plaintiffs' Counsel jointly request attorneys' fees of $379,896.27 and an award of reimbursement of expenses of $70,103.73, for a total award of $450,000.  The fee and expense award, to the extent it is approved by the Court will be paid by the Adviser Defendants, not the Columbia Funds themselves.  The amount of attorneys' fees and expenses that the Adviser Defendants would agree to pay, subject to Court approval, was not negotiated until the parties had reached agreement on the principle terms that appeared in the term sheet negotiated at the mediation session before Judge Lynch.  As set forth in the accompanying Plaintiffs'

Memorandum in Support of Class Counsel's Motion for An Award of Attorneys' Fees and Reimbursement of Expenses, the award is supported by the amount of time incurred by Plaintiffs' Counsel pursuing this action and the benefit that the action and the settlement has brought to Columbia's mutual fund holders.

57.    Lodestar is the arithmetical calculation of the number of hours each professional spent on a matter multiplied by that professions' hourly billing rate.  The total lodestar for the services performed by all of the Plaintiffs' firms in this action is $1,148,767.15.    The Compendium of Counsel's Declarations in Support of Award of Attorneys' Fee and Reimbursement of Expenses sets forth lodestar information for each petitioning firm and a breakdown of that time into categories as well as those firms' expenses and disbursements.

58.    The Notice mailed to Class members stated that Plaintiffs' Counsel will collectively seek an award of attorneys' fees and expenses in an amount not greater than $450,000.

**B.    Organization of Plaintiffs' Counsel**

59.    Plaintiffs' Class Co-Counsel, Stull, Stull & Brody and Milberg Weiss LLP, and Liaison Counsel, Moulton & Gans, P.C., are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions, and have achieved significant acclaim for their work.  Their reputation as attorneys unafraid to carry a meritorious case through trial and appellate levels gave them strong leverage in engaging in settlement negotiations with Defendants.  Plaintiffs' Counsel prosecuted this action cooperatively and with a minimum of duplication.

**C.    The Results Obtained From Counsel's Efforts
And The Quality of the Work Performed**

60.    This action and the Settlement have resulted in a significant benefit to Columbia

mutual fund holders.   There was no guarantee that Plaintiffs would achieve a reversal of the

dismissal of the action or success in convincing the Court or a jury that defendants violated the

ICA, IAA or common law and in particular that the statements made by Defendants during the

Class Period were materially false, that defendants breached their fiduciary duties to the Class or

that the fees charged by the Adviser Defendants were excessive.

61.    The quality of the work performed is reflected in the fact that Plaintiffs' Counsel

was able to obtain a favorable result for the Class in a situation where the complaint had been

dismissed.

62.    The overwhelmingly positive reaction of the Class, evidenced by the fact that few

objections have been filed to either the Settlement or the fee or expense application, is another

testament to the quality of the Settlement and a compelling factor justifying its approval by the

Court.

**D.    The Risks Undertaken By Counsel in Pursuing This Case**

63.    As shown in the accompanying memorandum of law, determination of a fair fee

must include consideration of the contingent nature of counsel's engagement and the extent of

the difficulties and uncertainties which Plaintiffs' Counsel overcame in obtaining the Settlement.

Here, Plaintiffs' Counsel agreed to prosecute this case on a wholly contingent-fee basis.  Counsel

knew from the outset that they might expend millions of dollars worth of attorneys' time in

pursuing this action on behalf of the Class, yet receive no compensation whatsoever if the action

ultimately proved unsuccessful.   In fact, they were operating from a position where the

Complaint had already been dismissed and a body of law had been developing suggesting that

success on the appeal was far from guaranteed. Professionals in the firms representing the Class collectively expended over 2300 hours with no assurance of success.

64.    This Declaration and the Joint Memorandum of Law in Support of Final Approval of Settlement, and Plaintiffs' Memorandum in Support of Joint Application for An Award of Attorneys' Fees and Reimbursement of Expenses to Plaintiffs' Counsel describe the substantial risks of litigation. Those same risks also constituted risks that counsel might never be paid for their efforts.

### E.    Risks of Contingent Litigation Generally

65.    There are numerous cases where Plaintiffs' Counsel in contingent-fee cases such as this, after expenditures of thousands of hours, has received no compensation whatsoever. Plaintiffs' Counsel who litigate cases in good faith and receive no fees whatsoever are often the most diligent members of the Plaintiffs' Bar. The fact that Defendants and their counsel know that the leading members of the Plaintiffs' Bar are prepared to, and will, go to trial, gives rise to meaningful settlements in actions such as this. The losses suffered by Plaintiffs' Counsel in other actions, where insubstantial settlement offers are rejected and Plaintiffs' Counsel ultimately receive little or no fee, should not be ignored.

66.    Plaintiffs' Counsel know from personal experience that despite the most vigorous and competent of efforts, attorneys' success in contingent fee litigation, such as this, is never assured. For example, the Milberg Weiss firm suffered several major defeats after years of litigation and trial where millions of dollars of time were expended and no compensation was received. Just by way of example, in *Robbins v. Koger Properties, Inc.,* 116 F. 3d 1441 (11th Cir. 1997), an $81 million verdict against an accounting firm was reversed on the grounds of causation and judgment was entered for the defendant. *See also Bentley v. Legent Corp.,* 849 F.

