# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

IN RE FLAG TELECOM HOLDINGS, LTD.       :
SECURITIES LITIGATION                              02 Civ. 3400 (WCC)
                                        :
THIS DOCUMENT RELATES TO:                         OPINION
                                                  AND ORDER
ALL ACTIONS                             :

- - - - - - - - - - - - - - - - - - - X

**COPY**

A P P E A R A N C E S :

MILBERG WEISS LLP
**Lead Counsel for Plaintiff and the
  Class**
One Pennsylvania Plaza
New York, New York 10119-0165

BRAD N. FRIEDMAN, ESQ.
LAUREN BLOCK, ESQ.
ANN GITTELMAN, ESQ.
MICHAEL MIARMI, ESQ. (pending)

        Of Counsel

MILBANK, TWEED, HADLEY & McCLOY LLP
**Attorneys for Defendant
  Citigroup Global Markets, Inc.**
One Chase Manhattan Plaza
New York, New York 10005-1413

JAMES N. BENEDICT, ESQ.
DOUGLAS W. HENKIN, ESQ.
C. NEIL GRAY, ESQ.
KEVIN ASHBY, ESQ.

        Of Counsel

SHEARMAN & STERLING
**Attorneys for Individual Defendants
  Andres Bande, Larry Bautista,
  Lim Lek Suan, Edward McCormack,
  Edward McQuaid, Daniel Petri,
  and Philip Seskin**
599 Lexington Avenue
New York, New York  10022

JEROME S. FORTINSKY, ESQ.
PANAGIOTIS KATSAMBAS, ESQ.
JAE WOO PARK, ESQ.

        Of Counsel

**Copies Mailed to Counsel of Record** 9|4|07

**CONNER, Senior D.J.:**

Plaintiffs Peter T. Loftin and Norman H. Hunter bring this proposed class action raising claims under the federal securities laws against Citigroup Global Markets Inc. f/k/a Salomon Smith Barney Inc. ("Citigroup") and eight individual defendants, namely, Andres Bande, Edward McCormack, Stuart Rubin, Larry Bautista, Daniel Petri, Edward McQuaid, Philip Seskin and Dr. Lim Lek Suan in connection with plaintiffs' purchase of common stock from Flag Telecom Holdings, Ltd. ("Flag" of the "Company").[1]  Plaintiffs purport to bring a class action on behalf of those who purchased Flag common stock between March 6, 2000 and February 13, 2002, as well as those who purchased Flag common stock pursuant to or traceable to Flag's initial public offering ("IPO") between February 11, 2000 and May 10, 2000 (the "Class Period").[2]  Plaintiffs allege that defendants

---

[1] In the Spring of 2002, several lawsuits asserting claims under the federal securities law were filed against Flag, Citigroup, Verizon Communications, Inc. ("Verizon") and the individual defendants (in addition to Andrew Evans, Vice President of Strategy and Marketing for Flag). On October 18, 2002, this Court consolidated the suits against defendants, named Loftin lead plaintiff and appointed Milberg Weiss Bershad Hynes & Lerach LLP n/k/a Milberg Weiss LLP as lead counsel.  Loftin subsequently filed a Second Corrected Consolidated Amended Complaint ("2CCAC"), which Citigroup, Verizon and the individual defendants moved to dismiss. We dismissed the 2CCAC, but granted plaintiff leave to replead his claims against all defendants named therein. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004) (Conner, J.) (*Flag I*). Plaintiff thereafter filed a Third Consolidated Amended Complaint ("3CAC" or the "Complaint") adding plaintiff Norman H. Hunter to the action, which Flag, Citigroup, Verizon and the individual defendants moved to dismiss. In an Opinion and Order dated January 12, 2005, this Court granted the motions of Flag, Evans and Verizon, denied in part and granted in part Bautista's motion to dismiss and denied in their entirety the motions filed by Bande, McCormack, Rubin, Petri, McQuaid, Seskin, Suan and Citigroup. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429 (S.D.N.Y. 2005) (Conner, J.) (*Flag II*). Plaintiffs' claims against Flag and Evans were dismissed with prejudice, and their claims against Verizon were dismissed without prejudice. *See id.*

[2] Hunter purchased 200 shares of Flag common stock in the IPO and is the only proposed class representative who bought shares in the IPO. He sold all of his shares in November 2001. (*See* Gray Decl. Opp. Class Cert., Ex. Z (Hunter Dep. at 53, 58-59).) Loftin purchased approximately 1.7 million shares of Flag common stock between July 17, 2000 and September 22, 2000. (*See id.*, Ex.

induced investors to purchase Flag securities pursuant to a registration statement and prospectus containing materially false and misleading information in violation of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "'33 Act"), and that defendants made materially false and misleading statements regarding Flag's financial condition, thereby causing Flag securities to trade at artificially inflated prices in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "'34 Act") and Rule 10b-5 promulgated thereunder. Plaintiffs now move pursuant to FED. R. CIV. P. 23 to certify the proposed class, and Joseph Coughlin, a purchaser of Flag common stock,[3] simultaneously moves pursuant to FED. R. CIV. P. 24 to intervene in the action to serve as a class representative.[4] For the following reasons, their motions are granted.

## BACKGROUND

The facts of this case are set forth extensively in our previous opinions, familiarity with which is presumed. *See Flag I, followed by, Flag II.* Accordingly, we recite only the facts relevant to our resolution of the present issues and such background facts as are helpful in providing context.

