with attorneys from Milberg Weiss. (*See id.*, Ex. 29 (Hunter Dep. at 88-89).) And Coughlin, during

his deposition, cogently explained the underlying basis for the litigation. (*See id.*, Ex. 30 (Coughlin

Dep. at 79-81).) Moreover, it appears that they have an understanding of their role as representatives

of the proposed class and have expressed an intention to and eagerness to consult with counsel in

the future.[15] (*See id.*, Ex. 28 (Loftin at 200),[16] Ex. 29 (Hunter Dep. at 86-87), Ex. 30 (Coughlin Dep.

at 93-94, 109-10).) Furthermore, all the representatives are aware that Milberg Weiss has been

indicted and do not believe that retaining new counsel is warranted at this time. For example, Loftin

testified that he learned of the indictment by reading an article in *Forbes* magazine and that he

believed new counsel was not necessary in part because the allegations of criminal wrongdoing

seemed to focus on Milberg Weiss's practice in California and not New York.[17] (*See id.*, Ex. 28

(Loftin Dep. at 154-56).) Accordingly, we believe that the proposed class representatives are

---

[15] The fact that the proposed representatives have not spoken with each other has little, if any, bearing on our analysis. *See In re Avon*, 1998 WL 834366, at *9-11.

[16] (*See id.* ("Well, I have got responsibilities to make sure that all the documents are provided that need to be provided; that I have given my deposition; that I am involved in any assistance that's needed by counsel and concerning questions, et cetera, things that I [] know about the case. *It is my job to keep up with the case and to make sure I understand where we are with the case and if there are settlement discussions, to be involved in those settlement discussions.*") (emphasis added).)

[17] (*See also* Friedman Reply Affd., Ex. 28 (Loftin Dep. at 154-56) ("Q. Did you consider any Milberg Weiss' ethics to be important in your selection of the firm? A. Absolutely. Q. Do you have any reason to believe that that – do you have any reason why your view in that regard may have changed? A. No. Q. Are you aware that Milberg Weiss and Mr. Schulman in particular have been indicted with respect to sharing fees with other individuals serving as plaintiffs in cases brought by Milberg Weiss? . . . A. I understand that there is something going on about that. . . . I thought about it, but it seemed to me that most of the allegations were based in California and not in New York and from what I read, and so it didn't seem to me to matter to me. . . . Q. Would you be concerned if for your interest and the interest of the class you are seeking to represent, if the firm were to be found guilty of the charges it is being accused of? . . . A. Every partner at Arthur Andersen wasn't guilty.").)

24

sufficiently knowledgeable and involved to adequately represent the putative class. *See Baffa*, 222 F.3d at 61-62; *In re Vivendi*, 242 F.R.D. at 88; *In re WorldCom*, 219 F.R.D. at 287; *In re Nortel Networks*, 2003 WL 22077464, at *5.

Moreover, "plaintiffs' lack of knowledge concerning the details of the litigation is not a ground to deny a class certification; plaintiffs are entitled to rely upon their counsel to conduct this litigation." *In re Avon*, 1998 WL 834366, at *9; *see also Baffa*, 222 F.3d at 62 (recognizing that "[f]ar from showing [the plaintiffs'] ignorance of the litigation or his inability to serve as class representative, [reliance on counsel] demonstrates [the plaintiffs'] ability to appreciate the limits of his knowledge and rely on those with the relevant expertise."). Defendants argue, however, that such reliance is inappropriate in the present litigation because of the much-publicized indictment of Milberg Weiss. Defendants emphasize that: (1) Milberg Weiss may be convicted and subsequently dissolved; (2) it may have conflicts of interest antagonistic to the class as a result of the indictment, *e.g.*, the firm may have its own reasons, irrespective of the class's best interests, for wanting to dispose of the litigation prior to its criminal trial or plea agreement or decision to dissolve the firm; and (3) it is possible that the government will call Loftin or other putative class members to testify in connection with its criminal prosecution of Milberg Weiss. These arguments, which are largely speculative, deserve little attention, if any.

We believe that it would be entirely inappropriate to deny class certification (where it is otherwise appropriate) because of the prospect of Milberg Weiss's conviction and subsequent dissolution. To date, Milberg Weiss has competently and vigorously represented plaintiffs and the putative class members, and defendants concede, as they must, that Milberg Weiss is eminently qualified to represent the proposed class and arguably has unrivaled experience in securities class

actions. (*See* Defs. Mem. Opp. Class Cert. at 22 n.65.) Milberg Weiss attorneys have done a significant amount of work during the course of this litigation, which dates back to 2002, and none of them are personally implicated in the indictment. They have conducted a significant amount of discovery and engaged in voluminous motion practice, and consequently have a vast institutional knowledge of the case. *See In re Initial Public Offering Sec. Litig.*, No. 21MC92, 2007 WL 1705668, at *4 (S.D.N.Y. June 11, 2007). Removing Milberg Weiss as counsel would undoubtedly prejudice the rights of the putative class members, who thus far have been capably represented by the firm and we have no reason to doubt will continue to be so. *See id.* As a colleague recently wrote:

> This Court takes seriously the presumption of innocence afforded to defendants until proven guilty. I will not disqualify and remove Milberg Weiss solely on the basis of the allegations in the indictment.

*Id.* In accord with the overwhelming majority of courts faced with this issue, we decline to do so as well. *See id.* at *4 n.22 (collecting cases). (*See also* Pls. Reply Mem. Supp. Class Cert., Ex. A.)