Supp. 429 (E.D. Va. 1994), *aff'd,* 50 F. 3d 6 (4th Cir. 1995) (directed verdict after plaintiffs' presentation of the case).

67.    Certainly there is no truth to the argument that a large fee is guaranteed by virtue of commencement of a class action. It takes hard and diligent work by skilled counsel to develop facts and theories which will persuade Defendants to enter into serious settlement negotiations, or alternatively, which will succeed at trial.

68.    Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after considerable effort.

**F.    Standing and Expertise of Plaintiffs' Counsel**

69.    The expertise and experience of counsel is another important factor in setting a fair fee. The expertise and experience of Plaintiffs' Counsel in this case are set forth in the accompanying individual affidavits of Plaintiffs' Counsel. Plaintiffs' Counsel are experienced and skilled practitioners in the securities litigation field, responsible for numerous legal decisions protecting investors' rights that enable litigations such as this to be successfully prosecuted.

**G.    Standing and Caliber of Defendants' Counsel**

70.    The quality of work performed by Plaintiffs' Counsel in attaining the Settlement may also be evaluated, in part, in light of the quality of the opposition. Bingham McCutcheon, LLP, its predecessor as counsel for certain defendants in this case, Dechert LLP, as well as Goodwin Proctor LLP, Bell, Boyd & Lloyd LLC, Peabody & Arnold LLP, Gouldston & Storrs, P.C. and Neal, Gerber & Eisenberg LLP, representing various defendants, are very skilled and experienced in defending actions such as these. Plaintiffs' Counsel was thus confronted with formidable opposition in the prosecution of the litigation.

71.    Defendants' Counsel in this action vigorously contested Plaintiffs' allegations, and aggressively and successfully moved to dismiss the Complaint. In the face of this defeat, and an appeal set to go forward, Plaintiffs' Counsel were able to persuade Defendants to enter into a substantial Settlement of this action.

**H.    The Objections To The Fee Request Should Be Overruled**

72.    Only 14 objections have been submitted that address the Fee Application.[13] The 23 objections to the Fee Application and the Settlement, in the aggregate, amount to a minute fraction of one percent of the over 850,000 individual mailed Notices sent to Class members. Given the low rate of objection, the foregoing statistics indicate a very favorable reaction of the fund security holders to the Fee Application.

73.    The objections to the fee request fall into two related categories. First, certain objectors argue that the fund security holders are getting either no benefit from the Settlement or only the benefit of the $100,000 hard dollar contribution to research expenses, and thus counsel for plaintiffs should not get their fees. *See* Seidel Ltr. (only benefit to funds is $100,000 so $450,000 in fees should not be awarded);[14] Ouzts Ltr. (same); Moellenhoff Ltr. (shareholder

---

[13] *See* Yared Ltr (Docket Entry #110); Miller Ltr. (#111); Hoyer Ltr. (#115); Stone Ltr. (#116); Randall Ltr. (#118); Ouzsts Ltr. (#119); Arsuaga/Merheb Ltr. (#120); Semin Ltr. (#123); Moellenhoff Ltr. (#124); Monette (#125); Osei-Bonsu Ltr. (#121); Seidel Ltr.; Fuller Ltr.

[14] Ms. Seidel's letter also expresses a concern "about the motivation of the class representatives in filing this case," citing the Milberg Weiss indictment and David Bershad's plea agreement. Counsel for Plaintiffs have discussed this issue with Ms. Seidel and confirmed to her that: (1) this litigation was not on a list of cases that prosecutors allege involved wrongdoing, nor were these lead plaintiffs identified by prosecutors as being involved in the scheme alleged in the indictment and (2) the firm of Stull, Stull & Brody is also co-lead counsel and was not indicted or implicated in any way with any of the alleged wrongdoing. Furthermore, subsequent to the indictment, the attorneys at Milberg Weiss who have worked on the matter have not included any attorneys who have been accused of any wrongdoing. Milberg Weiss has also taken affirmative, voluntary steps to ensure that no portion of any future fee is shared with any plaintiff. These steps include a mandatory review and approval process enforced in all cases by an independent monitor, Bart Schwartz, who is a highly respected former Chief of the Criminal Division of the

receives no benefit but attorneys get fee); Yared Ltr. (shareholders received no benefit from settlement); Arsuaga Ltr. (same); Miller Ltr. (same); Randall Ltr. (since Plaintiffs' counsel did not get a "financial settlement," fees should not be awarded); Fuller Ltr. (only interests served are those of Plaintiffs' Counsel and Fund management); Hoyer Ltr. (since settlement not beneficial to shareholders, Plaintiffs' Counsel should receive 1% of cash paid to shareholders).