Flag offered its shares to the general public in an IPO held on February 16, 2000. (*See* 3CAC

---

Y (PL 00037).)

[3] Coughlin purchased 250 shares of Flag common stock on February 23, 2000 and 100 shares of common stock on July 3, 2001. (*See* Gray Decl. Opp. Class Cert., Ex. P (Coughlin Dep. at 68-69).)

[4] Defendants have not submitted a memorandum of law in opposition to Coughlin's motion to intervene and oppose it on the sole ground that he is not typical of the putative class members and incapable of adequately and fairly representing them, which are requirements to certifying a proposed class representative pursuant to FED. R. CIV. P. 23(a). Therefore, because the analysis of Coughlin's motion to intervene is identical to our determination of plaintiffs' motion to certify him as a class representative, we will address the motions in tandem.

2

¶ 90.) The Company's Prospectus was incorporated into the Registration Statement filed with the

Securities and Exchange Commission ("SEC") in connection with the IPO which took effect on

February 11, 2000. (*See id.* ¶¶ 80, 90.)  Around the time of the IPO, Bande was Flag's Chief

Executive Officer ("CEO"), McCormack was Flag's Chief Financial Officer ("CFO"), Rubin was

General Counsel and Assistant Secretary, McQuaid, Petri, Seskin and Suan were all members of

Flag's Board of Directors and Bautista served as the Company's Vice President of Finance and

Treasurer. (*See id.* ¶¶ 53-54, 56-61; Gray Decl. Opp. Class Cert., Ex. C (the Prospectus at 57-60).)

It appears that all the individual defendants signed the Registration Statement in connection with

Flag's IPO, except for McQuaid, Seskin and Bautista.[5]  (*See* Gray Decl. Opp. Class Cert., Exs. B

(Registration Statement at II-7), D (Amended Registration Statement II-7).)  Citigroup served as the

lead underwriter of the IPO and assisted Flag in selling shares of Flag common stock to the public.

(*See* 3CAC ¶ 65.)  Plaintiffs allege that the price of Flag's common shares was artificially inflated

during the Class Period as a result of defendants' materially false and misleading statements in the

Registration Statement, Flag's SEC filings and certain press releases.   They contend that they and

other investors suffered damages when the falsity of defendants' statements was revealed and the

value of Flag stock plummeted.

---

[5] Plaintiffs allege:
[I]ndividual defendants, because of their positions with the Company, possessed the power and authority to control the contents of FLAG's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged . . . to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.
(*See* 3CAC ¶ 62.)

## I.    Pre-IPO

Flag was a "company that owned its own telecommunications infrastructure and sold access to it, on a wholesale basis, to other telecommunications companies that would, in turn, use such access to provide services to retail customers." (*See* Defs. Mem. Opp. Class Cert. at 4; *see also* 3CAC ¶ 2.) In the Prospectus, Flag described itself as a "carriers' carrier" that developed and offered a range of innovative telecommunications products and services to licensed international carriers, internet service providers and other telecommunications companies. (*See* 3CAC ¶ 2; Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 2, 37).)  At the time of the IPO, Flag's network consisted of: (1) the Flag Europe-Asia cable system ("FEA system"), which linked "the telecommunications markets of Western Europe and Japan through the Middle East, India, Southeast Asia and China along a route . . . adjoin[ing] countries with approximately 70% of the world's population";[6] (*see* Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 2, 46)); and (2) terrestrial connections linking a host of major European metropolitan areas.  (*See id.* at 37.) Customers could purchase broadband telecommunications capacity on Flag's network pursuant to Right of Use contracts ("ROUs") or Indefeasible Right of Use agreements ("IRUs"). (*See id.* at 43.) Since capacity on Flag's network was "portable," customers that acquired capacity on one segment of Flag's network could later obtain capacity on a different segment in response to their changing needs. (*See id.*)

---

[6] The FEA system consisted of approximately 28,000 kilometers of undersea digital fiberoptic cable that comes ashore at sixteen operational landings in thirteen countries. (*See* Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 37).) "It ha[d] an aggregate capacity of [ten] gigabits per second transmitting on two fiber pairs[,]" and was upgradeable to between twenty and forty gigabits per second depending on the location of the segment. (*See id.*) Around the time of the IPO, it served sixty-two customers. (*See id.*) Flag claimed that it was the world's longest independent, privately-owned digital fiberoptic undersea cable system. (*See id.*; 3CAC ¶ 4.)

4

In the Prospectus, Flag indicated that it was in the process of expanding its network through the construction of the Flag-Atlantic 1 cable system (the "FA-1 system"). (*See* 3CAC ¶¶ 4, 80.) The FA-1 system was a joint venture between Flag and GTS Transatlantic Holdings Ltd. ("GTS") to build two digital fiberoptic cables connecting Paris and London to New York. (*See id.*; Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 37).) The two cables would create a "self-healing ring"; if one cable failed, Flag could re-route the traffic on that cable onto the other cable in order to avoid service interruptions. (*See* Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 37).) According to the Prospectus, the FA-1 system intended to have a capacity more than fifteen times the maximum capacity of the most advanced cable in service on the Atlantic route at that time. (*See id.*) The estimated cost of its construction was $1.1 billion. (*See id.* at 38.)