Next, defendants assert various individualized arguments regarding the adequacy and typicality of the proposed class representatives.[18] First, defendants argue that Loftin cannot adequately represent those asserting '33 Act claims because he lacks standing to assert such claims, which plaintiffs do not appear to dispute. (*See* Defs. Mem. Opp. Class Cert. at 29-33.) It is axiomatic, however, that lead or representative plaintiffs in class actions are not required to have standing to bring all claims asserted in the Complaint. *See, e.g., Fishbury, Ltd. v. Connetics Corp.*,

---

[18] Defendants arguments in this regard are relevant to both Rule 23's typicality and adequacy of representation requirements. As we noted earlier, courts have recognized that the determinations with respect to Rule 23(a)(3) and (4) are overlapping. In analyzing defendants' arguments, we will apply the principles relevant to both requirements.

No. 06 Civ. 11496, 2006 WL 3711566, at *4 (S.D.N.Y. Dec. 14, 2006) ("It is well settled law in this Circuit that the lead plaintiff in a securities class action need not have standing to sue on all causes of action raised in the underlying class complaint.") (citing *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 (2d Cir. 2004)).

Defendants also contend, however, that Loftin is not typical of those asserting '34 Act claims because he is not entitled to the fraud-on-the-market presumption of reliance and is thus incapable of adequately representing them. "'While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" *Baffa*, 222 F.3d at 59 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) (internal citation omitted)). (*See* Defs. Mem. Opp. Class Cert. at 33-36.) The issue here – the fraud-on-the-market doctrine – "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." *Hevesi*, 366 F.3d at 77 (citing *Basic v. Levinson*, 485 U.S. 224, 245-47 (1988)). "This presumption, if unrebutted, thus allows plaintiffs to satisfy the element of reliance in securities fraud claims under the 1934 Act." *Id.* If, on the other hand, a plaintiff is not entitled to this presumption, he must prove individual reliance. *See Basic*, 485 U.S. at 247.

Defendants contend that Loftin is not entitled to the fraud-on-the-market presumption because of "his superior knowledge of the industry in which Flag operated . . . ." (*See* Defs. Mem. Opp. Class Cert. at 33.) They emphasize that Loftin was the founder and former CEO of Business

27

Telecom Incorporated ("BTI"), an integrated telecom services provider, and was consequently familiar with the telecom industry and its "upturns and downturns . . . that affected the capital markets" during the Class Period. (*See id.* at 34.) Loftin started BTI in 1983 as a domestic long distance retail company that targeted a commercial client base. (*See* Friedman Reply Aff., Ex. 28 (Loftin Dep. at 6, 8).) It later entered the local-phone market and, at some point, provided internet services. (*See id.* at 10-11.) At first, it bought watts lines from AT&T, but later developed its own network by installing fiberoptic cables in residential neighborhoods to provide local and long distance services. (*See id.* at 11-12.) On July 16, 1999, BTI filed a registration statement with the SEC to launch an IPO, but withdrew it on January 5, 2001 because of "unfavorable market conditions in [the] industry, as indicated by the IPO market for comparable companies and by the reductions in the stock prices of comparable public companies over the past few months." (*See* Gray Decl. Opp. Class Cert., Exs. V-W.) Accordingly, defendants argue that, because of Loftin's experience with BTI, he cannot rely on the integrity of the market and is not entitled to the fraud-on-the-market presumption.

Even assuming that Loftin is a more sophisticated investor than other putative class members by virtue of his experience with BTI, which we have reason to doubt,[19] it is well-established that an investor's sophistication does not preclude him from relying on the integrity of the market and

---

[19] The business of BTI is substantially different than that of Flag. In particular, Flag was an international telecommunications wholesale provider, while BTI is a small, domestic telecommunications retail provider. Moreover, Loftin testified that he had no involvement with BTI's accounting practices and that he had no experience with swap transactions. (*See* Friedman Reply Aff., Ex. 28 (Loftin Dep. at 38, 49).)

28

asserting the fraud-on-the-market presumption.[20]  Although we agree with other courts that, when

direct reliance is alleged in a complaint, the plaintiffs' investment sophistication is relevant to that

issue, *see In re AES Corp. Sec. Litig.*, 849 F. Supp. 907, 910 (S.D.N.Y. 1994) (Conner, J.) (collecting

cases); *see also Degulis v. LXR Biotechnology, Inc.*, 176 F.R.D. 123, 126 (S.D.N.Y. 1997), "[a]

plaintiff's sophistication as an investor generally is irrelevant to whether or not his claims are typical

of the class where subjective reliance is *not* an issue in the case." *In re Avon*, 1998 WL 834366, at

*8 (emphasis added) (collecting cases).  Here, the Complaint alleges only fraud-on-the-market

presumptive reliance, not actual reliance.

The Supreme Court in *Basic* provided examples of how defendants may rebut the

presumption of reliance.

> For example, if petitioners could show that the "market makers" were privy to the
> truth about the merger discussions . . . . Similarly, if, despite petitioners' allegedly
> fraudulent attempt to manipulate market price, news of the merger discussions
> credibly entered the market and dissipated the effects of the misstatements, those
> who traded . . . shares after the corrective statements would have no direct or
> indirect connection with the fraud.  Petitioners also could rebut the presumption of
> reliance as to plaintiffs who would have divested themselves of their . . . shares
> without relying on the integrity of the market.

*Basic*, 485 U.S. at 248-49 (footnotes omitted).  In the present case, there is no evidence, for example,

that Loftin was aware of any inside information, particularly the sort that would have revealed that

Flag's statements were materially false or misleading.  *See In re Indep. Energy Holdings PLC Sec.*

---

[20] Defendants argue that the "[t]he issue in this regard is not whether Loftin is sophisticated,
but how different he is from an 'average' investor." (*See* Defs. Mem. Opp. Class Cert. at 34.)  This
is clearly a distinction without a difference, and obviously an attempt to avoid the import of our prior
Opinion and Order in this matter dated June 21, 2006, in which we held that defendants were not
entitled to discovery of Loftin's investment history to rebut the fraud-on-the-market presumption
because his investor sophistication was irrelevant to such an argument.  We have not changed our
position.