74.    These objections should be overruled because they do not take into account the full value of the benefits resulting from this litigation.  As explained above, the benefit of the settlement and litigation is not simply the $100,000 contribution to research expenses but also to the extent that Plaintiffs played a role, the institution of break points, which resulted in a savings of approximately $15.8 million in 2004, to shareholders of Columbia Funds.  Since that time, the amount of saving to Columbia Funds shareholders has increased to a level of savings of $25.7 million in 2005, $28.1 million for 2006 and a projected savings of approximately $27.8 million in 2007.  Connaughton Aff. Par. 5.  Although the advisory fee reductions were implemented through the mechanism of Defendants' settlement with the SEC and the NYAG, it was this action, rather than the investigations and allegations of the SEC and the NYAG, that focused principally on the problem of excessive advisory fees and inadequate disclosure with respect to revenue sharing.

---

U.S. Attorney's Office, Southern District of New York.  Courts have very recently found Ms. Seidel's concerns to be unfounded after and despite the plea agreement by David Bershad.  *See, e.g., In re CMS Energy Securities Litig.*, 02 CV 72004 (E.D. Mich. Sept. 6, 2007) (appointing Milberg Weiss sole Class Settlement Counsel and approving settlement) (Declaration of John R. S. McFarlane, Ex. A); *In re Flag Telecom Holdings, Ltd. Securities Litig.*, 02 CV 3400 WCC, at 23-26 (S.D.N.Y. Sept. 4, 2007) (appointing Milberg Weiss sole Class Counsel on class certification motion) (Declaration of John R. S. McFarlane, Ex. B); *In re Beazer Homes USA Inc. Securities Litig.*, 07 CV 725 CC (N.D. Ga. Aug. 8, 2007) (Milberg Weiss appointed Co-lead Counsel under Private Securities Litigation Reform Act of 1995) (Declaration of John R. S. McFarlane, Ex. C); *In re American Express Financial Advisors Securities Litig.*, 04 CV 1773

75.    Second, some objectors contend that attorneys who work on a contingent basis should not receive any fees if the litigation is not decided in the plaintiffs' favor. *See* Monette Ltr. (attorneys should assume responsibility for contingent case); Fuller Ltr. (failure to prove allegations "beyond a reasonable doubt" should preclude counsel for Plaintiffs from recovering fees); Balfour Ltr. (Plaintiffs' Counsel litigated on contingent basis and if not successful, "the risk was theirs to expenses as well"). These objections should be overruled because they do not take into account that attorneys may obtain fees for their efforts in a contingent case under the "substantial benefit doctrine," which holds that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. We believe that we have sufficiently established that Plaintiffs had a causative role in the reduction of breakpoints and enhancement of communications.

**I.    Plaintiffs' Counsel Should Be Reimbursed for
The Expenses They Have Incurred**

76.    As discussed more fully in the accompanying fee and expense brief, the reimbursement of expenses under these circumstances is also appropriate. Plaintiffs' Counsel have incurred unreimbursed expenses in the amount of $70,103.73 for which they seek reimbursement. A breakdown of the aggregate expenses incurred by category is contained in the Compendium of Declarations submitted herewith by Plaintiffs' Counsel.

77.    The Notice mailed to the Class states that Plaintiffs' Counsel intended to apply for reimbursement of their expenses as part of the total request of up to a maximum of $450,000 for fees and expenses. We have already addressed the objections to the awarding of attorneys' fees. The same arguments would also apply to any objection to the reimbursement of expenses

---

(S.D.N.Y. Jul. 18, 2007) (appointing Milberg Weiss Class Co-Counsel for settlement purposes and approving settlement) (Declaration of John R. S. McFarlane, Ex. D).

because these expenses were all incurred in connection with Plaintiffs' Counsel' efforts to benefit the Class by benefiting the Funds.

78.    In view of the complex nature of these actions, the expenses incurred by Plaintiffs' Counsel are reasonable and necessary and were reasonably related to the pursuit of these actions.

## **CONCLUSION**

It is respectfully requested that the proposed Settlement should be approved as fair, reasonable and adequate.   In addition, it is respectfully requested that the Court approve Plaintiffs' Counsels' application for attorney's fees in the amount of $379,896.27 and expenses in the amount of $70,103.73, for a total of $450,000.

EXECUTED this 12th  day of September, 2007.

 

 

_____
MARK LEVINE

_____
JANINE POLLACK

 

_____
NANCY FREEMAN GANS

## CONCLUSION

It is respectfully requested that the proposed Settlement should be approved as fair, reasonable and adequate.  In addition, it is respectfully requested that the Court approve Plaintiffs' Counsels' application for attorney's fees in the amount of $379,896.27 and expenses in the amount of $70,103.73, for a total of  $450,000.

EXECUTED this 11th  day of September, 2007.


_____
MARK LEVINE


_____
JANINE POLLACK


_____
NANCY FREEMAN GANS

29

## CONCLUSION

It is respectfully requested that the proposed Settlement should be approved as fair, reasonable and adequate. In addition, it is respectfully requested that the Court approve Plaintiffs' Counsels' application for attorney's fees in the amount of $379,896.27 and expenses in the amount of $70,103.73, for a total of $450,000.

EXECUTED this 11th day of September, 2007.

_____
MARK LEVINE


_____
JANINE POLLACK


_____
NANCY FREEMAN GANS