The Prospectus also stated that Flag intended to further expand Flag's network by constructing or acquiring digital fiberoptic cables in other areas of the world or by purchasing capacity from competitors where "rapid access to a market [was] required or where it [was] not economically feasible to" construct or acquire new systems. (*See id.* at 2, 38.) In addition, it indicated that Flag was "in the preliminary stages of evaluating and developing a plan for a new trans-Pacific cable project that would link the telecommunications markets of the United States and Japan."[7] (*See id.* at 38.) The Prospectus stated that Flag's ultimate goal was "to establish FLAG Telecom as the leading global carriers' carrier by offering a wide range of cost-effective, capacity use options and wholesale products and services across [its] own global network." (*See id.* at 40.)

Plaintiffs claim, however, that defendants, at the time of the IPO, had "data in hand that

---

[7] The Prospectus warned, however, that Flag had not yet reached a final decision to pursue the construction of a trans-Pacific cable system. (*See* Gray Decl. Opp. Class Cert., Ex. B (Registration Statement at 38).)

5

demonstrated that, contrary to the rosy statements in the IPO Registration Statement and Prospectus, demand for FLAG's capacity was anything but strong." (*See* 3CAC ¶ 3.) Plaintiffs allege that defendants "touted the supposed demand for FLAG's fiber optic cable while there in fact existed in the broadband market an over-supply of fiber optic capacity." (*See id.*)

In *Flag II*, we held that, although defendants' representations in the Prospectus regarding the projected growth of the demand for telecommunications and broadband capacity did not give rise to any claims under the federal securities law, *see* 352 F. Supp. 2d at 450-51, plaintiffs alleged sufficient facts to demonstrate that the Prospectus contained a material misstatement concerning capacity pre-sales on the FA-1 system in violation of the '33 Act. *See id.* at 451. Specifically, plaintiffs allege that Flag and Alcatel Submarine Networks ("Alcatel") entered into an improper agreement for the purchase of capacity on the FA-1 system (the "Alcatel Sales Agreement"), which was part of a "fraudulent scheme" to inflate FA-1 system pre-sales to create the illusion that demand existed for capacity on the FA-1 system and to secure a line of credit necessary for its construction. (*See id.* ¶¶ 91-92, 95, 98.) Plaintiffs claim that, on January 12, 1999, Flag entered into an agreement with Alcatel to construct the FA-1 cable system in exchange for $646 million, but on September 20, 1999, Flag and Alcatel inexplicably revised the agreement to increase the contract price by $100 million to $746 million. (*See id.* ¶ 92.) Then, on October 8, 1999, Flag entered into an agreement with Alcatel wherein Alcatel agreed to purchase 6.2 gigabits of capacity on the FA-1 system for $50 million. (*See id.* ¶¶ 93-94.) This transaction was disclosed in the Amended Registration Statement issued on February 9, 2000. (*See id.* ¶ 91; Gray Decl. Opp. Class Cert., Ex. D (Amended Registration Statement at Cover Page, 50).)

On the same date that Flag entered into this capacity sales agreement with Alcatel, Flag

6

executed a new credit agreement with Barclays Bank, plc ("Barclays") wherein Flag was required to commit $100 million in pre-sale capacity on the FA-1 system in order to secure its desired credit facility. (*See* 3CAC ¶ 95.) Plaintiffs allege that, because Flag was aware that it was unable to secure the $100 million level in pre-sale capacity commitments from creditworthy customers, it asked Alcatel to pledge a commitment to purchase $50 million worth of capacity, for which Alcatel had no use, in consideration for an increase of $100 million in the contract price of their original construction agreement. (*See id.* ¶ 98.) They contend therefore that Alcatel's agreement to purchase pre-sale capacity on the FA-1 system was not a legitimate customer purchase commitment. (*See id.*) Plaintiffs emphasize that: (1) Alcatel is a construction company, not a telecommunications service provider, and would have no use for such a large capacity (*see id.* ¶ 94); (2) the revised construction contract effected only a change in price (*see id.* ¶¶ 92-94); (3) the capacity sales agreement with Alcatel allowed Flag to reduce the amount of capacity it was required to provide to Alcatel if Flag could find other customers that wished to purchase the capacity, an arrangement that Alcatel would not have approved if it actually intended to use the capacity (*see id.* ¶ 97); and (4) the Alcatel Sales Agreement was executed in close temporal proximity to the credit agreement with Barclays that required Flag to secure pre-sales on its FA-1 system. (*See id.* ¶ 95.)

Recently, however, the individual defendants submitted evidence that Flag had released Alcatel from its purchase commitment well before the effective date of Flag's Registration Statement, tending to show that Flag's statements in the Amended Registration Statement concerning the amount of pre-sales for capacity on the FA-1 system were not based on the transaction with Alcatel. Specifically, they have produced evidence showing that Alcatel's initial commitment to purchase $50 million of capacity on the FA-1 system was reduced to zero as of January 11, 2000 –

7

prior to the effective date of the Registration Statement on February 11, 2000. Plaintiffs contend, however, that the fact that Alcatel's commitment was reduced to zero prior to the effective date of the Registration Statement does not foreclose the possibility that Flag wrongfully induced Barclays to enter into the credit agreement that was referenced in the Amended Registration Statement, which was central to Flag's ability to convince potential investors of the Company's financial viability. In any event, plaintiffs have requested leave to amend their Complaint to include specific allegations that Flag entered into other sham pre-sale contracts not involving Alcatel that contributed to the total amount of pre-sales disclosed in the Amended Registration Statement, and it should be entitled to discovery regarding whether or not each contract constituted a true pre-sale.[8]