*Litig.*, 210 F.R.D. 476, 482 (S.D.N.Y. 2002) (explaining that atypicality has been found only "where there is evidence that the named plaintiff received information, either directly or indirectly, from an officer or director[,]" and not when plaintiff merely has some familiarity with the company or industry involved). The record sufficiently shows that Loftin relied on the integrity of the market,[21] and defendants have produced no evidence to the contrary.

Defendants next contend that Coughlin lacks standing to assert claims under the '33 Act. As explained *infra* pp. 44-46, those who have purchased shares prior to May 11, 2000 are able to trace those shares to the IPO and thus have standing to bring claims under the '33 Act with respect to such shares. Since Coughlin purchased 250 shares of Flag common stock on February 23, 2000, he has standing to bring claims relating to those shares under the '33 Act. However, with respect to the 100 shares of common stock that he purchased on July 3, 2001, Coughlin has no standing to assert claims under the '33 Act in connection with these shares[22] because they are not traceable to the IPO.[23]

---

[21] (*See* Friedman Reply Aff., Ex. 28 (Loftin Dep. at 88 (explaining that, in buying Flag stock, he relied on "the analyst reports and et cetera that were saying great things about Flag and some company information that had come out and sa[id] various positive things about Flag. So it all had to do with the positive outlook on Flag from the company and from the analysts."), 98 ("The answer is I read what Flag Telecom put out and I believed them to tell the truth.), 102 ("Just read what the chairman of the company says about their outlook, the positive outlook of the company, et cetera, and I took it at [] face value that the company was OK."), 102-03 ("The industry, the telecom industry was taking a turn, but the company itself kept talking about how great it was and what it was going to continue to do. So I just thought it was a market fluctuation. I didn't think that the company was lying to me about what they were going to do and what they had."), 120 ("I'm not a telecom expert . . . .").)

[22] It is unclear whether Coughlin intends on alleging claims under the '34 Act with respect to the shares that he purchased on July 3, 2001.

[23] Incidentally, defendants argue that, even if Coughlin were to have standing to assert claims under the '33 Act, he would be atypical and incapable of adequately representing the class because he would be required to prove that he relied upon the alleged misrepresentations in the Registration Statement. Defendants reason that, under § 11(a) of the '33 Act, a plaintiff who purchased shares

Lastly, defendants argue that "in-and-out" purchasers, including Hunter, should be excluded from the proposed class. "In the context of securities fraud cases, 'in-and-out' traders are those persons or entities who both bought and sold their shares before a company allegedly violating securities laws publicly disclosed the violations." *Roth v. Aon Corp.*, 238 F.R.D. 603, 607 (N.D. Ill. 2006) (citing *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 236 F.R.D. 62, 70 (D.N.H. 2006); *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 543 (E.D. Va. 2006)). Specifically, defendants point to those purchasers, including Hunter, who sold their shares of Flag common stock prior to Flag's announcement on February 13, 2002[24] after which the value of Flag common stock declined by 46%.[25] Defendants reason that these purchasers cannot show that they were damaged by the alleged

---

after the issuance of an earnings statement covering a period of at least twelve months after the effective date of the Registration Statement must prove reliance upon the alleged misrepresentation in the Registration Statement to establish liability. Defendants assert that Flag's Form 10-K for the fiscal year ending on December 31, 2000 filed with the SEC on March 30, 2001 and Form 10-Q for the quarterly period ending on March 31, 2000 filed with the SEC on May 15, 2001 serve, collectively, as an earnings statement for purposes of § 11 of the '33 Act, as they cover a period exceeding twelve months beginning after the effective date of the Registration Statement. Thus, defendants contend, any plaintiff who purchased Flag stock on or after May 15, 2001 – the time of the second filing – would be required to prove that he relied on the alleged misrepresentations in the Registration Statement in order to prevail on his § 11 claims under the '33 Act. Defendants argue that, because Coughlin purchased 100 shares on July 3, 2001, he would be required to prove individual reliance in order to establish liability under § 11 of the '33 Act with respect to those shares. (*See* Defs. Mem. Opp. Class Cert. at 37-38.) However, this argument is now moot, as we have held that Coughlin does not have standing to assert '33 Act claims with respect to the shares he purchased on July 3, 2001. In any event, plaintiffs have alleged that the Forms 10-K and 10-Q, which defendants assert comprise the earnings statement, contained materially misleading information. Such an earnings statement that violates the SEC filing requirements is incapable of shifting to plaintiff the burden to prove reliance under § 11 of the '33 Act. *See In re WorldCom*, 219 F.R.D. at 294.

[24] Hunter purchased his 200 shares of Flag common stock in the IPO and sold them all in November 2001. *See supra* n.2.

[25] In the February 13, 2002 announcement, Flag announced that fourteen percent of Flag's 2001 GAAP revenues were associated with reciprocal transactions and the company anticipated that

31

fraud or, at the very least, are subject to unique causation defenses.

There is no doubt that the gravamen of plaintiffs' allegations is that defendants engaged in a fraudulent scheme to artificially inflate the value of Flag common stock, and that their conduct was the proximate cause of the decline in stock value, as evidenced by the rapid decline in the value of Flag common stock after the corrective disclosure in the February 13, 2002 announcement. Plaintiffs emphasize, however, that they have alleged and submitted evidence that purchasers of stock who sold their shares prior to the announcement are able to show a causal connection between the alleged fraud and their economic loss because the truth regarding Flag's financial condition began to leak into the market prior to the February 13, 2002 announcement, causing the value of Flag common stock to decline.