## II.     The IPO

At the IPO, Flag offered 20,592,000 common shares in the United States and Canada and 11,088,000 shares outside the United States and Canada (excluding shares sold pursuant to an over-

---

[8] Defendants revealed this evidence in a letter to the Court and opposing counsel, dated April 27, 2007, requesting permission to file a motion for partial summary judgment on behalf of the individual defendants as to plaintiffs' claims under §§ 11, 12(a)(2) and 15 of the '33 Act. Defendants argued that, because plaintiffs' allegation that the Registration Statement was misleading is solely based on Flag's statement that it had secured in excess of $750 million in pre-sales for capacity on its FA-1 system, which included the amount of the allegedly phony, pre-sale contract with Alcatel, they were entitled to partial summary judgment because the evidence unequivocally shows that Flag had released Alcatel from its pre-sale obligation prior to the effective date of the Registration Statement, and therefore Flag's statements concerning the value of the pre-sales in the Registration Statement were not based on the transaction with Alcatel. At the pre-motion conference, we granted them permission to file the motion and indicated that we will first address plaintiffs' request for leave to amend the Complaint submitted by letter brief, as our decision with respect thereto will substantially affect defendants' arguments on their motion for partial summary judgment. Specifically, if Flag allegedly entered into other sham pre-sale contracts and relied upon those in computing the $750 million figure in the Amended Registration Statement in order to mislead investors as to the company's financial viability, plaintiffs' claims under §§ 11, 12(a)(2) and 15 of the '33 Act may remain viable.

allotment provision).  (*See* Gray Decl. Opp. Class Cert., Ex. C (Prospectus at Cover Page, 3).)  The

IPO was a success.  (*See* 3CAC ¶ 90.)  The offering commenced on February 11, 2000 and closed

on February 16, 2000 during which the company sold 27,963,980 common shares at a price of

$24.00 per share and shareholders sold 8,436,320 common shares at the same price for total net

proceeds to the company of approximately $634.6 million.  (*See* Gray Decl. Opp. Class Cert., Ex.

F at 21.)  In addition, on February 16, 2000, Flag registered 6,763,791 shares on SEC Form S-8 in

connection with its Long Term-Incentive Plan ("LTIP") pursuant to which certain Flag employees

were granted options to acquire Flag common shares and were able to sell the acquired stock as of

August 9, 2000.  (*See id.*, Ex. E.)   Shares also entered the market through sales by inside

shareholders who owned all of the Flag common stock prior to the IPO, including companies such

as Bell Atlantic Corporation, Telecom Asia Corporation Public Co. Ltd. and Marubeni Corporation.

(*See id.*, Ex. C (Prospectus at 63); *compare id.* Exs. F at 40 *with* G at 9.)


## III.   Post-IPO

After the IPO, Flag's common stock was listed and actively traded on the NASDAQ National

Market under the symbol FTHLQ.  (*See* 3CAC ¶ 68.)  Plaintiffs allege that Flag continued to mislead

investors by issuing materially false and misleading financial statements in violation of Generally

Accepted Accounting Principles ("GAAP") and SEC rules, as well as providing materially false and

misleading information in various press releases.[9]  (*See id.*  ¶¶ 76-77, 79, 99-135.)  According to

---

[9] In *Flag II*, we held that plaintiffs did not sufficiently allege that any statements made prior
to April 1, 2001 were materially false or misleading.  *See* 352 F. Supp. 2d at 466.  We did hold,
however, that plaintiffs' allegations were sufficient regarding the falsity of statements in Bande's
press releases on April 24, 2001 and November 6, 2001, as well as those in Flag's SEC form 10-Q
filing for the second quarter of 2001.  *See id.*

plaintiffs, "[r]ather than acknowledge the market conditions that were impacting FLAG's financial performance and prospects, [] defendants issued press releases and SEC periodic filings that falsely portrayed demand for FLAG's products and services as being strong and robust." (*See id.* ¶ 8.) Specifically, plaintiffs allege that Flag "artificially and fraudulently inflated its financial results through the use of reciprocal transactions with its competitors for the purchase and sale of fiber optic cable on various of FLAG's cable routes." (*See id.* ¶ 9 (emphasis removed).) They allege that Flag "and its competitors began entering into transactions whereby two companies would 'sell' each other cable that neither needed, so that both could book supposed revenues."[10] (*See id.*) These swap transactions allegedly had no business purpose and were designed to conceal the true financial condition of the participating companies.[11] (*See id.*) In addition, according to the Complaint, Flag's "public statements [regarding] these swap[] [transactions] were utterly misleading and omissive,

---

[10] For example, plaintiffs allege that, on June 23, 2000, Flag and Qwest entered into an ROU agreement wherein Qwest agreed to acquire capacity on the FEA system for a purchase price of $16.8 million. Shortly thereafter, on June 28, 2000, Flag purchased $16.8 million of capacity on Qwest's network linking the United States and Japan ("KPNQwest Swap # 1"). (*See* C3AC ¶ 137). Similarly, plaintiffs allege that, on June 27, 2001, Qwest agreed to purchase from Flag $20 million worth of capacity on Flag's North Asian Loop system (the "FNAL system") for a term of twenty-one years payable upon execution. On that same date, Flag agreed to purchase Qwest $20 million worth of capacity on a Qwest cable connecting the Pacific Northwest to Tokyo, Japan ("KPNQwest Swap # 5"). (*See id.*)