Specifically, plaintiffs cite their allegation in the Complaint that reads:

> FLAG thus continued to issue false and misleading statements about its condition and prospects, even though its competitors were beginning to acknowledge the difficulties they were facing. For instance, Level 3 is a company that FLAG listed in its SEC filings as a competitor. On June 19, 2001, as reported on *First Call*, Level 3 "cut its financial forecasts materially, citing weaker-than-expected demand from its targeted customer base and the macro economic environment."

(*See* 3CAC ¶ 172.) In addition, Dr. Scott D. Hakala, plaintiffs' expert,[26] opined:

> With respect to loss causation, there were demonstrable signs of slowing demand and concerns regarding excess long-haul and international optical fiber network capacity beginning in October 2000. These concerns increased significantly between February and June 2001 as a result of the financial distress of Winstar and, subsequently, 360Networks and further evidence of declining demand for long-haul and

---

it may have insufficient liquidity to continue operations in 2003. *See supra* p. 11.

[26] In their Reply, plaintiffs submitted the affidavit of Hakala, whom they retained to opine on, *inter alia*, the efficiency of the market for shares of Flag's common stock and its response to the release of certain financial statements, press releases and company statements, as well as other market occurrences. (*See generally* Hakala Decl.)

international optical network capacity. Beginning in February 2001, these "industry events" began to reveal the problems in the optical network industry and raised concerns relating to the relevant truths alleged in the Complaint and sustained by the Court in its rulings on the Motions to Dismiss, including concerns regarding the impairment in the values of optical fiber networks and the inflating of revenues and earnings attributable to capacity swaps and presales of optical fiber network capacity. *Further revelations of problems, including specific news concerning Flag Telecom, adversely affected the share price of Flag Telecom in August, September and October 2001.* The announcement of Global Crossing's financial problems, including disclosure of accounting problems, was associated specifically with Flag Telecom and led to a large decline in Flag Telecom's share price on January 28 and 29, 2002. Flag Telecom's share price fell further on February 13, 2002, on specific disclosures by the Company . . . . It is clear that Flag Telecom's allegedly false and misleading statements and earnings disclosures were generally inflationary in nature but, ultimately, could not prevent investors from partially realizing the relevant truth through both industry news events and through various admissions by Flag Telecom between February 2001 and April 2002. The event study and loss causation analyses summarized in Exhibit D [the chart] provide a basis for demonstrating that the company-specific and industry-specific corrective events were extremely significant and did not cause investors to realize the full extent of the damages until April 2002. However, economic losses were realized throughout most of the Class Period as various industry news events and adverse disclosures affected the share price of Flag Telecom. Additionally, this analysis demonstrates that a common method for analyzing and determining economic losses and allocating those losses to individual investors can be devised consistent with methods I have employed in other cases.

(*See* Hakala Decl. ¶¶ 6, 26 (emphasis added).) Accordingly, plaintiffs argue that they "may be able to demonstrate 'leakage' of the truth before the end of the class period[,]" and that they should be entitled to fully develop the facts surrounding this theory. (*See* Pls. Reply Mem. Supp. Class Cert. at 18-19.) In light of Hakala's affidavit, we agree that the record shows that it is conceivable that in-and-out purchasers asserting claims under both the '33 Act and '34 Act may be able to overcome defendants' affirmative defense of negative causation and prove loss causation, respectively, notwithstanding that the February 13, 2002 announcement is the most critical corrective disclosure.

It still remains to be determined, however, whether these traders should remain as part of the proposed class. The court in *Roth* addressed this very issue.

33

Defendants in various securities fraud cases have asserted that these "in-and-out" traders cannot have been damaged by any alleged fraud, as these traders have sold their shares before the disclosure of the fraud, and the resulting drop in stock price. *See BearingPoint*, 232 F.R.D. at 543 ("defendants contend that in-and-out trading members of the proposed class who sold before the April 20, 2005 disclosure cannot prove loss causation because any damage that resulted from their purchase of BearingPoint shares at an inflated price during the class period was cancelled out by the sale of their shares at a similarly inflated price later in the class period."). In support of this assertion these defendants typically cite to *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005) for the proposition that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss."

The courts in these cases must therefore determine "whether in-and-out traders could conceivably satisfy the requirement of loss causation, and [should] therefore [be] included in the proposed class." *BearingPoint*, 232 F.R.D. at 543. If these traders can demonstrate a loss, they should remain part of the class. *Id.* at 544. It is not impossible for "in-and-out" traders to make such a showing. . . .

> And although in-and-out traders often have no associated damage because they purchased and sold at prices with the same artificial inflation, this is not always the case. In cases where, as here, there are multiple disclosures, in-and-out traders may well be able to show a loss. *Moreover, it is also conceivable that the inflationary effect of a misrepresentation might well diminish over time, even without a corrective disclosure, and thus in-and-out traders in this circumstance would be able to prove loss causation* . . . In sum, because in-and-out traders may conceivably prove loss causation, they are appropriately counted as members of the proposed class.

*BearingPoint*, 232 F.R.D. at 544 (internal citations omitted).  It is therefore premature for courts to attempt to determine whether in-and-out traders have suffered losses at the class certification stage of the game. *See id.* Courts thus may properly include "in-and-out" traders as part of potential classes in securities fraud cases. *See id.*

238 F.R.D. at 607-08 (emphasis added; alterations in original); *see also In re Vivendi*, 242 F.R.D. at 86 n.5 ("[D]efendants oppose the inclusion of so-called in-and-out purchasers in any class certified-*i.e.*, those who purchased shares and sold them during the class period. Defendants do not oppose the appointment of any of the proposed class representatives on this basis. However, even

34

if they did raise such an argument, courts have consistently found that this does not render a representative's claim atypical.") (collecting cases); *BearingPoint*, 232 F.R.D. at 544 ("[B]ecause in-and-out traders may conceivably prove loss causation, they are appropriately counted as members of the proposed class.").[27]