[11] As alleged by plaintiffs, the swap transactions had only a positive effect on Earnings Before Interest, Tax, Depreciation and Amortization ("EBITDA") because Flag recorded the expenditures related to the swap as capital expenditures, rather than as expenses, and thus resulting depreciation expense, if any, was recognized in future periods, while the company recorded the receipt of capacity as revenue for the period in which the transaction took place. (*See* 3CAC ¶ 12.) Plaintiffs also allege that Flag, in contravention of GAAP, used inflated fair market values rather than book values (*i.e.*, the recorded amount) to account for its swap transactions. (*See id.* ¶¶ 15, 17.) Furthermore, they allege that Flag failed to disclose key elements of the swap deals in its financial statements as required by GAAP, including that the deals were in fact non-monetary and non-recurring. (*See id.* ¶¶ 26, 184.) According to plaintiffs, Flag combined stated revenues from the swap deals with recurring revenues to overstate revenue growth percentages. (*See id.* ¶¶ 22, 25, 184.)

designed to make it impossible for an investor to understand that, in fact, there was no 'sale' and no 'revenue' on any of these deals." (*See id.* ¶ 138.) For example, it would issue statements regarding each side of the transaction on different days and describe each as a separate transaction. (*See id.* ¶¶ 138-39.)

Plaintiffs also allege that Flag violated GAAP and SEC rules by accounting for revenue received from the sale of capacity pursuant to multi-year leases that were payable over the term of the lease by accounting for the full contract price at the inception of the lease in one lump sum. (*See id.* ¶¶ 19-20, 156-65.) Furthermore, according to the Complaint, Flag failed to recognize millions of dollars in impairment of the value of its FA-1 system throughout the Class Period, despite the fact that Flag was well aware of the decreasing demand for capacity in the market, in violation of GAAP and its own accounting policies. (*See id.* ¶¶ 34-35, 41-45, 194, 197.) In fact, in March of 2002, Flag disclosed in its SEC Form 10-K for the year ended December 31, 2001 that, given the "continued lack of demand," the asset value of the FA-1 system was impaired by $359 million. (*See id.* ¶¶ 35, 205 (emphasis removed).)

## IV.    Flag Announces That It Is Reviewing Its Business

On February 13, 2002, Flag announced that "[a]pproximately 14% of GAAP revenues for the full year 2001 was associated with reciprocal transactions entered into with other telecommunications companies and service providers[,]" and that it anticipated discontinuing operations in 2003. (*See id.* ¶¶ 28, 187.) Following this announcement, the market price of Flag shares declined by 46% in one day with a trading volume of 6,160,800 shares, compared to a daily average of 582,674 shares. (*See id.* ¶ 190.) In Flag's 10-K for fiscal year 2001, filed with the SEC

11

on April 1, 2002, the company disclosed that it would not be able to "make the required interest payments, due March 30, 2002, on . . . [certain] outstanding senior notes" and, in addition, that:

> [g]iven the high degree of competition in terms of alternative supply, price erosion and continued lack of demand on the trans-Atlantic route . . . we now believe that the asset value of our FA-1 system is impaired. We determined that the carrying value of the FA-1 system exceeded its fair value and we have therefore recognized an impairment charge of $359.0 million in the year ended December 31, 2001.

(*See id.* ¶ 192 (emphasis removed).)

Flag filed its Chapter 11 bankruptcy petition on April 12, 2002. (*See id.* ¶ 207.) During the bankruptcy proceedings, Flag prepared a "Pro-forma Reorganized Balance Sheet as of September 30, 2002." (*See id.* ¶ 199.) According to plaintiffs, the balance sheet indicated that the estimated value of Flag's property and equipment was $385 million. Flag had reported in its financial results for the third quarter of 2001 that its property and equipment were worth $2.3 billion – a write down of its estimated property and equipment by $1.9 billion, of which plaintiffs allege that the company was well aware during the Class Period. (*See id.* ¶¶ 36, 199.) After these disclosures and Flag's bankruptcy, this purported class action ensued. Plaintiffs now move pursuant to FED. R. CIV. P. 23 to certify the proposed class, and Coughlin simultaneously moves pursuant to FED. R. CIV. P. 24 to intervene in the action to serve as a class representative along with Loftin and Hunter.

## DISCUSSION

**I.    Class Action Requirements Pursuant to FED. R. CIV. P. 23**

The legal prerequisites for a class action under FED. R. CIV. P. 23 are well-established. First, a plaintiff must establish that: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses

12

of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). If these requirements are met, a plaintiff must then show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3). We have the benefit of deciding plaintiffs' motion after the Second Circuit's recent clarification "of a district court's role in assessing a motion for class certification." *See In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 39-40 (2d Cir. 2006). The Second Circuit held:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Id.* at 41. Having set forth the appropriate analytical framework, as there seemed to be some dispute among the parties, we can now turn to each specific requirement of Rule 23.