Here, plaintiffs have adequately shown that in-an-out purchasers, like Hunter, may be able to overcome defendants' negative causation argument or prove loss causation. Indeed, the fact that Hunter sold his shares in November 2001 and is himself an in-and-out purchaser ensures that plaintiffs' counsel will further attempt to collect evidence and establish that sufficient leakage

_____

[27] *See also Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105, 108 (S.D.N.Y. 1993) ("in-and-out traders[] . . . are still proper members of a plaintiff class"); *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 283 (S.D. Tex. 2005) ("Defendants argue that original allocants who sold prior to late April of 2002 could not have suffered a loss actionable under the 1933 Act because their losses could not have been caused by misstatements that had not yet been revealed. . . . Defendants have not cited and the court has not found any case that has relied on the negative causation defense to limit a putative class at the class certification stage of litigation.") (footnote omitted); *In re Tyco*, 236 F.R.D. at 71

> (The plaintiffs have satisfied this requirement by pleading that their claimed losses were caused by corrective disclosures. That they have specifically identified certain corrective disclosures in the complaint does not preclude them from later identifying additional disclosures. Thus, it is too early in the litigation to exclude former shareholders from the class simply because their losses were caused by corrective disclosures that have not yet been specifically identified. Tyco remains free to develop the issue further during discovery and to renew its argument in a properly supported motion for summary judgment at the appropriate time. . . . I also am unpersuaded by Tyco's assertion that the proposed class is unmanageable because some class members will have stronger loss causation arguments than others based upon when they sold their Tyco stock. As the First Circuit has recognized, classes are routinely certified where common issues predominate even though individual issues exist with respect to other matters such as affirmative defenses or damages. *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003). There is no reason why this principle should not also apply to the subject of loss causation. Here, the need to make different loss causation determinations for class members depending on when they sold their stock does not alter the "sufficient constellation of common issues [that] binds class members together" into a single class. *Waste Mgmt. Holdings [Inc. v. Mowbray]*, 208 F.3d [288,] 296 [(1st Cir. 2000)].").

35

occurred at least prior to that date. *See In re Tyco*, 236 F.R.D. at 71. If plaintiffs' leakage theory proves to be sustainable after further discovery, plaintiffs will be able to present their theory through the presentation of expert testimony without distracting from the common issues of fact in this litigation. Accordingly, in-and-out purchasers should not be excluded from the proposed class at this time, particularly in light of the fact that discovery is still incomplete and plaintiffs intend to further develop their leakage theory.

Defendants argue, however, that the affidavit of Hakala is inadmissible under FED. R. EVID. 702 and 703 and cannot be considered on this motion. (*See* Defs. Sur-Reply Mem. Opp. Class Cert. at 5 n.15.) In order to determine the admissibility of expert witness testimony under FED. R. EVID. 702 and 703, the Supreme Court has set forth a two-prong inquiry into the reliability and relevance of the evidence. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). First, the trial judge must determine whether the expert is proposing to testify to scientific knowledge. *See id.* at 592. "The adjective 'scientific' implies a grounding in the methods and procedures of science[]" and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *See id.* at 590. Second, the court must determine whether the testimony "will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592 (footnote omitted). In other words, the proper analysis is one that ensures that the proffered expert testimony "is not only relevant, but reliable." *Id.* at 589. Finally, the court must take into consideration the expert's background and practical experience when deciding whether an expert is qualified to render opinion testimony. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

Defendants do not dispute that Hakala's proffered opinions are relevant and that he has adequate background and practical experience in the field of business valuation and market

efficiency. Specifically, Hakala's opinions address the efficiency of the market for shares of Flag common stock and the market's responsiveness to certain material events throughout the Class Period. (*See generally* Hakala Decl.) This is relevant to loss causation – a necessary element of a claim under the '34 Act. Hakala also opines as to when unregistered shares entered the market, which is relevant to the parties' tracing arguments and the duration of the Class Period for the putative plaintiffs asserting claims under the '33 Act. (*See id.* ¶ 9.) As to Hakala's experience, he is a director of CBIZ Valuation Group, LLC, a publicly traded company and one of the largest business valuation and consulting firms in the United States with offices in Dallas, Chicago, Atlanta, Milwauke, St. Louis and Princeton. (*See id.* ¶ 1.) He has a Doctor of Philosophy in Economics from the University of Minnesota. (*See id.* ¶ 2.) Hakala has received the professional designation of Chartered Financial Analyst, awarded by the Association for Investment Management and Research, and has taught classes on asset pricing and market efficiency at the doctoral level. (*See id.*) He has served as a consultant and expert witness on numerous occasions in litigations similar to this one. (*See id.*)

Defendants appear to challenge only the reliability of Hakala's opinions. This Court's reliability assessment must focus on whether the reasoning or methodology underlying the testimony is scientifically valid. *See Daubert*, 509 U.S. at 590. In *Daubert*, the Supreme Court set forth four non-exclusive factors to aid in the reliability assessment: "(1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Id.* at 593-94. However, the reliability inquiry is

37

a "flexible" one, and the four *Daubert* factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular case. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-51 (1999). Thus, this Court's role is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

In reaching his conclusions, Hakala employed what is commonly termed as an event study. (*See* Hakala Decl. ¶ 5.) "In the majority of applications, the focus [of an event study] is the effect of an event on the price of a particular class of securities of the firm, most often common equity . . . ." *See generally* A.Craig MacKinlay, *Event Studies in Economics and Finance*, XXXV Journal of Economic Literature 13 (1997). That is precisely the focus of Hakala's study. Specifically, his event study covered the period from February 11, 2000 through February 13, 2002, and identified certain material events made public in analysts' reports, press releases, securities filings and news articles. (*See id.* ¶¶ 5, 16.) It also identified and analyzed possible market indices and the two most comparable companies in the telecommunication industry, as well as three additional competitive fiberoptic companies, to track market and industry elements of the movement in Flag's share price. (*See id.* ¶ 17.) The study then used integrated regression analysis to ultimately measure the effect of each selected event in the context of daily returns. (*See id.* ¶ 18.)