A.      **Rule 23(a)(1): Numerosity**

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is

13

impracticable . . . ." "'Impracticability means difficulty or inconvenience of joinder [not] . . . impossibility of joinder,' *In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999) (citation omitted), and the Second Circuit has observed that 'numerosity is presumed at a level of 40 members.' *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995), *cert. denied*, 515 U.S. 1122, 115 S.Ct. 2277, 132 L.Ed.2d 281 (1995) (citing 1 NEWBERG ON CLASS ACTIONS § 3.05 (2d ed. 1985)) . . . ." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007). Precise quantification of class members is not necessary, and "[i]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Id.* at 83-84 (collecting cases) (internal quotation marks omitted; citations omitted). Indeed, "[c]lass certification is frequently appropriate in securities fraud cases involving a large number of shares traded publicly in an established market." *In re Deutsche Telekom AG Sec. Litig.*, 229 F. Supp. 2d 277, 280-81 (S.D.N.Y. 2002) (citing *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 123 (S.D.N.Y. 1997)).

In the present case, Flag common stock was traded on NASDAQ and had daily average trading volumes of more than half a million shares and a final trading volume of 6,160,800 shares on the final day of the Class Period. More than twenty million shares of Flag common stock were sold in the United States during the Class Period. Thus, there may be thousands of putative class members dispersed throughout the nation. *See In re Interpublic Sec. Litig.*, No. 02 Civ. 6527, 2003 WL 22509414, at *2 (S.D.N.Y. Nov. 6, 2003) ("The number of persons who purchased or otherwise acquired IPG stock during the proposed class period is estimated to be in the 'thousands.' The putative class consists of a sufficient number of persons to make joinder impracticable.").

14

Accordingly, plaintiffs have established, and defendants do not dispute, that joinder is impracticable and that the proposed class satisfies the numerosity requirement.

### B.    Rule 23(a)(2): Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class . . . ." While "[p]laintiffs' grievances [must] share a common question of law or of fact[,]" *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam), "[n]ot every 'issue[ ] must be identical as to each [class] member . . . ." *In re Vivendi*, 242 F.R.D. at 84 (alterations added; alterations in original); *see also In re: Deutsche Telekom AG*, 229 F. Supp. 2d at 281 ("Commonality does not mandate that all class members make identical claims and arguments, only that common issues of fact or law affect all class members.") (internal quotation marks omitted; citation omitted). Plaintiffs must only "'identify some unifying thread among the members' claims that warrants class treatment.'" *In re Vivendi*, 242 F.R.D. at 84 (quoting *Cutler v. Perales*, 128 F.R.D. 39, 44 (S.D.N.Y. 1989); *see also In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855, 2003 WL 22077464, at *3 (S.D.N.Y. Sept. 8, 2003) ("The commonality requirement of Rule 23(a)(2) has been applied permissively by courts in the context of securities fraud litigation.") (internal quotation marks omitted; citations omitted).

Here, the following questions of fact and law are common to all members of the proposed class: (1) whether defendants violated the federal securities law by the acts and conduct alleged in the Complaint; (2) whether Flag issued false and misleading statements in the IPO Prospectus and elsewhere during the Class Period; (3) whether the individual defendants caused Flag to issue false and misleading statements in the Prospectus and elsewhere during the Class Period; (4) whether

defendants acted with the requisite scienter in connection with their alleged violations of the securities law; and (5) whether the market price of Flag securities was artificially inflated or distorted during the Class Period as a result of defendants' conduct as alleged in the Complaint. These similarities are sufficient to satisfy Rule 23's commonality requirement. *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290-91 (2d Cir. 1992). Defendants do not contend otherwise, and courts have consistently found substantially similar allegations to be sufficient. *See id.; see also In re Vivendi*, 242 F.R.D. at 84

> (Here, plaintiffs allege the following questions of fact or law are common to all members of the proposed class: (1) whether defendants violated the securities laws by the acts and conduct alleged in the FACC; (2) whether defendants issued false and misleading statements during the class period; (3) whether defendants acted with scienter in issuing materially false and misleading statements; (4) whether the market prices of Vivendi ordinary shares and ADSs during the class period were artificially inflated because of defendants' misconduct, and (5) whether the members of the class sustained damages, and, if so, what is the appropriate measure of damages. (FACC ¶ 45.) *Cf. In re Interpublic*, [] 2003 WL 22509414, at *3 [] (finding commonality requirement satisfied where plaintiffs raised common issues as to whether defendants' public filings and statements contained material misstatements, whether the defendants acted with scienter in misrepresenting material facts in the company's public filings and press releases, and whether the damages to the investors were caused by the defendants' misstatements); *In re Ashanti Goldfields Sec. Litig.*, No. CV 00-0717(DGT), 2004 WL 626810, at *12 (E.D.N.Y. Mar. 30, 2004) (finding commonality on similar allegations). Defendants do not dispute commonality. Plaintiffs have adequately demonstrated that these claims are common to the members of the proposed class, and the Court finds the commonality requirement is satisfied.);

*see also In re Nortel Networks*, 2003 WL 22077464, at *3; *In re Deutsche Telekom AG*, 229 F. Supp. 2d at 281.