Despite defendants' arguments, we find nothing unreliable about Hakala's methodology. The study culminates in an eighteen-page chart detailing 154 events and their effects on the value of Flag common stock. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2000 WL 310352, at *607 (S.D.N.Y. Mar. 24, 2000) (admitting a similar report based on a similar event study). Indeed, numerous courts have held that an event study is a reliable method for determining

market efficiency and the market's responsiveness to certain events or information. *See, e.g., In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) ("Use of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to [the company] which defendants allegedly have distorted. . . . As a result of his failure to employ such a study, the results reached by [the expert] cannot be evaluated by standard measures of statistical significance. Hence, the reliability of the magnitude and direction of his value estimates are incapable of verification."). Moreover, his analysis is based upon relevant and reliable data, which defendants do not appear to dispute. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, our consideration of Hakala's affidavit and his opinions contained therein is permissible under the Federal Rules of Evidence.[28]

Defendants contend, however, that, even if we were to consider Hakala's opinions, the leakage theory detailed in his affidavit cannot, as a matter of law, establish loss causation. (*See* Defs. Sur-Reply Mem. Opp. Class Cert. at 8-10.) They rely on the following passage from the Supreme Court's decision in *Dura*.

> [I]f, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells the shares later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. *But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. . . . Other things being equal, the longer the time between purchase and sale, the more likely that this is so, i.e., the more likely that other factors caused the loss.*

*Dura*, 544 U.S. at 342-43 (emphasis added). Defendants contend that Hakala's affidavit shows that

---

[28] We understand that defendants' *Daubert* challenge was abbreviated, and, as a result, they may renew their objection to the admissibility of Hakala's opinions at a future date.

market and industry forces, and not company-specific information, including, for example, statements and news relating to the fraud, were actually causing the decline in the value of Flag common stock. Therefore, defendants argue, Hakala's leakage argument is not sufficient to establish loss causation in light of *Dura's* "recognition that market and industry events must be factored out in order to determine whether any part of the alleged economic loss was caused by the alleged fraud." (*See* Defs. Sur-Reply Mem. Opp. Class Cert. at 9.)

As plaintiffs correctly point out, defendants' argument misrepresents the Supreme Court's holding in *Dura*. Contrary to defendants' suggestion, the Supreme Court in *Dura* was simply explaining that no liability exists under the securities law when the value of the stock declines as a result of some subsequent event that is unrelated to the alleged fraud. Indeed, the sale of stock at a "lower price may reflect, not the earlier misrepresentation, but *changed* economic circumstances, *changed* investor expectations, *new* industry-specific or firm-specific facts, conditions, or other events . . . ." *See Dura*, 544 U.S. at 342-43 (emphasis added). Under these circumstances, loss causation would not be established because the decline in value of stock would be due to subsequent events that have no connection to the alleged fraud. If, however, the publication of new information reveals that the alleged fraudulent information is incorrect, then this corrective information can serve as evidence of loss causation. As explained by the court in *In re Winstar Communications*, No. 01 CV 3014, 2006 WL 473885, at *14-15 (S.D.N.Y. Feb. 27, 2006):

> The Winstar defendants argue that a corrective disclosure must be based on fact-specific information, and cannot simply be opinions or speculations. The *Dura* opinion did not specify what was required to adequately plead loss causation. The Supreme Court spoke in terms of the "relevant truth" and the "truth" making its way into the market place. *Dura*, 125 S.Ct. at 1631-32. The Court did not address the means by which the information is imparted to the public. Specifically, *Dura* did not set forth any requirements as to who may serve as the source of the information, nor

40

> is there any requirement that the disclosure take a particular form or be of a particular
> quality. Thus, it is the inherent veracity of the information that is of paramount
> concern in *Dura*. It is the exposure of the falsity of the fraudulent representation that
> is the critical component of loss causation. . . . [I]n addition to formal disclosure by
> a defendant, "the market may learn of possible fraud [from] a number of sources:
> *e.g.*, from whisteblowers, analysts' questioning financial results, resignation of CFOs
> or auditors, announcements by the company of changes in accounting treatment
> going forward, newspapers and journals, etc."

(Internal citations omitted). Accordingly, plaintiffs have sufficiently demonstrated that in-and-out

purchasers may be able to overcome defendants' negative causation defense or establish loss

causation by virtue of leakage over the course of the Class Period, and, for the reasons stated above,

they should not be excluded from the proposed class.

### E.    Rule 23(b): Predominance and Superiority

Having addressed the requirements of Rule 23(a), the Court now turns to whether Rule

23(b)(3) has been satisfied. *See In re Vivendi*, 242 F.R.D. at 89. Rule 23(b)(3) requires a court to

find "that the questions of law or fact common to the members of the class predominate over any

questions affecting only individual members, and that a class action is superior to other available

methods for the fair and efficient adjudication of the controversy." The predominance element of

Rule 23(b) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by

representation." *Amchem Prods.*, 521 U.S. at 623. It requires that "law or fact questions common

to the class predominate over questions affecting individual members . . . ." *In re Initial Public*

*Offering Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006). This "'is a more demanding criterion than the

commonality inquiry under Rule 23(a). Class-wide issues predominate if resolution of some of the

legal or factual questions that qualify each class member's case as a genuine controversy can be

41

achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *In re Vivendi*, 242 F.R.D. at 90 (quoting *Moore v. Paine Webber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)) (internal citations and quotation marks omitted). "The predominance requirement is 'readily met' in many securities fraud actions." *In re WorldCom*, 219 F.R.D. at 288 (quoting *Amchem Prods.*, 521 U.S. at 625).