## C.    **Rule 23(a)(3): Typicality**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class . . . ." This requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham*, 960 F.2d at 291. "While the commonality inquiry establishes the existence of a certifiable class, the typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions." *In re Vivendi*, 242 F.R.D. at 84-85 (internal quotation marks omitted; citation omitted). It is oft-said that "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993); *see also In re Vivendi*, 242 F.R.D. at 85; *In re NASDAQ Market-Makers Antitrust Litig.*, 172 F.R.D. 119, 126-27 (S.D.N.Y. 1997). Our analysis should focus on whether the class representatives "have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *In re NASDAQ Market-Makers*, 172 F.R.D. at 126 (internal quotation marks omitted; citation omitted).

In the present case, the typicality requirement is met because plaintiffs and Coughlin, like the putative class members, will attempt to prove that they purchased Flag common stock during the Class Period and were injured by defendants' false and misleading representations made in the Registration Statement and throughout the Class Period in violation of the securities laws. In prosecuting their case, they, along with the putative class members, "will necessarily seek to develop facts relating to the alleged accounting irregularities and the dissemination of allegedly false or misleading statements underlying their claims." *In re Vivendi*, 242 F.R.D. at 85. Additionally, they will all seek to prove that defendants acted with the intent to deceive. *See id.* at 90. "Such

17

allegations are generally considered sufficient to satisfy the typicality requirement." *Id.* at 85; *see also In re Interpublic*, 2003 WL 22509414, at *3 (finding typicality when plaintiffs alleged "that the defendants distributed materially false and misleading information that artificially inflated the price of [the company's] common stock throughout the class period[]" and "[b]oth of the classes and its representatives [would] necessarily seek to develop facts sufficient to prove [the company's] underlying accounting fraud and subsequent dissemination of material misrepresentations regarding the company's projected Restatement, and to show why the misrepresentations were made."); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 280-81 (S.D.N.Y. 2003) (substantially the same); *In re Crazy Eddie Sec. Litig.*, 135 F.R.D. 39, 39-41 (E.D.N.Y. 1991) (substantially the same).

Defendants argue, however, that the typicality requirement is not satisfied because a "fundamental conflict" exists between plaintiffs' two sets of claims, namely, that: (1) the Registration Statement and the accompanying Prospectus, in violation of the '33 Act, contained materially false and misleading information regarding pre-sales of capacity on the FA-1 system misleading investors as to the company's economic viability; and (2) the individual defendants throughout the class period, in violation of the '34 Act, made materially false and misleading statements regarding the company's financial condition by, *inter alia*, accounting for swap transactions in violation of GAAP and SEC rules in order to artificially inflate the Company's revenue. As defendants point out, those asserting claims under the '33 Act may have to overcome the affirmative defense of "negative causation" – that the decline in Flag's stock price was due to something other than the alleged misstatements concerning the pre-sales listed in Flag's Registration Statement and Prospectus. Those asserting claims under the '34 Act must show "loss causation" – that the decline in Flag's stock price was due to, *inter alia*, the failure to appropriately disclose the

18

reciprocal transactions that took place after the IPO.[12] Therefore, defendants contend, "[i]f plaintiffs asserting '34 Act claims prove that their injury was caused by the alleged nondisclosures and misstatements relating to the reciprocal transactions, which is an affirmative element of their claims, they will necessarily establish that the decline in Flag's stock price was *not* caused by the alleged misstatements relating to pre-sales." (*See* Defs. Mem. Opp. Class Cert. at 1-2.) We disagree.

Defendants' argument overlooks that the decline in value of Flag stock may have been caused by *both* the alleged fraud relating to the reciprocal transactions *and* the alleged misstatements relating to pre-sales found in the Registration Statement. Under the doctrine of proximate causation, the harm may have been caused by either or both of these alleged acts of deception. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) ("a plaintiff [asserting claims under the securities law must] prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss.") (alteration added); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007) (same); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("We have often compared loss causation to the tort law concept of proximate cause, 'meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.'") (quoting *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001)) (citing *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992) (comparing loss causation to proximate cause)); *In re Initial Public Offering Sec. Litig.*, 297 F. Supp. 2d 668, 675 (S.D.N.Y. 2003) ("It is important not to lose sight of

---

[12] *See, e.g., In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005) ("the negative causation defense in Section 11 and the loss causation element in Section 10(b) are mirror images; in the former, the burden of proving negative causation is on the defendant, and in the latter, the burden of proving the existence of loss causation is on the plaintiff.").

why loss causation is a requirement of a securities fraud claim. At base, loss causation is nothing more than a securities fraud analog to the tort concept of proximate causation, 'meaning that the damages suffered by plaintiff must be a foreseeable consequence of any' scheme to defraud.") (quoting *Castellano*, 257 F.3d at 186).

Therefore, the two sets of claims are not antagonistic to each other because proof of one does not negate an essential element of the other. Moreover, in the present case, proposed class members may well have claims under both the '33 Act and '34 Act.[13]  *See, e.g., In re Deutsche Telekom AG,* 229 F. Supp. 2d at 283-84 (rejecting the identical argument and explaining that courts "have routinely certified a single class asserting both Securities Act and Exchange Act claims.").