In the present case, "there are common questions of law and fact involving violations of the securities laws based on a common course of conduct directed at the entire class[] . . . that predominate over any individualized questions that may exist." *In re Vivendi*, 242 F.R.D. at 90. The common issues in this action include: (1) whether Citigroup and the individual defendants misrepresented the amount of presales in the Registration Statement; (2) whether the individual defendants made materially false and misleading statements as to Flag's financial viability by, *inter alia*, reporting swap transactions in such a way as to artificially inflate revenues; (3) whether they failed to knowingly write-down assets, including the FA-1 system; (4) whether all defendants acted with the requisite scienter; and (5) whether the alleged misrepresentations proximately caused economic loss to the putative plaintiffs. Moreover, as fully explained *supra*, all members of the proposed class will be relying on the same legal theories and set of facts to prove their case. Specifically, all '33 Act plaintiffs may rely on the fraud-on-the-market presumption, and "the conclusion that the proposed class includes in-and-out traders, does not, alter the conclusion that common issues of law and fact will predominate over individual issues. The issue of whether in-and-out traders can satisfy loss causation is a single legal issue, not dependent on individual factual determinations, and the proper determination of individual damages can be determined at trial through the use of expert witnesses." *In re BearingPoint*, 232 F.R.D. at 544 (citing *In re Rent-Way*

42

*Sec. Litig.*, 218 F.R.D. 101, 119-20 (W.D. Pa. 2003)).  Because plaintiffs may be able to establish their leakage theory through the presentation of expert testimony, we do not believe that these issues will "make class litigation unwieldy or inefficient." *See id.*  Accordingly, we conclude that there are questions of law and fact common to the members of the class that predominate over any questions affecting only individual members.  *See In re Avon*, 1998 WL 834366, at *10.

The second requirement of Rule 23(b)(3) is "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  "The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." *In re Vivendi*, 242 F.R.D. at 91 (citing FED. R. CIV. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 385).  In determining whether a class action is superior to other available methods, Rule 23(b)(3) identifies several relevant factors to consider: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."  "This list of pertinent factors is nonexhaustive, . . . and the purposes of Rule 23 should weigh heavily in this determination . . . ." *In re Vivendi*, 242 F.R.D. at 91 (internal citations omitted; internal quotation marks omitted).  "[I]n general, [a] class action[] [is] particularly well-suited to resolution of [a] securities fraud case[,]" *In re Avon*, 1998 WL 834366, at *11, and is certainly best-suited for this case.

The proposed class consists of hundreds or even thousands of potential class members who are dispersed across the country. *See In re WorldCom*, 219 F.R.D. at 304.  "Few individuals could

even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail[,]" particularly when many of the putative plaintiffs have suffered economic loss of *de minimis* value. *Id.*; *see also In re Vivendi*, 242 F.R.D. at 92. Indeed, the prospect of investors filing separate actions is nightmarish, and we are unaware of any investors who have indicated a desire to do so. *See In re WorldCom*, 219 F.R.D. at 304 ("[S]hould shareholders and bondholders file their own individual lawsuits, such suits would risk disparate results, threaten to increase the costs of litigation for all parties exponentially, pose an enormous burden for courts throughout the land, and encourage a race to judgment to obtain the limited funds that are available to fund any recovery that plaintiffs may win here."). Furthermore, a class action will save an enormous amount in litigation costs for all parties and allow them to more efficiently prosecute their claims and defenses. *See id.*; *see also In re Interpublic*, 2003 WL 22509414, at *4; *In re Deutsche Telecom AG*, 229 F. Supp. 2d at 282. Lastly, we do not believe that this case poses manageability difficulties that justify denying certification, which defendants do not appear to dispute. *See In re Vivendi*, 242 F.R.D. at 107 ("The determination of whether a particular action is manageable is 'peculiarly' within the discretion of the district court.") (citing *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001), *cert. denied*, 536 U.S. 917 (2002)). Accordingly, a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Now that we have determined that the requirements of Rule 23 are satisfied, the only issue remaining is the precise definition of the Class Period and the identity of the putative class members.

## II.    Class Period

The parties agree, and the record shows, that the appropriate Class Period for class members asserting claims under the '34 Act is from March 6, 2000 to February 13, 2002, "in that the market rapidly reacted to and reflected all public information in the share price during that period of time." (*See, e.g.*, Hakala Decl. ¶ 5.)  The parties dispute, however, the appropriate Class Period for class members asserting claims under the '33 Act.  In particular, the parties disagree as to the period in which secondary market purchasers, like Coughlin, are able to trace their shares back to the IPO and thus have standing to assert claims under the '33 Act.

The parties agree that shares that are bought on the market after unregistered shares have entered the market cannot be traced back to the IPO.  *See, e.g., In re Initial Public Offering Sec. Litig.*, 227 F.R.D. 65, 117-18 (S.D.N.Y. 2004) ("Tracing may be established either through proof of a direct chain of title from the original offering to the ultimate owner (*e.g.*, if the owner was an allocant in the IPO, or took actual physical possession of share certificates directly from an allocant), or through proof that the owner bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement."), *vacated on other grounds*, 471 F.3d 24 (2d Cir. 2006).  Plaintiffs contend that putative class members asserting '33 Act claims who bought their shares on or before May 10, 2000 can trace their shares back to the IPO, reasoning that SEC Rule 144 prohibited the entry of unregistered shares of Flag common stock into the market prior to that date.[29]