We recognize, however, that if plaintiffs ultimately show that the decline in stock value was caused by both the misstatements in the Registration Statement and those made throughout the Class Period, a jury will have to determine the extent of harm caused by each, and it is here that the interests of class members could diverge. But it is well-established that "[t]he fact that the interests of some members of [the class] may ultimately diverge when it comes time to allocate damages does not warrant the denial of class certification where, as here, there is no current conflict that goes to the heart of the lawsuit." *In re Avon Sec. Litig.*, No. 91 CIV. 2287, 1998 WL 834366, at *11 (S.D.N.Y. Nov. 30, 1998) (internal quotation marks omitted; citation omitted).  Accordingly,

---

[13] Defendants argue in their Sur-Reply that the number of plaintiffs with claims under both the '33 Act and '34 Act is likely small because, as explained *infra* pp. 44-46, the class period for the '33 Act claims is from February 11, 2000 to May 10, 2000, while the class period for the '34 Act claims is from March 6, 2000 to February 13, 2002 – an overlap of only a little more than two months. (*See* Defs. Sur-Reply Mem. Opp. Class Cert. at 3.)  We do not see the relevance of this temporal overlap, as a plaintiff could assert a claim under the '33 Act with respect to his purchase of shares in February 2000, for example, as well as a claim under the '34 Act with respect to his purchase of additional shares in, for example, December 2000.

defendants' argument is unavailing,[14] and, for the reasons stated above, plaintiffs have satisfied the typicality requirement of Rule 26(a).

### D.    Rule 23(a)(4): Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class." "[A]dequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citing *In re Drexel Burnham*, 960 F.2d at 291); *see also In re Vivendi*, 242 F.R.D. at 85. Relevant to the first inquiry is whether the class representatives "possess the same interest and [have] suffer[ed] the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997); *see also In re WorldCom*, 219 F.R.D. at 282. "As many courts have observed, the issues of typicality and adequacy tend to merge because they 'serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.'" *In re Vivendi*, 242 F.R.D. at 85 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)); *see also In re NASDAQ Market-Makers*, 172 F.R.D. at 127 ("The commonality and typicality requirements blend together in determining whether the representative [p]laintiffs' claims are sufficiently typical of the classwide claims that the representatives will adequately represent the class.").

---

[14] Defendants assert the same argument in support of their contention that the representative parties cannot fairly and adequately protect the interests of the class, as required by Rule 26(a)(4). For the same reasons, we are unpersuaded.

In the present case, the record clearly shows that the interests of plaintiffs and the putative class members are aligned. Specifically, they all allegedly purchased Flag common stock in reliance upon certain materially false and misleading information provided by defendants pursuant to a single scheme of deception and were injured thereby. *See In re Drexel Burnham*, 960 F.2d at 291; *In re WorldCom*, 219 F.R.D. at 282; *In re Interpublic*, 2003 WL 22509414, at *4; *In re Deutsche Telekom AG*, 229 F. Supp. 2d at 282. As explained *supra* pp. 19-21, the fact that some putative class members relied upon materially false statements in the Registration Statement and others relied on materially false or misleading statements in Flag's financial statements, does not make the interest of any proposed class representative antagonistic to that of any member of the putative class.

Indeed, defendants do not directly contest the adequacy of the proposed class representatives under either of the two criteria identified by the Second Circuit. Instead, they contend that, in light of the indictment of Milberg Weiss, the class representatives "will potentially face difficult decisions about how to manage the case in the event that [the firm] is convicted or the firm collapses before its criminal trial begins[, and] . . . [they] have shown no interest, willingness, or ability to take an active role in or control the litigation for the benefit of the class." (*See* Defs. Mem. Opp. Class Cert. at 2.) Defendants' argument is, to say the least, unpersuasive.

"'[I]t is well established that "in complex actions such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected."'" *In re Vivendi*, 242 F.R.D. at 88 (quoting *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 181 (S.D.N.Y. 2005) (citation omitted)); *see also County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1407, 1416 (E.D.N.Y. 1989) (quoting *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 197 (S.D.N.Y. 1985) (citing cases)). "The

22

Supreme Court has indicated that, in the context of complex securities litigation, attacks on the adequacy of the class representative based on the representative's ignorance or credibility are rarely appropriate." *Long Island Lighting*, 710 F. Supp. at 1416 (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370-74 (1966)). It is sufficient if the class representatives are "aware of the basic facts underlying the lawsuit and . . . not . . . likely to abdicate his obligations to fellow class members." *In re Crazy Eddie*, 135 F.R.D. at 41 (internal quotation marks omitted; citation omitted). "[A] class representative will be found inadequate due to ignorance only when they 'have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'" *In re WorldCom*, 219 F.R.D. at 286 (quoting *Baffa*, 222 F.3d at 61).

Defendants emphasize that the representatives have failed to engage in more than a perfunctory review of the documents involved in the case, lack detailed knowledge of the claims asserted in the Complaint, have not communicated with each other and have given no thought to the indictment of Milberg Weiss. The record, however, shows otherwise. The proposed representatives are sufficiently familiar and involved with the litigation. Specifically, they have all received and reviewed the pleadings, consulted with Milberg Weiss on various issues relevant to the lawsuit, produced documents and participated in depositions. (*See* Friedman Reply Aff., Ex. 28 (Loftin Dep. at 131, 165), Ex. 29 (Hunter Dep. at 49-50, 88-100), Ex. 30 (Coughlin Dep. at 94-95, 97, 107-09).) Loftin, for example, is intimately familiar with the claims and was uniquely involved in the drafting of the Complaint, particularly with respect to the decision to initially name Verizon as a defendant. (*See id.*, Ex. 28 (Loftin Dep. at 165-66, 201, 205).) Hunter testified that he receives copies of various documents, including motions, "every two to three" months, which he reviews and discusses

23