---

[29] SEC Rule 144 imposes certain restrictions on the sale of so-called "restricted sales" before they can be sold into the market, including a minimum holding period. *See* 17 C.F.R. § 230.144. "Restricted securities include securities acquired directly or indirectly from the issuer in a transaction not involving any public offering." *S.E.C. v. Credit Bancorp, Ltd.*, 279 F. Supp. 2d 247, 251 n.3 (S.D.N.Y. 2003).  Shares acquired through the exercise of stock options under Flag's LTIP would

45

Defendants have produced evidence, however, that a significant amount of stock options pursuant to the LTIP were exercised by Flag employees on March 17, 2000 and March 23, 2000, which, if immediately sold, would have entered the market by that time. (*See* Gray Decl. Opp. Class Cert., Ex. ZZ.) In response, plaintiffs expert opined:

> [I]t would appear that the first exercise of employee stock options may have occurred on March 17, 2000. Assuming *arguendo* that those shares were sold into the open market, which does not appear to be the case, then the depository pool would be considered "contaminated" as of March 17, 2000.

(*See* Hakala Decl. ¶ 9.) However, plaintiffs' expert did not find any evidence of unregistered shares in the market prior to May 10, 2000, tending to show that the employees who exercised their stock options in March of that year did not sell the shares on the market until after May. (*See id.* ¶ 8.) Because defendants have produced no evidence that the shares acquired pursuant to the LTIP were actually sold on the market prior to May 10, 2000 and plaintiffs' expert has found no such evidence, we are inclined to resolve this dispute in favor of plaintiffs. Accordingly, the Class Period for '33 Act claims is February 11, 2000 to May 10, 2000, inclusive. This is, of course, subject to reconsideration upon the presentation of sufficient evidence showing that the market contained unregistered shares on or before May 10, 2000.

**III.    The Proposed Class Should Include Purchasers of Shares that Entered Through the London Stock Exchange**

Defendants argue that we must limit the class to those putative plaintiffs who purchased shares on U.S. exchanges because this Court lacks federal subject matter jurisdiction to adjudicate claims relating to shares purchased from non-U.S. exchanges. (*See* Defs. Mem. Opp. Class Cert. at

---

not be characterized as restricted shares. *See* 17 C.F.R. § 230.144.

47-48.) "The Securities Exchange Act is silent as to its extraterritorial application. *Cf.* 15 U.S.C. § 78aa (1988) (vesting federal district courts with exclusive original jurisdiction for violations of the Act)." *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991). Thus, the Second Circuit has derived the "conduct test" to determine whether a federal court has subject matter jurisdiction over a federal securities claim involving stock purchased abroad. *See id.* "'Under the 'conduct' test, a federal court has subject matter jurisdiction if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad. . . .'" *See In re Nortel Networks*, 2003 WL 22077464, at *7 (quoting *Alfadda*, 935 F.2d at 478); *see also Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261-62 (2d Cir. 1989).

In the present case, defendants' alleged activities in the United States satisfy the conduct test for subject matter jurisdiction. For example, Flag allegedly engaged in a swap transaction in the United States in an effort to artificially inflate its revenues. (*See* MacDonald Decl. ¶ 2 (describing a $20 million swap transaction that took place in Flag's United States office));[30] *see In re Nortel Networks*, 2003 WL 22077464, at *8 ("Defendants' activities in the United States satisfy the test for subject matter jurisdiction [because] . . . defendants were consummating risky vendor financing deals in an effort to boost reported 'revenues' throughout the Class Period.") (internal quotation marks omitted). Moreover, the activities of Flag are alleged to be part of a single fraudulent scheme, which was closely connected to the U.S. telecommunications industry and its investment economy. *See In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 73-75 (S.D.N.Y. 1999) ("Subject matter

---

[30] Allegedly, Flag may have also issued materially misleading statements in the United States in an attempt to artificially inflate the value of its stock sold abroad.

47

jurisdiction is thus supported by substantial fraudulent activity in the United States directly causing harm abroad, the manner in which the same fraudulent scheme allegedly straddled both sides of the border, and the degree of economic activity connecting [defendant] to the United States."). Thus, at this juncture, it appears that we have subject matter jurisdiction to adjudicate claims involving shares purchased on non-U.S. exchanges. Accordingly, we need not limit the class to those putative plaintiffs who purchased shares on U.S. exchanges.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to certify the proposed class action pursuant to FED. R. CIV. P. 23 is granted in its entirety. Furthermore, Joseph Coughlin's motion to intervene pursuant to FED. R. CIV. P. 24 is granted in its entirety. Accordingly, the following proposed class is hereby certified: All persons or entities who purchased common stock of Flag Telecom Holdings, Ltd. ("Flag" or the "Company") between March 6, 2000 and February 13, 2002, inclusive, as well as those who purchased Flag common stock pursuant to or traceable to the Company's initial public offering between February 11, 2000 and May 10, 2000, inclusive (collectively, the "Class Period"), but shall exclude: (1) defendants herein, members of each individual defendants' immediate family, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors and predecessors in interest or assigns of any such extended party; (2) Verizon Communications, Inc.; and (3) entities that had the right to appoint a director to Flag's Board of Directors and proceeded to make such an appointment (or, for reasons unique to them, chose not to exercise such right), such as Dallah Albaraka Holding Company, Telecom Asia Corporation Public Co. Ltd., Marubeni Corporation, the Asian Infrastructure Fund and Tyco

48

International Ltd.  It is further ordered that Peter T. Loftin, Norman H. Hunter and Joseph Coughlin

are appointed to serve as the representatives of the class, and the law firm of Milberg Weiss LLP is

appointed to serve as Class Counsel pursuant to FED. R. CIV. P. 23(g).


SO ORDERED.
Dated: White Plains, New York
  September 4, 2007

           _William C. Conner_
           Sr. United States District Judge

49